UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DENISE McKEOWN, ROBERT LUTTS

*Plaintiffs,*

v.

ADVEST, INC., KAREN M. SUGHRUE, GARRY
L. CRAGO, JEAN W. CHILDS, PAULA
EDWARDS COCHRAN, G. STEVENS DAVIS, JR.,
JULIA B. DEMOSS, WILLIAM R. DILL, LESLIE
A. FERLAZZO, JOYCE SHAFFER FLEMING, ERIC
W. HAYDEN, CATHERINE CHAPIN KOBACKER
ANNE MARCUS, CELESTE REID, RICHARD J.
SHEEHAN, JR., JOSEPH SHORT, GREGORY E.
THOMAS, SUSAN K. TURBEN, *and* DONALD
W. KISZKA

*Defendants.*

PLAINTIFFS DEMAND A JURY TRIAL
ON ALL COUNTS

05    10176 RGS

*Referred to MJ LP Cohen*

FILED
IN CLERKS OFFICE
RECEIPT # ____ P 12: 38 __
AMOUNT $ 150.00
SUMMONS ISSUED Y/N
LOCAL RULE 4.1 MASS
WAIVER FORM ____
Civil Action No. ____
MCF ISSUED ____
BY DPTY. CLK. ____
DATE 1-28-05

## COMPLAINT

Plaintiffs Denise McKeown and Robert Lutts (collectively, "the Bondholders"), bring this

action for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, Section

12(a)(2) of the Securities Act of 1933 and violations of Massachusetts statutory and common law

and allege as follows:

## SUMMARY OF THE ACTION

1.      This is an action brought by purchasers of Massachusetts Industrial Finance Agency Revenue Bonds, Bradford College Issue, Series 1998 (the "Bonds") and an insurer of some of the Bonds.  The Defendants in this action are the trustees of Bradford College (the "College"), its past President and Chief Financial Officer, and the underwriter of the Bonds.

2.      The issuance of the Bonds more than doubled the outstanding debt of the College. As municipal bonds issued by an instrumentality of the Commonwealth of Massachusetts for the benefit of a non-profit institution, the Bonds were exempt from the various registration requirements of the Securities Act of 1933, 15 U.S.C. §§ 77a, *et seq.*, and those of the Massachusetts Securities Act, Mass. G.L. c. 110A.  Rather, the Bonds were offered by means of an official offering statement dated May 1, 1998 (the "Official Statement") prepared by the sole underwriter of the offering, Defendant Advest, Inc. ("Advest").  This Official Statement contained numerous inaccurate and misleading statements, as alleged below.

3.      The Official Statement misleadingly failed to disclose that the College was mired in an ongoing fiscal, financial, and operational crisis.  As set forth in detail below, this crisis resulted from, *inter alia*, an abysmal 40% student retention rate, huge (and increasing) reductions to tuition revenue in the form of financial aid awards, and the complete absence of a viable strategic plan to address these and other problems.  In fact, the Defendants' own analysis, which was not disclosed, concluded that the College had sufficient resources to survive, at most, another 2 to 5 years.  In view of the College's dismal prospects for survival, the Defendants were constrained to resort to misrepresentations, omissions, and half-truths in the Official Statement in order to raise almost $18 million in debt financing that the College could not hope to repay.  The

-2-

Defendants knew material facts were omitted from the Official Statement or recklessly disregarded their obligation to include them.

4.    In particular, the Official Statement failed to make even the barest mention of the College's "severe and long-standing" student attrition crisis, and the enrollment figures presented in the Official Statement were accordingly misleading.  Similarly, the financial aid projections set forth in the Official Statement had no reasonable basis in reality; indeed, those projections were belied by the College's financial statements and by budgets prepared contemporaneously with the bond offering.  And contrary to the Official Statement's references to Bradford's "strategic plan" and ongoing "strategic initiatives," the College was in truth bereft of any plan to balance its budget and to staunch its operating losses.  Finally, the Official Statement misrepresented that the College had committed to contribute its own funds toward the construction project financed by the Bonds, when in reality the Defendants had determined to cut corners on the project in order to place only the funds of the Plaintiffs at risk.

5.    The College's assumption of this bond debt accelerated and exacerbated its financial crisis.  Even when low enrollment in September 1998 precipitated yet another fiscal emergency, the College's trustees nevertheless unnecessarily continued to expend funds on new dormitories and thereby recklessly depleted the Bondholder's collateral.  Such reckless actions and omissions by the trustees, occurring at a time when the College was either insolvent or in the zone of insolvency, constituted a breach of their fiduciary duties to the Bondholders as creditors of the College.  Inevitably — and predictably — the College determined to shut down.  The Plaintiffs bring this action to recover their damages incurred as a result of the Defendants' violations and breaches.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction of the subject matter of this action pursuant to § 27 of the Securities Exchange Act of 1934, 15 U.S.C.§§ 78a, *et seq.* (the "Exchange Act"), 28 U.S.C. § 1331. The claims asserted herein arise under §§ 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1(a), § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the United States Securities Exchange Commission (the "SEC"). This Court has personal jurisdiction of each of the Defendants pursuant to § 27 of the Exchange Act. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7.    Venue is proper in this district pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b) and (c), because many of the Defendants' acts and transactions complained of herein occurred in this District. In connection with the acts and conduct alleged herein, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including interstate telephone communications and the United States mails.

## PARTIES

### *Plaintiffs*

8.    Bondholder Plaintiff Denise McKeown is an individual with a principal place of residence in Winchester, Massachusetts. Denise McKeown holds bonds in the principal amount of $200,000.00.

9.    Bondholder Plaintiff Robert Lutts is an individual with a principal place of residence in Salem, Massachusetts. Robert Lutts holds bonds in the principal amount of $75,000.00.

*Defendants*

10.    Defendant Advest is an investment banking firm that specializes, among other things, in underwriting offerings of securities. Advest served as the sole underwriter of the College's May 1, 1998 bond offering. As the sole underwriter, Advest was responsible for the preparation of the Official Statement for the sale of the Bonds, and received substantial fees out of the money raised in the bond offering. Advest engaged and/or participated in the unlawful conduct alleged herein in order to, among other things, profit through its participation in the College's issuance of the Bonds. Advest is a Delaware corporation with a principal place of business in Hartford, Connecticut.

11.    Defendant Karen M. Sughrue is, upon information and belief, a resident of the State of New York. At all times relevant to this complaint, Defendant Sughrue was a trustee of the College. As of February 6, 1998, Defendant Sughrue was the Chair of the Board of Trustees, a member of the Executive Committee of the Board of Trustees, an *ex officio* member of all other committees of the Board of Trustees, and an officer of the College.

