UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DENISE McKEOWN, ROBERT LUTTS

Plaintiffs,

v.

ADVEST, INC., KAREN M. SUGHRUE, GARRY
L. CRAGO, JEAN W. CHILDS, PAULA
EDWARDS COCHRAN, G. STEVENS DAVIS, JR.,
JULIA B. DEMOSS, WILLIAM R. DILL, LESLIE
A. FERLAZZO, JOYCE SHAFFER FLEMING, ERIC
W. HAYDEN, CATHERINE CHAPIN KOBACKER,
ANNE MARCUS, CELESTE REID, RICHARD J.
SHEEHAN, JR., JOSEPH SHORT, GREGORY E.
THOMAS, SUSAN K. TURBEN, and DONALD
W. KISZKA

Defendants.

Civil Action No.  05CV10176 RGS

PLAINTIFFS OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS

On May 13, 1998, Bradford College (the "College" or "Bradford"), a small private liberal

arts college in Haverhill, Massachusetts issued $17.93 million in bonds.  The proceeds of which,

in part, would be used to build and renovate dormitories for the school's students.  The bonds

were sold, pursuant to an Official Statement ("OS").   The OS indicated that the bond

committments would be paid by an increased enrollment, reductions of financial aid, and a $1

million contribution from the College.  As a result of the representations described in the OS, the

Plaintiffs in this action purchased bonds.

Plaintiffs allege that the OS failed to include critical information that would have made it

apparent that the College would not reach its enrollment targets.  Moreover, the statements

regarding financial aid commitments were false; aid awards for the present and upcoming years

were increasing, not decreasing.  The OS also failed to inform potential bond purchasers of the

College's inability to retain students who enrolled in its classes. The OS also referred to a plan whereby the College was going to turn around its financial performance; however, there was no such plan.

In this lawsuit, Plaintiffs seek to hold the trustees and officers of Bradford and the bonds' underwriter, Advest, liable for the misrepresentations contained in the OS. Plaintiffs contend they have adequately pled the existence of the misrepresentations, and omissions of material fact by the Defendant and, therefore, the Defendant's motion must be denied.

## FACTUAL BACKGROUND

Bradford College was a small liberal arts college with an enrollment of approximately 500 full-time students for most of the 1990s. The College had financial difficulties and on February 6, 1997, the College's chief financial officer, Defendant Donald Kiszka informed the Board of Trustees that the College only had enough cash to survive another 2 to 3 years. C, ¶45. The officers and the Board were unwilling to make cost containment measures to stay in operation. C, ¶45. A member of the Board Committee, Defendant Thomas, admitted there was "insufficient enrollment to assure the financial well-being of the College. C, ¶49.

The College's financial problems were a result of inadequate tuition revenues due to poor enrollment and most importantly its continued inability to retain students. The College had a high attrition rate with only 40% of its students graduating. C, ¶47. The New England Association of Schools and Colleges ("NEASC"), the College's accrediting body, found that student enrollment and retention at Bradford was a "crisis". C, ¶50. The Association found that attrition was the major cause of Bradford's financial instability. C, ¶50.

In order to attract students the College gave financial aid awards. The level of financial aid given to attract students had risen every year since 1989, and had reached a level well above

2

average for comparable institutions in Massachusetts. C, ¶¶53, 55. In the last full academic year prior to the bond offering, financial aid contributed by Bradford accounted for almost 50% of the gross tuition Bradford earned; OS at A-14.

For the 1997-98 school year, full-time enrollment had gone up 13% and the school's application matriculation rate for accepted students climbed from 25% to 34%; OS at A-8. This was a one year aberration and not a trend. The Administration and the Trustees decided to build new dormitories and renovate existing ones in order to attract new students. C, ¶39. To finance the construction project, they turned to Defendant Advest to underwrite a tax exempt conduit financing through the Massachusetts Industrial Financing Agency ("MIFA"). Advest determined that $17.93 million was the maximum bonding capability of the College and agreed to underwrite the issue. C, ¶42. The Trustee Defendants authorized the bond offering in February, 1998 on the recommendations of Advest and Defendants Short and Kiszka, the current president and chief financial officer of the College. C, ¶39. One Bradford Trustee, William Nofsker, resigned rather than approve the offering, on the ground that the College did not have sufficient enrollment to justify an expansion plan. C, ¶48.

MIFA issued a $17.93 million revenue bond offering on May 1, 1998, based on the OS, which contained a written disclosure of information relating to Bradford. This section of the OS was signed by Defendants Kiszka and Short; OS, A-18. Although issued by MIFA, a body politic of the Commonwealth of Massachusetts, the bonds were not an obligation of the Commonwealth and were solely payable by Bradford; OS, Cover 1.

