# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

T. ROWE PRICE TAX-FREE HIGH YIELD
FUND, INC., SMITH BARNEY INCOME
FUNDS/SMITH BARNEY MUNICIPAL
HIGH INCOME FUND, DRYDEN
NATIONAL MUNICIPALS FUND, INC.,
LOIS AND JOHN MOORE and ACA
FINANCIAL GUARANTY CORPORATION

                *Plaintiffs*,

    v.

KAREN M. SUGHRUE, GARRY L.
CRAGO, JEAN W. CHILDS, PAULA
EDWARDS COCHRAN, G. STEVENS
DAVIS, JR., JULIA B. DEMOSS, WILLIAM
R. DILL, LESLIE A. FERLAZZO, JOYCE
SHAFFER FLEMING, ERIC W. HAYDEN,
CATHERINE CHAPIN KOBACKER,
ANNE MARCUS, CELESTE REID,
RICHARD J. SHEEHAN, JR., JOSEPH
SHORT, GREGORY E. THOMAS, SUSAN
K. TURBEN, DONALD W. KISZKA and
ADVEST, INC.,

                *Defendants*.

Civil Action No.  04-11667 RGS
Consolidated into
Civil Action No. 05-10176-RGS*

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

*The original Motion to Dismiss was filed in the 04-11167-RGS case but the case has since been consolidated into 05-10176. For the Court's convenience, Plaintiffs have filed their Opposition to the Motion to Dismiss under both civil action numbers.

## TABLE OF CONTENTS

**FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

I.     PLAINTIFFS' HAVE SUCCESSFULLY ALLEGED VIOLATIONS OF THE SECURITIES
       EXCHANGE ACT OF 1934 AGAINST ALL DEFENDANTS . . . . . . . . . . . . . . . . . . . 11

       A.     The Standards For Determining Whether Plaintiffs Have Adequately Pled Causes of
              Action For Violating Rule 10b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       B.     Defendants' Disclosure of Information Regarding Future Enrollments Was
              Misleading and Plaintiffs Have Sufficiently Alleged Necessary Scienter. . . . . 14

              1.     Failure to disclose Bradford's plummeting acceptance rate and its lower
                     number of deposits was misleading, particularly in light of its misleading
                     disclosure of an increased number of acceptances. . . . . . . . . . . . . . . . . 14

              2.     The Amended Complaint alleges sufficient facts of scienter with regard to the
                     expected fall enrollment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

       C.     Defendants' Disclosure of Information Regarding Future Financial Aid Expenditures
              Was Misleading and Plaintiffs Have Sufficiently Alleged Necessary Scienter. . 24

              1.     The stated expectation that financial aid would likely decrease was false and
                     misleading, particularly in light of the fact that financial aid awards were
                     actually increasing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

              2.     Defendants' failure to disclose the financial aid data they possessed that
                     contradicted the disclosures in the Official Statement and painted the College
                     in a negative light is strong evidence of scienter. . . . . . . . . . . . . . . . . . 29

       D.     Defendants' Failure To Disclose Bradford's Student Retention Crisis Was
              Misleading and Plaintiffs Have Sufficiently Alleged Necessary Scienter. . . . . 32

              1.     By failing to make necessary disclosures of Bradford's historic inability to
                     retain students, the Official Statement was materially false and misleading.
                     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

              2.     Failure to disclose a known and urgent crisis raises a strong inference of scienter
                     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E.  Plaintiffs Have Sufficiently Alleged Defendants' False Disclosure of the Existence of a Strategic Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

F.  Defendants' Disclosure That Bradford Would Contribute $1 Million To The Renovation Project When It Had No Intention of Making Such a Contribution Was False, Misleading and Intentional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

G.  Plaintiffs Have Met The Minimal Burden Necessary To Plead Loss Causation Adequately . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

H.  Plaintiffs Can Sufficiently Tie All of the Defendants To Violations of the 1934 Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    1.  Advest was reckless in failing to confirm easily accessible information relevant to the bond offering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    2.  Plaintiffs Have Stated Causes of Action Under Section 10(b) Against The Officer Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    3.  The Trustee Defendants May Be Found Liable As Control Persons of Bradford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

II.  PLAINTIFFS HAVE STATED A CLAIM AGAINST ADVEST UNDER SECTION 12 OF THE SECURITIES ACT OF 1933. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

A.  Plaintiffs' Interest In Bradford's Contract To Repay The Bond Debt Is A Separate Security That Is Not Exempt From The Antifraud Provisions of the 1933 Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    1.  The agreement of a beneficiary of conduit financing to repay the proceeds of a municipal bond offering is a separate security which may be subject to the antifraud provisions of the 1933 Act. . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    2.  Neither the structure of exemptions permitted under the Securities Act or the purpose of the governmental issued security exemption support Advest's position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

B.  Plaintiffs' Have Properly Pled The Elements of a Section 12(a)(2) Claim . . . . . 61

    1.  Rule 9(b) Pleading Standards Do Not Apply To This Count . . . . . . . . 61

    2.  Plaintiffs have appropriately pled that the Official Statement contained materially false statements and misleading material omissions. . . . . . . . 62

    3.  Plaintiffs have standing as purchasers in the initial offering . . . . . . . . . 62

III.  PLAINTIFFS HAVE STATED CAUSES OF ACTIONS FOR THEIR MASSACHUSETTS
      STATUTORY AND COMMON LAW CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

      A.   Plaintiffs Have Stated Claims Against All Defendants For Violation of the Uniform
           Securities Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

           1.   The Massachusetts Uniform Securities Act Applies To An Offering of
                Massachusetts Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

           2.   The Bradford Defendants cannot escape liability as the officers and trustees
                of the entity that issued a misleading Official Statement merely because
                Advest underwrote a firm commitment bond offering. . . . . . . . . . . . . . . 64

                a.   The Uniform Securities Act did not intend issuers to not be "sellers"
                     in public offerings and the opposite holding would thwart the
                     purposes of the civil liability provisions. . . . . . . . . . . . . . . . . . . . 66

                b.   Some of the Plaintiffs were solicited by Bradford. . . . . . . . . . . . 73

           3.   Plaintiffs have sufficiently stated a claim for misrepresentation under the
                Uniform Securities Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

           4.   Plaintiffs' Claims Are Not Precluded By A Statute of Repose . . . . . . . . 75

      B.   Plaintiffs' Fraud Claims Plead Reliance With The Requisite Specificity and
           Plaintiffs Could Reasonably Rely on the Representations In Bradford's Official
           Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

      C.   The Bradford Defendants Responsible For the Misrepresentations In the Official
           Statement Can Be Held Liable For Negligent Misrepresentation To Initial Offering
           Bond Purchasers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

      D.   There Is No Basis To Dismiss The Plaintiffs' Chapter 93A Claims . . . . . . . . . . 86

      E.   The Court Cannot Consider The Trustee Defendants' Affirmative Defense That
           Massachusetts Statutes Immunize Them From Liability Because Facts Necessary To
           Establish The Defense Cannot Be Found In The Four Corners Of The Complaint Or
           Documents The Court May Consider On a Motion To Dismiss . . . . . . . . . . . . . 89

IV.   PLAINTIFFS SHOULD BE GIVEN LEAVE TO AMEND THEIR COMPLAINT IF THEY
      HAVE FAILED TO PROPERLY PLEAD ANY OF THE CAUSES OF ACTION . . . . 90

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

On May 13, 1998, Bradford College ("Bradford" or the "College"), a small private liberal arts college in Haverhill, Massachusetts floated a $17.93 million bond issue, the proceeds of which were to be used to build and renovate dormitories for the school's students.  The financing was bold, given that the college had failed to generate any surplus for nine straight years, and had only balanced its budgets by withdrawing money from its endowment or soliciting gifts.  Nonetheless, the Official Statement, the offering memorandum pursuant to which the bonds were sold, described a plan to operate profitably in the future based on an increased enrollment and reductions of financial aid.  The key to the viability of this vision was selective evidence described in the Official Statement that indicated that the college was successfully attracting increasing numbers of students without having to purchase such admissions by large grants of financial aid.  As a result of the representations described in the Official Statement, the five bondholder plaintiffs[1] in this action purchased $8.37 million of the bonds.  The sixth plaintiff, ACA Financial Insurance Corp. ("ACA"), insured an additional $5.51 million.

Unfortunately, the representations in the Official Statement regarding the College's ability to attract larger numbers of lower cost students were entirely false.  The increase in student enrollment was a one year blip, not a long term trend, and the Official Statement failed to include critical information that would have made it apparent that the College would not reach its enrollment targets.  With regard to financial aid, the statements regarding financial aid

---

[1]      Three of the bondholder plaintiffs, T. Rowe Price Tax-Free High Yield Fund, Inc., Smith Barney Income Funds/Smith Barney Municipal High Income Fund and Dryden National Municipals Fund, Inc. (collectively, the "Institutional Bondholders") are institutional investors who purchased the Bonds for mutual funds they managed. The remaining bondholder plaintiffs, Lois and John Moore (the "Moores") are a married couple who purchased the bonds from Advest for their own account.

commitments were simply false; aid awards for the present and upcoming years were increasing, not decreasing. The Offering Statement also failed to inform potential bond purchasers of the most serious financial problem facing Bradford, its inability to retain students who enrolled in its classes. The Offering Statement also misrepresented the "Plan" pursuant to which the College was going to turn around its financial performance. There was no such plan.

In this lawsuit, Plaintiffs seek to hold the trustees and officers of Bradford[2] and the underwriter of the bonds, Defendant Advest, Inc. ("Advest") liable for the misrepresentations contained in the Official Statement. All Defendants have moved to dismiss all claims, but because the Plaintiffs have adequately pled the existence of the misrepresentations, even under enhanced pleading rules applicable to securities actions, and because of Defendants' responsibility for those misrepresentations, Defendants' motions must be denied.

## FACTUAL BACKGROUND

Bradford was a small liberal arts college with an enrollment of less than 500 full time students for most of the 1990s. As noted above, starting in 1989, the College began to routinely operate in the red, running a deficit from its operations for every academic year between 1989 and 2000. Amended Complaint ("AC"), ¶ 60. By 1987, negative cash flow due to the recurrent annual operating losses had reached a critical point. The College's chief financial officer, Defendant Donald Kiszka informed the Board of Trustees in February 1987 that the College only had enough cash to survive another 2 to 3 years. AC, ¶ 47. Only by enacting "devastating" and

---

[2]     Defendant Joseph Short was the President of Bradford, and a trustee of the College through June 30, 1998. Defendant Donald Kiszka was the chief financial officer of the College, holding the titles of Treasurer and the Vice President for Administration and Finance. Short and Kiszka are collectively referred to herein as the "Officer Defendants." The sixteen remaining individual defendants were trustees of Bradford at the time of the bond issuance and through the announcement of the College's closing. They will be referred to herein collectively as the "Trustee Defendants."

2

"disruptive" cuts and freezing salaries – measures the officers and trustees were unwilling to make – would there be sufficient cash to operate for five years. AC, ¶ 47. At the very same meeting Defendant Thomas, a member of the Board committee that oversaw the College's admissions admitted there was "insufficient enrollment to assure the financial well-being of the College." AC, ¶ 52.

There were several sources for the College's financial problems. Perhaps most pressing was its continued inability to retain students. Only 40 % of its students graduated after matriculation, an extraordinarily high attrition rate. AC, ¶ 49. The New England Association of Schools and Colleges ("NEASC"), the College's accrediting body, found that student retention at Bradford was a "crisis" and the "pre-eminent financial fact" NEASC found that attrition was the major cause of Bradford's financial instability and gave the institution "scant hope" of fulfilling its aspirations. AC, ¶ 53.

Those students who did attend were given generous financial aid awards to entice them. The level of financial aid given to attract students had risen every year since 1989, and had reached a level well above average for comparable institutions in Massachusetts. AC, ¶ 56, 58. In the last full academic year prior to the bond offering, financial aid contributed by Bradford reduced its gross tuition by almost 50%. Official Statement (Exhibit A to the Amended Complaint) at A-14.[3] Effectively, Bradford was purchasing its admissions by awarding substantial financial aid.

---

[3]    As is customary in municipal bond offerings, the Official Statement consisted of a memorandum describing the offering, which was signed by MIFA, the state agency formally issuing the bonds and an appendix that described the operations and financials of the institution receiving the bond proceeds, Bradford. The appendix was signed by Short and Kiszka. Most of the misrepresentations and other relevant disclosures are contained in the appendix, and Plaintiffs will designate the appendix's pages as "A-_"

For the 1997-98 school year, however, full-time enrollment jumped 13% and the school's matriculation rate for accepted students climbed from 25% to 34%. Official Statement at A-8. The Trustees and Administration at Bradford came to believe that if they could keep increasing enrollment, the College could generate sufficient revenues to survive. The Administration and the Trustees decided to build new dormitories and renovate existing ones to house the new students they hoped to attract. AC, ¶ 42. To finance the construction project, they turned to Defendant Advest to underwrite a tax exempt conduit financing through the Massachusetts Industrial Financing Agency ("MIFA"). Advest determined that $17.93 million was the maximum bonding capability of the College and agreed to underwrite the issue. AC, ¶ 45. The Trustee Defendants authorized the bond offering in February 1998 on the recommendations of Advest and Defendants Short and Kiszka, the current president and chief financial officer of the College. AC, ¶ 42. One Bradford Trustee, William Nofsker, resigned rather than approve the offering, on the ground that the college did not have sufficient enrollment to justify the expansion plan. AC, ¶ 50.

MIFA issued a $17.93 million revenue bond offering, dated as of May 1, 1998. The Official Statement described the offering and contained Bradford financial statements and an appendix that summarized the financials and provided operational information relating to Bradford. This section of the Offering Statement was signed by Defendants Kiszka and Short. Official Statement at A-18. Although issued by MIFA, a body politic of the Commonwealth of Massachusetts, the bonds were not an obligation of the Commonwealth or MIFA and were solely payable by Bradford. Offering Memorandum Cover, 1.

For potential investors, the critical questions necessary to evaluate the risks in the

4

Bradford offering were whether the 1997 increase in enrollment was the beginning of a trend, as opposed to a random occurrence, and whether the school was subsidizing its increased enrollments by liberal financial aid awards. The Official Statement provided false and materially misleading information on both of these critical areas. With regard to admissions, after setting forth a table showing increases in the fall semester headcount from 484 full time equivalent students in 1993 to 584 students in 1997, the Official Statement, at A-13, stated:

> To attain the final goal of a balanced budget . . . the College is planning to increase enrollment to the level of at least 725 full-time students by fall 2000, with approximately 80% of those students living in campus facilities. As of April 3, 1998, applications received by the College to date total 879, an increase of more than 18% from April 3, 1997. The total of 879 exceeds total applications received for the fall 1997. . . .Based on this increase in applications, historic rates for conversion of applications into enrollments, the number of applications from freshmen and deposits received to date, the College believes that it can reach its goal of enrolling 225 new students for the fall of 1998 while increasing the quality of its students and reducing slightly the average amount of financial aid awards to such students from College funds.

While application numbers had technically risen, the Official Statement failed to disclose critical information investors needed to know to assess the realistic likelihood that the College would meet its goals. The College did not disclose that despite the increase in applications, the College's acceptance rate – the percentage of applicants it deemed worthy of admission had sharply dropped, from 80% to 70%. The number of actual acceptances had also dropped. AC, ¶ 62. Perhaps even more importantly, the number of students who had committed to attend Bradford by actually paying a deposit – the best indication of how many new students would actually enroll – had declined by almost 20%. AC, ¶ 63.

Moreover, disclosing the increase in the number of applications, even if technically

5

correct, was misleading because of the College's decision to accept applications off the internet.

The college knew that it was easier for web applicants to apply to several schools, making it less

likely that such applicants would attend if accepted. The College knew that accepting web

applications would artificially inflate the application numbers, but reduce the institution's

acceptance and matriculation percentages. AC, ¶ 61.

If the College's disclosure of admission trends was misleading, its disclosures relating to

financial aid were outright fraudulent. The Official Statement, at A-13, recited:

> [D]uring the 1997-98 academic year, the College estimates that financial aid will be reduced to 29.9% of student income versus 30.3% the previous year. This expected reduction is a result of change in methodology of aiding students with college-funded support versus additional loans funded by students and/or parents. The College's financial plan currently calls for a further reduction of financial aid spending for 1998-1999 academic year to 28.8% of student income.

The Official Statement was dated as of May 1, and not formally released until May 13,

AC, ¶ 67,[4] near the end of Bradford's academic year, and long after the financial aid

commitments to students attending the fall and spring terms had been made, as well as long after

the college had determined the amount of student income it would receive for those two terms.

AC, ¶ 56. Financial aid for the 1997-98 academic year actually consumed over 35% of student

income, a 17% increase over the preceding year, not a reduction. Moreover, the College knew its

---

[4] The Amended Complaint has inconsistent allegations regarding when the Official Statement was released to the public. Paragraph 46 states that the bonds were issued on May 1, 1998 while paragraph 67 states the bond financing closed six days prior to May 19, 1998, which, of course, would be May 13, 1998. The latter date is correct. The bonds were issued "as of" May 1, 1998, and all papers necessary to complete the bond offering, were executed on May 13, including, Advest's underwriting agreement, the Loan and Trust Agreement pursuant to which the bonds were issued, and an Officers' Certificate signed by Defendants Kiszka and Short certifying that no adverse material change has occurred since the date of the financial and statistical information included in the Official Statement, and that no event has occurred which needs to be disclosed so that any information in the Official Statement will not be misleading in any material respect. Plaintiffs, of course, can amend their complaint to include this information and clarify the bond issuance date.

6

budget figures were misleading because the Spring 1998 enrollment was less than budgeted, while the amount of financial aid committed was $250,000 more than budgeted. AC, ¶ 56.

The predictions for the forthcoming financial year were also false. Although the Official Statement credited a reduction in the amount of financial aid to a new methodology in calculating aid, such a plan was a fiction. There was no new methodology and the persons responsible for awarding financial aid were never advised or instructed to make any reductions or initiate changes. AC, ¶ 59. Indeed, the College's 1998-99 budget, which was submitted to the Trustee Defendants just two days before the official date of the bond offering, budgeted 31.3% of student income, not 28.8% of student income, on Bradford financial aid. AC, ¶ 57. Moreover, the actual financial aid commitments, which had already been made to the incoming students prior to the May 1 issuance, proved to be even higher, coming in again at 35% of student income. AC, ¶ 70.

The Official Statement did not alert investors to any kind of student retention problem at Bradford. Indeed, by only disclosing fall semester headcounts, instead of fall and spring semester, investors were unable to realize that Bradford's student retention problem was so severe that it lost significant numbers of students after just one semester. Spring semesters historically manifested a 7% attrition rate. AC, ¶ 54.

The Official Statement repeatedly referenced the College's plan to expand Bradford's enrollment and achieve financial equilibrium. But as determined by NESAC, who did its decennial accreditation review just a few months after the bond issuance, there was no such plan. There was no plan to deal with student retention, no plan to reduce financial aid, no plan to increase the student body to the target disclosed in the Official Statement and no plan to determine why the College's budgeting process required it to go through annual budget crises. In

7

short, NESAC concluded, there was no strategic plan.  AC, ¶60.

The Bondholder Plaintiffs each purchased bonds as part of the initial offering from Advest. Advest sought insurance to assist with continuing sales of the bonds. It sent the Official Statement to Plaintiff ACA to review and ACA also had conversations with Kiszka. Based on the representations in the Official Statement and the conversation with Kiszka, ACA agreed to provide financial insurance for $5.51 million of the bonds.  AC, ¶ 66, 67.

In the September after the bond issuance, the problems hidden by the Official Statement rose to the surface. The fall 1998 enrollment was substantially lower than projected by the College, with much of the problem attributable to upperclass attrition.  AC, ¶ 68. Those who did attend received record amounts of financial aid.  AC, ¶ 70. Financial aid was provided to 90% of the student body, as opposed to a disclosed rate of 80%, and the average recipient got $9,660, far more than 50% of Bradford's gross tuition.  AC, ¶ 72. Although there was no longer a need for expanded dormitory space, Bradford did not cancel the project and return the unspent funds to the Bondholders. Instead, it continued to build dormitories for non-existent students elected to cut funding for student recruitment.  AC, ¶ 71, 72.

By the fall of 1999, it was clear that the College could not achieve the enrollment required to pay the bonds.  AC, ¶ 75. In November 1999, the College announced that it would cease operations at the end of the school year.  AC, ¶ 76. The bonds were declared in default in January, 2000.  AC, ¶ 78.

## PROCEDURAL BACKGROUND

The Institutional Bondholders and ACA filed a class action lawsuit relating to the Bradford bonds in this Court within a year of the announcement of the school's intended close.  AC, ¶ 79. At

8

that time, however, there was some optimism that an orderly liquidation of Bradford's assets might result in payment of the Bonds. All of the Defendants and Bradford, consequently, entered into tolling agreements relating to the Plaintiffs' claims, in exchange for the Institutional Bondholders and ACA dismissing, without prejudice, the original lawsuit. The agreements specifically referenced the statutes of limitation and statutes of response relating to the Plaintiffs' federal and state securities claims, and Defendants agreed they would be estopped from raising such statutes as a defense to all the Plaintiffs' claims[5]. Each of the Plaintiffs, is a party to, or an intended beneficiary of, the tolling agreements. AC, ¶ 79.

