UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENISE MCKEOWN, ROBERT LUTTS, Plaintiffs, vs. ADVEST, INC., KAREN SUGHRUE, et al., Defendants | C.A. No. 05-10176-RGS **CONSOLIDATED WITH** |
| T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC., et al., Plaintiffs, vs. ADVEST, INC., KAREN SUGHRUE, et al., Defendants | C.A. No. 04-11667-RGS |

**REPLY IN SUPPORT OF**
**BRADFORD DEFENDANTS' MOTIONS TO DISMISS**

The Bradford Defendants[1] reply as follows to the plaintiffs' Oppositions to

Bradford Defendants' Motions to Dismiss ("Opposition" or "Opp'n").[2]

---

[1]      "Bradford Defendants" refers to all defendants in this action except Advest, Inc.

[2]      The Bradford Defendants moved to dismiss the original complaint in the T. Rowe Price action, which asserted only federal claims, on January 20, 2005. On the same day, the T. Rowe Price plaintiffs amended their complaint to add the state claims. On March 1, 2005, the Bradford Defendants filed a motion to dismiss the Amended Complaint, incorporating the first motion by reference. After the McKeown action was consolidated with the T. Rowe Price action, the Bradford Defendants moved to dismiss the McKeown complaint and incorporated by reference into their motion their briefs in support of their motions to dismiss the T. Rowe Price complaint. The Bradford Defendants' briefs on their motions to dismiss the T. Rowe Price action are referred to, respectively, as "MTD Fed." and "MTD State." Because the complaints in the two actions are substantively identical and the oppositions to the motions to dismiss largely duplicative, the references in this motion to the complaint and Opposition are to those in the T. Rowe Price action.

## <u>INTRODUCTION</u>

Plaintiffs' concessions significantly limit the issues to be decided on the Bradford Defendants' motion to dismiss.  They have abandoned their claims for breach of fiduciary duty; they make no attempt to support their control-person securities fraud claims against defendants Donald Kiszka and Joseph Short; and they concede that they cannot connect any of the 16 Trustee Defendants to any alleged misrepresentation or omission in the Official Statement, which requires the dismissal of all the remaining claims against them.[3]  *See* Opp'n at 11 n.7, 50, 51.

The Opposition also makes clear that plaintiffs were not misled about the College's financial condition, its prospects, or the risks of investing in the bonds.  They do not deny that the Official Statement not only disclosed accurate and comprehensive financial data that depicted an institution that was unable to staunch continued and significant losses, but warned that any turnaround would depend on its ability to achieve unprecedented and uncertain increases in enrollment in the next two years.  Where the overall picture was one of financial troubles, uncertainty, and risk, plaintiffs cannot credibly assert they were defrauded by optimistic statements which they claim gave them a glimmer of hope that better times might be ahead.

---

[3]     Plaintiffs' concession relates to all the Bradford Defendants other than Donald Kiszka and Joseph Short.  Opp'n at 2 n.2 and 51 n.37.

I.      **PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE SECURITIES EXCHANGE ACT.**

      A.      **Plaintiffs Have Failed to Allege Any Actionable Misrepresentation or Omission.**

            1.      **The Amended Complaint Fails to State a Claim for Nondisclosure of Attrition.**

                  a.      **The Official Statement Disclosed the College's Significant Attrition Problem.**

Plaintiffs defy reality in continuing to insist that the Official Statement did not disclose the College's attrition problem.  They do not and cannot deny that the Official Statement not only referred to the College's need to improve its retention of students, but disclosed a sharp drop in the number of students from the "fall" to "spring" semesters of the most recent academic year.  MTD Fed., Exh. A (Official Statement) (cited herein as "OS,"), at Appx. A, pages A-7, A-8, A-17 (enrollment fell from 602 full and part-time students in fall 1997 to 566 full and part-time students in spring 1998).

Plaintiffs' claim approaches the frivolous in view of the actual enrollment figures in the Official Statement, which reveal eye-popping levels of attrition for each of the five years preceding the issuance of the bonds.  On the same page that discloses fall-to-spring attrition for the current year, the Official Statement includes two tables of figures that set out, respectively, (1) the College's total enrollment for each year from 1993 to 1997, and (2) the College's "admissions trends," which include enrollment figures for new students at Bradford for each year from 1993 to 1997.  A simple comparison of (1) the numbers of new students who enrolled at the College for each year from 1993 to 1997, with (2) the total number of students who were enrolled in each of those years, shows that, year after year, students were leaving the College in droves.  Although new students at a four-year

college should be expected to make up approximately 25% of the total student body, new enrollment at Bradford significantly exceeded this percentage for each year from 1993 through 1997. Specifically, the numbers of incoming students made up not 25%, but 38% of the total student body in 1993; 42% in 1994; 40% in 1995; 36% in 1996; and 40% in 1997. OS, Appx. A, at A-8.[4] The obvious fact that the College was enrolling far more new students each year than should have been needed to replace graduating seniors indicates appreciable levels of attrition.

The actual extent of the attrition problem is similarly apparent from a comparison of (1) the total number of new students who enrolled for each year from 1993 through 1996, with (2) the total number of students who were enrolled as of fall 1996. Absent attrition, the total of all the new students who enrolled from 1993 through 1996 should be roughly equivalent to the total enrollment in 1996. In fact, however, as the enrollment figures in the Official Statement show, although a total of 828 new students enrolled at Bradford in the years from 1993 through 1996 (186 + 223 + 224 + 195 = 828), Bradford's total enrollment as of fall 1996 was only 544. OS, Appx. A, at A-8. In other words, nearly 300 of the 633 students who had newly enrolled in 1993, 1994, and 1995 (186 + 223 + 224 = 633) could not be accounted for by 1996. Similarly, although a total of 876 new students enrolled at Bradford for the years 1994 through 1997, Bradford's total enrollment as of fall 1997 was only 584. *Id.* Again, nearly 300 of the 642 students who had enrolled since 1994 were no longer at Bradford.

---

[4]    Bradford enrolled 186 new students in 1993, when total enrollment on a full-time equivalent (FTE) basis was 484, which amounts to 38% of the total student body. For 1994, there were 223 new students and total enrollment of 529 (42% new). For 1995, there were 224 new students and total enrollment of 555 (40% new). For 1996, there were 195 new students and total enrollment of 544 (36% new). For 1997, there were 234 new students and total enrollment of 584 (40% new). OS, Appx. A at A-8.

Where the Official Statement accurately discloses student headcount figures that reflect substantial and continuing attrition, plaintiffs as a matter of law cannot claim that the Official Statement failed to disclose attrition.  *See, e.g., Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.,* 941 F.2d 561, 571 (7th Cir. 1991) ("[n]o jury could find that a reasonable investor would be misled … when the truth was under his nose in black and white").

### b. Plaintiffs' Allegations Fail to Support an Inference that Any of the Bradford Defendants Acted with Scienter in Purportedly Failing to Disclose Attrition.

Plaintiffs argue that the Bradford Defendants may be deemed to have acted with scienter with respect to College's attrition problem because, they claim, the attrition crisis, which they characterize as "the 800 pound gorilla in the living room," was "not even hinted at in the Official Statement."  Opp'n at 35-36.  As discussed above, however, the premise for this argument could not be further from the truth.  Because the Official Statement actually disclosed attrition, there is no basis for any reasonable inference, much less a strong one, that any of the Bradford Defendants intended to deceive investors about attrition.  *See* MTD Fed. at 28 & n.17.

### 2. The Amended Complaint Fails to State a Claim for Misrepresenting Predicted New Enrollment.

### a. The Enrollment Prediction Was Not an Actionable Misrepresentation, as a Matter of Law.

Plaintiffs have failed to establish the actionability of their claim that the Official Statement, which was issued in May 1998, made a false representation in stating that the College "believe[d]" it could enroll 225 new students in fall 1998.  *See* OS, Appx. A, at A-8 and A-13.  Plaintiffs do not deny that the Official Statement warned that this goal

5

might not be achieved.  There is no merit in their attempt to escape the bespeaks caution

doctrine, or to cast this prediction as a misrepresentation of "existing fact," by arguing

that several discrete pieces of "interim admissions statistics," when put together in some

unexplained way, supposedly indicated that new student enrollment in September would

likely fall short of this goal by 15%.  Opp'n at 15-17.  Where the statement is so

obviously a prediction about events that will occur several months into the future, and

where new enrollment is so obviously dependent on contingencies, no reasonable

investor could deem the prediction material, as a matter of law.  *See, e.g., Shaw v. Digital

Equipment Co.,* 82 F.3d 1194, 1210-11 (1st Cir. 1996) ("[i]n many circumstances, the

relationship between the nonpublic information that plaintiffs claim should have been

disclosed and the actual results or events that the undisclosed information supposedly

would have presaged will be so attenuated that the undisclosed information may be

deemed immaterial as a matter of law").

     Plaintiffs have also pointed to no facts suggesting that information existed in May

1998 that could or should have indicated that the prediction of new student enrollment

would not be met, much less that any of the Bradford Defendants actually knew of such

information as of the time of the Official Statement.[5]  There is first no merit in plaintiffs'

assertion that the Official Statement improperly relied on the admittedly increased

---

[5]    Plaintiffs admit that they cannot tie any of the Trustee Defendants to any of the statements of which they complain in the Official Statement.  Opp'n at 51.  As plaintiffs acknowledge, the date of Mr. Kiszka's and Mr. Short's purported involvement in the Official Statement is unclear from the Amended Complaint.  Opp'n at 6 n.4.  Plaintiffs assert that the bonds were issued "as of" May 1, 1998.  Opp'n at 6 n.4.  In a footnote to the Opposition, plaintiffs assert that Mr. Kiszka and Mr. Short signed an Officers' Certificate on May 13, 1998, which plaintiffs claim "certif[ies] that no adverse material change has occurred since the date of the financial and statistical information included in the Official Statement, and that no event has occurred which needs to be disclosed so that any information in the Official Statement will not be misleading in any material respect."  Opp'n MTD at 6 n.4.  Plaintiffs do not suggest for what purpose, or for whose benefit, the certificate was provided, nor have they included any allegation about the certificate in the complaint.  Regardless of whether Mr. Kiszka's and Mr. Short's alleged involvement is gauged as of May 1 or May 13, however, plaintiffs have failed to allege that either defendant had knowledge of any information contradicting the prediction as of either date.

number of applications the College had received for 1998 (18% <u>more</u> than for 1997) as a factor supporting the prediction of new student enrollment for 1998 because the number of applications included internet applications. Opp'n at 16. Perhaps most fatally to plaintiffs' argument, although plaintiffs acknowledge that the College had "begun" to accept internet applications for 1998, they do not allege that any of the Bradford Defendants actually knew the College had begun to do so, nor do they state how many of the total number of applications purportedly included internet applications. Am. Cp. ¶61; Opp'n at 16.

And even if plaintiffs had alleged facts suggesting both that the total number of applications included some appreciable number of internet applications and that such fact was known to the Bradford Defendants, plaintiffs have failed to allege facts suggesting that any of the Bradford Defendants knew, or should have known, that internet applications were any less likely to result in enrollments than paper applications. Plaintiffs do not seriously argue that internet applications are inherently unreliable, or were known to be so in May 1998.[6] Instead, they now claim, for the first time, that the real problem with internet applications at Bradford in 1998 was that a new admissions director was hired in September 1997 who made changes that resulted in the admissions department's counting of <u>incomplete</u> internet applicants as actual applications. Opp'n at 17 n.12 (referring to a "Bradford memorandum" which plaintiffs claim "summariz[es] a

---

[6]     Plaintiffs provide no factual or even logical support for their glib assertion that "[i]t is a reasonable inference that students who apply to a school with a push of a computer key have less commitment than those who go through the effort to obtain and return a paper application," or for their suggestion that students who apply by internet apply to more schools due to the greater "ease" of applying. Opp'n at 16 n.11, and at 17. Plaintiffs do not suggest that students are not required to provide the same information, essays, recommendations, transcripts, and non-refundable application fees when they apply by internet as when they apply by mail. In the absence of such allegations (which plaintiffs cannot credibly make), it is not reasonable to infer that internet applicants apply to more schools, or do so with less commitment, than those who submit their applications by mail.

presentation by Bradford admissions personnel explaining to the Board of Trustees why the admissions rate had dropped"). Plaintiffs, however, have offered no facts suggesting that even the admissions department had recognized any problem with the counting of internet applications as of May 1998, much less that any of the Bradford Defendants knew how admissions personnel were counting applications, and plaintiffs do not state <u>when</u> "admissions personnel" informed the Board of the purported counting problems. *Id.* In sum, the Amended Complaint provides no factual basis for any reasonable inference that any of the Bradford Defendants knew anything in May 1998 that suggested that the increased numbers of applications were not reasonably supportive of the prediction of new enrollment in September 1998.

Plaintiffs similarly fail to allege any facts to support their assertion that the Official Statement made a misstatement in predicting new enrollment because it referred generally to the unspecified "historic rate for conversion of applications into enrollments," when the College's acceptance rate (percentage of total applications that were accepted) was lower in 1998 than in 1997. Opp'n at 15-16. Plaintiffs do not allege any facts suggesting that such an acceptance rate, even if known, could not be reconciled with a belief that the College could enroll 225 new students in 1998 (nine <u>fewer</u> new students than in 1997).

Plaintiffs also err in asserting that the number of deposits the College had received by the time of the Official Statement meant that the enrollment prediction would likely not be reached. Opp'n at 15. Plaintiffs still do not state when in "spring 1998" the receipt of deposits is supposedly the "best indicator" of fall enrollment, nor do they explain how deposits received by such unspecified date correlate with actual fall

enrollment (the conclusory assertion that such deposits are the "best" or "most reliable" indicator of likely enrollment does not begin to suggest the degree of any correlation). Plaintiffs have not alleged that Bradford required students to send in their deposits by May 1, that the bulk of deposits were received by such date, or that Bradford considered the number of deposits received as of May 1 (or even May 13) to be reliably predictive of fall enrollment, which plaintiffs cannot deny is the critical fact for purposes of this claim.[7]  And, as with the other "interim" data, plaintiffs have not explained why, even if true, the fact that the College had received 20% fewer deposits as of May 1, 1998, than as of May 1, 1997, would indicate that it was unlikely that 225 new students (again, nine fewer new students than in 1997) would enroll in fall 1998.

No less significantly, although plaintiffs claim that the Bradford Defendants should have known from these various pieces of "interim" admissions data "that the College would likely fail to meet fall enrollment goal by 15%," plaintiffs provide no facts, or even explanation, to suggest how this number (or, indeed, any other number) was, could have been, or should have been derived from any or all of such data.  Am. Cp. ¶62.  Thus, even if the enrollment prediction could be deemed to have been a misstatement at all at the time it was made, there is no basis for any conclusion that it was

---

[7]      There is no merit in plaintiffs' attempt to suggest that Bradford actually received most of its deposits by May 1 by pointing to what they conclusorily assert is the "well-known admissions cycle for U.S. colleges and universities," which plaintiffs assert includes the receipt of deposits by May 1.  Opp'n at 18 n.13.  Even a quick search of college web sites belies plaintiffs' suggestion that all colleges require deposits to be received by May 1.  See *www.nsa.edu/admissions/costs* (deposits at New St. Andrews College in Idaho due June 1, and are accepted even later at an extra charge); *www.cas.bethel.edu/catalog/ admitfa/admpro.html* (students who are accepted but who have not submitted deposits to Bethel University by June 1 may be moved to waitlist); *www.ccad.edu/admis-cklist.html* (deposits at Columbus College of Art & Design due June 1); *www.wisconsinmentor.org/applications/Ripon_College/apply.html* (accepted applicants at Ripon College are informed of deposit deadline in admission letter); *www.ciu.edu/college/admissions/tuition.php* (deposits to Columbia International University Bible College due 21 days after acceptance).

a <u>material</u> one.[8]  In short, because plaintiffs have failed to "provide factual support for the

claim that the statements or omissions were fraudulent, that is, facts that show exactly

why the statements or omissions were misleading," their claim fails as a matter of law.

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002); *Stone & Webster, Inc.*

*Securities Litigation*, __ F.3d __ (1st Cir. 2005) (2005 WL 1654040 at *3).[9]

> **b.**    **Plaintiffs Have Failed to Allege Facts Supporting a**
> **Strong Inference that Any of the Bradford Defendants**
> **Entertained Scienter With Respect to the Prediction of**
> **New Enrollment.**

Plaintiffs have likewise failed to point to facts that could support a reasonable

inference, much less a strong one, that any of the Bradford Defendants acted with scienter

with respect to the prediction of new enrollment for 1998.  Their attempt to suggest such

an inference by asserting a "divergence between internal reports and external statements"

is misplaced in the first instance because they do not claim that, by May 1998, any sort of

---

[8]    Plaintiffs do not even allege that the prediction of 225 new students for fall 1998 did not come true.  Although plaintiffs allege that <u>total</u> enrollment for fall 1998 was 532, which they claim fell short of a <u>budget</u> projection by 79 students, they neither allege that the Official Statement made any misrepresentation about <u>total</u> 1998 enrollment, nor do they state the number of <u>new</u> students who enrolled in fall 1998.  Am. Cp. ¶68.  Plaintiffs allege that three-quarters of the 79-student shortfall was due to the historic attrition problem, but do not allege that the remaining portion of the shortfall was made up of new students; and even if it were, such an allegation would at best suggest that new student enrollment fell short by only 20 students (25% of 79), which is approximately 9% less than the prediction of 225 new students.  *Id.*

[9]    Plaintiffs have also failed to establish the materiality of any prediction of new student enrollment for a single year.  Plaintiffs illogically suggest its materiality on the ground that "one of the critical issues for any potential purchaser of Bradford's bonds was whether the fall 1997 increase in enrollment was a <u>fluke</u> or the <u>beginning of a trend</u> that would allow Bradford to generate operational surpluses."  Opp'n at 14 (emphasis added).  Apart from the fact that only an oracle could say whether two successive good years of <u>new</u> student enrollment signaled the beginning of a "trend" (in either new or total enrollment) that might turn the College's admittedly unstable financial condition around, no reasonable investor could rely on a prediction that new student enrollment in 1998 would be 4% <u>lower</u> than in 1997 as signaling the beginning of a "trend" in ever-increasing enrollment.  Plaintiffs obviously grasp at straws in suggesting that a single year's prediction of new enrollment would have been material to investors because the College was dependent on alumni contributions to fund its operations, and the enrollment of fewer freshmen in 1998 meant there would be fewer alumni in the class of 2002 to make monetary contributions in the future.  Opp'n at 34 n.23.  Given the serious and obvious financial troubles that beset the College in the short term, as well as its substantial levels of attrition, no reasonable investor could deem it material to an assessment of long-term investment risks that 15% fewer freshmen might enroll in 1998.

internal document at Bradford stated, or anyone at Bradford had concluded, that new enrollment in fall 1998 would likely be lower than 225 by any amount, much less by 15%.

