## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DENISE McKEOWN, ROBERT LUTTS
*Plaintiffs*

vs.

ADVEST, INC., KAREN M. SUGHRUE, et al.
*Defendants*

Civil Action No. 05-10176-RGS

**CONSOLIDATED WITH**

T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC., et al.
*Plaintiffs*

vs.

ADVEST, INC., KAREN M. SUGHRUE, et al.
*Defendants*

Civil Action No. 04-11667-RGS

### PLAINTIFFS DENISE McKEOWN AND ROBERT LUTTS MOTION TO SUPPLEMENT OPPOSITION TO MOTION TO DISMISS WITH WRITTEN RESPONSE IN LIEU OF ORAL ARGUMENT

On October 7, 2005 the plaintiffs and defendants came before the Court to argue regarding defendants Motion to Dismiss. Counsel for all parties except Plaintiffs Denise McKeown and Robert Lutts (hereinafter McKeown and Lutts) had an opportunity to present oral argument. Due to limited time, the comprehensive nature of the Motion and the Court's need to turn attention to a criminal matter the hearing was terminated before counsel for McKeown and Lutts could be heard. While McKeown and Lutts understand that the Court had no alternative but to abbreviate the

hearing, McKeown and Lutts respectfully request that the Court allow them to make written supplementation, attached as Supplementation A, in lieu of oral argument. Alternatively McKeown and Lutts respectfully request that the hearing be continued to a later date.

DENISE McKEOWN, ROBERT LUTTS

By their attorney,

William A. Sheridan, Esq., BBO#: 458140
Law Offices of William A. Sheridan
One Center Plaza, Suite 240
Boston, MA 02108
(617) 720-2700

Dated: October 14, 2005

2

## *CERTIFICATE OF SERVICE*

I, William A. Sheridan, hereby certify that I have served, a copy of

**Plaintiffs Denise McKeown and Robert Lutts Motion To Supplement Opposition To Motion To Dismiss With Written Response In Lieu Of Oral Argument**

by mailing same to:

Scott A. Roberts, Esq.
Robert E. Sullivan, Esq.
A. Lauren Carpenter, Esq.
Sullivan Weinstein & McQuay, P.C.
Two Park Plaza
Boston, MA 02116

Atty. Sarah Walters
Jonathan L. Kotlier, Esq.
Nutter, McClennen & Fish, LLP
World Trade Center West
155 Seaport Blvd
Boston, MA 02110

Thomas G. Hoffman, Esq.
Thomas M. Greene, Esq.
Michael Tabb, Esq.
Greene & Hoffman
125 Summer Street, 14th Floor
Boston, MA 02110

__10/14/05__
Date

William A. Sheridan

3

*Supplementation A*

## PLAINTIFFS McKEOWN AND LUTTS WRITTEN SUPPLEMENTATION IN LIEU OF ORAL ARGUMENT REGARDING DEFENDANTS MOTION TO DISMISS

The Official Statement (OS) did disclose the defendants had been operating with budget

deficits and increasing financial aid for a number of years. The essence of plaintiffs case, however,

is that the defendants misrepresented that they could pay off the bonds with increasing net tuition

revenue generated by increasing total enrollment and reductions in financial aid.

In an effort to avoid redundancy, McKeown and Lutts incorporate the arguments contained

in the Oppositions of all plaintiffs and the oral arguments of institutional defendants' Attorney

Michael Tabb. McKeown and Lutts, however, offer the following points in order to respond to the

defense's oral assertions and hopefully shed light on the depths of the deception and the credibility

of the causes of action:

### (A)   Increased Revenues, Enrollment and Attrition Relationship

(1)   Defendants represented that they were going to increase total enrollment to

725 students by the fall of 2000 (OS 11) but did not disclose their atrocious retention rate.

- (2)   In order to increase enrollment to 725 students they must accomplish the following:

  - (a)   Continue to enrol an average first year fall enrollment of 212 students (five year average calculated from (OS A-8 Admission Trends).

  - (b)   Since the enrollment in the spring of 1998, which was the time of publication of the OS, was 547 (OS A-8), they must add an additional 178 students to get to 725 by the fall of 2000. This is an average of about 59 additional students a year.

(c)     They must also replace the students that leave. This, of course, relates to the undisclosed 60% attrition. Assuming that attrition happens linearly, they would lose approximately 20% of each class. From first year to second year they would lose approximately 42 students (20% of 212); from second year to third year they would lose approximately 34 students (20% of 170); from third year to fourth year they would lose approximately 27 students (20% of 136). This is a total of 103 students that would have to be replaced, each year, between spring 1998 and fall 2000.

(d)     Consequently in each of the three years they need to enroll a first year class of 374 students to satisfy their average enrollment, plus account for attrition plus satisfy the necessary increments.

