UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENISE MCKEOWN, ROBERT LUTTS,<br>         Plaintiffs,<br><br>vs.<br><br>ADVEST, INC., KAREN SUGHRUE, et al.,<br>         Defendants | C.A. No. 05-10176-RGS<br><br>**CONSOLIDATED WITH** |
| T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC., et al.,<br>         Plaintiffs,<br><br>vs.<br><br>ADVEST, INC., KAREN SUGHRUE, et al.,<br>         Defendants | C.A. No. 04-11667-RGS |

**BRADFORD DEFENDANTS' RESPONSE TO PLAINTIFFS MCKEOWN AND LUTTS' WRITTEN SUPPLEMENTATION IN LIEU OF ORAL ARGUMENT REGARDING DEFENDANTS' MOTION TO DISMISS.**

The Bradford Defendants[1] respond to certain matters in Plaintiffs McKeown and Lutts' Written Supplementation in Lieu of Oral Argument Regarding Defendants' Motion to Dismiss ("Supp."). In seeking to support their baseless claims, plaintiffs McKeown and Lutts ("plaintiffs") rely on assertions of fact and law that are patently erroneous.

**I.   THE OFFICIAL STATEMENT ACCURATELY DISCLOSES THE COLLEGE'S HIGH LEVEL OF ATTRITION.**

Plaintiffs do not deny that the enrollment figures in the Official Statement accurately show the numbers of <u>new</u> students who enrolled at Bradford College in the fall for each year from 1993 to 1997, as well as the College's <u>total</u> fall enrollment for each

---

[1] "Bradford Defendants" refers to all defendants in this action except Advest, Inc.

such year. They also do not (and cannot) deny that the simplest of comparisons and calculations of those figures show that significant numbers of students were leaving Bradford each year. They do not deny, for example, that those numbers show (1) that new students made up substantially more than 25% of the student body in each of those years, and (2) that, year after year, hundreds of students who should have been in attendance could not be accounted for. There is no merit in plaintiffs' assertion that these accurate enrollment figures somehow concealed or misstated the College's attrition problem, much less that they were designed to do so.[2]

### A. Reasonable Investors Are Held to Know What Simple Calculations Would Have Revealed.

First, plaintiffs offer no support at all for their assertions that "the reasonable investor should not be required to take data from two different charts and make computations to determine attrition," and that "[i]f there is a 60% attrition rate it should be so stated in black and white." Supp. at 3. Contrary to plaintiffs' insistence, a number of cases have held that reasonable investors are deemed to know matters that they could have determined by calculating and comparing information that was available to them, even if such matters were not stated in so many words.

In *Werner v. Werner*, 267 F.3d 288, 299-300 (3rd Cir. 2001), for example, the Third Circuit affirmed the dismissal of a securities fraud action in which plaintiffs alleged that a proxy statement had failed to disclose the amount of money that would inure to the management defendants as a result of the deletion of the company's right of first refusal. The Court found this nondisclosure not actionable "because the shareholders had <u>access</u>

---

[2] Plaintiffs also ignore the fact that the enrollment figures were not the only indications of attrition in the Official Statement. As discussed in the defendants' principal briefs, the Official Statement expressly set out the number of students who had left the College between the fall and spring semesters of the most recent academic year, and referred to the need to improve retention.

<u>to the information necessary to calculate</u> the extent to which management benefited by deleting the right of first refusal." *Id.* at 299 (emphasis added). The Court explained in detail the calculation by which the shareholders could have determined that figure, which required them to use numbers set forth <u>in different documents</u>, as follows:

> A shareholder who was interested in [the amount of the benefit management incurred by deleting the right of first refusal] <u>only had to look to the 1993 and 1994 annual reports</u> to determine how many shares were issued each year pursuant to the Restricted Stock Plan. Using those same reports, <u>shareholders could determine the approximate fair market value</u> ("FMV") of Restricted shares at the date of issuance. <u>Shareholders could employ the following equation to compute the amount</u> of money the management defendants would have gotten for their shares had the right of first refusal been exercised: **[(FMV 1997 – FMV in 1993) x number of shares issued in 1993] + [(FMV 1997 – FMV 1994) x number of shares issued in 1994]** Interested shareholders could then <u>compare the amount yielded by the above equation</u> to the $66 million the management defendants would actually receive in the Recapitalization as proposed.

