UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10176-RGS

DENISE MCKEOWN AND ROBERT LUTTS

v.

ADVEST, INC., et al.

*CONSOLIDATED WITH*

CIVIL ACTION NO. 04-11667-RGS

T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC., et al.

v.

ADVEST, INC., et al

MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS

September 30, 2006

STEARNS, D.J.

Plaintiffs[1] in these consolidated actions are three bond funds, a bond insurer, and four individuals who purchased bonds for the benefit of Bradford College (the College), a now defunct educational institution that was located near Haverhill, Massachusetts. The bonds at issue were sold through an offering statement dated May 1, 1998 (Official

---

[1] Plaintiffs are as follows: T. Rowe Price Tax-Free High Yield Fund, Inc. holds bonds in the amount of $6 million; Smith Barney Income Funds/Smith Barney Municipal High Income Fund holds bonds in the amount of $2,345,000; Dryden National Municipals Fund, Inc., holds bonds in the amount of $1 million; Lois and John Moore hold bonds in the amount of $20,000; Denise McKeown and Robert Lutts hold bonds in the amounts of $200,000 and $75,000, respectively (collectively, the bondholders). ACA Financial Guaranty Corporation is an insurer of $5.51 million of the bonds.

Statement), that was prepared by defendant Advest, the sole underwriter of the bond offering. Also named as defendants are seventeen of the College trustees[2] and two of the College's officers[3] (collectively, the Bradford defendants). The Complaints allege violations by all defendants of Section 10(b) of the Securities Exchange Act of 1934 and its attendant regulation Rule 10b-5 (Count I). The Complaints also allege control person liability on the part of the Bradford defendants pursuant to Section 20(a) of the Act (Count II); violation by Advest of Section 12(a)(2) of the Securities Act of 1933 (Count III); violations of G.L. c. 110A, § 410 against all defendants (Count IV); fraud and intentional misrepresentation against all defendants (Count V); and negligent misrepresentation on the part of all defendants (Count VI).[4] Defendants have moved to dismiss the Complaints in their entirety.

## BACKGROUND

On February 6, 1998, the Trustees of the College voted to approve an $18 million bond offering, the primary purpose of which was to refurbish student dormitories. In

---

[2]The trustee defendants are: Karen M. Sughrue, Chair of the Board of Trustees as of February 6, 1998 and an officer of the College; Gary L. Crago, the Vice-Chair of the Board of Trustees; Jean W. Childs; Paula Edwards Cochran; G. Stevens Davis, Jr.; Julia B. DeMoss; William R. Dill; Leslie A. Ferlazzo; Joyce Shaffer Fleming; Eric W. Hayden; Catherine Chapin Kobacker; Anne Marcus; Celeste Reid (Lee); Richard J. Sheehan; Gregory E. Thomas; Susan K. Turben; and Joseph Short, the President of the College from 1989 until July 1998.

[3]In addition to Short, the former College President (who is also named as a trustee), the complaints name Donald W. Kiszka, the Vice President for Administration and Finance, and Treasurer of the College from 1989 until August 1999, as a defendant.

[4]In addition, the T. Rowe Price Amended Complaint alleges a violation of G.L. c. 93A (Count VII). In their opposition to defendants' motions to dismiss, plaintiffs have agreed to dismiss all claims for breach of fiduciary duty.

addition to the dormitory project (for which almost $11 million was allocated), revenue from the bonds was earmarked to: (1) repay an outstanding debt of approximately $5.2 million incurred as the result of a 1995 bond issue; (2) establish a Debt Service Reserve Fund; and (3) pay $341,370 in costs associated with issuing the new bonds. The total amount to be financed was $17.93 million. (Amended Complaint, ¶¶ 42-43).[5] The bonds were to be secured by a lien on the College's tuition receipts, the net amount of which was dependent on (1) total student enrollment, and (2) the amount of offsetting student financial aid. (Amended Complaint, ¶ 44).

In mid-April of 1998, Advest contacted plaintiff ACA to secure insurance for a portion of the bonds. On May 19, 1998, ACA issued a $5.51 million policy. (Amended Complaint, ¶ 67). The bonds were then sold. Upon completion of the offering, the bond proceeds were deposited into a "Construction Fund," which was to doubly serve as security for the debt.

