**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| |
|---|
| DENISE MCKEOWN and ROBERT LUTTS<br><br>*Plaintiffs*<br><br>v.<br><br>ADVEST, INC., et. al.<br><br>*Defendants* |

Civil Action No.: 05-10176-RGS

Consolidated With

| |
|---|
| T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC. et al.<br><br>*Plaintiffs,*<br><br>v.<br><br>KAREN M. SUGHRUE, et. al.,<br><br>*Defendants.* |

Civil Action No.: 04-11667 RGS

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTIONS TO VACATE**
**DISMISSAL AND FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**

Plaintiffs T. Rowe Price Tax-Free High Yield Fund, Inc., Smith Barney Income Funds/Smith

Barney Municipal High Income Fund, Dryden National Municipals Fund, Inc., Lois and John Moore,

and ACA Financial Guaranty Corporation file this memorandum in support of their motion to vacate

the Court's Order of Dismissal dated October 5, 2006, pursuant to Fed.R.Civ.P. 59(e) and their

Motion for Leave to File a Second Amended Complaint pursuant to Fed.R.Civ.P. 15(a).

**I.     PURSUANT TO RULE 59(e) PLAINTIFFS MAY SEEK LEAVE TO FILE AN**
**AMENDED COMPLAINT NOTWITHSTANDING THE COURT'S ORDER OF**
**DISMISSAL**

On October 5, 2006, the Court dismissed the Plaintiffs' Amended Complaint for the reasons

set forth in the Court's Memorandum And Order On Defendants' Motions To Dismiss

("Memorandum"). The principal ground was Plaintiffs' failure to meet the heightened pleading

standards under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Although

the Plaintiffs' Oppositions to Defemdants' Motion To Dismiss requested leave to amend in the event

the Court found the Plaintiffs those standards, the Court did not expressly rule on Plaintiffs' request.

Nonetheless, for the reasons set forth below, many of the deficiencies perceived by the Court can be

remedied by an amendment specifying additional facts. Accordingly, Plaintiffs seek leave to amend.

When a District Court has dismissed a complaint without leave to amend for failure to state

a claim, the proper way to get a proposed amended complaint before the Court is to move to vacate

the dismissal order pursuant to Rule 59(e). Mipuri v. ACT Manufacturing, Inc., 212 F.3d 624, 628

(1st Cir. 2000); Acevedo-Villalobos v. Hernandez, 22 F. 3d 384, 389 (1st Cir. 1994). Although not

expressly stated in the rule, a party can seek to vacate a judgment pursuant to a Rule 59(e) motion.

Foman v. Davis, 371 U.S. 178, 181 (1962). A party has ten days from the entry of judgment[1] to file

a Rule 59(e) motion.[2]

Ordinarily, a motion under Rule 59(e) is addressed to the Court's discretion, and such

motions are frequently denied. The Supreme Court, however, has made it clear that a different

standard applies when a plaintiff files a Rule 59(e) motion after a District Court has dismissed a

viable lawsuit on technical grounds without granting the plaintiff leave to amend. Foman v. Davis,

---

[1]    The Court's October 5, 2006 Order of Dismissal, not the Memorandum (which was docketed on October 3, 2006) is considered the "judgment" from which the time period requirements are measured. Pursuant to Fed.R.Civ.P. 58, a judgment dismissing the Plaintiffs' complaint required the entry of a separate document pursuant to Fed.R.Civ.P. 58(a). Only the Order of Dismissal meets Rule 58's "separate document" requirement.

[2]    Plaintiffs' motions are timely notwithstanding the fact they were filed more than 10 calender days after October 5, 2006, the date the Order of Dismissal was docketed. Fed.R.Civ.P. 6(a) provides that whenever the Rules of Civil Procedure require a party to take a particular act within a time period of 11 or fewer days, weekends and federal holidays are excluded from the computation of the period. The rule expressly identifies Columbus Day, which was celebrated on October 9, 2006, as one of the holidays excluded from the calculation. In accordance with Rule 6(a) the proper day for filing a motion to vacate judgment is Friday, October 20, 2006.

