**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

DENISE MCKEOWN and ROBERT LUTTS

*Plaintiffs*

v.                                                                    Civil Action No.: 05-10176-RGS

ADVEST, INC., et. al.

*Defendants*

Consolidated With

T. ROWE PRICE TAX-FREE HIGH YIELD
FUND, INC. et al.

*Plaintiffs*,                                               Civil Action No.: 04-11667 RGS

v.

KAREN M. SUGHRUE, et. al.,

*Defendants*.

**ASSENTED TO MOTION TO SUBSTITUTE A CORRECTED VERSION OF THEIR
PROPOSED SECOND AMENDED COMPLAINT**

Plaintiffs T. Rowe Price Tax-Free High Yield Fund, Inc., Smith Barney Income Funds/Smith

Barney Municipal High Income Fund, Dryden National Municipals Fund, Inc., Lois and John Moore,

and ACA Financial Guaranty Corporation (the "T. Rowe Plaintiffs") request leave to substitute a

corrected version of their proposed second amended complaint for the one originally filed as Exhibit

A to the T. Rowe Plaintiffs' Motion for Leave to File a Second Amended Complaint on October 20,

2006. In support thereof, the T. Rowe Plaintiffs state as follows:

1.        On October 20, 2006, the T. Rowe Plaintiffs filed a motion for leave to file a second

amended complaint and attached their proposed amended complaint as Exhibit A. Due however to

a software failure just 90 minutes prior to the filing deadline, Plaintiffs were unable to proofread the

last few pages of the Complaint.  There are a few typos commencing at paragraph 140 and the original version does not contain page numbers.

2.      Additionally, the T.  Rowe Plaintiffs have discovered an error in paragraph 107, which stated that the Moore's purchased their Bradford Bonds on August 27, 1998.  The correct date was August 27, 1999.

3.      The T.  Rowe Plaintiffs desire to substitute a corrected version of the Proposed Second Amended Complaint for the one originally filed.  A copy of the corrected [Proposed] Second Amended Complaint is attached as Exhibit A.  Defendants have no objection to  substituting a corrected version of the proposed pleading and have assented to this motion.

WHEREFORE, for the reasons set forth above the Court should allow the T.  Rowe Plaintiffs to file a corrected [Proposed] Second Amended Complaint and substitute it for the one originally filed on October 20, 2006 as Exhibit A to the T.  Rowe Plaintiffs' Motion For Leave To File a Second Amended Complaint.

By their attorneys,


T. ROWE PRICE TAX-FREE HIGH
YIELD FUND, INC., SMITH BARNEY
INCOME FUNDS/SMITH BARNEY
MUNICIPAL HIGH INCOME FUND,
DRYDEN NATIONAL MUNICIPALS
FUND, INC., LOIS and JOHN MOORE,
and ACA FINANCIAL GUARANTY
CORPORATION


/s/ Michael Tabb
Thomas Hoffman, Esq.  BBO # 237320
Michael Tabb, Esq. BBO # 491310
Greene & Hoffman, P.C.
125 Summer Street, 14th Floor
Boston, Massachusetts  02110
Date: November 29, 2006          (617) 261-0040

Certificate of Service

      I hereby certify that this document filed through the ECF system will be sent electronically
to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies
will be sent to those indicated as non-registered participants on November 29, 2006


                              **/s/ Michael Tabb**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC., SMITH BARNEY INCOME FUNDS/SMITH BARNEY MUNICIPAL HIGH INCOME FUND, DRYDEN NATIONAL MUNICIPALS FUND, INC., LOIS AND JOHN MOORE AND ACA FINANCIAL GUARANTY CORPORATION<br><br>*Plaintiffs*,<br><br>v.<br><br>KAREN M. SUGHRUE, GARRY L. CRAGO, JEAN W. CHILDS, PAULA EDWARDS COCHRAN, G. STEVENS DAVIS, JR., JULIA B. DEMOSS, WILLIAM R. DILL, LESLIE A. FERLAZZO, JOYCE SHAFFER FLEMING, ERIC W. HAYDEN, CATHERINE CHAPIN KOBACKER, ANNE MARCUS, CELESTE REID, RICHARD J. SHEEHAN, JR., JOSEPH SHORT, GREGORY E. THOMAS, SUSAN K. TURBEN, DONALD W. KISZKA *and* ADVEST, INC.,<br><br>*Defendants*. | Civil Action No. 04-11667 RGS<br><br><br><br>PLAINTIFFS DEMAND A JURY TRIAL ON ALL COUNTS |

## [PROPOSED] SECOND AMENDED COMPLAINT

Plaintiffs T. Rowe Price Tax-Free High Yield Fund, Inc., Smith Barney Income Funds/Smith Barney Municipal High Income Fund, Dryden National Municipals Fund, Inc. and Lois and John Moore (collectively, "the Bondholders") and Plaintiff ACA Financial Guaranty Corporation by their undersigned attorneys, bring this action for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, Section 12(a)(2) of the Securities Act of 1933 and violations of Massachusetts statutory and common law and allege as follows:

## SUMMARY OF THE ACTION

1.     This is an action brought by purchasers of Massachusetts Industrial Finance Agency Revenue Bonds, Bradford College Issue, Series 1998 (the "Bonds") and an insurer of some of the Bonds.  The Defendants in this action are the trustees of Bradford College (the "College"), its past President and Chief Financial Officer, and the underwriter of the Bonds.

2.     The issuance of the Bonds more than doubled the outstanding debt of the College. As municipal bonds issued by an instrumentality of the Commonwealth of Massachusetts for the benefit of a non-profit institution, the Bonds were exempt from the various registration requirements of the Securities Act of 1933, 15 U.S.C. §§ 77a, *et seq*., and those of the Massachusetts Securities Act, Mass. G.L. c. 110A.  Rather, the Bonds were offered by means of an official offering statement dated May 1, 1998 (the "Official Statement") prepared by the sole underwriter of the offering, Defendant Advest, Inc. ("Advest").  This Official Statement contained numerous inaccurate and misleading statements, as alleged below.

3.     The Official Statement misleadingly failed to disclose that the College was mired in an ongoing fiscal, financial, and operational crisis.  As set forth in detail below, this crisis resulted from, *inter alia*, an abysmal 40% student retention rate, huge (and increasing) reductions to tuition revenue in the form of financial aid awards, and the complete absence of a viable strategic plan to address these and other problems.  In fact, the Defendants' own analysis, which was not disclosed, concluded that the College had sufficient resources to survive, at most, another 2 to 5 years.  In view of the College's dismal prospects for survival, the Defendants were constrained to resort to misrepresentations, omissions, and half-truths in the Official Statement in order to raise almost $18 million in debt financing that the College could not hope to repay.  The Defendants knew material

2

facts were omitted from the Official Statement or recklessly disregarded their obligation to include them.

4.    In particular, the Official Statement failed to make even the barest mention of the College's "severe and long-standing" student attrition crisis, and the enrollment figures presented in the Official Statement were accordingly misleading.  Similarly, the financial aid projections set forth in the Official Statement had no reasonable basis in reality; indeed, those projections were belied by the College's financial statements and by budgets prepared contemporaneously with the bond offering.  And contrary to the Official Statement's references to Bradford's "strategic plan" and ongoing "strategic initiatives," the College was in truth bereft of any plan to balance its budget and to staunch its operating losses.  Finally, the Official Statement misrepresented that the College had committed to contribute its own funds toward the construction project financed by the Bonds, when in reality the Defendants had determined to cut corners on the project in order to place only the funds of the Plaintiffs at risk.

5.    The College's assumption of this bond debt accelerated and exacerbated its financial crisis.  Even when low enrollment in September 1998 precipitated yet another fiscal emergency, the College's trustees nevertheless unnecessarily continued to expend funds on new dormitories and thereby recklessly depleted the Bondholder's collateral.  Such reckless actions and omissions by the trustees, occurring at a time when the College was either insolvent or in the zone of insolvency, constituted a breach of their fiduciary duties to the Bondholders as creditors of the College.  Inevitably — and predictably — the College determined to shut down.  The Plaintiffs bring this action to recover their damages incurred as a result of the Defendants' violations and breaches.

3

<u>JURISDICTION AND VENUE</u>

6.      This Court has jurisdiction of the subject matter of this action pursuant to § 27 of the Securities Exchange Act of 1934, 15 U.S.C.§§ 78a, *et seq.* (the "Exchange Act"), 28 U.S.C. § 1331. The claims asserted herein arise under §§ 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1(a), § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the United States Securities Exchange Commission (the "SEC"). This Court has personal jurisdiction of each of the Defendants pursuant to § 27 of the Exchange Act. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this district pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b) and (c), because many of the Defendants' acts and transactions complained of herein occurred in this District. In connection with the acts and conduct alleged herein, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including interstate telephone communications and the United States mails.

<u>PARTIES</u>

*Plaintiffs*

8.      Bondholder Plaintiff T. Rowe Price Tax-Free High Yield Fund, Inc. ("T. Rowe"), is a tax-free high yield fixed-income investment fund incorporated in and having a principal place of business in the State of Maryland, and managed by T. Rowe Price Associates, Inc. T. Rowe holds Bonds in the principal amount of $6,000,000.

9.      Bondholder Plaintiff Smith Barney Income Funds/Smith Barney Municipal High Income Fund ("Smith Barney") is a municipal high yield fixed-income investment fund organized

4

in the Commonwealth of Massachusetts and having a principal place of business in the State of New York, and is managed by SSB Citi Fund Management Group.  Smith Barney hold Bonds in the principal amount of $ 2,345,000.

10.    Bondholder Plaintiff Dryden National Municipals Fund, Inc. ("Dryden"), formerly known as Prudential Municipal Series Fund, Inc. is a Maryland corporation with a principal place of business in New Jersey.  Dryden holds Bonds in the principal amount of $1,000,000.

11.    Bondholder Plaintiffs Lois and John Moore are individuals with a principal place of residence in Ipswich, Massachusetts.  Mr. and Mrs. Moore hold Bonds in the principal amount of $20,000.

12.    Plaintiff ACA Financial Guaranty Corp. ("ACA") is a Maryland corporation with a principal place of business in the State of New York.  ACA is the insurer of approximately $5.51 million in principal amount of the Bonds.

*Defendants*

13.    Defendant Advest is an investment banking firm that specializes, among other things, in underwriting offerings of securities.  Advest served as the sole underwriter of the College's May 1, 1998 bond offering.  As the sole underwriter, Advest was responsible for the preparation of the Official Statement for the sale of the Bonds, and received substantial fees out of the money raised in the bond offering.  Advest engaged and/or participated in the unlawful conduct alleged herein in order to, among other things, profit through its participation in the College's issuance of the Bonds. Advest is a Delaware corporation with a principal place of business in Hartford, Connecticut. Advest also maintains an office in Boston, Massachusetts, and the Bonds were offered to the public from Advest's Boston office.