12.    Defendant Garry L. Crago is, upon information and belief, a resident of the Commonwealth of Massachusetts. At all times relevant to this complaint, Defendant Crago was a trustee of the College. As of February 6, 1998, Defendant Crago was the Vice-Chair of the Board of Trustees, the Chair of the Enrollment Management Committee of the Board of Trustees, the Vice-Chair of the Buildings and Grounds Committee of the Board of Trustees, and a member of the Executive and Finance Committees of the Board of Trustees.

13.    Defendant Jean W. Childs is, upon information and belief, a resident of the Commonwealth of Massachusetts. At all times relevant to this complaint, Defendant Childs was a trustee of the College. As of February 6, 1998, Defendant Childs was the Vice-Chair of the

Institutional Advancement Committee of the Board of Trustees, and a member of the Enrollment Management Committee and the Buildings and Grounds Committee of the Board of Trustees.

14.    Defendant Paula Edwards Cochran is, upon information and belief, a resident of the State of Florida. At all times relevant to this complaint, Defendant Cochran was a trustee of the College. As of February 6, 1998, Defendant Cochran was the Chair of the Membership and Trustee Development Committee of the Board of Trustees, and a member of the Executive, Buildings and Grounds, and Institutional Advancement Committees of the Board of Trustees.

15.    Defendant G. Stevens Davis, Jr. is, upon information and belief, a resident of the State of New Hampshire. At all times relevant to this complaint, Defendant Davis was a trustee of the College. As of February 6, 1998, Defendant Davis was the Chair of the Buildings and Grounds Committee of the Board of Trustees, and a member of the Executive, Enrollment Management, and Finance Committees of the Board of Trustees.

16.    Defendant Julia B. DeMoss is, upon information and belief, a resident of the Commonwealth of Pennsylvania. Defendant DeMoss has been a trustee of the College since February 4, 1998.

17.    Defendant William R. Dill, Ph.D., is, upon information and belief, a resident of the State of Maine. At all times relevant to this complaint, Defendant Dill was a trustee of the College. As of February 6, 1998, Defendant Dill was the Chair of the Academic Affairs Committee of the Board of Trustees, and a member of the Executive, Finance, and Membership and Trustee Development Committees of the Board of Trustees.

18.    Defendant Leslie A. Ferlazzo is, upon information and belief, a resident of the Commonwealth of Massachusetts. At all times relevant to this complaint, Defendant Ferlazzo was a trustee of the College. As of February 1997, Defendant Ferlazzo was the Chair of the

Board of Trustees, an *ex officio* member of all of the committees of the Board of Trustees, and an officer of the College. As of February 6, 1998, Defendant Ferlazzo was the Vice-Chair of the Finance Committee of the Board of Trustees, and a member of the Institutional Advancement and Membership and Trustee Development Committees of the Board of Trustees.

19.    Defendant Joyce Shaffer Fleming is, upon information and belief, a resident of the State of Michigan. Defendant Fleming has been a trustee of the College since February 4, 1998.

20.    Defendant Eric W. Hayden is, upon information and belief, a resident of the Commonwealth of Massachusetts. At all times relevant to this complaint, Defendant Hayden was a trustee of the College. As of February 6, 1998, Defendant Hayden was the Chair of the Finance Committee of the Board of Trustees, the Vice-Chair of the Student Affairs Committee of the Board of Trustees, and a member of the Executive and Academic Affairs Committees of the Board of Trustees.

21.    Defendant Catherine Chapin Kobacker is, upon information and belief, a resident of the State of Ohio. At all times relevant to this complaint, Defendant Kobacker was a trustee of the College. As of February 6, 1998, Defendant Kobacker was the Vice-Chair of the Membership and Trustee Development Committee of the Board of Trustees, and a member of the Institutional Advancement and Student Affairs Committees of the Board of Trustees.

22.    Defendant Anne Marcus is, upon information and belief, a resident of the State of Connecticut. At all times relevant to this complaint, Defendant Marcus was a trustee of the College. As of February 6, 1998, Defendant Marcus was the Chair of the Student Affairs Committee of the Board of Trustees, the Vice-Chair of the Enrollment Management Committee of the Board of Trustees, and a member of the Executive and Finance Committees of the Board of Trustees.

-7-

23.     Defendant Celeste Reid, a/k/a Celeste Reid Lee, is, upon information and belief, a resident of the Commonwealth of Massachusetts.  Defendant Reid has been a trustee of the College since February 4, 1998.

24.     Defendant Richard J. Sheehan, Jr., is, upon information and belief, a resident of the Commonwealth of Massachusetts.  Defendant Sheehan has been a trustee of the College since February 4, 1998.

25.     Defendant Gregory E. Thomas is, upon information and belief, a resident of the Commonwealth of Massachusetts.  At all times relevant to this Complaint, Defendant Thomas was a trustee of the College.  As of February 6, 1998, Defendant Thomas was a member of the Academic Affairs, Enrollment Management, and Student Affairs Committees of the Board of Trustees.

26.     Defendant Susan K. Turben, Ph.D., is, upon information and belief, a resident of the State of Ohio.  At all times relevant to this complaint, Defendant Turben was a trustee of the College.  As of February 6, 1998, Defendant Turben was the Chair of the Institutional Advancement Committee of the Board of Trustees, the Vice-Chair of the Academic Affairs Committee of the Board of Trustees, and a member of the Executive and Finance Committees of the Board of Trustees.

27.     Defendant Joseph Short is, upon information and belief, a resident of the Commonwealth of Massachusetts.  From 1989 until about July 1998, Defendant Short was both a trustee and the President of the College, and an *ex officio* member of each of the committees of the Board of Trustees.

28.     Defendants Sughrue, Crago, Childs, Cochran, Davis, DeMoss, Dill, Ferlazzo, Fleming, Hayden, Kobacker, Marcus, Reid, Sheehan, Thomas, Turben and Short are collectively

referred to as the "Trustee Defendants."

29.     Defendant Donald W. Kiszka is, upon information and belief, a resident of the Commonwealth of Massachusetts. From 1989 until about August 1999, Defendant Kiszka was the Vice President for Administration and Finance, as well as the Treasurer, of the College. Defendant Kiszka was also an officer of the Board of Trustees of the College. Defendants Kiszka and Short are sometimes collectively referred to as the "Officer Defendants."

30.     As officers, trustees and/or controlling persons of an entity which is governed by certain provisions of the federal and state securities laws, and in connection with the sale of the Bonds, along with Defendant Advest, the Officer and Trustee Defendants had a duty timely to disseminate accurate and truthful information with respect to the College's operations, finances, administration, and performance; to correct any previously issued statements from any source that have become materially misleading or untrue; and to disclose any trends or developments that would have materially affected the College's ability to meet its obligations under the Bonds. The Defendants' representations, acts and omissions violated these specific requirements and obligations.