The OS provided false and materially misleading information on the critical areas of enrollment, attrition and financial aid. With regard to admissions, after setting forth a table

3

showing increase in the fall semester headcount from 484 full-time equivalent students in 1993 to

584 students in 1997, the OS stated:

> "To attain the final goal of a balanced budget . . . the College is
> planning to increase enrollment to the level of at least 725 full-time
> students by fall 2000, with approximately 80% of those students
> living in campus facilities. As of April 3, 1998, applications
> received by the College to date total 879, an increase of more than
> 18% from April 3, 1997. The total of 879 exceeds total
> applications received for the fall 1997 . . . Based on this increase in
> applications, historic rates for conversion of applications into
> enrollments, the number of applications from freshmen and
> deposits received to date, the College believes that it can reach its
> goal of enrolling 225 new students for the fall of 1998 while
> increasing the quality of it students and reducing slightly the
> average amount of financial aid awards to such students from
> College funds." OS at A-13.

While application numbers had technically risen, the OS failed to disclose critical

information nvestors needed to know to assess the realistic likelihood that the College would

meet its goals. The Defendants were aware of or recklessly disregarded this critical information

when the OS was published. The College did not disclose that despite the increase in

applications, the College's acceptance rate - the percentage of applicants it deemed worthy of

admission had sharply dropped, from 80% to 70%. Although the number of applications had

increased, the number of acceptances had dropped. C, ¶59. Perhaps even more importantly, the

number of students who had committed to attend Bradford by actually paying a deposit - the best

indication of how many new students would actually enroll - had declined by almost 20%. C,

¶60.

Even the total number of applications disclosed was misleading because of the College's

decision to accept applications off the internet. The Defendants knew or recklessly disregarded

that it was easier for web applicants to apply to several schools, making it less likely that such

applicants would attend if accepted. The Defendants knew or recklessly disregarded that accepting web applications would increase the application numbers, but reduce the institution's acceptance and matriculation percentages. C, ¶58.

With respect to financial aid the OS recited:

> [D]uring the 1997-98 academic year, the College estimates that financial aid will be reduced to 29.9% of student income versus 30.3% the previous year. This expected reduction is a result of change in methodology of aiding students with college-funded support versus additional loans funded by students and/or parents. The College's financial plan currently calls for a further reduction of financial aid spending for 1998-99 academic year to 28.8% of student income. A-13.

The OS was dated as of May 1, and not formally released until May 13, C, ¶64, after the financial aid commitments to students attending the 1997-1998 fall and spring terms had been made, as well as after the college had determined the amount of student income it would receive for those two terms. C, ¶53. Financial aid consumed for the 1997-98 academic year was actually over 35% of student income, a 17% increase over the preceding year, not a reduction. Moreover, the College knew its budget figures were misleading because the Spring '98 enrollment was less than budgeted, while the amount of financial aid committed was $250,000 more than budgeted. C, ¶53.

The OS, A-13, stated that financial aid would be reduced due to a new methodology in calculating aid. However, there was no new methodology and the persons responsible for awarding financial aid were never advised or instructed to make any reductions or initiate changes. C, ¶56. In fact, the College's 1998-99 budget, which was submitted to the Trustee Defendants on April 29, 1998, or almost two weeks before the OS was released, budgeted financial aid for 31.3% of student income, not 28.8% of student income. C, ¶54. Moreover, the

actual financial aid commitments, which had already been made to the incoming students prior to the May 13 OS release, proved to be even higher, coming in again at 35% of student income. C, ¶67.

The OS did not alert investors to any kind of student retention problem at the College. Indeed, by only disclosing fall semester headcounts, instead of fall and spring semester, investors were unable to realize that Bradford's student retention problem was so severe that it lost significant numbers of students after just one semester. At mid-year there was a 7% attrition rate historically, nor did the OS reveal that it lost 60% of its entering class before graduation. C, ¶¶47, 51.

The OS also repeatedly referenced the College's plan to expand Bradford's enrollment and achieve financial equilibrium. NEASC, however, who did its decennial accreditation review just a few months after the bond issuance, determined there was no such plan. There was no plan to deal with student retention, no plan to reduce financial aid, no plan to increase the student body to the target disclosed in the OS and no plan to determine why the College's budgeting process required it to go through annual budget crises. C, ¶57.

The Bondholder plaintiffs each purchased bonds as part of the initial offering from Advest. Advest, sought insurance to assist with continuing sales of the bonds. It sent the OS to ACA Financial Insurance Corp. ("ACA") to review and ACA also had conversations with Kiszka. Based on the representation in the OS and the conversation with Kiszka, ACA agreed to provide financial insurance for $5.51 million of the bonds and issued an insurance policy on May 19, 1998. C, ¶¶63, 64.