Bradford filed for bankruptcy in 2001, and by 2004, although the bankruptcy had not been concluded, it became clear that the College's assets would not be sufficient to pay the outstanding bonds. In July 2004, the bondholder plaintiffs, but not ACA, filed a new lawsuit in this Court alleging violations of Rule 10b-5 and Section 10 of the Securities Exchange Act of 1934 (Count I), violation of Section 20 of the 1934 Act (Count II) and violation of Section 12 of the Securities Act of 1933 (Count III). At the same time, all of the plaintiffs filed a parallel action in Massachusetts Superior Court alleging violations of the Massachusetts Uniform Securities Act, the Massachusetts Consumer Protection Act, and common law claims of fraud, negligent misrepresentation and breach of fiduciary duty.

Defendants moved to stay the state action pending resolution of the plaintiffs' federal securities claims in this Court and on January 18, 2005 the Superior Court granted defendants' motion. Consequently, on January 21, 2005 the Plaintiffs amended their complaint to add ACA as

---

[5]    Copies of the tolling agreements are attached as Exhibits 1 and 2 to the Plaintiffs' Motion To Strike In Support Of Their Opposition To Defendants' Motions To Dismiss.

9

a party and to add the state law causes of action previously only brought in the state action, Counts

IV through VIII of the Amended Complaint.  With the exception of those paragraphs relating to

ACA's issuance of insurance on the bonds, the factual allegations of the Complaint were not revised.

Nor were the allegations relating to the federal securities counts, Counts I through III, altered.

Coincidentally the Trustee and Officer Defendants filed their motion to dismiss the original

complaint on the same date.  The Amended Complaint, however, was filed before the Motion to

Dismiss and Plaintiffs were aware not of the Bradford Defendants' grounds for seeking dismissal

of the complaint.[6]

Accordingly, although the Court has before it an Amended Complaint, Plaintiffs have not

previously had the opportunity to address any pleading deficiencies or errors alleged by the

Defendants.  Not surprisingly, Defendants allege several such deficiencies in their motion.  As

demonstrated below, Plaintiffs believe most of these alleged deficiencies have no merit or can be

ignored. In the event, however, that the Court does agree that the Plaintiffs have stumbled over some

of the pleading intricacies in a federal securities action, they request the opportunity to amend to

cure.  Plaintiffs have not pled evidence in their complaint, but they can provide additional details

regarding what the Defendants and Bradford did (and did not do) in connection with the issuance

of the bonds and the Official Statement. Given Rule 15's mandate that amendments to pleadings

should be liberally allowed and the acknowledged Byzantine complexity of the securities pleading

requirements, see In re Number Nine Visual Technology Corp. Securities Litigation, 51 F. Supp. 2d

---

[6]      This explains why the Court has three motions to dismiss filed by two sets of defendants before it.
Because the Amended Complaint did not alter the allegations relating to the federal claims, the parties stipulated that
the Defendants would respond to the Amended Complaint, but that the Bradford Defendants could leave their original
motion to dismiss on file, and would only have to address the recently added state claims if they moved to dismiss the
Amended Complaint. Advest, which had not filed a responsive pleading or motion to dismiss, has dealt with both the
state and federal claims in its motion to dismiss the Amended Complaint.

1, 27, n. 22 ("Number Nine")(Young, J., noting the "gamesmanship" required to successfully plead

a securities claim is now reminiscent of pre-Federal Rules pleading practices), Plaintiffs should be

given at least one opportunity to repair any pleading deficiencies.

**ARGUMENT**

## I.    PLAINTIFFS' HAVE SUCCESSFULLY ALLEGED VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AGAINST ALL DEFENDANTS

Seven of the eight counts Plaintiffs have brought are premised on misrepresentations and

omissions found in the Official Statement.[7] Defendants assert that each of these counts fail because

the Plaintiffs have failed to plead the existence of a materially misleading statement as a matter of

law, and that even if such statements or omissions could be found, Plaintiffs have failed to meet the

applicable pleading standards that attach to these counts.  There is little doubt that the highest

standard applies to Count I, Plaintiffs' claims for violation of § 10 of the 1934 Act and Rule 10b-5

under the Act.  Consequently, if Plaintiffs establish that they have successfully established causes

of action against the Defendants under Count I, there should be no question that they have

successfully plead the misrepresentation elements of their other counts.  To avoid duplication

Plaintiffs will not repeat the misrepresentation analysis in those sections of this memorandum.

Plaintiffs allege five categories of misrepresentation in the Official Statement: (1)

misrepresentation of expected enrollment; (2) misrepresentation of financial aid awards; (3) non-

disclosure and misrepresentation of student retention problems; (4) misrepresentation of existence

of a strategic plan and (5) misrepresentation of the College's intent to contribute to the capital

---

[7]    The only exception is Count VIII, against the Trustee and Officer Defendants, for breach of their fiduciary duties owed to the creditors of Bradford.  Plaintiffs have decided to drop this claim and will not oppose the Bradford Defendants' motion to dismiss this count.

11

improvements being financed by the bonds.[8]  After setting forth the standards for evaluating the sufficiency of the Plaintiffs' pleading, Plaintiffs will examine each of the alleged misrepresentations to determine whether they have successfully stated the existence of a material false or misleading statement, and whether, for each alleged misrepresentation, there are sufficient facts alleged to raise a strong inference of scienter.  Plaintiff will then examine the remaining issues raised with regard to their 1934 Act claims:  whether Plaintiffs have sufficiently alleged loss causation; whether sufficient facts are alleged to tie the specific defendants to the alleged misrepresentations; and, with regard to the Officer and Trustee Defendants, whether Plaintiffs have sufficiently alleged control person liability under § 20.

A.    The Standards For Determining Whether Plaintiffs Have Adequately Pled Causes of Action For Violating Rule 10b-5

Even in connection with a motion to dismiss a securities fraud action, the basic principles of Rule 12(b)(6) jurisprudence still guide this Court.  "We must accept the allegations of the complaint as true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the law, we must deny the motion to dismiss."  In re Segue Software Inc. Securities Litigation, 106 F. Supp. 2d 161, 165 (D. Mass. 2000), citing Vartanian v. Monsanto Co. 14 F.3d 697, 700 (1st Cir. 1994).  All reasonable inferences must be granted in favor of the plaintiff.  In re Raytheon Securities Litigation, 157 F. Supp. 131, 145 (D. Mass. 2001).

To state a cause of action under Rule 10b-5, the plaintiff must simply plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiffs' reliance upon the

---

[8]    The Amended Complaint does devote a subsection, ¶s 47-48, to alleging that the Official Statement did not disclose the financial crisis recognized by the Trustee and Officers in February 1997.  Plaintiffs do not contend that Defendants were obligated to disclose the content of that meeting in the Official Statement.  As described below, however, the Officers and Trustees' recognition that Bradford was in financial crisis and would soon have insufficient cash to operate is highly relevant evidence of scienter.

12

statement or omission caused the plaintiffs' injury. Gross v. Summa Four, Inc. 93 F.3d 987, 992 (1st Cir. 1996). Claims under Rule 10b-5, however, fall under the heightened pleading specificity requirements established by Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4. Aldridge v. A. T. Cross Corp., 284 F. 3d. 72, 78 (1st Cir. 2002)("Aldridge"). To meet these requirements, the plaintiffs must set forth each allegedly misleading statement or omission, including its time, place and content. In Re PerkinElmer, Inc. Securities Litigation, 286 F. Supp. 2d 46, 51 (D. Mass. 2003). Plaintiffs must further provide factual support for the claim that the statements or omissions were fraudulent, that is why the statements or omissions were misleading. Aldridge, 284 F.3d at 78. Plaintiffs are also required to set forth sufficient facts that give rise to a "strong inference" of scienter rather than merely a reasonable inference. In re Cabletron Systems, Inc. 311 F.3d 11, 28 (1st Cir. 2002)("Cabletron"). Notwithstanding the specificity requirements established by Rule 9(b) and the PSLRA, the Plaintiffs are not required to plead evidence. Cooperman v. Individual, Inc., 171 F.3d 43, 48-49 (1st Cir. 1999).

Here both sets of Defendants assert that the alleged misrepresentations and omissions relied upon by the Plaintiffs are not material as a mater of law. Information which would have assumed actual significance in the deliberations of a reasonable security holder is material. Cabletron, 311 F.3d at 34. With regard to an alleged omission, the omitted fact is material if is substantially likely "that the disclosure of the omitted fact would have been viewed by the reasonable investor as having materially altered the 'total mix' of information made available." Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). While Rule 10b-5 does not create an affirmative duty of disclosure, such a duty will arise if an issuer has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information. Gross v. Summa Four, Inc. 97

13

F.3d 987, 992 (1st Cir. 1996). In general, the materiality of a statement or omission is a question of

fact that should normally be left to jury rather than resolved by the court on a motion to dismiss.

Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 176 (1st Cir. 1994).

> With these principles in mind the Court can analyze the sufficiency of the Plaintiffs' 10b-5

allegations.

> B.    Defendants' Disclosure of Information Regarding Future Enrollments Was
>        Misleading and Plaintiffs Have Sufficiently Alleged Necessary Scienter.

>>       1.    Failure to disclose Bradford's plummeting acceptance rate and its lower
>>             number of deposits was misleading, particularly in light of its misleading
>>             disclosure of an increased number of acceptances.

As noted above, one of the critical issues for any potential purchaser of Bradford's bonds was

whether the fall 1997 increase in enrollment was a fluke or the beginning of a trend that would allow

Bradford to generate operational surpluses. Had the Official Statement merely stated the College's

goal to increase enrollment to 725 students, including 225 new students for the 1998-1999 academic

year, it is arguable that such forecasting would have been the type of broad, optimistic statements

about a company's future that cannot be the basis of a claim under the securities laws, especially

when accompanied by a disclaimer that the College might not reach these targets. See. e.g. In re

Stone & Webster Securities Litigation, 253 F. Supp. 2d 102, 117 (D. Mass. 2003).

> The Official Statement, however, went further, misleadingly informing investors of objective

statistics–some disclosed, some undisclosed–that purportedly confirmed the College's forecast.

>> As of April 3, 1998, applications received by the College to date total 879,
>> an increase of more than 18% from April 3, 1997. The total of 879 exceeds
>> total applications received for the fall 1997. . . . Based on this increase in
>> applications, historic rates for conversion of applications into enrollments, the
>> number of applications from freshmen and deposits received to date, the
>> College believes that it can reach its goal of enrolling 225 new students for

14

the fall of 1998 while increasing the quality of it students and reducing slightly the average amount of financial aid awards to such students from College funds. Official Statement, at A-13. (emphasis added)

As required by the PSLRA, the Complaint describes why this disclosure is false and misleading. To assert that the College's target is obtainable, the Official Statement relies on three current and statistics known (or knowable) by the Defendants: (1) an increased number of applications (which is disclosed); (2) the historic rate of conversion of applications into enrollments (which is disclosed, but is misleading for reasons that are not disclosed), and (3) the number of deposits received to date (which is not disclosed). Of the three statistics, the number of deposits is the most reliable indicator of enrollment for the upcoming year. Students who actually pay money to the College to reserve a place are most likely to attend and pay the tuition and fees that will be used to repay the bond debt. But the number of deposits received at the time of the offering was down by 20% from a year earlier[9], AC, ¶ 63, a very strong indication that enrollment in the fall would not increase, but fall. Which is what occurred, AC, ¶ 68.

The historic rate of conversion of applications into enrollments (which was partially disclosed)[10] might be relevant if there was reason to believe that the historic rate would apply. However, the College knew, but failed to disclose, that the acceptance rate had dropped dramatically, from 80% to below 70%. AC, ¶ 62. This was not because the College had become more selective

---

[9]     The Defendant and Officer Defendants complain that ¶ 62 does not specify what the alleged 20% reduction applies to. It is obvious from the context of the Amended Complaint that the plaintiffs are comparing statistics from the prior year at the same time. These figures come from Admissions status reports generated in the ordinary course of business by Bradford and circulated to, among others, the president and CFO. If necessary, the Plaintiffs can include such detail in an amended pleading.

[10]     The conversion rate could be calculated from the figures disclosed on the Admissions Trends table on A-8 of the Official Statement. They ranged from a low of 19.7% for the fall of 1994 to a high of 27.1% for the current year. Putting aside the extraordinary year of 1997-98, the historic average rate was 20.2%. Taking the most recent year into account, the average was 21.6%.

15

due to increased competition for available spots. Even though the College was intentionally trying to increase enrollment it was actually accepting less students. AC, ¶ 62. The quality of student applying had declined. AC, ¶ 62.

The one figure the College fully disclosed, the number of applications, was clearly the least relevant number for evaluating future enrollment. This was clear from the Admissions Trends Table on page A-8 of the Official Statement. The year Bradford received the fewest applications, the current year, it had the most enrollments and the highest headcount. The year it received the most applications, 1994, it had the lowest rate of converting applicants into enrollees (19.7% compared to 27.1% for 1997). Yet not only did Bradford tout the least relevant statistic, which by itself is not a securities violation, but the Complaint properly alleges that this statistic was misleading and inaccurate because the application numbers were not comparable to prior years without further disclosure.

The Amended Complaint alleges the current year's application numbers were not comparable to prior years because Bradford had begun to accept and count standardized web applications, a change the College knew artificially inflated the application numbers. AC, ¶ 62. Web applicants applied to more schools because of the ease in applying and consequently were less likely to attend any particular school to which they applied.[11] AC, ¶ 62. Defendants dispute that acceptance of web applicants leads to a material change in the acceptance or matriculation rate. Even under the heightened standard applied to federal securities cases, however, the Court must still draw reasonable

---

[11]    A web applicant who applies, and is accepted to, ten schools will reject nine. A paper applicant who only applies, and is accepted to, five schools, will only reject four. When a college's pool of multi-application applicants increases, its matriculation rate for accepted applicants will almost certainly fall, since the odds of converting multi-application applicants into enrollees are much longer.

16

inferences in the Plaintiffs' favor. It is a reasonable inference that students who apply to a school with a push of a computer key have less commitment than those who go through the effort to obtain and return a paper application.

Moreover, Defendants ignore the allegations in paragraph 62 that Bradford knew that students who submitted web applications were less likely to attend, that it knew the matriculation rate would decline (which it did), and that it knew counting web applications artificially inflated application numbers.[12] If the College itself thought this statistic was not indicative of increased admissions, it should have never been disclosed it, or, at a minimum disclosed the differences between the two application figures. Thus, the Amended Complaint includes sufficient allegations to establish that every element that allegedly supported the College's assertion that it would likely meet its September 1998 goal was misleading.

Defendants assert that Plaintiffs have not establish that the undisclosed interim admissions statistics are material because there are no allegations in the Amended Complaint regarding when the College had materially significant numbers of applications and acceptances. However, it is the Defendants who made misleading references to the number of deposits already accepted, the number of applications already received and the College's acceptance rate. The fact that Defendants partially disclosed this information voluntarily demonstrates that they believed the interim statistics were material in assessing whether Bradford would meet its enrollment targets in the coming semester.

---

[12]     The Trustee and Officer Defendants question Plaintiffs' source for these allegations. Although the Plaintiffs are not required to plead evidence, these allegations are based on a Bradford memorandum summarizing a presentation by Bradford admissions personnel explaining to the Board of Trustees why the admissions rate had dropped. The memorandum describes the "softness" of internet applications, how half completed internet applications were included in the application count when a paper equivalent had not historically been counted as applications and how these changes from historical treatment had been introduced by the new head of admissions who had taken the post in September 1997 prior to the bond issuance. The memorandum specifically states that the inclusion of web applications "artificially increases numbers." These facts can be included in an amended pleading.

17

Indeed, the Official Statement presents this information as if these statistics are highly material to this important factor.[13]

Defendants contend that they cannot be liable for their projections of future enrollment. They rely on the First Circuit's opinion in Shaw v. Digital Equipment, Corp., 82 F. 3d 1194, 1209 (1st Cir 1996) ("Shaw"), asserting that its holding makes it plain that Bradford had no obligation to disclose its forward looking projections or opinions.   But Shaw confirms that even if Defendants had no obligation to disclose the projections, once they had voluntarily done so liability may attach if there is no reasonable basis for the projection. 82 F. 3d at 1211, n. 21. The facts alleged by the Plaintiffs raise an allowable inference that there was no reasonable basis for the prediction, and that Defendants did not act in good faith. See Section I.B.2, infra.

It is equally well established that "(w)hen a corporation does make a disclosure--whether it be voluntary or required--there is a duty to make it complete and accurate." Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir.1987). Disclosed facts may "not be 'so incomplete as to mislead.'" Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir.1990) (en banc) (quoting SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir.1968), cert. denied, 394 U.S. 976 (1969)). Here, Bradford's selective disclosure of admissions data could clearly be found to mislead; it publicized only the favorable statistics, while concealing the more relevant unfavorable information.

Moreover, disclosures which appear to be couched as a projection, frequently make

---

[13]     Defendants fail to consider the well-known admissions cycle for U.S. colleges and universities. Prospective freshmen file their applications in the fall while colleges and universities make their admissions decisions in the winter and early spring. By May 1, the date of the Official Statement, students have to return deposits in order to guarantee their spaces. Consequently, by May 13, the date the Official Statement was released, Bradford would not only have made its decisions on virtually all of its applications, but it would have received the incoming class' deposits. Thus, the admissions information available on May 13 (or May 1) was highly probative of the likely enrollment for the upcoming term. If the Court cannot take judicial notice of these facts, Plaintiffs can set them forth in an amended pleading.

18

actionable representations about the present. A prediction about the future contains at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a rational basis for that belief, and (3) the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement. Helvig v. Vencor, Inc. 251 F.3d 540, 557 (6th Cir. 2001); In re Sepracor, Inc. Securities Litigation, 308 F. Supp. 2d 20, 33-34 (D. Mass. 2004). For the reasons described above, the selective disclosure described is actionable because undisclosed facts that undermined the accuracy of the statements were known to Bradford and the Defendants and there was no reasonable basis for belief in light of the most recent, most relevant admission statistics. Further, for the reasons set forth below, a strong inference can be drawn that Bradford and the authors of the disclosure did not genuinely believe the projection. Thus, the Plaintiffs' Complaint does not allege misrepresentation with regard to vague predictions of the future, but instead alleges that "hard" present facts were either not disclosed or misleadingly disclosed.

This claim's focus on the failure to properly disclose present facts defeats Defendants' invocation of the "bespeaks caution" doctrine. That defense precludes liability for "soft" information, such as forecasts, estimates, projections and opinions when such statements are accompanied by cautionary disclosures that adequately warn of the possibility of different results. Shaw, 82 F. 2d at 1213. Here, Defendants claim Plaintiffs were adequately warned of future enrollment disappointments because directly following the enrollment disclosure, the Official Statement also stated "failure to achieve this enrollment goal and future enrollment targets may adversely affect the College's ability to reach Financial Equilibrium."

But as Shaw makes plain, the bespeaks caution doctrine has no application to a statement which has the appearance of a projection, but also implicitly makes a false statement of present fact.

19

> To the extent plaintiffs allege that the . . . statement encompasses [a] representation of *present fact*, and that such a representation was false or misleading when made, the surrounding cautionary language could not have rendered the statement immaterial as a matter of law. *See Harden* [v. Raffensperger], 65 F.3d [1392] at 1405-06 (explaining that the bespeaks caution doctrine cannot render misrepresentations of "hard" fact nonactionable]

82 F.3d at 1213 (emphasis in original) See also In re Number Nine Visual Technology Corp. Securities Litigation 51 F. Supp. 2d 1, 19 (D. Mass. 1999)("Number Nine") ("The 'bespeaks caution' defense is inapplicable where, as here, the plaintiffs challenge the truthfulness of a claim regarding *present facts* as opposed to forward-looking statements", citing Shaw (emphasis in original)).

The projections of the fall enrollment are not immaterial as a matter of law and the Plaintiffs have set forth sufficient facts explaining why the statement was false and misleading. As set forth below, they can also make a strong showing of scienter.

> 2.    The Amended Complaint alleges sufficient facts of scienter with regard to the expected fall enrollment

Liability under Section10(b) and Rule 10b-5 requires scienter, "a mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976). This can be pled by allegations that give rise to an inference that defendants said one thing while believing or knowing another. In re Segue Software, Inc. Securities Litigation, 106 F. Supp. 2d 161, 166 (D. Mass. 2000). Plaintiffs must show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness. Aldridge, 284 F. 2d at 82.