Plaintiffs' argument also fails because they have not alleged specific facts supporting a reasonable inference that any of the Bradford Defendants actually had knowledge of the pieces of "interim" data from which plaintiffs claim they should somehow have deduced the conclusion that plaintiffs claim diverged from the prediction. The Amended Complaint alleges only that such interim information was known to the "College" and "admissions personnel." Am. Cp. ¶¶61-64. Plaintiffs make virtually no effort to suggest that the <u>Trustee Defendants</u> had knowledge of such data, and their efforts to suggest that Mr. Kiszka or Mr. Short had such knowledge are plainly ineffective. Although the Opposition asserts that Mr. Kiszka and Mr. Short "had access and regularly received the reports and data which contradicted the Official Statement's projections regarding enrollment," it cites only paragraph 34 of the Amended Complaint in support of this statement. Opp'n at 50. That paragraph does not even purport to tie Mr. Kiszka or Mr. Short to knowledge of any particular fact at any particular time, but instead makes the conclusory allegation that Mr. Kiszka and Mr. Short had "access to the adverse non-public information about the College's operational and financial condition" by reason of "their Board membership and/or executive and administrative positions with the College, and their attendance at and participation in Board meetings." Am. Cp. ¶34. Although the complaint makes no such allegation, plaintiffs also assert in their Opposition that their allegations about the College's receipt of 20% fewer deposits "come

from Admissions status reports generated in the ordinary course of business by Bradford and circulated to, among others, the president and CFO."  Opp'n at 15 n.9.

It is well established that plaintiffs cannot establish scienter with general assertions of knowledge such as these, but must instead identify the report, its particular contents, and the facts on which they base their claim, as well as the time of receipt by the defendant who is claimed to have the knowledge of such facts.  *See, e.g., Stone & Webster,* 2005 WL 1654040 at *8 (despite their "supervisory involvement with accounting" at company, president and CFO could not be deemed to know of improprieties in accounting for 10 contracts which rendered matters in financial statements misleading); *Shaw,* 82 F.3d at 1224 n.38 ("generalized allegations regarding the existence of an internal 'reporting system' do not 'substantially assist a securities fraud complaint in overcoming the hurdle of Rule 9(b)," and citing *Arazie v. Mullane*, 2 F.3d 1456 1467 (7th Cir. 1993), as "refusing to credit 'scanty' allegations concerning internal documents, absent indication of 'who prepared the projected figures, when they were prepared, how firm the numbers were, or which … officers reviewed them'").[10]

Nor is there any valid basis for plaintiffs' attempt to suggest scienter from the fact that the College was in financial difficulty at the time of the bond issue.  In the cases on which they rely, the courts not only made clear that financial difficulties are not enough in themselves to support a strong inference of scienter, but pointed to multiple indicia of scienter that are indisputably not present here, such as insider trading, compensation tied

---

[10]     *See also Fitzer v. Security Dynamics Technologies, Inc.,* 119 F. Supp. 2d 12, 25 (D. Mass. 2000) ("[t]his court cannot speculate that because former employees in the corporation knew of changes in the sales profiles, the corporate executives must also have known about the changes and fraudulently concealed them in the … press release"); *Guerra v. Teradyne, Inc.,* No. Civ. A. 01-11789-NG (D. Mass. Jan. 16, 2004) (2004 WL 1467065 at *25) (plaintiff failed to establish defendant's knowledge, and therefore basis for inference of scienter, where, although plaintiff identified the types of reports on which management typically relied, she failed to identify any specific report containing such information, the exact information in that report, or how the information rendered the statement a misrepresentation).

to company earnings, and fraudulent accounting practices.[11]  Additionally, plaintiffs'

suggestion that the Bradford Defendants had a motive to defraud investors because they

did not want to face the "disgrace" of having the College fail on their watch is plainly

illogical.  Opp'n at 23.  The bond proceeds were not sought (and plaintiffs do not allege

they were used) to keep the College running in the short term, and thus to stave off an

embarrassing failure, but were instead sought and used to build improvements (to be

completed by August 2000) that were intended to build a foundation for achieving

financial stability in the <u>future</u>.  Indeed, plaintiffs allege that the Trustee Defendants and

the College continued spending the bond proceeds <u>on the construction project</u> even

"when the College was insolvent or in the zone of insolvency."  Am. Cp. ¶72.

Finally, plaintiffs cannot deny that the Official Statement's explicit disclaimer

that the enrollment goals might not be reached weighs against any notion that the

defendants acted with scienter with respect to the enrollment predictions.  *Geffon v.*

*Micrion Corp.,* 249 F.3d 29, 37 (1st Cir. 2001) (no scienter where defendants warned that

event might not occur); *In re Polaroid Corp. Sec. Litig*., 134 F. Supp. 2d 176, 186 (D.

Mass. 2001) ("any indicia of scienter [drawn from] overly optimistic statements … is

offset by the Company's cautionary admissions").

---

[11]     In *In re Cabletron Systems, Inc.,* 311 F.3d 11, 39 (1st Cir. 2002), not only did the defendant officers have a motive to improve the company's financial results by making the misstatements that increased the value of their own stock, they were also alleged to have directed "large-scale fraudulent practices" and to have engaged in insider trading.  Similarly in *Aldridge,* 284 F.3d at 83, the defendant officers failed to disclose questionable business arrangements, failed to comply with generally accepted accounting standards, and their compensation "depended on the company's earnings," which were directly affected by their misrepresentations.  In *Nathanson v. Nonagen, Inc.,* 267 F.3d 400, 425 (5th Cir. 2001), the President and CEO of a "one-product company" to which patent protection for the single product was critical was held to have acted with scienter in stating that a patent covered the product, particularly where he had ample time and expertise to assess the coverage of the patent.

3.    **The Financial Aid Predictions Cannot Support a Fraud Claim.**

a.    **The Estimate of the Financial Aid Percentage Is Not Actionable, as a Matter of Law.**

Plaintiffs fail to point to any specific facts to support their claim that the Official Statement made actionable misstatements in estimating financial aid as a percentage of total student revenues, for either the current academic year (1997-98) or the next one (1998-99). There is no merit in plaintiffs' attempt to render the estimates actionable by characterizing them as misrepresentations of "hard facts" rather than the predictions they plainly are.

As to the estimate for the then-current year, 1997-98, plaintiffs assert in their Opposition that the College "earned virtually all of its student revenue (and incurred all of its student aid expense) when students matriculated in September and January," and that "the College" therefore knew, in May 1998, the actual income and financial aid figures on which the estimate was based. Opp'n at 25. Contrary to this assertion, however, plaintiffs' complaints not only contain no such allegations, but suggest that the figures had <u>not</u> been definitively determined as of May 1998. *See* Am. Cp. ¶56 (College knew revenues for spring "would be lower"; audited financials "soon" confirmed that financial aid awards were more than 35% of student income; College had data that proved that the estimate "was substantially incorrect"). Moreover, the level of attrition at the College, together with the fact, as plaintiffs allege, that over 80% of students were receiving financial aid, which the Official Statement indicates may include monthly payment plans, suggest that revenues and financial aid expenditures were in flux during the course of the semester, and further preclude any reasonable inference that revenue

14

and financial aid expenditures were fixed at the date of matriculation, or indeed, at any time before the year was over. *See, e.g.,* OS, Appx. A, at A-10.

Additionally, although plaintiffs claim that an audit <u>subsequently</u> determined, based on the actual audited amount of revenues and financial aid awards, that financial aid awarded for 1997-98 actually comprised 35% of student revenues rather than the estimated 29.9%, plaintiffs do not state the percentage that they evidently believe would have been suggested by whatever interim numbers they claim were "knowable" in May 1998, nor do they state the degree to which they claim the estimate was "substantially incorrect" at that time. Am. Cp. ¶56. There is therefore no basis for any reasonable inference that the estimate was <u>materially</u> different from the percentage that was purportedly indicated by the "knowable" numbers.

Plaintiffs similarly fail to establish a right to base a securities claim on the estimate that financial aid for the following academic year, 1998-99, would comprise 28.8% of student income, rather than 31.3%, which percentage plaintiffs have calculated from the figures in a budget they allege was revised after the Official Statement was issued. Am. Cp. ¶57. Even if the securities laws allowed recovery for an entirely prospective projection that was obviously dependent on a number of factors, including future enrollment, and that was also subject to an express disclaimer, plaintiffs cannot establish that any of the Bradford Defendants knew the estimate was wrong in May 1998,

15

much less knew that it was wrong to any material degree.[12] There is no merit in plaintiffs' reliance on a memorandum from Mr. Kiszka that is not referenced or alleged in their complaint to suggest that the pertinent revenue and financial aid figures from which plaintiffs calculated the percentage were the same before and after the budget was revised. Opp'n at 28 n.19. Particularly where plaintiffs provide no reason to believe that Mr. Kiszka's memorandum purported to identify <u>all</u> the changes that were made to the budget, the supposed fact that the memorandum does not mention changes in "the income portion of the budget or the financial aid numbers," as plaintiffs claim, would not reasonably suggest that no such changes were made. *Id.*

Finally, plaintiffs have offered no valid basis to conclude that a 5% difference in financial aid as a percentage of revenue for the current year, or 2% for the next year, would be material to a reasonable investor in any event. These percentages are by definition <u>comparative</u> ratios; they do not purport to suggest the actual dollar amount of financial aid the College will award or any other significant information about the College's actual financial condition.[13] Although plaintiffs try to suggest such materiality by asserting "that financial aid spending for the 1998-99 academic year was budgeted to be 31.3% of student income, an increase of almost 10% (or $280,000) over what was represented in the Official Statement," it is clear that plaintiffs have derived this number

---

[12] Plaintiffs err in asserting that the Official Statement does not contain a disclaimer as to the estimate of financial aid for 1998-99. Opp'n at 26-27 & n.18. Immediately after stating that "the College believes that it can reach its goal of enrolling 225 new students for the fall of 1998 while increasing the quality of its students <u>and reducing</u> slightly the average amount of <u>financial aid awards</u> to such students from College funds, the disclaimer states, "[i]f <u>these</u> <u>goals</u> are in fact met and if the College can otherwise successfully implement its budget, it expects to achieve a small operating budget surplus for the 1998-1999 fiscal year." OS, Appx. A at A-13 (emphasis added). The fact that the Official Statement uses the word "goals" in the plural, immediately after a sentence that refers to reducing financial aid, leaves no doubt that the disclaimer includes the College's ability to reduce financial aid awards.

[13] Where, as the Official Statement plainly shows, the most important variable for the College's financial wellbeing is <u>revenues</u>, whether financial aid makes up 2% more or less of those revenues is insignificant; what matters is the amount of revenue.

16

not from the Official Statement, but by applying the different percentages to the numbers in the 1998-99 budget. Because the Official Statement on its face makes no assertions about the dollar amount of revenue or financial aid for the upcoming year, it provides no way to quantify the potential effect on the College's financial condition of a 2% difference in financial aid as a percentage of revenue. Am. Cp. ¶57.[14]

### b.     Plaintiffs Have Failed to Allege Facts Supporting a Strong Inference of Scienter.

Plaintiffs fail just as obviously in attempting to suggest that any of the Bradford Defendants entertained scienter with respect to the estimates of financial aid, for either the current academic year or the next. Although plaintiffs seek to support this claim with the assertion that "[d]efendants possessed highly relevant information … that directly contradicts the hard numbers presented in the Official Statement," this argument fails of its own premise because the statements of which they complain are "estimates," by their very terms, not "hard numbers." Opp'n at 29 (emphasis added). The argument also fails because plaintiffs have failed to allege specific facts indicating that any of the Bradford Defendants knew of the matters that plaintiffs claim contradicted the estimates for either year.

As to the estimate for 1997-98, although plaintiffs assert that the "College" had the figures for income and financial aid that purportedly belied the estimate of the percentage, they do not claim that any of the Bradford Defendants were aware of those figures at the time of their purported involvement in the Official Statement. Opp'n at 25; Am. Cp. ¶56. Plaintiffs make virtually no attempt to link any of the Trustee Defendants

---

[14]     Indeed, as plaintiffs allege, the shortfall in enrollment in fall 1998 left the College with revenues for 1998-99 that were $2 million lower than the budget had assumed. Am. Cp. ¶68. Accordingly, it is plain that the College's actual financial aid expenditures in 1998-99 were substantially lower than the figures plaintiffs have calculated by applying the percentage to the budgeted figures.

with those figures.  As with the enrollment predictions, their attempt to attribute such knowledge to Mr. Kiszka and Mr. Short relies on conclusory assertions that they had "access" to and "received" unidentified reports containing unspecified information at some unstated time.  Opp'n at 50, *citing* Am. Cp. ¶¶34, 57.  As discussed above, such vague allegations are insufficient as a matter of law to support any inference of scienter. And as to the estimate for 1998-99, as discussed above, there is no basis for any reasonable inference that any of the Bradford Defendants had knowledge in May 1998 of the final budget numbers on which plaintiffs base their claim.  Moreover, as with enrollment, the disclaimer that the estimate might not be met precludes any inference of scienter.

    **4.**    **The Amended Complaint Fails to State a Claim for Misrepresentation of the College's "Plan" to Increase Enrollment.**

Plaintiffs have failed to point to any facts suggesting that the Official Statement made an actionable misrepresentation in stating that the College "planned" to increase enrollment or that it was pursuing "Strategic Initiatives" to try to improve its financial position.  Opp'n at 36-38.  Where the Official Statement does not purport to describe specific aspects of that "plan," and where the Amended Complaint establishes that the College had actually embarked on concrete efforts to improve its financial condition, including the construction project that was funded by the bonds, there is no reasonable basis to conclude that the Official Statement's references to such a "plan" were actionable misstatements.  *See* MTD Fed. at 13-14.  It is well established that vague statements about the future that are lacking in specific content are not material, as a matter of law, and therefore cannot support a securities fraud claim. *See, e.g., Shaw,* 82

18

F.3d at 1217-18 (vague statements that are lacking in specificity not material, as a matter of law); *Guerra,* 2004 WL 1467065 at *9 (lack of specificity "renders the statement virtually meaningless" and inactionable under securities laws); *Lain v. Evans*, 123 F. Supp. 2d 344, 348 (N.D. Tex. 2000) (statement that company "has aggressive growth plans … to become a major player" too vague to support securities fraud claim).

Moreover, where the Official Statement indicates that these "strategic initiatives" had already been in place for two years, and where, as plaintiffs acknowledge, the Official Statement shows little or no improvement in the College's financial condition over those two years, plaintiffs cannot claim to have reasonably relied on the vague representations regarding such a plan as indicating that the College's financial condition would improve. *See, e.g.,* OS, Appx. A, at A-8 (disclosing significant fall-to-spring attrition in current academic year, 1997-98); *id.*, Appx. B, 1996 and 1997 Financial Statements, at page 4 (College lost almost three times as much cash in its operations from July 1996 to June 1997 as it had lost in previous year); Opp'n at 23 n.14 (acknowledging that 1997 financial statement in Official Statement "does not indicate any change in the financial condition of the College …, [n]or did things look better in the current year, in which the operational loss was about the same amount").  In determining the materiality of a statement, a court must not "attribute to investors a childlike simplicity but rather …determine whether a reasonable investor would have considered the omitted information significant at the time." *See Hillson Partners Ltd. Ptp. v. Adage, Inc.,* 42 F.3d 204, 213 (4th Cir. 1994).

Additionally, plaintiffs' claim that there was no "plan" relies on a report prepared by the New England Association of Schools and Colleges ("NEASC"), which on its face

fails to support plaintiffs' claim.  *See* Exhibit A hereto.[15]  Although that report states that

there is no evidence of an "<u>effective</u> strategic plan," it makes several references to the

existence of "plans," albeit ones that the author evidently considers ineffectual.  *See, e.g.,*

Report at 6 ("<u>planning</u> has focused on individual units, either academic or

administrative," and "has been aimed at short-term goals"); *id.* at 7 ("[c]onsiderable and

ongoing discussions and mission and identity, however, constitute an informal <u>strategic

planning</u> process"); *id.* at 8 ("[o]ther <u>planning</u> efforts, while sincere and often time-

consuming, are not addressing core concerns that will ensure the long-term viability of

the institution") (emphasis added).  Where the NEASC report belies plaintiffs' allegations

that there was no "plan," there is no basis for any inference that the Official Statement

made a material misstatement in referring to a plan, much less that any of the Bradford

Defendants acted with scienter with respect to such statement.