(3)     Historically the percent of applicants that actually enroll is approximately 20% (OS A-8 Admission Trends) or one out of every five applicants. Consequently they will need to receive 1870 applications, in each of the three years, to enroll classes of 374 students. This would be an increase of 88% in applications from the average of 992 and an increase of 76% in actual students from the average of 212.

(4)     The foregoing could not be calculated without the disclosure of the 60% attrition rate.

(5)     Plaintiffs contend that predicting a 725 student enrollment in the fall of 2000 without disclosing the 60% attrition rate is an omission of material fact in that it would definitely affect the total mix of information to the reasonable investor. The Defendants knew that if they made such revelations, more likely than not, the reasonable investor would not invest.

(6)     Moreover the OS touting, regarding increases in applications, deposits, acceptances and a class of 225 in the fall of 1990 was deceptively misleading even if true. They needed 374 students not just 225 and indications of 225 as an acceptable target was misleading..

2

**(B)   Purported OS Attrition Revelations**

In their briefs both Advest and Bradford claim they revealed the attrition because if you take data from the Bradford Fall Semester Enrollment Statistics Chart (OS A-8) and the Admissions Trend Chart (OS A-8) you can see some attrition. Plaintiffs contends that this is overly simplistic and misleading for the following reasons:

(1)   The Advest Reply Brief (p. 8) states that if we add the incoming first year students for 1994-1997 we should see a total of 876 students and since there are only 602 (a loss of 274 students) attrition has been revealed. Bradford in their Reply Brief (p. 4) argues that if we add incoming new students the years 1993-1996 we should see an enrollment of 828 students; however, the total enrollment for the fall of 1996 was only 544 students (a loss of 284 students) showing attrition.

(2)   Plaintiffs contend that the reasonable investor should not be required to take data from two different charts and make computations to determine attrition. If there is a 60% attrition rate it should be so stated in black and white. Moreover, every college has a certain rate of attrition and there should be a qualification of the seriousness of the attrition rate and how it could impact on the investment.

(3)   Assuming arguendo, that such calculations are expected of the reasonable investor the data defendants refer to is still misleading as, utilizing the data cited about by Advest and Bradford would lead to an Advest rate of 31% and a Bradford attrition rate of 34% which are a far cry from the real attrition rate of 60%. These chart Calculations lead to a misrepresentation in and of itself. In short the defendants are pointing to a specific misrepresentation in the OS charts to attempt to excuse a material omission of fact. Rather than revelation of the 800 pound gorilla

3

jumping on the furniture, it shows they were hiding the 800 pound gorilla in the basement.

### (C)   Financial Aid

The fact that in the several years before the OS the college had given out significant financial aid was revealed in the OS. What is significant; however, were the representations that they were going to reduce financial aid when they knew it was increasing. Also, of material significance is the representation that they were going to reduce financial aid by a new "methodology" (OS A-13) when none existed.

### (D)   Trustee Control

The Bradford defendants contend that there is no indication of control by the Trustee Defendants. The OS (A-2), however, specifically states that "The College is governed by a Board of Trustees (the "Board") which includes the President of the College as a voting member". This is in and of itself evidence of the trustees control.

### (E)   Advest Significantly Contributed To Preparations Of The OS

It is true that without further discovery Plaintiffs cannot completely describe Advest's role in the preparation of the OS; however, it can be shown on the facts and allegations available that Advest materially contributed to the preparation of the OS. Specifically Advest calculated the maximum bondability of the College. This determination, of course, is the cornerstone of the OS. In order to make such a determination Advest would have had to determine the payment amounts necessary to amortize the bonds; it would have had to determine the gross and net tuition amounts to make the payments; it would have had to determine the total enrollments necessary to generate such tuition and, among other things, it would have had to ascertain attrition rates to ensure such enrollments were attainable and sustainable. To do otherwise would have been grossly reckless.

4

Advest is primarily liable due to its significant contribution to the preparation of the OS.

**(F)     The "*Gorsey*" Case**

In the *Gorsey* case Judge Zobel was asked to determine only whether a certain type of financing was an industrial revenue bond as defined by Rule 131 and was, therefore, subject to the Rule 131 provisions. The Plaintiffs argued that it was an industrial revenue bond because it was to finance an industrial or commercial enterprise and, therefore, was covered by Rule 131. The court determined that because the bond did not fit the parameters of 26 IRC §103 it was not an industrial revenue bond covered by Rule 131. The Court was not asked to determine if a bond, that was not an industrial finance bond, could be a type of conduit financing subject to the anti-fraud provisions for reasons other than Rule 131 protection. Plaintiff contends there is no reason that a non-profit educational entity should escape the anti-fraud provisions because it is not covered by a rule applying to Industrial Revenue Bonds. If Congress intended non-profit educational entities to be exempt from the anti-fraud provision it would designate 15 USC 77(c)(2)(4) and (14) as exempt rather than just 15 USC 77(c)(2) and (4).

5