(Emphasis added.)

Similarly in *Demaria v. Andersen*, 153 F. Supp. 2d 300, 312-13 (S.D.N.Y. 2001), *aff'd*, 318 F.3d 170 (2d Cir. 2003), the court held there was no actionable omission in a prospectus that did not explicitly state that the ratio of the company's net loss as a percentage of revenue was no longer declining. As the court noted, the prospectus disclosed the major components that the investors could have added up to determine the company's net loss for the most recent quarter. *Id.* The investors could then have determined whether the ratio of net loss as a percentage of net revenue was still declining by comparing the most recent net loss to the net loss in the previous quarters. *Id.* at 313. As the court explained, "[b]y virtue of <u>uncomplicated calculations</u>, the Prospectus' disclosure of ILife's loss would have placed any reasonable investor on notice that, holding that rate of revenue growth constant, net loss as a percentage of revenue would have increased dramatically from the prior quarter and that the stockholders' deficit

would have grown as well." *Id.* *See also Ash v. LFE Corporation*, 525 F.2d 215, 219 (3rd Cir. 1975) (proxy statement was not required to state the amount by which directors' pension benefits would increase; "[t]he facts are disclosed prominently and candidly," and "those responsible for the preparation of proxy solicitations [need not] assume that stockholders cannot perform <u>simple subtraction</u>"); *Mesh v. Bennett*, 481 F. Supp. 904, 906 (S.D.N.Y. 1979) (no actionable omission in proxy statement that did not indicate that a modification of an incentive stock purchase plan would cost the corporation over $17 million where this figure "could <u>easily [be] estimated</u> … from the information provided"); *Bank of Lexington & Trust Co. v. Vining-Sparks Securities, Inc.*, 959 F.2d 606, 612 (6th Cir. 1992) (no actionable omission in confirmation statement that did not set out yield to call on bonds where the statements "disclosed both the call price and the call date, information from which yield to call can <u>easily be calculated</u>"); *Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1988) (no actionable omission in offer to purchase that did not disclose per-share figure for share purchase, where investors could calculate this figure from available information; "[t]he defendants' failure to perform this calculation for investors cannot be said to have 'significantly altered the "total mix" of information' available to reasonable investors"; "no further disclosure required where '<u>conclusion obvious to anyone conversant with elementary mathematics</u>'"), *quoting Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 5 (2d Cir. 1983) (emphasis added).

Similarly here, where the Official Statement disclosed the data from which a reasonable investor could see that the College had a significant attrition problem and could also determine its extent, the Official Statement cannot be deemed to have made any actionable misrepresentation or omission with respect to attrition.

4

### B.  The Attrition Disclosed in the Official Statement Is Entirely Consistent with the 60% Attrition Rate Alleged in the Complaint.

Plaintiffs are also wrong in asserting that the enrollment figures in the Official Statement are "misleading" (as noted, however, they do not claim that those figures are inaccurate). They base their assertion on their claim that the enrollment figures purportedly show that attrition was only 34% for the period from 1993 to 1996 and 31% for the period from 1994 to 1997, while the complaint alleges that the College had an attrition rate of 60%. Supp. at 3. This assertion is based on mathematical assumptions which, as discussed below, are demonstrably mistaken.

The Amended Complaint makes quite clear that its allegation of a 60% attrition rate refers to the percentage of students who enrolled but left the College before graduating. *See* Amended Complaint ¶¶3, 49 (alleging that 60% attrition rate "mean[t] that substantially fewer than half of all entering freshmen remained enrolled at the College through their senior year"). The enrollment figures in the Official Statement indicate attrition levels that are entirely consistent with that four-year figure. As the Bradford Defendants showed in their reply brief, the enrollment figures in the Official Statement show that, although a total of 828 new students enrolled at Bradford in the years from 1993 from 1996 (186 (in 1993) + 223 (in 1994) + 224 (in 1995) + 195 (in 1996) = 828), Bradford's total enrollment as of fall 1996 was only 544. Reply in Support of Bradford Defendants' Motion to Dismiss ("Reply") at 4 (citing figures at page A-8 of Appendix A of Official Statement). Simple subtraction shows that 284 of the 633 total new students who had enrolled in 1993, 1994, and 1995 (186 + 223 + 224 = 633) were no longer at Bradford by the fall of 1996 (828 − 544 = 284). The 284 missing students constitute approximately 45% of the total 633 students who enrolled in 1993, 1994, and