Plaintiffs point to four main subject areas of alleged misstatements and omissions. First, they claim that the Official Statement did not disclose the College's severe and longstanding student attrition crisis and presented misleading information about trends in student enrollment. Second, plaintiffs claim that the projections of student financial aid set out in the Official Statement had no basis in reality. Third, although the Official Statement touted the College's "strategic plan" and its ongoing "strategic initiatives," plaintiffs maintain that the College had no concrete plan to balance its budget and staunch the flow

---

[5]The McKeown Complaint asserts the same factual allegations as the T. Rowe Price Amended Complaint. Claims are discussed using the structure and numbering of the T. Rowe Price Amended Complaint.

of red ink. Finally, plaintiffs allege that the Official Statement falsely represented a commitment by the College to contribute internally generated funds towards the costs of dormitory construction. (Amended Complaint, ¶ 4).

## THE APPLICABLE LEGAL STANDARDS

1. The Securities Exchange Act of 1934

The elements of a viable claim under Section 10(b)[6] and Rule 10b-5 are: (1) a material misrepresentation [or omission]; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. See In re Stone and Webster Sec. Litig., 414 F.3d 187, 193 (1st Cir. 2005), citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-342 (2005). A fact is material if there is a substantial likelihood that "the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, Inc. v. Levinson, 485 U.S. 224, 231-232 (1988), citing TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). See also Milton v. Van Dorn Co., 961 F.2d 965, 969 (1st Cir. 1992) ("The mere fact that an investor might find information interesting or desirable is not sufficient to satisfy the materiality requirement."). In an action for securities fraud, a plaintiff must also meet the heightened pleading standard of

---

[6]Section 10(b) provides that it is unlawful for a person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance. . . ." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated thereunder, provides that it is unlawful for a person "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates . . . as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

Fed. R. Civ. P. 9(b). The Rule requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The First Circuit applies the particularity requirement of Rule 9(b) strictly. New England Data Services v. Becher, 829 F.2d 286, 288 (1st Cir. 1987); Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st Cir. 1994). A complaint must provide "facts that show exactly why the statements . . . were misleading." Aldridge v. A.T. Cross. Corp., 284 F.3d 72, 78 (1st Cir. 2002). In addition, the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4, requires, in pertinent part, that a complaint specify: (1) each statement alleged to have been misleading; and (2) the reason or reasons why the statement is alleged to have been misleading. 15 U.S.C. § 78u-4(b)(1). Finally, the PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [scienter]." 15 U.S.C. § 78u-4(b)(2). A plaintiff "must not only allege the time, place, and content of the alleged misrepresentations with specificity, but also the 'factual allegations that would support a reasonable inference that adverse circumstances existed at the time of the offering, and were known and deliberately or recklessly disregarded by defendants.'" Greebel v. FTP Software, Inc., 194 F.3d 185, 193-194 (1st Cir.1999), quoting Romani v. Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir.1991). The PSLRA and Rule 9(b) pleading standards are for all practical purposes identical. Greebel, 194 F.3d at 194.

Before turning to the specific statements that are alleged to have been misleading, I note the broad allegation made by plaintiffs that the Official Statement portrayed the financial condition of the College as "stable and improving," when in fact the College was

5

mired in an ongoing fiscal, financial, and operational crisis. (Amended Complaint, ¶ 3). This blunderbuss claim is not supported by any fair reading of the Official Statement and its attached financials. These would have alerted any reasonably attentive reader to the College's troubled financial state, both past and present. The Official Statement clearly disclosed that the College had incurred operating budget deficits in *each successive year* beginning in 1989. It also disclosed that operating expenses had increased by 64 percent from $4.7 million in 1993 to $11.7 million in 1997, far outstripping student tuition income, which had increased by only $1 million from $3.2 million to $4.2 million (or 31 percent) over the same period. The "Statement of Cashflows" for the years 1995 through 1997 indicated that the College had lost $1,825,680 in 1996-1997, compared to $609,454 in 1995-1996. Thus, in the year prior to the Official Statement, the College suffered a loss approximately three times greater than the deficit incurred during the immediately preceding year. Finally, Standard & Poor's rating of the bonds – "BBB minus" – would be recognized by any reasonably sophisticated investor as the lowest grade given to a security north of junk bond status. Moreover, as defendants note, one of the stated goals of the bond offering was to "bring financial equilibrium and stability to the College." "Stability" was defined in the Official Statement as "[o]perating the College within a balanced budget." Any reasonable reader would have understood that if a "goal" of the offering was to achieve a balanced budget, something less than fiscal health was at play when the bonds were issued.