371 U.S. 178 (1962), the Supreme Court's seminal case on the standards for ruling on a Motion to

Amend under Rule 15(a) is actually a Rule 59(e) case. In Foman, the plaintiff's complaint alleged

that she was contractually entitled to a portion of her father's estate based on oral promises given in

exchange for her commitment to take care of him. A judge from the District of Massachusetts

dismissed the oral contract claim without leave to amend. Shortly after the dismissal, the plaintiff

filed a motion for leave to file an amended complaint seeking recovery under quantum meruit. The

motion, which was treated as a Rule 59(e) was summarily denied by the District Court, and the First

Circuit found no abuse of discretion.

Reviewing the decision to deny to motion to amend the complaint after the entry of judgment,

the Supreme Court reversed, holding that the First Circuit "erred in affirming the District Court's

denial of petitioner's motion to vacate the judgment in order to allow amendment of the complaint".

371 U.S. at 182. The Court then set forth the familiar language setting for the standard of ruling

upon motions to amend complaints under Rule 15(a).

> If the underlying facts or circumstances relied upon by a plaintiff may be a
> proper subject of relief, he ought to be afforded an opportunity to test his
> claim on the merits. In the absence of any apparent or declared reason–such
> as undue delay, bad faith or dilatory motive on the part of the movant,
> repeated failure to cure deficiencies by amendment, futility of amendment,
> etc.–the leave sought should, as the rules require, be "freely given". 371 U.S.
> at 182.

The Court's holding makes it clear that when presented with a motion to amend in

conjunction with a Rule 59(e) motion, the Court reviews both motions under a Rule 15(a) standard.

A failure to permit a proposed amendment that would constitute an abuse of discretion under Rule

15(a) will also be an abuse of discretion under Rule 59(e). Firestone v. Firestone, 76 F. 3d 1205,

1208 (D.C. Cir. 1996) Similarly, if the Court would ordinarily permit the amended complaint

proposed by the Plaintiffs to go forward, the fact that the motion to amend is made after the entry

of an order of dismissal has no affect on the Court's analysis.  Rule 15(a) controls here.

**II.      THE PLAINTIFFS SHOULD BE PERMITTED TO AMEND THEIR COMPLAINT**

**A.      Due to the Complex Pleading Requirements for Federal Securities Cases, Plaintiffs Are Ordinarily Permitted at Least One Opportunity to Correct Pleading Deficiencies**

One of the hallmarks of the Rules of Federal Civil Procedure is that cases should not be

dismissed for failure to meet pleading requirements without some opportunity to correct deficiencies.

"The view that the pleading of cases is a game in which every miscue should be fatal is antithetic

to the spirit of the federal rules." Rodi v. New England School of Law, 389 F.3d 5, 20 (1st Cir.

2004).  Dismissal without leave to amend is improper unless it is clear that the complaint cannot be

saved by any amendment.  Barry Aviation, Inc. v. Land O' Lakes Municipal Airport Commission,

377 F.3d 682, 687 (7th Cir. 2004);  Chang v. Chen, 80 F.3d 1293, 1296 (9th Cir. 1996).

These rules apply with equal, or possibly greater, force to dismissals under the PSLRA, a

statute that Judge Young had observed has established a Byzantine pleading code. See In re Number

Nine Visual Technology Corp. Securities Litigation, 51 F. Supp. 2d. 1, 27 n. 22 (D. Mass., 1999).

As the Ninth Circuit has noted, because the PSLRA requires pleading "with an unprecedented degree

of specificity and detail", adherence to the liberal amendment provisions of Rule 15(a) is "especially

important".  Eminence Capital, LLC v Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003).  Potentially

meritorious cases should not be tossed out because the parties' lawyers failed to meet the arcane

standards.  The Ninth Circuit recognized and empathized the complaint drafter's dilemmas.

> But how much detail is *enough* detail?  When is an inference of deliberate recklessness *sufficiently* strong?  There is no bright-line rule.  Sometimes it is easy to tel, but often it is not.  The acid test is the motion to dismiss. . . .In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.  Id. (emphasis in original)

The Court found that the Plaintiffs had made a sufficient showing that they could overcome the deficiencies found in the District Court's memorandum and reversed the dismissal without leave to appeal.  The Court granted the relief notwithstanding the fact that the Plaintiffs had amended their complaint twice previously, once after the District Court had ruled on Defendants' first set of motions to dismiss and had dismissed the complaint with leave to amend.  Even with these prior opportunities, Plaintiffs were entitled to another attempt when "it appears that plaintiffs had a reasonable chance of successfully stating a claim if given another opportunity." 316 F.3d at 1053.