5

14.    Defendant Karen M. Sughrue is, upon information and belief, a resident of the State of New York.  At all times relevant to this complaint, Defendant Sughrue was a trustee of the College.  As of February 6, 1998, Defendant Sughrue was the Chair of the Board of Trustees, a member of the Executive Committee of the Board of Trustees, an *ex officio* member of all other committees of the Board of Trustees, and an officer of the College.

15.    Defendant Garry L. Crago is, upon information and belief, a resident of the Commonwealth of Massachusetts.  At all times relevant to this complaint, Defendant Crago was a trustee of the College.  As of February 6, 1998, Defendant Crago was the Vice-Chair of the Board of Trustees, the Chair of the Enrollment Management Committee of the Board of Trustees, the Vice-Chair of the Buildings and Grounds Committee of the Board of Trustees, and a member of the Executive and Finance Committees of the Board of Trustees.

16.    Defendant Jean W. Childs is, upon information and belief, a resident of the Commonwealth of Massachusetts.  At all times relevant to this complaint, Defendant Childs was a trustee of the College.  As of February 6, 1998, Defendant Childs was the Vice-Chair of the Institutional Advancement Committee of the Board of Trustees, and a member of the Enrollment Management Committee and the Buildings and Grounds Committee of the Board of Trustees.

17.    Defendant Paula Edwards Cochran is, upon information and belief, a resident of the State of Florida.  At all times relevant to this complaint, Defendant Cochran was a trustee of the College.  As of February 6, 1998, Defendant Cochran was the Chair of the Membership and Trustee Development Committee of the Board of Trustees, and a member of the Executive, Buildings and Grounds, and Institutional Advancement Committees of the Board of Trustees.

18.     Defendant G. Stevens Davis, Jr. is, upon information and belief, a resident of the State of New Hampshire.  At all times relevant to this complaint, Defendant Davis was a trustee of the College.  As of February 6, 1998, Defendant Davis was the Chair of the Buildings and Grounds Committee of the Board of Trustees, and a member of the Executive, Enrollment Management, and Finance Committees of the Board of Trustees.

19.     Defendant Julia B. DeMoss is, upon information and belief, a resident of the Commonwealth of Pennsylvania.  Defendant DeMoss has been a trustee of the College since February 4, 1998.

20.     Defendant William R. Dill, Ph.D., is, upon information and belief, a resident of the State of Maine.  At all times relevant to this complaint, Defendant Dill was a trustee of the College. As of February 6, 1998, Defendant Dill was the Chair of the Academic Affairs Committee of the Board of Trustees, and a member of the Executive, Finance, and Membership and Trustee Development Committees of the Board of Trustees.

21.     Defendant Leslie A. Ferlazzo is, upon information and belief, a resident of the Commonwealth of Massachusetts.  At all times relevant to this complaint, Defendant Ferlazzo was a trustee of the College.  As of February 1997, Defendant Ferlazzo was the Chair of the Board of Trustees, an *ex officio* member of all of the committees of the Board of Trustees, and an officer of the College.  As of February 6, 1998, Defendant Ferlazzo was the Vice-Chair of the Finance Committee of the Board of Trustees, and a member of the Institutional Advancement and Membership and Trustee Development Committees of the Board of Trustees.

22.     Defendant Joyce Shaffer Fleming is, upon information and belief, a resident of the State of Michigan.  Defendant Fleming has been a trustee of the College since February 4, 1998.

7

23.     Defendant Eric W. Hayden is, upon information and belief, a resident of the Commonwealth of Massachusetts.  At all times relevant to this complaint, Defendant Hayden was a trustee of the College.  As of February 6, 1998, Defendant Hayden was the Chair of the Finance Committee of the Board of Trustees, the Vice-Chair of the Student Affairs Committee of the Board of Trustees, and a member of the Executive and Academic Affairs Committees of the Board of Trustees.

24.     Defendant Catherine Chapin Kobacker is, upon information and belief, a resident of the State of Ohio.  At all times relevant to this complaint, Defendant Kobacker was a trustee of the College.  As of February 6, 1998, Defendant Kobacker was the Vice-Chair of the Membership and Trustee Development Committee of the Board of Trustees, and a member of the Institutional Advancement and Student Affairs Committees of the Board of Trustees.

25.     Defendant Anne Marcus is, upon information and belief, a resident of the State of Connecticut.  At all times relevant to this complaint, Defendant Marcus was a trustee of the College.  As of February 6, 1998, Defendant Marcus was the Chair of the Student Affairs Committee of the Board of Trustees, the Vice-Chair of the Enrollment Management Committee of the Board of Trustees, and a member of the Executive and Finance Committees of the Board of Trustees.

26.     Defendant Celeste Reid, a/k/a Celeste Reid Lee, is, upon information and belief, a resident of the Commonwealth of Massachusetts.  Defendant Reid has been a trustee of the College since February 4, 1998.

27.     Defendant Richard J. Sheehan, Jr., is, upon information and belief, a resident of the Commonwealth of Massachusetts.  Defendant Sheehan has been a trustee of the College since February 4, 1998.

8

28.     Defendant Gregory E. Thomas is, upon information and belief, a resident of the Commonwealth of Massachusetts.  At all times relevant to this Complaint, Defendant Thomas was a trustee of the College.  As of February 6, 1998, Defendant Thomas was a member of the Academic Affairs, Enrollment Management, and Student Affairs Committees of the Board of Trustees.

29.     Defendant Susan K. Turben, Ph.D., is, upon information and belief, a resident of the State of Ohio.  At all times relevant to this complaint, Defendant Turben was a trustee of the College.  As of February 6, 1998, Defendant Turben was the Chair of the Institutional Advancement Committee of the Board of Trustees, the Vice-Chair of the Academic Affairs Committee of the Board of Trustees, and a member of the Executive and Finance Committees of the Board of Trustees.

30.     Defendant Joseph Short is, upon information and belief, a resident of the Commonwealth of Massachusetts.  From 1989 until about July 1998, Defendant Short was both a trustee and the President of the College, and an *ex officio* member of each of the committees of the Board of Trustees.

31.     Defendants Sughrue, Crago, Childs, Cochran, Davis, DeMoss, Dill, Ferlazzo, Fleming, Hayden, Kobacker, Marcus, Reid, Sheehan, Thomas, Turben and Short are collectively referred to as the "Trustee Defendants."

32.     Defendant Donald W. Kiszka is, upon information and belief, a resident of the Commonwealth of Massachusetts.  From 1989 until about August 1999, Defendant Kiszka was the Vice President for Administration and Finance, as well as the Treasurer, of the College.  Defendant Kiszka was also an officer of the Board of Trustees of the College.  Defendants Kiszka and Short are sometimes collectively referred to as the "Officer Defendants."

33.     As officers, trustees and/or controlling persons of an entity which is governed by

certain provisions of the federal and state securities laws, and in connection with the sale of the Bonds, along with Defendant Advest, the Officer and Trustee Defendants had a duty timely to disseminate accurate and truthful information with respect to the College's operations, finances, administration, and performance; to correct any previously issued statements from any source that have become materially misleading or untrue; and to disclose any trends or developments that would have materially affected the College's ability to meet its obligations under the Bonds.   The Defendants' representations, acts and omissions violated these specific requirements and obligations.

34.    Defendants Short and Kiszka participated in the drafting, preparation and/or approval of the Official Statement and were aware of or recklessly disregarded the misstatements contained therein and omissions therefrom, and were aware of their materially misleading nature.  Because of their Board membership and/or executive and administrative positions with the College, and their attendance at and participation in Board meetings, Defendants Short and Kiszka each had access to the adverse non-public information about the College's operational and financial condition, as particularized herein, and knew that those adverse facts rendered the positive statements made by and about the College and its operational and financial condition materially false and misleading.

35.    The Trustee Defendants participated in the drafting, preparation and/or approval of the Official Statement and were aware of or recklessly disregarded the misstatements contained therein and omissions therefrom, and were aware of their materially misleading nature.  Because of their membership on the Board of Trustees of the College, and their attendance at and participation in Board meetings, the Trustee Defendants had access to the adverse non-public information about the College's operational and financial condition, as particularized herein, and knew that those

adverse facts rendered the positive statements made by and about the College and its operational and financial condition materially false and misleading.

36.     Each of the Officer and Trustee Defendants had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related thereto. To discharge their duties, the Officer and Trustee Defendants were required to exercise reasonable and prudent supervision over the dissemination of information concerning the operations and financial reporting of the College. Defendants Short and Kiszka, by virtue of their high level positions with the College, directly participated in the administration of the College, were directly involved in the day-to-day operations of the College at the highest levels and were privy to confidential proprietary information concerning the College and its operating and financial condition as alleged herein. These Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements alleged herein, were aware that the false and misleading statements were being issued regarding the College and approved or ratified these statements, in violation of federal and state securities laws.

37.     By reason of their management positions and/or membership on the College's Board of Trustees, the Officer and Trustee Defendants were "controlling persons" within the meaning of § 20(a) of the Exchange Act, and were officers, directors or persons of a similar status or performing similar functions within the meaning of § 410(b) of Mass. G.L. Ch. 110A, and had the power and influence to direct the management and activities of the College and its employees, and to cause the College to engage in the unlawful conduct complained of herein.

11

38.    By reason of its direct participation in the preparation of the Official Statement, Defendant Advest was a broker-dealer or agent that materially aided in the sale of the Bonds within the meaning of § 410(b) of Mass. G.L. Ch. 110A.

## SUBSTANTIVE ALLEGATIONS

39.    The College is a private institution that operated continuously since its founding in 1803 until about June 2000, when it closed as the result of insolvency brought on by deficit spending, operating losses, negative cash flow, and the lack of a viable business plan.

40.    At all times during the relevant period, the College was governed by a Board of Trustees (the "Board"). The Board met three times per year. The Officer Defendants administered the day-to-day operations of the College.

41.    The College's primary source of operating revenue was tuition and fees paid by students enrolled at the College. The greater the number of enrolled students, the more revenue the College should have expected to collect to fund its operations.

42.    On February 6, 1998, Defendants Short, Kiszka and Advest recommended, and the Trustee Defendants voted to approve, a project of construction and renovation of dormitories on the campus of the College. The Trustee Defendants, on the recommendation of the Officer Defendants and Advest, further voted to authorize the issuance of bonds to finance the project, and to approve Defendant Advest as the underwriter for the bond offering. Authority of the Trustees was necessary to issue the bonds. Additionally, had the Trustees rescinded that authority, the issuance could not go forward. As described below, on May 8, 1998, the Trustees learned that the budgets that were the basis of the projection in the Official Statement would not be met and the College would not

12

meet the enrollment goal necessary to break even or even make debt service payments on the bonds. Nonetheless, the Trustee elected not to rescind their approval or postpone the bond issuance.