31.     Defendants Short and Kiszka participated in the drafting, preparation and/or approval of the Official Statement and were aware of or recklessly disregarded the misstatements contained therein and omissions therefrom, and were aware of their materially misleading nature. Because of their Board membership and/or executive and administrative positions with the College, and their attendance at and participation in Board meetings, Defendants Short and Kiszka each had access to the adverse non-public information about the College's operational and financial condition, as particularized herein, and knew that those adverse facts rendered the

positive statements made by and about the College and its operational and financial condition materially false and misleading.

32.    The Trustee Defendants participated in the drafting, preparation and/or approval of the Official Statement and were aware of or recklessly disregarded the misstatements contained therein and omissions therefrom, and were aware of their materially misleading nature. Because of their membership on the Board of Trustees of the College, and their attendance at and participation in Board meetings, the Trustee Defendants had access to the adverse non-public information about the College's operational and financial condition, as particularized herein, and knew that those adverse facts rendered the positive statements made by and about the College and its operational and financial condition materially false and misleading.

33.    Each of the Officer and Trustee Defendants had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related thereto. To discharge their duties, the Officer and Trustee Defendants were required to exercise reasonable and prudent supervision over the dissemination of information concerning the operations and financial reporting of the College.  Defendants Short and Kiszka, by virtue of their high level positions with the College, directly participated in the administration of the College, were directly involved in the day-to-day operations of the College at the highest levels and were privy to confidential proprietary information concerning the College and its operating and financial condition as alleged herein.  These Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements alleged herein, were aware that the false and misleading statements were being issued regarding the College and approved or ratified these statements, in violation of federal and state securities laws.

-10-

34.    By reason of their management positions and/or membership on the College's Board of Trustees, the Officer and Trustee Defendants were "controlling persons" within the meaning of § 20(a) of the Exchange Act, and were officers, directors or persons of a similar status or performing similar functions within the meaning of § 410(b) of Mass. G.L. Ch. 110A, and had the power and influence to direct the management and activities of the College and its employees, and to cause the College to engage in the unlawful conduct complained of herein.

35.    By reason of its direct participation in the preparation of the Official Statement, Defendant Advest was a broker-dealer or agent that materially aided in the sale of the Bonds within the meaning of § 410(b) of Mass. G.L. Ch. 110A.

## SUBSTANTIVE ALLEGATIONS

36.    The College is a private institution that operated continuously since its founding in 1803 until about June 2000, when it closed as the result of insolvency brought on by deficit spending, operating losses, negative cash flow, and the lack of a viable business plan.

37.    At all times during the relevant period, the College was governed by a Board of Trustees (the "Board").   The Board met three times per year.   The Officer Defendants administered the day-to-day operations of the College.

38.    The College's primary source of operating revenue was tuition and fees paid by students enrolled at the College.   The greater the number of enrolled students, the more revenue the College should have expected to collect to fund its operations.

39.    On February 6, 1998, Defendants Short, Kiszka and Advest recommended, and the Trustee Defendants voted to approve, a project of construction and renovation of dormitories on the campus of the College.   The Trustee Defendants, on the recommendation of the Officer

-11-

Defendants and Advest, further voted to authorize the issuance of bonds to finance the project, and to approve Defendant Advest as the underwriter for the bond offering.

40.     The bonds authorized by the Trustee Defendants were intended to finance not only renovations to existing residence halls and construction of new residential facilities at the College, but also (i) the refunding of the College's then-outstanding 1995 bond debt of approximately $5.2 million; (ii) the establishment of a Debt Service Reserve Fund, out of which the College could make payments in service of the debt obligation created by means of the Bonds themselves; and (iii) the payment of $341,370 in costs of issuance of the bonds, including payment to Defendant Advest of fees in the amount of, upon information and belief, no less than $161,370. All told, the total amount to be financed by means of the bonds was $17.93 million.

41.     The Bonds were secured by a lien on the College's tuition receipts, which in turn were dependent upon the College's level of enrollment. The proceeds from the sale of the Bonds, after certain distributions, were deposited into a "Construction Fund" out of which the construction and renovation project costs were to be paid. For so long as funds remained in it, the Construction Fund was available as collateral against the College's debt under the Bonds in the event that the College defaulted on a repayment obligation. Thus, the more money that the College spent on the project, the less there was available to redeem the Bonds in the event of default.

42.     Defendant Advest determined that the $17.93 million financed under the Bonds represented the maximum bonding capability of the College. This sum amounted to more than double the level of the College's total outstanding debt at that time. The portion of the bond financing earmarked for the dormitory construction and renovation project, almost $11 million, was insufficient to cover the entire cost of that project.

-12-

*Defendants' False and Misleading Statements and Omissions*

43.    The Bonds were issued on May 1, 1998, pursuant to the Official Statement prepared by Defendants Kiszka and Short in cooperation with Defendant Advest. Although at the time of the offering the College was mired in a financial and operational crisis, with little to no prospect of recovery, the Official Statement ("OS") prepared by these Defendants recklessly and intentionally omitted any reference to such problems.   Rather, the Official Statement portrayed the financial and operational condition of the College as both stable and improving.  In particular, the Official Statement offered the following affirmative misrepresentations, misleading statements, and half-truths:

- "A portion of the proceeds of the Series 1998 Bonds, together with an equity contribution by the Institution [identified in table form as $1 million], will be used by the Institution for the construction or alteration of buildings . . . ." (OS p. 10)

- "One of the goals of the Institution's strategic plan is to increase enrollment to at least 725 full-time students by the fall of 2000." (OS p. 11)

- The Official Statement contains a table showing "Bradford College Fall Semester Enrollment Statistics" for the years 1993 through 1997, showing a growth in full-time equivalent enrollment from 484 to 584 students over that period. (OS APP. p. 8)

- Another table in the Official Statement reports "Admissions Trends" over the same 1993-1997 period, showing new enrollment growth from 186 incoming freshman and transfer students in 1993 to 234 such students in 1997. (OS APP. p. 8)

- "[D]uring the 1997-98 academic year, the College estimates that financial aid will be reduced to 29.9% of student income versus 30.3% the previous year. . . .  The College's financial plan currently calls for a further reduction of financial aid spending for 1998-1999 academic year to 28.8% of student income." (OS APP. p. 13)

- "To attain the final goal of a balanced budget . . . the College is planning to increase enrollment to the level of at least 725 full-time students by fall 2000, with approximately 80% of those students living in campus facilities." (OS APP. p. 13)

- "Based on this [18%] increase in applications [over 1997], historic rates for conversion of applications into enrollments, the number of applications from freshmen and deposits received to date, the College believes that it can reach its goal of enrolling 225 new students for the fall of 1998 while increasing the quality of it students and reducing slightly the average amount of financial aid awards to such students from College funds." (OS APP. p. 13)