In the September after the bond issuance, the problems hidden by the OS rose to the surface. The fall 1998 enrollment was substantially lower than projected by the College with

much of the problem attributable to upperclass attrition. C, ¶65. Those who did attend received increased, rather than reduced amounts of financial aid. C, ¶67. Financial aid was provided to 90% of the student body, as opposed to a disclosed rate of 80%, and the average recipient got $9,660, far more than 50% of Bradford's tuition. C, ¶67. Although there was no longer a need for expanded dormitory space, Bradford did not cancel the project and return the unspent funds to the Bondholders. Instead, it continued to build dormitories for non-existent students and, cut funding for student recruitment. C, ¶¶68, 69.

By the fall of 1999, the College could not retain the enrollment it required to pay the bonds. C, ¶72. In November, 1999, the College announced that it would cease operations at the end of the school year. C, ¶73. The bonds were declared in default in January, 2000. C, ¶75.

## PROCEDURAL BACKGROUND

The Liquidation of Bradford's assets did not result in full payment of the Plaintiffs Bonds. All of the Defendants, and Bradford, consequently, entered into tolling agreements relating to the claims. The Plaintiffs are intended beneficiaries of the tolling agreements. This complaint was filed on January 28, 2005 just before the benefits of the tolling agreement expired.

Defendant Advest has now filed a Motion to Dismiss contending there are deficiencies in the pleadings. The Plaintiffs believe most of these deficiencies have no merit and can be ignored. In the event, however, that the Court does agree that the Plaintiffs have pleading inadequacies, they request the opportunity to amend to cure. Plaintiffs have not pled evidence in their complaint, and can provide additional details regarding what the Defendants and Bradford did (and did not do) in connection with the issuance of the bonds and the OS. Given Fed.R.Civ.P. 15's mandate that amendments to pleadings should be liberally allowed and the well acknowledged complexity of the securities pleading requirements, see *In re Number Nine Visual*

7

*Technology Corp. Securities Litigation*, 51 F.Supp.2d 1, 27, n. 22 (Young J.)(noting the "gamesmanship" required to successfully plead a securities claim is now reminiscent of pre-Federal Rules pleading practices), Plaintiffs should be given an opportunity to repair any pleading deficiencies.

**ARGUMENT**

**I.      THE STANDARD ON MOTION TO DISMISS UNDER RULE 12(B)(6)**

In order to survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6) "a complaint must set forth factual allegations either direct or inferential, respecting each material element necessary to sustain recovery under some actionable theory." See, *Berner v. Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997). Applying this standard, a court reviews the pleadings "accepting as true all well-pleaded averments and indulging all reasonable inferences in plaintiffs' favor"; see, *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996); *In re Segue Software Inc. Securities Litigation*, 106 F.Supp.2d 161, 165 (D. Mass. 2000); *In re Raytheon Securities Litigation*, 157 F.Supp. 131, 145 (D. Mass. 2001). Plaintiffs contend that they have satisfied the requirements and the complaint should not be dismissed.

**II.     PLAINTIFFS HAVE SUCCESSFULLY ALLEGED VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AGAINST ALL DEFENDANTS**

**(A)     Materiality**

Six of the seven counts Plaintiffs have brought are premised on misrepresentations and omissions or negligence relating to the OS. The exception is Count VII for Breach of Fiduciary Duty. Count II does not apply to Defendant Advest. Defendant Advest asserts that each of the counts applicable to it fail because the Plaintiffs have failed to plead the existence of a materially

misleading statement as a matter of law, and that even if such statements or omissions could be found, Plaintiffs have failed to meet the applicable pleading standards that attach to these counts.

Plaintiffs allege several categories of misrepresentations or omissions of material fact in the OS. They are as follows: (a) misrepresentations and omissions regarding enrollment relating to applications, acceptances, deposits and student retention; (b) misrepresentation and omissions of material fact regarding financial aid; (c) misrepresentation and omissions of material fact regarding the College's contribution toward construction; and (d) misrepresentation of material fact regarding a financial plan.

In Count I Plaintiffs allege the Defendant has violated Section 10(b) of the 1934 Act and Rule 10(b)(5).

To state a cause of action Rule 10(b)(5), the Plaintiff must plead that the Defendant made a false statement or omitted a material fact, with scienter, and that plaintiffs' reliance upon the statement or omission caused the plaintiff's injury. *Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir. 1996).