To meet the heightened pleading requirements of the PSLRA, Plaintiffs are required to set forth sufficient facts that give rise to a "strong inference" of scienter. However, the inferences need not be irrefutable. Cabletron, 311 F.3d at 38. "Plaintiffs need not foreclose all other

characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder." Aldridge, 284 F. 3d at 82. Even when evaluating the strength of Plaintiffs' scienter evidence, Plaintiffs are still entitled to have all reasonable inferences drawn in their favor. Id.

Defendants assert that the Plaintiffs have not sufficiently plead scienter because some of the traditional badges of scienter, such as insider trading or personal financial interest in the bond financing, are not present. To require such evidence, of course, would make it impossible to plead securities fraud with regard to any bond issuance by a non-profit entity, since by definition such organizations do not issue equity to shareholders. The First Circuit, however, has rejected a rigid formula for pleading scienter, preferring to rely on a "fact-specific approach" that proceeds case by case. Cabletron, 311 F.3d at 38.

However, in the leading First Circuit case concerning scienter pleading under the PSLRA, Greebel v. FTP Software, Inc., 194 F.2d 185, 196 (1st Cir. 1999), the Court of Appeals did specify certain fact patterns that are relevant to demonstration of scienter, at least two of which are relevant here: the divergence between internal reports and external statements, and disregard of the most current factual information before making statements. Here, of course, when the Official Statement pronounced optimism in meeting the enrollment target, such hope was contradicted by the internal reports, which indicated that the College would do significantly worse than the prior year. This pronouncement was also at odds with the current figures possessed by the authors of the Official Statement.

Even more probative of scienter, however, is the nature of the selective disclosure. As summarized above, the officers, trustees and underwriter had access to three statistics that had some relevance to the fall enrollment numbers. Only one of these three, the number of applications, was

21

positive; yet it was the only one disclosed. Not only were the two negative statistics (acceptance rate and number of deposits) not disclosed, those statistics were far more probative as to whether the enrollment target could be met. If the officers, Trustees and underwriters were really trying to give prospective investors insight as to the likelihood of Bradford achieving its goal, it is highly doubtful they would have publicized the number of applications and ignored the more relevant statistics. On the other hand, if they were attempting to manipulate investors and conceal weaknesses that would likely discourage investors from financing the project they would disclose precisely in the manner adopted in the Official Statement. The deliberate concealment of the most relevant statistics while disclosing more favorable, but untrustworthy statistics, is strong evidence that the Defendants did not act in good faith. And this analysis, does not even take into consideration that the application data itself was misleading because of failures to disclose material differences between the way applications were obtained in prior years.

The fact that Defendants included and focused upon the application data in the Official Statement, knowing that the undisclosed recent changes in admissions procedures artificially inflated the number of applications, AC, ¶ 62, is also strong evidence of scienter. Knowingly comparing statistics from two periods without disclosing changes in the method of compiling set data which make the comparison dubious is plainly evidence of intent to deceive or manipulate.

The Court can also take into consideration the subjective knowledge of the Trustee's and Officers, as evidenced by the February 1987 Trustee's meeting. Only fifteen months earlier, one of the authors of the Official Statement, Kiszka, informed the Board, that the College would likely only survive two or three more years if nothing changed. ¶ 47. None of the allegations in the Amended Complaint, or the disclosures in the Official Statement, or the information in the Financial

22

Statements gives any indication that the financial situation had changed at all in the interim.[14] The Bradford defendants' knowledge of the precarious financial condition, and their failure to make disclosures (or to check the accuracy of disclosures actually made) to persons who were going to loan funds to that institution, is information the Court can and should consider in weighing whether their conduct was knowing or reckless.

Although none of the Bradford trustees and officers would personally profit from the bond issuance, their knowledge that the school's survival was on the line is also evidence to be considered in assessing scienter. Several cases have recognized that the serious deterioration of an entity's financial health is a motive for the alleged fraud and should be considered as evidence of scienter. Cabletron, 311 F.3d at 39; Aldridge,284 F.3d at 83; Nathenson v. Nonagen, Inc., 267 F.3d 400, 425 (5th Cir. 2001). This is particularly the case where the conduct involved hides the severity of the financial decline from investors. Even if they would not directly profit from the bond offering, the Court can take into consideration that the Bradford Defendants had invested substantial personal and professional commitment to the College. It is not surprising that they would take reckless action to try to finance a project they viewed as the only viable alternative to liquidation, a step they steadfastly refused to consider. AC, ¶ 73. Allowing the 195 year old institution to expire on their watch would be a personal and professional disgrace. This is a considerable motive for manipulating the information provided to investors who represented the last best hope for Bradford.

Taken together, all of this conduct is more than adequate evidence of scienter.

---

[14]    The Financial Statement for 1997, attached as Appendix B to the Official Statement, which was released seven months after the February 1997 trustees' meeting does not indicate any change in the financial condition of the College. Although net assets increased by $361,600, more than $1.2 million of the College's "income" was an unrealized gain on investment assets, a surplus which could disappear in short notice if the markets turned. Putting aside investment gains and gifts of more than $1.35 million, Bradford's operations lost $4.5 million. Appendix B at 3. Nor did things look any better in the current year, in which the operational loss was about the same amount.

C.    Defendants' Disclosure of Information Regarding Future Financial Aid Expenditures Was Misleading and Plaintiffs Have Sufficiently Alleged Necessary Scienter.

1.    The stated expectation that financial aid would likely decrease was false and misleading, particularly in light of the fact that financial aid awards were actually increasing.

The Official Statement devotes substantial attention to Bradford's grant of financial aid to its students. See, e.g. Official Statement at A-10. The tables on page A-10 show that the amount of such awards increased every year between 1993 and 1997 while the financial statements make it clear that the Bradford's grants of financial aid were a substantial charge against the tuition income it would otherwise have earned. MIFA's disclosure notes that the award of financial aid to students (along with 10 other factors, such as "competition", "legislation" and "costs") are "things" that will affect Bradford's future revenue and expenses. Official Statement at 11. The Official Statement makes it clear that financial aid awards are material to Bradford's finances.

In at least three locations, the Official Statement declares that Bradford has taken steps and will continue to take steps to reduce the amount of aid awarded and the percentage of aid given as compared to total student revenue.[15] The anticipated reduction is specifically stated to be the result

---

[15]    On page A-13 the Official Statement states:

[D]uring the 1997-98 academic year, the College estimates that financial aid will be reduced to 29.9% of student income versus 30.3% the previous year. This expected reduction is a result of change in methodology of aiding students with college-funded support versus additional loans funded by students and/or parents. The College's financial plan currently calls for a further reduction of financial aid spending for 1998-1999 academic year to 28.8% of student income.

Two paragraphs later, as part of its discussion of the upcoming fall enrollment described in Section I.B above, the Official Statement states that based on an increase in applications, historic conversion rates and the number of deposits received, the College believes it can meet its fall enrollment goal "while. . . reducing slightly the average amount of financial aid awards to such students from College funds."

And on page A-17, the Official Statement states: "The strategic initiatives of the College for the last two years and for the next three years are. . . 3. To increase net tuition revenues by close management of three variables: increased enrollment, prudent use of financial aid and setting of tuition and fee levels to attract students."

24

of a new program to reduce aid, Official Statement at A-13 and has been conducted pursuant to a two year old initiative. Official Statement at A-17.

The Amended Complaint plainly pleads sufficient facts to demonstrate material falsity. The Complaint alleges that the actual financial aid awards for the current fiscal year were almost $250,000 higher than the budget referenced in the disclosure and that the actual percentage of aid to student income was 35%, not 29.9%--an increase of 14% instead of a 1.3% decrease. AC, ¶ 56.

Contrary to Defendants' assertion, the Complaint does not allege that these discrepancies were determined later, and that Plaintiffs are trying to hold them liable for failing to miss their targets. The Complaint alleges that the actual numbers were known and knowable at the time the Official Statement was published because in May, just seven weeks before the end of the fiscal year (and only a week or two before the end of the academic term) the College knew how much financial aid it had given to its students for the school year and how much student revenue it would receive. AC, ¶ 56. Unlike a traditional business, which might have substantial additional customer revenue or fulfillment expenses seven weeks before its' fiscal year's end, Bradford earned virtually all of its student revenue (and incurred all of its student aid expense) when students matriculated in September and January. AC, ¶ 56. By May, the College had real numbers,[16] not obsolete budget

---

[16]    Even if the Amended Complaint did not allege Bradford's receipt of actual numbers, given the size of the discrepancy and the importance of the financial aid data to the College's financial picture, the Court could reasonably infer the current falsity of the projection on May 13. In Shaw, the plaintiffs' complaint adequately alleged material falsity regarding Digital's representation that a restructuring reserve was adequate, merely by alleging that five months later Digital did substantially increase its restructuring reserve and that given the size of the reserve and the nature of the problems facing Digital, defendants must have known about the forthcoming changes when it affirmatively stated that the reserve was adequate. 82 F. 3d at 1212-1214. See also Shaw, 82 F. 3d at 1210-11(reasonable to credit plaintiff's unsubstantiated allegation that defendant knew about substantial third quarter loss one month before public announcement) Cooperman v. Individual, Inc., 171 F.3d 43, 48 (1st Cir. 1999)(reasonable to infer that Defendants did know about undisclosed dispute between CEO and Board at the time of IPO, even though matter was not made public until 4½ months later). See generally Number Nine, 51 F. Supp. at 14-17. (Liability for alleged false or misleading statement based solely on disclosure of problem at a later date when problem is of such a nature that is reasonable to infer its existence at the time of the misleading statement; cannot infer knowledge of inventory valuation merely from an

numbers, to base its disclosures upon.[17]

Once again, because Plaintiffs' claim rests on misrepresentations of *present facts* as opposed to future projections, the bespeaks caution doctrine does not apply.  Shaw, 82 F.3d at 1213; In re Number Nine Visual Technology Corp. Securities Litigation, 51 F. Supp. 2d 1, 19 (D. Mass. 1999).  Here, the disclosure of the budget projections implicitly stated that Bradford was not in possession of facts that contradicted the budget numbers.  According to the Amended Complaint it had such data, and this was not disclosed to potential investors.  Further, the bespeaks caution doctrine cannot apply because there was no particularized disclaimer regarding financial aid.  In re Focus Enhancements Securities Litigation, 309 F. Supp. 2d. 134, 162 (D. Mass. 2001)(boilerplate warnings to investors insufficient to establish "bespeaks caution" defense; disclaimer must be sufficiently related in subject matter and strong in tone). The Official Statement does not warn that financial aid awards, which would appear to be within the complete control of Bradford, might fluctuate[18] and it

---

announcement eight months later, but knowledge of other types of corporate problems can be inferred over periods shorter than eight months.) Here, seven weeks before the end of the fiscal year and months after the transactions at issue, it is eminently reasonable to infer that defendants knew (or could have easily determined) that financial aid amounts and percentages were higher than Bradford's budget, even if those figures were not formally announced until submission of Bradford's year end financials.

[17]    Moreover, even if Court ignores the Amended Complaint allegations regarding the existence of the hard numbers at the time of the Official Statement, the Complaint also alleges that Defendants knew the budget figures were invalid because while the total amount of financial aid was comparable to what had been awarded in the past but the spring enrollment figures were lower than predicted by the budget, decreasing student revenues. AC, ¶ 56. These facts meant the percentage of financial aid to student revenue would necessarily increase.  When the denominator decreases while the numerator remains the same, the percentage must increase.

[18]    The disclaimer on page A-13 states:

> If these goals are in fact met and if the College can otherwise successfully implement its budget, it expects to achieve a small operating budget surplus for the 1998-1999 fiscal year. Conversely, failure to achieve this enrollment goal and future enrollment targets may adversely affect the College's ability to reach Financial Equilibrium.

The reference to "goals" in the first sentence quoted above does not appear to refer to the financial aid budget estimates described two paragraphs earlier in the Official Disclaimer. Not only does the physical placement of the disclaimer, but the nomenclature as well, supports this reading.  In this section of the Official Statement only the College's desires to

26

certainly does not disclose that the budget predictions advanced may be worthless because the College had made financial aid commitments and awards prior to the date of the prospectus, but had not bothered to calculate whether their projections were consistent with amounts they had actually granted.

The Amended Complaint also establishes material falsity for the estimate of financial aid awards for the upcoming year. While the Official Statement states that the current estimate of financial aid for 1998-99 is a further reduction to 28.8% of student income, the budgets circulating among the Bradford officers and Trustees at the time of the offering, evidence an increase above the current level to 31.3%. AC, ¶ 57. This translates to a reduction of revenue of $280,000, a material amount since the superceded budget discussed in the Official Statement only anticipated a "small operating budget surplus." See Crowell v. Ionics, Inc., 343 F. Supp. 2d 1, 18 (materiality is determined by effect on income, not revenue; argument that misstatement is not material because only a small amount of revenue involved is "specious"). Moreover, the increase is highly relevant to determining whether Bradford was in control of its financial aid awards and was, indeed, taking steps to reduce such awards.

Defendants assert the Court should ignore the contemporaneous budget allegations because its final version was completed after the offering, sometime in May 1998. Merely because the budget was finalized after the Official Statement does not mean the Court must ignore the allegation.

---

attain a balanced budget and to enroll more students are described as "goals". Indeed the second sentence of the disclaimer specifically refers to "this enrollment goal", indicating that the prior sentence's reference to "goals" also refers to enrollment goals. At a minium the disclaimer is ambiguous.

Yet even if it could be interpreted to warn of the uncertainty of meeting financial aid estimates, it is only referring to estimates for the next academic year, 1998-99; it does not warn that the financial aid numbers for the current year might be materially different.

Courts can infer that information formally announced after the date of the an alleged misleading statement was known before the date of the statement when it is reasonable that the persons responsible for the misrepresentation would likely have known the information. Number Nine, 51 F. Supp. at 14-17. See also footnote 16, infra, and authorities cited therein. The budget, which was drafted by Defendant Kiszka, was circulated to the Trustees on April 29, two days before the date of the Official Statement, and reviewed by the Finance Committee of the Board of Trustees a week before the May 13 closing. Drawing all reasonable inferences in favor of the Plaintiffs, the Court can infer that the discrepancies between the financial aid figures in the two budgets were known to the Bradford Defendants (and could have been discovered by Advest) by the closing date, May 13.[19] Accordingly, Plaintiffs have pled sufficient allegations to find that the financial aid budget numbers were false at the time of the Offering.

The Official Statement also recited that the reason Defendants anticipated a reduction in financial aid was the implementation of a new "methodology" which sought to replace direct aid with loans to students and parents. Official Statement at A-13. This initiative was supposed to have been in place for the past two years. Official Statement at A-17. But the Amended Complaint alleges that there was no initiative. Not only was there was no plan to modify Bradford's financial aid practices, no one instructed the persons responsible for the awards to reduce them and neither

---

[19]    In fact, a May 26, 1998 memorandum from Defendant Kiszka demonstrates that there were no changes to financial aid numbers between the original version circulated in April and the final version approved in May. Kizcka's memorandum describes the changes that were made and the only items changed were expected expenditures by the various departments, which were cut by $300,000. He identifies no changes to the income portion of the budget, or the financial aid numbers. Thus, earlier versions of the budget that were circulated before the Official Statement contained the increased financial aid to student income ratio that conflicted with the disclosure in the Official Statement. Allegations containing this information, if necessary, can be added to an amended pleading.

the officers or Trustees took any steps to control the amount of aid awarded.[20] AC, ¶ 59. The lack

of any plan to control financial aid, especially in light of the increasing amount of tuition discounting

is clearly something investors would find material. It would demonstrate that Bradford's optimistic

statements that they could reduce financial aid awards were unfounded. Indeed the lack of such a

plan would help investors assess whether Bradford's goal of financial equilibrium was likely.

Asserting that a plan was in place to reduce financial aid awards, when none existed, is plainly a

materially false statement.

> 2. Defendants' failure to disclose the financial aid data they possessed that contradicted the disclosures in the Official Statement and painted the College in a negative light is strong evidence of scienter.

The same evidence that supports the strong inference of scienter with regard to the enrollment

data supports such a finding with regard to the financial aid figures. Indeed, the case is stronger.

With regard to enrollment, Defendants were guilty of manipulation: selectively, but not falsely,

disclosing favorable statistics while suppressing more relevant negative information. Here

Defendants possessed highly relevant information, critical to evaluating their ability to turn Bradford

around, that directly contradicted the hard numbers presented in the Official Statement. Either the

Defendants were intentionally lying or they were practicing willful ignorance by refusing to check

and disclose the most recent data. And in the case of the actual financial aid figures for 1997-98,

---

[20]    The Amended Complaint does not set forth the evidence Plaintiffs will rely upon to prove the non-existence of the alleged changes in financial aid awards. It is, of course, difficult to prove that something does not exist. Plaintiffs have reached this conclusion based on their examination of relevant, contemporary admissions and financial aid records, none of which discuss a new financial aid methodology or contain instructions to limit financial aid. Additionally, plaintiffs' investigator interviewed, Jean Scott, the President of Bradford who succeeded Short in September 1998. When faced with a financial crisis the moment she entered the office, she conducted an investigation to understand the problem's origins. Plaintiffs believe she would testify that she not only concluded that there was no plan for reducing aid, but that over generous tuition discounting, due to liberal financial aid awards, was one of the principal reasons for the crisis. Factual allegations to this effect can be added, if necessary, to an amended pleading.

29

these figures were not fresh, they were months old; an investor would certainly expect they would have been updated as part of the complete disclosure that was mandated for a bond issuance.

Plaintiffs' scienter allegations compare favorably to allegations Judge Young found sufficient in Number Nine. To support their claim that inventory was overvalued on a financial statement, the class plaintiffs in Number Nine relied upon articles in trade publications that stated that computer hardware comparable to that marketed by the company at issue was losing market share and being replaced by newer technology. The articles did not specifically reference the company's products and there was no evidence that any of the defendants read the articles. Reference to the articles was sufficient to meet the First Circuit's and the PSLRA's scienter requirements.

> The Court holds that the above-referenced trade publication excerpts satisfy the pleading requirement with respect to scienter. Accepting their contents as representative of industry knowledge, the excerpts show that Number Nine either knowingly misrepresented the value of VL Bus inventory at the time it made the challenged statements, or recklessly disregarded such facts by failing to remain informed of important developments in the market for graphics cards.

51 F. Supp. 2d at 27. If failing to remain abreast of trade publications (and a consequent failure to make an accounting adjustment based on such trade publications) constitutes sufficient recklessness to infer scienter, failing to stay abreast of important internal data that directly contradicts written representations must, at a minimum, also constitute a strong showing of scienter. Indeed, the First Circuit has recognized that publishing statements when Defendants knew facts suggesting that the statements were inaccurate or misleadingly incomplete is classic evidence of scienter. Aldridge, 284 F.3d at 83.

A strong inference of scienter can also be inferred from the Official Statement's claims that a program was in place to reduce financial aid awards when no such program existed. Plainly, the

positive statement that a plan is in place, when no such plan existed and no actions were taken strongly infers that the authors and publishers of such statements intended to deceive the readers of the Official Statement, or that they were culpably reckless about reporting the non-existing policies and methodologies. See e.g. In re Lernout & Haupsie Securities Litigation, 208 F. Supp. 2d 74, 88 (D. Mass. 2002)(officers likely knowledge of fictitious claims of revenue from Korean subsidiary was sufficient evidence of scienter).

Even if no specific single allegation contained in the complaint, by itself, raises a strong enough inference of scienter, the plaintiff may combine various facts and circumstances indicating fraudulent intent to satisfy the scienter requirement. Cabletron, 311 F. 3d at 39. Here, the various facts and circumstances–the nature of the false statements, the ease with which truthful and accurate information could have been found, the internal documents known to Defendants that contained the true information, Defendants' clear knowledge of Bradford's financial precariousness, and Defendants' desire to save the College headed for collapse, even to the extent of embarking upon an audacious borrowing program to attract potential enrollees whose existence were unknown–all strongly infer that the placement of false information in the Official Statement did not occur due to negligence. Either Defendants intended to deceive or they recklessly refused to check their own financial records without concern of the financial danger they were creating for investors.

D.    Defendants' Failure To Disclose Bradford's Student Retention Crisis Was Misleading and Plaintiffs Have Sufficiently Alleged Necessary Scienter.

1.    By failing to make necessary disclosures of Bradford's historic inability to retain students, the Official Statement was materially false and misleading.

The Amended Complaint states that Bradford had an attrition rate of greater than 60% and a historical, longstanding problem with retaining students. AC, ¶ 49. The inability to retain students

31

was a principal cause of Bradford's financial crisis, which was an "organizational" reality and a "pre-eminent financial fact." AC, ¶ 53, 54. Defendants do not deny that the attrition crisis at Bradford was material and that it had to be disclosed; they defend on the ground that it was adequately disclosed in the Official Statement.[21] This is simply not so. If the Plaintiffs' Amended Complaint overstated the contents of the Official Statement as baldly as the Defendants' supporting memoranda, the Amended Complaint would be summarily dismissed.