Finally, like the NEASC report itself, the thrust of plaintiffs' allegations about the

plan is that it was not "effective," "realistic," or "functional."  Am. Cp. ¶60.  These

allegations amount to nothing more than the purported failure to disclose what plaintiffs

perceive as mismanagement, which is not a viable claim under the securities laws.  *See*

cases cited at MTD Fed. at 37.

> **5.  The Official Statement Did Not Make an Actionable
> Misrepresentation in Stating that the College Would
> Contribute $1 Million to the Construction Project.**

Plaintiffs no longer try to support their allegation that the College had "<u>no</u> present

intention" of making a $1 million equity contribution to the construction project.  Am.

Cp. ¶65 (emphasis added).  Instead, they now claim that the Official Statement

---

[15]    The Court may consider the NEASC report because plaintiffs refer to and rely on it in their
Amended Complaint, as well as their Opposition.  *See* Am. Cp. ¶¶53, 60; Opp'n at 37.

misrepresented that the College would make the contribution because the College's intention to make the contribution was "conditional and delayed," in that it intended to make the contribution only at the end of the project. Opp'n at 39. Where nothing in the Official Statement purported to suggest <u>when</u> the contribution would be made, there is no basis for any reasonable inference that the statement is a misrepresentation, much less an intentional one, even if the College intended to make it at the end.

## B.     <u>Plaintiffs Have Failed to Allege Facts Supporting Loss Causation.</u>

Plaintiffs acknowledge that, to establish loss causation, they must allege facts showing that their loss was "caused by the <u>materialization</u> of the <u>concealed</u> risk." Opp'n at 41 (emphasis added). As the Supreme Court recently explained in affirming the dismissal of a securities fraud complaint for failing to adequately plead loss causation, allowing plaintiffs to maintain securities fraud claims when they have failed to plead facts showing that the alleged misrepresentations caused their losses would impermissibly "tend to transform a private securities action into a partial downside insurance policy." *Dura Pharmaceuticals, Inc. v. Broudo*, __ U.S. __, 125 S. Ct. 1627, 1634, 161 L. Ed. 2d 577 (2005) (emphasis added).

Plaintiffs' Opposition fails to point to any facts that could support an inference that their losses were caused by the alleged misrepresentations or omissions, rather than by the risks that were disclosed in the Official Statement (which risks were, no doubt, the reason that "the buyers that Advest had found for the Insured Bonds <u>would not have purchased them without the insurance</u>" provided by ACA, as plaintiffs allege, Am. Cp. ¶67 (emphasis added)). Plaintiffs allege that the College "closed as the result of insolvency brought on by deficit spending, operating losses, negative cash flow, and the

lack of a viable business plan," all of which risks were evident from the Official

Statement, including its disclosures of the College's continuing problems and

unimproved financial condition.  Am. Cp. ¶39.  Where plaintiffs' own allegations so

clearly establish that the risks that materialized were the very risks that were disclosed,

and even warned about, in the Official Statement, plaintiffs cannot sustain the

requirement of showing loss causation, as a matter of law.  *See* MTD Fed. at 34-37.

Particularly in view of these admissions, there is no validity in plaintiffs'

suggestion that any of the matters that were purportedly misrepresented could be deemed

the cause of the financial problems that did the College in.  Plaintiffs assert that the

"financial crises that caused the new president to shut the school and default on the

bonds" were caused in large part by "lower than expected enrollment in the fall 1998,"

namely, the enrollment of "only 532 students, 79 fewer than projected in the budget."

Opp'n at 42, *citing* Am. Cp. ¶68.  Although plaintiffs thus attribute this ultimately fatal

financial crisis to the shortfall in <u>total</u> enrollment, they do not claim that the Official

Statement made any representation at all, whether true or false, about <u>total</u> enrollment for

1998.  To the contrary, the only misrepresentations plaintiffs claim the Official Statement

made about enrollment are the purported non-disclosure of attrition (an assertion that is

demonstrably incorrect, *see* Section I(A)(1)(a) above), and the prediction that the College

believed it could enroll 225 <u>new</u> students in 1998.  Plaintiffs, however, do not even allege

that the prediction of new student enrollment did not come true, much less that any

shortfall in new student enrollment had a substantial effect on the College's financial condition.[16]  *See* note 8 above.

The fact that plaintiffs are not complaining about the effect on the College of anything that they claim was misrepresented in the Official Statement is further apparent from their allegations that the "gutting" of the admissions office in response to the enrollment crisis "guaranteed the College's inability to recruit enough students to survive let alone to meet its financial obligations," and that the Trustee Defendants "deplet[ed] the assets of the College and recklessly reduce[ed] collateral available to repay the Bonds" by continuing to use the bond proceeds on the dormitory construction project. Am. Cp. ¶¶71, 72.  There is no merit in plaintiffs' attempt to distance themselves from these allegations, which are fundamentally inconsistent with their ability to establish loss causation, by suggesting that they are alleged only in the "alternative" as part of their claim for breach of fiduciary duty.  Opp'n at 43.  The Amended Complaint does not remotely suggest that these allegations are asserted in the "alternative," but, to the contrary, incorporates them explicitly into the securities fraud claim (as well as all the other claims).  *See* Am. Cp. ¶¶80, 86, 89, 92, 95, 99, 102, and 105 (incorporating ¶¶1-79, including ¶¶71, 72, and 73, into all counts).  As the court held in *Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland,* 763 F. Supp. 28, 32-33 (S.D.N.Y. 1991), a plaintiff's right to "set forth two or more statements of a claim alternatively or hypothetically, … subject to the obligations of Rule 11 … does not excuse a party from being bound by its own explicit admissions of fact."

---

[16]     Plaintiffs similarly fail to allege any facts suggesting that the purported misstatements of the estimates of financial aid as a percentage of revenue, or the College's purported intention to make an equity contribution at the end of the project, caused the College's financial crisis.

In short, because plaintiffs have not shown, and cannot show, that the losses of which they complain were due to anything other than the same financial problems that were disclosed in the Official Statement, as well as intervening events of alleged mismanagement and depletion of collateral, allowing plaintiffs to go forward on these claims would be tantamount to allowing them to use the federal securities laws as additional downside insurance for what plaintiffs well knew was a borderline junk-bond investment that simply did not pan out.

C.     **Plaintiffs Have Failed to Allege Any Basis for Holding the Trustee Defendants Liable for Securities Fraud, Whether Under §10(b) or §20(a).**

All of the plaintiffs acknowledge that they "have not pled specific facts that connect any of the Trustee Defendants to the misrepresentations and omissions in the Official Statement." Opp'n at 51.[17] This concession requires the dismissal of their §10(b) claims against the Trustee Defendants, without more (and, indeed, all the remaining claims against them).

Plaintiffs err in arguing that their allegations are sufficient to impose liability on the Trustee Defendants under §20(a) for their purported control of the College.[18] Although plaintiffs do not deny that they must allege a primary violation by the purportedly controlled entity to state a claim for control-person liability, they do not even claim to have alleged such a violation by the College, and they plainly have not. Plaintiffs misplace reliance on *In re WorldCom Inc. Securities Litigation*, 294 F. Supp. 2d 392, 419-20 (S.D.N.Y. 2003), in suggesting that it is enough merely to "depict" a primary violation (whatever that may mean), rather than to allege one. Opp'n at 52 (emphasis

---

[17]     *See also* McKeown plaintiffs' Opposition at 22.

[18]     Plaintiffs make no attempt to support their control-person claims against Mr. Kiszka or Mr. Short. Opp'n at 50-51. Count II should therefore be dismissed against them, without more.

added).  Contrary to plaintiffs' suggestion, the court in *Worldcom* expressly noted that the complaint in that case "adequately <u>alleged</u> a primary §10(b) violation by … WorldCom," the bankrupt company which the individual defendants were alleged to have controlled. *Id.* at 419 (emphasis added).  And, in any event, where the complaints fail to allege any primary violation by anybody at all, much less the entity the Trustee Defendants are claimed to have controlled, the control claim against them should be dismissed.

Even if plaintiffs could overcome this fatal deficiency, they err in suggesting that a mere conclusory allegation of "control" by the Trustee Defendants, or allegations that the Trustee Defendants had some general involvement in the governance of the College, could support the control-person claim against them for alleged misstatements in the Official Statement.  Opp'n at 53.  Plaintiff must allege <u>facts</u>, not mere conclusions, to support a reasonable inference that a defendant actually controlled the primary violator, and did so <u>with respect to the alleged misstatements</u>.[19]  *See Lernout & Hauspie Sec. Litig.,* 286 B.R. 33, 43-44 (D. Mass. 2002) (to state §20(a) claim, plaintiff must allege facts that indicate "the director's ability to control the <u>content</u> of the financial documents") (emphasis added).  Where the Trustee Defendants' only involvement in the governance of the College is alleged to have been by means of three meetings every year, where plaintiffs' only allegation relating to their purported control over the Official

---

[19] The First Circuit recently addressed the possibility that the plaintiff must establish "culpable participation" in the fraud by the controlling person as an element of a §20(a) claim, noting that such a requirement "would seem to imply a culpable state of mind" and require facts supporting a strong inference that the controlling person acted with scienter. *In re Stone & Webster,* 2005 WL 1654040 at *3 n.4, *4 n.6, *9 n.10.  Although the Court declined to decide the issue because it had not been raised by the parties or decided by the district court, the Court stated, "[i]t is not our intention to foreclose that question," and, "[s]hould the district court determine that 'culpable participation' is an element of a claim under §20(a) and that the strong-inference requirement of the PSLRA therefore applies, this may require the dismissal of claims we have remanded."  *Id.* at *4 n.6.  Because culpable participation should be considered an element of a §20(a) claim, and because plaintiffs have failed to establish culpable participation by the Trustee Defendants, the claim against them should be dismissed for this reason as well.  *See* MTD Fed. at 39 n.24.

Statement is the conclusory assertion that the Trustee Defendants "participated in drafting, preparation and/or approval" of the Official Statement (for which they allege Advest was principally responsible), where the Trustee Defendants did not sign the Official Statement, where the Board is not alleged to have voted on it, and where plaintiffs acknowledge that they cannot tie the Trustee Defendants to any of the alleged misrepresentations or omissions in the Official Statement, there is no basis for a reasonable inference that the Trustee Defendants actually had control over the content of the Official Statement as required to support liability under §20(a).

II.     **PLAINTIFFS' FAILURE TO ALLEGE ACTIONABLE MISREPRESENTATIONS OR OMISSIONS REQUIRES DISMISSAL OF ALL THE REMAINING STATE-LAW CLAIMS AGAINST THE BRADFORD DEFENDANTS.**

With the exception of plaintiffs' claim for breach of fiduciary duty, which they have abandoned, all the state-law claims against the Bradford Defendants are based on allegations of misrepresentations or omissions in the Official Statement. Plaintiffs' acknowledgement that they cannot tie the Trustee Defendants to any misrepresentation or omission in the Official Statement requires dismissal of the remaining state-law claims against them, without more.

Moreover, plaintiffs offer no authority that could support any of their state-law claims against any of the Bradford Defendants where plaintiffs have failed to plead any actionable material misrepresentation or omission. Contrary to plaintiffs' suggestion, their allegations cannot be deemed sufficient under Rule 9(b) any more than under the Private Securities Litigation Reform Act ("PSLRA"). As the First Circuit has made clear, "[i]n the securities context, and in general, this circuit has strictly applied Rule 9(b)." *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 361 (1st Cir. 1994),

26

*quoting New England Data Services v. Becker*, 829 F.2d 286, 288 (1st Cir. 1987). Like

the PSLRA, this Circuit's application of the Rule 9(b) standard provides that "the

complaint must set forth 'specific facts that make it reasonable to believe that

defendant[s] knew that a statement was materially false or misleading.'" *Id., quoting*

*Greenstone v. Cambex Corp.,* 975 F.2d 22, 25 (1st Cir. 1992) (emphasis added).

Plaintiffs have plainly failed to do so here.

 Nor is there any validity in plaintiffs' reliance on *Rodi v. Southern New England*

*School of Law*, 389 F.3d 5 (1st Cir. 2004), to attempt to escape the effect of the

disclaimers in the Official Statement on their ability to establish reasonable reliance on

the alleged misrepresentations for purposes of their Massachusetts-law claims. *Rodi* is

wholly distinguishable; it is not a securities case, but involves allegations than the dean of

an unaccredited law school fraudulently induced a student to attend by writing him a

letter representing that he was "highly confident" that the school would receive

accreditation, when he knew the school had "identifiable deficiencies" that would

"almost certainly" preclude accreditation. *Id.* at 10. The court held that the general

disclaimer in the school catalog that the school did not represent it would be accredited

by the time of any student's graduation did not speak to the critical issue of the capacity

to become accredited, and thus did not preclude reasonable reliance. *Id.* at 16. Even if

*Rodi* could be deemed even remotely instructive in the context of written representations

and disclosures made in the context of a bond offering, it does not help the plaintiffs here

because they cannot establish any actionable misrepresentation in the first instance, and

because the disclaimers here directly address the risks that plaintiffs claim were

misstated.

**III.    THE STATE-LAW CLAIMS ARE DEFICIENT FOR OTHER REASONS AS WELL.**

**A.    Plaintiffs Have Failed to State a Claim Against the Bradford Defendants Under the Uniform Securities Act.**

**1.    Plaintiffs Lack Standing to Assert a Claim Under §410.**

Plaintiffs err in asserting that M.G.L. c. 110A, §414, affords them a basis for suing under the Uniform Securities Act.  The language on which they rely provides, in pertinent part, that M.G.L. c. 110A, §410, applies to "persons who sell or offer to sell when … an offer to sell is made in the commonwealth," and that "an offer to sell … is made in the commonwealth, whether or not either party is then present in the commonwealth, when the offer … originates in the commonwealth."  M.G.L. c. 110A, §§414(a), (c) (emphasis added).

The allegations of the Amended Complaint do not suggest that any "offer" to sell the bonds originated in Massachusetts.  Instead, plaintiffs allege that "the Bonds were offered by means of an official offering statement … prepared by the sole underwriter of the offering, Defendant Advest, Inc."  Am. Cp. ¶2 (emphasis added).  Plaintiffs also allege that "[t]he College, through the Official Statement, offered, and Advest, through its firm underwriting, sold, securities."  *Id.* ¶93 (emphasis added).  Plaintiffs' own allegations therefore establish that the College's "offer" of the bonds was through the Official Statement for which Advest was responsible.  *Id.* ¶13.  Because plaintiffs do not allege that Advest, who they allege is a Delaware corporation with a principal place of business in Connecticut, originated the Official Statement in Massachusetts, plaintiffs have failed to allege any tenable basis for bringing a claim under §410.

28

## 2.    The Bradford Defendants Are Not Alleged to Be Parties Who May Be Held Liable Under the Uniform Securities Act.

Plaintiffs make no attempt to support any primary claim under §410 against any of the Bradford Defendants, but instead rely solely on §410(b). Opp'n at 63-64. Although plaintiffs do not deny that §410(b) by its terms applies only to control persons of "sellers," and not "offerors," and although plaintiffs have not alleged that the College was a "seller," but only an "offeror," plaintiffs argue that the College may nonetheless be deemed a "seller" for which the Bradford Defendants may be secondarily liable under §410(b). Plaintiffs' argument ignores the clear federal precedents under §12(2) of the Securities Act of 1933, which the Massachusetts legislature and the SJC have directed courts to follow in construing §410, and which establish that the College cannot be deemed a "seller" because it neither sold nor actively solicited purchases of the bonds. MTD State at 3-5. Plaintiffs offer no principled reason to construe settled Massachusetts law differently, but rely instead on a proposed revision to the Uniform Securities Act which they admit the Massachusetts legislature has never adopted, as well as a decision by the Washington Supreme Court construing its own enactment of that act. Opp'n at 70. This Court should not effect a judicial amendment of §410(b) that neither the courts nor the legislature of Massachusetts have adopted or even suggested they might adopt.[20]

There is similarly no merit in plaintiffs' argument that the College could be deemed to have been a "seller," and all the Bradford Defendants therefore secondarily liable under §410(b), because Mr. Kiszka purportedly had some "contact with at least

---

[20]    The only ground plaintiffs offer for suggesting that the SJC might adopt plaintiffs' interpretation of §410 is "the SJC's concern with protecting investors." Opp'n at 73. Such a general "concern" (a concern that §410 itself expresses) does not reasonably suggest that the SJC would expand §410 to impose liability on entities which existing jurisprudence establishes are not subject to the statute. Moreover, the fact that plaintiffs can point to only one state that has adopted the interpretation plaintiffs urge further counsels against imputing to the SJC or the Massachusetts Legislature any intent to change Massachusetts law in such a drastic manner. Opp'n at 70.