5

1995 (284 ÷ 633 = .4486). In other words, 45% of the students who had enrolled at Bradford in those three years had left by 1996. Because the complaint makes clear that the purported 60% attrition rate refers to attrition over four years, however, the three-year attrition figure of 45% must be increased by one-third (15%) to extrapolate the attrition rate over four years, which yields an attrition rate of 60%. Performing the same calculation using the enrollment figures for 1994 through 1997 indicates a similar four-year attrition level of 60%.[3]

Plaintiffs do not explain how they crunched the same enrollment figures in the Official Statement to purportedly reach an attrition rate of 34% for 1993 to 1996 (which they unaccountably term the "Bradford attrition rate"), or an attrition rate of 31% for 1994 to 1997 (which they term the "Advest rate"). Supp. at 3. Hit-and-miss calculations using the same figures, however, have shed light on their errors. With respect to both purported rates, it is evident that, instead of determining the number of enrolled students who had left the College over three years as a percentage of the total number of new students who had enrolled <u>in those three years</u>, plaintiffs actually mistakenly calculated the number of students who had left over those three years as a percentage of the total number of new students who had enrolled <u>over four years</u>.

Thus, with respect to the purported "Bradford attrition rate" of 34%, it appears that plaintiffs first determined, correctly, that 284 of the 633 new students who had

---

[3]   Namely, although a total of 876 new students enrolled at Bradford in the years from 1994 through 1997 (223 (in 1994) + 224 (in 1995) + 195 (in 1996) + 234 (in 1997) = 876), Bradford's total enrollment as of fall 1997 was only 584; 292 of the 642 total new students who had enrolled in 1994, 1995, and 1996 (223 + 224 + 195) had left and did not enroll in 1997 (876 – 292 = 584). See Reply at 4. The 292 students who left comprise approximately 45% of the 642 total students who enrolled in those three years (292 ÷ 642 = .4548). Increasing this figure by one-third to reflect a fourth year of attrition yields a four-year attrition rate of 60%.

6

enrolled in 1993, and 1994, and 1995 had left by 1996.[4] Plaintiffs, however, then calculated those 284 missing students <u>not</u> as a percentage of the total new student enrollment for 1993, 1994, and 1995, but as a percentage of the <u>828</u> total new students who had enrolled in each of the <u>four</u> years from 1993 through fall 1996 (284 ÷ 828 = .3429). However, because the new students who were newly enrolled in 1996 could not have left by that time, they cannot logically be included in calculating attrition.

Plaintiffs obviously made the same erroneous assumption in purporting to reach a 31% "Advest rate" of attrition for the period from 1994 through 1997. That is, they apparently calculated the number of new students who had enrolled in 1994, 1995, and 1996, but who had left by 1997 (i.e., 292 students) as a percentage of the total number of new students who had enrolled in 1994, 1995, 1996, <u>and 1997</u> (876 total students), which would yield a figure of approximately 33% (292 ÷ 876 = .3337).[5] (Plaintiffs, however, also appear to have made an arithmetical error in calculating this amount as 31%.) Plaintiffs then compounded their errors with respect to the purported "Bradford" and "Advest" attrition rates by failing to recognize that their calculations (even if they were not based on mistaken assumptions), would indicate at best attrition over <u>three</u> years, and that each figure must therefore be increased by another one-third to indicate a four-year attrition rate (which, even based on plaintiffs' mistaken calculation of the three-year rates

---

[4] See page A-8 of Appendix A to Official Statement; see also Reply at 4 (noting that "nearly 300 of the 633 students who had newly enrolled in 1993, 1994, and 1995 (186 + 223 + 224 = 633) could not be accounted for by 1996").

[5] See page A-8 of Appendix A to Official Statement.

7

as 31% or 34%, would yield four-year attrition rates of more than 41% and 45%, respectively).[6]

In short, because the enrollment figures in the Official Statement accurately and obviously indicated Bradford College's attrition problem in a level consistent with the attrition rate alleged in the complaint, the Official Statement cannot be deemed to have made any material omission relating to attrition, much less an intentional one.