    A. Statements/Omissions Regarding Attrition and Enrollment

        i. Attrition

Plaintiffs claim that there was no candid reference in the Official Statement to the College's recurring problems with student attrition. If 1989 is taken as the base year, the College had suffered an attrition rate of almost 60 percent to the time of the bond offering. (Amended Complaint, ¶ 49). Although the Official Statement listed student enrollment for the years 1993 through 1997, plaintiffs claim that the reported figures consisted of only the fall semester enrollments, without flagging the average decline in enrollment at the beginning of each spring semester (typically 7 percent). (Amended Complaint, ¶ 54).

While student attrition was not specified in so many words as an investment risk, the Official Statement made no effort to conceal the College's retention problem. As explained in the Official Statement,

> the [dormitory construction] Project will enhance the residential life component of the College, with anticipated corresponding improvements to the competitive position of the College and its ability to retain students. (Official Statement at A-7).

The Official Statement also acknowledged that the College confronted increasing competition in attracting students, and might well fall short of its enrollment goals. In a section entitled "Bondowner's Risks," the Official Statement gave the following warning.

Dependence on Tuition Payments

Colleges and universities are in general highly dependent upon tuition and fee revenues from students and, to a lesser extent, dormitory and other auxiliary enterprise revenues to pay debt service. One of the goals of the Institution's strategic plan is to increase enrollment to at least 725 full-time students by the fall of 2000. . . . *A failure by the Institution to attract and retain students in sufficient numbers to accomplish such goal could aversely affect the ability of the Institution to make required payments on the Series 1998 Bonds. Demographics for traditional college-age students also are intensifying the competition for students by all colleges and universities, including the Institution.* (Id. at 11). (Emphasis added).

7

Even more striking, however, was a chart in the Official Statement entitled "Bradford College Fall Semester Enrollment Statistics." The chart indicated that in the fall of 1997, 602 full and part-time students were enrolled at the College. The narrative accompanying the chart disclosed that by the spring of 1998, the student body had shrunk to 566 full and part-time students. (Id. at A-8). Simple subtraction would tell a reader that 36 students had been lost over the course of the preceding semester.

Plaintiffs' secondary argument, that the absence of a more alarmingly graphic description of the losses in student enrollment obscured the issue of whether the shrinkage was expected or abnormal, carries little weight in light of other disclosed information. A second chart, entitled "Admissions Trends," detailed student enrollment figures for the school years 1993 to 1997. The chart revealed that during the fall semesters 1993 through 1995, a total of 633 new students enrolled at the College. By the fall of 1996, the student headcount amounted to 568 students, of whom 195 were identified as new students. Accordingly, in the fall of 1996, only 373 of the students who had enrolled during the years 1993 through 1995 remained enrolled. In other words, 260 of 633 students had left the College, an attrition rate of nearly 40 percent.

### ii. Enrollment

The Official Statement represented that

> [t]o attain the final goal of a balanced budget . . . the College is planning to increase enrollment to the level of at least 725 full-time students by fall 2000. . . . As of April 3, 1998, applications received by the College to date total 879, an increase of more than 18% from April 3, 1997. . . . Based on this increase in applications, historic rates for conversion of applications into enrollments, the number of applications from freshmen and deposits received to date, the College believes that it can reach its goal of enrolling

8

>225 new students for the fall of 1998 while increasing the quality of its students and reducing slightly the average amount of financial aid awards to such students from College funds. (Id. at A-13).

Plaintiffs claim that the number of applications was inflated because the College had begun accepting applications over the Internet. Plaintiffs suggest that because a web applicant could easily submit identical electronic applications to multiple schools, the College's admissions personnel knew or should have known that a web applicant would be far less likely to enroll if accepted than would be a traditional paper and pen applicant. (Amended Complaint, ¶ 61). Moreover, plaintiffs allege that the College failed to disclose that the overall quality of its applicants was declining. The College's acceptance rate had historically ranged between 77 and 80 percent. In the fall of 1998, the acceptance rate dropped to 70 percent. (Amended Complaint, ¶ 62).