The Court should not deny the Plaintiffs' motions because limited amendment is asserted to be consistent with the policies and goals of the PSLRA.  The D.C. Circuit recently rejected this argument in Belizan v. Hershon, 434 F.3d 579, 583-84 (D.C. Cir. 2006).  While the PSLRA may have changed the pleading requirements,

> it does nothing to change the ordinary consequences of a "failure to meet pleading requirements." On the other hand, had the Congress wished to make dismissal with prejudice the norm, and to that extent supercede the ordinary application of Rule 15(a), we would expect the text of the PSLRA so to provide. Cf. 21 U.S.C. § 1605(e) (under the Biomaterials Access Assurance Act of 1998, "[a]n order granting a motion to dismiss" in a suit against a supplier to a manufacturer of medical devices "shall be entered with prejudice"). Unable to derive any guidance from the PSLRA itself, we are governed simply by Rule 15(a), which, as we have observed, allows "maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." United States v. Hicks, 283 F.3d 380, 387 (2002)(quoting 6 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1471 505-06 (2d ed. 1990)).

434 F.3d at 583-84.

Accordingly, the standards set forth by the Supreme Court in <u>Foman</u> apply to this action. Plaintiffs' request to amend their complaints should be permitted unless there has been undue delay, bad faith or dilatory motive on the part of the plaintiffs, repeated failure to cure deficiencies by amendment, or amendment is futile. There has been no suggestion that the Plaintiffs are proceeding in bad faith. Accordingly, Plaintiffs will address the other grounds for denial of amendment they anticipate Defendants to raise.

**B.     Plaintiffs Have Not Repeatedly Failed To Cure Pleading Deficiencies Through Amendment**

Defendants have no ground to claim that Plaintiffs have repeatedly failed to cure pleading deficiencies. While Plaintiffs have previously amended their complaint, the amendment was not for the purpose of curing deficiencies in the Complaint. They filed their Amended Complaint on January 20, 2005, two days after the Massachusetts Superior Court stayed a parallel action in that Court.[3]   The Amended Complaint made no changes to the factual allegations in the original Complaint and merely added the state claims from the stayed state action to this case[4]. The Amended Complaint was filed before any of the Defendants served motion to dismiss that set forth their objections to the Complaint.

---

[3]     Plaintiffs' original complaint in this Court solely alleged violations of the federal securities law. They had filed a parallel action in Suffolk Superior Court to prosecute their state law claims.

[4]     At oral argument on the Motion to Stay, counsel for the Bradford Defendants informed the Superior Court that they intended to move to dismiss the state action on res judicata grounds if this Court dismissed the federal action on a motion to dismiss. When the Superior Court stayed the state court action, Plaintiffs added their state court claims to this action to preserve their rights to bring them.

Accordingly, it is impossible to claim that Plaintiffs have repeatedly amended their complaints to correct pleading deficiencies. The proposed Second Amended Complaint ("SAC") is the first effort by the Plaintiffs to respond to the alleged pleading deficiencies in the Complaint.

### C.    Plaintiffs Have Not Unduly Delayed In Seeking Amendment

Plaintiffs anticipate that notwithstanding the prompt request to amend following the Court's dismissal order, Defendants will allege that Plaintiffs unduly delayed in making the request. Defendants will likely assert that Plaintiffs should have moved to amend before the Court dismissed the complaint, attempting to convince the Court that it is inappropriate for the Plaintiffs to rely on one of the fundamental rules of Rule 12 jurisprudence: that even in cases involving heightened pleading requirements, amendments should be allowed if it is possible for the plaintiff to plead a valid claim. The Court should reject the argument.

Although "undue delay" is a sufficient ground to deny an amendment, delay, by itself, is not. Delay only become "undue delay" when it becomes prejudicial, placing an undue burden on the opposing litigant. Adams v. Gould, Inc., 739 F.2d 858, 868 (3rd Cir. 1984) "Delay that is neither intended to harass nor causes any unascertainable prejudice is not a permissible reason" Carmona v. Toledo, 215 F.3d 124, 136 (1st Cir. 2000). Prejudice is the touchstone of inquiry under Rule 15(a) Lone Star Ladies Investment Club v. Schlotzsky's, Inc., 238 F. 3d 363, 368 (5th Cir. 2001). In the absence of prejudice or a strong showing under any of the other Foman factors, there is a presumption that leave to amend should be granted. Lowrey v. Texas A. & M. University System, 117 F.3d 242, 245 (5th Cir. 1997).