43.    The bonds authorized by the Trustee Defendants were intended to finance not only renovations to existing residence halls and construction of new residential facilities at the College, but also (i) the refunding of the College's then-outstanding 1995 bond debt of approximately $5.2 million; (ii) the establishment of a Debt Service Reserve Fund, out of which the College could make payments in service of the debt obligation created by means of the Bonds themselves; and (iii) the payment of $341,370 in costs of issuance of the bonds, including payment to Defendant Advest of fees in the amount of, upon information and belief, no less than $161,370.  All tolled, the total amount to be financed by means of the bonds was $17.93 million.

44.    The Bonds were secured by a lien on the College's tuition receipts, which in turn were dependent upon the College's level of enrollment.  The proceeds from the sale of the Bonds, after certain distributions, were deposited into a "Construction Fund" out of which the construction and renovation project costs were to be paid.  For so long as funds remained in it, the Construction Fund was available as collateral against the College's debt under the Bonds in the event that the College defaulted on a repayment obligation.  Thus, the more money that the College spent on the project, the less there was available to redeem the Bonds in the event of default.

45.    Defendant Advest determined that the $17.93 million financed under the Bonds represented the maximum bonding capability of the College.  This sum amounted to more than double the level of the College's total outstanding debt at that time.  The portion of the bond financing earmarked for the dormitory construction and renovation project, almost $11 million, was insufficient to cover the entire cost of that project.

13

*Defendants' False and Misleading Statements and Omissions*

46.    The Bonds were issued on May 13, 1998, pursuant to the Official Statement dated as of May 1, 1998.  (A true and correct copy of the Official Statement is attached hereto as Exhibit A.)  The Appendix to the Official Statement, which contained the disclosures relating to Bradford, was signed by Defendants Kiszka and Short but, as evidenced by the correspondence between Advest and the College, most of the Appendix was actually written by Advest, with Kiszka providing specific information about Bradford's operations as necessary.   Short and Kiszka approved all of the disclosures in the Appendix and authorized Advest to sign their names.

47.    As the underwriter for the Bonds, Advest had a continuing duty to conduct a reasonable investigation through the date of the offering.  It also could not rely solely on the representations of the officers at Bradford with whom it was dealing, Short and Kiszka, but had a duty to verify the information they provided.  Advest recklessly carried out these duties.  According to records of the College, Advest only visited the College twice.  It never critiqued or challenged any of the budgets or projections produced by the College, even though, as described below, some of the projections contained unreasonable assumptions.  It never requested contingency plans or alternative scenarios, even though it knew the College's plans for repayment of the borrowed funds depended upon an ambitious and unprecedented expansion program.  If Advest did not know of the Admissions data and the budgets that were circulated in month prior to the bond offering, it violated its duty to verify the most current information.  If it  was aware of the information, it permitted the Official Statement to be circulated notwithstanding its knowledge that the Statement contained false and materially misleading information.

14

48.     At the time of the offering, the College was mired in a financial and operational crisis, with little to no prospect of recovery; however, the Official Statement prepared by these Defendants recklessly and intentionally omitted any reference to such problems.  Rather, the Official Statement portrayed the financial and operational condition of the College as both stable and improving.  In particular, the Official Statement offered the following affirmative misrepresentations, misleading statements, and half-truths:

- "A portion of the proceeds of the Series 1998 Bonds, together with an equity contribution by the Institution [identified in table form as $1 million], will be used by the Institution for the construction or alteration of buildings . . . ."  (p. 10)

- "One of the goals of the Institution's strategic plan is to increase enrollment to at least 725 full-time students by the fall of 2000."  (p. 11)

- The Official Statement contains a table showing "Bradford College Fall Semester Enrollment Statistics" for the years 1993 through 1997, showing a growth in full-time equivalent enrollment from 484 to 584 students over that period.  (p. A-8)

- Another table in the Official Statement reports "Admissions Trends" over the same 1993-1997 period, showing new enrollment growth from 186 incoming freshman and transfer students in 1993 to 234 such students in 1997.  (p. A-8)

- "[D]uring the 1997-98 academic year, the College estimates that financial aid will be reduced to 29.9% of student income versus 30.3% the previous year.  This expected reduction is a result of change in methodology of aiding students with college-funded support versus additional loans funded by students and/or parents.  The College's financial plan currently calls for a further reduction of financial aid spending for 1998-1999 academic year to 28.8% of student income."  (p. A-13)

- "To attain the final goal of a balanced budget . . . the College is planning to increase enrollment to the level of at least 725 full-time students by fall 2000, with approximately 80% of those students living in campus facilities.  As of April 3, 1998,

15

applications received by the College to date total 879, an increase of more than 18% from April 3, 1997. " (p. A-13)

• "Based on this [18%] increase in applications [over 1997], historic rates for conversion of applications into enrollments, the number of applications from freshmen and deposits received to date, the College believes that it can reach its goal of enrolling 225 new students for the fall of 1998 while increasing the quality of it students and reducing slightly the average amount of financial aid awards to such students from College funds. If these goals are in fact met and if the College can otherwise successfully implement its budget, it expects to achieve a small operating surplus for the 1988-1999 fiscal year." (p. A-13)

• "The strategic initiatives of the College for the past two years and for the next three years [include]: . . . To increase net tuition revenues by close management of three variables: increased enrollment, prudent use of financial aid and setting of tuition and fee levels to attract students." (A-17)

46. The affirmative representations and statements made about the College by the Defendants in the Official Statement were each known to be, or were recklessly disregarded by the Defendants as being, false and misleading when made. As set forth more fully below, the true facts, which the Defendants knew but intentionally or recklessly concealed — and disclosure of which was necessary to make the affirmative statements not misleading — were that the College suffered from an abysmal student retention rate that was wholly ignored in the Defendants' enrollment projections and was blatantly omitted from any mention in the Official Statement; that the amount of College-funded financial aid had grown year after year, with no reasonable basis to represent that it might be reduced; that, as a result, even without regard to its obligation to repay the Bonds, the College's cash flow position — as confirmed by its own internal, but undisclosed, assessment in this time period — was such that the College could survive, at best, another 2-5 years; and that, notwithstanding the

16

Official Statement's references to "financial plans" or "strategic initiatives," the College lacked at that (or any) time a viable strategic plan to achieve any of its stated goals.

47.     <u>Financial Instability</u>.   The Official Statement contained no reference to the fiscal disasters that had plagued the College since Defendants Short and Kiszka took over in 1989, and that continued to plague the College through the issuance of the Bonds.   In particular, the Official Statement failed to disclose that the Trustee Defendants and Defendants Short and Kiszka had expressly identified the College's persistent negative cash flow situation as a critical problem that the College needed to resolve in order simply to survive.   The Official Statement omitted to discuss the assessment of the Trustee Defendants and the College's administration regarding the impact of this cash flow situation.   This matter was discussed at length at a meeting of the Board on February 6, 1997, only a year before the Trustee Defendants approved the bond offering.   This meeting was attended by Trustee Defendants Ferlazzo, Sughrue, Childs, Crago, Davis, Dill, Hayden, King, Marcus, Thomas, Turban, and Short, and by Defendant Kiszka.   Defendant Ferlazzo, at that time the Chair of the Board, stated:

> [T]he cash flow model indicates that the College may be able to survive for five more years.   To stem cash bleeding, however, which would occur in that period would be devastating to the faculty and staff in terms of no salary increases and other cost cutting measures.

However, even this view was overly optimistic according to the College's longtime chief financial officer, Defendant Kiszka:

> Vice President and Chief Financial Officer Don Kiszka, when asked about the financial "breathing room for the College," said that there is a possibility of the College surviving five years assuming more layoffs and no salary increases, but felt that it would be more like two or three years.   Looking at the bigger picture, layoffs and cutbacks would be very disruptive and send a bad message.

17

As events confirmed, this assessment by Defendant Kiszka of the current financial condition of the College and its prospects for survival — in contrast to the misrepresentations of the Official Statement, signed by Defendant Kiszka one year later — was entirely accurate.

48.     Thus, in 1997 the Trustee and Officer Defendants recognized that because of its cash flow problems the College could hope to survive, at the most, through the year 2001, assuming drastic and demoralizing cost-cutting measures were implemented.  Yet approximately one year later, having implemented no such widespread cost-cutting measures, and during the College's tenth consecutive year of budget deficits, these Defendants recommended and approved the issuance of the Bonds, thereby obligating the College to incur an additional cash flow drain of about $1.25 million annually through the year 2028.  This additional cash obligation was to be funded by tuition proceeds that were, in turn, dependent primarily upon two factors: the College's level of student enrollment, and the degree to which the College discounted its tuition revenues by funding financial aid awards to students.  Each of these factors was the subject of further misrepresentations and omissions in the Official Statement.

49.     The Official Statement stated that if the College met its recruitment goals and otherwise met its current budget, it expected to achieve a budget surplus for the upcoming fiscal year.  At the time the bonds were issued, the Officer and Trustee Defendants knew that notwithstanding the representations in the Official Statement, the College would not likely reach its admissions targets, its current budget for the upcoming fiscal year or financial equilibrium, as defined by the Official Statement.  At the May 8, 1998 Trustee's meeting, Defendant Kiszka informed Defendant Short and the entire Board of Directors that the College could would likely be

30 students short of their student enrollment goal in the Fall of 1998 and that the College would likely not meet its projected budget for the upcoming year. Defendant Kiszka informed Short and the Trustee Defendants, that in order to preserve an investment grade bond rating, the projected budget would have to cut by $300,000. The Trustees instructed the Officers to make the cuts.

50.     The College had gone through several rounds of painful budget cuts in the last several years and only a year earlier Kiszka and the Chair of the Board of Trustees had warned that further budget cuts would be devastating to the College. Although at the time of the bond issuance the Trustees and Officer Defendants did not know precisely which programs or positions would be cut, they knew from Kiszka's prior comments that such cuts would harm the College's academic programs, the marketing and admissions programs designed to increase enrollment and critical student programs needed to retain students. Indeed, only two weeks earlier, on April 28, 1998, in preparation for the May 8 Trustee's meeting, Kiszka circulated to Short and the Trustees a Preliminary Budget which recommended increases to the faculty, as well as increased funding and staffing for the library, the Academic Computer Center, Human Resources, Financial Aid Support and Student Services. Kiszka informed the Trustees that "these additions are deemed critical for the expansion of programs, maintain government regulations, support additional fund raising and maintain human resource development." Upon information and belief, Short, Kiszka and the Trustees knew, when they authorized substantial budget cuts on May 8, 1998 that many of these critical positions and programs would not be funded because it would be easier to make cuts by not hiring new (but necessary) positions instead of firing existing staff and faculty.