- "The strategic initiatives of the College for the past two years and for the next three years [include]: . . . To increase net tuition revenues by close management of three variables: increased enrollment, prudent use of financial aid and setting of tuition and fee levels to attract students." (OS APP. p. 17)

44.    The affirmative representations and statements made about the College by the Defendants in the Official Statement were each known to be, or were recklessly disregarded by the Defendants as being, false and misleading when made. As set forth more fully below, the true facts, which the Defendants knew but intentionally or recklessly concealed — and disclosure of which was necessary to make the affirmative statements not misleading — were that the College suffered from an abysmal student retention rate that was wholly ignored in the Defendants' enrollment projections and was blatantly omitted from any mention in the Official Statement; that the amount of College-funded financial aid had grown year after year, with no reasonable basis to represent that it might be reduced; that, as a result, even without regard to its obligation to repay the Bonds, the College's cash flow position — as confirmed by its own internal, but undisclosed, assessment in this time period — was such that the College could survive, at best, another 2-5 years; and that, notwithstanding the Official Statement's references

-14-

to "financial plans" or "strategic initiatives," the College lacked at that (or any) time a viable strategic plan to achieve any of its stated goals.

45.    <u>Financial Instability.</u> The Official Statement contained no reference to the fiscal disasters that had plagued the College since Defendants Short and Kiszka took over in 1989, and that continued to plague the College through the issuance of the Bonds. In particular, the Official Statement failed to disclose that the Trustee Defendants and Defendants Short and Kiszka had expressly identified the College's persistent negative cash flow situation as a critical problem that the College needed to resolve in order simply to survive. The Official Statement omitted to discuss the assessment of the Trustee Defendants and the College's administration regarding the impact of this cash flow situation. This matter was discussed at length at a meeting of the Board on February 6, 1997, only a year before the Trustee Defendants approved the bond offering. This meeting was attended by Trustee Defendants Ferlazzo, Sughrue, Childs, Crago, Davis, Dill, Hayden, King, Marcus, Thomas, Turban, and Short, and by Defendant Kiszka. Defendant Ferlazzo, at that time the Chair of the Board, stated:

> [T]he cash flow model indicates that the College may be able to survive for five more years. To stem cash bleeding, however, which would occur in that period would be devastating to the faculty and staff in terms of no salary increases and other cost cutting measures.

However, even this view was overly optimistic according to the College's longtime chief financial officer, Defendant Kiszka:

> Vice President and Chief Financial Officer Don Kiszka, when asked about the financial "breathing room for the College," said that there is a possibility of the College surviving five years assuming more layoffs and no salary increases, but felt that it would be more like two or three years. Looking at the bigger picture, layoffs and cutbacks would be very disruptive and send a bad message.

As events confirmed, this assessment by Defendant Kiszka of the current financial condition of the College and its prospects for survival — in contrast to the misrepresentations of the Official Statement, signed by Defendant Kiszka one year later — was entirely accurate.

46.     Thus, in 1997 the Trustee and Officer Defendants recognized that because of its cash flow problems the College could hope to survive, at the most, through the year 2001, assuming drastic and demoralizing cost-cutting measures were implemented.  Yet approximately one year later, having implemented no such widespread cost-cutting measures, and during the College's tenth consecutive year of budget deficits, these Defendants recommended and approved the issuance of the Bonds, thereby obligating the College to incur an additional cash flow drain of about $1.25 million annually through the year 2028.  This additional cash obligation was to be funded by tuition proceeds that were, in turn, dependent primarily upon two factors: the College's level of student enrollment, and the degree to which the College discounted its tuition revenues by funding financial aid awards to students.  Each of these factors was the subject of further misrepresentations and omissions in the Official Statement.

47.     Enrollment Attrition.  While the Official Statement presented extensive data on new student enrollment at the College, there was no reference whatsoever to the College's severe, long-standing problem with student attrition.  In fact, since 1989, the College's approximate student attrition rate had been an extraordinary 60% — meaning that substantially fewer than half of all entering freshmen remained enrolled at the College through their senior year.

48.     The Defendants, moreover, were well aware of the College's enrollment and retention problem, and of that problem's financial import.  When the College's Board initially

-16-

voted in 1996 to approve the construction project to build new dormitories, one of the College's trustees at the time, William J. Nofsker, resigned in the middle of his second term because he concluded that Bradford did not have the enrollment to justify its expansion plan and opposed pursuing any such project. As reported in the press on November 30, 1999, Mr. Nofsker stated, in part, that: "I didn't think [the College] had enough of a student body to support the expansion."

49.    In addition, the College's inadequate enrollment was the topic of extended discussion during the Board's pivotal February 6, 1997 meeting, described above, at which the College's ability to survive was addressed.    Specifically, the Chair, Defendant Ferlazzo, announced that "[b]ecause of the enrollment shortfall, the College is at financial risk.    If enrollment trends continue for 1997-98, and changes are not made in the operations of the College, there is the very real potential of a $300,000-400,000 deficit in FY 1998." At this same meeting in February, 1997, Defendant Thomas, a member of the Enrollment Management Committee of the Board, stated that the College faced "insufficient enrollment to assure the financial well-being of the College."

50.    The longstanding enrollment and attrition crisis persisted into 1998, existed at the time of the bond offering in May of that year, and continued apace thereafter. Growing out of its on-site decennial evaluation of the College in November 1998, the New England Association of Schools & Colleges, Inc. (the "NEASC"), the College's accrediting body, noted:

> Enrollment management (with related financial issues) is a fully recognized problem at Bradford.  In fact, it is a crisis.  A small private college that graduates only 40% of its entering classes has scant hope of being able to fulfill aspirations much higher than survival. . . .  Attrition is of course a pre-eminent financial fact . . ..

-17-

The NEASC also noted in its evaluation, *inter alia*, that a broad awareness by insiders at the College "of financial instability, like that of the attrition which is the major cause of it, is among the strongest organizational realities at Bradford."

51.    The Official Statement, however, misleadingly omitted reference to any such known "pre-eminent financial fact" or "organizational reality" that would call into question the College's ability to service the Bonds out of its tuition revenue. Indeed, as part of their effort to sweep material, adverse facts under the rug and out of view, the Defendants presented enrollment information in the Official Statement in a manner that intentionally concealed the College's persistent attrition crisis. The Official Statement, for example, reported 1993-1997 enrollment levels only for the *fall* semester of each year; yet, as the Defendants well knew but failed to disclose, enrollment in the *spring* semester of each of those years was markedly lower than fall enrollment levels, as a result of the College's chronic inability to retain students. As then known but not disclosed, the average rate of mid-year student attrition during this time period was over 7%, *without even taking into account* students who completed the academic year in June but who failed to return to the College the following fall. By omitting key attrition information, the Defendants materially overstated the College's actual historical enrollment levels and, as a result, misportrayed the College's ability to service the nearly $18 million dollars in debt that the Defendants sought to place with the purchasers of the Bonds.