(1)    Defendant contends that plaintiffs have failed to allege adequately any actionable misstatement or omission. Plaintiffs insist, however, that they have adequately alleged that Defendant has omitted material facts necessary to make statements in the OS not misleading. According to the OS the subject bonds were to be repaid by tuition receipts. C, ¶41. Therefore, facts that bore on the College's ability to bring in tuition revenue could be considered material. A fact is material if there is substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available; see, *Basic Inc. v. Levinson,* 485 U.S. 224, 231-232, 108 S.Ct. 978 (1988); *TSC Industries v. Northway Inc.,* 426, U.S. 438, 449; 96 S.Ct. 2126 (1976); *In re*

*Sepracor Inc. Securities Litigation*, 308 F.Supp.2d 20, 27 (2004); *Garvey v. Arkoosh et. al.*, D.C. Ma. Civ. A. 04-10438 (Feb 4, 2005).

Since the bonds were to be repaid from tuition revenue any omission of material fact relating to College tuition and its utilization it for repayment of the bonds would be viewed by a reasonable investor as significantly altering the total mix of information available.

Enrollment and Retention

The greater the tuition paying student enrollment the greater the tuition revenue and wherewithal to repay the bonds. As can be seen from the Complaint, (C, ¶43), the OS painted a rosy picture of enrollment and increase in enrollment. Historically, however, the problem with tuition revenues was an inability to retain its students, see C, ¶¶47, 50, 51. The OS informed investors about the fall enrollment but said nothing about the spring enrollment historically being down by 7%, and nothing about 60% of students who enrolled leaving before graduation. The defense Memorandum at pp. 4 and 5 states that the OS "... clearly disclosed that ... the College was having difficulty attracting and retaining students (OS at A-7)"; however, A-7 actually states "... the Project will enhance the residential life component of Bradford College ... and its ability to retain students." This is a far cry from a disclosure that indicates the College is having a revolving door crisis with student attrition. This material fact was known to the Defendant or recklessly disregarded when the OS was released on May 13, 1998, see C, ¶44, and should have been disclosed.

Enrollment and Applications

Enrollment and tuition are also a function of applications. The OS published on May 13, 1998 indicated a rise in applications over the previous year (OS, A-13). This information was misleading since, for the first time, the College had decided to count internet applications. At the

time of publication the Defendant knew or recklessly disregarded the fact that internet applications resulted in far fewer acceptances than hard applications and should have disclosed that material information or abstained from claiming increased applications without qualification, see C, ¶59.

The OS, A-13 published on May 13, 1998, projected increased enrollment and consequently revenues based on freshman deposits. On May 13, 1998 the College and Defendant knew or recklessly disregarded the fact that deposits had declined by 20%, see C, ¶60. This material fact should have been disclosed.

Enrollment and Acceptances

The OS A-13, projected increase enrollment and consequently tuition on conversion of applications into enrollment (matriculation). By May 13, 1998, the College and the Defendant knew or recklessly disregarded the fact that acceptances had dropped from 80% to 70%. This material fact should have been disclosed.

Enrollment and Financial Aid

The bonds were to be repaid by increased tuition revenues, decreased financial aid and a $1M contribution from the College. Facts relating to or inability to reduce financial aid and, of course, an increase in financial aid would have been material to a reasonable investor. As can be seen from the Factual Background and the Complaint at the time the OS was published financial aid had actually increased rather than decreased from 1997-1998 and it was known that the budget from 1998-1999 called for 31.3% of student income as opposed to 28.8% expressed in the OS at A-13. These material facts were known or recklessly disregarded and should have been disclosed.

11

<u>College Contribution</u>

The bond issue was not enough to pay for the construction project. To allay concern, therefore, the College committed to contribute $1M to the construction project; see, OS at 10. However, at a meeting of the trustees in February 1998, over three months before the OS publication the trustees were planning to cut costs to avoid the contribution or hold its contribution until the very end , see C, ¶62. This, of course, would have been when risk had significantly diminished, see C, ¶62. This material fact should have been disclosed to the investors.

<u>Lack of Strategic Plan</u>

The OS referred to a Strategic Plan which would in effect increase enrollment and reduce financial aid. This, of course, would have increased net revenues and consequently the ability to repay bonds. Investors were led to believe that a plan existed with systems and procedures for increasing enrollment, reducing financial aid and increasing net revenues was in place. There was no such plan; see C, ¶¶56, 57. This was a material misrepresentation.