Defendants' claim they adequately disclosed the College's attrition and student retention problem on pages A-7 and A-11, but, suspiciously, do not quote the language which constitutes the disclosure. There are indeed references to student retention on those pages, but only a clairvoyant would be able to divine the existence of an attrition crisis from these routine disclosures. The disclosure on p. A-7 occurs in the middle of the section entitled "The Project" which describes what

---

[21]    With regard to Plaintiffs' non-disclosure claims in general, Advest asserts that there is only a duty to disclose when a defendant has omitted a material fact necessary to make the statements not misleading. That is not entirely accurate. Disclosure is also required where there is a statute or regulation that requires disclosure. Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996) Here, the required contents of an Official Statement issued in connection with a municipal bond offering are set forth in Rule 15c2-12(f)(3), which, among other things, requires disclosure of "financial information or operating data. . .material to an evaluation of the Offering." In its interpretive ruling on this rule, Release 33-7049, a copy of which is attached as Exhibit A, the SEC interprets this rule to require

> a description of known facts that would significantly affect the financial information presented or future financial operations of the issuer, as well as a discussion of its projected operations. For example, in a hospital financing, a steadily declining population in the surrounding community that, in the future, would not support the size of the facility to be built would be important to investors. Disclosure of currently known conditions and their future impact is critical to informed decision making.

Release 33-7049, § IIIC3c. Information about Bradford's current inability to retain students is analogous to the hospital's steadily declining population in the example provided by the SEC. Both trends call in doubt the ability of the institution to pay and are facts investors would not likely know absent disclosure. Such matters have to be disclosed.

Additionally, as described below, there are misleading disclosures in the Official Statement that require accurate information regarding the attrition problem to be disclosed for the Official Statement to not be misleading. In the section of the Official Statement entitled Bondholders' Risks, the issuer warns of the future possibility that Bradford may have difficulty attracting students. When an issuer warns about a current problem as only being a future possibility, the disclosure is misleading unless the truth about the current problem is fully disclosed. Number Nine, 52 F. Supp. 2d at 24-25. Also, the disclosure of fall enrollment statistics was misleading unless the routine spring attrition was not also disclosed. See AC, ¶ 54, and footnote 23, infra.

Bradford intends to do with the bond proceeds, as opposed to a discussion of its current financial or operational condition.

> The primary purpose of the Project is to expand residential capacity, which will enable Bradford College to accommodate increased enrollment. In addition, the Project will enhance the residential component of Bradford College, with anticipated corresponding improvements to the competitive position of the College and its ability to retain students. Furthermore, the Project is necessary due to the deteriorated condition of the Tupelo East and West residence halls and the Cluster Houses.

Such language hardly constitutes the disclosure of a student retention crisis. From this paragraph the reader would hardly know that most Bradford College enrollees leave before graduation. The fact that the administration considers the Project useful in retaining students is not the equivalent of conceding an attrition problem.

The reference on p. A-17 is even more innocuous. In the section entitled "Strategic Initiatives," the Official Statement describes a newly created position entitled Coordinator of Planning and Transition.

> The Coordinator works with faculty and staff and provides periodic reports to the Cabinet and the Trustees, to review, revise and establish programs and services to attract and retain students.

Paraphrasing the job description of an employee who is concerned with student attraction and retention is not the equivalent of informing potential investors that medium and long range planning at Bradford has been impossible because the College cannot accurately predict how many returning students will be present in subsequent semesters. All businesses take some action to retain their existing customers. Making brief references to these activities does not constitute disclosure of a severe retention or attrition problem.

Defendants also contend they adequately disclosed any problem with retention by publishing,

33

at A-8, the spring 1998 enrollment figures, which record a reduced enrollment from the fall numbers. But the spring figures are not disclosed in the same manner as the fall figures, and it is difficult to determine whether the difference between the total number of full and part-time students is only 16 students (only a 2.7% decrease) or 36 students (a more worrisome 6% attrition rate).[22]  Moreover, there is no description, much less analysis, of the difference in the enrollment figures.  Potential investors would not know whether such discrepancies are expected and normal (in fact, the mid semester attrition rate was lower than the historical 7% mid year attrition rate, AC ¶ 54) or are otherwise accounted for, such as due to a group of juniors taking spring semester abroad or at an affiliated institution.  Even if a reader was able to directly compare the fall and spring enrollment statistics, the publishing of a single spring's student numbers, without explanation or context, does not identify a material problem concerning attrition.  Viewing the Official Statement in the light most favorable to the Plaintiffs, the Official Statement is misleading.[23]

Finally, Defendants rely upon the Bondholders' Risks disclosure in the portion of the Official

---

[22]    The Official Statement recites "(s)pring 1998 full- and part-time enrollment was 566."  The table on the same pages lists 550 full-time students and 32 part-time students for Fall 1997, an apparent difference of 16, but also lists a "headcount" of 602.  The difference is due to a category in the table identified as ELI Students. Nothing in the Official Statement states whether the spring total is merely the sum of the full and part-time students (in which case the discrepancy is only 16 enrollees) or if it includes the ELI students.  By not using consistent terms, it is impossible to compare figures in the Official Statement that were not directly laid out for comparison purposes.

[23]    Indeed, the Amended Complaint alleges that the failure to track the spring semester's enrollments over several years, in a manner comparable to how the fall semester's enrollment is charted on p. A-8, is misleading. See AC, ¶ 54. Had several years of fall and spring enrollments been disclosed, potential investors would have been able to see the routine loss of 7% of the student body between the fall and the spring, and seen that retention was a serious problem that haunted Bradford year after year.  Investors would have also known how difficult it would be to achieve Bradford's disclosed enrollment targets.  Investors would realize that the College not only had to find new applicant pools to meet the higher entering class targets, it would have to find substantial additional students to replace the ones who routinely abandoned the school after a semester.

Further, investors would certainly think twice before loaning the institution an unprecedented amount of money if there would be far fewer alumni than would have been anticipated by its annual new student enrollment figures.  This is particularly important with regard to an institution that repeatedly relied upon alumni gifts to balance its operational budget.  If there would be fewer alumni in the following years due to heavy attrition, there would be fewer persons whose gifts could be counted upon to pay the bond debt.

Statement drafted by MIFA. In the subsection dedicated to "Dependence on Tuition Payments", MIFA describes Bradford's goal of increasing enrollment to at least 725 full-time students by Fall 2000, and notes "(a) failure by the Institution to attract and retain students in sufficient numbers to accomplish such goal could adversely affect the ability of the Institution to make required payments." Official Statement at 8. This boilerplate truism concerning future events does not constitute adequate disclosure of an existing, present crisis. Indeed, it is strong evidence of fraud and scienter.

Disclosing a known, existing problem as merely a future possibility is actionable. In re Apple Computer Securities Litigation, 886 F.2d 1109, 1115 (9th Cir. 1989)(disclosing possibility of future problems with new product when serious problems necessitating delay existed at time of disclosure was actionable); Number Nine, 51 F. Supp. 2d at 24-25, citing and quoting Huddleston v. Herman & MacLean, 640 F. 2d 534, 544 (8th Cir., 1981)("To warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."). Here, a very real and threatening attrition crisis affected the ability of the institution to survive and yet Bradford disclosed it existence as if it were no more likely than revenue fluctuation due to "governmental regulation and developments affecting the federal or state tax-exempt status of non-profit organizations." Official Statement at 11. Investors had a right to know of a serious retention crisis at the time they were investing, and they were deliberately not informed.

> 2.    Failure to disclose a known and urgent crisis raises a strong inference of scienter.

The attrition crisis at Bradford is the 800 pound gorilla in the living room. It was the dominating and pre-eminent financial fact at the College, and yet it is not even hinted at in the

Official Statement. Just as one cannot honestly ignore a gorilla in the living room, Defendants failure to deal with attrition could not be an accident; at best it was willful ignorance that is the equivalent of culpable recklessness. The scope of the crisis was such, that the very failure to reveal it is evidence of scienter.

Defendants contend that their references to student retention demonstrate that their was no intent to conceal or mislead. Yet the alleged disclosures are so tepid, so colorless, that they are completely consistent with an intent to mislead. They raised the possibility of a potential problem without disclosing the reality actually facing the College. Had defendants truly intended to make a complete disclosure they would have been more forthcoming. The fact that the most reasonable reading of what they wrote would not lead a potential investor to recognize that a problem existed is sufficient to raise a strong inference of scienter. Cf. Livid Holdings Ltd. v. SalomonSmithBarney, Inc., ___ F.3d ___, 2005 WL 767100 *5 (9th Cir. 2005)(where complaint alleges that defendants knew contested statement's most obvious interpretation was misleading when made, heightened pleading standard for scienter has been met).

Additionally, of course, the other facts and circumstances described above can also be considered in examining whether sufficient scienter has been alleged. For the reasons described above, scienter also exists regarding the failure to disclose the College's attrition situation.

E.    Plaintiffs Have Sufficiently Alleged Defendants' False Disclosure of the Existence of a Strategic Plan

The Official Statement pegs Bradford's turnaround on the execution of its strategic plan (also

36

described in the Official Statement as the College's strategic initiatives).[24] There are numerous references to these initiatives in the Official Statement. The Amended Complaint alleges, that there was no plan to deal with the attrition crisis, no plan to reduce financial aid, and no plan (as opposed to stated goal) of increasing enrollment. AC, ¶ 59. Indeed, according to NEASC, the accrediting body, Bradford's current planning for "recruitment, retention, faculty size, curricular structure and many other parameters was inconsistent with their goal of enrolling over 700 students within two and a half years. AC, ¶ 60. There may have been goals, but there was no plan.

Defendants attempt to trivialize this allegation by characterizing it as an assertion that the Official Statement lied when it claimed that Bradford did not intend to increase its enrollment. Mischaracterizing Plaintiffs' allegations will not make them go away. There is a difference between having a dream and having a plan to make the dream a reality, and it is the latter the Plaintiffs allege did not exist. Falsely stating that such a plan existed is a materially false misrepresentation.[25]

The Bradford Defendants point to affirmative steps that Defendants took to increase enrollment, particularly relying on marketing plan the College commissioned from George Dehne Associates, which is referenced in the Official Statement at A-17. First, the actions Bradford took in the past does not mean that it had a current plan at the time of the offering to achieve the

---

[24] Advest claims that Bradford never represented that it had a strategic plan. This is inaccurate. The Official Statement explicitly refers to Bradford's "strategic plan" on p. 11 and notes the importance of meeting that plan to being able to pay the bonds.

[25] The difference between a representation about the existence of a strategic plan, and a vague statement about attempting to meet the goals of the plan must be made clear. Assuming the plan contained some premises and Defendants did not misrepresent current conditions that made attainment of the plan's goals unlikely, Defendants cannot be held liable merely for not meeting the plan's goals. Indeed, securities law assumes the market discounts vague assertions about meeting distant plan goals. But even if the market does not expect the issuer to meet all of its goals, it clearly is material that there is a concrete plan. With Bradford's track record, it is hard to conceive that any investor would have entrusted any funds with Bradford had the college disclosed its mediocre financial history and then informed the investor that it had no concrete plan to meet the goals necessary to permit repayment of the bonds.

37

objectives set out by its former consultant.[26] Moreover, the Official Statement acknowledges that the Dehne plan was merely a marketing plan, not a strategic plan for insuring the College's continued existence. The fact that the Trustees solicited a marketing plan a year earlier is hardly conclusive evidence that the strategic plan claimed by the Official Statement really existed.

The Court must take the allegations of the Complaint as true. If no plan existed, but the College represented the existence of such a plan to get investors to fund unachievable objectives, the Official Statement contained a material falsehood.[27] Further, the false representation of the existence of a fictional plan leads to a strong inference that the persons who described the fictitious plan in a document designed to raise money intended to deceive the potential investors.

F.     Defendants' Disclosure That Bradford Would Contribute $1 Million To The Renovation Project When It Had No Intention of Making Such a Contribution Was False, Misleading and Intentional

The final material misrepresentation alleged by the Plaintiffs are the statements on page 10 of the Official Statement that the dormitory construction and renovation project will be paid for by the bond proceeds and an equity contribution of $1 million from Bradford. Official Statement at 10.

---

[26]     According to the Official Statement, the Dehne plan was submitted to the President in the Spring of 1997, a year before the offering. It is not the strategic plan or strategic initiative that the Official Statement claimed was then currently existing at the time of the bond offering.

[27]     Further evidence of the lack of a plan, not currently included in the complaint but which can be added by an amendment, is the fact that the budget cuts being considered by Bradford, the Officer Defendants and the Trustee Defendants at the time of the Offering directly contradicted the strategic initiatives described in the Official Statement. The cuts being considered (and ultimately adopted) included cuts to the admissions and enrollment department which the officers and trustees knew would hinder the ability to meet their enrollment targets, faculty positions the Official Statement stated would be hired, and student services which the Official Statement claimed the College was trying to improve. Indeed, while the Official Statement discloses planned growth and expansion, the reality was substantial cuts that would make it impossible to recruit the students or carry out the programs necessary to pay the bond debt.

38

Although Bradford's commitment is not conditioned in the Official Statement,[28] minutes of the Board of Trustees demonstrate that the Trustees had no intention to make such a contribution on behalf of the College. The Finance and Building and Grounds Committees of the Bradford Board of Trustees, composed of 11 of the individual defendants, recognized that the bond offering would be insufficient to pay the full costs of the renovation, but refused to commit Bradford's funds to make up the difference. Instead, the committees recommended, that *"every effort"* (emphasis added) be made to reduce construction costs so Bradford would not have to make a contribution. If a contribution had to be made, Bradford would only do so at the end of the final phase. AC, ¶ 65. The Official Statement did not disclose the conditional and delayed nature of Bradford's "equity contribution."

Defendants' primary defense to this claim is to deny the words of the Complaint. They claim the meeting minutes do not support the allegation that Bradford misrepresented the equity contribution. But the minutes are clear. *Every effort* is to be used so that Bradford does not have to make the contribution. Only if it absolutely must, will Bradford advance funds, and then only at the end of the project. The primary thrust of the committees' conclusion is that if at all possible, the project will be built solely using the bondholders' money. The meeting minutes, which are quoted verbatim in the Amended Complaint, AC, ¶ 65, support the allegation.[29]

Defendants also claim that by May 1998 the Trustees had changed their position and decided to make the contribution. But there are no facts in the Amended Complaint to support such an

---

[28]   On page 10, the Official Statement states that an equity contribution from the College "will be used to build and renovate campus buildings." A table on the same page informs investors that the contribution will be $1 million. AC, ¶ 46.

[29]   In fact, Bradford never made the contribution. This fact is not in the Amended Complaint, but can be inserted in an amended pleading.

assertion. Nor do Defendants present any documents that contradict the meeting minutes. In fact, to Plaintiffs' knowledge, the meeting minutes referenced in paragraph 65 are the last minutes of the Board prior to the Bond issuance. Defendants' desire to have the Court dismiss this claim based on their uncorroborated assumption that the Board must have changed its mind flies in the face of the requirement that the Court must decide the motion to dismiss on the allegations in the complaint and the reasonable inferences that can be drawn in the Plaintiffs' favor.

Plaintiffs do not devote any paragraphs of the Amended Complaint to explaining the materiality of the misrepresentation. Yet materiality is obvious. In any loan financing, a representation that the borrower will make a sizeable equity contribution, in this case almost 10%, is clearly material. Such a contribution insures the bondholders that it is not only their money that is at risk, and that the project has value to the borrower as well. Further, the amount of an equity contribution is directly relevant to the value of property the borrower will own. This is an important consideration if the bondholders are not fully secured and may have to look to the assets of the borrower to obtain repayment, as, of course, occurred in this case. To the extent Plaintiffs' failure to explain materiality is a pleading defect, this defect can easily be cured by amendment.

Scienter is not an obstacle to this claim. At the time of the offering, the authors of the Official Statement and the underwriter would have reviewed the relevant board minutes to insure that Bradford had in fact authorized the bond issuance. The subcommittees' recommendation to not make an equity contribution unless there was no other choice would have been reviewed at the same time and both the authors and the underwriter would have known that the Board had not authorized an equity contribution. Nonetheless, they did not correct or modify the disclosures in the Official Statement. Ignoring the black and white mandate of the Board of Trustees strongly infers actionable

40

scienter.

     G.     Plaintiffs Have Met The Minimal Burden Necessary To Plead Loss Causation Adequately

Although a Rule 10b-5 complaint must allege loss causation, it is a "minimal burden" and is not subject to the heightened pleading standards for allegations of misrepresentation and scienter. Crowell v. Ionics, Inc., 243 F. Supp. 2d 1, 22 (D. Mass. 2004). See also Dura Pharmaceuticals, Inc. v. Broudo, Docket No. _____, slip op. at 10 (April 19, 2005 ) ("Dura Pharmaceuticals") (causation "pleading rules are not meant to impose a great burden upon a plaintiff.") Loss causation is the causal connection between a material misrepresentation and the alleged loss. Dura Pharmaceutical at 6. The common law principles of proximate causation are applied to determine whether loss causation has been properly alleged. Dura Pharmaceutical, at 8-9 (citing the Restatement (Second) of Torts, treatises on Tort law and Massachusetts common law as sources to be examined to determine elements of loss causation).

Although Dura Pharmaceuticals, the recent Supreme Court decision on securities fraud loss causation, does not provide much guidance on the necessary nexus between allegations of economic loss and the alleged misrepresentations,[30] courts have required "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2nd Cir. 2005) citing Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2nd Cir. 2001). Stated another way, the loss must be foreseeable and the loss must be caused by the materialization of the concealed risk. Lentell, 396 F.3d at 173. Such a showing is made when

---

[30]     Dura Pharmaceuticals merely holds that a simple allegation of a purchase of inflated stock is not a sufficient pleading of loss causation. Slip op. at 7-9. The Court expressly declined to consider other proximate cause or loss-related questions. Id. at 9.

a jury could find that by failing to disclose material information, the defendant disguised the very risk to which plaintiff fell victim. Castellano v. Young & Rubicam, 257 F.3d 171, 186 (2nd Cir. 2001). Or, as Judge Mazzone stated in Miller v. New America High Income Fund, 755 F. Supp. 1099, 1108 (D. Mass. 1991) the Plaintiffs "must allege that they were injured because the risks that materialized were the risks of which they were unaware as a result of defendants' misleading statements."

Here, Plaintiffs allege that the very risks they contend defendants concealed – the lower than disclosed expected enrollment in the fall 1998 , AC ¶ 68; the ballooning financial aid awards and tuition discounting, AC, ¶ ¶ 70, 75; the historic level of student attrition, AC, ¶¶ 68, 74; and the lack of a strategic plan, ¶ 74 – led to the financial crises that caused the new president to shut the school and default on the bonds. AC, ¶¶ 74-76. As a result of that default, the principal amount of the bonds remains unpaid. AC, ¶ 78. Plaintiffs, thus, clearly allege facts that demonstrate that their losses are caused by the materialization of the very problems Defendants are alleged to have concealed in the Official Statement. Moreover, it is foreseeable that these undisclosed risks would result in an inability to pay the bonds.

Defendants contend that the allegations in the Amended Complaint must be interpreted as pleading that the Plaintiffs' losses were caused, as a matter of law, by other events or by risks adequately warned about in the Official Statement. By ignoring the allegations of the Amended Complaint cited in the preceding paragraph, and relying on those allegations favored by Defendants, the Court would violate a cardinal rule of Rule 12(b)(6) jurisprudence, that all allegations in the Complaint must be viewed in the light most favorable to the Plaintiffs. See e.g. In re Allaire Corp. Securities Litigation, 224 F. Supp. 2d 319, 338 (D. Mass. 2002)(although other interpretations of

42

complaint were possible, loss causation adequately alleged when all inferences drawn in plaintiffs favor).

Nor can defendants rely upon allegations relevant to the Plaintiffs' breach of fiduciary duty count to attempt to dismiss the 1934 Act claims. Rule 8(e)(2) permits the Plaintiffs to plead alternative theories of liability and such claims do not have to be pled consistently. Consequently, a causation allegation related to one theory of liability cannot be used as an "admission" to defeat an alternative count. Rodriguez-Suris v. Montesinos, 123 F.3d 10, 20-21 (1st Cir. 1997). Thus, merely because plaintiffs alleged in their breach of fiduciary duty count that they were damaged by the failure of the Bradford Defendants to close the College immediately after the disappointing enrollment in fall 1998, AC, ¶ 72, or that the fall 1998 cuts to the admissions department budget assured that the College could never recruit sufficient students to meet its financial obligations, AC, ¶ 71, does not mean that these events were the sole causes of the Plaintiffs' losses and the misrepresentations in the Official Statement were not a material factor in causing the losses.[31]

---

[31]     Even if the inconsistent allegations related to the breach of fiduciary duty count could be considered in evaluating whether causation had been adequately alleged, the Court would have to deny the Defendants' motion. First, the Amended Complaint does not allege that these two events were the *sole* cause of Plaintiffs' damage. While these events may have harmed the plaintiffs, these allegations do not require a finding that the misrepresentations were not a material factor in causing Plaintiffs' damages. The damage caused by the admissions office budget cuts, in fact, is completely consistent with Plaintiffs' claim that the misrepresentations caused their investment losses. The Fall 1998 budget crisis was directly caused by the lower than predicted enrollment, the higher than disclosed financial aid awards, and the historic attrition problems, all of which Defendants knowingly or recklessly failed to disclose in the Official Statement. These undisclosed events caused the College to make additional cuts that destroyed the possibility of meeting their financial goals, a completely foreseeable event given the looming financial bad news Defendants failed to disclose in May 1998.