29

one" of the institutional bondholders "before its purchase regarding the alleged merits of

the bond issue" and thus "solicited" a sale.  Opp'n at 73.  Apart from the fact that the

Amended Complaint makes no such allegation, such fact, even if alleged, could not

support a reasonable inference that Mr. Kiszka actually "solicited" any of the plaintiffs

within the meaning of §12(2) or §410.  As the First Circuit held in *Shaw,* 82 F.3d at 1215,

neither a company nor its directors can be held liable under §12(2) "unless they actively

'solicited' the plaintiffs' purchase of the securities to further their own financial motives,

in the manner of a broker or a vendor's agent."  As the court recognized in *Montcalm*

*County Board of Commissioners v. McDonald & Co. Securities, Inc.,* 833 F. Supp. 1225,

1232 (W.D. Mich. 1993), under *Pinter v. Dahl*, 486 U.S. 622 (1988), a person is not

deemed to have "solicited" under §12(2) unless he was "an issuer or a paid participant

who actually <u>contacted</u> a buyer," in the sense that he initiated the contact, and "<u>urged</u> the

buyer to purchase" the securities.  *Quoting* Joseph E. Reece, Would Someone Please Tell

Me the Definition of the Term "Seller":  The Confusion Surrounding Section 12(2) of the

Securities Act of 1933, 14 <u>Del. J. Corp. L.</u> 35, 104-05 (1989) (emphasis added).  The

court in *Montcalm* held that a securities broker was not a statutory "seller" under §12(2)

because he never executed a purchase of a security except at the request of the plaintiff

and because all contacts were initiated by the plaintiff.  *See also Wheaten v. Mathews*

*Holmquist & Associates, Inc.,* No. 94 C 1134 (N.D. Ill. Jan. 10, 1995) (1995 WL 12523

at *11) (same); *Ryder Int'l Corp. v. First American National Bank*, 749 F. Supp. 1569

(N.D. Ala. 1990), *aff'd*, 943 F.2d 1521 (11th Cir. 1991) (bank that did not "urge,"

"persuade," or "otherwise influence" customer to buy securities did not "solicit" purchase

and could not be liable under §12(2)).  Thus, even if plaintiffs were to allege that there

was some "contact" between Mr. Kiszka and any of the institutional bondholders "regarding the alleged merits of the bond issue," such allegation would not suggest that Mr. Kiszka initiated the contact or urged the bondholder to purchase the bonds, and thus could not support any conclusion that he, much less the College, "solicited" the sale such as to qualify as a "seller."

   3.     **Plaintiffs' §410 Claim Is Untimely.**

        There is no merit in any of the arguments by which plaintiffs attempt to avoid the bar of the statute of repose in §410(e). Plaintiffs first err in asserting that the provision is not a statute of repose because the SJC referred in passing to its period for suit as a "limitations period" in *Marram v. Kobrick Offshore Fund, Ltd.,* 442 Mass. 43, 50, 809 N.E.2d 1017, 1027 (2004). Because the court in *Marram* had no occasion to, and plainly did not, address whether the provision was a statute of repose, its use of the term "limitations," which is widely used interchangeably with the term "statute of repose," does not begin to suggest an opinion as to whether the provision is a statute of repose. *See, e.g.,* Black's Law Dictionary at 835, 1169 (5th ed. 1979) (definition of "statute of limitations" states that "statutes of limitations are statutes of repose" and are "sometimes referred to as 'statutes of repose'"; definition for "Repose statutes" refers reader to "Limitation (Statute of limitation)").

        Plaintiffs similarly err in suggesting that statutory provisions may be deemed statutes of repose only if they indicate that the period for suit begins as of a "definitively established date" or "bright-line" event. Opp'n at 75. Although the SJC has recognized that the period of a statute of repose "generally" begins to run from a definitively established date, its decisions do not hold, or even suggest, that this is a required feature

of a statute of repose. *McGuinness v. Cotter*, 412 Mass. 617, 625 (1992). Instead, the SJC looks to the language of the statute to determine whether the legislature intended the time period for bringing suit to be absolute, and thus a statute of repose. *See* MTD State at 9-10 (SJC has found intent to create statute of repose in statute providing that suit "shall" be brought within a certain time, or "in no event" after such time). Plaintiffs do not, and obviously cannot, explain how the language in §410(e), "<u>no person may sue more than four years</u> after discovery of the violation," may reasonably be read as anything other than an absolute and mandatory four-year period for bringing suit, and thus a statute of repose.

Plaintiffs' position is not advanced by §410(g), which states that "any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this chapter or any rule or order hereunder is void." *Id.* Plaintiffs illogically argue that the existence of this provision suggests that the legislature would likewise have expressly precluded waivers of the time for bringing suit had it deemed that period to be "as essential to the statutory scheme as posited by the Bradford Defendants." Opp'n at 76-77. The absence of a statutory provision, however, cannot reasonably be deemed to evidence the legislature's intent. *See, e.g., Lolley v. Campbell*, 28 Cal. 4th 367, 121 Cal. Rptr. 2d 571, 48 P.3d 1128 (2002) (bills that are not enacted have little value in determining legislature's intent). To the contrary, because the language of §410(e) plainly establishes the Legislature's intent to create a non-tollable statute of repose, the Legislature had no reason to repeat this intent in another enactment.

Plaintiffs do not attempt to deny that their own allegations establish that they discovered the matters that they claim violated the act more than four years before they

32

brought this suit. *See* MTD State at 11; Am. Cp. ¶77 ("[o]n November 22, 1999, when the College announced that it would cease operations, the Bondholders learned for the first time that a reasonable possibility existed that their bonds would not be paid in accordance with the bond indenture"). Nor is there any merit in the suggestion that the "discovery" of a securities violation cannot be deemed a sufficiently definite event to trigger the running of a statute of repose. In an analogous context, the court in *Gordon v. Millivision Holdings, LLC*, No. 03086 (Mass. Super. Ct. Jan. 14, 2005) (2005 WL 705110 at *4), construed as a statute of repose a statutory time period for suit that was triggered by a "violation" of the Massachusetts Wage Act, M.G.L. c. 149, §150 ("[a]ny employee claiming to be aggrieved by a violation [of the Wage Act] may … within three years of such violation, institute … a civil action"). As the court explained, "[t]his is not a negligence or tort action in which the harm or breach may be difficult to discover[]," but rather "a commercial dispute and such claim[s] are, seldom if ever, inherently unknowable." *Id.*

Finally, plaintiffs offer no basis for any inference that the SJC might hold that the time period of a statute of repose may be extended by a tolling agreement on a "waiver" theory. Instead, the SJC has made quite clear that the time period set by a statute of repose is "absolute," that "statutes of repose may not be 'tolled' for <u>any</u> reason," and "[t]he <u>only</u> way to satisfy the 'absolute time limit' of a statute of repose is to 'commence' the action prior to the expiration of that time limit." *Nett v. Bellucci*, 437 Mass. 630, 635, 774 N.E.2d 130, 134-135 (2002) (emphasis added). Accordingly, notwithstanding the existence of the tolling agreement, which the Bradford Defendants referenced quite

plainly in their motion, MTD State at 11, plaintiffs' claim is barred as a matter of law by the absolute time limit in §410(g).[21]

**B.** **Plaintiffs' Negligent Misrepresentation Claim Is Not Viable Under Massachusetts Law.**

Plaintiffs' claim for negligent misrepresentation would fail even if plaintiffs could plead an actionable misrepresentation. Plaintiffs wrongly assert that the Bradford Defendants have "conceded" that privity does not apply to negligent misrepresentation claims in Massachusetts. Opp'n at 82. The Bradford Defendants' acknowledgement that the Supreme Judicial Court has recognized the theory of negligent misrepresentation in §552 of the Restatement (Second) of Torts in narrow situations involving the dissemination of information in rendering professional or business services in no way suggests that Massachusetts law has abandoned its long-standing requirement of privity for negligent misrepresentation claims in other contexts, and nothing else in Massachusetts law suggests that it has. MTD at 20. Plaintiffs similarly err in arguing that the alleged involvement of Mr. Kiszka and Mr. Short in the Official Statement may be deemed to fall within the purview of §552. Plaintiffs do not allege that the business, profession, or employment of either Mr. Kiszka or Mr. Short, who were officers of the College, was to provide information for the professional guidance of others, unlike the lawyers, accountants, architects, and inspectors who are retained to provide such services and to which Massachusetts courts have applied §552. Because there is no suggestion in Massachusetts law that a claim under §552 would apply on the allegations in this case, and because plaintiffs' allegations establish there was no privity between the plaintiffs

---

[21]    The SJC's holding that statutes of repose are "absolute" indicates that the time periods they establish are jurisdictional; as such, they are not waivable and may be raised by the Court *sua sponte*. *See, e.g., LaVallee Northside Civic Ass'n v. Virgin Islands Coastal Zone Management Commission*, 866 F.2d 616, 625 (3d Cir. 1989).

and any of the Bradford Defendants, the claim for negligent misrepresentation should be dismissed.

### C.  Plaintiffs Have Failed to Allege a Viable Claim Under Chapter 93A.

Plaintiffs do not deny that they must plead the existence of a commercial relationship or business transaction between themselves and the Bradford Defendants to sustain a claim against them under M.G.L. c. 93A, §11.  They plead no such relationship, however, but instead rely entirely on §552 and the factors supporting such liability in claiming that their allegations suggest a commercial relationship sufficient to support a Chapter 93A claim.  Opp'n at 87-88.  Their argument fails because, even if they had pled a sufficient basis for liability under §552, which they have not, nothing in Massachusetts law suggests that the preconditions for imposing liability under §552 establish a commercial relationship sufficient to support a Chapter 93A claim.  The two concepts are obviously not interchangeable; §552 looks to the scope of a tort duty, while Chapter 93A requires conduct by a defendant who is engaged in "trade and commerce."  Because plaintiffs have not alleged that any of the Bradford Defendants was involved in any commercial transaction with any of the plaintiffs, and also because plaintiffs' allegations do not suggest any conduct by the Bradford Defendants that is proscribed by any established law, plaintiffs cannot maintain a Chapter 93A claim against them.

### III.  ALL THE STATE-LAW CLAIMS AGAINST THE TRUSTEE DEFENDANTS ARE BARRED BY STATUTORY IMMUNITY.

Although the issue of statutory immunity is largely rendered moot by plaintiffs' concession that they cannot tie the Trustee Defendants to any of the misrepresentations or omissions in the Official Statement, plaintiffs' state-law claims may be dismissed by

reason of the statutory immunity as well.  Plaintiffs' procedural arguments cannot save their claims from the bar of immunity.

Plaintiffs first err in suggesting that the applicability of immunity should not be determined on a motion to dismiss because they have not alleged that the College was a tax-exempt organization under 26 U.S.C. §501(c)(3).  It is well established that, on a motion to dismiss, a court may take judicial notice of public records and other matters that are not reasonably subject to dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *Guerra*, 2004 WL 1467069 at *1, *citing In re Stone & Webster, Inc.,* 253 F. Supp. 2d 102, 128 nn.10 & 11 (D. Mass. 2003), *aff'd in pt., vac'd in pt.,* 2005 WL 1654040.

Internal Revenue Service ("IRS") Procedure No. 82-39 provides, among other things, that "the listing of an organization in [IRS] Publication No. 78 signifies it has received a ruling or determination letter … stating that contributions by donors to the organization … are deductible," and that "[e]ach such ruling or determination letter is based on a factual showing by the organization that its character, purposes, activities, and method of operation satisfy the statutory requirements for qualification at the time the ruling or determination letter is issued."  (IRS Procedure No. 82-39 is attached hereto as Exhibit B.)  *See also Estate of Sally H. Clopton v. Commission of Internal Revenue*, 93 T.C. 275, 277 (1989) (IRS Publication No. 78 "is the official IRS guidance on which the public can rely for determining the deductibility of charitable contributions" to tax-exempt organizations).  IRS Publication No. 78, which is published on the IRS's official web site, and of which the Court may take judicial notice, lists Bradford College as a tax-exempt organization, and therefore establishes its tax-exempt status as a matter

of law.  (The pertinent pages of the IRS web site, including the page that lists Bradford College as a tax-exempt organization, are attached hereto as Exhibit C.)

Nor is there any merit in plaintiffs' argument that application of the statutory immunity should not be decided at this time because the Bradford Defendants have offered an affidavit on a single, limited factual issue needed to establish the immunity, namely, that the Trustee Defendants were not compensated for serving on the Board. Opp'n at 89-90.  Plaintiffs have not suggested any doubt as to the truth of the matter, and the determination of the immunity issue would expedite and streamline this action by allowing dismissal of all the state-law claims against the Trustee Defendants on such ground as well.  Accordingly, and only if the Court does not dismiss all state-law claims against the Trustee Defendants for such reasons, the Trustee Defendants respectfully request that this Court convert their motions into motions for summary judgment on the limited issue of whether the Trustee Defendants were compensated, and dismiss all the state-law claims against them by reason of statutory immunity.

## IV.    THE COURT SHOULD DENY PLAINTIFFS LEAVE TO AMEND.

Finally, the Court should deny the plaintiffs' requests for leave to amend.  It is well established that a district court does not abuse its discretion in denying leave to amend in opposition to a motion to dismiss when the plaintiff, as here, makes a "bare request" to amend and does not show that it could plead legally sufficient claims if allowed to amend.  *See, e.g., In re Merrill Lynch & Co., Inc.,* 273 F. Supp. 2d 351, 392 (S.D.N.Y. 2003), *aff'd*, 396 F.3d 161 (2d Cir. 2005); *In re Capstead Mortgage Corp. Sec. Litig.,* No. Civ. A. 3:98-CV-1716-L (N.D. Tex. Sep. 19, 2003) (2003 WL 22221320 at *3) ("perfunctory" request to amend, that does not demonstrate how amendment would

cure defects, cannot withstand motion to dismiss).  Because plaintiffs have failed to point

to any facts they could allege that might conceivably save their claims, their request to

amend should be denied.

Defendants also note that, as plaintiffs acknowledge, plaintiffs did not serve their

respective complaints in this action until in and after October 2004, more than six years

after the Official Statement was issued, and nearly five years after the College announced

it was closing its doors.  Opp'n at 90.  The complaints (whose factual allegations are

virtually identical to the complaint the T. Rowe Price plaintiffs filed in 2000, *see* Am. Cp.

¶79) rely on a wide variety of Bradford documents that plaintiffs have obviously had for

years, including but not limited to internal memoranda, correspondence, admissions

status reports, minutes of Board meetings, audited financial statements, and budgets.  *See,*

*e.g.,* Am. Cp. ¶¶42, 47, 50, 51, 54, 56, 57, 61, 62, 63, 65, 68, 69, 70, 74, 75.  Where

plaintiffs have already had more than enough time to adduce facts to assess their claims

and frame their complaints, and where they have failed to explain what more they could

allege that might conceivably state a claim, there is no reason to allow them leave to file

an obviously futile amendment.

                                        THE BRADFORD DEFENDANTS
                                        By their attorneys,


                                        /s/  A. Lauren Carpenter
                                        Robert E. Sullivan, BBO #487820
                                        Scott A. Roberts, BBO #550732
                                        A. Lauren Carpenter, BBO #551258
                                        SULLIVAN, WEINSTEIN & McQUAY, P.C.
                                        Two Park Plaza
                                        Boston, MA 02116
Dated:  July 29, 2005                   (617) 348-4300
                                        Email:  lcarpenter@swmlawyers.com


                                        38

**<u>CERTIFICATE OF SERVICE</u>**

I, A. Lauren Carpenter, hereby certify that a true and correct copy of the foregoing document was served by hand on all counsel of record on this 29th day of July, 2005.

/s/  A. Lauren Carpenter

A. Lauren Carpenter



Founded in 1885

## NEW ENGLAND ASSOCIATION OF SCHOOLS & COLLEGES, INC.
### COMMISSION ON INSTITUTIONS OF HIGHER EDUCATION

WALTER F. EGGERS Chair (1999)
Provost and Vice President for
Academic Affairs
University of New Hampshire

ADRIAN TINSLEY Vice Chair (2001)
President
Bridgewater State College

PATRICK DUFFY (1999)
Concord, New Hampshire

PENINA M. GLAZER (1999)
Marilyn Levin Professor of History
Hampshire College

NANCY H. HENSEL (1999)
Provost and Vice President for
Academic Affairs
University of Maine at Farmington

DAVID HORNFISCHER (1999)
Vice President for Administration/
Finance, Secretary/Treasurer
Berklee College of Music

ROGER H. PERRY (1999)
President
Champlain College

PEPITA SOTO (1999)
Boston, Massachusetts

TREY WILLIAMS (1999)
Vice President and Dean of Students
Bradford College

BOOKER T. DEVAUGHN (2000)
President
Three Rivers Community-Technical College

JONATHAN K. FARNUM (2000)
Coventry, Rhode Island

ATTILA O. KLEIN (2000)
Professor of Biology
Brandeis University

SHEILA E. MEGLEY, R.S.M. (2000)
President
Regis College

MERRILY E. TAYLOR (2000)
University Librarian
Brown University

JOHN F. VAN DOMELEN (2000)
President
Wentworth Institute of Technology

JOHN H. DUNN (2001)
Executive Vice President for Academic Affairs
Springfield Technical Community College

WILLIAM R. DURGIN (2001)
Vice President for Business Affairs
and Treasurer
College of the Holy Cross

BARBARA D. WRIGHT (2001)
Associate Professor of German
University of Connecticut

**Director of Commission**
CHARLES M. COOK
E-Mail: ccook@neasc.org

**Associate Director of the Commission**
PEGGY L. MAKI
E-Mail: pmaki@neasc.org

**Associate Director of the Commission**
JUDITH B. WITTENBERG
E-Mail: jwittenberg@neasc.org

May 11, 1999

Dr. Jean Scott
President
Bradford College
320 South Main Street
Haverhill, MA 01835-7393

Dear President Scott:

I write to inform you that at its meeting on April 23, 1999, the Commission on Institutions of Higher Education took the following action with regard to Bradford College:

> that action on the accreditation of Bradford College be deferred;

> that the College submit a report for consideration in Spring, 2000, emphasizing its success in:

> 1. strengthening the congruence between the College's mission and its academic programs and ensuring that these programs are supported with sufficient resources;

> 2. improving retention;

> 3. ensuring that the College library is adequately staffed and appropriately managed;

> 4. strengthening the College's fiscal condition by eliminating annual budget deficits, decreasing the spending rate from the endowment, lowering the tuition discount rate, and developing a multi-year financial plan, and otherwise improving its administrative capacity in financial matters, including the implementation of sound accounting procedures;

> that this report be followed by a visit by Commission representatives to validate its contents;

> that the College's accreditation status be determined based on the Commission's findings following the Spring, 2000, evaluation.