### C. There Was No Obligation to Explain the Importance of Attrition to the Investment, or to Compare the College's Attrition Rate with that of Other Colleges.

Evidently recognizing that they cannot state a viable claim for concealment of attrition, plaintiffs make a last-ditch attempt to reconfigure their claims. Their effort fails, however, because their new theories continue to rely on their demonstrably baseless assertion that attrition was not disclosed, and also because they assert purported misrepresentations that are not alleged in the complaint (and, indeed, misrepresentations that do not even appear in the Official Statement). Thus, plaintiffs now assert, for the first time, that the College's "predicti[on]" of 725 total enrollment in fall 2000 was an omission of material fact "without disclosing the 60% attrition" because the College would have to enroll greatly increased numbers of students each year to reach this level

---

[6] The Bradford Defendants note that a four-year attrition rate of approximately 60% may be deduced in another way from the same enrollment figures, and, specifically, by considering the amount by which the students in each year's incoming class exceeded the expected replacement proportion of 25%. Thus, incoming students made up 13% more than the expected 25% of the student body in 1993; 17% more in 1994, 15% in 1995, 11% in 1996, and 15% in 1997. See Reply at 4 (noting that incoming students made up 38% of total student body in 1993, 42% in 1994, 40% in 1995, 36% in 1996, and 40% in 1997). The average yearly rate of attrition over this five-year period is therefore approximately 14.2% (13 + 17 + 15 + 11 + 15 = 71; 71 ÷ 5 = 14.2). In other words, approximately 14.2% of the College's total student body (not considering graduating seniors) needed to be replaced in each of the years from 1993 to 1997. The approximate four-year attrition rate (14.2% x 4) is therefore 57%.

8

of enrollment given attrition.[7] Supp. at 2. They also claim for the first time that the Official Statement's "indications of 225 as an acceptable target" for new student enrollment in fall 1998 "was deceptively misleading <u>even if true</u>" because, in view of attrition, the College actually needed more than this number of new students in fall 1998 to reach an enrollment figure of 725 in 2000. *Id.* (emphasis added). Even if the complaint had asserted these claims, which it did not, they would fail because the Official Statement <u>did</u> disclose attrition, as well as all other relevant financial and enrollment data the investors needed to determine whether the College was likely to pull itself out of the financial mire in which it was obviously stuck.

Plaintiffs also err in asserting that "every college has a certain rate of attrition" and that the Official Statement should have included "a qualification of the seriousness of the attrition rate and how it could impact on the investment." Supp. at 3. The Official Statement makes quite clear that the College's principal source of income is tuition revenues. It is therefore self-evident that attrition has a negative effect on tuition revenues. Moreover, the economic effects of attrition are accurately reflected in the College's serious cash-flow problems, which are set forth in detail in the Official Statement. And to the extent plaintiffs are suggesting that the Official Statement should have compared Bradford College's attrition rate with that of other colleges, such a claim would not be actionable even if it were pled. As the Bradford Defendants established in their principal brief, "[t]he federal securities laws do not ordain that the issuer of a security compare itself in myriad ways to its competitors, whether favorably or unfavorably," and, instead, "it is precisely and uniquely the function of the prudent

---

[7] The Official Statement does not in fact make any such "prediction," but merely states that the College "is planning" to increase enrollment to such a level. Official Statement, Appendix A, at A-13.

9

investor, not the issuer of securities, to make such comparisons among investments." *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 375-76 (3rd Cir. 1993) (emphasis in original).

|  |  |
|---|---|
|  | THE BRADFORD DEFENDANTS<br>By their attorneys, |
|  | /s/ A. Lauren Carpenter<br>Robert E. Sullivan, BBO #487820<br>Scott A. Roberts, BBO #550732<br>A. Lauren Carpenter, BBO #551258<br>SULLIVAN, WEINSTEIN & McQUAY, P.C.<br>Two Park Plaza<br>Boston, MA 02116 |
| Dated: November 15, 2005 | (617) 348-4300<br>Email: lcarpenter@swmlawyers.com |

## CERTIFICATE OF SERVICE

I, A. Lauren Carpenter, hereby certify that a true and correct copy of the foregoing document was served by hand on all counsel of record on this 15th day of November, 2005.

/s/ A. Lauren Carpenter
A. Lauren Carpenter