All of this is set out as supposition rather than fact. Plaintiffs do not provide the number of on-line applications received by the College as of the date of the Official Statement. Nor do they explain why a student applying on-line would have had less interest in ultimately enrolling in the College than a student who had completed a postal mail application. The court assumes (there being no evidence to the contrary) that the applicants who applied to the College over the Internet were subject to the same admissions requirements and non-refundable application fees as were other applicants. Moreover, there is no factual support for the allegation that the quality of student applicants was declining (or if it was, that it made any difference to the College in terms of its student recruitment goals). Assuming that the gross acceptance rate dropped to an average of 70 percent from 77 to 80 percent of applications received, the decline is

statistically meaningless given the 18 percent increase in total applications.  Finally, plaintiffs argue that the best predictor of enrollment for the fall of 1998 would have been the number of students who had made firm tuition deposits during the spring semester (when the Official Statement was issued).  According to plaintiffs, this number had shrunk by almost 20 percent, although how this 20 percent figure was derived is never explained. More telling is the fact that plaintiffs never allege that the College was unable to meet its goal of enrolling 225 *new* students in the fall of 1998.  Although plaintiffs note that enrollment for the fall 1998 semester was lower than predicted, they admit that "fully three quarters of this enrollment deficit was attributable to the failure of previously enrolled students to return to Bradford." (Amended Complaint, ¶ 68).

    B.  Statements Regarding Financial Aid Awards

The Official Statement indicated that

> [d]uring the 1997-1998 academic year, the College estimates that financial aid will be reduced to 29.9% of student income versus 30.3% the previous year. This expected reduction is a result of change in methodology of aiding students with college-funded support versus additional loans funded by students and/or parents.  The College's plan currently calls for a further reduction of financial aid spending for 1998-1999 academic year to 28.8% of student income.  Approximately 80% of full-time students receive Bradford-funded financial aid.  (Official Statement at A-13).

Plaintiffs claim that there was no reasonable basis for the defendants to make these statements.  When the Official Statement was published, only two months remained in the 1997-1998 academic year.  Financial aid commitments had already been made, and had exceeded the budgeted amount by $250,000.  (Id.).  Plaintiffs argue that as a result, the amount of student aid, rather than declining as a percentage of total tuition receipts,

remained "in line with the College's track record." This track record, however, was fully disclosed in the Official Statement. The College's audited financials (attached to the Official Statement) revealed that in every year since 1989, the level of student financial aid as a percentage of tuition revenue had risen. (Id.).[7]

Defendants make a persuasive argument that the statements regarding projected financial aid are non-actionable under the "safe harbor" provision of the PSLRA, 15 U.S.C. § 78u-4(b)(1)-(2), which shields a defendant from liability for "forward looking" forecasts that are accompanied by meaningful cautionary statements regarding factors that might adversely influence the predicted results. The lack of evidence supporting a strong inference of scienter dictates the same result. "The most salient feature of the PSLRA is that whatever the characteristic pattern of the facts alleged, those facts must now present a *strong* inference of scienter. A mere reasonable inference is insufficient to survive a motion to dismiss." Greebel, 194 F.3d at 196 (emphasis supplied).

Scienter is "a mental state embracing the intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-194 n.12 (1976). Plaintiffs may meet the scienter requirement by alleging conduct that amounts to recklessness. Recklessness consists of "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." Greebel, 194 F.3d at 198.

---

[7]The Official Statement projected a drop in scholarship aid to 28.8 percent of tuition income. Whether expressed as a comparative ratio or in dollars ($280,000), it is doubtful that a reasonable investor would have thought the difference between 31.3 percent and 28.8 percent to be of material significance.