Defendants, of course, can demonstrate no prejudice, other than having to defend a viable action they would rather ignore. This is not a case where discovery has been enlarged or the scope

of the litigation unduly expanded at a late hour.  Indeed, given that the existing state court action will recommence if the dismissal was valid, Defendants cannot say they are being dragged back into litigation unnecessarily.

Nor, given their affirmative embrace of delay in the history of this controversy, can Defendants credibly claim they are harmed because the lawsuit is long removed by events.  Plaintiffs filed an action in this court based on alleged misrepresentations in the Official Statement in November 2000, within a year of the announcement of Bradford College's closing.  See Amended Complaint, ¶ 79. SAC, ¶ 114.  In order to induce the Plaintiffs to dismiss their timely complaint, the Defendants entered into a six month tolling agreement and agreed to pay Plaintiffs' attorneys fees in drafting and filing the complaint.  Six months later, Defendants signed a unlimited tolling agreement.  If Defendants were truly interested in a quick determination of their liability they would have never entered in two tolling agreements, and at a minimum would have capped the time necessary for Plaintiffs to file an action.  When Defendants intelligently and deliberately waived the short limitations period of the securities laws, they  hardly complaint they are prejudiced when it takes a little time to reach a just resolution.[5]

The only prejudice they can claim is that they have been deprived of the procedural advantages of the PSLRA.  But as demonstrated above, the PSLRA does not immunize them from the bedrock principles of Rule 15(a).  Defendants may be entitled to make the Plaintiffs meet the highest pleading standard to proceed, but they are not entitled to limit the Plaintiffs to one attempt

---

[5]        It is also not a sufficient ground to deny an amended complaint because the case is more than two years old.  After the Plaintiffs served the Defendants in late October, 2004, it took Defendants four months to respond to file their motions to dismiss.  Plaintiffs did require two months to respond to the three motions to dismiss, but such a response period is not exceptional when the Plaintiffs were faced with over 120 pages of briefing.  It took five months from the filing of Plaintiff's opposition to get a hearing before the Court and almost a year to get a decision.  There may have been delays progress of this action, but little of it is attributable to the Plaintiffs.

to meet that burden. The vast majority of cases allow the Plaintiff at least a second opportunity to plead a viable claim.

Defendants will likely ask the Court to follow In re Stone & Webster Inc. Securities Litigation, 217 F.R.D. 96 (D. Mass. 2003) rev. in part on other grounds, 414 F.3d 187 (1st Cir. 2005), where Judge Lindsay refused to permit the Plaintiffs to amend their complaint to add additional facts after he had dismissed most of their securities claims. Yet, if one reads the full opinion, it is clear that what particularly perturbed the Court was a sense of gamesmanship that is wholly lacking here.

> The fact that the plaintiffs chose to oppose the motions to dismiss on the grounds that their complaint was, in their view, sufficiently pleaded, rather than providing the additional information known to them during the necessarily lengthy period during which the motions to dismiss were being considered, smacks of gamesmanship bordering on bad faith. . . . Considerable effort of the parties and the court was expended in the disposition of the motion to dismiss: the papers of the parties in support of and in opposition to the motion, the relevant documents at issue, and the pertinent cases created a veritable mountain of documents--a mountain that I laboriously climbed more than once. I also note that counsel for the plaintiffs had several contacts with the court during the pendency of the motions to dismiss, including the filing of four motions for leave to file notices of supplemental authority and a letter that was dated one week before I issued my memorandum and order. . . .To hold back facts the plaintiffs now characterize as helpful or even crucial to their case, all the while filing updates regarding the state of the law and checking in on the progress of the decision on the motions to dismiss and the hundreds of pages of briefing and other materials engendered thereby, strikes me as precisely the sort of "undue delay" that should result in a denial of leave to amend.