51.     When the revised preliminary budget was approved by the Trustees in June 1998, many of the "critical" additions to the budget were eliminated or deferred, including the faculty

positions and funding for the library and financial aid staffing.  Additionally, the Student Recruitment budget was cut by 22%, the advertising budget was cut by 18% and the Student Affairs budget was cut by $48,000, with a substantial cut to the athletic programs.  These areas were essential to the College attracting (and retaining) the substantial quantity of new students it needed to pay the debt service on the Bonds.

52.    The Official Statement disclosed that the College believed it could meet financial equilibrium if it met its current budget.  When the bonds were issued, the Bradford Defendants knew that the College would not meet its current budget and that a revised budget would likely impair the College's academic programs and its plans to attract and retain students.  Nonetheless, the Official Statement made no reference the budget cuts or the unlikelihood of it meeting its current budget.  Further, although the Official Statement informed potential investors that "increased activity in the area of clubs, sports and intramurals" was a "major goal" of the College,  Defendants did not disclose that the budget cuts would likely mean this goal would not be achieved.  Failure to disclose the budget cuts and their likely effect on Bradford's abilities to meet its financial and operational goals made the Official Statement misleading.

53.    Enrollment Attrition.  While the Official Statement presented extensive data on new student enrollment at the College, there was no reference whatsoever to the College's severe, long-standing problem with student attrition.  In fact, since 1989, the College's approximate student attrition rate had been an extraordinary 60% — meaning that substantially fewer than half of all entering freshmen remained enrolled at the College through their senior year.

54.    The Defendants, moreover, were well aware of the College's enrollment and retention problem, and of that problem's financial import.  When the College's Board initially voted in 1996

20

to approve the construction project to build new dormitories, one of the College's trustees at the time, William J. Nofsker, resigned in the middle of his second term because he concluded that Bradford did not have the enrollment to justify its expansion plan and opposed pursuing any such project. As reported in the press on November 30, 1999, Mr. Nofsker stated, in part, that: "I didn't think [the College] had enough of a student body to support the expansion."

55.     In addition, the College's inadequate enrollment was the topic of extended discussion during the Board's pivotal February 6, 1997 meeting, described above, at which the College's ability to survive was addressed. Specifically, the Chair, Defendant Ferlazzo, announced that "[b]ecause of the enrollment shortfall, the College is at financial risk. If enrollment trends continue for 1997-98, and changes are not made in the operations of the College, there is the very real potential of a $300,000-400,000 deficit in FY 1998." At this same meeting in February, 1997, Defendant Thomas, a member of the Enrollment Management Committee of the Board, stated that the College faced "insufficient enrollment to assure the financial well-being of the College."

56.     The longstanding enrollment and attrition crisis persisted into 1998, existed at the time of the bond offering in May of that year, and continued apace thereafter. Growing out of its on-site decennial evaluation of the College in November 1998, the New England Association of Schools & Colleges, Inc. (the "NEASC"), the College's accrediting body, noted:

> Enrollment management (with related financial issues) is a fully recognized problem at Bradford. In fact, it is a crisis. A small private college that graduates only 40% of its entering classes has scant hope of being able to fulfill aspirations much higher than survival. . . . Attrition is of course a pre-eminent financial fact . . . .

The NEASC also noted in its evaluation, *inter alia*, that a broad awareness by insiders at the College "of financial instability, like that of the attrition which is the major cause of it, is among the strongest organizational realities at Bradford."

57.     Investors are as interested in academic attrition as accrediting bodies. Standard & Poor's Public Finance Criteria for 1998 recognized that "a trend of increasing attrition is a sign of rising student dissatisfaction and is often a precursor to declining demand." For investors considering purchasing the bonds of a small college that required growth in order to repay the borrowed funds, it is hard to imagine more material information than data that would provide insight as to whether sufficient demand existed to meet the institution's ambitious plans.

58.     Defendants were well aware of Bradford's attrition situation when the Bonds were issued. On January 22, 1998, Kiszka distributed a Bradford student retention report to persons involved in the bond offering, including Advest. The report showed that for the most recent graduating class, Class of 1997, only 36% of the freshman class graduated from Bradford, an attrition rate of 64%. Nor was there any evidence that the trend was abating. By the second semester of their sophomore year, the Class of 2000 was already suffering a 31% attrition rate, and that historically Bradford suffered an additional 20% attrition between sophomore and junior years.

59.     The Official Statement, however, misleadingly omitted reference to any such known "pre-eminent financial fact" or "organizational reality" that would call into question the College's ability to service the Bonds out of its tuition revenue. Indeed, as part of their effort to sweep material, adverse facts under the rug and out of view, the Defendants presented enrollment information in the Official Statement in a manner that intentionally concealed the College's persistent attrition crisis. The Official Statement, for example, reported 1993-1997 enrollment levels

22

only for the *fall* semester of each year; yet, as the Defendants well knew but failed to disclose, enrollment in the *spring* semester of each of those years was markedly lower than fall enrollment levels, as a result of the College's chronic inability to retain students.  As then known but not disclosed, the average rate of mid-year student attrition during this time period was over 7%, *without even taking into account* students who completed the academic year in June but who failed to return to the College the following fall.

60.     The Statement did disclose, by year, the number of new students and continuing students, but the charts aggregated freshman and transfer admissions, making it impossible to calculate attrition.  The undisclosed number of transfer students made it appear that larger numbers of entering freshmen had remained at the College.  For example, if an investor compared the disclosed number of "new admissions" for the fall semesters 1994 through 1997, 862, with the total Fall 1997 enrollment, 602, it would appear that the College had lost 274 students, an attrition rate of 31%.  Such a calculation understated by almost half the actual attrition rate, 60%.  The data provided was incomplete and highly misleading.

61.     The difference between the actual 60% rate, and the rate that could be manually calculated based on the information disclosed in the Statement was highly material.  A 30 to 40% attrition rate between freshman to senior year, is routine in private non-elite colleges,[1] while a 60% attrition rate, as noted by NEASC, is extraordinary and constitutes a sign of crisis.  Moreover, an investor who was attempting to determine the likelihood that Bradford could meet the ambitious enrollment goals necessary to pay back the bonds would overestimate the number of returning

---

[1]     In the mid 1990s, the national rate for freshman graduating within 6 years was 52%, the Massachusetts rate was 62%.  An attrition rate of 30-40% in four years compares favorably, while a 60% rate is clearly below average.

students in 2000 by 46 -71 students for the senior class alone if he or she applied a 30% or 40%

attrition rate instead of a 60% rate.  Failure to provide accurate, meaningful data deprived investors,

including the Plaintiffs, of the ability to properly assess the real risks involved in purchasing the

Bonds.

62.     By omitting key attrition information, the Defendants materially overstated the

College's ability to service the nearly $18 million dollars in debt that the Defendants sought to place

with the purchasers of the Bonds.  Defendants had made accurate attrition information, such as the

January 1998 retention report available to Standard & Poor's, a bond rating agency, but refused to

disclose such information to the purchasers of the Bond. Upon information and belief, Defendants

deliberately decided not to make such a disclosure because they knew it would reflect poorly upon

the College and dampen the market for the Bonds.

63.     <u>Financial Aid</u>.  Likewise, at the time that the Official Statement was prepared, the

Defendants knew, or but for their reckless disregard for the truth should have known, that the

representations in the Official Statement regarding financial aid were false and misleading when

made.  The Defendants stated in the Official Statement that the amount of financial aid to be

awarded by the College was anticipated to drop to 29.9% of student income in the 1997-98 academic

year, and to 28.8% in 1998-99.

64.     There was no reasonable basis for the Defendants to make any such statements.  There

were only two months remaining in that fiscal year when, in the Official Statement, the Defendants

"estimate[d] that financial aid will be reduced to 29.9% of student income" for the 1997-98 academic

year.  However, by the date of the Official Statement, all financial aid commitments for the fiscal

year had been applied against students' tuition bills for the fall and spring semesters, and Defendants

knew (or would have known, but for their reckless disregard for their duties) that the amount of financial aid applied against tuition income the College was otherwise entitled to receive was almost a quarter of a million dollars greater than budgeted.   In reality, financial aid awards for 1997-98 actually consumed *over 35%* of student income, as the College's audited financials for the year soon confirmed.  Even, however, before the audited financial reports were received (and before the bonds were issued) all of the Defendants knew the predictions regarding financial aid for the present and upcoming years were false.

65.      In early October 1997, Kiszka received a report from the Bradford Admissions Office (which was also responsible for awarding financial aid) summarizing the College's enrollment and financial aid figures for the current academic year.  The report stated 430 students would receive aid from Bradford in the upcoming year, with an average award of $9,186 per student.  The Admission Report also disclosed that aid awards to new students were 12.3% higher than awards to returning students ($9,810 per student for new students vs. $8,733 for returning students).  No later than December 1997, Kiszka forwarded this document to Advest in response to Advest's request for financial aid and enrollment information in connection with proposed bond financing.  Upon information and belief, this report was also distributed to the Trustees.[2]   At the same time that Kiszka provided the financial aid information to Advest, he sent Advest (and the Trustees) budgets

---

[2]      Plaintiffs do not possess a complete copy of this document, only the portions Kiszka forwarded to Advest.  However, the format and font of the documents as well as its presentation of enrollment and financial aid information is identical to other reports in the Plaintiff's possession from James Abbuhl, Bradford's Vice President for Enrollment Management to the Bradford Board of Trustees.  During this time period, Abbuhl regularly prepared reports from the Admissions Office with the lastest enrollment and financial aid statistics for upcoming meetings of the Board of Trustees.  The document referenced above contains financial aid information through September 29, 1997 and the Board of Trustees was scheduled to meet on October 15 and 16, 1997.  Based on this information, it is Plaintiffs' reasonable belief that the document fragment Kiszka sent to Advest was pages from Abbuhl's admissions and financial aid report to the Trustees in connection with the October meeting.

for the 1997-98 year, which included an estimate of Bradford's contribution of financial aid. Kiszka's budgets contained a figure for financial aid $100,000 lower than the numbers he received from the financial aid office.   The backup for his financial aid calculation, which was also distributed, showed an average award of approximately $200 lower per student than the numbers he received from the Admissions Office.   Based on his lower number for Bradford aid, Kiszka calculated the estimated percentage of aid to student income for 1997-98 to be 28.9%, the number which was ultimately put in the Official Statement. Had he used the Admissions Department's numbers, the percentage would have been 30.6%, higher than the percentage of aid in the prior year. Plaintiffs are unaware of the Admission Department ever revising its figures for 1997-98 financial award, and in his memoranda and notes accompanying his budget reports, minutes of the College Cabinet, minutes of the Finance Committee and minutes of the Board of Directors, Kiszka never stated why he chose not to use the Admissions Department's numbers.   In fact, according to the audited Financial Report for 1997-98, the Admissions Department's numbers understated the actual amount of Bradford aid awarded to students for that fiscal year.