52.    Financial Aid. Likewise, at the time that the Official Statement was prepared, the Defendants knew, or but for their reckless disregard for the truth should have known, that the representations in the Official Statement regarding financial aid were false and misleading when made. The Defendants stated in the Official Statement that the amount of financial aid to be

-18-

awarded by the College was anticipated to drop to 29.9% of student income in the 1997-98 academic year, and to 28.8% in 1998-99.

53.    There was no reasonable basis for the Defendants to make any such statements. There were only two months remaining in that fiscal year when, in the Official Statement, the Defendants "estimate[d] that financial aid will be reduced to 29.9% of student income" for the 1997-98 academic year. However, by the date of the Official Statement, the College knew that spring semester enrollment was lower than predicted in its budget and consequently student revenues for the spring semester would be lower. It had also, by that time, made all financial aid commitments, and Defendants knew (or would have known, but for their reckless disregard for their duties) that financial aid commitments were almost a quarter of a million dollars greater than budgeted.    In reality, however, financial aid awards for 1997-98 actually consumed *over 35%* of student income, as the College's audited financials for the year soon confirmed. At the time the Official Statement was distributed, the College possessed, and the Defendants had access to, the data that proved the 1997-98 "estimate" was substantially incorrect. The actual percentage of student aid was in line with the College's track record, as the Defendants knew well from past experience:  In every year since 1989, and notwithstanding its annual budget deficits, the College had without fail increased the level of financial aid that it awarded to students. The College's audited financials for that time period confirm this fact.

54.    With respect to its statements about the next academic year, the Official Statement represented that "[t]he College's financial plan *currently* calls for a further reduction of financial aid spending for 1998-1999 academic year to 28.8% of student income" (emphasis added).  This statement, too, was materially misleading and without reasonable basis. The College's 1998-1999 budget — which was originally submitted to the Trustee Defendants on April 29, 1998,

-19-

reviewed by the Finance Committee of the Board on May 8, 1998, and revised at a "special meeting" of the College's administration later that month — reflects that financial aid spending for the 1998-1999 academic year was budgeted to be 31.3% of student income, an increase of almost 10% (or $280,000) over what was represented in the Official Statement.

55.     The Official Statement further omitted the material fact that the persistent and increasing level of financial aid funded by the College was anomalously high relative to peer institutions. The percentage of financial aid as a percentage of the College's receipts for tuition and fees was well above average for comparable institutions as by the Massachusetts Health and Educational Facilities Authority, an independent state agency for the year ending in 1997.

56.     <u>Lack of Strategic Plan</u>. Although the Official Statement repeatedly referred to Bradford's "strategic plan . . . to increase enrollment" and its "strategic initiatives . . . for the past two years," the College in reality had no business plan or strategic program to meet any of the goals articulated in the Official Statement, on which the Bondholders relied in purchasing the Bonds and on which ACA relied in insuring the Bonds. Nor did long-range planning form an integral part of the Trustee Defendants' deliberations. Specifically, even though student retention had long been recognized as a critical problem, the College had no plan to improve retention rates at the time that the Bonds were issued. With regard to the aim of reducing financial aid awards, no plan was in place to modify the College's practices in order to realize this goal: No one advised or instructed the College personnel responsible for awarding aid to reduce the amount of aid awarded, nor did any of the Trustee or Officer Defendants take steps to control the amount of aid given. Moreover, there was no systematic effort to impose budget discipline. In short, the College had no strategic plan to staunch its operating losses despite representations to the contrary in the Official Statement.

-20-

57.    The College's lack of a viable strategic plan was confirmed a few short months after the Bonds were issued, in a report authored by the College's accrediting body, the NEASC. The NEASC report, published in January 1999 based on, *inter alia*, an on-site evaluation of the College in early November 1998, found that "Bradford College has not recently engaged in systematic, broad-based planning . . . . There is no evidence that an effective strategic plan, or even a strategic planning process, is now in place." With respect to the College's regular revenue shortfalls, the NEASC determined that "[t]he College does not currently have a realistic plan in place to address the critical issues raised by these operating deficits." In connection with enrollment growth, the NEASC noted the College's goal of growing enrollment to over 700 students but observed that "it is difficult to determine precisely how this figure is anchored in current planning for recruitment, retention, faculty size, curricular structure, and many other parameters." Whatever informal planning discussions that did occur were "fragmented, tentative, unformed, and almost wholly within the parameters of the status quo. They provide an illusion of planning that is not an effective substitute for those systematic, broad-based mechanisms which could bring together all stakeholders in the College's community." In the final analysis, "[t]he College does not have a functional strategic plan, based on a widely accepted and coherent mission, informed by institution-wide, up-to-date assessment systems and linked to its budget processes." And, consistent with the absence of a strategic plan, the NEASC found that the College's "disturbing record" of 11 consecutive annual operating budget deficits was "punctuated by so many 'surprises' that these disorienting events seem almost to have become routine.

58.    Unrealistic Enrollment Projections.    The Official Statement described the College's plan to increase enrollment over 30% in three years and the College's belief, based on

the increased number of applications it had received to date, that it could meet its goal of enrolling 225 new students in the fall of 1998. But the number of applications was misleading because the College began to accept and count standardized web applications. Because a prospective student could easily send a standardized Web application to several schools, the College's admission personnel recognized that students who submitted web applications were far less likely to attend if accepted. Thus the College knew its matriculation rate for accepted students would almost certainly decline. The College also knew that counting web applications artificially inflated the applications numbers. The College failed to disclose these matters.

59.    Further, the College failed to disclose that the quality of student applying to the College was declining. While the Official Statement showed historic acceptance rates for the College of between 77% and 80%, for Fall 1998 the College's acceptance rate was only 70%, a steep decline which substantially reduced the possibility of the College meeting its enrollment goal. Although the College had more applications for Fall 1998, it had fewer actual acceptances than it had for Fall 1997. Given the number of actual acceptances at the time of the Official Statement, and applying the College's historic matriculation rate, it would have been clear that the College would likely fail to meet fall enrollment goal by 15%, but by focusing on the misleading application numbers and not disclosing the actual acceptance numbers or rates, the College misled prospective purchasers of its bonds.

60.    The College also knew the number of students who had actually placed deposits for Fall 1998 had dropped. The number of students who had actually placed deposits by spring 1998 was the best indicator or how many students would be enrolling. Despite more applicants, the number of students who had actually placed deposits at the time of the Official Statement, had declined by almost 20%.