<u>Cautionary Statements</u>

The defense argues that the pertinent OS statements were only projections, puffery or soft or cautionary information that bespoke caution. Essentially they contend that these are forward-looking statements that are not actionable. However, when the subject matter of the alleged misrepresentation or material omissions are matters of fact rather than conjecture by the time the statements were made they cannot be considered protected as forward-looking; see *In re Number Nine Visual Technology Corp. Securities Litigation*, *id.* at 19, 23; *In re Sepracor Inc. Securities Litigation, id.* at 28. By the time of publication the facts relating to atrocious retention rates, misleading internet application numbers, reduced deposits, reduced acceptance percentages and

the lack of a plan existed and were known or recklessly disregarded. These undisclosed facts undermined enrollment and tuition revenue representations. Moreover, vague or boilerplate disclaimers are insufficient to give protection. General statements regarding uncertainty must be tailored to the Defendants statements or omissions, see *Amylin Pharms Inc. Securities Litigation*, 2003 WL 21500525 (S.D. Cal. May 1, 2003); *In re Sepracor Inc. Securities Litigation, id.* at 33-34. These were known or recklessly disregarded facts, at the time of publication and cannot be protected as an opinion or statement of belief, see *Helwig v. Vencor Inc.*, 251 F.3d 540, 557. Plaintiffs contend that, to be properly tailored, cautionary statements would have to have included reference to the foregoing areas of applications, acceptance, matriculation, deposits, retention, financial aid, planning and capital contribution.

### (B)    Scienter

The defense urges dismissal on the basis that Plaintiffs have not adequately pleaded scienter. Plaintiffs contend that they have sufficiently alleged that Defendant Advest (1) knew of the adverse facts that were misrepresented or should have been disclosed or (2) recklessly disregarded these facts by not fulfilling its duty as an underwriter as required in *Greebel v. FTP Software Inc.*, 194 F.3d 185 (1st Cir. 1999), *Garvey, id.* at 6.

It has been held that underwriters are just as responsible as the issuer if a prospectus is false or misleading since prospective investors rely upon the underwriters in deciding whether to purchase; see *Escott v. Barchris Construction Corp.*, 283 F.Supp. 643, 696 (1968). The Court in *Escott* observed that it is not unlikely that the issuer would make self-serving statements to an underwriter to induce underwriting, *id.* at 696, and that the purpose of the securities laws was to protect investors and, therefore, underwriters are made responsible for the truth of the prospectus, *id.* at 697. The Court in *Escott* went on to say that the underwriters must make a reasonable

13

attempt to verify data submitted to them, *id.* at 697. The Court also cited decisions by the Securities and Exchange Commission that an underwriter must go beyond and behind the representations of management; see *Matter of Richmond Corp.*, CCH Sec. L. Rep. 76, 904 (1963); *Matter of Charles E. Bailey & Co.*, 35 Sec. 33 (1953).

The Complaint alleges that Advest was responsible for, and prepared the OS, C, ¶¶2, 10, 40. That Advest made a determination of the maximum bonding capability of the College; C, ¶42. Advest solicited buyers for the bonds; C, ¶64. It obtained insurance for some of the bonds; C, ¶63. The Complaint alleged Advest knew or would have known but for reckless disregard of the misrepresentations and omissions, C, ¶79, and that it knew or would have known in the exercise of reasonable care of the misrepresentations and omissions; C, ¶87.

The Court in *Greebel*, *id.* at 195, acknowledged that indirect and circumstantial evidence could be used to establish a strong inference of scienter. The Court went on to list examples of scienter, *id.* at 196, which included divergence between internal reports and external statements. Such is the case here where the College had 11 years of budget deficits; C, ¶51; and internal minutes of meetings indicating that the College had two to three years to survive, C, ¶45; that drastic cost cutting measures were necessary, C, ¶46, and that due to enrollment shortfalls the College was at financial risk, C, ¶¶48, 49. The Court in *Greebel* stated that disregard of the most current factual information before making statements was indicative of scienter. In this case as can be seen from above Defendant Advest disregarded factual information relative to applications, matriculation expectations, percent of acceptances, percent of deposits, retention rates and existence of a plan. All of the foregoing were basic college admissions data that would have been available by May, 1998. The Court in *Greebel* also pointed to the closeness in time of a fraudulent statement or omission and the disclosures of inconsistent information as being

telltale of scienter.   In this case there could not have been more ripeness with respect to admission data than in May of the year.

The defense claims that in citing the NEASC audit of November, 1998, and report of January, 1999, they are citing something that was unavailable to them at publication in May, 1998.  Plaintiffs do not fault defendant for not considering in May a NEASC report that did not yet exist.  They do fault Defendant for not disclosing the data reported as the NEASC report specifies that the data would have been available at the College before and at the time of publication of the OS.  If NEASC observed the data Advest could or did observe the data.

In *Aldrich v. AT Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) the Court stated that the fact that defendant published when they knew facts suggesting that statements were inaccurate or misleading was a classic case of scienter.  Moreover, the Court in *In re Number Nine Visual Technology Corp. Securities Litigation*, *id.* at 26, 27, the Court essentially said that it would be reckless to not be cognizant of information that was closely related to the industry.  If Advest looked at the basic admission information they would have known of the material problems.  If Advest did not look at this basic admissions data that was essential to enrollment and tuition it would have been in reckless disregard.