The allegations here must be contrasted with the facts in Miller v. New America High Income Fund, 755 F. Supp. 1099, 1108 (D. Mass. 1991), the case relied upon by the Defendants. There, the Plaintiffs' complaint conceded that their losses were not caused by the subject of the misrepresentations. The alleged misrepresentations were that the defendants, managers of a junk bond fund, would only invest in certain types of bonds and engage in defensive portfolio management tactics. Had plaintiffs' alleged losses been caused by Defendants' failures to invest in the types of junk bonds promised, Judge Mazzone found the complaint would have stated a cause of action. However, the plaintiffs' admitted the losses were caused solely by the collapse of the junk bond market. Only if the Plaintiffs here made an analogous concession--for example, that Bradford defaulted because some market force caused virtually all small colleges to fail--would the Court be justified in dismissing on loss causation grounds at this stage.

43

Moreover, a defense that the plaintiffs' losses were caused by some intervening event other that the alleged misrepresentations indisputably raises factual issues that cannot be decided on a Rule 12(b)(6) motion to dismiss. Emergent Capital Investment Management, LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2nd Cir. 2003); Swack v. Credit Suisse First Boston, 2004 WL 2203482 *12 (D. Mass 2004)(Woodcock, J.).

Defendants' argument that Plaintiffs losses were caused by risks of which they were fully knowledgeable is also unavailing. Once again Defendants rely upon the generic disclaimers that were the basis of their "bespeaks caution" defense. A colorless disclaimer that Bradford might not achieve its desired objectives fails to sufficiently warn investors that there are present facts known(or recklessly ignored) by Defendants that strongly indicated that Bradford's expectations were not going to be met. See Rodi v. Southern New England School of Law, 389 F. 3d 5, 15 (1st Cir. 2004), discussed in detail at 80, infra. If Defendants' argument is accepted, the simple disclaimer that an investment involves risk and the investor might lose his investment, would immunize all transactions from liability on loss causation grounds because no matter how egregious the fraud, the investor was warned about the very contingency which occurred, the loss of his investment.

H.    Plaintiffs Can Sufficiently Tie All of the Defendants To Violations of the 1934 Act

All Defendants allege that even if Plaintiffs have successfully pled Rule 10b-5 violations against Bradford, who is not a party in this action, they have not sufficiently pled facts that demonstrate that the persons the Plaintiffs have sued have violated the securities laws. There are three categories of Defendants against whom the Plaintiffs have alleged violation of Rule 10b-5: the underwriter, Advest; the Officer Defendants, and the Trustee Defendants. Plaintiffs will analyze the claims against each of them in turn.

1.    Advest was reckless in failing to confirm easily accessible information relevant to the bond offering

Advest concedes, as it must, that as the underwriter for the bond offering it had a duty to perform a reasonable investigation. <u>Glassman v. Computervision Corp.</u> 90 F. 3d 617, 628 (1st Cir. 1996). This is particularly true for municipal securities offerings where the issuers are usually exempt from the registration requirements, but the SEC has placed specific duties on the underwriters to provide accurate disclosures to prospective purchasers pursuant to Rule 15c2-12, 17 CFR §240.15c2-12. Where an underwriter's conduct constitutes a sufficiently extreme departure from the standards of the profession, scienter is established. <u>SEC v. Dain Rauscher, Inc.</u>, 254 F.3d 852, 859 (9th Cir. 2001).

The First Circuit has identified at least two components of the duty to conduct a reasonable investigation. First, the underwriter must continue to investigate the issuing entity up until the date of the offering. <u>Glassman</u>, 90 F.3d at 628. Second, the underwriter cannot rely solely on the representations of management where it is possible to verify the information. <u>Id.</u> The allegations of the Complaint make it plain that Advest failed both of these duties.

Here, plaintiffs have alleged that material out of date information was published in the Official Statement, particularly the obsolete financial aid data and the predictions from outdated budgets. AC, ¶¶ 56, 57, 62, 63. It can reasonably be inferred that Advest either neglected to determine whether updated information was available, or simply ignored the current information. Advest plainly knew that the College possessed actual data, not just projections, regarding its financial aid spending for the almost completed school year, and it also knew that updated budgets, which would have contained the latest financial aid and enrollment projections were being circulated

among Bradford Officers and Trustees at the time the bond offering was in its final stages.[32]

It is also clear from the Complaint's allegations that Advest did not verify data and projections contained in the Official Statement. The true status of the College's enrollment prospects for the next year were set forth in Admissions Reports that were routinely circulated.[33] The most recent report would have verified the selective disclosure relating to admissions data. The updated budgets were also readily available from Defendants Kiszka and Short, as well as the Trustees. The February 1998 Trustees minutes, which Advest would have reviewed to insure that the bond offering had been authorized, would have let Advest know that the College did not intend to make a $1 million equity contribution, and a review of February 1997 board minutes would have revealed the depth of the financial crisis, including Kiszka's accurate prediction that the College could only survive for two or three more years, and the extent of the College's attrition problem. A simple request to review the Strategic Initiatives referenced so prominently in the Official Statement, or the "new methodology" that allegedly reduced the financial aid awards would have determined that these programs and plans did not exist. It is impossible to believe an underwriter who was actually attempting to verify the statements in the Official Statement would not have made these discoveries.

The ease with which the truth could have been determined by an attentive underwriter is sufficient to infer sufficient recklessness on the part of an underwriter who had a positive obligation to question and investigate. However, there are additional facts Plaintiffs can plead in the event the Court does not believe these are sufficient facts are alleged in the Amended Complaint. These

---

[32]    The Official Statement, at A-17, states that a revised budget for the upcoming year is presented to the Trustees and the Finance Committee in May.

[33]    To the extent this fact is not currently included in the complaint, it can be included in an amended pleading.

46

include that Advest only visited the College twice, that it never critiqued or challenged any of the projections provided by Bradford, that it never requested contingency plans or alternative scenarios, that it accepted projections with facially unreasonable assumptions and premises, that it relied on obsolete budget data provided by Bradford six months prior to the offering and made no effort to update the information. If the current allegations are insufficient, Plaintiffs should be given leave to further describe Advest's reckless conduct.

Advest also contends that it cannot be held primarily liable for a Rule 10b-5 violation because it was not the author of the false and misleading statements in the Official Statement, but only had review and approval responsibilities. Relying on Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994) it contends only the persons who actually made the alleged misrepresentations can be found liable under Section 10(b). However Central Bank does not always shield underwriters from primary liability. Quaak v. Dexia, S.A., 357 F.Supp. 2d 330, 341 (D. Mass. 2005). "Primary liability may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.'" SEC v. First Jersey Securities, Inc, 101 F.3d 1450, 1471 (2nd Cir. 1996) quoting Azreilli v. Cohen Law Offices, 21 F.3d 512, 517 (2nd Cir. 1994).

In evaluating Advest's role in the fraud at issue, the Court must consider the enhanced role the underwriter plays in municipal bond offerings. As will be discussed in more detail in Section II.A.1 infra, the issuers and beneficiaries of municipal bond offerings are ordinarily exempt from registration, particularly when the offering is made for the benefit of an educational or otherwise non-profit entity. 15 U.S.C. §§ 77c(a)(2) and (4). To insure that investors do receive accurate disclosures regarding the relevant entities in a municipal bond offering, the SEC has passed Rule

47

15c2-12, 15 CFR §240.15c2-12, which places primary responsibility for the distribution of financial and operating information material to the evaluation of the offering on the underwriter. Under the Rule, a securities dealer cannot underwrite or even recommend a municipal security unless it has reviewed the offering's official statement, taken responsibility for distributing the statement to all purchasers and potential purchasers of the bonds, and insured that material information relative to the bond offering will be available through municipal security information repositories. 15 CFR §240.15c2-12b and c. The SEC also requires the underwriter to have a reasonable basis for the truth of the key representations made by an issuer in the Official Statement. Municipal Underwriter Responsibilities, Securities Exchange Act Release No. 26100, § III, 53 C.F.R. 37778 (Sept. 28, 1988)

In its official Interpretation of an underwriter's responsibilities in connection with a municipal security offering, which the SEC promulgated at the same time it proposed Rule 15c2-12, the SEC has emphasized the "vital position" the underwriter plays in such offering. Moreover, with regard to negotiated municipal offerings, such as the one involved in this case, the SEC anticipates that the underwriter will be "involved in the preparation of the official statement." Indeed, because the underwriter must review a near complete draft of the official statement before it commits to an offering, the SEC expects it will often influence the content of the statement before actually committing to an offering. Municipal Underwriter Responsibilities, Securities Exchange Act Release No. 26100, § III, 53 CFR 37778, 37789-90 (Sept. 28, 1988). In practice, the SEC's expectations have been proven correct, the underwriter does often prepare and draft the offering documents, including the disclosures. See e.g. SEC v. Dain Rauscher, Inc., 254 F.3d 852, 854 (9th Cir. 2001).

48

While it is possible for the plaintiffs to conduct pre-discovery investigations to determine whether misrepresentations have been made in an offering document, they cannot determine who actually drafted what portions of the Official Statement without discovery; this information is known only to Advest and the individual defendants who signed the Bradford disclosures. If the Court determines that there are not sufficient allegations to determine whether the underwriter should be held liable as a primary violator, it should allow the Plaintiffs to conduct discovery on this matter before it dismisses these claims against Advest with prejudice[34].

---

[34]    Such discovery will not defeat the purpose of the discovery stay mandated by 15 U.S.C. § 78u-4(b)(3)(B) because Plaintiffs have demonstrated that they have a meritorious securities fraud claim. The purpose of the requested discovery is not to determine if there is a violation, but to discover who is responsible for it. Further, because Advest will still remain in the action under Plaintiffs' Section 12 claims, Uniform Securities Act claims, fraud, negligent representation and 93A claims, see Section II and III, infra, granting Plaintiffs discovery on this issue will not burden a party who would otherwise be exempt from discovery demands of this action. Plaintiffs will be entitled to the same discovery to defend against Advest's "due diligence" and "reasonable efforts" defenses in the other state and federal claims.

2.    Plaintiffs Have Stated Causes of Action Under Section 10(b) Against The Officer Defendants

The Bradford Defendants do not contest the Plaintiffs' ability to tie the Officer Defendants, Short and Kiszka, to the misrepresentations and omissions in the Official Statement. Kiszka and Short, after all, signed the appendix to the Official Statement containing the Bradford disclosures. The Bradford Defendants, however, do contest whether Plaintiffs have sufficiently alleged scienter with regard to these individuals.

As the two senior officers of the College, Short and Kiszka, had access and regularly received the reports and data which contradicted the Official Statement's projections regarding enrollment and financial aid. AC, ¶ 34.[35] Kiszka, as the College's CFO, was the person who initiated and circulated the budgets that contradicted the financial aid projections and those budgets were circulated to the President. AC, ¶ 57. Kiszka also had access to the current year financial aid data that belied the Official Statement's predictions regarding the current year's financial aid predictions. Similarly, the admissions data that contradicted the Fall 1998 enrollment prediction was routinely generated by the school's admissions office and such reports were regularly distributed to the President and the CFO.

The President and CFO would also know whether or not a student retention crisis existed at Bradford. Indeed, the dire situation was disclosed in the February 1997 board meeting, and Kiszka himself was the one who predicted only two to three more years for the College. AC, ¶ 47. They would have both known of the non-existence of the financial aid reduction plan and the lack of a strategic plan. With regard to the Board decision to use all efforts to avoid making an equity

---

[35]    To the extent such allegations pled with sufficient specificity in the current complaint, they can be detailed by an amended pleading.

contribution, Short attended the meeting where this policy was decided. AC, ¶ 65. Although not alleged in the Amended Complaint, the minutes of the Board Committee meetings, which the Bradford Defendants have attached as Exhibit 2 to their supporting memorandum, show that Kiszka was also present and made the financial presentation to the Committee members.[36]

In short, the Plaintiffs have alleged, or can easily amend to allege, that Short and Kiszka had knowledge of all of the material facts that were either falsely stated or materially omitted. Although they signed the Bradford appendix contained within the Official Statement, they either recklessly failed to check the records and information they possessed, or they intentionally ignored or misrepresented them. Combined with the other circumstances described in the Complaint and described above, these facts are sufficient to raise a strong inference of scienter with regard to these two defendants.

3.    The Trustee Defendants May Be Found Liable As Control Persons of Bradford

The Bradford Defendants correctly state that the Plaintiffs have not pled specific facts that connect any of the Trustee Defendants' to the misrepresentations and omissions in the Official Statement[37]. Although many of the Trustees had knowledge regarding the contested statements, the Trustees did not sign the Official Statement, and without discovery the Plaintiffs cannot specifically allege the roles the individual Trustee Defendants had in drafting, preparing and approving it.

The Trustee Defendants, however, are still liable to the Plaintiffs as control persons under

---

[36]    Kiszka, in fact, appears to have drafted the minutes of the Committee meetings, since his initials are at the bottom of the document.

[37]    Plaintiffs do not consider Defendant Short to be a Trustee Defendant. See footnote 2. Although he sat on the board of trustees, he was also the President. He signed the disclosure and most certainly can be held responsible for its contents.

§ 20(a).  To establish a §20(a) claim, a plaintiff must plead (1) an underlying violation by a controlled person or entity; and (2) that a defendant controlled the violator. <u>Aldridge</u>, 284 F.3d at 85; <u>Garvey v Arkoosh</u>, 354 F. Supp. 2d 73, 85 (2005).  The Complaint clearly depicts Rule 10b-5 violations by Bradford, the entity the Trustee Defendants are alleged to control.  The fact that Bradford has filed for bankruptcy and is not a party to action is immaterial.  See e.g. <u>In re WorldCom Inc. Securities Litigation</u>, 294 F. Supp. 2d 392, 419-20 (S.D.N.Y. 2003) (Plaintiffs stated § 20(a) claim against Director Defendants based on their control of WorldCom notwithstanding fact that WorldCom was not a defendant in action.) .

The Bradford Defendants also allege that the Plaintiffs have not sufficiently alleged their control over Bradford.  The Bradford Defendants forget, however, that the PSLRA's heightened pleading standards do no apply to § 20 claims.  <u>In re WorldCom Inc. Securities Litigation</u>, 294 F. Supp. 2d at 415-16.  Liability under § 20 is not premised on the defendant having made an untrue statement or material omission, or having acted with a particular state of mind, so neither Rule 9(b) or 15 U.S.C. § 78u-4(b) apply.  Moreover, the First Circuit has recognized that "(c)ontrol is a question of fact that will not ordinarily be resolved summarily at the pleading stage." <u>Cabletron</u>, 311 F.3d 11, 41 (1st Cir. 2003).  Accordingly, Plaintiffs control claims against the Trustee Defendants survive if the Amended Complaint alleges that they exercised control over Bradford in accordance with Rule 8(a).  The Amended Complaint meets this showing.

The Amended Complaint states (as does the Official Statement) that Bradford was governed by the Trustee Defendants. AC, ¶ 40.  It also alleges that they had the power and influence to direct the management and activities of the College, AC, ¶ 37, 87, and describes many incidents when they

did indeed direct the management of Bradford.[38]   It further states that they participated in the drafting, preparation and/or approval of the Official Statement and were aware of or recklessly disregarded the misrepresentations and material omissions contained within it.  AC, ¶ 35.  These allegations constitute a short, plain statement that the Board had the ability to control and did exercise control over the College, including the activities that caused the claimed misconduct.  At this stage of the proceeding, that is all that is required.[39]

## II.   PLAINTIFFS HAVE STATED A CLAIM AGAINST ADVEST UNDER SECTION 12 OF THE SECURITIES ACT OF 1933.

### A.   Plaintiffs' Interest In Bradford's Contract To Repay The Bond Debt Is A Separate Security That Is Not Exempt From The Antifraud Provisions of the 1933 Act.

#### 1.   The agreement of a beneficiary of conduit financing to repay the proceeds of a municipal bond offering is a separate security which may be subject to the antifraud provisions of the 1933 Act.

Count III, which Plaintiffs have brought against Advest alone, alleges that Advest sold bonds to them through the use of a prospectus that contained untrue statements of material fact and material omissions in violation of § 12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2).  Advest's principal defense is that the bond offering was exempt from Section 12.  Exemptions from the securities laws are narrowly construed and Advest bears the burden of proving the exemption.  Tcherepnin v. Knight, 389 U.S. 332, 336 (1967); S.E.C. v. Ralston Purina Co., 346 U.S. 119, 126 (1953)

Section 3(a) of the 1933 Act exempts several categories of securities from many, but not all,

---

[38]  See e.g. ¶¶ 47, 51  (attempting to engage in financial planning), ¶ 50 (approving dormitory construction project), ¶¶ 57, 69 (reviewing and approving Bradford's budget), ¶ 65 (deciding to not make a equity contribution to the renovation project), ¶ 72 (deciding to continue with renovations and to expend monies from the Construction Fund), ¶ 73 (refusing to liquidate Bradford regardless of bleak financial future).

[39]   There can be no doubt that Plaintiffs have alleged sufficient control status and control exercise by the Officer Defendants, who are plainly alleged to have had and exercised day to day control over Bradford.  AC, e.g. ¶ 34.

of the Act's provisions. Pursuant to subsection (4), "any security issued by a person organized and operated exclusively for religious, educational, benevolent, fraternal, charitable or reformatory purposes and not for pecuniary profit" is exempt. The subsection (4) exemption protects Bradford from the registration requirements of the 1933 Act. However, Section 12's antifraud provision covers all securities "whether or not exempted", except for those exempted under subsections (2) and (14) of §3(a). Only if the Bradford bonds qualify under these later exclusions is Advest free from Section 12 liability.

Advest contends that because the formal issuer of the bonds was the Massachusetts Industrial Finance Agency, a body politic of the Commonwealth, the bonds are exempt under the provision for governmental issuers, subsection (2). But neither MIFA or any other division of the Commonwealth had any obligation to make any payments to the bondholders; repayment is solely the obligation of Bradford. This type of municipal bond financing is known as conduit financing, because the state entity issuing the bonds is merely a conduit for flowing money into a private entity, and the resources and credit of the state or municipality do not stand behind the financing. See generally, United States v. Massachusetts Industrial Finance Agency, 910 F.Supp. 21, 24 (D. Mass. 1996).

If the private parties who are the beneficiaries of conduit financing are exempt from the registration and antifraud provisions of the securities laws because of an expansive reading of §3(a)(2), substantial danger exists for investors. The SEC recognized the potential for abuse as far back as 1968, when it promulgated Rule 131, 15 CFR § 230.131. By that rule, the SEC announced its position that more than one security is offered and issued in a conduit financing. It found that the underlying agreement by the private entity that received the proceeds of a conduit financing to repay those monies was a "separate security" distinct from the bond issued by the government entity.

Recognizing that the typical conduit financing arrangement "represents a financing by a private company", it analyzed the situation as follows:

> The municipality of other governmental units usually has no significant obligation under the bond, except to the extent of applying lease payments received from the private company to the payment of principal and interest. The investor cannot look to the municipality for interest payments or repayment of the principal; he can only look to the possibility of success or failure of the private company. The municipality serves as a conduit through which the amounts payable under the lease arrangement flow from the private company to the bondholder. In these circumstances, the investor is offered an interest in an obligation of the private company which is a "security" within the meaning of the securities acts and should have the benefit of the disclosures required by the Securities Act of 1933 and the Securities Exchange Act of 1934 when applicable. (emphasis added)

Industrial Revenue Bonds, Notice of Proposed Rulemaking, 33 FR 3142 (Securities & Exchange Comm., February 16, 1968). The SEC has also recognized that there are two issuers in conduit financings, the official government entity and the obligor responsible for payment of the bonds. See e.g. 15 CFR 240.15c2-12(f)(4)("issuer of municipal securities" defined as "governmental issuer specified in section 3(a)(29) of the Act and the issuer of any separate security"). It, of course, follows that if the "separate security" is not exempt from the 1933 Act, the issuer and all persons involved in the offering must meet the requirements of the Act. Industrial Revenue Bonds, Notice of Proposed Rulemaking, 33 FR at 3142-43.