The Commission gives the following reasons for its action.

Dr. Jean Scott
May 11, 1999
Page 2

The Commission defers action on institutions seeking continued accreditation when it judges that "it has insufficient data on which to base a decision." In deferments, action is tabled to a specific time and the institution is asked to submit information as required. Deferments are not included in the Commission's public announcements.

We are cognizant of the fact that Bradford College has recently experienced a major fiscal crisis compounded by unforeseen enrollment shortfalls at the same time it has undergone major changes in staffing at the senior administrative level, including the 1998 appointment of a new president. Financial difficulties at a time of administrative transition have presented unwelcome challenges for the College leadership. Certainly the College is to be commended for its determination to vigorously confront the diverse problems, and the initial efforts to resolve its many troublesome situations show some promise. The Commission is hopeful that the Spring, 2000, report and evaluation visit will reveal that the College has made significant progress toward eliminating the problems that threaten its capacity to fulfill the *Standards for Accreditation*.

The areas to be given emphasis in the College's 2000 report are matters related primarily to the Commission's standards on *Mission and Purposes, Programs and Instruction, Library and Information Resources,* and *Financial Resources.*

We applaud the College for its recent efforts at redefining its mission and for its progress toward producing an officially adopted "concise statement" that will "provide direction to the curricula and other activities," in keeping with the standard on *Mission and Purposes* (1.2, 1.3). We understand that this new mission will be formally approved by the Trustees at its next meeting. However, we look forward to learning that the congruence between this new mission and the College's existing academic programs has been strengthened, that these academic offerings "are consistent with and serve to fulfill [the institution's] mission and purposes" *(Programs and Instruction,* 4.2), so that there is no discrepancy between the College's intended direction and the nature of the curriculum, which seemed to the visiting team to be only partially governed by the previous mission statement. Moreover, given the current financial problems, we also wish to see evidence that the College has supported its programs with adequate resources so as to meet the Commission's requirement in this regard. We note that the attrition rate for matriculated students at the College is higher than might be expected at a small private institution, with only about 45 percent persisting to graduation, which raises the question as to whether the current academic offerings are being supported with the necessary resources. We remind you of our statement: "The institution provides sufficient resources to sustain and improve programs and instruction" (4.2). The high rate of attrition also leads us to query whether the College's admission and retention policies and procedures are "clear" and "consistent with its mission and purposes," and whether "appropriate mechanisms" are being implemented to "address the needs" of admitted students "so as to provide reasonable opportunities for . . . success" (4.33, 4.34). Therefore, we look forward to learning more about the College's continued progress in these matters in the 2000 report.

The Commission wishes to register serious concern about the staffing of the College's library. Although improvements have been made in the past few years in the library facilities, the monograph collection, and information technology, the recent elimination of the position of Library Director is most troubling, as are the decreased numbers of professional and clerical support staff. These staffing deficits seem directly related to the fiscal crisis, and we would point out that our standards require that "ostensible financial stability is not achieved at the expense of educational quality" (*Financial Resources,* 9.1). We also remind you that our standard on *Library and Information Resources* specifically requires that "professionally qualified and numerically adequate staff administer the institution's library and information resources" (7.4). Therefore, we urge that the College take steps to ameliorate the apparent deficiencies in this regard.

Dr. Jean Scott
May 11, 1999
Page 3

Finally, while the Commission understands that the recent budget difficulties at the College are part of a longstanding pattern that pre-dated the arrival of the current leadership and that major steps have already been taken to mitigate them, we are anxious to receive evidence in the 2000 report that the College's financial condition has been greatly strengthened. We also wish to learn that the College's administration of financial matters has been significantly improved. To be more specific, we are eager to receive information about the College's progress toward eliminating the recurrent annual operating deficits, the most recent of which necessitated drastic action by the newly-arrived president in Fall, 1998. The Commission standard on *Financial Resources* requires that "the institution has and implements a realistic plan for addressing issues raised by the existence of any operating deficit" (9.4). We note with concern, too, that the spending rate from the endowment is projected to be in excess of seven percent of its market value, which is much higher than is typical for comparable institutions, and would encourage the College to decrease this to a level more in keeping with what is considered good practice. Another factor contributing to the financial difficulties may be the rather high tuition discount rate, which has increased in the past few years and is now at 48 percent, well above the average for a school of the College's size. Therefore, as the College begins to develop a workable multi-year financial plan, we hope to see that its operating deficits, endowment spending, and tuition discounting have been brought into line and that the overall financial condition of the institution is much healthier. Sound management in the fiscal area will also contribute to improvement; most importantly, we encourage the College to address serious problems identified by the visiting team with its accounting procedures, so that its sense of its finances is more complete and accurate, and can provide "a basis for sound financial decision making" (9.4).

The submission of the report in January, 2000, will be followed by a visit by Commission representatives to validate its contents.

The Commission expresses its appreciation for the comprehensive self-study prepared by Bradford College and for the evaluation report submitted by the visiting team chaired by Dr. John McDonald. The Commission also welcomed the opportunity to meet with you and Dr. McDonald during its deliberations.

You are encouraged to share this letter with members of the College community. It is the Commission's policy to inform the chair of the institution's governing board on its accreditation status. In a few days, we will be sending a copy of this letter to Ms. Karen M. Sughrue. The institution is free to release information about the evaluation and the Commission's action to others, in accordance with Commission policy.

The Commission hopes that the evaluation process has contributed to institutional improvement. It appreciates your cooperation in the effort to provide public assurance of the quality of higher education in New England.

If you have any questions about the Commission's action, please contact Charles M. Cook, Director of the Commission.

Sincerely,

Walter F. Eggers

WFE/slo

Enclosure

cc: Ms. Karen M. Sughrue
    Visiting Team

A Report to

# BRADFORD COLLEGE

By

An Evaluation Team Representing the
Commission on Institutions of Higher Education of the

## *New England Association of Schools and Colleges*

Based on study of the College's self-evaluation documents and on a campus visit
which took place between November 1st and 4th, 1998.

## Members of the Team

*Dr. John J. McDonald*, Professor of English, Saint Michael's College, Colchester, VT; Chairperson

*Mr. William B. Hall*, Vice President for Business and Financial Affairs, Salve Regina University, Newport, RI

*Dr. George J. Larkin*, Vice President for Student Affairs, New Hampshire College, Manchester, NH

*Ms. Marcia L. Dworak*, Library Director, College of the Atlantic, Bar Harbor, ME

*Dr. David B. House*, President, St. Joseph's College, Standish, ME

*Mr. Joseph L. Subbiondo*, Dean of the School of Liberal Arts, Saint Mary's College of California, Moraga, CA

This report represents the views of the evaluation team as interpreted by the Chairperson. It is made to the institution prior to its consideration by the Commission. This is a confidential document, prepared as a service to Bradford College. All comments in the report are made in good faith, and they are conceived solely as an educational evaluation of the College, with particular attention paid to the manner in which the institution appears to be carrying out its objectives.

COMMISSION ON INSTITUTIONS OF HIGHER EDUCATION

NEW ENGLAND ASSOCIATION OF SCHOOLS AND COLLEGES

PREFACE PAGE:  BRADFORD COLLEGE

1.  *HISTORY:*       Year chartered or authorized 1803, chartered Year first degrees awarded ___1965___
                                                                                    1804

2.  *TYPE OF CONTROL* (CHECK OR FILL-IN):

| | PUBLIC | | | | PRIVATE | |
|---|---|---|---|---|---|---|
| State | | | | Nonprofit | X | |
| City | | | | Religious group (name) | | |
| Other Specify | | | | Other (specify) | | |

3.  *DEGREE LEVEL* (CHECK ALL APPROPRIATE CATEGORIES):

    Associate ___X___  Baccalaureate ___X___  Master's _____  Professional _____  Doctoral _____

4.  *ENROLLMENT IN DEGREE PROGRAMS* (FOR FALL SEMESTER OF THE MOST CURRENT YEAR):

| | FULL-TIME | PART-TIME | FTE |
|---|---|---|---|
| Associate | ∅ | | |
| Baccalaureate | 548 | 29 | 566 |
| Graduate | ∅ | | |

5.  *CURRENT FACULTY:*

    Full-time ___35___      Part-time ___52___      FTE ___44___

6.  *CURRENT FUND DATA FOR MOST RECENTLY COMPLETED FISCAL YEAR*
    (SPECIFY YEAR) __6/30/98__ :

| EXPENDITURES | | REVENUES | |
|---|---|---|---|
| Instruction | 2,863,000 | Tuition  (Net of Fin. Aid) | 4,372,000 |
| General | 7,745,000 | Gov't Appropriations | |
| Auxiliary Enterprises | 1,055,000 | Gifts/Grants/Endowment | 2,946,000 |
| Other | 1,825,000 | Auxilialry Enterprises | 3,016,000 |
| | | Other | 2,102,000 |
| TOTAL: | 13,488,000 | | 12,436,000 |

7.  *OFF-CAMPUS LOCATIONS:*    N/A

    Total _____      In-state _____      Out-of-state _____

8.  *ACCREDITATION HISTORY:*

    Candidacy: None    Initial Accreditation: Dec., 1931 Last Comprehensive Eval:  Fall, 1986
    Last Commission Action: Fifth-year interim report accepted.
    Last Action Taken on: September 18, 1992

9.  *OTHER CHARACTERISTICS:*

## INTRODUCTION

This document reports on a decennial comprehensive evaluation visit made on November 1 -- 4, 1998, to advise Bradford College and to recommend action concerning its continued accreditation to the Commission on Higher Education of the New England Association of Schools and Colleges.

The visit and this report come at a difficult time for Bradford. A major leadership transition is in progress, and the College is dealing with a serious financial crisis.

Bradford appointed a new President on July 1, 1998, and the Vice President for Institutional Advancement has been in his current position for only a year. The Interim Vice President and Academic Dean unexpectedly left the College for a different opportunity in the late summer of 1998, and the Vice President for Enrollment Management has decided to leave early in 1999. The last-named Vice President had been at Bradford for only one year as well. Within top leadership, these changes leave only two Vice Presidents who have significant senior administrative time at Bradford -- the Vice President for Student Affairs and the Vice President for Administration and Finance.

Into this as yet unformed leadership team's lap then fell a budget crisis. A shortfall from projected numbers of matriculated students, arising largely from a severe, long-standing problem with retention, left the College with a FY'99 operating budget suddenly out of balance by about $2 million (from a total budget of approximately $12 million). This imbalance, realized and reported to the new president only in late September, led to immediate layoffs that included the Library Director, the second-ranking financial officer, and about a dozen other full- or part-time employees. No full-time faculty members were released. Non-personnel expenses were cut significantly, and an endowment benefaction was converted to cash in order to control the immediate crisis.

But not all the news from Bradford is negative. It has just completed a moderately successful $17 million Capital Campaign ($3 million short of its goal), and it enjoys a large endowment relative to the size of its operations. The number of students currently on campus exceeds the enrollment of all but one year in the history of the College. There is a strong and widespread belief among all constituencies -- from the Board through faculty, staff, and students -- that the new President possesses leadership characteristics and strength which will meet Bradford's current challenges.

. It should be admitted that the Chair of the Visiting Team devoted serious
thought to suggesting that the decennial visit be deferred for a year so that
President Scott could have a fair run at presenting a more "normalized"
institution to the Commission's evaluation process. But there have already
been two deferrals of this visit, which was originally scheduled for 1996, so it
was necessary that the Commission should immediately have as clear a view
of Bradford College as possible.

Because so many crises have unfolded during the few short months of Dr.
Scott's presidency -- crises that the Bradford community and the Visiting
Team see unequivocally as a set of severe tests that were in no way caused by
her or by her young administration -- the tone of this report may well seem at
times to be unstintingly dreary. The Visiting Team, however, feels a primary
responsibility to describe and assess the nature of the challenges which
Bradford now faces. In most cases these are not short-term problems. They
arise from attitudes and structures long in place at the College. But the
attitudes often have strongly positive aspects as well, even though they have
recently produced some very negative results. So the challenge both in
writing and in reading this report will be clearly to bring those positive
aspects into focus, with their associated possibilities, even as the details of the
current crises are described and assessed. Over and over again, as team
members tried to comprehend the problems faced by the institution, their
individual reactions were at base sympathetic -- even affectionately
sympathetic -- for Bradford's aspirations. Moreover, these aspirations have
been at least partially realized in the loyalty of Bradford's faculty and
alumni/nae, several of whom the Team met. This report is therefore written
mainly as an attempt to assist the College in focusing enormous energies
which are at work in its community.

### I. Mission and Purposes

Bradford's "Mission and Purpose" is printed on page five of its current
Catalog. The Team found that the statement is well-known among all
constituencies at the College, although more with bemusement than as a
guide for decision-making. The focus of the community's discussion of its
mission has for some time been the statement's invocation of "The Bradford
Plan for a Practical Liberal Arts Education," which was introduced at the
College in 1983. Everyone seems to agree with something intangible behind
the "Plan," and with something behind the mission statement within which
the "Plan" is embedded, but no one commits to these "somethings" so
strongly as to produce a new statement which can guide decisions.

Many faculty therefore consciously distinguish a real, unwritten mission
from the published mission statement. Many others in the community --
administrators, faculty, and the Board alike -- appear to confuse mission with

market definition. Hence considerations of Bradford's mission often become
discussions of "The Dehne Report," which is cited as if it were a defining
mission document. It is in fact a market study provided to the College in 1997
by external consultants.

In some respects Bradford is a College in search of a revised, refined, or new
identity, but without as yet the ability to pull together all the stakeholders
needed to create a critical mass of support for a new vision. The institution is
currently market-driven rather than mission driven. "The Dehne Report"
has analyzed the market, and Bradford sees itself as responding to that
analysis. But this response has thus far led only tentatively towards the
articulation of a functioning mission.

A mission proposal drafted by the "Planning and Transition Committee," for
example, appears to be a set of modifications to the "Bradford Plan," rather
than a substantive revision based on assessment of mission effectiveness. The
process of mission revision has not yet tackled fundamental questions about
the College, and it appears to operate without leadership from the Board.
There is little input from students as well. The President said that Bradford is
"re-thinking what it sees as its identity," and noted that work groups have
been discussing this issue for the past year. She acknowledged the
community's discomfort with some of the terminology of the "Bradford
Plan," such as its use of the word "practical," and she echoed almost everyone
the Team interviewed in saying that the "Plan" needed modification. She
further noted that the mission statement is "pretty pale in comparison with
what we actually do."

This was a theme which prevailed throughout the visit: the mission
statement does not accurately reflect the real working of the College.
Otherwise stated, faculty, trustees, and administrators share a sense that
Bradford has a unique mission which makes it distinct, but they also
acknowledge that this is not articulated in the mission statement. On the
other hand, they are not able to describe the mission in terms different from
what appears in the Catalog.

Although the "Bradford Plan" provides direction to the curriculum of the
College as required by Standard One, the direction is idiosyncratic. The
curriculum seems to be as much defined by students' individual choices as it
is by a statement of mission.

A representative selection of comments from trustees, faculty and
administrators may help to describe the haze behind which Bradford's
mission statement has withdrawn:

"There is a great deal of dissatisfaction with the mission statement."

"The Bradford Plan led to a dislodging of instructional identity that has never settled down."

"The whole mission statement needs to be updated."

"The Bradford Plan is incredibly well developed, but it needs to be 'tweaked'."

"The difficulty is in marketing the mission. It is too wordy and cumbersome. The process [for creating it] was too inclusive."

"Our language is complicated. We can't wrap ourselves around it, let alone explain it to outsiders."

"There needs to be a serious, almost revolutionary change in how we see ourselves."

"Does the mission statement accurately describe the mission? It depends on which version you hear."

Summarily put, Bradford College currently lacks a well articulated and broadly accepted mission. There are fundamental questions about the College that need to be raised, heard, understood and settled by all stakeholders. There has been years-long discussion of the mission, but the process does not yet appear to be verging towards a clear conclusion.

The Visiting Team recommends that the College consider raising consideration of its mission to a high, immediate priority, and that it devise a plan by which <u>all</u> of Bradford's constituents can be drawn appropriately into a process which will clarify its vision at this critical time in its history.

## II. Planning and Evaluation

Having just inaugurated a new President, having just concluded a Capital Campaign, having struggled with rapid and continuing changes at the vice-presidential level, and having suffered through a 1998/99 crisis caused by the matriculation of many fewer students than were required by its preliminary budget, Bradford College has not recently engaged in systematic, broad-based planning that effectively interrelates all areas of the institution. Instead, planning has focused on individual units, either academic or administrative. It has been aimed at short-term goals.

There is no evidence that an effective strategic plan, or even a strategic planning process, is now in place. "The Dehne Report," cited in the "Self Study" and spoken of by many faculty and administrators as though it were a plan, is actually a market analysis for purposes of recruiting and public relations. The "Self Study" has not provided a solid basis for planning either,

perhaps because it was initially conceived for a 1996 visit and seems to have been prepared by a process of updating rather than by re-thinking its two-year-old conception.

Considerable and ongoing discussions about mission and identity, however, constitute an informal strategic planning process. Unfortunately, these discussions are fragmented, tentative, unformed, and almost wholly within the parameters of the status quo. They provide an illusion of planning that is not an effective substitute for those systematic, broad-based mechanisms which could bring together all stakeholders in the College's community. There are some isolated calls for "out-of-the-box" thinking, but there is no evidence that such thinking has actually occurred. No group -- trustees, faculty, students or administrators -- appears to be challenging fundamental assumptions about Bradford College.  The College appears to lack the resolve needed to tackle these assumptions, although such resolve might have been expected to arise from the dramatic financial instability of this Fall, as well as from the longer-standing confusion over Bradford's mission.