Plaintiffs allege that the defendants "knew (or would have known, but for their reckless disregard for their duties) that financial aid commitments were almost a quarter of a million dollars greater than budgeted . . . as the College's audited financials for the year *soon confirmed.*" (Amended Complaint, ¶ 56) (emphasis added). Plaintiffs do not allege that any of the defendants were aware of the results of the College's audited financials at the time the Official Statement was issued; in fact, the reverse appears true. Similarly, although plaintiffs claim that the "College knew" that student revenues for the 1998 spring semester would be lower than predicted in the budget, there is no allegation that any defendant shared that supposed knowledge. Nor does the fact that a draft of the 1998-1999 budget was forwarded to the trustees on April 29, 1998, two days before the Official Statement was issued, support a "strong" inference that the defendants knew or should have known that the financial projections set out in the budget were overly optimistic.[8]

C.  Statements Regarding the Strategic Plan

Despite repeated references to the College's "strategic plan . . . to increase enrollment" and to its "strategic initiatives," plaintiffs allege that the College had no concrete business plan or strategy to accomplish any of the goals articulated in the Official Statement. In rebuttal, defendants point out that the Official Statement lists the affirmative steps taken by the College to increase enrollment, including the hiring of a consultant to

---

[8]The allegation that Kiszka and Short, as officer defendants "had access to the adverse non-public information" because of the positions they held at the College states a conclusion, not a fact. (Amended Complaint, ¶ 34). "General averments of defendants' knowledge of material falsity [do] not suffice." Gross v. Summa Four, Inc., 93 F.3d 987, 991 (1st Cir.1996) (citation omitted).

12

advise on student retention, the designation of a faculty member to lead a student recruitment campaign, and the efforts undertaken to improve the quality of campus life. Defendants argue that while these efforts failed (and may have been doomed to fail), failure alone does not support a reasonable inference that the College's representation that it "planned" to increase enrollment was untruthful. "[C]ourts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace – loosely optimistic statements that are so vague, [or] so lacking in specificity . . . that no reasonable investor could find them important to the total mix of information available." Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1217-1218 (1st Cir. 1996) (citations omitted).

### D. The College's Equity Contribution

The Official Statement represented that the College would make a $1 million equity contribution from its internal funds towards the completion of the dormitory construction project. Plaintiffs allege that the representation was false and misleading because the defendants did not intend to commit new funds towards the project, but intended instead to reduce project costs by an equivalent amount. Plaintiffs point to a joint meeting held by the Finance and Buildings and Grounds Committees on February 5, 1998, some three months before the bond offering, which made the following recommendation to the full Board.

> The College will have to review the projects and attempt to reduce the final two phases to correspond with the bond financing *or* the College will have to include an equity contribution to fund a portion of the construction. It was agreed that the bond financing would proceed as recommended with Advest and that the College would make every effort to reduce its construction costs

*or* make an equity contribution *at the end in the final phase of the project.*

(Amended Complaint, ¶ 65). (Emphasis in original).

Plaintiffs argue that defendants knowingly or recklessly failed to disclose this "either/or" contingency, and misled bond investors by representing that the College would contribute its own funds towards the construction costs. (Id.). This is very thin gruel. That unnamed members of an informal trustee committee contemplated an alternative to a direct contribution of College funds to the construction project in February of 1998 is not evidence that the Board of Trustees had decided against an equity contribution in May of 1998 (when the Official Statement was issued).

   2.  Control Person Liability Under Section 20(a)[9]

To establish a § 20(a) claim, a plaintiff must plead (1) an underlying violation by a controlled person or entity, and (2) that defendants controlled the violator. Aldridge v. A.T. Cross, 284 F.3d at 85. Because plaintiffs have failed to adequately allege a violation of Section 10(b), the derivative claim under § 20(a) necessarily fails. See Suna v. Bailey Corp., 107 F.3d 64, 72 (1st Cir. 2002).

   3.  Violation of Section 12(a)(2) of the Securities Act of 1933 against Advest

---

[9]Section 20(a) provides that: "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

Section 12(a)(2) prohibits the offer or sale of securities by way of a false or misleading prospectus.  15 U.S.C. § 77l. Plaintiffs have failed to show that the Official Statement was false or misleading.  Accordingly, this claim also fails.

4.  State Law Claims

As the foundational federal claims will be dismissed, the court declines to exercise supplemental jurisdiction over the remaining state law claims.  See 28 U.S.C. § 1367(c)(3); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

## ORDER

For the foregoing reasons, defendants' motions to dismiss are <u>ALLOWED</u>.[10]

        SO ORDERED.

        /s/ Richard G. Stearns

        _____
        UNITED STATES DISTRICT JUDGE

---

[10] Plaintiffs' Motions to Strike in Support of Their Opposition to Defendants' Motions to Dismiss (Docket # 38 in the McKeown case; Docket # 43 in the T. Rowe Price case) are <u>DENIED</u> as moot.