Plaintiffs here did not defend on the ground that all aspects of the Complaint was adequately plead. Their brief expressly noted some shortcomings and is replete with footnotes documenting facts that could be added to meet the alleged shortcomings. Rather than holding back facts, Plaintiffs outlined the additional facts they believe established their case. While no formal motion was filed, the briefs had a separate section requesting leave to amend and counsel at oral argument specifically discussed

additional facts that would meet alleged pleading deficiencies.[6]  It also appears to have been

significant in Stone & Webster that the Plaintiffs delayed in seeking an amendment even after the

motion to dismiss was decided.  The Court there did not fully dismiss all of the claims when it ruled

on the motions to dismiss, but the plaintiffs waited until the remaining claims were about to be

resolved by summary judgment before asking for leave to amend.

The Court in Stone & Webster faced disingenuous conduct that distinguishes that action from

the one at bar.[7]  To the extent Judge Lindsay relied on District Court opinions from other states that

justified limiting amendments based on the PSLRA, those cases are now erroneous in light of the

more recent Court of Appeals decisions in Eminence Capital and Belzian.  Indeed, Judge Lindsay's

opinion has only been cited once, and that Court refused to follow his lead.  Winer Family Trust v.

Queen, 2005 WL 102936 (E.D. Pa. 2005) * 3-4.  Under well-established principles of Rule 15(a)

jurisprudence, Plaintiffs' conduct does not provide a basis to deny the requested amendment.

## III.    AMENDMENT IS NOT FUTILE BECAUSE THE PROPOSED SECOND AMENDED COMPLAINT CURES THE PLEADING DEFICIENCIES CITED BY THE COURT IN THE MEMORANDUM

The final ground for possibly denying the motion is futility of amendment.  The Court,

however, did not state in the Memorandum that amendment was futile and the allegations in the

proposed Second Amended Complaint cure the deficiencies noted by the Court in the Memorandum.

---

[6]      It's also significant to note that even if the Plaintiffs had amended the Complaint based on the alleged deficiencies originally outlined in the Defendants' motions they still would not have included all of the facts necessary to address the Court's concerns.  Defendants' argument that the extent of attrition was sufficiently disclosed in the Official Statement because the current enrollment figures could be compared against the size of the last several years freshman classes was adopted by the Court in its Memorandum at p.8.  But that argument was never expressed in writing, either in the principal briefs or the reply briefs; it was brought up for the first time at oral argument.  There are some perceived pleading deficiencies that a party simply cannot foresee until the Court issues an opinion.

[7]      Conduct bordering on bad faith is a sufficient reason, by itself, to deny a requested amendment and explains why the First Circuit found no abuse of discretion when it reviewed the lower court's refusal to amend the complaint.  In re Stone & Webster, Inc. Securities Litigation, 414 F.3d 187, 215 (1st Cir. 2005)

Plaintiffs will address each of the alleged misrepresentations in the order set forth in the Memorandum.

Attrition:      Notwithstanding any specific disclosures Official Statement relating to the serious attrition situation at Bradford, the Court found the table entitled "Admission Trends" adequate disclosure because an investor could compare the size of the entering classes to the current number of students and calculate an attrition rate of approximately 40%. Memorandum at 8. The Second Amended Complaint explains why the statistics in the Admissions Trend chart were misleading and why the difference between the actual attrition rate, and the rate calculated by the Court was material.

The number of upperclassmen disclosed in the Admissions Trend chart includes returning students and transfers; by amalgamating these two groups of students it appeared a far greater percentage of freshmen had remained at the College. (SAC, ¶ 60). In fact, the attrition rate was not 30 or 40%, which is the rate derived from the Admission Trend table, but as much as 64% for the last year for which statistics were available. SAC, ¶ 53, 58. While a 40% rate over three years is not unusual, a 60 to 65% rate was extraordinary. SAC, ¶ 61. Moreover, if an investor attempted to predict enrollment based on a 40% attrition rate as opposed to a 60% attrition rate, he would be off by 46-71 students in the senior class alone. SAC, ¶ 61.

The Second Amended Complaint also discloses that attrition was an important factor to bond professionals who examine the rate to determine if there is sufficient demand for the institution; a highly relevant fact when considering a college that requires extensive growth to repay the bonds. SAC, ¶ 57.

To establish scienter, the new allegations set forth that Advest and the College's Officers had a chart setting forth the actual attrition rates, that they provided it to Standard & Poor's to obtain a bond rating, but deliberately refused to include the information (or closely related information such as the college's graduation rate within 5 or 6 years) because it would reflect poorly on the college. SAC, ¶ 58, 62.