66.    In January 1998 and April 1998, Kiszka circulated to the Defendants, including Advest, revised operating budgets for 1997-98 based on actual operations.   These budgets were compiled after the College had received all or substantially all tuition income for the academic year and committed financial aid to the students who had attended.   The revised budgets reported respectively that financial aid was 31% and 32% of student income.   Even using Kiszka's numbers, there was no factual basis in May 1998 to claim that the financial aid ratio was going to meet a target of less than 30% or even less than 30.3%, the percentage of aid the Official Statement disclosed for the prior year.

26

67.     The financial aid discrepancy was material because one of the keys to the College achieving financial equilibrium, according to the Official Statement, was increasing net tuition revenue by controling financial aid awards.  The Official Statement stated that the College believed it could reach this goal because the financial aid percentage was expected to decrease.  But the truth, as set forth in the Kiszka's internal financial statements, was the amount of financial aid was increasing, not decreasing.  Whether the College really had control over the percentage of tuition discounting being awarded was highly material to investors, particularly when increasing enrollment was fundamental to the ability of the institution to repay the bonds.

68.     To this end, failure to disclose the large discrepancy in aid awards between new students and returning students was highly misleading.  The Official Statement showed a substantial increase in enrollment in the present year and predicted reduced levels of aid.  This strongly suggested that there was sufficient demand to permit the College to increase enrollment without reducing the net amount of revenue received from each student.  In actuality, the opposite was true. The College had attracted a record number of new students by offering them a record amount of aid.  Armed with the knowledge that the College needed to engage in steep tuition discounting in order to increase enrollment, investors would be able to recognize the substantial risks posed by the College's growth strategy.  This information was not provided.

69.     With respect to its statements about the next academic year, the Official Statement represented that "[t]he College's financial plan *currently* calls for a further reduction of financial aid spending for 1998-1999 academic year to 28.8% of student income" (emphasis added).  This statement, too, was materially misleading and without reasonable basis.  The College's 1998-1999 budget — which was originally submitted to the Trustee Defendants on April 29, 1998, reviewed

by the Finance Committee of the Board on May 8, 1998, and revised at a "special meeting" of the College's administration later that month — reflects that financial aid spending for the 1998-1999 academic year was budgeted to be 31.3% of student income, an increase of almost 10% (or $280,000) over what was represented in the Official Statement.

70.     The basis for the College's belief that the financial aid percentage would be lower in the future, as stated in the Official Statement, was that the College had instituted " a change in methodology of aiding students with college-funded support versus additional loans funded by students and/or parents."  In fact, there had been no such change, and accordingly, no reasonable basis for believing that the level of tuition discounting would decline.  In the fall of 1998 when Jean Scott replaced Short as the College's president, she conducted an investigation to determine why the level of financial aid had jumped so dramatically for the year 1998-99.  By talking with the College's admissions personnel, she discovered that there were no controls on the amount of financial aid offered to attract students and that no program existed to offer loans, as opposed to aid, to students who would otherwise receive aid.  Ms. Scott discovered these facts merely by asking a few questions to the admissions staff.

71.     Moreover, in connection with the 1998-99 school year, Bradford instituted several new financial aid programs which its administrators knew would increase Bradford's financial aid obligations.  These included:

- Bradford changed the way it awarded its Presidential, Arts and Leadership scholarships.  Previously it had awarded between $2,000 to $5,000 to these scholarship recipients on a sliding scale, but for the 1998-99 year, it awarded all recipients a flat $5,000 award, without cutting back on the number of awardees.

- Bradford expanded its scholarship program for transfer students, permitting more transfer students to become eligible for financial aid.

28

> • Bradford gave financial aid to many students who had not received it in the previous year, including 36 sophomores. The fact that Bradford gave new grants to more than 10% of its returning class belies the Official Statement's claim that there was a concerted program to have needy students finance their Bradford education by loan instead of aid grants.

The expansion of these financial aid programs increased financial aid awards by more than half a million dollars.

72.    Upon information and belief, the Director of Admissions and the financial aid staff did not have the authority to initiate these changes in awarding financial aid by themselves; at a minimum, Kiszka and Short approved these new programs. Yet, these increases in financial aid are not reflected in any of Kiszka's budget reports for 1998-99, including those used by Bradford, Kiszka and Advest in creating the financial disclosures in the Official when projecting financial aid for the upcoming year.

73.    The financial aid awarded for Academic Year 1998-99 was substantially higher than the amount predicted by the Official Statement. The percentage of aid to student income was not 28.8%, but 39.1%. Although the College ultimately had 82 fewer students than the budgets which were the basis of the Official Statement, the financial aid commitment was $280,000 more than the amount budgeted for a much larger enrollment. Put another way, had the financial aid awards been in accordance with the estimate in the Official Statement, the College would have had an additional $1.26 million in revenue, notwithstanding the reduced enrollment. Notwithstanding the reduced number of students on campus, more aid was given to more students. Financial aid was given to 90% of Bradford students as opposed to the figure of 80% disclosed in the Official Statement, and

the average financial aid award exceeded $10,000, as opposed to the amount in Kizska's budgets, $8,840. The financial aid projections were off by more than 25%.

74. The Defendants had no reasonable basis to believe that they could achieve the 28.8% financial aid goal set forth in the Statement. As noted above, Short and Kiszka knew that the financial aid budgets did not reflect new financial aid programs that would increase the amount of financial aid awarded, and they either knew or were reckless in failing to know that there were no controls in the financial aid department to stop rampant tuition discounting and no program to substitute loans for aid awards. Moreover, the aid commitments to returning students and the vast majority of commitments to new students, had already been made by the time the bonds were issued.[3] As part of their due diligence before borrowing money on the financial markets, Short, Kiszka and Advest had a duty to confirm the accuracy and reliability of Kiszka's budget estimates. A cursory check with the Admission Office would confirm that aid had been offered to more students than in previous years and checking a representative sample of financial aid awards to students who were planning to attend in the Fall would confirm that the average award substantially exceeded the budgets. If they performed such an examination, then they knew it was unlikely the plan would be achieved. If they failed to perform such an examination, then their failure to confirm material estimates they knew investors would rely upon was reckless.

75. The Official Statement further omitted the material fact that the persistent and increasing level of financial aid funded by the College was anomalously high relative to peer

_____

[3] According to a report from the Admissions Office given to the Trustees prior to their May 8, 1998 meeting, financial aid awards were given to returning students in April, so they would know their financial situation before they left campus, and awards to new students were made shortly after acceptance, starting in February. According to the Application Reports regularly circulated by the Admissions Office, by April 20, 1998, the College had accepted more than 75% of the applicants it ultimately accepted for the 1998-99 term. Most applicants for fall semester applied during the winter and their applications were reviewed in the spring.

institutions. The ratio of financial aid to the College's receipts for tuition and fees was well above average for comparable institutions as by the Massachusetts Health and Educational Facilities Authority, an independent state agency, for the year ending in 1997.

76.     <u>Lack of Strategic Plan</u>.  Although the Official Statement repeatedly referred to Bradford's "strategic plan . . . to increase enrollment" and its "strategic initiatives . . . for the past two years," the College in reality had no business plan or strategic program to meet any of the goals articulated in the Official Statement, on which the Bondholders relied in purchasing the Bonds and on which ACA relied in insuring the Bonds.  Nor did long-range planning form an integral part of the Trustee Defendants' deliberations.  Specifically, even though student retention had long been recognized as a critical problem, the College had no plan to improve retention rates at the time that the Bonds were issued.  With regard to the aim of reducing financial aid awards, no plan was in place to modify the College's practices in order to realize this goal.  No one advised or instructed the College personnel responsible for awarding aid to reduce the amount of aid awarded, nor did any of the Trustee or Officer Defendants take steps to control the amount of aid given.  Moreover, there was no systematic effort to impose budget discipline.  In short, the College had no strategic plan to staunch its operating losses despite representations to the contrary in the Official Statement

77.     The College's lack of a viable strategic plan was confirmed a few short months after the Bonds were issued, in a report authored by the College's accrediting body, the NEASC.  The NEASC report, published in January 1999 based on, *inter alia*, an on-site evaluation of the College in early November 1998, found that "Bradford College has not recently engaged in systematic, broad-based planning . . . .  There is no evidence that an effective strategic plan, or even a strategic planning process, is now in place."  With respect to the College's regular revenue shortfalls, the

31

NEASC determined that "[t]he College does not currently have a realistic plan in place to address the critical issues raised by these operating deficits." In connection with enrollment growth, the NEASC noted the College's goal of growing enrollment to over 700 students but observed that "it is difficult to determine precisely how this figure is anchored in current planning for recruitment, retention, faculty size, curricular structure, and many other parameters." Whatever informal planning discussions that did occur were "fragmented, tentative, unformed, and almost wholly within the parameters of the status quo. They provide an illusion of planning that is not an effective substitute for those systematic, broad-based mechanisms which could bring together all stakeholders in the College's community." In the final analysis, "[t]he College does not have a functional strategic plan, based on a widely accepted and coherent mission, informed by institution-wide, up-to-date assessment systems and linked to its budget processes." And, consistent with the absence of a strategic plan, the NEASC found that the College's "disturbing record" of 11 consecutive annual operating budget deficits was "punctuated by so many 'surprises' that these disorienting events seem almost to have become routine."

78.    Unrealistic Enrollment Projections. The Official Statement described the College's plan to increase enrollment over 30% in three years, to 725 students, and the College's belief, based on the increased number of applications it had received to date, that it could meet its goal of enrolling 225 new students in the fall of 1998. Defendants knew these projections were not reasonable at the time, and Defendants Short and Kiszka have admitted this.

79.    In the Spring of 2000, in connection with Bradford's closure, Kiszka and Short were interviewed by Martin Van Der Werf, a reporter for the Chronicle of Higher Education, a respected periodical that reports on colleges and universities in the United States. Van Der Werf asked Short

about the projection in the Official Statement that Bradford planned to expand to 725 students by

the fall of 2000. After initially questioning whether Bradford had ever made such a projection, Short

stated, "I'm surprised we had that number, it clearly wasn't realistic." Short could not explain to

Van der Werf why the College expected to grow so quickly and admitted "We didn't have a clear

idea of how it would happen."