61.   The combination of inflated application numbers, reduced acceptances, reduced deposit rates and lower expected matriculation rates meant that at the time of the Official Statement was issued, based on the information the College already had, it was almost impossible for the College to meet its enrollment target, and any statement to the contrary was misleading.   The Officer Defendants.   By omitting to include vital admissions data that demonstrated the enrollment goal was unachievable, the Defendants falsely perpetrated the belief that the College would be able to generate sufficient revenue to repay the bonds.

62.   No Equity Financing. The bond financing was not intended to cover the complete cost of the dormitory construction and renovation project.  The Official Statement unequivocally represented that the College would therefore make a $1 million equity contribution toward the completion of the project.  This representation was false and misleading, however.  At the time the Official Statement was prepared and circulated, there was no present intention among the Defendants to commit the College to contribute any of its own funds toward the construction project.  Rather, the Defendants' true intention was to cut corners on the project in an effort to bring project costs down to the level of the bond financing.  According to the minutes of the February 5, 1998 joint meeting of the Finance and the Building and Grounds Committees of the Board, the Trustee Defendants on those committees — who at the time were Defendants Sughrue, Short, Davis, Hayden, Ferlazzo, Crago, Childs, Cochran, Dill, Marcus, and Turben — reviewed the financing proposal for the construction project, and determined that the amount to be financed under the Bonds "does not cover all the cost of the three-phase project."  These Trustee Defendants, therefore, agreed to recommend to the full Board as follows:

> The College will have to review the projects and attempt to reduce
> the final two phases to correspond with the bond financing *or* the
> College will have to include an equity contribution to fund a

-23-

> portion of the construction.  It was agreed that the bond financing
> would proceed as recommended with Advest and that the College
> would make every effort to reduce its construction costs *or* make
> an equity contribution *at the end in the final phase of the project*.

(Emphases added).  The Defendants knowingly or recklessly failed to disclose this contingent

and delayed nature of the College's putative "equity" contribution, and instead falsely and

misleadingly represented that $1 million of the College's own funds "will be used" for the

construction project.

### Defendant Advest Procures Insurance for the Bonds

63.    In mid-April 1998, during the time Defendant Advest was marketing the Bonds to

various potential investors, Defendant Advest contacted Plaintiff ACA to procure insurance for a

portion of the Bonds.  In evaluating that request ACA reviewed, and relied on, the Official

Statement.  In addition, on or about April 30, 1998 an ACA employee had a telephone call with

Defendant Kiszka, in which Kiszka stated that 1999 student applications to the College exceeded

historical levels.   These statements by Defendant Kiszka further reinforced the misleading

statements and omissions of the Official Statement detailed above.

64.    Relying on the Official Statement and the conversation with Defendant Kiszka, on

May 14, 1998 ACA gave a written commitment to provide insurance for $5.51 million in

principal amount of the Bonds (the "Insured Bonds").  ACA issued an insurance policy for the

Insured Bonds on May 19, 1998, only six days after the closing of the Bond offering.  On

information and belief, the buyers that Defendant Advest had found for the Insured Bonds would

not have purchased them without the insurance.  Because Defendant Advest had given its firm

commitment to underwrite the offering of the Bonds, the ACA insurance policy facilitated

Defendant Advest's ability to sell the Insured Bonds.

-24-

*The Accelerating Financial Crisis*
*and the Trustee Defendants' Breaches of Fiduciary Duty*

65.    After the bond offering, when the academic year began in September 1998, the

College enrolled only 532 students, 79 fewer than projected in the budget that the College had

prepared back in May.  Fully three-quarters of this enrollment deficit was attributable to the

failure of previously enrolled students to return to Bradford — a level of attrition consistent with

that of prior years.  Another factor was a lower acceptance rate by the College, due to the lower

quality of internet applicants.  Predictably, the College's actual revenues were more than $2

million — or 13.25% — below budget.

66.    Faced with an accelerating financial crisis, the Trustee Defendants approved a

revised 1998-99 budget in the fall of 1998.  The revised budget relied upon more than $1.5

million in endowment funds (plus a one-time $600,000 gift) to partially offset losses from

operations.  This diversion of endowment funds represented greater than 7% of the appreciated

market value of the endowment.  This percentage was very high compared to the average

spending rate of institutions similar to the College, and as a matter of law gave rise to a

presumption of the Trustee Defendants' imprudence under the express terms of § 2 of the

Massachusetts Uniform Management of Institutional Funds Law, Mass. G.L. c. 180A.

67.    Despite the College's massive revenue shortfall, the budgeted amount of financial

aid *increased* by $280,000 for 1998-99.  Tuition assistance was provided to 479 recipients, or an

incredible 90% of enrolled students, a 10% increase over the previous year.  Average aid per

recipient shot up to $9,600, an increase of $770 over original projections.  Instead of reducing

financial aid to 28.8% of student income (as Defendants purported in the Official Statement),

financial aid under the revised budget mushroomed to 35% of student income; and given the

-25-

recurrent deficiencies of the College's budgeting process, the actual percentage was no doubt known by the Defendants to be even higher.

68.     As part of its effort to slash spending and reduce its operating losses, the College gutted its admissions program through budget cuts and employee layoffs. These stop-gap measures further guaranteed the College's inability to recruit enough new students to survive, let alone to meet its financial obligations as they came due.

69.     Notwithstanding these circumstances, the Trustee Defendants proceeded with the construction project to build new residential space to house students on campus even though it was an enrollment shortfall that had precipitated the budget crisis in the first instance. That is to say, the Trustee Defendants and the College continued to expend monies from the bond financing's Construction Fund, unnecessarily depleting the assets of the College and recklessly reducing the collateral available to repay the Bonds, all at a time when the College was insolvent or in the zone of insolvency. In the fall of 1998, when the Defendants knew that enrollment would not meet their projections and additional dormitory space was not needed, Defendants still could have cancelled the most expensive phase of the construction project and saved the expenditure of at least $5.3 million. At the time the decision was made to go forward with completing the project, Defendants were aware that the College could not afford to pay debt service on the Bonds based on current projected operating revenues. Without regard to their fiduciary obligation to the College's creditors, the Trustee and Officer Defendants continued to spend bond proceeds they knew they could not afford to repay to build facilities they knew they did not have enough enrollment to use.

70.     In fact, the Trustee Defendants' reckless depletion of the collateral for the Bonds was consistent with their stated intent to operate the College at all costs rather than preserve its

-26-

assets for the benefit of creditors. At the February 1997 meeting of the Board, the Trustee Defendants then present discussed various alternatives for the College and agreed that liquidation "is not an acceptable option." The Trustee Defendants' later failure to protect and preserve the interests of the Bondholders was wholly in keeping with this predetermination.