### (C)    Particularity

The defense contends that Plaintiffs Complaint does not include sufficient particularity.  For sufficient particularity Plaintiffs must specify (1) the statements that they contend were fraudulent, (2) the identity of the speakers, (3) where and when the statements were made and (4) why they were fraudulent; see *In re Number Nine Visual Technology Corp. Securities Litigation*, *id.* at 9.  Plaintiffs contend they have pleaded with sufficient particularity.  Specifically they allege that the time of the misrepresentations and omissions of material fact occurred when the

15

OS and oral communication relating to it were published in May of 1998. The section above lists the alleged material misrepresentations and why they were fraudulent. Scienter and the particularity of allegations relating thereto is also discussed above. The Complaint specifically alleges that Advest established the bond limit, prepared and marketed the OS, received a fee; knew or recklessly disregarded basic material facts relating to enrollment, enrollment retention and financial aid; and knew or recklessly disregarded the lack of a Strategic Plan.

Plaintiffs contend that they have pleaded with adequate particularity; however, if the Court is dissatisfied requests leave to amend.

### (D)    Loss Causation

The defense admits the pleading of transactional causation but contends Plaintiffs have not adequate y pleaded loss causation. The Plaintiffs have lost the value of their investment and the Complaint at least implies that fact, C, ¶¶5, 74, 75, 82.

The defense also contends that loss causation was due to other defendants continuation of the construction project. Allegations regarding continuation of the project go only to mitigation of damages by fiduciaries.

Plaintiff contends adequate loss causation is pled but, if the Court is dissatisfied, requests leave to amend.

### (E)    Advest Was Not Merely A Secondary Actor

The Complaint alleges that Advest determined the maximum bond amount and had responsibility for preparation of the OS and marketed and sold the bonds. As can be seen from *Escott v. Barchris Construction Corp.*, 283 F.supp. 643 (1968). Advest as the underwriter had a duty to look behind management assertions and protect the investors. Such activity and duty

made Defendant Advest a significant contributor and not just a secondary actor who merited protection by the Central Bank Doctrine.

Moreover, at this stage of the litigation Plaintiffs contend that they have adequately pleaded that Advest played a significant role.

## III.    (A)    APPLICABILITY OF 12(A)(2) OF THE SECURITIES ACT

Defendant contends that it is exempt from the Section 12(a)(2) liability. It is Plaintiffs contention that, while the College may be exempt from registration, neither the College or other Defendants are exempt from the anti-fraud provisions of Section 12.

Defendant Advest is correct in stating that they were the underwriter of the bonds issued in May, 1998, by the College through the Massachusetts Industrial Finance Agency ("MIFA").

However, neither MIFA nor the Commonwealth were liable for any amount owed under the bonds. Bradford College was responsible for paying all amounts borrowed. Municipal bond issuances where a state instrumentality, for tax purposes, issues bonds for the benefit of a private entity are known as conduit financing. For more than thirty years, the SEC, the Courts and the commentators have realized that where the investor is actually relying on the promise of a private-non state entity to pay the bonds, there are actually two securities involved in the transaction: the formal security issued by the state instrumentality, and an "underlying" security-- the private entity's private contractual promise and obligation to repay all bond proceeds with interest. If the underlying security is not exempt from the 1933 Act anti-fraud provision, it's issuer must comply with those provisions.

The College's underlying promise to pay must be examined to determine if the Defendants are exempt from the anti-fraud provisions. Any person who offers or sells a security by use of prospectus or oral communications that is untrue or omits a material fact necessary to

17

make it not misleading can be held liable, see 15 U.S.C. 77l(a)(2). The foregoing section states they can be found liable regardless of whether they are exempted from registration by 15 U.S.C. 77c(1), (3)-(13). Congress, in drafting this law clearly decided not to exempt, from the anti-fraud provisions, non-profit education institutions such as the College, since such institutions are listed in 15 U.S.C. 77c(4) which is specifically not exempted as can be seen above. The statute specifically states that exemptions do remain intact for institutions and entities listed in 15 U.S.C. 77(c)(2) and (14). The section defense relies on is 77(c)(2). Clearly MIFA's security as an instrumental ty of the Commonwealth is exempt under 77(c)(2); however, the second security in the conduit financing which involved these defendants is not.