Courts, commentators and even Congress have accepted the SEC's interpretation of the 1933 Act regarding the existence of two securities in conduit financing transactions. See, McCay v. Juran & Moody 1998 WL 1780694 *5 (D. N.D.,1998) (finding a separate non-exempt security in a conduit financing for purposes of North Dakota Blue Sky laws) ; Thomas Hazen, The Law of Securities Regulation, sec. 4.3[A][1] (5th ed., 2005); Louis Loss and Joel Seligman, Fundamentals of Securities

Regulation, pp. 268-72 (3d ed. 1995). The most concrete affirmation of the existence of a separate security in conduit financing is the action taken by Congress when it decided, against the SEC's wishes, to not require registration of many of the bond offerings within the scope of Rule 131. Instead of amending the § 2(1) definition of "security" to clarify that separate securities did not exist or were not "securities" under the 1933 Act,[40] in 1970 it expanded the exemption under §3(a)(2), specifically exempting "any security which is an industrial development bond" that bears interest that is excludable from gross income under specific designated sections of the Internal Revenue Code. See Pub.L. 91-373, Title IV, §401(a).[41]

Plainly, if Congress intended all securities issued by a governmental entity to be automatically exempt from the 1933 Act, it would not have amended the statute to specifically exempt certain types of conduit financing issues; the existing form of the statute would have provided such an exemption. Congress' action implicitly recognizes that some types of municipal securities are not exempt, even when a body politic of a state has formally issued the security. Further, there must be some significance that Congress did not exempt all types of tax-exempt municipal securities permitted by the tax code, but only specific types of industrial development bonds.

Advest contends that only those types of conduit financings directly within the scope of Rule 131, which is limited to financing for the benefit of an "industrial or commercial enterprise", can create separate securities. It asserts that if the Bradford offering did not fall within Rule 131, no non-

---

[40]    Contrast Pub.L. 105-554 § 1(a)(5) which deleted non-security based swap agreements from the definition of "security" in Securities Exchange Act of 1934 through the enactment of 15 U.S.C. §78c-1. This Congressional action, which was also taken in response to a regulatory position that Congress disapproved, shows that Congress will clarify the definition of "security" if it believes a regulatory agency has incorrectly interpreted it.

[41]    The actual text of the provision is set forth in footnote 45, infra.

exempt separate security exists. Advest misunderstands what the SEC has done and the scope of its powers. While the SEC has some discretion to define what types of securities may be registered, it does not have the ability to create a "security". At most it may offer its opinion as to when it understands a "security" to exist under the 1933 Act. A "security" is ultimately defined by §2(a)(1). If a debt instrument falls within the definition, whether the SEC acknowledges it or not, it is subject to the Act's requirements.

Thus, merely because the SEC did not include conduit financings on behalf of non-profit entities within the scope of Rule 131 does not mean separate securities only exist in industrial revenue bond financings.[42] If separate securities exist in conduit financings because a private entity, not a state or municipal entity, stands behind the ultimate payment, it does not matter if the tax treatment of the offering is determined by the industrial revenue bond sections of the tax code or other provisions. There is no reason under the securities laws why separate securities would exist in one type of conduit financing, but not another.

This is borne out by <u>McKay v. Juran & Moody, Inc.</u> 1998 WL 1780694 *5 (D. N.D.,1998), which involved a North Dakota Blue Sky Act claim[43] for failing to register certificates of participation in lease agreements that defendants sold to the plaintiff. The certificates were formally issued by North Dakota counties, and defendants, like Advest here, claimed they qualified for the

---

[42]      There is a reason why the SEC only included industrial revenue bonds within the scope of Rule 131 and not municipal bond conduit financings involving non-profit entities. Rule 131 is a registration rule. Its purpose is to require the private entities profiting from industrial revenue bond financings to register their offerings before the sale. Bradford, and other educational, benevolent and non-profit entities, however, are exempt from registration pursuant to §3(a)(4). There is no reason to include them within the scope of Rule 131 because even if the scope of Rule 131 was expanded, such entities, unlike private for profit companies, would be exempt from registration in any event.

[43]      The plaintiff's federal securities claims were dismissed on statute of limitation grounds.  1998 WL 1780694 *3.

statutory exemption for securities issued by a state entity. The certificates were instruments that were similar, but distinct, from revenue bonds, and the municipal issuers did not have any responsibility for their payment. The District Court examined Rule 131, and found "the principles of Rule 131 apply in this case," even though the certificates were not industrial revenue bonds[44]. It found that there were two separate securities, one issued by the state, one issued by the private party responsible for repayment. Because the later was not a state entity, the certificates were not exempt.

The same result applies here. The Bradford bonds comprised two securities, one issued by MIFA, and the second, which contained the College's promise of repayment, issued by Bradford. Because Bradford is exempt from registration as an educational entity, there was no requirement to register the Bonds. But because entities qualifying for the subsection (4) exemption are not exempt from Section 12, Advest can be held liable for any misstatements in any prospectus pursuant to which the securities were sold.

> 2.    Neither the structure of exemptions permitted under the Securities Act or the purpose of the governmental issued security exemption support Advest's position.

Advest claims that the tax exempt status of bond issuance itself is sufficient grounds for exemption. While Congress did expand the §3(a)(2) exemption for certain types of industrial development bonds in 1970, there is no doubt that the Bradford bonds do not fall within the

---

[44]    Although not expressly stated, the financing would not have fallen under Rule 13, since the purpose of the certificates of participation was to fund the construction of county jails, not industrial or commercial enterprises. Indeed, Rule 131 could not apply under any circumstances since the violation alleged was a failure to register under North Dakota's securities laws. Rule 131, even if applicable, only mandates registration under the federal securities laws. Nor does it purport to identify what constitutes a "security" under state securities statutes. North Dakota does not appear to have had a state equivalent of Rule 131.

exemptions' parameters,[45] the bonds are not industrial revenue bonds, nor is any interest paid on their behalf excluded from gross income on account of the specific tax code provisions cited in the statute.[46] Nor can Advest claim Congress intended to exempt all tax exempt municipal securities. Congress passed only a narrow exemption in 1970. If Congress intended to exempt all conduit financings that benefited tax exempt entities such as Bradford, it would have either passed a broader exemption or amended Section 12 so it no longer applied to securities exempted by subsections (2), (4) and (14) of §3(a), instead of just (2) and (14). By granting institutions such as Bradford only exemption from registration, Congress clearly did not intend that Bradford and other non-profit institutions enjoy a broad exemption from the antifraud provisions of the 1933 Act.

Advest strongly relies on Judge Zobel's opinion in Gorsey v. I.M. Simon & Co, 1987 WL 7749, Fed.Sec. L. Rep. ¶ 93,173 (D. Mass. 1987) and two other cases In re Bexar County Health Facility Development Corp. Sec. Litigation, 125 F.R.D. 625 (E.D. Pa. 1989) and Lieberman v. Cambridge Partners, LLC 2003 WL 229921, Fed. Sec. L. Rep. ¶ 92,650. These cases merely focus on whether the debt instrument at issue fell within Rule 131. Unlike McKay, they do not consider whether separate securities exist in the conduit financings regardless of the literal applicability of Rule 131. Indeed Bexar County purports to require proof that Congress intended to strip tax-exempt entities of their purported exemption from Section 12's antifraud provision. The Court wholly

---

[45]    The 1970 amendment to subsection (2) expanded the exemption to apply to "any security which is an industrial development bond (as defined in section 103(c)(2) of Title 26) the interest on which is excludable from gross income under section 103(a)(1) of Title 26 if, by reason of the application of paragraph (4) or (6) of section 103(c) of Title 26 (determined as if paragraphs (4)(A), (5), and (7) were not included in such section 103(c) ), paragraph (1) of such section 103(c) does not apply to such security."

[46]    In any event, it appears that this exemption is no longer available. When Congress amended the Internal Revenue Code in 1986 it completely overhauled its treatment of tax exempt municipal securities. "Industrial development bonds" no longer exist under the Code, and the specific statutes specifying the tax status that must be met to qualify for the exemption no longer exist. By failing to update the statutory references and repealing the sections necessary for qualification of the exemption, Congress must be presumed to have eliminated the exemption.

59

ignores Congress' clear mandate that charitable and educational entities should only be exempt from the 1933 Act's registration provisions because Congress intentionally chose to not exempt §3(a)(4) securities from Section 12.

Finally, the Court must consider whether expanding the government issued security exemption to cover the types of private entities Congress deliberately chose not to exempt from §12 is consistent with the policies of the federal securities laws. The Supreme Court, in <u>Gustafson v. Alloyd Company</u>, 513 U.S. 561, 571 (1995) has already cautioned against interpreting §3(a)(2) to illogically allow this exemption to be enjoyed by private entities.

> Why would Congress grant immunity to a private seller from liability in a recission suit for no reason other than that the seller's misstatements happen to relate to securities issued by a government entity? No reason is apparent. The anomaly disappears, however, when the term "prospectus" relates only to documents that offer securities sold to the public by an issuer. The exemption for government-issued securities makes perfect sense on that view, for it then becomes a precise and appropriate means of giving immunity to governmental authorities.

Permitting the government-issued security exemption to protect private entities and their underwriters does not serve the precise and appropriate purpose of this statute. <u>Gustafson</u> makes it clear that §3(a)(2) is designed to protect true government financings. Applying the exemption to a private party Congress did not originally intend to exempt does not further that purpose and unnecessarily expands an exemption that is supposed to be construed narrowly to effectuate its purpose.

60

B.    Plaintiffs' Have Properly Pled The Elements of a Section 12(a)(2) Claim

1.    Rule 9(b) Pleading Standards Do Not Apply To This Count

Fraud is not an element of a Section 12 claim and Plaintiffs are not required to prove scienter or reliance.  Gustafson v. Alloyd Co. 513 U.S. 561, 582 (1995); Shaw, 82 F.3d at 1223. Consequently, Rule 9(b) heightened pleading standards do not apply to a Section 12 claim unless the claim "sounds in fraud." Section 12 claims do not "sound in fraud" if they do not include allegations of scienter or reliance. Shaw, 82 F.3d at 1223.  Nor do claims based on negligence. Id.; Number Nine, 51 F. Supp. 2d at 13.

Here, in contrast to Plaintiff's Rule 10b-5, fraud and negligent misrepresentation counts, Plaintiffs do not allege that they relied on the false and misleading representations.  Compare AC, ¶ 92 with AC, ¶¶ 85, 97 and 100.  Also, in contrast to their Rule 10b-5 and fraud counts, Plaintiffs only allege negligent conduct in Count III as opposed to reckless or deliberate conduct in the other counts.[47]  Compare AC, ¶ 90 with AC, ¶¶ 83, 97.  Accordingly the Amended Complaint does not "sound in fraud" and Rule 8 pleading rules apply to this claim.[48]

---

[47]    Plaintiffs do alternatively plead that Advest knew about the false statements and material omissions, but such an allegation does not convert their claim into one which "sounds in fraud."

> Although the complaint does assert that defendants actually possessed the information that they failed to disclose, those allegations cannot be thought to constitute "averments of fraud", absent any claim of scienter and reliance.  Otherwise, any allegation of nondisclosure of material information would be transformed into a claim of fraud for the purposes of Rule 9(b).

Shaw, 82 F.3d at 1223. See also Number Nine, 51 F. Supp.2d at 13.

[48]    Advest asserts that because the Plaintiffs are pleading the same misstatements and omissions under their Rule 10b-5 and Section 12 claims, the latter necessarily "sound in fraud." However, to conserve judicial resources and to avoid duplicative actions, the same misrepresentations can be pled in the same Complaint under both theories. However, the Plaintiffs may not submit any evidence in support of their Section 12 claim suggesting that defendants' conduct was done knowingly, intentionally, or with reckless disregard for the truth. Number Nine, 51 F. Supp. 2d at 13.

2.    Plaintiffs have appropriately pled that the Official Statement contained materially false statements and misleading material omissions.

Advest correctly states that the same misrepresentations and omissions that constitute the Plaintiffs' Rule 10b-5 claims, are also the misstatements and omissions that form the basis of their Section 12 claim. For the reason set forth in Section I, the Plaintiffs have set forth sufficient allegations to state a claim under the most stringent standard. Consequently, they meet the less rigorous Rule 8 standard that applies to this claim. Plaintiffs rely on their discussion above and do not need to add anything further.

3.    Plaintiffs have standing as purchasers in the initial offering

Plaintiffs have alleged that they purchased their Bradford bonds from Advest who was the sole underwriter for the May 1998 public offering. AC, ¶¶ 13, 90. The Court can reasonably infer, especially from the size of the positions taken by the Institutional Bondholders, that Plaintiffs purchased their holdings in the primary offering and not in the secondary market. If, however, this is not a reasonable inference, Plaintiffs, all of whom are initial purchasers, can amend their complaint to repair this technical error.

## III.    PLAINTIFFS HAVE STATED CAUSES OF ACTIONS FOR THEIR MASSACHUSETTS STATUTORY AND COMMON LAW CLAIMS

The Amended Complaint includes five claims under Massachusetts Law: violation of the Uniform Securities Act, M.G.L. c. 110, § 410; violation of Chapter 93A; fraud; negligent misrepresentation; and breach of fiduciary duty to creditors. Plaintiffs have elected to dismiss the fiduciary duty claims, but have stated viable causes of action for the remaining state law counts.

A.    Plaintiffs Have Stated Claims Against All Defendants For Violation of the Uniform Securities Act

The Massachusetts version of the Uniform Securities Act, M.G.L. c. 110A, broadly regulates securities offerings in the Commonwealth, but contains only a single civil remedy for misrepresentations and omissions, § 410. Marram v. Kobrick Offshore Fund, Ltd., 442 Mass 43, 50, 809 N.E. 2d 1017, 1025 (2004) ("Marram"). Section 410(a)(2) provides a cause of action against any person that offers or sells a security by means of any untrue statement of material fact or any omission of a material fact. Section 410(b) also provides liability for

> Every person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller. . .

The Amended Complaint alleges that Bradford and Advest are liable under subsection (a)(2) while Plaintiffs seek to hold the Bradford Defendants, as officers, directors and control persons of Bradford, liable under subsection (b).

1.    The Massachusetts Uniform Securities Act Applies To An Offering of Massachusetts Securities

All Defendants contest the Plaintiffs' standing to bring claims under Ch. 110A on the ground that the complaint does not allege where the bonds were purchased. The test for application of the statute, however, is not correctly stated by the Defendants, but is actually set forth in the Act. Section 414(a) states that § 410 applies to persons who sell or offer to sell " when (1) an offer to sell is made in the commonwealth, or (2) an offer to buy is made and accepted in the commonwealth." Subsections (c) and (d) elaborate when these conditions have been met. Subsection (c) states:

> For the purpose of this section, an offer to sell or buy is made in the commonwealth, whether or not either party is then present in the commonwealth, when the offer (1) originates from the commonwealth or (2) is directed by the offeror to the commonwealth and received at the place to which it is directed. . .

The Amended Complaint specifically alleges that Bradford, a Massachusetts college with no out of state offices, offered the securities to the Plaintiffs. AC, ¶ 93. The Court can reasonably infer that Bradford's offer "originated" in the Commonwealth, satisfying the requirement that an offer to sell a security be made in the Commonwealth. Indeed, it is inconceivable that a bond offering by a Massachusetts state agency on behalf of a Massachusetts educational institution would not be found to "originate" in Massachusetts. Where the Plaintiffs were located and whether Advest sold the securities from their main office in Hartford or their Boston office is immaterial. The statute specifically states that the presence of the buyers or the sellers in Massachusetts at the time of the offer or sale is unnecessary.

> 2.    The Bradford Defendants cannot escape liability as the officers and trustees of the entity that issued a misleading Official Statement merely because Advest underwrote a firm commitment bond offering.

Section 410(b) establishes broad secondary liability for five categories of persons who have specified relationships with a primary violator. However, the primary violator must be a statutory "seller" for such liability to arise; the statute does not impose liability on control persons, employees or broker/dealers of §410(a)(2) violators who only offer a security. Relying primarily upon federal authority, the Bradford Defendants argue that only Advest, the underwriter, could be found to be a "seller" and, consequently, they must be dismissed.

The Bradford Defendants' argument arises out of <u>Pinter v. Dahl</u>, 486 U.S. 622, 647 (1988), a United States Supreme Court decision interpreting the term "seller" under Section 12(1) of the

64

1933 Act. The Court ruled that "sellers" are limited to those who pass title of the securities to the plaintiff and any other person who successfully solicited the plaintiff's purchase of securities provided the solicitor was "motivated at least in part by a desire to serve his own financial interests or those of the security owner." Id. The Court specifically rejected an alternative interpretation of "seller," adopted by numerous lower courts, that would also hold liable persons whose actions were a "substantial factor" in causing the transaction to occur. Id. at 648-51.

In Shaw, the First Circuit examined the effect of Pinter in a firm commitment underwriting, such as the one alleged in the Amended Complaint, in a Section 12(2) case. 82 F.3d at 1215-16. Where the underwriter purchases the entire issue and then resells it to the investing public, the underwriter is the person who has transferred title to the purchaser. Accordingly, the Court held, the issuer and its officers, notwithstanding any responsibility they may have had for any false statements in the prospectus, are not liable unless they successfully solicited the buyer's purchase. Id. at 1216. Such solicitation, the Court found, does not occur when the issuer or persons connected to it participate in the preparation of the prospectus or other routine activities relating to the securities offering. Id. There must be factual allegations describing the issuer's solicitation to survive a Rule 12(b)(6) motion. Id.

The mechanical application of the definition of "seller" has been criticized by commentators as the elevation of form over substance. For no valid reason, an issuer and his officers and directors can be held liable for Section 12 violations in a best-efforts securities underwriting – where the underwriter effectively acts as the issuer's agent – but have no liability, despite their responsibility for the contents of the prospectus, in a firm commitment underwriting. 3B Bloomenthal & Woolf, Securities and Federal Corporate Law (2d. Ed. 2004), § 12:20. The Bradford Defendants urge that

65

this senseless result be carried over to the Uniform Securities Act. But the structure of the Uniform Act is significantly different than the 1933 Act, and the purposes of the Act are undermined by unthinking adoption of federal precedent. Moreover, there is evidence that the drafters of the Uniform Act did not intend issuers and their control persons to escape all civil liability in these circumstances. Not surprisingly, therefore, the sole state Supreme Court that has squarely faced whether an issuer responsible for a misleading prospectus in a firm commitment underwriting should be a statutory "seller" under the Uniform Securities Act has rejected the application of Pinter, a result the Massachusetts Supreme Judicial Court would likely reach were it faced with the issue. For the reasons set forth below, the Institutional Bondholders can allege successful solicitation by Bradford with regard to this offering.

> a.    The Uniform Securities Act did not intend issuers to not be "sellers" in public offerings and the opposite holding would thwart the purposes of the civil liability provisions.

The purpose of §410(a)(2) is to create a strong incentive for sellers of securities to disclose fully all material facts about the security. Marram, 442 Mass at 51, 809 N.E. 2d at 1025. By allowing rescission without proof of scienter, negligence, reliance or loss causation, the statute provides a heightened deterrent to prevent misrepresentations. Id at 51-53, 1025-27. Section 410(b) furthers this deterrent effect by imposing joint and several personal liability on persons affiliated with the primary violator who are in a position to insure accurate disclosure. Thus, the seller's control persons, officers, directors, partners, and all persons having a similar status or fulfilling a similar function, as well as those employees who materially aided in the sale are potentially liable. If the seller employs a broker/dealer or other agent to aid in the sale that person, too, may be liable if he materially aided in the sale.

66

In a public offering where the issuer is the seller, this circle of secondary liability makes eminent sense. These control persons, employees and agents are generally the persons responsible for the offering memorandum that is required in public offerings, and the specter of potential liability provides the incentive to assure the complete and accurate disclosure that is the purpose of the statute, regardless of the solvency or financial condition of the issuer.

Secondary liability, however, is distributed irrationally in public offerings where an underwriter is deemed to be the sole seller. Liability is no longer coterminous with responsibility. In a firm commitment offering managed by an underwriter of any size, it is foolhardy to believe the officers and directors of the underwriter would be able to influence the disclosures of a client like Bradford, much less insure their accuracy. Any attempt to impose liability would almost certainly fail because high level executives of a sizable underwriter or their outside directors would surely qualify for the "reasonable care" defense provided by the statute.[49] Further, the provision for liability of a broker/dealer makes no sense. The underwriter is the broker/dealer; it does not retain another. At the same time, the persons who have the most culpability for misstatements in a prospectus, those affiliated with the issuer, have no threat of liability under the Uniform Act at all, not even as an aider or abettor. When "seller' is too narrowly construed, many of the strongest incentives for accurate disclosure are lost, while much of the remaining liabilities are either ineffective or serve no purpose.

Due to the different structure of the Securities Act of 1933, narrowly construing the definition of "seller" does not create anomalous secondary liability that occurs in the Uniform Securities Act. Unlike the Uniform Act, the Securities Act has two primary civil liability provisions, one for sellers

---

[49]    It is precisely for this reason Plaintiffs have not named the officers and directors of Advest, although technically viable claims against them exist.