Closely tied to its confusion over identity is the still unformed vision for the College's future.  The Bradford community does not currently have a firm sense of where the College is heading. While it privileges "The Bradford Plan for a Practical Liberal Arts Education," there appears to be little confidence that its current version is an accurate way to describe Bradford.  Nevertheless, there is overt and widespread loyalty to an *idea* that the "Bradford Plan," in some new version, should be the defining characteristic of the College.

Several individuals from diverse constituencies did identify -- separately, but with remarkable clarity and concordance -- what they regard as distinct characteristics of Bradford College.  These included: (1) a personalized approach to learning; (2) the integration of academic and co-curricular life into a seamless experience; (3) experiential learning as the key to keeping the liberal arts in contact with everyday life; (4) interdisciplinarity as a style of instruction; (5) a "holistic flavor" to all inquiry and action; (6) the recruitment of a nationally, racially, ethnically, and intellectually diverse student body; and (7) the tendency of Bradford alumni to assume careers in the not-for-profit, service sector.

The Executive Committee for Planning and Transition, together with its associated workgroups, are cited as a center of planning and evaluation. Although considerable effort arises from this Executive Committee, its minutes and document drafts do not yet represent a cohesive, integrated planning effort. Evidence of the weakness in systematic planning can be seen in two key areas: (1) the lack of evaluation directed at the way in which the College implements its mission; and (2) enrollment management.

Other planning efforts, while sincere and often time-consuming, are not addressing core concerns that will ensure the long-term viability of the institution.

No institution-wide efforts seem to have been made in the last decade other than those which were organized in the context of "The Dehne Report." The Board of Trustees has, for example, devoted some time to long-range issues, but there is scant evidence that this forms an integral part of its deliberations. Another specific example: although there is reference in the president's inaugural speech to a target population of 750 full-time students (currently there are 548), it is difficult to determine precisely how this figure is anchored in current planning for recruitment, retention, faculty size, curricular structure, and many other parameters.

Enrollment management (with related financial issues) is a fully recognized problem at Bradford. In fact it is a crisis. A small, private college that graduates only 40% of its entering classes has scant hope of being able to fulfill aspirations much higher than survival. The situation is graphically presented in a recent yearbook, which juxtaposes entering first-year and graduating-class group pictures. The relatively large group of entering students set against the tiny gathering of graduates testifies specifically to the students' own sense of attrition. That sense was further expressed in a meeting with students, many of whom felt the absence of their former classmates. Attrition is of course a pre-eminent financial fact, but it also directly affects many other aspects of the College, including the students' perception of their experience.

All constituencies, including students, referred to budget crises which have regularly occurred during the last decade or longer. Faculty spoke of "October Surprises," as a category of experience at Bradford, but in fact these events are in many respects not surprises at all. They rather manifest precisely how poor Bradford's planning has been. One leader explained the situation by saying that it is difficult to predict enrollments, but there is little evidence to support such a statement in any sense other than as it points to the lack of effective data analysis, assessment, and strategic response by the College.

This universal awareness of financial instability, like that of the attrition which is the major cause of it, is among the strongest organizational realities at Bradford. It drives much of the conversation about the College's present and future. It must have been a primary motivation for hiring consultants to produce "The Dehne Report," but it has not yet motivated thorough, sustained, searching and coordinated efforts to plan and evaluate.

Academic evaluation appears to be systematically well developed at the "micro" level but mostly absent at the "macro" level. Even at the "micro" level, there appears to be a weak connection between evaluation and improvement. This may occur partially because the "micro" evaluations

include virtually no outcomes assessment. This specifically means that the
requirement for assessment of outcomes and documentation for assertions of
quality as described in the commission's "Policy Statement on Institutional
Effectiveness" is not met as it relates to academic evaluation. People evaluate
programs or faculty or courses, but there is little evidence that this focuses on
"outcomes" or results in substantive change. Individual programs undergo
periodic review, but the curriculum as a whole remains largely unchallenged,
despite the deliberations of work groups that have been addressing curricular
issues. This has led, for instance, to a structure of "majors" which appears to
be inappropriate to the faculty resources of the College. Whether these
numerous majors really produce students who are educated to assume an
active and productive role in society remains an unanswered question.

Students confirmed the Team's impression of fragmented evaluation. Those
whom we met were articulate, forthcoming, and purposeful. They took our
discussion seriously. They valued Bradford's highly personalized approach to
learning, but they discussed it in terms which pointed out serious limitations.
They noted, for example, that a student can have a faculty member as an
instructor seven or more times during the course of study. Although the
students recognized the value of this focused personal contact with a faculty
member, they also wondered about the breadth of exposure to their fields
inherent in such an arrangement.   The Team's impression is that education
at Bradford is personalized to the point that there is virtually a curriculum for
each student.  In an attempt to educate students within the framework of the
"Bradford Plan," the College may have disconnected itself from its financial
realities and ended by creating an untenable curriculum. It may also have
fragmented the academic community in ways which partially account for the
extraordinarily high rate of attrition.

Planning and evaluation for student services are much more systematically
accomplished than planning in academic and other areas (see section VI of
this Report), but even this cannot effectively be attached to an institutional
level of planning as long as that more general level remains poorly
organized.

The ingredients for serious planning appear to be present at Bradford: a caring
faculty, a supportive board, a new and openly communicative President, a
hard-working staff, and alumni and donors who have proved their loyalty by
seeing the institution through many changes over the years.

The Visiting Team recommends that long-range planning mechanisms be
designed so that the plans produced are realistic, tied to budget, inclusive,
strategic, and capable of evaluation. The evaluation should be part of the
plans and should be executed faithfully. The planning mechanisms ought to
be put in place as quickly as possible.

### III. Organization and Governance

Conventional and well-tested governance mechanisms are in place at Bradford College. They are sincere efforts to achieve participation in the decision-making processes at the college, but they appear often to have lacked effectiveness during the period since Bradford's last decennial evaluation.

Many faculty, trustees, and staff praise the governance structure, although several individuals acknowledged that it has not been effective. This ineffectiveness is generally evident in the weakness of communication among the community's constituent groups, in the persistent confusion surrounding institutional identity, in faculty-staff tensions, and in the lack of reasoned questioning of the status quo.

Constituents expressed dissatisfaction with the previous President's "top-down" management style and with an organizational culture that tended to discourage challenges to the status quo. They universally share great expectations for the new President's management style, which is seen as open but decisive. Virtually everyone indicated an enthusiastic willingness to work with the President, even though she has had to direct a significant reduction in force which resulted from the most recent "October Surprise," and even after she has made it clear that the belt-tightening will last longer than the current year.

Some very serious problems face Bradford College, but at least on the surface there is a level of complacency among faculty and staff which matches the often-cited apathy among students. Despite several major budget shortfalls and evidence of serious financial instability, there is a "business as usual" attitude that seems to overlook evidence which points to structural difficulties. An effective governance system should result in an informed academic community, which in turn should pave the way to better management of resources. Instead, several faculty, students and administrators noted that rumors provide a primary -- and reliable -- source of information. However accurate or inaccurate to the facts of the current crisis, this perception was virtually universal among faculty and staff interviewed.

Formal communication is demonstrably poor in critical areas. Budget information, for example, has not been shared in ways that make effective input from concerned constituencies possible; hence many people feel they are in the dark when it comes to matters of budget allocation. This perception was probably heightened at the time of the Team Visit, given the recent announcement of budget problems so severe that layoffs were required to bring the situation under control.

Students expressed concern about the budget situation, too, but they recognized that there was considerable apathy among their peers. Many seemed in fact not fully engaged in the life of the College. Only two students were present for the open meeting with the Visiting Team, despite the Team Chair's repeated warnings to the administration that he feared such an outcome, because a miniature version of it had occurred during his preliminary visit to the College. After somewhat unorthodox last-minute recruitment efforts were made by a Team Member, a total of eleven students were attracted to the open meeting. A Bradford administrator who saw the eleven students coming out of the meeting commented that that was pretty good attendance, and didn't seem to understand that it was both minimal and attained only after unusually proactive efforts by the Team. But the same thing happened in non-student contexts as well. An open faculty/staff meeting was attended by about a half dozen faculty and three or four staff members -- all mid-level management. The Board of Trustees' breakfast was a welcome exception to this pattern: All key members of the Board were present, despite significant travel which was required of some. Nonetheless, the general lack of response to the Team's requests for group consultations by anyone other than those individuals who had immediate responsibility for the accreditation arrangements was a continually astonishing feature of this visit.

How decisions are made and communicated; how policies are implemented; what roles key stakeholders should take in decision-making -- these are all questions that need to be addressed at Bradford. Outside the President's office there seems to be little sense of urgency about addressing them. At present, the faculty seems leaderless, possibly because the Interim Academic Vice President has been in place for less than six months, and she was preceded by another Interim Academic Vice President of short tenure. The Board appears to have been largely quiescent, although supportive. When this posture of the Board indirectly arose as a topic of conversation during a meeting with faculty, some individuals suggested that traditional roles of faculty and Board had been reversed. The perception in that meeting was that the Board does not provide very strong leadership and, despite its impressive financial support, may not be effective in calling faculty and administration to account for the state of the institution.

The Visiting Team recommends that future strategic planning initiatives assess the College's governance system and administrative structure to determine whether they can be made more effective and efficient. Some of this consideration should take up specific questions of formal organization, including the optimum number and distribution of vice presidents in an institution the size of Bradford. More fundamentally, however, this planning should consider the Team's general perception that major College constituencies may more or less comfortably have separated themselves from the life of the community -- most importantly Bradford's students. The

patterns of actual communication within the community may provide valuable clues to specific situations which need to be addressed.

## IV. Programs and Instruction

"The Bradford Plan"

In 1982-83, the College developed and implemented the "Bradford Plan for a Practical Liberal Arts Education." As the College states in its "Mission," the Plan "combines the liberal arts with hands-on career preparation and seeks to provide students with knowledge about the world in which they live and the skills necessary to live in that world in an autonomous and socially beneficial manner" (p. 2 of the "Self Study").

During the 1980's, the Plan helped shape a distinctive institutional model to respond to the changing educational needs of students. Since then, the integration of liberal and professional education has become a goal common to a broad range of colleges and universities. Bradford can take pride in claiming its share of credit for establishing this trend in American higher education.

As the goals of the Plan have become mainstream, the College reports in its "Self Study" that it is planning to revise its mission statement in order to reestablish an institutional niche. After interviewing trustees, administrators, faculty and students, the Team discovered that the "Plan" has become diffuse as it has taken on altered and finally disparate meanings. The Team repeatedly heard that the College is engaging this recognized problem by informally reexamining the "Plan's" assumptions, and by assessing its current relevance. This attempted reexamination constitutes one of the critical changes through which Bradford has gone in recent years, as it has struggled to make itself more consistently attractive to prospective students. While the Team recognized that programs and curriculum have sometimes been moved by these changes, it also saw that movement has largely been driven by the College's perception of market trends. In sum, marketing consultants instead of academic leadership has guided Bradford's recent curricular development.

Coincident with the arrival of President Scott, Bradford has been exploring "The Dual Curriculum," an educational program that integrates "community involvement, professional development, personal development, and multi- and/or cross-cultural experiences" ("Self-Study," p. 40). Within this framework, the College is examining an array of educational initiatives including a creativity theme, an international focus, an integrated curriculum, alternative educational experiences, a revised academic calendar, and cross-disciplinary models. A number of faculty members and

administrators suggested to the Team that "the College is looking for a glue that will hold the curriculum together."

One defining characteristic of the "Bradford Plan" is its organization of "concentrations" along the lines of five academic divisions: Creative Arts, Humanities, Natural Sciences and Mathematics, Human Studies, and Management. In effect, students and faculty were designing individual majors focused by cross-disciplinary clusters. After considering a review by marketing consultants, Bradford recently decided to identify its "majors" according to traditional disciplines. This decision was based on the premise that traditional majors would attract and retain students. Instead of majoring in "Humanities" or "Human Studies," students now major in "English" or "Sociology." As the College reverted to traditional disciplinary designations, however, it did not add faculty members or change the curriculum. The College understands its "majors" to be non-traditional, even though they appear to be marketed in direct response to traditional student expectations. Understood in the widespread, traditional meaning of the word "major," then Bradford's new method of identifying courses of study has produced "majors" which are severely limited in courses and staffing when compared to comparable quality institutions. To understand the "thinness" of these "major" programs, one has only to see that that there are 35 full-time faculty who are currently delivering 32 programs.

The College presents its "major" programs in the context of many other educational requirements or choices: students must complete a general education core and prove "competency" in several areas; they are encouraged to enroll in career internships, community service learning projects, and "practical minors;" they are required to produce sophomore "portfolios" and extensive senior projects.

The College mandates periodic review of major programs in each of the five academic divisions through an "assessment-of-learning-in-the-majors" project. The Curriculum Committee, an executive faculty committee, is responsible for reviewing and approving all changes in the curriculum. As a result of these reviews, the College has on occasion eliminated majors because of low enrollments and too few course offerings. Chemistry and Mathematics have both recently been dropped. While such program reductions do occur, however, the College is much more inclined to expansion. Between the completion of the "Self Study" and the Team Visit, in fact, three new "majors" were added. As one faculty member said: "If we don't continue to grow programs, we will no longer be viable." The Team found that the campus community, for the most part, considers dropping courses or programs to be evidence of failure.

General Education

The Team agrees with the College's assessment that its general education program is a "substantial and coherent introduction to the broad areas of knowledge." The General Education Core requirements are organized into the following interdisciplinary areas: "Human Heritage;" "The Individual, Science, and the Environment;" "Perspective on the Arts;" "Wellness;" "American Experience;" "Global Perspectives;" "The Individual and the Community;" and the "Senior Seminar in Ethics and Values."

One-third of the total number of courses required for graduation are in general education -- 41 of 121 credits, with the following distribution: 29 in the Core sequence, 6 in English, 3 in mathematics, and 3 in computer proficiency. All students are required to demonstrate competence in written English communication, in mathematics, in computers, and in critical thinking. Most competencies are course-based, although some can also be met through testing. The general education program clearly meets the expectations of the Standard.

## Faculty Scholarship

In its "Self Study", the College reports that "Faculty scholarship is integral to faculty work at Bradford" (p.32). In reviewing the resumes of the full-time faculty, the Team noted that faculty members have terminal degrees from a variety of distinguished colleges and universities, including Cornell, North Carolina (Chapel Hill), the Rhode Island School of Design, Michigan State, and Smith. As the "Self Study" indicates, 85% of faculty members are or have been productive scholars and artists engaged in a full range of research and creative activities with results made public in books, chapters, essays, papers, exhibitions, performances, and reviews. The Team also notes that all full-time faculty are currently engaged in undergraduate research in the sense that all are involved in directing the students' senior projects.

The "Self Study" reports that the annual allocation for faculty development has been $1,000 (reduced by the budget crisis to $750 this year). Most of these funds are drawn from an Endowment established for this purpose by the Christine A. Johnson Endeavor Foundation. In addition, the College awards two one-semester sabbaticals each year.

## Instruction

Bradford reports in its "Self Study" that there has been an increased emphasis on integrating technology into teaching. The College has established a Center for Instructional Technology to help faculty experiment with computer instruction. Faculty members enthusiastically expressed their appreciation of this initiative to the Team. They indicated that computer upgrades and technology workshops have greatly improved their integration of technology into teaching.

The College also offers faculty members a variety of other opportunities to improve their teaching. There is the "Teaching and Learning Library," located in the Center for Academic Achievement, which offers a special Collaborative Learning Collection. Through the Academic Dean's Office and the Faculty Affairs Committee, the College requires faculty members to attend two faculty workshops each year.

Bradford places special emphasis on student advising. The Team in fact heard from students that academic advising is one of the principal strengths of the College. The students praised the faculty for their advising and considered their successful advisement to be proof of the College's commitment to student-centered education. The Portfolio Advising and Assessment Program, established in 1993 under the sponsorship of the Pew Foundation, is a comprehensive advising program for first and second year students. At the end of the fourth semester, each student demonstrates, through presentation of a Portfolio, how learning and development goals have been met through course work and co-curricular activities.

## Admissions and Retention

The College is struggling through a budget shortfall because it built its annual budget on the assumption that it would substantially increase its enrollment this year (as it in fact did increase its enrollment last year). When the number of new and returning students did not meet projections, the College found itself in a severe budget deficit -- an income shortfall of more than 15% which was recognized, announced, and dealt with only in late September and early October.

A major reason for this crisis is, however, a continuing history of poor retention. Prior to the Team's visit, the President had established a committee to study retention issues at the College and to make recommendations to improve the situation. The Team applauds this effort and strongly encourages the College to pursue its goal of a retention rate near 70%. This would be a superb accomplishment, since the current retention to graduation rate hovers in a 40% range. Currently, an Academic Support Advisor leads a process by which students who are considering leaving the College are identified. They are then advised about alternatives at Bradford. According to the "Self Study," "The small size [of the College attracts many students, but it] is also one of the most frequently heard reasons for leaving" (p. 43). The Team would suggest that another reason why students leave is the "thinness" of most "major" programs.

### V. Faculty

The Team commends Bradford for its current, lucid, and comprehensive Faculty Handbook. The Handbook, which has already been through a number of substantive revisions in recent years, is now being revised to incorporate recently adopted policies, including a new workload policy and compensation program. To avoid misinterpretation of material in the Handbook, the College provides a glossary of terms that includes items such as "authority," "division chair," "faculty meeting," and "professional misconduct." Because words often have meanings specific to an institution, arising out of its unique culture and history, the glossary greatly enhances the Handbook's clarity. Moreover, because the document is well written and clearly organized, faculty members and administrators can rely on it without fear of misunderstanding. In short, faculty members consider the Handbook the "law of the land" in that it accurately describes their roles, rights and responsibilities.