Enrollment. The Court discounted the Amended Complaint's allegation that the College's decision to accept web applications artificially inflated the application numbers disclosed in the Official Statement on the ground that it was "supposition rather than fact." Memorandum at 9. The Second Amended Complaint demonstrates it was the opinion of the admission staff itself that acceptance of web applications inflated the numbers, and describes how the former head of admissions deliberately counted as web submission that were incomplete as "applications". Historically, similar submissions had been classified as only "inquiries". SAC, ¶ 87. The Court also found that there was no support for the allegation that the quality of students had declined. Memorandum at 9. The Second Amended Complaint explains that at the time of the bond issuance, the College had accepted far fewer applicants despite its receipt of far more applications. SAC, ¶ 88. Had the College disclosed the reduced acceptance rate investors would have been able to accurately predict the College's shortfall of new students by simply applying historic averages that were disclosed. SAC, ¶ 89. The Second Amended Complaint also identifies several internal documents and presentations that support these claims. SAC, ¶¶ 87-89.

The Court disregarded the Plaintiffs' claim that the failure to disclose the College had a 20% reduction in deposits was material because the basis of the statistic was not disclosed. The reports to the Trustees and Officers from which this percentage was taken (and additional reports to the

College Officers and Trustee disclosing a reduced number of students placing deposits) are now fully identified. SAC, ¶ 90. And what the Court deemed to be the "most telling" flaw in the Plaintiff's enrollment argument–their failure to allege that the College failed to meet its disclosed goal of 225 new students–is also corrected. The Second Amended Complaint alleges that the College failed to meet its freshman goal by 21 students, and its goal for total enrollment by 82 students. SAC, ¶ 99.

The Second Amended Complaint also contains powerful allegations that the Defendants knew the student enrollment goals would not be met before the Bonds were issued. Based, in part, on new evidence that the Plaintiffs discovered after the motions to dismiss were briefed, the complaint now alleges that on May 8, 1998, just five days before the Closing, the CFO of the College informed the Trustees, that based on the most recent information, the College expected it would miss its fall enrollment target for returning students by 30 seats. SAC, ¶ 49, 84.

There are many allegations strengthening Plaintiffs' showing of scienter relating to this misrepresentation, including:

- Defendant Short admitted to a reporter for the Chronicle of Higher Education that the College's disclosed goal of increasing enrollment to 725 students "clearly wasn't realistic." SAC, ¶ 79.

- Defendant Kiszka admitted to the same reporter that at the time the bonds were issued it was "impossible" predict Bradford's enrollment. The College never knew what its enrollment would be until August 1. SAC, ¶ 80.

- The assumptions behind projections of the fall enrollment were obviously unreliable. The projections wholly ignored the College's historic attrition rates when predicting the numbers of returning students. In the face of years of evidence of losses of returning juniors, the projections predicted that number of seniors would increase. SAC, ¶ 85.

Financial Aid: With regard to Plaintiffs' allegations regarding financial aid misrepresentations, the Court questioned the materiality of the misrepresentation and the sufficiency of allegations from which scienter could be inferred. The specific shortcomings identified by the Court have been corrected and more detail relating to the financial aid allegations has been added.

With regard to the current fiscal year, 1997-1998, the the Second Amended Complaint describes how the Bradford chief financial officer, Kiszka, calculated the expected percentage of financial aid using numbers all of the Defendants knew were wrong. Instead of using the numbers provided by the Bradford Admissions Department, which was in charge of distributing financial aid, Kiszka used his own, lower numbers. SAC, ¶ 65. Had Kiszka used the proper numbers, they would have reflected that the percentage of student revenue lost by financial aid awards was increasing, not decreasing as claimed by the Official Statement. SAC, ¶ 65. Further, when Kizcka revised his budgets in January and April, 1998, the aid percentage increased above the level ultimately disclosed in the Statement, but Kiszka kept the percentage from his prior budget calculation. SAC, ¶ 66.

The Second Amended Complaint also alleges the Defendants deceptively failed to disclose the substantial difference between the amounts of aid awarded to new students as opposed to returning students, approximately $1,000 per student. The Official Statement's expectation that aid funding in the present year would be lower, in conjunction with the disclosure of a record number of new students gave the appearance that the College could increase enrollment without using aid as a financial incentive. In fact, the opposite was true; record levels of aid were necessary to attract the new class. SAC, ¶ 68. All defendants were aware of the large amount of aid necessary to attract the new class, but none of them were willing to disclose these figures.