80.    Van der Werf, also interviewed Kiszka who admitted there was no realistic basis for

predicting that Bradford would have 225 new students in the fall of 1998. Kiszka told Van der Werf

that in truth it was "impossible" to predict Bradford's fall enrollment. "Bradford never knew what

its enrollment would be until August 1 of every year."

81.    Kiszka's and Short's statements to Van der Wolf are strong evidence that Kiszka and

Short knew at the time the Official Statement was circulated that there was no reasonable basis in

fact for the enrollment projections and the statements regarding the enrollments the College expected

to obtain in the future.

82.    Although Bradford may not have known in May 1998 exactly how many students it

would have in the fall of 1998, Defendants knew to a near certainty that the College would not have

sufficient enrollment to meet their financial and operational goals for the upcoming year,

notwithstanding the assertion in the Official Statement that the College expected to reach its

enrollment goals and believed it could obtain an operational surplus in 1998. Kiszka and Short had

presented budgets to Advest and the Board of Trustees that projected a Fall 1998 enrollment of 630,

225 new students and 405 returning students. These budgets projected operating surpluses between

$83,000 and $164,500. In February 1998, the Board authorized the bond issue based on these budget

and the statements in the Official Statement that the College expected 225 new students to enroll in

the Fall of 1998 and that the College foresaw an operating profit were derived from these budgets.

83.    On April 20, 1998, at a meeting of the College Cabinet, a committee of the executive officers of the College, Kizska and Short were informed that the best estimate for Fall enrollment was 612, 392 returning students and 220 new students.  Further, they were told that the number of returning students could be lower and that further monitoring of the numbers would be done.

84.    On May 8, 1998, Kizska informed the Board of Trustees that based on the information he had learned from the College Cabinet and additional follow up information, Bradford should expect to have 30 fewer students than anticipated in the earlier budgets.  He also advised the Trustees that the College had to cut $300,000 from its budget to preserve its bond rating.  As noted above, Kiszka, Short and the Board of Trustees knew that such cuts would likely result in critical programs and positions not being funded and that the College's plans for attracting and retaining students would be seriously affected.  No reference, however, was made in the Official Statement about either the budget cuts or the likely failure to reach the College's enrollment goals.  Had the College disclosed that it was likely Bradford would not meet its total enrollment goal for 1998, investors would have know that Bradford's ability to reach its disclosed target of 725 full time students in three years was very doubtful.

85.    Even without knowledge of specific information contradicting the enrollment projections, the Defendants were reckless in relying upon the College's projections.  The College's projections of Fall 1998 enrollment, which were provided to Advest, were obviously faulty because they ignored Bradford's historic attrition problems.  The attrition rate for returning juniors (including transfer students) between Fall 1996 and Fall 1997 was 37%.  Yet Kiszka only projected a

34

sophomore class attrition rate of only 10%, a difference which inflated the projection by 35 students. For returning seniors (including junior transfer students), the Fall 1997 attrition rate was 12%. Kiszka, however, projected that there would be more seniors in Fall of 1998 than there were juniors in 1997; not only did he not factor in attrition, he predicted (without any historical or factual basis) that the class would grow. Although Advest had the historical information that demonstrated that these attrition rates were fanciful, it did not critically review the projections, notwithstanding its duty as an underwriter to do so.

86.     The Official Statement disclosed the College's expectation that it would have 225 new students for the next academic year and stated that Bradford believed it would reach that goal based on an 18% increase in admissions, "historic rates for conversion of applications into enrollments" and applications and deposits received to date. The Official Statement selectively disclosed favorable (but almost meaningless) statistics while suppressing negative information that would have informed investors that the College was not likely to meet its goal. This undisclosed information also established that the Defendants had no reasonable basis for predicting that the new student projection would be reached.

87.     Although Bradford's applications for the forthcoming year had increased, the disclosure was misleading because the College had significantly changed the manner it obtained applications and what it counted as an "application." The largest change was that the College's acceptance of world wide web applications. According to a presentation by the Admissions staff to the Board of Trustees, which was designed to explain why the College was not obtaining more matriculates despite substantial increases in the number of applications, counting web applications "artificially inflates numbers." The Admissions Staff informed the Trustees that most incomplete

35

applications were web applications and that students often filled out a section of the application as an inquiry but did not complete the application. Although such incomplete forms were historically counted as inquiries, the Vice President for Enrollment, James Abbuhl changed the procedure and instructed the staff to count these submissions as applications. According to the staff, this change in procedures accounted for the increase. Defendants failed to disclose these matters.[4]

88.     More important than the number of applications was the number of acceptances and the number of student who had sent Bradford deposits in order to hold a spot for the coming year. While the Official Statement showed historic acceptance rates for the College of between 77% and 80%, as of April 20, 1998, the College's acceptance rate for the Fall 1998 was only 66%, a steep decline which substantially reduced the possibility of the College meeting its enrollment goal. Indeed, although the college had more applicants, substantially more applications then the prior year, it had fewer acceptances. The Board of Trustees, and Kiszka, were informed of these statistics in a report from Abbuhl, the Vice President for Enrollment Management, dated April 20, 1998[5]. The

---

[4]     The presentation to the Board of Directors did not occur until the spring of 1999, but the staff described practices that had put into place by Abbuhl for the prior academic year–the year of the Offering. Although it is unknown if the Defendants had specific knowledge of the changes in Admissions Office policies regarding the counting of admissions, Defendants were reckless if they did not have such knowledge. The large increase in admissions, in connection with the need to make accurate representations to potential bondholders required the Defendants to investigate why there was a sharp increase in the number of applications for the current admissions cycle and to determine if the change was due to an increased interest in Bradford or a more mundane reason. Had Defendants performed any kind of investigation, they would have discovered the change was simply due to a change in what the Admission Office defined as an application.

[5]     Plaintiffs do not know if Advest received a copy of the April 20, 1998 report, but upon information and belief, it received comparable reports which evidenced the reduced acceptance rate. Throughout the spring semester, the Admissions Office routinely generated Applications Reports which set forth in tabular form the latest numbers on applications received, acceptances and deposits received, and comparable numbers from the year before. These reports were routinely circulated to Short and Kiszka, Advest's principal contacts at Bradford. From January 22, 1998 through the issuance of the Bonds, these reports consistently showed a reduced acceptance rate (between 65 and 70%) and a lower number of deposits received as compared to the prior year. As part of its diligence obligation as the Bond's underwriter, Advest should have checked on the admission statistics for the upcoming year. Had it done so, it would have received these reports or the information contained within them. If it failed to obtain such information from Bradford, it recklessly abandoned its duties an the underwriter.

April 20 report also evidenced that while the College had more applications for Fall 1998, it had fewer actual acceptances than it had for Fall 1997. Upon information and belief, the reason for the reduced acceptance rate was either the number of incomplete applications that Bradford now counted as "applications" for its statistics, or because the quality of student applying to Bradford was declining. The College wanted to expand and was desperately attempting to lure students to the school; there was no reason for it to reject any capable student.

89.     Had the number of actual acceptances or the acceptance rate been disclosed in the Official Statement, by applying the College's historic matriculation rate for accepted students, which was disclosed, an investor would have been able to calculate that the College would likely fail to meet its new student enrollment goal by 15%. However, by using the statistics purported to be relevant by the Official Statement, the number of applications and the "historic rates for conversion of applications into enrollments," the investor would project a incoming class with 25 more students, very close to the number the College predicted. For the reasons set forth above, due to the reduced acceptance rate, the Defendants knew (or were reckless in not knowing) that the historic rate for matriculation of applicants (as opposed to the matriculation rate for accepted students) was irrelevant.

90.     The College also knew the number of students who had actually placed deposits for Fall 1998 had dropped. The number of students who had actually placed deposits by spring 1998 was the best indicator or how many students would be enrolling. Despite more applicants, the number of students who had actually placed deposits at the time of the Official Statement, had declined by almost 20%, according to an Admissions Department report comparing deposits on hand between May 6, 1998 and May 6, 1997. Upon information and belief, this information was given

to the Trustees at their May 8, 1998 meeting.  The April 20, 1998 Admissions Report circulated to the Trustees and Kiszka showed a 7% decline in the number of deposits received, but also noted that the May 1, 1998 deposit deadline would give the College an accurate read of the likely size of the incoming class.  Given the importance of the enrollment figures to the Trustees, the fact that the Trustees knew important updated information would be available after May 1, 1998, and the report was generated just before the meeting, it is likely the report was prepared for the Trustees.  Even, however, if the Trustees only received the April 20 Admissions Report, the decline in deposits would have alerted the Trustees that the prediction of new students was likely off by 16 students.

91.     The combination of inflated application numbers, reduced acceptances, reduced deposit rates and lower expected matriculation rates meant that at the time of the Official Statement was issued, based on the information the College already had, it was almost impossible for the College to meet its enrollment target, and any statement to the contrary was misleading.  By omitting to include vital admissions data that demonstrated the enrollment goal was unachievable, the Defendants falsely perpetrated the belief that the College would be able to generate sufficient revenue to repay the bonds.

92.     The sloppiness and unreliability of the Bradford enrollment projections was a sharp departure from the quality of projections ordinarily provided in connection with educational bonds.  Christine Maxwell, a director of the bond rating agency Standard & Poor's, told Van der Werf, the reporter for the Chronicle of Higher Education:

> The numbers we were given were much different than what was actually occurring, or at least what the result was in the fall [of 1998].  We ask for previews of the final enrollment numbers, and schools are usually able to come out with pretty good numbers of where they are going to come out.

38

Notwithstanding that the enrollment figures were identified as projections, an experienced investor in the bond market could not have predicted the degree of variability from the disclosed projections without substantial additional disclosure of what Advest, the Officers and the Trustees actually knew, as opposed to what they were wishing for.

93.     No Equity Financing.  The bond financing was not intended to cover the complete cost of the dormitory construction and renovation project.  The Official Statement unequivocally represented that the College would therefore make a $1 million equity contribution toward the completion of the project.  This representation was false and misleading, however.  At the time the Official Statement was prepared and circulated, there was no present intention among the Defendants to commit the College to contribute any of its own funds toward the construction project.  Rather, the Defendants' true intention was to cut corners on the project in an effort to bring project costs down to the level of the bond financing.  According to the minutes of the February 5, 1998 joint meeting of the Finance and the Building and Grounds Committees of the Board, the Trustee Defendants on those committees — who at the time were Defendants Sughrue, Short, Davis, Hayden, Ferlazzo, Crago, Childs, Cochran, Dill, Marcus, and Turben — reviewed the financing proposal for the construction project, and determined that the amount to be financed under the Bonds "does not cover all the cost of the three-phase project."  These Trustee Defendants, therefore, agreed to recommend to the full Board as follows:

> The College will have to review the projects and attempt to reduce the final two phases to correspond with the bond financing *or* the College will have to include an equity contribution to fund a portion of the construction.  It was agreed that the bond financing would proceed as recommended with Advest and that the College would make every effort to reduce its construction costs *or* make an equity contribution *at the end in the final phase of the project*.