*The New Administration and the Closure of the College*

71.     Defendant Short resigned as President of the College in the summer of 1998. In early 1999, the College's new president, Jean Scott, underscored the materiality of the misrepresentations and omissions of the Official Statement in a letter responding to the NEASC's report. With respect to enrollment issues, President Scott wrote that the College "agree[s] that poor retention is among the important causes of our systemic financial problems." In connection with the College's budget, President Scott confirmed that "our accounting methods mask some of what should be seen as 'deficit spending,' since the College draws a larger percentage from its endowment than is customary or, in our view, prudent." And as regards the lack of a viable business plan, she admitted that "[t]he College does need a functional strategic plan, based on a widely accepted mission, informed by assessment, and linked to the allocation of resources."

72.     Defendant Kiszka resigned from his positions as Vice President and Chief Financial Officer of the College in the summer of 1999. That fall, his successor, Brenda Smith, described the College's financial situation upon her arrival as "an incredible red flag" of insurmountable problems, centering on the College's "struggling" due to an abnormally high level of tuition discounting.

73.     On or about November 22, 1999, the College announced that it would cease operations in June 2000. This announcement of the College's closure confirmed Defendant

Kiszka's original (but undisclosed) assessment, at the February 1997 meeting of the Board, that the College could survive no more than three years given its financial and operational disarray.

74.    The Bonds were secured by a lien on the College's tuition proceeds; unless the College stopped operations, the bondholders' investment was protected. On November 22, 1999, when the College announced that it would cease operations, the Bondholders learned for the first time that a reasonable possibility existed that their bonds would not be paid in accordance with the bond indenture.

75.    On January 5, 2000, the indenture trustee for the Bonds gave a "Notice of Default" under the indenture. On August 22, 2000, the indenture trustee notified the College that an "Event of Default" had occurred under the indenture. On October 31, 2000, the indenture trustee declared immediately due and payable the principal amount of the Bonds, together with accrued interest. As of the date hereof, the accelerated principal under the Bonds remains unpaid and outstanding.

76.    On November 21, 2000 the Plaintiffs filed an action in the United States District Court for the District of Massachusetts, No. 00-12408-NG against the College, Advest, and certain trustees and officers of the College alleging violations of federal and state securities laws and commission of various torts in connection with the issuance and sale of the Bonds. This complaint was subsequently dismissed without prejudice. To induce the voluntarily dismissal, without prejudice, of this complaint, the College and all of the defendants named in this action entered into a Standstill and Tolling Agreement dated as of November 21, 2000 (the "First Tolling Agreement"), and later into a Second Standstill and Tolling Agreement dated as of June 22, 2001 (the "Second Tolling Agreement", and together with the First Tolling Agreement, the "Tolling Agreements"). The Tolling Agreements tolled the deadline for commencement of all

claims brought by the Plaintiffs in this action through the date of the filing of this Complaint. Each of the Plaintiffs is either a party to, or identified beneficiary of, the Tolling Agreements.

**COUNT I**
**Violation of Section 10(b) of the 1934 Act and Rule 10b-5 Against All Defendants**

77.    The Bondholders reallege and incorporate by reference paragraphs 1 through 76 above as if set forth fully herein.

78.    Each of the Defendants knew, or was reckless in failing to know, of the material omissions and misrepresentations contained in the Official Statement as set forth above. Because of their Board membership and/or their executive positions with the College, the Trustee Defendants and Defendants Short and Kiszka (a) knew or had access to information concerning the material adverse non-public information about the College's financial condition, which information was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements and other public representations of and about the College.

79.    Further, through its position as underwriter of the Bonds, Defendant Advest knew, or would have known in the absence of reckless disregard of the facts alleged herein, the actual financial and operating condition of the College, but failed to ensure that the public statements for which it was responsible accurately reflected the actual financial and operating condition of the College.

80.    The Defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal material adverse information regarding the financial and operational condition of the College as specified herein. The Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false and misleading statements specified above, which were misleading in that they contained

-29-

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

81.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly and indirectly, violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

      (a)    Employed devices, schemes, and artifices to defraud;

      (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Bondholders and others similarly situated in connection with their purchases of the Bonds.

82.    The Bondholders have suffered damages in that they purchased the Bonds in reliance on the Defendants' misrepresentations and omissions. The true facts concealed by these misrepresentations and omissions were a substantial factor in causing loss to the Bondholders. The Bondholders would not have purchased the Bonds at the prices they paid, or at all, if they had not been so misled regarding the College's inability to service the debt that it incurred by reason of the issuance of the Bonds, or otherwise to repay the Bonds. For these injuries and damages, the Bondholders are entitled to relief as requested below.

## COUNT II
### Violation of § 20(a) of the Exchange Act and Rule 10b-5
### Against the Trustee Defendants and Defendants Short and Kiszka

83.    The Bondholders reallege and incorporate by reference paragraphs 1 through 82 above as if set forth fully herein.

-30-

84.    The Trustee Defendants and Defendants Short and Kiszka acted as controlling persons of the College within the meaning of § 20 of the Exchange Act. By reason of their positions as senior officers and/or trustees, as alleged above, these Defendants had the power and authority to cause the College to engage in the wrongful conduct complained of herein.

85.    By reason of such wrongful conduct, the Trustee Defendants and Defendants Short and Kiszka are liable to the Bondholders pursuant to § 20(a) of the Exchange Act. The true facts concealed by the misrepresentations and omissions of these Defendants were a substantial factor in causing loss to the Plaintiffs. As a direct and proximate result of these Defendants' wrongful conduct, the Plaintiffs suffered damages for which they are entitled to relief as requested below.

**COUNT III**
**Violation of § 12(a)(2) of the Securities Act of 1933,**
**Against Advest**

86.    The Bondholders reallege and incorporate by reference paragraphs 1 through 85 above as if set forth fully herein.

87.    Advest was the firm offer underwriter of the Bonds and sold bonds to all of the plaintiffs. Advest sold the bonds by means of the Official Statement, a prospectus that contained the numerous untrue statements of material fact described above. For the reasons set forth above, the Official Statement also omitted material facts necessary to make the statements contained in the Official Statement not misleading. Advest knew or, in the exercise of reasonable care, should have known that the statements identified above were untrue and/or misleading.

88.    The conduct of Advest alleged above constituted a violation of the §12(a)(2) of the Securities Act of 1933, causing the Bondholders substantial loss and injury. The true facts

concealed by the misrepresentations and omissions caused substantial losses to the Bondholders for which they are entitled to relief as requested below.

## COUNT IV
### Violation of Mass. G.L. c. 110A, § 410, Against All Defendants

89.     The Bondholders reallege and incorporate by reference paragraphs 1 through 88 above as if set forth fully herein.

90.     The College, through the Official Statement, offered, and Advest, through its firm offer underwriting, sold, securities to each of the Bondholders by means of untrue statements of material fact and/or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  The untrue statements of material facts and the omissions to state material facts have been outlined above.