Advest argues that because the Bradford Bonds are not subject to Rule 131, an SEC registration rule concerning the conduit financing of certain types of industrial development bonds, Bradford's contractual promise to pay the bonds should not be considered a "security" subject to the act. But while the SEC's release on Rule 131 only dealt with industrial revenue bonds, it does not mean the "underlying security" analysis only applies to the types of conduit financing directly addressed by Rule 131. First, Rule 131 was promulgated to require securities registration of the underlying securities issued by the for-profit beneficiaries of industrial revenue bonds. Educational institutions like Bradford, however, are exempt from registration (but not the anti-fraud provisions), and could never have been required to register even if the SEC promulgated a rule that dealt with the conduit financing of non-profit private entities. It is not surprising, therefore, that issuers such as Bradford are not subject to the terms of Rule 131. More important, while the SEC has authority to regulate who is required to register their securities, it does not have the power to create or define securities. An investment vehicle must meet the requirements of the Securities Act if it is a "security". If an interest in the obligation of a private

18

entity to repay bond proceeds constitutes a "security", when the issuer of such an interest is the for-profit beneficiary of a conduit financing (which no one contests), then a security also exists when an identical type of interest is offered by a non-profit beneficiary of conduit financing. While the status of the issuers affects the exemptions for which the issuer or its securities can qualify, it does not affect whether the investment vehicle offered by the issuer is a "security". In *Gorsey v. I.M. Simon & Co*, Civ A No. 86-1875-2 (D. Mass. Feb 23, 1987) relied upon by the Defendants addressed the narrow issue of whether the security at issue fell within Rule 131, neither the Court or the parties addressed the broader issue of whether other "second securities" present in conduit financings, that did not fall within Rule 131, were exempt.

As seen above 15 U.S.C. 77(c)(4) exempts non-profit educational institutions from registration. It does not exempt such institutions from the anti-fraud provisions. The only institutions or entities exempted from the anti-fraud provisions are 77(c)(2) and (14). If Congress wanted to exempt educational institutions it easily could have stated that 77(c)(2) and (4) and (14) were exempt. Congress did not and we must interpret that to mean that Congress considered it and decided not to exempt educational institutions from the anti-fraud provisions. Moreover to argue that educational institutions that were consciously made answerable to the anti-fraud provisions is exempt from those provisions, just because it uses a governmental conduit to market its security, would have little rationale.

Exemptions from the Securities Act are narrowly construed. Here the exemption for securities issued by an educational entity is only an exemption from registration, and Defendants cannot point to a statutory exemption which exempts the "second security" issued by Bradford from claims under Section 12(a)(2).

Plaintiff respectfully contends that there is no exemption.

19

**(B)    STANDING FOR A SECTION 12(A)(2) CLAIM**

The defense argues that Plaintiffs have no standing as it was not alleged that their bonds were purchased in the initial public offering. The defense argues that plaintiffs only alleged that they "hold" the bonds and did not purchase them.

The Plaintiffs, however, do allege that this is an action brought by "purchasers" of Massachusetts Industrial Finance Agency Revenue Bonds, Bradford College Issue, Series 1998. See, C, ¶1.

The defense, therefore, cannot complain that a purchase was not alleged. Plaintiff McKeown purchased her bonds from Advest in May, 1998, and Plaintiff Lutts also purchased most of his from Advest in May, 1998. All that is required is that they be traceable to the initial public offering; see *In re Number Nine Visual Technology Corp. Securities Litigation, id.* at 9.

The Complaint does not allege an initial offering purchase; however, Plaintiffs contend it is implied. If the Court feels it necessary Plaintiffs request permission to amend.

**(C)    FACTS SUFFICIENT TO STATE A SECTION 12(A)(2) CLAIM**

The defense argues insufficient facts and insufficient particularity are alleged in the Complaint to sustain a Section 12(A)(2) claim. The defense references pp. 11-20 of their memorandum as reasons for its contentions. In response, therefore, plaintiff references their rebuttal rational, supra. Section, II A, B. and C. Moreover, plaintiffs contend that they are not required to plead scienter or reliance with respect to their 12(A)(2) claim, see 15 U.S.C. 77l(2). Plaintiffs have alleged that Defendants knew or in the exercise of reasonable care should have known that due to material misrepresentations and omissions the OS and oral communications regarding it were misleading, C, ¶87. The Plaintiff should be allowed to offer alternative pleading. To do otherwise would allow the Defendant to take the position that they were not

20

misleading but only negligent. This would avoid recourse to an investor protection statute, that was configured to approach a strict liability standard. The onus should now be on the Defendants to show due diligence.

## IV.   (A)   PLAINTIFFS HAVE STATED A CLAIM FOR VIOLATION OF THE MASSACHUSETTS SECURITIES LAWS

The defense contends this count should be dismissed because Plaintiffs have not adequately pleaded standing. The defense argues that Plaintiffs have not pleaded that the bonds were purchased in Massachusetts and have not pleaded they were purchased as part of the initial offering. Plaintiffs do not agree.

The Plaintiffs have pleaded that the bonds were issued by the College through MIFA an instrumentality of the Commonwealth, C, ¶1; that the Plaintiffs are residents of Massachusetts, C, ¶¶8, 9; that the College was located in Massachusetts and that the construction project was to take place in Massachusetts, see OS. Plaintiffs contend that they have adequately at least by inference pleaded that the purchase occurred in Massachusetts.