67

who make false statements (§12, 15 U.S.C. § 77l) and a second for an issuer who file a false registration statement (§ 11, 15 U.S.C. § 77k). Moreover, the control person provision of the 1933 Act, § 15, 15 U.S.C. § 77o, reaches both violations. Accordingly, in most public offerings, even if the officers and directors of the issuer cannot be held liable for false statements in a prospectus as the control person of a Section 12 "seller," they still face liability for their responsibility for such statements because of their control of an issuer who has made misrepresentations in a registration statement. The control person liability provision rationally gives an incentive to provide accurate disclosures to the persons who have the ability to do so. Because the Uniform Act, however, has a single civil liability provision, narrowing the definition of "seller" confounds the incentives of the Act.

Given this background, it is not surprising that there is evidence that the drafters of the Uniform Securities Act did not intend issuers to not be considered sellers in these situations. Massachusetts adopted the Uniform Securities Act in 1972, and it was promulgated by the Uniform Laws Commission in 1956, decades before the Supreme Court's 1988 <u>Pinter</u> decision narrowed the definition of "seller." Although the commentary to the 1956 draft of the Uniform Act does not address who should be deemed a "seller" under §410(a)(2), comments to the 1985 revision of the Uniform Act indicate that issuers should be "sellers" under the Uniform Act's civil liability provisions.

The 1985 revision of the Uniform Securities Act restructured the prior version of the Act. The prohibition against selling a security through the use of false or misleading statements was moved to §501(2) and the private right of action to enforce that right was codified in §605. However, the civil liability provisions, with one exception not relevant here, were not intended to

68

be substantively changed by the revisions.[50] Section 605 (a), the primary violation section, continued to impose liability on a person who "offers to sell or sells a security."[51] Further, Comment 2 to §605 plainly stated that seller's liability under the revised act and under the existing law included persons whose participation was a substantial contributive factor in the violation, a definition that would clearly cover issuers who published false prospectuses:

> Section 501(2) follows closely Section 12(2) of the Securities Act of 1933 which imposes liability for material misrepresentations or omissions in the disclosures given to buyers. *As in the case with the latter, liability may be imposed on a person in addition to the immediate seller if the person's participation was a substantial contributive factor in the violation.* See, e.g. Davis v. Avco Financial, 739 F.2d 1057 (6th Cir. 1984)(emphasis added).

Indeed, to confirm that officers and directors of issuers were covered by the civil liability provisions, the secondary liability provision, § 605(d),[52] no longer limited the liability of control persons officer and directors to persons who were related to a violating "seller. Section 605(d) clarifies that any person related to a violator of Section (a) is liable, regardless of whether the violator had sold or

---

[50]    Comment 1 to §605 of the 1985 revision states: "This section has been rewritten, but, with the exception of subsection (c)[relating to market manipulation], is not intended to alter significantly existing law.

[51]    Section 605(a) of the 1985 revision of the Uniform Securities Act states in relevant part:

A person who offers to sell or sells a security in violation of Section 501(s) . . . is liable to one who purchases the security from that person.

[52]    Section 605(s) of the 1985 revision of the Uniform Securities Act states in relevant part:

A person who directly or indirectly controls another person who is liable under subsection (a) or (c), a partner, officer, or director of the person liable, a person occupying a similar status or performing similar functions, an employee of the person liable if the employee materially aids in the act, omission, or transaction constituting the violation, and a broker-dealer of sales representative who materially aids in the act, omission, or transaction constituting the violation, are also liable jointly and severally with and to the same extent as the other person . . .

merely offered to sell.[53]  This clarification confirms liability of individuals in the Bradford Defendants' position in a firm commitment underwriting when the prospectus contains misrepresentations.

Plaintiffs, of course, recognize that Massachusetts has not adopted the 1985 revision of the Uniform Securities Act.  However, when the drafters of a statute adopted by the Massachusetts Legislature clarify what they intended when the original statute was propounded, such information is entitled to weight in construing the statute. Cf. Kale v. Combined Insurance Co., 861 F.2d 746, 752, n.7 (subsequent legislative statements are entitled to interpretive weight, particularly when intent of original body is unclear).

Plaintiffs have been able to only find one court in a jurisdiction that has adopted the Uniform Securities Act that has squarely addressed the issue of who is a "seller" in a firm commitment underwriting, and that Court has repeatedly ruled that the purposes of the act are only fulfilled if the issuer is recognized as a "seller."  The Supreme Court of Washington first addressed the issue in Haberman v. Washington Public Power Supply System, 109 Wash 2d 107, 744 P.2d 1032 (1987), a bondholders' suit arising out of the infamous Washington Public Power Supply System ("WPPSS") default in the mid 1980s.  The WPPSS was a joint operating agency and division of the state of Washington that had issued bonds to construct two nuclear power plants.  The cost of the plants far exceeded original estimates and the agency defaulted on billions of dollars of municipal bonds shortly after construction of the power plants was halted.  Among other claims, the Bondholders brought suit under the civil liability provision of Washington's enactment of § 410 of

---

[53]      The Bradford Defendants have practically conceded that if § 410(b) liability extended to officers and directors of a violator of subsection (a)(2), as opposed to only a "seller" who has violated the primary liability section, they are persons who could be found liable under subsection (b).

70

the Uniform Securities Act against the issuer and other persons who they claimed had participated in the sale of the bonds. The trial court dismissed the bondholders' claim on the ground that the bonds were sold in a firm commitment underwriting and only the underwriters could be liable under Washington's securities' laws for selling the bonds to the plaintiffs.

Recognizing that Washington's statute was based on both Section 12(2) and the Uniform Securities Act, the Washington Supreme Court surveyed the approaches taken by state and federal courts on how to define "seller."[54] After reviewing the approaches taken by various courts, it concluded that liability should attach when the defendants' action was a "substantial factor in bringing about the transaction." 109 Wash 2d at 130-31, 744 P.2d at 1051. In part, the Court was influenced by the Commentary to the 1985 Revision to the Uniform Securities Act cited above. Id. It was particularly concerned that too narrow a definition would defeat the remedial purpose of the statute in firm underwritten bond issues and felt that only the substantial factor test appropriately supported the remedial purposes of the Act.

The Court explained its ruling with the following:

> Our substantial contributive factor analysis simply expands the strict privity approach to sellers so as to include those parties who have the attributes of a seller and thus who policy dictates should be subject to liability under RCW 21.20.430(1) [the Washington statutory equivalent of §410(a)], but who would escape primary liability for want of privity.
>
> Here, for example, the Supply System sold all the bonds to underwriters who then sold them to plaintiffs and intervenors. If we were to require strict privity for liability under RCW 21.20.430(1), only the underwriters would be potentially liable for prospectus fraud, cutting off all potential claims against the issuer of the bonds and others acting together with the issuer who were

---

[54]    The Court noted that the federal courts' interpretation of state securities laws was generally unhelpful because the federal courts usually only repeated what their circuit had ruled with regard to Section 12(2) instead of interpreting the state enactment. 109 Wash 2d at 129, 744 P. 2d at 1051.

71

the actual beneficiaries of the sale proceeds. The result allows issuers of securities to insulate themselves from liability to ultimate purchasers simply by selling to middlemen beyond their control, even in situations where they know that the securities will be resold immediately to buyers who will rely on Official Statements and Annual Reports written by the issuer to facilitate the sales. Unlike the federal Securities Act of 1933, § 11, the WSSA does not provide for separate issuer liability. Thus, if privity were required for liability under RCW 21.20.430(1), an issuer in a firm commitment underwriting would never be liable, regardless of its culpability. We find such a result contrary to the clear purposes of the WSSA.

109 Wash 2d. at 132, 744 P.2d at 1052.

Haberman was decided before Pinter. After the Supreme Court's decision, the Washington Supreme Court had an opportunity to change its position in light of the federal precedent in State v. Hoffer, 113 Wash 2d 148, 151-52, 776 P.2d 963, 964-65 (1989). The Court, however, recognized the substantial contributive factor test was the still the appropriate standard under the Uniform Securities Act in light of the Act's structure and policies. The Court gave three reasons for rejecting Pinter. First, the purpose of the state statute was different than the federal securities laws. While the latter was also concerned with protecting the integrity of the markets, the state statute was primarily was concerned with protecting investors and should therefore be more broadly construed. Second, the structure of the two statutes are different. While the federal statute had a separate provision for liability for issuers (§ 11), the Uniform Securities Act did not. Third, the Court returned to the problem of firm commitment underwritings, refusing to believe that the Washington Legislature would insulate issuers from liability when they were creators of the written disclosures and reports that were critical in informing investors. Id. 113 Wash 2d. at 152, 776 P. 2d at 965.

The concerns of the Washington Supreme Court in Haberman and Hoffer, and their understanding of the purposes of the Uniform Securities Act, are same concerns and understanding

72

the Supreme Judicial Court demonstrated in its analysis of the Uniform Securities Act in <u>Marram</u>. The SJC has clearly stated its view that the Act is "redressive" and "preventative" and is to be read to provide substantial protection to the buyer of securities who receives false and misleading information. 442 Mass. at 51-52, 809 N.E. 2d at 1025-26. Given the SJC's concern with protecting investors, it is likely that the Court would recognize a broader definition of "seller" is necessary to obtain the statute's objectives.

      b.     Some of the Plaintiffs were solicited by Bradford.

Even if the Court finds that "seller" should be defined in accordance with <u>Pinter</u> and <u>Shaw</u>, that does not necessarily mean that Bradford and its officers and Trustees could not be liable under §410. Persons that successfully solicited the plaintiff to purchase the securities in further of their own financial ends may be held liable as "sellers." <u>Pinter</u> 486 U.S. at 687. Here, although not currently alleged in the Amended Complaint, Kiszka, on behalf of Bradford, did have contact with at least one of the Institutional Bondholders before its purchase regarding the alleged merits of the bond issue. Such contact could be found to constitute "solicitation" and such an allegation would be sufficient to allow the § 410 claims against the Bradford Defendants to go forward. <u>Lone Star Ladies Investment Club v. Schlotzsky's</u>, 238 F. 3d 363, 370 (5th Cir. 2001) (allegation of solicitation by issuer in a firm underwriting issuance is sufficient to avoid dismissal under § 12(a)(2) claim; whether issuer acted as underwriter's agent is issue for summary judgment). The Institutional Bondholders should be given leave to amend to allege solicitation.

73

3.    Plaintiffs have sufficiently stated a claim for misrepresentation under the Uniform Securities Act.

Defendants' attack on the merits of Plaintiffs' Uniform Securities Act claim repeat their assertions that the complaint fails to state the existence in the Official Statement of any materially false or misleading statements or omissions. For the reasons set forth above, the five categories of statements identified in Section I do state claims for false and misleading statements and it is unnecessary to repeat the analysis.

In evaluating the sufficiency of Plaintiffs' Uniform Securities Act claims, the court should keep in mind that plaintiffs are not required to plead negligence, scienter, reliance or loss causation to state a claim under § 410. Marram, 442 Mass at 51-53, 809 N.E. 2d at 1025-27 and nn.18 and 24. Further, because fraud is not an element of the statutory claim, Plaintiffs are not required to meet particularity requirements of Rule 9(b). Stolzoff v. Waste Systems International, Inc., 58 Mass. App.Ct. 747, 764, 792 N.E. 2d 1031, 1045-46 (2003) (claims under M.G.L. c. 110A, § 410 erroneously dismissed for failure to comply with Mass.R.Civ.P. 9(b))

The Bradford Defendants' assertion that estimates and projections cannot be the basis of a claim under § 410 is erroneous. The Supreme Judicial Court expressly held that an opinion is actionable if it is inconsistent with facts known at the time the opinion is made. Marram, 442 Mass. at 58, 809 N.E. 2d at 1030 n. 24. Similarly incorrect is their assertion that general written disclaimers can overcome specific misrepresentations of fact. Id. at 54, 809 N.E. 2d at 1028 (written warning that investment manager could concentrate holdings in one industry did not as a matter of law refute plaintiff's claim that that defendant made specific misrepresentation concerning diversification). Indeed the Court cited authority that alleged misrepresentations relating to risk and

74

volatility ordinarily raise genuine issues of fact. Id. at 58, 809 N.E.2d at 1030.

4.    Plaintiffs' Claims Are Not Precluded By A Statute of Repose

Astonishingly, the Bradford Defendants' assert that notwithstanding the Tolling Agreements they knowingly signed to induce Plaintiffs to dismiss voluntarily their original timely action, Plaintiffs' Uniform Security Act claims are barred by a statute of repose.  The argument is astonishing for at least two reasons: (1) § 410(e) is not a statute of repose, and (2) the Bradford Defendants are contractually bound not to raise the defense.

Statutes of repose completely eliminate a cause of action without regard to whether the cause of action has accrued or been discovered. Klein v. Catalano, 386 Mass 701, 708, 437 N.E. 2d 514. (1982).  They commence from a "definitely established date" such as the date on which the act or omission occurred which forms the basis of the cause of action.  Nissan Motor Corp. v. Commissioner Of Revenue, 407 Mass 153, 158, 552 N.E. 2d 84 (1990).  A statute of repose creates a bright line method of determining when the statutory period starts and ends so beneficiaries will obtain certainty that potential liabilities are extinguished. Nett v. Bellucci, 437 Mass.630, 639, 774 N.E. 2d 130, 137 (2002).  A statute of limitation, on the other hand is the procedural measure which "normally" governs the time within which legal proceedings must be brought after the cause of action accrues.  They ordinarily do not begin to run until the date of the Plaintiff's injury or the date of discovery.  McGuiness v. Cotter, 412 Mass 617, 621-22, 591 N.E. 2d 659, 662 (1992). Ordinarily, when the Legislature intends to create a statute of repose, it does so directly by language that unambiguously announces no exceptions to the statutory period. Id. 412 Mass at 622, 591 N.E. 2d at 663.

Section 410(e), which provides that no person may sue for a violation of the statute more than

75

four years after its discovery does not create a "definitely established date" from which the limitation period runs or a "bright line" which will enable a defendant to know, with certainty, when liability has been extinguished. Indeed, commencement of the time period is pegged to a plaintiff's "discovery," which is a classic commencement of a normal limitations period. Nor is the time period tied to an act or omission by the defendant. Thus, it is hard to see how § 410(e) would give any defendant repose, since it starts to run at an indeterminate discovery date which could be years (or even decades) after the event in question. The language of §410(e) also does not contain the unambiguous "without exception" finality that is the hallmark of a statute of repose. But perhaps the best evidence that § 410(e) is a statute of limitation and not repose is that the Supreme Judicial Court has described the four year term of § 410(e) as a "limitations period," not a period of repose. Marram, 442 Mass at 54, 809 N.E. 2d at 1028, and n. 20.

Even if § 410(e) was a statute of repose, the relevant question is not whether the statute can be tolled, but whether it can be waived. Plaintiffs do not rely on an equitable tolling theory to proceed with their action, but rather on Defendants' intentional waiver of their right to raise a statute of limitations or statute of repose defense based on the time covered by the Tolling Agreement.[55] Defendants raise no reason why they could not legally waive this defense, and the statute makes it clear that they can. Unlike most statutes, the Uniform Securities Act has a provision that identifies which provisions of the statute cannot be waived.[56] Only a person acquiring a security is unable to waive another person's compliance with the Act's provisions. If strict compliance with the

---

[55]    To the extent the Court cannot reasonably infer that under the tolling agreements the Defendants waived their rights to raise limitations and repose defenses during the tolling period, Plaintiffs can amend their complaint.

[56]    Section 410(g) states that "any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this chapter or any rule or order hereunder is void."

limitations period is as essential to the statutory scheme as posited by the Bradford Defendants, the non-waiver provision would also cover the protections the Act grants to security sellers.[57]

Finally, the Bradford Defendants fail to inform the Court that they are contractually barred from raising this argument. The Tolling and Standstill Agreements signed by each of the Bradford Defendants state that

> Each Potential Defendant hereby agrees and acknowledges that he, she or it shall not plead or raise and is estopped from pleading or raising the period of time during the Tolling Period as part of a defense of bar based upon any Limitations Period with respect to any Claim. (emphasis added)

The Bradford Defendants do not explain why these agreements are void or why they should be allowed to enjoy the valuable consideration they received for executing them – Plaintiffs' dismissal of a timely filed law suit – while the Plaintiffs should be wholly deprived of the benefit of their bargain. The Court should not tolerate the Bradford Defendants' gamesmanship and lack of candor with regard to this purported defense.

B.    Plaintiffs' Fraud Claims Plead Reliance With The Requisite Specificity and Plaintiffs Could Reasonably Rely on the Representations In Bradford's Official Statement

Defendants' arguments in favor of dismissing Plaintiffs' fraud claims for the most part repeat their earlier assertions that the Amended Complaint fails to plead material misrepresentations, scienter and personal involvement of the individual defendants to the requisite level of specificity

---

[57]    In fact, the Bradford Defendants fail to cite any authority that statutes of repose in Massachusetts cannot be voluntarily waived. Undoubtedly, this is because the purpose of statutes of repose is to give particular types of defendants the benefit of a date certain when liability will end, allowing such defendants to be secure in their reasonable expectation that they will not be called upon to resist an older claim when memories have faded and evidence may be lost. Nett v. Bellucci, 437 Mass.630, 639, 774 N.E. 2d 130, 137 (2002). Defendants who voluntarily waive the protection of a statute of repose, particularly sophisticated litigants represented by counsel, have no reasonable expectation of repose and understand the risks taken by agreeing to such a waiver. Where statutes have been enacted for the specific benefit of a class of persons, there is no reason that members of that class cannot intelligently waive such protection, particularly if they are receiving valuable consideration in return.

required by Fed.R.Civ.P. 9(b). Plaintiffs have addressed these arguments in their discussion of the Rule 10b-5 causes of action and there is no need to repeat the analysis.

In evaluating Plaintiffs' common law fraud claims, however, the Court should recall that although the circumstances of fraud must be plead with specificity under Rule 9(b), the heightened pleading standards for scienter and proof of misrepresentation do not apply the fraud count. For common law fraud, the specificity requirement only extends to the particulars of the misleading statement. Rodi v. Southern New England School of Law, 389 F. 3d 5, 15 (1st Cir. 2004) ("Rodi"). It is satisfied when the complaint states the "who, what, where and when" of the allegedly false or fraudulent misrepresentation. Alternative Systems Concepts, Inc. v. Synopsys, Inc. 374 F.3d 23, 29 (1st Cir. 2004). The other elements of fraud, such as intent and knowledge, may be averred in general terms. Rodi, 389 F. 3d at 15

All Defendants assert that Plaintiffs' have failed to adequately plead reliance. The Bondholder Plaintiffs' however, have pled that the false statements in the Official Statement were made for the express purpose of inducing the Plaintiffs to purchase the bonds, AC, ¶¶ 97, 100, that they did indeed purchase the bonds in reliance upon the Defendants' false statements and omissions, AC, ¶¶ 85, 97, 100 and that they would not have purchased the bonds if they had not been misled, AC, ¶ 85. With regard to ACA, the Amended Complaint alleges that it reviewed the Official Statement, AC, ¶ 66, that its conversation with Kiszka reinforced the misleading statements and omissions, ¶ 66, that the misleading statements in the Official Statement were intended to induce ACA to issue an insurance policy, ¶¶ 97, 100 and that ACA relied on the misrepresentations in the Official Statement (and in the conversation with Kiszka) in issuing the policy, ¶¶ 67, 97, 100. Authority cited by the Defendants establishes that such allegations are sufficient. Sebago, Inc. v.

78

Beazer East, Inc., 18 F. Supp. 2d 70, 86 (D. Mass. 1998)(allegations that plaintiffs received allegedly false representations, their agent reviewed the representations and that they then purchased product in reliance upon representations adequately pleads reliance in conformity with Rule 9(b)).[58]

The Bradford Defendants contend that Plaintiffs could not reasonably rely on the alleged misrepresentations and omissions because the other disclosures in the Official Statement warned them of the dangers faced. Putting aside the Bradford Defendants' propensity to overstate the disclaimers in the Official Statement and the financial results,[59] they argue the warnings that Bradford might not be able to achieve its financial objectives make it unreasonable for the Plaintiffs to rely on other information that might be incorrect or misleading. In essence, they argue that since the investors were warned of the potential risk, it is irrelevant if the Defendants concealed or misstated facts that would have allowed Plaintiffs to evaluate the risks for themselves.

The First Circuit's recent decision in Rodi v. Southern New England School of Law, 389 F. 3d 5, 14-17 (1st Cir. 2004) makes short work of the Bradford Defendants' contentions. In Rodi, the

---

[58]    The cases cited by the Bradford Defendants clearly relate to situations not before the Court. In In re Lupron Marketing and Sales Practices Litigation, 295 F. Supp. 2d 148,175 (D. Mass. 2003), there appears to have been no dispute that the plaintiffs either did not consult the fraudulent average wholesale price or knew it was inflated. Here the Plaintiffs read the Official Statement and did not know about the misrepresentations. (To the extent the complaint does not explicitly state that the Plaintiffs read the Official Statement, Plaintiffs are willing to amend.) In Johnson v. Brown & Williamson Tobacco Corp., 122 F. Supp. D 194, 208 (D. Mass 2000), the plaintiff was unable to identify the specific promotional material that contained misrepresentations that he claimed he relied upon. Plaintiffs here have sufficiently identified the false statements their fraud claims are based upon.