The Handbook covers the following topics: the "organization of faculty," including the structure of the Faculty Senate (as well as faculty committees and meetings); "the administration" of the College, including the roles and responsibilities of the President, vice presidents, deans and directors; "faculty personnel policies," including faculty appointments, academic freedom, full-time and part-time faculty responsibilities, faculty contracts, faculty evaluation criteria, and faculty benefits; and "academic procedures," including portfolio advising and syllabus guidelines.

The Team considered the policies and practices in the document to be fully in accord with the standards formulated by the Commission. In complying with the Handbook, Bradford College ensures that qualified faculty members are appointed; that searches are open and competitive; that faculty members are encouraged and supported in their efforts to improve effectiveness in teaching, scholarship, and service; and that faculty evaluations are fair and consistent. Due to the quality of the Handbook, faculty members know what Bradford expects of them.

The Team commends the College for its latest revision of the faculty workload, whereby the number of courses taught by full-time faculty members was reduced from eight to seven per academic year. This reduction will enable the faculty to have sufficient time to advance the College's mission by carrying out responsibilities for advising students, directing senior research projects, supervising assessment portfolios, designing curricula, revising programs, and participating in campus governance. The Team was convinced that faculty members are not only active in these many activities, but that they are extraordinarily generous and effective.

The Handbook contains an explicit, comprehensive statement regarding academic freedom, in which it maintains that "Academic freedom is the right of scholars and teachers of higher education to freely study, discuss, investigate, teach, exhibit, perform, and publish" (p. 33). In all discussions

with faculty and students, the Team was assured that there have been no incidents that could be construed as significant violations of this principle. Faculty members indicated that they are free to criticize the institution without fear of retaliation. In light of the fact that the College does not award tenure, Bradford is to be commended for its strong support of academic freedom in and out of the classroom.

The Team is concerned about the lack of diversity among the faculty. There are no full-time faculty from historically underrepresented groups -- African American, Asian American, Latino/a, and Native American. Administrators and faculty members recognize that a diverse faculty is one of the expectations of the Commission. While they stated that they supported the diversity guidelines set forth in the Standards, they find themselves at a loss as to how to implement them. Some claimed that they had offered positions to minority faculty but that their offers were rejected because of the College's salary schedule. The Team strongly recommends that the College make immediate and sustained efforts to diversify its faculty.

As stated in Standard Four, the Team affirms the College's recognition that the number of faculty members is insufficient to support its advertised major programs. This should not, however, be construed as a recommendation to increase the size of the faculty, which can be considered adequate or even generous in relation to the number of students enrolled. The problem is that the one-to- one ratio of faculty members to programs (35/32) is inadequate to offer the breadth and depth expected of a "major" program in American higher education. Bradford should address this problem as a high priority, but in the context of its other pressing needs. It should consider reconfiguring its major programs, reducing the number of its programs, or appointing additional faculty members if significant, new, and stable sources of revenue can be developed.

### VI. Student Services

Bradford College provides a co-curricular environment which allows both intellectual and personal development for its diverse student body. The provided services avoid exclusion of any constituent group. They have been designed largely following the guidance of a varied group of assessments which are administered at different stages of a student's college career. The individual services, as well as the philosophy from which they derive, are found in several public documents, including the Student Handbook, the Catalog, and special purpose publications.

The financial aid program is conducted in a manner which meets the guidelines of all relevant external agencies. The various types of aid are well publicized in widely distributed pamphlets. The criteria for awarding financial aid are published in the admissions viewbook, the financial

advising brochure, and the Catalog. There was some vehement concern, stated repeatedly by a number of students, that the College systematically reduces need-based grants as the student progresses through the institution.

Bradford provides effective orientation programs and exceptional academic advisement, as well as career development and placement services, relevant health education, and access to professional health care, including psychological care. These services are described in the Catalog, the Student Handbook, and various brochures and flyers.

Student leadership and participation in campus organizations and governance are encouraged by qualified professional staff who, in most cases, have been student leaders themselves. Positions such as membership on the Curriculum Committee, the Computer Advisory Committee, and the Board of Trustees are just a few of the leadership opportunities which Bradford students enjoy. They also serve as peer tutors, RA's, and orientation leaders. The positions are described in various brochures and in the Student Handbook.

Despite this rich structure of opportunities, the students who met with the Team complained of a high degree of apathy in the general student body. That complaint appears to point to a set of facts which are deeper than the conventional nature of the complaint might suggest. It would be prudent of the College to make sure that it understands any possible connections among its extraordinary attrition rates, a financial aid system which is sometimes interpreted by students as "bait and switch," conventional-seeming student "apathy," and the repeatedly demonstrated lack of student interest or involvement with the accreditation process.

Although the College does not participate in traditional intercollegiate athletics, it does provide a comprehensive club sport and intramural program for all of its students. It also offers a number of recreational programs. The programs are promoted by the Director of Athletics in various publications and flyers. The Director has both the credentials and the experience to carry out his responsibilities. Other professional staff are also well qualified.

The College has no on-campus athletic facility. Instead it has a long-standing arrangement with "Cedardale," a very large and up-to-date fitness facility about 1.5 miles from campus. This seems satisfactory to the students, but barely so.

Bradford has identified, published widely, and implemented a set of clearly-stated ethical standards to guide student service activities. These standards meet guidelines published by the appropriate professional associations, including the National Association of Student Personnel Administrators, the American College Personnel Association, and the Council for the

Advancement of Standards. Bradford also publishes students rights, responsibilities, and other necessary information in its <u>Student Handbook</u>. A copy is given to each entering student. The College abides by the requirements of the "Buckley Amendment" as it deals with records requiring confidentiality.

Bradford's Student Affairs Division practices regular and systematic evaluation, and uses the results of that evaluation to set up its programs in ways that meet measured student needs. Among the tools used are the CIRP survey, which is given to all freshmen, and the "Quality of Life Survey," which is given in the late Fall. These surveys and other assessment tools are used to make decisions regarding the identification and satisfaction of student needs.

## VII. Library and Learning Resources

Bradford College has made significant and much needed improvements during the last few years in the areas of library and information resources. In the library, these improvements include the development of a reference service which provides a wide assortment of electronic databases, together with instruction in their use. Library facilities have been considerably enhanced. A significant grant to upgrade the monograph collection, plus some recent increases in the library's budget for materials, have all had positive effects. The Center for Information Technology, the Multimedia Lab, and the Media Center now offer a full range of services, up-to-date equipment, and on-site instruction for students, classes, and faculty in support of the academic program.

The College has therefore made good progress in addressing this standard. It will still require sustained, long term efforts to bring the monograph collection up to a size and quality that will effectively support and enrich the institution's academic offerings. Bradford has in fact outlined a plan (in the Projection section of its "Self Study") to continue the growth of its monograph acquisition budget. This plan will need to be followed, and other current levels of support for library resources maintained, in order for the library to continue developing as a vital part of the academic program. In this regard it is encouraging to note that recent emergency budget cuts did not affect earlier planned increases for acquisitions.

The current condition of facilities, services, and equipment are clearly sufficient to meet the standard. Lighting improvements in a few areas, the provision of some group study spaces, the solution of an after-hours security issue regarding access through an elevator, and addressing the safety of a troublesome internal staircase would bring the library facility to a level of true excellence.

Copies of the Self Review of the Hemingway Library for the last few years demonstrate that the library's administration developed yearly goals which have significantly advanced the library's progress toward meeting the standards. The recent reduction in force, on the other hand, eliminated the position of Library Director. Library Directors in academic libraries have the important responsibility of using their experience and professional training in Library Science to lead their institutions in developing strategies for dealing with increasingly complex issues which are involved in the provision of information to a college community. The development of appropriate methodologies for the education of students in the intelligent use of the vast amounts of information that is now available from ever-new sources requires always higher levels of expertise. The institution should take this opportunity carefully to plan a new staffing pattern for the library so as to insure that professionally qualified and experienced librarians do work appropriate to their expertise, and that they are supported by clerical or semiprofessional staff where appropriate. The College's "Self Study" reports that the staffing structure in place at the time the Study was drafted had led to a situation in which "expansion of services has increased the workload of the current Library staff, and the lack of clerical support detracts from the time required for professional Librarians to perform needed services." If this was true when the "Self Study" was written, the subsequent elimination of the Library Director's position is difficult to construe as an appropriate response to the identified problem. The Team strongly recommends that Bradford consider hiring a library consultant to look at the organizational structure of the library and offer recommendations for a new structure which includes a staffing plan and job descriptions. A fresh look at the structure may well bring increased productivity, efficiencies, and savings. At the present time, however, the College does not meet Standard 7.4.

The library does not have a system to evaluate its programs, collections, and services regularly and systematically. Evaluation efforts thus far have not been sustained or used in a manner which is clear to the library staff. The Center for Information Technology, on the other hand, has developed an evaluation system, and it uses the results from regular evaluations to make improvements.

### VIII. Physical Resources

Bradford has substantially increased its investment in physical resources over the past few years. This past April, the College secured financing for the construction of new residential facilities and the renovation of existing dormitories. The campus has added a fiber optic network which provides email, intranet and internet capabilities for students, faculty, and staff. In 1997, the administrative computer system was reviewed with the assistance of an outside consulting firm. The College then purchased a new system and has

implemented a number of software modules (Registrar, Financial Aid, and others).

Bradford has sufficient and appropriate physical resources, including computer labs, equipment, buildings, and grounds to serve institutional needs as defined by its mission and purposes.

The College has an experienced maintenance team. Proper management, maintenance, and operation of its physical facilities are accomplished by this team. However, much of the work performed by the College's maintenance staff is done on a reactive as opposed to a proactive basis. A current list of required or deferred maintenance was not available for review. It is important for such a list to be completed and kept current. The dollar value of the deferred maintenance should be incorporated into a long-range campus master plan, as well as into the budget process.

A number of campus buildings have been brought into compliance with ADA requirements. These renovations included the installation of ramps, elevators, Braille signage, modified entrances; designated parking spaces, handicapped-accessible restrooms, and alarm systems for hearing-impaired students living in residence halls. Some additional ADA renovations are still necessary.

Although the College has made significant improvements in the technology area, it should consider completing the campus network. This should include wiring in all campus dormitories. Prospective students are beginning to demand certain specific amenities in today's dormitories, including computer jacks.

The College has completed both a <u>Facilities Condition Survey Report</u> of its existing facilities and a <u>Master Facilities Plan</u> for future planning purposes. The <u>Master Facilities Plan</u> has been designed to provide improved buildings, better integration between buildings and open spaces, better traffic circulation patterns, and improved parking. Both plans were completed by professional architects.

## IX. Financial Resources

Bradford College has not balanced its operating budget for a number of years. In the current fiscal year (98/99), the College is projecting a balanced budget, but this balance has been achieved only after difficult decisions taken as late as October, 1998 -- a matter of weeks prior to the Team's visit. These decisions included the elimination of ten full-time and four part-time positions, as well as substantial operating expense reductions. Even with these cuts, the College required an infusion of $600,000 from a benefactor in order to reach the balanced budget now approved by the Board of Trustees. Finally, because of

internal accounting practices described below, even this budget appears to be seriously out of balance.

Bradford's budget format must be updated to current Financial Accounting Standards and AICPA guidelines. The College continues to produce internal budget reports that do not include depreciation expense. It has properly been recorded in the year-end audited financial statements, in the Statement of Activities. Since the annual depreciation expense is in excess of $1 million, failure to include the amount in the internal budget statements creates a major discrepancy between the projected budget and the year-end audit. The 1998/99 budget referred to above does not presently include depreciation expense. If it were included, as it will be a year-end audit, the small surplus shown in the final revised budget (per the Kiszka memo dated 10/13/98 to Dr. Jean Scott and the Board of Trustees) will become a large deficit for 1998/99. That actual year-end deficit in fact appears likely to be similar in magnitude to the deficit cited for 1997/98 in the Preface Page of this report.

Some other numbers included in the revised budget of 10/13/98 may be incorrect. The bond interest and the short-term interest related to the Line of Credit (lines 232 and 233) may be understated; portions of lines 237 -- 240 (capital costs) should not be included as deductions from the operating budget since these are "balance sheet items." Finally, the endowment earnings projected (lines 210 and 211) for operations are in excess of 7% of the market value of the endowment. This percentage is very high compared to the average spending rates of institutions similar to Bradford.

Bradford does not provide for a measurement of operations in the Statement of Activities in its June 30, 1996, 1997, and 1998 audited financial statements. A measurement of operations allows an institution to display its "bottom line" or the increase [decrease] in net assets provided by its main sources of income ( tuition and fees, room and board, and Trustee-approved endowment spending) less related expenses. Items such as realized and unrealized gains on endowment above the Board-approved spending rate, as well as unexpected contributions for unrestricted purposes, would then be listed in a non-operating section below the measurement of operations.

In the last few fiscal years, Bradford has had large realized and unrealized gains on its endowment, and it has received large unrestricted contributions, over and above standard annual giving. However, the College has still reported large decreases in unrestricted net assets. If even some of the "windfall" described above had been shown in a "non-operating" section distinct from a measurement of operations, Bradford's operating losses would have been much higher than those reported. Separation of  non-operating items from operations-items would give the College a better chance to see where changes must occur.

Another significant factor contributing to Bradford's deficits is its very high tuition discount rate. Bradford's financial aid as a percentage of tuition and fees was 42%, 43%, 45%, and 48% in the fiscal years ended June 30, 1996, 1997, 1998, and 1999, respectively. These percentages are well above the average for a school of Bradford's size according to Massachusetts HEFA Comparisons for the year ended 1997.

Bradford College has a budget process which is centralized among the top management of the institution. Neither the faculty nor the College Budget Advisory Committee (CBAC) perceives the process to be participative -- or even informative. Some faculty members thought that the process was in fact meaningless, given that in two of the last three years emergency cuts were made to budgets by way of "October Surprises," after the fiscal year had begun.

Bradford had a "quasi-endowment" (reserve) in excess of $11 million as of June 30, 1998. Thus the College has the ability to respond to financial emergencies and unforeseen circumstances. On the other hand, during FY'98 the College added approximately $18 million in long-term, tax-exempt debt. This debt reduces the "cushion" provided by the relatively large unrestricted endowment. The debt instrument also includes restrictive covenants as to how the College will operate in the future.

Bradford has an established Line of Credit with a bank for $4.8 million. The College has been using a majority of this $4.8 million throughout much of the year. Comparatively-speaking, colleges and universities tend only to use lines of credit during slow periods of the business cycle, such as the end of each semester. Once the semester starts, the Line of Credit is usually paid down to $0. For FY'99, Bradford again anticipates fully using its Line of Credit throughout the entire year. The College has therefore budgeted $275,000 for short-term loan interest payments.

The Team strongly recommends that cash flow projections be done not only for the current year, but for future years as well. These projections should be analyzed and a determination made about paying down the Line of Credit with "unrestricted endowment" to see whether long-term reductions in short-term interest expense will compare favorably with an alternative reduction in endowment income.

Given the substantial deviations from currently recommended accounting standards which were observed, the Team strongly urges that the College thoroughly review all of its accounting processes.

### X. Public Disclosure

Bradford College's mission statement is prominently and completely presented in the Catalog. The College's promotional publications then use

themes extracted from the mission statement to describe student life and academic programs at the College.

Information regarding academic majors and minors published in the Catalog is confusing, however.  It is difficult to determine quickly what majors and minors are available to students.  Other aspects of the academic program are clearly described, including the responsibilities of the student.

The "Self Study" summarily claims that "The college documents statements and promises made regarding program excellence and learning outcomes and achievements of faculty, students, and graduates very well."  Excepting the achievements of faculty, however, the Team found no specific reference to evidence which might support such a broad conclusion. Moreover, the claim does not accord with the Team's observations about the College's lack of outcomes assessment. Since Standard 10.7 requires this documentation to be "readily available" and "valid," the institution does not adequately meet this standard.

The process for annual review of publications is well developed.  There are appropriate mechanisms in place to insure adequate feedback to authors, provide quality control, and ensure uniformity of style in major publications.

## XI. Integrity

Bradford College operates within its amended charter, which was granted to it by the Commonwealth of Massachusetts. These principles appropriately define the authority and responsibility of the Board of Trustees, chief administrative officers, faculty, and students of the College. Principles and processes of governance are clearly stated in the appropriate publications and documents, including, for example, the Student Handbook, the Bradford College Catalog, the Faculty Manual, and the Staff Handbook. The Staff Handbook is currently under revision and needs to be completed expeditiously, because there is some confusion about new or updated policies as they relate to federal and state laws and regulations.

Appropriate statements regard the College's management of its operations with integrity, honesty, fairness and inclusiveness are also found in the appropriate publications, as well as in reports to state and federal agencies, accreditation groups and foundations.

Recruiting material and the Catalog are annually reviewed to assure accuracy, clarity, and "truth in advertising."

Internal concerns arise from an historical pattern of centralized management with faulty communication of decisions to those whose work is affected. Past downsizing of staff, or the failure to increase staff as the institution grows, has

sometimes been interpreted as overburdening the retained staff, largely because consultation appears to have been lacking.

An Office of Human Resources has recently been created, staffed by a part-time director. The hope is that this will lead to greater consistency in the application of policies.

The "Self Study" refers to Bradford's intent to write an Affirmative Action Plan, but this document, if it was in fact written, remained unavailable at the time of the visit.