The Second Amended Complaint provides further details regarding why the prediction of the level of aid for the upcoming year were also fraudulent. Defendants were aware of the existence of at least three new aid programs that would expand the number of students on aid and increase aid awards to certain scholarship recipients. These program expansions would result in more than a half a million dollars in new aid being awarded. SAC, ¶ 71. Yet none of the budgets for 1998-99 that were used to draft the Official Statement reflected theses expansions of aid. SAC, ¶ 72.

The Complaint states in greater detail how much of the financial aid for 1998-99 had already been committed in May 1998, and that based on these awards, the Defendants knew (or were reckless in not knowing) that the expected percentage of aid awarded as a percentage of student income was grossly understated. In fact, although the College anticipated an enrollment 15% greater than it achieved, it exceeded the aid budget for a much larger class by $280,000. In other words, had the budgets properly projected the fall class' enrollment, the financial aid budget would have been exceeded by $1.26 million. SAC, ¶ 73. The new allegations also describe what the Defendants knew about the understatement, and what they should have know with a minimum of inquiry. SAC, ¶ 73-74.

One of the principal reasons for the substantial understatement of the 98-99 financial aid level, according to the Second Amended Complaint, was that contrary to the disclosures in the Official Statement, there was no program to shift students from Bradford provided aid to loans. Indeed, there were no controls on the financial aid staff at all regarding the use of aid to attract students. SAC, ¶ 70. The Second Amended Complaint describes why the Defendants were either aware of the non-existence of these programs or reckless in failing to be aware of them. Id.

Lack of a Stategic Plan: The Second Amended Complaint does not make any significant changes to these allegations.

The College's Equity Contribution: The Court dismissed these alleged misrepresentations on the ground an informal committee's recommendation in February 1998 is insufficient evidence of the Trustee's intent in May 1998. The new allegations plainly allege that the Finance Committee of the Board of Trustee's was not an "informal" committee, but subgroup of the Trustees who had special expertise in finance and whose recommendations were invariably adopted by the Trustees. SAC, ¶ 94. The Complaint further states that the full board adopted the Committee's recommendation when the Board authorized Bradford to go forward with the bond issue and the Committee's instruction to senior management of the College was never rescinded. SAC, ¶ 95.

Financial Instability: The Amended Complaint contained an introductory section entitled "Financial Instability" which did not make any specific allegations of misrepresentation. That section is expanded in the Second Amended Complaint and alleges that the Defendants were aware that as a result of Kiszka's announcement at the May 8, 1998 Trustee's Meeting that the College would not meet its enrollment targets by 30 students, the Trustees and Kiszka agreed that $300,000 in budget cuts had to be made immediately. SAC, ¶ 49. The Second Amended Complaint alleges that at the time of the announcement the Trustees and Kiszka knew that the cuts would likely mean that programs and positions identified as critical to the College only two weeks earlier would likely be cut, as well as cuts in the College's recruiting and marketing programs that were critical to meet the aggressive growth goals outlined in the Official Statement. SAC, ¶ 50-51. The Trustees were also aware that it was likely the College would cut (as it ultimately did) Student Affairs programs that the Official Statement identified as important goals for the College. SAC, ¶ 52. Although the

Trustees and Officers knew the cuts would affect the ability of the College to achieve their operational and financial goals, the cuts were not disclosed in the Official Statement. SAC, ¶ 52.

The new allegations, if permitted, plainly correct any pleading flaws in the earlier complaint and state actionable claims for misrepresentation. Accordingly, the Plaintiffs' proposed amendment is not futile.

## IV.    NEW EVIDENCE IS AN ADDITIONAL GROUND FOR VACATING THE JUDGMENT AND ALLOWING AN AMENDMENT TO THE COMPLAINT

Rule 59(e) also permits alteration of a judgment in the event of the discovery of new evidence. This is an additional ground for vacating the judgment and permitting an amended complaint. Here, the allegations in the Second Amended Complaint regarding the directors and officers' knowledge on May 8, 1998 that Bradford would fail to meet its enrollment targets in the fall by 30 students are a direct result of information the Plaintiffs' attorneys learned after they filed their opposition to Defendants' Motions to Dismiss in May 2005

In May 2005, Plaintiffs' counsel received a call from Brenda Smith, a former officer of Bradford who had been retained by the bankruptcy estate to assist in the College's liquidation of assets. Ms. Smith informed Plaintiffs' counsel that the College intended to sell the building where the College stored its remaining administrative records, and the College was offering the Plaintiffs the opportunity to select which boxes they would like to have preserved for the litigation. Anything not selected would be destroyed. A similar message was communicated to counsel for the Bradford Officers and Trustees. On a mutually convenient date in June 2005, counsel for the Plaintiffs, Michael Tabb and Thomas Hoffman, joined counsel for the Bradford Defendants in Haverhill to jointly examine the remaining records.