39

(Emphases added).  The Defendants knowingly or recklessly failed to disclose this contingent and delayed nature of the College's putative "equity" contribution, and instead falsely and misleadingly represented that $1 million of the College's own funds "will be used" for the construction project.

94.    The Finance Committee and the Buildings and Grounds Committee were standing committees of the Board of Trustees which were jointly responsible for monitoring the dormitory renovation and consequent bond financing on behalf of the Board of Trustees.  Due to their special expertise, the Board of Trustees ordinarily followed their recommendations and the College's senior management followed the committee's direction unless otherwise countermanded by the Board of Trustees.

95.    The full board of directors was informed of the Committees' recommendations regarding the financing of the bonds and the commitment of College funds at a full meeting of the Board of Directors that was held later that day.  Based on the Committee's recommendation, the Board of Trustees authorized the College to enter into the bond financing with Advest as the underwriter. The Committees' instruction to the College's officers that they attempt to reduce the cost of the project and not make any equity contribution until the end of the project was never rescinded.  The equity contribution committed in the Official Statement was never made.

96.    Upon information and belief, Advest knew the Bradford Trustees and Officers did not intend to make the equity contribution notwithstanding the disclosures in the Official Statement. As part of it duty as an underwriter, Advest would have reviewed the minutes of the Board of Directors and it Finance Committee, especially the meeting where the Committee and the Board approved the Bond Issue.  Had they read those meetings, they would have found the passage quoted

above evidencing the Officers and Trustees intention not to pay the contribution if they could avoid it.

*Defendant Advest Procures Insurance for the Bonds*

97.      In mid-April 1998, during the time Defendant Advest was marketing the Bonds to various potential investors, Defendant Advest contacted Plaintiff ACA to procure insurance for a portion of the Bonds.  In evaluating that request, ACA reviewed, and relied on, the Official Statement.  In addition, on or about April 30, 1998, an ACA employee had a telephone call with Defendant Kiszka, in which Kiszka stated that 1999 student applications to the College exceeded historical levels.  These statements by Defendant Kiszka further reinforced the misleading statements and omissions of the Official Statement detailed above.

98.      Relying on the Official Statement and the conversation with Defendant Kiszka, on May 14, 1998 ACA gave a written commitment to provide insurance for $5.51 million in principal amount of the Bonds (the "Insured Bonds").  ACA issued an insurance policy for the Insured Bonds on May 19, 1998, only six days after the closing of the Bond offering.  On information and belief, the buyers that Defendant Advest had found for the Insured Bonds would not have purchased them without the insurance.  Because Defendant Advest had given its firm commitment to underwrite the offering of the Bonds, the ACA insurance policy facilitated Defendant Advest's ability to sell the Insured Bonds.

*The Accelerating Financial Crisis*

99.      After the bond offering, when the academic year began in September 1998, the College enrolled only 548 students, 82 fewer than projected in the budget that the College had prepared back in May.  Fully three-quarters of this enrollment deficit was attributable to the failure

41

of previously enrolled students to return to Bradford — a level of attrition consistent with that of prior years. The College also failed to attract 225 new students. It only drew 204 new students, 21 fewer than predicted and 30 fewer than the prior year. Consequently, the College's actual revenues were more than $2 million — or 13.25% — below budget.

100.    Faced with an accelerating financial crisis, the Trustee Defendants approved a revised 1998-99 budget in the fall of 1998. The revised budget relied upon more than $1.5 million in endowment funds (plus a one-time $600,000 gift) to partially offset losses from operations. This diversion of endowment funds represented greater than 7% of the appreciated market value of the endowment. This percentage was very high compared to the average spending rate of institutions similar to the College, and as a matter of law gave rise to a presumption of the Trustee Defendants' imprudence under the express terms of § 2 of the Massachusetts Uniform Management of Institutional Funds Law, Mass. G.L. c. 180A.

101.    As part of its effort to slash spending and reduce its operating losses, the College gutted its admissions program through budget cuts and employee layoffs. These stop-gap measures further guaranteed the College's inability to recruit enough new students to survive, let alone to meet its financial obligations as they came due.

*The Moores' Purchase of Bradford College Bonds*

102.    In August 1999, the Moores were a husband and wife who occasionally invested in municipal bonds to derive additional income. Mr. Moore was permanently disabled and received Social Security disability payments. The Moores had a limited tolerance for risk and were not

speculators.  The Moores generally invested in bonds with the intention of holding them through maturity.

103.     For approximately three years prior to August 1999, the Moores had used June Breakstone as their bond broker.  The Moores had placed fewer than a half dozen orders for bonds through Ms. Breakstone.  Ms. Breakstone was aware that the Moores trusted and relied upon her judgment in selecting bonds, and encouraged them to rely upon her judgment. Ms Breakstone was familiar with the Moores' risk profile and knew they were only interested in purchasing investment grade bonds.  Mrs. Moore had informed Ms. Breakstone that the Moore's principal interest was income with safety.

104.     In or about 1998, Ms. Breakstone left her prior employer and came to work at Advest. When Ms. Breakstone joined Advest, the Moore's became Advest clients.

105.     In August 1999, Ms. Breakstone advised the Moores of the ability to purchase $20,000 in Advest bonds.  Ms Breakstone informed the Moores that Bradford had issued bonds to build and renovate dormitories and the College was planning to expand enrollment.  The Moores had no prior knowledge of Bradford or its financial condition before the Ms. Breakstone suggested that they purchase the bonds.

106.     Neither Advest or Ms. Breakstone informed the Moores that although the College was hoping to expand, it had badly failed to meet its enrollment goals in the Autumn of 1998 was forced to make substantial budget cuts.  Neither Advest or Ms. Breakstone informed the Moores that the College had not balanced its operational budget for 12 years.  Neither Advest or Ms. Breakstone informed the Moores that the College's financial aid budget was continuously rising and that the College was unable to meet its goal for 1997-98 of reducing its level of financial aid.  Neither Advest

or Ms Breakstone disclosed Bradford's problems with attrition, or that its budget cuts had decimated the marketing and recruitment efforts necessary for the College to reach its enrollment targets. Neither Advest or Ms. Breakstone informed the Moores that the College's CFO had stated two years earlier that the college could only survive 2-3 more years given its cash flow situation. Had any of these facts been disclosed, the Moores would not have purchased Bradford bonds because they were too risky. Advest, as Bradford's underwriter and the principal market maker for its bonds knew all of the facts set forth above.

107.    On August 27, 1999, on Advest's recommendation the Moores purchased $20,000 of Bradford bonds. At the time of purchase, Plaintiffs believed that they were the original purchasers of bonds. The Moores do not know if they are original purchasers of bonds Advest had in inventory since the original bond offering, but which they were unable to sell without insurance, or are secondary purchasers.

108.    The Bradford bonds were not suitable for the Moores, given their low risk profile, the Moores' need to live off of the cash generated by the bonds and Mr. Moore's permanent disability.

*The New Administration and the Closure of the College*

109.    Defendant Short resigned as President of the College in the summer of 1998. In early 1999, the College's new president, Jean Scott, underscored the materiality of the misrepresentations and omissions of the Official Statement in a letter responding to the NEASC's report. With respect to enrollment issues, President Scott wrote that the College "agree[s] that poor retention is among the important causes of our systemic financial problems." In connection with the College's budget, President Scott confirmed that "our accounting methods mask some of what should be seen as

'deficit spending,' since the College draws a larger percentage from its endowment than is customary or, in our view, prudent." And as regards the lack of a viable business plan, she admitted that "[t]he College does need a functional strategic plan, based on a widely accepted mission, informed by assessment, and linked to the allocation of resources."

110.    Defendant Kiszka resigned from his positions as Vice President and Chief Financial Officer of the College in the summer of 1999. That fall, his successor, Brenda Smith, described the College's financial situation upon to her arrival as "an incredible red flag" of insurmountable problems, centering on the College's "struggling" due to an abnormally high level of tuition discounting.

111.    On or about November 22, 1999, the College announced that it would cease operations in June 2000. This announcement of the College's closure confirmed Defendant Kiszka's original (but undisclosed) assessment, at the February 1997 meeting of the Board, that the College could survive no more than three years given its financial and operational disarray.

112.    The Bonds were secured by a lien on the College's tuition proceeds; unless the College stopped operations, the bondholders' investment was protected. On November 22, 1999, when the College announced that it would cease operations, the Bondholders learned for the first time that a reasonable possibility existed that their bonds would not be paid in accordance with the bond indenture.

113.    On January 5, 2000, the indenture trustee for the Bonds gave a "Notice of Default" under the indenture. On August 22, 2000, the indenture trustee notified the College that an "Event of Default" had occurred under the indenture. On October 31, 2000, the indenture trustee declared

immediately due and payable the principal amount of the Bonds, together with accrued interest.  As of the date hereof, the accelerated principal under the Bonds remains unpaid and outstanding.

114.    On November 21, 2000, the Plaintiffs filed an action in the United States District Court for the District of Massachusetts, No. 00-12408-NG against the College, Advest, and certain trustees and officers of the College alleging violations of federal and state securities laws and commission of various torts in connection with the issuance and sale of the Bonds.  This complaint was subsequently dismissed without prejudice.  To induce the voluntarily dismissal, without prejudice, of this complaint, the College and all of the defendants named in this action entered into a Standstill and Tolling Agreement dated as of November 21, 2000 (the "First Tolling Agreement"), and later into a Second Standstill and Tolling Agreement dated as of June 22, 2001 (the "Second Tolling Agreement", and together with the First Tolling Agreement, the "Tolling Agreements").  In addition to requiring the Defendants to pay the Plaintiffs cost in drafting and filing their complaint, the Tolling Agreements tolled the deadline for commencement of all claims brought by the Plaintiffs in this action through the date of the filing of this Complaint.  Each of the Defendants also expressly waived their right to raise any defense in any subsequent lawsuit that the Plaintiffs' claims against them were precluded by any statue of limitation, any statute of repose or laches.  Each of the Plaintiffs is either a party to, or identified beneficiary of, the Tolling Agreements.

## COUNT I
## Violation of Section 10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

115.    The Bondholders reallege and incorporate by reference paragraphs 1 through 114 above as if set forth fully herein.

46

116.     Each of the Defendants knew, or was reckless in failing to know, of the material omissions and misrepresentations contained in the Official Statement as set forth above.  Because of their Board membership and/or their executive positions with the College, the Trustee Defendants and Defendants Short and Kiszka (a) knew or had access to information concerning the material adverse non-public information about the College's financial condition, which information was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements and other public representations of and about the College.