91.     Each of the Defendants knew, or in the exercise of reasonable care could have known, of the material omissions and misrepresentations contained in the Official Statement as set forth above.  Because of their Board membership and/or their executive positions with the College, the Trustee Defendants and Defendants Short and Kiszka knew or had access to information concerning the material adverse non-public information about the College's financial condition, enrollment and financial aid problems and which information was not disclosed. Further, Defendant Advest, through its position as underwriter of the Bonds, knew, or, in the exercise of reasonable care, could have known of the actual financial and operating condition of the College, but failed to ensure that the public statements for which it was responsible accurately reflected the actual financial and operating condition of the College.

92.     The conduct of the Defendants alleged above constituted a violation of the Massachusetts Securities Act, Mass. G.L. c. 110A, § 410, causing the Bondholders substantial

loss and injury. The true facts concealed by the misrepresentations and omissions of these Defendants were a substantial factor in causing loss to the Bondholders for which they are entitled to relief as requested below.

## COUNT V
### Fraud and Intentional Misrepresentation Against All Defendants

93.    The Bondholders reallege and incorporate by reference paragraphs 1 through 92 above as if set forth fully herein.

94.    The Defendants fraudulently, intentionally and/or with reckless disregard as to the truth or falsity of such statements, made materially untrue and misleading statements to Plaintiffs, or aided and abetted in the making of such statements. Defendants knew such statements were untrue and misleading at the time they made them to the Plaintiffs. Said statements were made with the express purpose of inducing the Bondholders to purchase the Bonds and to induce ACA to insure the Bonds. Plaintiffs detrimentally relied on the materially untrue and misleading statements made by the Defendants, or which were made by others with their assistance and abetting, and Defendants knew the Plaintiffs would rely upon the misrepresentations to their detriment. The true facts concealed by these misrepresentations and omissions were a substantial factor in causing losses to the Plaintiffs.

95.    The fraudulent statements and omissions made by the Defendants, including the concealment of the actual financial and operating condition of the College by Defendants from the Plaintiffs, have caused the Plaintiffs to incur substantial loss and injury for which they are entitled to relief as requested below, and for which they are further entitled to punitive damages based on the wanton, willful and malicious actions of the Defendants as alleged herein.

-33-

## COUNT VI
### Negligent Misrepresentation Against All Defendants

96.    The Bondholders reallege and incorporate by reference paragraphs 1 through 95 above as if set forth fully herein.

97.    The Defendants negligently made materially untrue and misleading statements to the Plaintiffs, or aided and abetted in the making of such statements, which the Defendants knew or should have known but for their negligence were untrue and misleading at the time they made such statements.    Said statements were made with the express purpose of inducing the Bondholders to purchase the Bonds and to induce ACA to insure the Bonds.    The Plaintiffs reasonably relied on the materially false and misleading statements made by the Defendants, or which were made with their assistance and abetting, to the detriment of the Plaintiffs.

98.    As a result of the material misstatements made by Defendants to the Plaintiffs, or which were made with their assistance and abetting, and the material omissions of fact concealed by the Defendants from the Plaintiffs, the Plaintiffs have incurred substantial loss and injury for which they are entitled to relief as requested below.

## COUNT VII
### Claim for Breach of Fiduciary Duties Against the Trustee Defendants

99.    The Bondholders reallege and incorporate by reference paragraphs 1 through 98 above as if set forth fully herein.

100.    At all times during the relevant period, the College was insolvent or operating in the zone of insolvency, and had no ability to satisfy its Bond obligations.    Accordingly, the Trustee Defendants owed fiduciary duties to the Bondholders.

-34-

101.    The Trustee Defendants breached their fiduciary duties to the Bondholders by failing to consider in good faith the Bondholders' interests as creditors of the College and recklessly depleting the collateral specifically securing their Bonds, as alleged above.

102.    As a result of the Trustee Defendants' breach of their fiduciary duties the Bondholders have incurred substantial loss and injury for which they are entitled to relief as requested below.

## BASIS OF ALLEGATIONS

103.    Plaintiffs have alleged the foregoing based upon the investigation of counsel and their agents, which investigation included a review of the College's Board meeting minutes, financial statements, accreditation report and response thereto, and media reports about the College. Pursuant to FED. R. CIV. P. 11(b)(3), Plaintiffs believe that after reasonable opportunity for discovery, substantial additional evidentiary support will likely exist for the allegations set forth herein.

## PRAYERS FOR RELIEF

WHEREFORE, the Plaintiffs demand relief as follows:

(a)    That the Defendants be held jointly and severally liable to the Plaintiffs for the losses that they have incurred;

(b)    That the Plaintiffs be awarded pre- and post-judgment interest;

(c)    That the Plaintiffs be awarded their reasonable costs and expenses (including attorneys' fees) incurred in connection with this action;

(d)    That the Plaintiffs be awarded such multiple and/or punitive damages as may be appropriate under law;

(e)    That the Plaintiffs be awarded extraordinary equitable and/or injunctive relief, including attaching, impounding and imposing a constructive trust upon or otherwise restricting the assets of the Defendants to assure that the Plaintiffs have an effective remedy; and

(f)    That the Plaintiffs be awarded such other and further relief as the Court determines is just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DENISE McKEOWN, ROBERT LUTTS

By their attorney,

William A. Sheridan, Esq., BBO#: 458140
Law Offices of William A. Sheridan
One Center Plaza, Suite 240
Boston, MA 02108
(617) 720-2700

Dated: January 28, 2005

$JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Denise McKeown and Robert Lutts

**DEFENDANTS** IN CLERKS OFFICE
Advest Inc. et. als.

FILED

2005 JAN 28 P 12:36 Delaware Corporation with principal place of residence in Hartford, CT

(b) County of Residence of First Listed Plaintiff **Middlesex, MA**
(EXCEPT IN U.S. PLAINTIFF CASES)

U.S. DISTRICT COURT County of Residence of First Listed Defendant
DISTRICT OF MASS. (IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number) **(617) 720-2700**
William A. Sheridan, BBO# 458140
One Center Plaza, Suite 240
Boston, MA 02108

Attorneys (If Known)
Unknown

05 10176 RGS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | |
| ☐ 196 Franchise | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | |

Also in PERSONAL INJURY column:
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability
**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 27 USC 10(b), 20(a), 20A, 15 USC 12(a)(2), 78j(b), 78t(a), 78t-1(a), 77l(a)(2), Rule 10(b)(5)

Brief description of cause: **Securities misrepresentation and negligent misrepresentation and breach of fiduciary duty**

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions)
JUDGE **Hon Richard G. Stearns**
DOCKET NUMBER **CA No. 04-11667 RGS**

DATE **1/23/05**
SIGNATURE OF ATTORNEY OF RECORD
**William A. Sheridan, Esq.**

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____