The defense also contends that the purchase did not relate to the initial offer and refers to its argument in prior section of its memorandum. Plaintiffs contend that it had adequately pleaded that the purchase is traceable to the initial offering and refers to the arguments in Section III, B.

The defense also argues that Plaintiffs have not pleaded a single material misleading representation or omission in the OS and refers to its prior memorandum arguments. Plaintiff contends that they have pled significant material misrepresentation and omission and refers to their arguments in Section II, A.

If the Court feels there are deficiencies in these areas, Plaintiffs request leave to amend.

21

**(B)    PLAINTIFFS HAVE STATED A CLAIM FOR FRAUD AND INTENTIONAL MISREPRESENTATION**

The defense argues that Plaintiffs common law count for intentional misrepresentation should be dismissed because they have not pleaded materially misleading statements or omissions by Advest and cite their arguments at pp. 11-27.  Plaintiffs have countered those arguments at Section II, A, and refers to those arguments in opposition.

The defense also contends that this count must be dismissed because Plaintiffs have not pleaded reasonable reliance.  Plaintiffs have alleged detrimental reliance with respect to this Count, C, ¶94.  Plaintiffs also alleged that the misrepresentations and omissions were material.  If they were material reliance would be reasonable.  Massachusetts is a notice pleading state.  The Plaintiffs particularity has gone far beyond notice in their pleadings.  The defense cites cases involving post-pleading proceedings such as, for Summary Judgment to establish that reliance must be reasonable.

Indeed, it may be that reliance must be reasonable; however, Plaintiffs contend that it has been adequately pleaded at this stage.  If the Court feels otherwise, Plaintiffs request leave to amend.

**C.    PLAINTIFFS HAVE STATED A CLAIM FOR NEGLIGENT MISREPRESENTATION**

The defense contends that this Count must be dismissed for failure to allege materially misleading statements or omissions and cite their previous arguments.  In response Plaintiffs refer to Section II, A, above contending their were such actionable material misrepresentations and omissions.

The defense also contends that dismissal is required for failure to allege reasonable reliance and cites their prior arguments.  In response Plaintiffs refer to Section IV, B, above

22

contending that alleging reasonable reliance is unnecessary and if it is, they have adequately plead, see C, ¶97.

The defense contends this Count must be dismissed because of failure to allege due diligence and failure of reasonable care and cites their previous arguments. In response Plaintiffs contend that they have adequately alleged failure of reasonable care, C, ¶97, and in further response, refers to its arguments in Sections II, B and E.

## V.    THE COMPLAINT SHOULD NOT BE DISMISSED AND CERTAINLY NOT WITH PREJUDICE

The defense contends the Plaintiffs should not be given leave to amend and should be dismissed with prejudice because they have had plenty of time to plead their case. They further infer that the Plaintiffs as putative members of the initial class action suit and benefactors of the tolling agreements have been intimately involved in the litigation process. That simply is not the case. These Plaintiffs were not actually involved in the case and did not realize they would have to obtain separate counsel until January, 2005. Their present counsel was retained in January, 2005. At that time the tolling agreements has been terminated and they had until January 30, 2005, to file before the Statute of Limitations ran. Present counsel had a wealth of information relating to the case from various investigations and other sources and is convinced the Plaintiffs have a viable case. There was, however, little time to file before the statue ran and that may have led to some pleading deficiency.

This is a complex pleading area. As the Court in *In re Number Nine Visual Technology Corp. Securities Litigation* at 23 noted:

> ". . . Who could have expected that, in little over half a century, society would become so chary of dealing with cases on the merits that the law, like some ancient amphibian would begin to slip back into the primeval ooze of common law forms of pleadings?"

23

### CERTIFICATE OF SERVICE

I, William A. Sheridan, hereby certify that I have served, a copy of

**Motion to Enlarge Page Limit of Plaintiffs Opposition to Defendant's Motion to Dismiss**

by mailing same to:


Scott A. Roberts, Esq.
Robert E. Sullivan, Esq.
A. Lauren Carpenter, Esq.
Sullivan Weinstein & McQuay, P.C.
Two Park Plaza
Boston, MA 02116

Atty. Sarah Walters
Jonathan L. Kotlier, Esq.
Nutter, McClennen & Fish, LLP
World Trade Center West
155 Seaport Blvd
Boston, MA 02110

Thomas G. Hoffman, Esq.
Thomas M. Greene, Esq.
Michael Tabb, Esq.
Greene & Hoffman
125 Summer Street, 14th Floor
Boston, MA 02110

_4/15/05_
Date

25