[59]    The Bradford Defendants breathless characterization of the Official Statement would lead one to believe that every page contained a black legend "IMPENDING DOOM." They ignore that the bonds were rated as "investment grade." They also ignore that the Official Statement recites that fulltime enrollment had increased 37.5% in eight years (400 to 550), the endowment had increased 204% in the same period and net assets of the College had increased from $11.9 million in 1994 to $16.8 million in 1997. Although the College had run operational budget deficits for several years in a row the Official Statement also reveals that Bradford's alumni gave generously. While a public company that ran nine years of deficits might likely be out of business, the Bradford Defendants fail to inform the Court that it is not uncommon for non-profit entities to routinely run operational deficits that are made up by donor's contributions. If professionals as sophisticated as Standard & Poor's rated the bonds as investment grade, the Bradford Defendants can hardly argue that plaintiffs' claims should be dismissed at the pleading stage because, as a matter of law, any investor who perused the Official Statement would obviously know this was a financial black hole.

79

plaintiff alleged that the Southern New England School of Law made representations regarding their prospect for ABA certification when he applied for admission and matriculated. The law school claimed the former student could not reasonably rely on the representations because the school's catalogue specifically disclaimed any representation that the school would be accredited at any time prior to graduation. The law school argued that since the plaintiff's injury flowed from the broken promise of accreditation, and the disclaimer flatly contradicted any such representation, reliance on the promise was objectively unreasonable.

The First Circuit rejected such arguments:

> This argument erects, and then attacks, a straw man. As said, the plaintiffs' complaint allege that the defendants falsely implied that SNESL had capacity to achieve near-term accreditation. This is a meaningful distinction. It is one thing for an actor to demur when asked to guarantee a third party's actions. It is quite another for an actor to mislead a person into believing that the actor possesses means and abilities fully within its control. Given this distinction, the defendants' reliance on the disclaimer is misplaced: inasmuch as the disclaimer does not cover the alleged misrepresentations, it cannot defeat them.

389 F.3d at 16

The parallel to this case is obvious. Here Defendants' characterize Plaintiffs' claims as flowing from the broken promise to repay the bonds or meet enrollment goals. Defendants claim that since Bradford warned that it might not be able to meet these goals, any reliance on such promises was unreasonable. But Plaintiffs do not complain that Defendants falsely guaranteed cash flow or class enrollments. They claim Defendants misrepresented and concealed operational and financial data that would have allowed them to realize Bradford had no reasonable ability to service the bond debt, and that Bradford had objective information that indicated it could not meet its disclosed objectives.

80

A second ground in <u>Rudi</u> for denying the law school's unreasonable reliance argument was that "Massachusetts courts consistently have held that disclaimers do not automatically defeat fraudulent misrepresentation claims." 379 F.3d at 17, citing <u>Bates v. Southgate</u>, 308 Mass 170, 31 N.E. 2d 551, 558 (1941) and others. The Court recognized that given Massachusetts courts's strong policy that "a party may not contract out of fraud," cases based on disclaimers should not be decided on an undeveloped record at the motion to dismiss stage. They require a full factual record before decision. 379 F.3d at 17. Indeed, the cases upon which the Bradford Defendants' unreasonable reliance argument relies were all decided on a full factual record at summary judgment or trial.[60]

Under Massachusetts law, reasonable reliance is ordinarily a question of fact for the jury. See <u>Roti</u>, 389 F.3d at 16, <u>Marram</u>, 442 Mass. at 59-61, 809 N.E. 2d at 1031-32. <u>Marram</u>, like <u>Roti</u>, specifically cautions against granting such motions without a complete factual record. This Court should follow those appellate courts' advice and deny Defendants' motions to dismiss the fraud count.

---

[60]     None of the cases relied upon by the Bradford Plaintiffs are remotely analogous. All three involve alleged oral misrepresentations. In two of the cases, the representations were contradicted by written documents the plaintiff had either signed or was bound by. <u>Sound Techniques, Inc. v. Hoffman</u>, 50 Mass. App. 425, 737 N.E. 2d 920 (2000) (lease contradicted oral representation); <u>Kuwaiti Danish Computer Co. v. Digital Equipment Corp.</u>, 438 Mass 459, 781 N.E. 2d 787 (2003)(price quotation contradicted oral representation). Here, the disclaimers did not contradict the parts of the Official Statement on which the Plaintiffs rely. There is nothing inconsistent with disclosing future goals and objectives but then observing that there can be no promise that the goals will be met. In the third case, the plaintiff had personal knowledge that the representation was false. <u>Cote v. Astra USA, Inc.</u> 1998 WL 1184110 (Mass. Super, 1998). The Amended Complaint does not allege that any of the Plaintiffs had any knowledge of Bradford before they read the Official Statement.

C.    The Bradford Defendants Responsible For the Misrepresentations In the Official Statement Can Be Held Liable For Negligent Misrepresentation To Initial Offering Bond Purchasers.

The only argument unique to Defendants' opposition to Plaintiffs' negligent misrepresentation count is the Bradford Defendants' assertion that they cannot be liable to any bond purchasers for a failure to use reasonable care. They contend that since the Plaintiffs purchased their bonds from Advest and had no contact with them, they owed no duty to the Plaintiffs.

Putting aside that the Amended Complaint expressly states that ACA contacted Kiszka and relied upon his representations before issuing insurance on the bonds, Defendants' attempt to limit the duties owed by persons who know third parties will rely upon the information they provide is misguided. As the Bradford Defendants reluctantly concede, in Massachusetts liability for negligent misrepresentation is not limited by privity. Instead, liability for negligent misrepresentation is determined by the principles of § 552 of the Restatement (Second) of Torts, which Massachusetts has adopted. That section provides:

> One who, in the course of his business, profession *or employment*, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. (Emphasis added).

See. e. g. Marram, 442 Mass at 60, 809 N.E.2d at 1031, n. 25; Golber v. BayBank Valley Trust Co., 46 Mass. App. Ct. 256, 257 (Mass. App. , 1999).

The persons who may reasonably rely on the information provided is limited. Section 552 limits the loss suffered to "a  person or one of a limited group of persons for whose benefit and

guidance he (the information provider) intends to supply the information or knows that the recipient intends to supply it...". <u>Nycal Corp. v. KPMG Peat Marwick LLP</u>, 426 Mass 491, 496, 688 N.E. 2d 1368, 1371-72 (1998).[61]  Third parties who do not deal directly with the information provider may have a cause of action, accordingly, if the information provider knows they will rely upon the information.  Further, the comments to § 552 make clear that it is not necessary that the person who is to become a plaintiff be known or identified to the defendant.  It is enough that the maker of the representation intends it to reach either a particular person or a class of persons, distinct from the much larger class who might "sooner or later" have access to the information, and that the plaintiff proves to be a member or such a particular class.  Restatement (Second) of Torts, § 552, comment h.  <u>See also</u>, <u>Nycal Corp. v. KPMG Peat Marwick LLP</u>, 426 Mass at 497, 688 N.E. 2d at 1372.  In short, the absence of privity can be overcome by justifiable reliance by the Plaintiffs and the defendant's knowledge of reliance by a particular class of persons.

Here, the Complaint sufficiently alleges that the Plaintiffs are within the class of persons the Bradford Defendants expected the Official Statement would be circulated.  AC, ¶ 100.  Indeed, the Amended Complaint states that the negligent statements were made for the "express purpose" of inducing the Plaintiffs to purchase the bonds and write an insurance policy.  At this stage of the litigation, this is all that needs to be alleged.

The Bradford Defendants cite authority that holds that corporate officers are not liable for negligent representation to open market security purchasers who rely upon their publicly issued

---

[61]    The information must also be used in the transaction that the information provider intended to influence or a similar transaction.  <u>Nycal Corp. v. KPMG Peat Marwick LLP</u>, 426 Mass at 496, 688 N.E. 2d at 1371-72.  There is no dispute that the Bradford Defendants prepared the Official Statement for the bond offering.

statements. There is a substantial difference, however, between statements made by an officer of a public company whose stock can be purchased by anyone, and the representations made in an Official Statement for a bond offering of an entity that does not otherwise issue public securities. In the later case, the statements are made to a much smaller class, and the likelihood that the persons within the class will rely upon them is much greater.

A purchaser of securities in an initial offering of an entity that has not previously "gone public" is necessarily dependant upon the Offering Statement or Prospectus for all his information about the previously private organization. Such organizations do not publicly issue financial statements or other informational briefings. They do not have analysts who study their financial statistics and operational results. They are generally not followed by the financial media. As such, Bradford and the Bradford Defendants had to have expected that potential purchasers of Bradford's debt securities would view the Offering Statement as the primary source of information about the advisability of the investment. The Offering Statement was written and promulgated by the Bradford Defendants specifically for the purpose of providing information to the small class of potential investors in the initial offering. It knew recipients of the Offering Statement would rely upon the information contained therein in making their investment decision.

On the other hand, secondary market purchasers of securities of a public corporation are a far more diffuse group. They represent a group of people who have purchased at widely different points in time. They have been exposed to a great variety of information about the public corporation, including S.E.C. filings such as 10-Qs, 10-Ks, 8-Ks, etc, analysts reports, press releases, media coverage, and even rumor and supposition. The officers and directors of a public corporation do not necessarily know who the holders of the securities are, and have probably never

84

communicated intentionally with many of them. The buying and selling behavior of such persons might be the result of a wide variety of factors, only one of which is information flowing from management.

Not surprisingly, therefore, those cases which look at misrepresentations in a public offering find that it is different from the secondary market situation in terms of the applicability of § 552. In re Bank of Boston Securities Litigation 762 F.Supp. 1525 (D. Mass. 1991) is the leading case in this District. In that case, Judge Harrington considered the state law negligent misrepresentation claims of secondary market purchasers and dismissed them because they were based on "widely disseminated information" and there was no evidence that the Bank actually knew the nature and extent of public reliance on its public statements. However, the Court did not dismiss claims brought by the public offering purchasers (the "acquisition class"), but simply observed that the acquisition class plaintiff would be required at trial to show direct reliance on the defendants' representations. In refusing to dismiss the "acquisition class" claims, Judge Harrington stated regarding the plaintiffs' ability to prove reliance at trial, "...at this early stage the Court will not make a determination as to their ability to do so." Id. at 1536.  See also Burstein v. Applied Extrusion Technologies, 150 F.R.D. 433 (D. Mass. 1993)(same holding). These cases clearly hold that the small class of public offering purchasers stand on a different footing from the secondary market purchaser who presumptively cannot satisfy the elements of §552. Plaintiffs, who purchased in the initial offering, cannot have the negligent misrepresentation claims dismissed at this time.

Finally, the Bradford Defendants have raised the novel argument that the principles of § 552 of the Restatement apply only to professionals such as lawyers, accountants, and architects, and not to corporate officers and directors who prepare securities filings. This argument is entirely

85

unsupported by any Massachusetts case law, and flies in the face of §552. As quoted above, § 552 specifically attaches liability to a provider of negligent information who acts "in the course of his business, profession, *or employment*..." Clearly the drafters of the Restatement anticipated that corporate employees, in addition to businesses and professionals, could be held personally liable for negligent misrepresentation. The Bradford Defendants provide no rationale why corporate employees who fail to exercise reasonable care in providing information they know third parties will rely upon should be treated differently than lawyers or accountants. Many Massachusetts cases, including Marram, have corporate officers who the Courts found could be liable for negligent misrepresentation. This Court should avoid a wholesale modification of traditional Massachusetts law.

    D.    There Is No Basis To Dismiss The Plaintiffs' Chapter 93A Claims

The arguments to dismiss Plaintiffs' Chapter 93A claim mostly repeat arguments addressed to Plaintiffs' other causes of action. Plaintiffs will only address arguments specifically devoted to the Chapter 93A claims and rely on the early sections of this memorandum to deal with duplicative arguments.

Defendants' arguments that Plaintiffs' complaint does not allege conduct of sufficient rascality is baseless. It is well established that actionable claims of fraud, securities fraud and negligent misrepresentation can qualify as unfair and deceptive trade practices violative of M.G.L. c. 93A, § 11. Marram, 442 Mass at 62, 809 N.E. 2d at 1032-33 (conduct that constitutes negligent misrepresentation or violations of M.G.L. c. 110A may constitute violations of M.G.L. c. 93A, §11); Stolzoff v. Waste Systems Int. Inc. 58 Mass. App. Ct. 747, 765, 792 N.E. 2d 1031, 1045 (2003) (conduct that constitutes fraud or negligent misrepresentation may constitute violation of M.G.L. c.

93A, § 11). Accordingly, if any of plaintiffs' claims survive they have also stated a cause of action for violation of § 11.

The Bradford Plaintiffs assert they have not had a "business relationship" with the Plaintiffs and therefore 93A liability will not attach. Privity is not required to support a 93A claim so long as the plaintiffs and defendants are involved in a commercial relationship which is not minor or insignificant. See Reisman v. KPMG Peat Marwick 965 F.Supp. 165 (D. Mass. 1997); Nei v. Boston Survey Consultants 388 Mass. 320, 321. 446 N.E. 2d 681 (1983) ; Reisman v. KPMG Peat Marwick 57 Mass. App. Ct. 100, 124, 787 N.E. 2d 1060, 1078 (2003). Thus, the question here is whether the "commercial relationship" between the preparers and signers of an Official Statement for a publicly offered security and the initial purchasers of such a security is minor or insignificant. Massachusetts precedent demonstrates that it is not.

It is apparent that there has been a convergence, if not outright identity, between the concept of "reliance" under § 552 of the Restatement (Second) of Torts, discussed in Section III.C., supra, and the concept of a "transactional business relationship" which is not "minor or insignificant" under Chapter 93A. This is most evident in the case of Spencer v. Doyle, 50 Mass. App. Ct. 6, 13, 733 N.E. 2d 1082 (2000). In that case, the Appeals Court reviewed the potential ch. 93A liability of an accounting firm to purchasers of securities of a public company that the firm had audited. The Court rejected the claim because the record was devoid of any evidence that the accountants "had actual knowledge of any reliance by participants on the audit so as to create a commercial relationship." This is precisely the same factor which determines liability under § 552 of the Restatement. Massachusetts decisions addressing the applicability of 93A to securities sales have definitely followed the same line as cases deciding the applicability of § 552 of the Restatement. See, for

87

example, Salkind v. Wang, 1995 WL 170122 (D. Mass. 1995) (open market purchasers not in a commercial relationship with corporate officials); Young v. Deloite & Touche 2004 WL 2341344, 18 Mass. L. Rptr. 287 (Mass. Super.) (no commercial relationship where defendant's activities were not intended to help solicit people to purchase the company's securities); Marram, 442 Mass. at 62, 809 N.E. 2d at 1017 (93A claim upheld for original purchaser misled by corporate official); Stolzoff v. Waste Systems International, 58 Mass. App. Ct. at 765, 792 N.E. 2d at 1045 (93A claim upheld for original purchasers misled by corporate officials); Reisman v. KPMG Peat Marwick, 57 Mass. App. Ct. at 124, 787 N.E. 2d at 1078 (auditor with direct contact with prospective investors subject to liability).

Of the factors cited in those cases as supporting 93A liability, all of them are present here. The Bradford officials certainly knew that prospective purchasers would look at and reasonably rely on the Official Statement. They prepared and signed the Official Statement knowing that Bradford and Advest intended to use it to attract investors to purchase the securities. They knew that prospective purchasers had few or no other sources of information about Bradford. Most importantly, they knew prospective purchasers would rely on the Statement. These factors overwhelmingly support the viability of a 93A claim. At a minimum, it is impossible for the Court to conclude that there is no possible set of facts that would preclude the Plaintiffs from recovering from the Bradford Defendants under ch. 93A, and accordingly, this claim cannot be dismissed at this stage of the proceedings.

E.   The Court Cannot Consider The Trustee Defendants' Affirmative Defense That Massachusetts Statutes Immunize Them From Liability Because Facts Necessary To Establish The Defense Cannot Be Found In The Four Corners Of The Complaint Or Documents The Court May Consider On a Motion To Dismiss

The Trustee Defendants seek to dismiss the Massachusetts causes of action because two Massachusetts statutes limit liability for uncompensated trustees of non-profit charitable corporations, M.G. L. c. 231, §§ 85K and 85W. Both statutes require proof that the defendant did not receive compensation other than reimbursement for actual expenses to obtain the immunity. No allegations to that effect are contained within the Amended Complaint, but Defendants rely upon an Affidavit of Karen Sughrue to make the necessary factual showing.

The Court must deny the Trustee Defendants' efforts to apply the statutes at this time.  On a Motion To Dismiss, this court may only consider affirmative defenses "definitively ascertainable from the allegations of the complaint, the documents (if any) incorporated therein, matters of public record, and other matters of which the court may take judicial notice." Banco Santander de Puerto Rico v. Lopez-Stubbe (In re Colonial Mortgage Bankers, Corp.), 324 F.3d 12, 16 (1st Cir. 2003). Consideration of documents not attached to the complaint or incorporated into the complaint is forbidden. Waterson v. Page, 987 F.3d 1, 3 (1st Cir. 1997). Nor may the Court consider affidavits. Shabazz v. Cole, 69 F.Supp.2d 177, 185 (D. Mass. 1999).[62]

Without consideration of the Sughrue affidavit, the Trustee Defendants cannot make the

---

[62]   The Plaintiffs would vigorously oppose any effort to convert the Bradford Defendants Motion To Dismiss into a Motion For Summary Judgment pursuant to Fed. R. Civ. P. 12(b).  Plaintiffs may not conduct discovery until the Court rules on the sufficiency of their complaint pursuant to the PSLRA. Accordingly, they cannot conduct the factual investigation to determine whether the Trustee Defendants truly qualify for the Massachusetts immunity statutes.

factual showing necessary to qualify for the statutory immunities.[63]  Consequently, their motion to

dismiss on these grounds must be denied.[64]

## IV.    PLAINTIFFS SHOULD BE GIVEN LEAVE TO AMEND THEIR COMPLAINT IF THEY HAVE FAILED TO PROPERLY PLEAD ANY OF THE CAUSES OF ACTION.

In the event the Court finds that there are pleading deficiencies in the Amended Complaint,

leave is requested to correct them.  Given the requirement that Plaintiffs' complaint should not be

dismissed unless it is beyond doubt that plaintiffs can prove no set of facts that would entitle them

to relief, Swierkiewicz v. Sorema, N.A., 534 U.S. 506 (2002), and the liberal amendment rules under

Rule 15, such leave is ordinarily granted.

Advest, however, has already stated that it opposes the granting of leave to amend on the

ground the Plaintiffs have already amended their complaint once.  That amendment, however, was

not substantive.  It merely added state court claims which derived from the same nucleus of events

when the Superior Court stayed the Plaintiffs' parallel state court action.  The amendment was made

before Defendants filed and served their motions to dismiss and, accordingly, did not address any

points raised by their briefs.  Plaintiffs should have at least one opportunity to address the defects

claimed by the Defendants in their motions.

Nor have Plaintiffs unduly delayed.  Plaintiffs served this action and the parallel state action

on the nineteen defendants in October 2004.  It is the Defendants who requested and required more

---

[63]    M.G.L. c. § 85K also requires proof that Bradford was qualified as a tax-exempt organization under 26 U.S.C. § 501(c)(3).  There are no allegations in the Complaint to that effect and the Bradford Defendants have provided no evidence of Bradford's status with the IRS.

[64]    Plaintiffs do not accept that if Trustee Defendants were able to make the statutory showing they would be entitled to dismiss the state law claims.  However, as this matter is not properly before the Court, the plaintiffs will not brief these defenses at this time.

than four months to prepare motions to dismiss. Plaintiffs have responded in half that time, but understand that Defendants require an additional two months to file a reply. Plaintiffs do not doubt Defendants' good faith in requesting these extensions, but only note that the long delay in having these motions to dismiss fully briefed is not attributable to the Plaintiff.

As demonstrated above, in the event the Court finds pleading deficiencies, amendment is not futile and the Plaintiffs have acted equitably and appropriately. Amendment should be permitted, if necessary.

## CONCLUSION

WHEREFORE, for the reasons set forth above, Defendants' Motions To Dismiss should be denied in their entirety.

> T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC., SMITH BARNEY INCOME FUNDS/SMITH BARNEY MUNICIPAL HIGH INCOME FUND, DRYDEN NATIONAL MUNICIPALS FUND, INC., LOIS and JOHN MOORE, and ACA FINANCIAL GUARANTY CORPORATION
>
> By their attorneys,
>
> /s/ Michael Tabb
> Thomas Hoffman, Esq.  BBO # 237320
> Thomas Greene, Esq. BBO# 210020
> Michael Tabb, Esq. BBO # 491310
> Greene & Hoffman, P.C.
> 125 Summer Street, 14th Floor
> Boston, Massachusetts  02110
> (617) 261-0040

Dated: May 2, 2005

91