### Summary of Institutional Strengths and Concerns

The Visiting Team particularly calls attention to the following strengths and concerns, which are drawn from preceding observations:

### Strengths:

1. President Jean Scott has demonstrated courage, resilience, and a gift for consensus formation in the few but eventful months since her arrival at Bradford. She shows every sign of being able to pilot Bradford through a difficult shoal in its history and on toward deeper, more productive and more refreshing waters.

2. The Board of Trustees has provided essential financial support, not only during Bradford's recent financial difficulty but also for many years past. Its contributions during the recent Century III campaign were particularly impressive, as has been its successful provision of renewed executive leadership as the College's approaches its 200th anniversary.

3. The faculty and staff of Bradford are intensely focused on the students whom they serve, and the results of their devotion are well represented by the impressive young people with whom the Team was privileged to have conversations. These students consistently recognize the support and guidance which has been given them by countless members of the College community.

4. The market value of the College's endowment has grown impressively -- by 189% -- over the five-year period between 1992 and 1997.

5. Bradford's physical plant is attractive and well-maintained, with a lived-in look that expresses a distinctive personality. This is a testimony most particularly to the maintenance and cleaning staffs, which take obvious pride in their work. Not only are they individually effective, but they are part of a carefully organized and well-supervised organization.

6. Three tested aspects of the curriculum are especially interesting and valuable: the portfolio, which seems to be valued more in retrospect than in prospect by students, the senior project, of which both faculty and students are rightly proud, and the internship program, which is carefully administered and greatly appreciated.

7. The College has made commendable progress in several areas relating to the Faculty: compensation has been improved, courseloads have been brought into a range which allows more extensive preparation, and an impressive <u>Handbook</u> has been implemented.

### Concerns:

1. The College has not formulated a concise mission statement which clearly delineates a distinctive character for Bradford, and the current mission statement is interpreted in a wide variety of ways by different constituencies. Despite several years of work and many drafts, no coherent philosophy of education which informs the College's policies and curriculum has gained wide acceptance.

2. The budget process is not sufficiently organized, and does not have appropriate control mechanisms, such that it can reliably provide timely, accurate financial reports necessary for sound decision-making. Despite enrollment growth, Bradford has incurred operating budget deficits in every year since 1989. This disturbing record has, moreover, been punctuated by so many "surprises," that these disorienting events seem almost to have become routine. The College does not currently have a realistic plan in place to address the critical issues raised by these operating deficits.

3. Bradford's budgetary consultation process does not now reach all relevant constituencies in effective ways. As one example only, the College Budget Advising Committee is not placed in the process so as to allow its members properly to affect the formation of the budget or even consistently to review significant budget issues.

4. The College does not have a functional strategic plan, based on a widely accepted and coherent mission, informed by institution-wide, up-to-date assessment systems and linked to its budget processes.

5. The current organization of the library appears to leave it without effective professional direction. This places a critical resource, which has been improving during the last several years, in jeopardy of immediate regression. Bradford's library has been a concern of the New England Association for at least a decade, so this possible regression is particularly disappointing.

6. The curriculum has become diffuse, difficult to understand, and inefficient. There are 32 offered "majors," staffed by a full-time faculty of 35. The size of the faculty is appropriate for the number of students enrolled, but it is difficult to understand how the relatively large number of "majors" can be adequately staffed. These academic programs appear to be driven by perceived and changeable student needs rather than by an agreed-upon mission. This has led Bradford near to a <u>de facto</u> "system" of individually designed majors

which appears not to be supportable by the financial resources available to the College.

7. Although the student body is admirably diverse, the Board, the faculty, the administration and the staff are not.

8. Poor retention is among the important sources of Bradford's systemic financial problems. It also casts serious doubts on the effectiveness with which the College educates the majority of students whom it has recruited.

9. A great deal of the communication on the Bradford College Campus appears to be informal, which can be valuable. Unfortunately, a seriously unfavorable result of a great deal of uncoordinated communication has also been the generation of data which is often inconsistent across the College. Decisions based on these variable data can be ineffective. A more important result in the long run, however, is the generation of misunderstanding and finally mistrust. Some tension between faculty and staff was evident to the Visiting Team, and it appeared often to be related to such misunderstandings.

A significant number of recommendations, some considered by the Team to be urgent, appear in the body of this report.

Westlaw.

Rev. Proc. 82-39                                                      Page 1
Rev. Proc. 82-39, 1982-27 I.R.B. 18, 1982 WL 196338 (IRS RPR), 1982-1 C.B.
759

**c**

Internal Revenue Service (I.R.S.)

Revenue Procedure

Published: July 6, 1982

SECTION 1. PURPOSE

  This revenue procedure supersedes Rev. Proc. 72-39, 1972-2 C.B. 818, and restates
the extent to which contributors may rely on the listing of an organization in
Publication No. 78, Cumulative List of Organizations described in Section 170(c) of
the Internal Revenue Code, for purposes of deducting contributions under section
170 of the Code and for making grants under section 4945. It reflects changes in
the procedure adopted as a result of the creation of the office of the Assistant
Commissioner (Employee Plans and Exempt Organizations).  In addition, it reflects
the Service decision to revoke the procedures for suspending advance assurance of
deductibility of contributions.

SEC. 2. BACKGROUND

  .01 Section 170 of the Code, with certain limitations, allows deductions for
federal income tax purposes of contributions or gifts made to or for the use of an
organization that qualifies as an organization described in section 170(c).  In
order for contributions by donors to be deductible, the organization must qualify
at the time of the contribution.  Thus, it is the responsibility of an organization
receiving contributions to ensure that its character, purposes, activities, and
method of operation satisfy the qualification requirements of section 170(c) in
order for contributors to have the assurance that their contributions at the time
made are deductible.

  .02 Section 1.509(a)-7(a) of the Income Tax Regulations sets forth general rules
regarding reliance by contributors and grantors to organizations described in
sections 509(a)(1), (2), and (3) of the Code . This regulation provides that once
an organization has received a final ruling or determination letter classifying it
as an organization described in section 509(a)(1), (2), or (3), the treatment of
contributions and grants, and the status of contributors and grantors to such
organization under sections 170, 507, 545(b)(2), 556(b)(2), 642(c), 4942, 4945,
2055, 2106(a)(2), and 2522, will not be affected by reason of a subsequent
revocation by the Service of the organization's classification as described in
section 509(a)(1), (2), or (3) until the date on which notice of change of status
is made to the public.

  .03 The Service issues and updates Publication No. 78. Generally, the listing of
an organization in Publication No. 78 signifies that it has received a ruling or
determination letter from the Service stating that contributions by donors to the
organization (or to a parent organization and subordinate units covered by a group
exemption letter) are deductible as provided in section 170 of the Code.  Each such

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rev. Proc. 82-39, 1982-27 I.R.B. 18, 1982 WL 196338 (IRS RPR), 1982-1 C.B.
759

ruling or determination letter is based on a factual showing by the organization
that its character, purposes, activities, and method of operation satisfy the
statutory requirements for qualification at the time the ruling or determination
letter is issued.  If there is material change in the character, purposes,
activities, or method of operation of an organization from those on which the
ruling or determination letter was based and the change is such that the
organization ceases, as a matter of law, to qualify under section 170(c), the
ruling or determination letter also immediately ceases to be applicable (see also
Sec. 12.02 of Rev. Proc. 80- 25, 1980-1 C.B. 667).  Where this circumstance occurs,
except for the validation provision of section 7428(c) (see Sec. 4.02), it is only
by exercise of the authority under section 7805(b) that contributors to the
organization may be allowed a deduction for contributions made after the
organization ceases to qualify under section 170(c).

 .04 Publication No. 78 also indicates the foundation classification under section
509(a) of the Code of the listed organizations to which this section applies.  This
classification is important to indicate appropriate limitations for deductibility
purposes and to indicate whether private foundations making grants to particular
organizations would be required to exercise expenditure responsibility.

SEC. 3. EFFECT ON PUBLICATION No. 78

 .01 Where an organization listed in or covered by Publication No. 78 ceases to
qualify as an organization contributions to which are deductible under section 170
of the Code and the Service subsequently revokes a ruling or a determination letter
previously issued to it, contributions made to the organization by persons unaware
of the change in the status of the organization generally will be considered
allowable if made on or before the date of an appropriate public announcement, such
as publication in the Internal Revenue Bulletin, stating that contributions are no
longer deductible.  Under certain circumstances, such as where a legally
enforceable obligation under local law has been made to the organization prior to
the date of publication, and the satisfaction of such pledge is on or after the
date, the allowance period may be extended upon specific exercise of authority
under section 7805(b). See, for example, Rev. Rul. 78-129, 1978-1 C.B. 67.
However, the Service is not precluded from disallowing a deduction for any
contribution made after an organization ceases to qualify under section 170, where
the contributor (1) had knowledge of the revocation of the ruling or determination
letter, (2) was aware that such revocation was imminent, or (3) was in part
responsible for, or was aware of, the activities or deficiencies on the part of the
organization that gave rise to the loss of qualification.

 .02 With regard to an organization's public charity status under section
509(a)(1), (2), or (3) of the Code, donors may rely on the classification of an
organization listed in or covered by Publication No. 78 for such purpose to the
same extent as provided for section 170 purposes in .01 above. Private foundations
may rely on an organization's listed public charity status for grant-making
purposes under section 4945 except where the grantor (1) had knowledge of the
revocation of the ruling or determination letter classifying the organization as
one described in section 509(a)(1), (2), or (3); or (2) was in part responsible
for, or was aware of, the act, the failure to act, or the 'substantial and
material' change on the part of the organization that gave rise to the revocation
of the ruling or determination letter classifying the organization as one described

                © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rev. Proc. 82-39                                                          Page 3
Rev. Proc. 82-39, 1982-27 I.R.B. 18, 1982 WL 196338 (IRS RPR), 1982-1 C.B.
759

in section 509(a)(1), (2), or (3). For guidelines concerning 'substantial and
material' changes, see Rev. Procs. 81-6, 1981-1 C.B. 620, and 81-7, 1981-1 C.B.
621.

.03 The advance assurance of deductibility and public charity status provided by
paragraphs .01 and .02 above applies only to contributions or grants made to an
organization listed in or covered by Publication No. 78 in the organization's
official name, its recognized popular name, or a contraction of either of these
names that is reasonably identifiable or widely known. Therefore, the advance
assurance of deductibility and public charity status provided by paragraphs .01 and
.02 does not apply to contributions or grants made nominally to an organization
listed in or covered by Publication No. 78 but with the understanding or on a
condition that they be made available to or for the use of an organization not
listed in or covered by Publication No. 78.

.04 The provisions of paragraphs .01 and .02 above do not apply to an
organization that is not listed in or covered by Publication No. 78.  In such a
case the effect of a ruling or determination letter concerning the deductibility of
contributions to the organization or its public charity status is determined in the
manner described in Rev. Proc. 80-24, 1980-1 C.B. 658.

SEC. 4. RELATIONSHIP WITH SECTION 7428 OF THE CODE

.01 Section 7428 of the Code creates a remedy under declaratory judgment
procedures, in part, for cases involving a determination by the Service with
respect to the continuing qualification of an organization as one described in
section 170(c)(2) or 501(c)(3), or to the continuing classification of an
organization under section 509(a). The remedy is available in these cases if the
Service determines that revocation of exemption under section 501(c)(3),
deductibility status under section 170(c)(2), or public charity status under
section 509(a) is appropriate, the organization has exhausted its rights to file a
protest and have a conference as set out in Rev. Proc. 80-25, and the Service has
issued a final adverse determination letter to the organization.

.02 However, section 7428(c) of the Code provides for the 'validation of certain
contributions' made during the pendency of a proceeding for declaratory judgment
involving the revocation of a determination that the organization is described in
section 170(c)(2). Under this provision, contributions from individuals (up to a
maximum of $1,000) and from other charitable organizations described in section
170(c)(2) may continue to be deductible. Statutory protection for such
contributions, if declaratory judgment is sought on the revocation action, would
begin on the date of publication of the revocation and end on the date on which the
court first determines that the organization is not described in section 170(c)(2).
This reliance, however, is not extended to any individual who was responsible, in
whole or in part, for the activities (or failures to act) on the part of the
organization that were the basis for the revocation.

SEC. 5. EFFECT ON OTHER DOCUMENTS

Rev. Proc. 72-39 is superseded.

SEC. 6. EFFECTIVE DATE

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rev. Proc. 82-39                                                    Page 4
Rev. Proc. 82-39, 1982-27 I.R.B. 18, 1982 WL 196338 (IRS RPR), 1982-1 C.B.
759


  This revenue procedure is effective July 6, 1982, the date of its publication in
the Internal Revenue Bulletin.

 Rev. Proc. 82-39, 1982-27 I.R.B. 18, 1982 WL 196338 (IRS RPR), 1982-1 C.B. 759

END OF DOCUMENT

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Internal Revenue Service IRS.gov

DEPARTMENT OF THE TREASURY

## Search for Charities

Publication 78, *Cumulative List of Organizations described in Section 170(c) of the Internal Revenue Code of 1986*, is a list of organizations eligible to receive tax-deductible charitable contributions. You may consult the paper version of this Publication, which is available for sale from the Government Printing Office or available for viewing at many public libraries. This online version is offered to help you conduct a more efficient search of these organizations. Please note that some organizations eligible to receive tax-deductible contributions may not be listed in this publication. In addition to the paper and online versions of Publication 78, you may verify an organization's tax-exempt status and eligibility to receive tax-deductible charitable contributions by requesting to see an organization's IRS letter recognizing it as tax-exempt or directly calling the IRS (toll-free) at 1-877-829-5500.

You may generally take charitable contribution deductions up to 50% of your adjusted gross income, but 20% and 30% limitations apply in some cases. (These limitations are explained in the Publication 78 help file). Publication 78 uses a coding system to identify these limitations. Publication 526, *Charitable Contributions* contains more detailed information about the deductibility of contributions.

**Most Recent Data Update: March 31, 2005**

Search Now

---

**Suspension of Exemption and Disallowance of Tax Deduction**

Under section 501(p) of the Internal Revenue Code, no deduction is allowed under any provision of the Code for any contribution to an organization during any period in which the organization's tax exemption is suspended under section 501(p). No deduction is allowed under any provision of the Code for contributions made to the following organizations during the suspension period:

> Al Haramain Islamic Foundation, Inc.
> Ashland, Oregon
>
> Benevolence International Foundation, Inc.
> Palos Hills, Illinois
>
> Global Relief Foundation, Inc.
> Bridgeview, Illinois
>
> Holy Land Foundation for Relief and Development
> Richardson, Texas
>
> Islamic African Relief Agency – USA
> a/k/a Islamic American Relief Agency – USA
> Columbia, MO
>
> Rabbi Meir Kahana Memorial Fund
> Cedarhurst, New York

---

The online version of Publication 78, Cumulative List of Organizations, is produced from computer records and is subject to certain limitations, particularly in the format and arrangement of the entries.

Organizations are listed only under the legal name (or recognized abbreviation such as 'VFW') currently listed with the Internal Revenue Service. Following the name is the address (city and state) used by the organization. No separate listings of 'common' or 'popular' names of organizations are included. However, some exceptions to the general rule may appear.

Subordinate units that are included in group exemption letters are not listed separately. However, the listing for the central organization indicates that contributions to subordinate units covered by the group exemption are also deductible.

If the organization's name does not include the name of an individual, it will be in strict alphabetical sequence of the name, exclusive of an introductory 'The'.

If the organization's name includes the name of an individual, it will generally be listed alphabetically according to the surname of the individual. For example, "The John Smith Foundation" will be listed under 'S' as "Smith Foundation, The John". However, some exceptions to this general rule may appear. If you are unable to find an organization listed under the surname of an individual, you should see if it is listed under the given name of the individual. Names with ampersands are alphabetized without considering the ampersand. For example, "The Brown & White Foundation" would be alphabetized "Brown W . . .". Organizations whose names begin with numbers, such as 400 Club, will come at the end of the list after the 'Z's.' These are in sequence by the first digit of the number.

If questions about the deductibility codes and/or other information arise after you've found your organization in our database, please see the Pub 78 help page.

**Download Now**

The electronic version of Publication 78, Cumulative List of Organizations, is also available for download. This publication lists the names of organizations eligible to receive tax deductible contributions, as well as the percentage of the contribution that is deductible.

**Format:** Microsoft Word, ASCII Text

For general information on charitable contributions, see Publication 526. For information about the substantiation and disclosure requirements for charitable contributions, see Publication 1771.

 **Internal Revenue Service IRS.gov**

DEPARTMENT OF THE TREASURY

## Search for Charities, Online Version of Publication 78

Organization

Name | Includes ▼ | Bradford

○ At least one of the words
○ All of the words

Location

City | | State | MA ▼ | Country | USA ▼

Deductibility Code | All... ▼

[ Search ]   [ Clear ]   **Begin New Search**

Show | 25 ▼ | OK   « Prev | 1-8 | Next »

| Name | City | State | Country | Code |
|---|---|---|---|---|
| Bradford & Dorothy Church Memorial Fund | Boston | MA | USA | 4 |
| Bradford and Dorothea Endicott Foundation | Boston | MA | USA | 4 |
| Bradford Christian Academy Incorporated | Haverhill | MA | USA | -- |
| Bradford College Alumni Association Inc. | North Andover | MA | USA | -- |
| Bradford College Inc. | Haverhill | MA | USA | -- |
| Friends of the Bradford M. Field Memorial Library | Leverett | MA | USA | -- |
| Little League-Riverside Bradford | Haverhill | MA | USA | -- |
| Riverside-Bradford Baseball League I. | Bradford | MA | USA | -- |

« Prev | 1-8 | Next »