The attorneys spent a full day reviewing approximately 150 boxes, and agreed to preserve between 55 and 60 boxes. While Mr. Tabb was working with the Bradford Defendants' counsel, Mr. Hoffman examined the contents of some of the boxes. He discovered the box containing the records of the Trustees from the relevant time period. Included in one box was a letter from the fall of 1998 from Defendant Sughrue, Chair of the Board of Trustees, to Kiszka, regarding the financial crisis caused by the Fall 1998 enrollment shortfall. In the letter, Ms. Sughrue expressed her frustration and vexation that the Board of Trustees had first been informed about the expected shortfall of students at the May 8, 1998 Trustee's meeting. Among other things she expressed the opinion that the Board of Trustees should have been informed about the likely enrollment shortfall earlier. See Affidavit of Thomas Hoffman In Support of T. Rowe Plaintiffs' Motion To Vacate Dismissal, ¶ 3 ("Hoffman Affidavit").

Ms. Sughrue's letter was the first time the Plaintiff's attorneys were aware that the trustees and the officers knew with near certainty that the College would not meet the enrollment goals which were the basis of the projections in the Official Statement. Prior to that, the Plaintiff's attorneys were aware of discussion at the May Trustee's meeting that a revised budget should be prepared in order to have a sufficient reserve if the College missed its goal by 25 to 30 students. But none of the minutes indicated that the College's officers had informed the Board that it was likely that the enrollment targets will not be met. Hoffman Affidavit, ¶ 4. The Sughrue letter caused the Plaintiff's attorneys to review all the records they possessed regarding the May 1998 Trustees' meeting and the budget cuts enacted as a result of that meeting in a new light. This has resulted in many of the new allegations relating to Defendants' knowledge that they would not meet the enrollment goals and the effect of the budget cuts.

Plaintiffs do not have a copy of the Sughrue letter.  They did not bring a copying or scanning equipment with them, knowing that the boxes with important evidence would be preserved.  In Haverhill, counsel agreed the documents should be stored at the offices of Bradford's bankruptcy counsel, Gadsby and Hannah (now McCarter & English).  After the boxes were transferred, however, counsel for Bradford would only allow Plaintiffs access to the boxes if there was agreement regarding access with Defendants' counsel.  Counsel for the Bradford Defendants refused to permit such access, citing the mandatory discovery stay under the PSLRA, notwithstanding the fact that Plaintiff's counsel had examined documents at Haverhill.  Plaintiffs' counsel are aware that important evidence concerning Defendants' scienter is contained in the records of the Trustees.

Because new evidence exists which was not available to the Plaintiffs' prior to the submission of their opposition to the motions to dismiss, the motion to vacate judgment should be allowed so Plaintiffs may incorporate that evidence in an amended pleading.

## CONCLUSION

WHEREFORE, for the reasons set forth above, Plaintiffs motions to vacate the order of dismissal and Plaintiffs' motion for leave to amend their complaint should be allowed.

By their attorneys,

**T. ROWE PRICE TAX-FREE HIGH
YIELD FUND, INC., SMITH BARNEY
INCOME FUNDS/SMITH BARNEY
MUNICIPAL HIGH INCOME FUND,
DRYDEN NATIONAL MUNICIPALS
FUND, INC., LOIS and JOHN MOORE,
and ACA FINANCIAL GUARANTY
CORPORATION**


**/s/ Michael Tabb**
**Thomas Hoffman, Esq.  BBO # 237320**
**Michael Tabb, Esq. BBO # 491310**
**Greene & Hoffman, P.C.**
**125 Summer Street, 14th Floor**
**Boston, Massachusetts  02110**
**(617) 261-0040**

**Date: October 20, 2006**

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be send to those indicated as non-registered participants on October 20, 2006

**/s/ Michael Tabb**