117.     Further, through its position as underwriter of the Bonds, Defendant Advest knew, or would have known in the absence of reckless disregard of the facts alleged herein, the actual financial and operating condition of the College, but failed to ensure that the public statements for which it was responsible accurately reflected the actual financial and operating condition of the College.

118.     The Defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal material adverse information regarding the financial and operational condition of the College as specified herein.  The Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false and misleading statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

119.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly and indirectly, violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

47

    (a)    Employed devices, schemes, and artifices to defraud;

    (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Bondholders and others similarly situated in connection with their purchases of the Bonds.

120.    The Bondholders have suffered damages in that they purchased the Bonds in reliance on the Defendants' misrepresentations and omissions. The true facts concealed by these misrepresentations and omissions were a substantial factor in causing loss to the Bondholders. The Bondholders would not have purchased the Bonds at the prices they paid, or at all, if they had not been so misled regarding the College's inability to service the debt that it incurred by reason of the issuance of the Bonds, or otherwise to repay the Bonds. For these injuries and damages, the Bondholders are entitled to relief as requested below.

## COUNT II

### Violation of § 20(a) of the Exchange Act and Rule 10b-5
### Against the Trustee Defendants and Defendants Short and Kiszka

121.    The Bondholders reallege and incorporate by reference paragraphs 1 through 120 above as if set forth fully herein.

122.    The Trustee Defendants and Defendants Short and Kiszka acted as controlling persons of the College within the meaning of § 20 of the Exchange Act. By reason of their positions as senior officers and/or trustees, as alleged above, these Defendants had the power and authority to cause the College to engage in the wrongful conduct complained of herein

123.    By reason of such wrongful conduct, the Trustee Defendants and Defendants Short and Kiszka are liable to the Bondholders pursuant to § 20(a) of the Exchange Act.  The true facts concealed by the misrepresentations and omissions of these Defendants were a substantial factor in causing loss to the Plaintiffs.  As a direct and proximate result of these Defendants' wrongful conduct, the Plaintiffs suffered damages for which they are entitled to relief as requested below.

### COUNT III
### Violation of § 12(a)(2) of the Securities Act of 1933,
### Against Advest

124.    The Bondholders reallege and incorporate by reference paragraphs 1 through 123 above as if set forth fully herein.

125.    Advest was the firm offer underwriter of the Bonds and sold bonds to all of the plaintiffs.  Advest sold the bonds by means of the Official Statement, a prospectus that contained the numerous untrue statements of material fact described above.  For the reasons set forth above, the Official Statement also omitted to material facts necessary to make the statements contained in the Official Statement not misleading.  In the exercise of reasonable care, Advest should have known that the statements identified above were untrue and/or misleading.

126.    The conduct of Advest alleged above constituted a violation of the §12(a)(2) of the Securities Act of 1933, causing the Bondholders substantial loss and injury.  The true facts concealed by the misrepresentations and omissions caused substantial losses to the Bondholders for which they are entitled to relief as requested below.

### COUNT IV

### Violation of Mass. G.L. c. 110A, § 410, Against All Defendants

127.    The Bondholders reallege and incorporate by reference paragraphs 1 through 126 above as if set forth fully herein.

128.    The College, through the Official Statement, offered, and Advest, through its firm offer underwriting, offered and sold, securities to each of the Bondholders by means of untrue statements of material fact and/or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  The untrue statements of material facts and the omissions to state material facts have been outlined above.  All of the College's and Advest's offers to sell securities were made within the Commonwealth.

129.    Each of the Defendants knew, or in the exercise of reasonable care could have known, of the material omissions and misrepresentations contained in the Official Statement as set forth above.  Because of their Board membership and/or their executive positions with the College, the Trustee Defendants and Defendants Short and Kiszka knew or had access to information concerning the material adverse non-public information about the College's financial condition, enrollment and financial aid problems and which information was not disclosed.  Further, Defendant Advest, through its position as underwriter of the Bonds, knew, or, in the exercise of reasonable care, could have known of the actual financial and operating condition of the College, but failed to ensure that the public statements for which it was responsible accurately reflected the actual financial and operating condition of the College.

130.    The conduct of the Defendants alleged above constituted a violation of the Massachusetts Securities Act, Mass. G.L. c. 110A, § 410, causing the Bondholders substantial loss and injury.  The true facts concealed by the misrepresentations and omissions of these Defendants

50

were a substantial factor in causing loss to the Bondholders for which they are entitled to relief as requested below.

## COUNT V

### Fraud and Intentional Misrepresentation Against All Defendants

131.    The Bondholders and ACA reallege and incorporate by reference paragraphs 1 through 130 above as if set forth fully herein.

132.    The Defendants fraudulently, intentionally and/or with reckless disregard as to the truth or falsity of such statements, made materially untrue and misleading statements to Plaintiffs, or aided and abetted in the making of such statements.  Defendants knew such statements were untrue and misleading at the time they made them to the Plaintiffs.  Said statements were made with the express purpose of inducing the Bondholders to purchase the Bonds and to induce ACA to insure the Bonds.  Plaintiffs detrimentally relied on the materially untrue and misleading statements made by the Defendants, or which were made by others with their assistance and abetting, and Defendants knew the Plaintiffs would rely upon the misrepresentations to their detriment.  The true facts concealed by these misrepresentations and omissions were a substantial factor in causing losses to the Plaintiffs.

133.    The fraudulent statements and omissions made by the Defendants, including the concealment of the actual financial and operating condition of the College by Defendants from the Plaintiffs, have caused the Plaintiffs to incur substantial loss and injury for which they are entitled to relief as requested below, and for which they are further entitled to punitive damages based on the wanton, willful and malicious actions of the Defendants as alleged herein.

## COUNT VI

### Negligent Misrepresentation Against All Defendants

134.    The Bondholders and ACA reallege and incorporate by reference paragraphs 1 through 133 above as if set forth fully herein

135.    The Defendants negligently made materially untrue and misleading statements to the Plaintiffs, or aided and abetted in the making of such statements, which the Defendants knew or should have known but for their negligence were untrue and misleading at the time they made such statements.  Said statements were made with the express purpose of inducing the Bondholders to purchase the Bonds and to induce ACA to insure the Bonds.  The Plaintiffs reasonably relied on the materially false and misleading statements made by the Defendants, or which were made with their assistance and abetting, to the detriment of the Plaintiffs.

136.    As a result of the material misstatements made by Defendants to the Plaintiffs, or which were made with their assistance and abetting, and the material omissions of fact concealed by the Defendants from the Plaintiffs, the Plaintiffs have incurred substantial loss and injury for which they are entitled to relief as requested below.

## COUNT VII

### Violation of Mass. G.L. c. 93A Against All Defendants

137.    The Bondholders (except John and Lois Moore) and ACA reallege and incorporate by reference paragraphs 1 through 136 above as if set forth fully herein.

138.    Each of the defendants and the Bondholders (except John and Lois Moore) and ACA are persons who are engaged in commerce in the Commonwealth of Massachusetts.

139.    The conduct of the Defendants described above constituted unfair and deceptive trade practices in violation of the Massachusetts Consumer Protection Act, Mass. G.L. c. 93A, § 2.  Said conduct caused the Bondholders and ACA substantial loss and injury for which they are entitled to relief under M.G.L. c. 93A, § 11, including but not limited to a trebling of their actual damages and payment of their attorneys' fees, as requested below.

## COUNT VIII

### Breach of Fiduciary Duty By the Moores Against Advest

140.    The Moores reallege and incorporate by reference paragraphs 1 through 139 above as if set forth fully herein.

141.    Since they became clients of the firm, the Moores relied on the advice and recommendations made by Advest with regard to purchasing bonds.  Advest encouraged the Moores to trust and rely upon them and was aware that the Moores had offered their trust.  Accordingly, Advest owed fiduciary duties to the Moores.

142.    Advest breached its fiduciary duties to the Moores by recommending the Moores purchase Bradford bonds which they knew were unsuitable for the Moores given their risk profile.  Advest also breached its fiduciary duty to the Moores by failing to disclose the negative information about Bradford know to it since the bond issuance, including but not limited to the fact that the College had not achieved financial equilibrium, that the College had badly missed its enrollment goals, that it was highly doubtful the College could reach enrollment targets set forth in the Official Statement, that the College had failed to lower its level of financial aid despite its expectation that it would do so, and that due to the failure to meet enrollment targets the College had instituted substantial budget cuts that affected the College's ability to recruit or retain students.

143.    As a result of Advest's breach of its fiduciary duties, the Moores have incurred substantial loss and injury for which they are entitled to relief as requested below.

## BASIS OF ALLEGATIONS

144.    Plaintiffs have alleged the foregoing based upon the investigation of counsel and their agents, which investigation included a review of the College's Board meeting minutes, financial statements, accreditation report and response thereto, media reports about the College, and interviews of and discussions with College personnel. Pursuant to FED. R. CIV. P. 11(b)(3), Plaintiffs believe that after reasonable opportunity for discovery, substantial additional evidentiary support will likely exist for the allegations set forth herein.

## PRAYERS FOR RELIEF

WHEREFORE, the Plaintiffs demand relief as follows:

(a)    That the Defendants be held jointly and severally liable to the Plaintiffs for the losses that they have incurred;

(b)    That the Plaintiffs be awarded pre- and post-judgment interest;

(c)    That the Plaintiffs be awarded their reasonable costs and expenses (including attorneys' fees) incurred in connection with this action;

(d)    That the Plaintiffs be awarded such multiple and/or punitive damages as may be appropriate under law;

(e)    That the Plaintiffs be awarded extraordinary equitable and/or injunctive relief, including attaching, impounding and imposing a constructive trust upon or otherwise restricting the assets of the Defendants to assure that the Plaintiffs have an effective remedy; and

(f)    That the Plaintiffs be awarded such other and further relief as the Court determines is just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

T. ROWE PRICE TAX-FREE HIGH YIELD
FUND, INC., SMITH BARNEY INCOME
FUNDS/SMITH BARNEY MUNICIPAL HIGH
INCOME FUND, DRYDEN NATIONAL
MUNICIPALS FUND, INC., LOIS and JOHN
MOORE, and ACA FINANCIAL GUARANTY
CORPORATION

By their attorneys,


/s/ Michael Tabb
Thomas Hoffman, Esq.  BBO # 237320
Thomas Greene, Esq. BBO# 210020
Michael Tabb, Esq. BBO # 491310
Greene & Hoffman, P.C.
125 Summer Street, 14th Floor
Boston, Massachusetts  02110
(617) 261-0040

Dated: October 20, 2006