## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................... 2

FACTUAL AND PROCEDURAL BACKGROUND ......................................... 5

    A.   The Bradford College Bond Offering ................................................ 5

    B.   History of this Lawsuit ................................................................ 6

ARGUMENT ...................................................................................... 8

  I.   THERE IS NO BASIS FOR VACATING THIS COURT'S DETAILED ORDER AND JUDGMENT. ......................................................... 8

    A.   The Standard:  Vacating a Judgment is an "Extraordinary Remedy" That Should Be Granted Sparingly and Only in Very Limited Circumstances. ...................................................................... 8

    B.   Plaintiffs Have Not, and Cannot, Satisfy the Stringent Standard Applied to Motions to Vacate. ...................................................10

  II.   EVEN IF THE COURT WERE TO REACH PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT, PLAINTIFFS HAVE NOT ESTABLISHED ANY BASIS FOR GRANTING THE MOTION. ......13

    A.   Plaintiffs Have Failed to Satisfy the Heightened Standard Applicable to their Motion for Leave to Amend After Dismissal. ..................................13

    B.   Allowing Amendment in These Circumstances is Inconsistent with the PSLRA. .................................................................................16

  III.   THE MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT SHOULD BE DENIED BECAUSE THE PROPOSED AMENDMENT IS FUTILE. .................................................................................17

    A.   The Proposed Second Amended Complaint Fails to State a Claim Against Advest Under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 or Under Section 12(a)(2) of the Securities Act of 1933. .................................................................................18

        1.   The Official Statement Contained Forward-Looking Predictions and Beliefs That Were Accompanied by Specific, Cautionary Language Which Renders All of the Purported Misstatements or Omissions Inactionable as a Matter of Law ......................................19

        2.   The Proposed Second Amended Complaint Fails to Allege an Actionable Misstatement or Omission Regarding Attrition ..................20

        3.   The Proposed Second Amended Complaint Fails to Allege an Actionable Misstatement or Omission Regarding Enrollment ...............23

Table of Contents
(continued)

Page

    4.    **The Proposed Second Amended Complaint Fails to Allege an Actionable Misstatement or Omission Regarding Financial Aid Awards** ..............................................................................25

    5.    **The Proposed Second Amended Complaint Fails to Allege an Actionable Misstatement or Omission Regarding the College's Equity Contribution** ....................................................................27

    6.    **The Proposed Second Amended Complaint Fails to Allege an Actionable Misstatement or Omission Regarding the College's "Financial Instability"** ..................................................................28

    7.    **The Proposed Amendments Do Not Even Purport to Address Many of the Deficiencies in Plaintiffs' Federal Securities Fraud Claims**...........30

   B.    **There is No Viable State Claim Against Advest**.....................................31

 IV.  **PLAINTIFFS SHOULD BE REQUIRED TO PAY ADVEST'S ATTORNEYS' FEES**............................................................................32

**CONCLUSION** ..................................................................................................33

# TABLE OF AUTHORITIES

CASES

*Aoude v. Mobile Oil Corp.*,
  892 F.2d 1115 (1st Cir. 1989) ............................................................................ 14

*Arrieta-Colon v. Wal-Mart Puerto Rico, Inc.*,
  434 F.3d 75 (1st Cir. 2006) .................................................................................. 8

*Central Bank of Denver N.A. v. First Interstate Bank of Denver*,
  511 U.S. 164 (1994) ............................................................................................ 30

*Cook v. Rumsfeld*,
  No. 04-12546-GAO, 2006 WL2559766, at *1 (D. Mass. Sept. 5, 2006) ......................... 4, 10

*Correa-Martinez v. Arrillaga-Belendez*,
  903 F.2d 49 (1st Cir. 1990) .................................................................................. 17

*Dietzel v. Springfield Terminal Railway Co.*,
  No. 03-12560-RGS, 2006 WL 3231187 (D. Mass. Nov. 8, 2006) ..................................9-10

*EEOC v. Argent Indus., Inc.*,
  746 F. Supp. 705 (S.D. Ohio 1989) .................................................................... 12

*FDIC v. World University, Inc.*,
  978 F.2d 10 (1st Cir. 1992) ...................................................................... 8, 10, 15

*Firestone v. Firestone*,
  76 F.3d 1205 (D.C. Cir. 1996).................................................................. 8, 13, 15

*First Nat'l Bank v. Continental Illinois Nat'l Bank & Trust Co.*,
  933 F.2d 466 (7th Cir. 1991) ............................................................................... 14

*Fitzer v. Security Dynamics Tech.*,
  119 F. Supp. 2d 12 (D. Mass. 2000) .......................................................... 20, 22

*Foman v. Davis*,
  371 U.S. 178 (1962)...........................................................................................9-10

*Glassman v. Computervision Corp.*,
  90 F.3d 617 (1st Cir. 1996) ................................................................................. 14

*Greebel v. FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999).............................................................................. 18

*Gross v. Summa Four, Inc.*,
  93 F.3d 987 (1st Cir. 1991) ....................................................................... 18, 20, 22

*Harris v. City of Auburn,*
  27 F.3d 1284 (7th Cir. 1994) ................................................................4, 13-15

*Hayes v. Douglas Dynamics, Inc.,*
  8 F.3d 88 (1st Cir. 1993) ...................................................................... 8

*In re Boston Tech., Inc. Sec. Litig.,*
  8 F. Supp. 2d 43 (D. Mass. 1998) ....................................................... 20

*In re Bristol-Myers Squibb Secs. Litig.,*
  228 F.R.D. 221 (D.N.J. 2005) .............................................................. 16

*In re Cabletron Systems, Inc.,*
  311 F.3d 11 (1st Cir. 2002) ................................................................. 18

*In re Champion Enterprises Inc., Secs. Litig. v. Champion Enterprises, Inc.,*
  145 F. Supp. 2d 871 (E.D. Mich. 2001) ............................................... 16

*In re Stone & Webster, Inc. Sec. Litig.,*
  217 F.R.D. 96 (D. Mass. 2003), *aff'd in relevant part by*, 414 F.3d 187 (1st Cir. 2005) . Passim

*Linton v. New York Life Ins. and Annuity Corp.,*
  No. 04-11362-RWZ, 2006 WL 3043224 (D. Mass. Oct, 25, 2006) ....................................... 9

*Maldonado v. Dominguez,*
  137 F.3d 1 (1st Cir. 1998) ................................................................... 18

*Manzoli v. Commissioner,*
  904 F.2d 101 (1st Cir. 1990)................................................................ 14

*Marie v. Allied Home Mortgage Corp.,*
  402 F.3d 1 (1st Cir. 2005) ...................................................................2, 8-10

*Mirpuri v. ACT Mfg., Inc.,*
  212 F.3d 624 (1st Cir. 2000)................................................................ 14

*Nat. Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.,*
  899 F.2d 119 (1st Cir. 1990) ................................................................ 12

*Pomerleau v. West Springfield Pub. Schools,*
  362 F.3d 143 (1st Cir. 2004)................................................................8, 10

*Resolution Trust Corp. v. Gold,*
  30 F.3d 251 (1st Cir. 1994) ................................................................. 17

*Roger Edwards, LLC v. Fiddes & Sons, Ltd.,*
  227 F.R.D. 19 (D. Me. 2005) ............................................................... 32

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996) ................................................................. 18, 20, 22

*Sheehan v. City of Gloucester*,
    321 F.3d 21 (1st Cir. 2003) ............................................................................ 14

*U.S.A. ex rel. Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*,
    179 F.R.D. 541 (S.D. Ohio 1998) ........................................................ 2, 8-9, 12

## STATUTES, RULES & REGULATIONS

15 U.S.C. §78u-4(b)(2) ........................................................................................ 18

Fed. R. Civ. P. 59(e) ..................................................................................... Passim

Fed. R. Civ. P. 9(b) ............................................................................................. 12

Fed. R. Civ. P. 15(a) .............................................................................. 9-10, 14-15

Fed. R. Civ. P. 60(b) ............................................................................................. 9

Mass. Gen. L. ch. 110A, § 410 ........................................................................... 36

Mass. Gen. L. ch. 93A .......................................................................................... 36

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC., et al., Plaintiffs v. KAREN M. SUGHRUE, et al., Defendants | ) ) ) ) ) ) ) ) ) ) ) Civil Action No: 04-11667-RGS Consolidated into Civil Action No: 05-10176 |

ADVEST, INC.'S OPPOSITION TO PLAINTIFFS'
MOTION TO VACATE DISMISSAL AND PLAINTIFFS'
MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Defendant Advest, Inc. ("Advest") hereby opposes Plaintiffs' Motion to Vacate Dismissal and Plaintiffs' Motion for Leave to File Second Amended Complaint.[1] There is no basis for this Court to take the extraordinary step of vacating its thorough and well reasoned Order dismissing this action. Accordingly, the Court should deny the Motion to Vacate and need not reach the Motion for Leave to Amend. Even if considered by the Court, the Motion for Leave to Amend should be denied, particularly where Plaintiffs are not entitled to have their Motion considered under the liberal standard favoring amendment because they delayed seeking to further amend their Amended Complaint until *after* this securities fraud action was dismissed. As set forth below, Plaintiffs' Motions are baseless and their conduct in delaying to seek amendment constitutes bad faith. Under these circumstances, Advest is entitled to

---

[1] The Court dismissed two consolidated actions: one filed by T. Rowe Price Tax-Free High Yield Fund, Inc., Smith Barney Income Funds/Smith Barney Municipal High Income Fund, Dryden National Municipal Fund, Inc. and John and Lois Moore, Civil Action No. 04-11667-RGS (the T. Rowe Price Action) and one filed by Denise McKeown and Robert Lutts, Civil Action No. 05-10176-RGS (the McKeown Action). Plaintiffs in the T. Rowe Price Action have filed a Motion to Vacate the Dismissal and a Motion for Leave to File a Second Amended Complaint, which motions Advest vigorously opposes. Plaintiffs in the McKeown Action have not sought to vacate the judgment or amend their Complaint.

reimbursement of the attorneys' fees and costs incurred in connection with the preparation of this Opposition.

## INTRODUCTION

On September 30, 2006, this Court issued a detailed Memorandum and Order ("Order") dismissing this purported securities fraud action without leave to amend.  Final judgment was entered on October 3, 2006.  In reaching that decision, the Court rejected Plaintiffs' contention that Bradford College ("Bradford" or "the College"), its officers and trustees and underwriter Advest, somehow misled investors when, in May 1998, in an effort to turn around the College's financial situation and to reinvigorate the College, the Massachusetts Industrial Finance Agency ("MIFA") issued bonds for the benefit of Bradford.  As the Court held, the allegedly misleading Official Statement and attached financials "would have alerted any reasonably attentive reader to the College's troubled financial state, both past and present" and made clear that "something less than fiscal health was at play."  "Standard & Poor's rating of the bonds – BBB minus – would be recognized by any reasonably sophisticated investor as the lowest grade given to a security north of junk bond status."  Order at 6.  Nothing Plaintiffs are arguing now changes this assessment.  Thus, there is no basis for vacating the final judgment.  Nor is there any basis for granting Plaintiffs' belated motion for leave to further amend their Amended Complaint.

The decision whether or not to vacate the judgment rests solely within this Court's discretion.  However, vacating a judgment is an "extraordinary remedy and should be granted sparingly."  *U.S.A. ex rel. Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, **179 F.R.D. 541, 547 (S.D. Ohio 1998)**.  Thus, absent a manifest error of law or the discovery of new evidence, it is not appropriate to vacate a final judgment.  *Marie v. Allied Home Mortgage Corp.*, **402**

F.3d 1, 7 (1st Cir. 2005).  As Plaintiffs cannot begin to establish that either of these circumstances exists here, the Court's Order should stand.

Plaintiffs' only argument to support their Motion to Vacate is based on their purported discovery of "new evidence" that is not new at all.  Specifically, Plaintiffs contend that a letter, "*discovered*" *15 months ago*, indicates that, one week *after* the date of the Official Statement, the trustees may have learned that the College was unlikely to meet its enrollment projections.  As this Court found, however, the Official Statement never promised that Bradford *would* meet its enrollment projections, but rather warned that the College "might well fall short of its enrollment goals."  Order at 7.  Thus, Plaintiffs' purported evidence is neither new nor relevant.

Even if this vague letter did anything to change the analysis – which it does not – Plaintiffs admit that it was found more than 15 months ago; several months before the parties completed the briefing on the motions to dismiss and before this Court heard argument on those motions.  If this purported "newly discovered evidence" was so critical Plaintiffs could have, and should have, raised it then.  Plaintiffs' tactics – holding back allegedly relevant facts until after the parties briefed motions to dismiss the first Amended Complaint and after that Amended Complaint was dismissed – smack of gamesmanship.  The Plaintiffs offer no reasonable explanation for their conduct and this Court should not condone or reward them for it.

In very similar circumstances, Judge Lindsay denied a motion to amend reasoning that "[a] plaintiff shouldering the burden of pleading under the [Private Securities Litigation Reform Act ("PSLRA")] cannot pull its punches in this way and then expect a district court to allow that plaintiff another chance once the matter has not only been fully briefed, but actually

decided." *In re Stone & Webster, Inc. Sec. Litig.*, **217 F.R.D. 96, 98-99 (D. Mass. 2003),** *aff'd in relevant part by*, **414 F.3d 187 (1ˢᵗ Cir. 2005).  Judge Lindsay's reasoning applies with even greater force here because a Motion to Vacate is subject to much greater scrutiny than a simple motion to amend a complaint filed before judgment is entered.** *Harris v. City of Auburn,* **27 F.3d 1284, 1287 (7ᵗʰ Cir. 1994);** *Cook v. Rumsfeld*, **No. 04-12546-GAO, 2006 WL2559766, at \*1 (D. Mass. Sept. 5, 2006).  Plaintiffs have shown total disregard for the resources of this Court and the defendants and their Motion to Vacate should be denied for this reason alone.**

**The Court need not reach the Plaintiffs' Motion for Leave to File Second Amended Complaint.  Nevertheless, that Motion should be denied for additional reasons.  First, the purpose of the PSLRA would be frustrated by allowing Plaintiffs to amend in these circumstances.  It has been more than six years since Bradford College defaulted on the bonds at issue.  This is not a case where Plaintiffs filed their first complaint with little or no information or where the critical information resides only with defendants.  Instead, as set forth in their first Amended Complaint and their Opposition to the motions to dismiss (filed more than one year ago), Plaintiffs had access to documents and conducted witness interviews before filing this lawsuit.  As Judge Lindsay recognized in** *Stone & Webster*, **granting leave to amend in a securities fraud action like this one would undermine the purpose of the PSLRA, which imposes heightened pleading standards in order to prevent Plaintiffs from filing unsubstantiated lawsuits with the hope that they will procure a basis for their claims through discovery.**

**Second, amendment is not appropriate where it would be futile.  The Proposed Second Amended Complaint does not contain any new allegations that would in any way change this**

Court's conclusion that the Official Statement was not misleading.  As this Court already found, however, the Official Statement fully disclosed the risky nature of the investment in Bradford, and Plaintiffs' purportedly "new" allegations do not change that analysis.

Third, Plaintiffs' "new" allegations do not even purport to address many of the flaws in Plaintiffs' original pleading – flaws that the Court did not need to reach in dismissing the case - including, for example, their failure to plead scienter as to Advest, loss causation and standing, and the fact that the bonds at issue are exempt from liability under Section 12(a)(2).  Thus, even if the Court were to vacate its reasoned judgment – which it should not – and consider the Motion for Leave to File Second Amended Complaint, it should deny that Motion.

### FACTUAL AND PROCEDURAL BACKGROUND

A.    The Bradford College Bond Offering

This Court has already reviewed hundreds of pages of briefing addressing the underlying bond offering that gave rise to this action and Advest will not repeat the full background here.[2]  In summary, the Plaintiffs are bondholders and an insurer of bonds (the "Series 1998 Bonds") issued by MIFA on behalf of Bradford College pursuant to an Official Statement, dated May 1, 1998.   As this Court acknowledged in dismissing the action, throughout the mid-1990s, Bradford had experienced problems with cash flow and its ability to attract and retain students.  The bond offering was part of the College's effort to turn itself

---

[2]        The trustees and officers (the "Bradford Defendants") filed a motion to dismiss the federal claims on January 20, 2005 and moved to dismiss the state claims on March 1, 2005.  The memorandum in support of their motion to dismiss the federal claims is referenced herein as "Bradford Def. Mem."  Advest filed its motion to dismiss all of the claims, and supporting memorandum, on February 28, 2005, which memorandum is referenced herein as "Advest Mem."  The Opposition filed by the *T. Rowe Rowe Price* plaintiffs is referenced as "Opp." and the reply briefs filed by Advest and the Bradford Defendants on July 29, 2005 are referenced as "Advest Reply" and "Bradford Def. Reply," respectively.  In preparing this briefing, Advest discovered that its reply brief, while filed and served along with its assented-to motion for leave to file a reply, on July 29, 2005, was never entered on the docket.  The assented-to motion for leave was allowed on August 24, 2005.  At the Court's request, Advest is attaching that reply hereto as Exhibit 1.

around, to improve its "competitive position . . . and its ability to retain students," (Official

Statement at A-7).[3] One of the stated goals of the offering was to bring financial equilibrium

and stability to the College within a balanced budget. "Any reasonable investor would have

understood that if a goal of the offering was to achieve a balanced budget, something less than

fiscal health was at play." Order at 6.

As the Court also found, the Official Statement was replete with cautionary language

and made clear that an investment in the "BBB –" rated bonds was a risky one. *See* Order at

6. Unfortunately, the risks identified in the Official Statement came to fruition in June 2000,

three years after the offering, when the College was forced to close its doors and later filed for

bankruptcy.

B.     History of this Lawsuit

Plaintiffs originally filed suit against the former trustees and officers of the College (the

"Bradford Defendants") and underwriter Advest in November 2000 but voluntarily dismissed

the action after the defendants agreed to enter into a tolling agreement. Almost four years

later, in July 2004, Plaintiffs re-filed their securities fraud claims and served the defendants the

following October. In January 2005 Plaintiffs amended their Complaint. Plaintiffs alleged that

"the Official Statement portrayed the financial and operational condition of the College as both

stable and improving" and failed to disclose the College's severe and longstanding attrition

crisis. Plaintiffs also challenged the sufficiency of the following disclosures: (1) the College's

predictions of student financial aid, (2) its strategic planning; and (3) its intention to contribute

internally generated funds towards the costs of dormitory construction.

---

[3]     A copy of the Official Statement was attached to the Amended Complaint.

All defendants filed their motions to dismiss the Amended Complaint on February 28, 2005. Plaintiffs filed a 91 page Opposition on May 2, 2005. Throughout their Opposition, Plaintiffs cited to additional information not included in the Amended Complaint and asked that they be given the opportunity to further amend the Amended Complaint to include that additional information if the Court determined that the Amended Complaint was not sufficient to withstand the dismissal motions. The defendants filed reply briefs on July 29 and on October 6, 2005 the Court heard oral argument on the motions. This Court reviewed hundreds of pages of briefing regarding the sufficiency of the Amended Complaint before issuing a detailed Memorandum and Order on September 30, 2006 dismissing the Amended Complaint without leave to amend. That Order was entered, and the case was closed, on October 3.

In its Memorandum and Order, the Court reviewed, in detail, each of the allegedly misleading statements identified by the Plaintiffs and determined that the "Plaintiffs have failed to show that the Official Statement was false or misleading." Order at 15. The Court rejected Plaintiffs' overarching assertion that the Official Statement portrayed the financial condition as "stable and improving," finding that "[t]his blunderbuss claim is not supported by any fair reading of the Official Statement and its attached financials. These would have alerted any reasonably attentive reader to the College's troubled state, both past and present." Order at 6. The Court correctly concluded that the Official Statement warned investors that the bonds were a risky investment and that the Plaintiffs' complaints regarding the adequacy of the disclosures in the document were misplaced. *See id.*

Nonetheless, on October 20, 2006, the Plaintiffs filed the instant Motion to Vacate Dismissal and Motion for Leave to File Second Amended Complaint. Although Plaintiffs filed a single Memorandum in support of both Motions, the Motions are separate and must be

considered separately; if the Court denies the Motion to Vacate, as it should, there is no need to consider the Motion for Leave to Amend.  Plaintiffs also attempt to water down the very stringent standard applicable to their Motion to Vacate by confusing it with the more liberal standard usually given to motions to amend – which standard is applicable only where, unlike here, no final judgment has entered.  Under the appropriate standard, the Motion to Vacate cannot be granted and the Court need not reach the Motion for Leave to Amend.

## ARGUMENT

I.    **THERE IS NO BASIS FOR VACATING THIS COURT'S DETAILED ORDER AND JUDGMENT.**

    A.    **The Standard:  Vacating a Judgment is an "Extraordinary Remedy" That Should Be Granted Sparingly and Only in Very Limited Circumstances.**

A party asking the Court to vacate a final judgment under Fed. R. Civ. P. 59(e) faces a very high hurdle.  The standard applicable to Rule 59(e) motions is necessarily heightened in order to preserve the interests of finality and conservation of scarce judicial resources.  *See Am. Textile Mfrs.*, **179 F.R.D. at 547.**  "Motions under Rule 59(e) must either clearly establish a manifest error of law or must present newly discovered evidence."  *FDIC v. World University, Inc.*, **978 F.2d 10, 16 (1st Cir. 1992);** *see also Marie*, **402 F.3d at 7;** *Pomerleau v. West Springfield Pub. Schools*, **362 F.3d 143, 147 (1st Cir. 2004).**  And even where one of these grounds exists, a Rule 59(e) motion "is an extraordinary remedy and should be granted sparingly."  *Am. Textile Mfrs.*, **179 F.R.D. at 547.**  The decision whether or not to vacate a judgment is entirely within the Court's discretion.  *Arrieta-Colon v. Wal-Mart Puerto Rico, Inc.*, **434 F.3d 75, 89 (1st Cir. 2006);** *Hayes v. Douglas Dynamics, Inc.*, **8 F.3d 88, 90 n. 3 (1st Cir. 1993);** *Firestone v. Firestone*, **76 F.3d 1205, 1208 (D.C. Cir. 1996).**

Plaintiffs have not, and cannot, meet this burden.  Recognizing this, Plaintiffs attempt to apply a different standard.  To do so, they must water down the stringent standard under Rule 59(e) by merging it with the more liberal standard for granting leave to amend under Rule 15(a) and mischaracterize the United States Supreme Court's holding in *Foman v. Davis*, 371 U.S. 178 (1962).  This argument should not long detain the Court.

Notwithstanding Plaintiffs' creative interpretations of *Foman*, that Court never created a new, more liberal standard for motions to vacate.  The procedural posture of the *Foman* case is complex and though the Court briefly discussed a motion to vacate, it *never* addressed the standard applicable to such motion.  *See* 371 U.S. at 181-82.  At the outset, the Court upheld the lower court's treatment of a motion to vacate as a Rule 59(e) motion rather than a motion under Rule 60(b).  *Id.* at 181.  Then, without considering the standard applicable to a motion to vacate, the Court *separately* addressed the standard for amendment under Rule 15(a).  *Id.* at 182.  Contrary to the Plaintiffs' suggestion, the Court did not equate the liberal Rule 15(a) standard with the much more stringent Rule 59(e) one.  *Id.*  Indeed, post-*Foman,* courts considering motions to vacate under Rule 59(e) consistently have held that the applicable standard is rigorous.  *See Marie*, 402 F.3d at 7; *Linton v. New York Life Ins. and Annuity Corp.*, No. 04-11362-RWZ, 2006 WL 3043224, at *1 (D. Mass. Oct, 25, 2006); *Am. Textile Mfrs.*, 179 F.R.D. at 547.

Other courts in this District have recently explained that it is "very difficult to prevail on a Rule 59(e) motion" and that the moving party must "either clearly establish a manifest error of law or must present newly discovered evidence."  *Marie*, 402 F.3d at 7; *see also Dietzel v. Springfield Terminal Railway Co.*, No. 03-12560-RGS, 2006 WL 3231187 at *1 (D. Mass. Nov. 8, 2006); *Linton,* 2006 WL 3043224, at *1.  For example, in *Dietzel*, this Court

recently denied a motion for a new trial pursuant to Rule 59(e) because "[d]efendant's motion touche[d] neither of the [two] permissible bases for vacating a judgment." *Dietzel,* **2006 WL 3231187 at \*1.**

Likewise, in *Cook v. Rumsfeld*, **Judge O'Toole denied Plaintiff's Rule 59(e) motion for reconsideration of the court's grant of defendants' motion to dismiss where no manifest error of law or fact or newly discovered evidence was shown.** *See* **No. 04-12546-GAO, 2006 WL 2559766, at \*1 (D. Mass. Sept. 5, 2006). Judge O'Toole held that "to the extent that [the plaintiff] seeks to present new arguments that could have been made previously, relief under Rule 59(e) is not warranted."** *Id.* **In short, parties seeking to vacate a judgment face a very high hurdle and** *Foman* **does not state otherwise.[4] Logic and an appreciation for the scarcity of judicial resources also dictate that reasoned dismissals on the merits are not easily set aside.**

### B.    Plaintiffs Have Not, and Cannot, Satisfy the Stringent Standard Applied to Motions to Vacate.

Plaintiffs plainly fail to meet the rigorous standard applicable to a motion to vacate under Rule 59(e). **Plaintiffs' "new" evidence is a letter indicating that one week** *after* **the date of the Official Statement, the trustees** *may* **have learned that the College was unlikely to meet its enrollment projections.[5]** *See* **Affidavit of Thomas Hoffman, ("Hoffman Aff."), ¶ 3. Plaintiffs admit that they discovered this letter in June 2005 –** *15 months* **before this Court**

---

[4] Also, *Foman* **is distinguishable because there, unlike here, the action had been dismissed on a technicality. In** *Foman*, **the lower court had dismissed petitioner's claims on statute of frauds grounds and denied her motion to amend to state an alternative theory of recovery. Applying the more liberal standard under Rule 15(a), the Supreme Court held that amendment was appropriate to cure a technical deficiency in an otherwise meritorious claim. Of course here, in contrast to** *Foman*, **the first Amended Complaint was dismissed because, after detailed analysis of the claims, this Court found that the Official Statement was not false or misleading and that plaintiffs' claims are not viable.**

[5] Although plaintiffs do not state the grounds on which they base their Motion – instead attempting to water down the standard to fit their purposes – it appears that they rely solely on their alleged discovery of new evidence. *See* **Plts' Motion at ¶ 4;** *see also Marie,* **402 F.3d at 7;** *Pomerleau,* **F.3d at 147;** *World Univ., Inc.*, **978 F.2d at 16.**

- 10 -

issued its Memorandum and Order dismissing all of their claims. Despite "discovering" this allegedly relevant letter in June 2005, Plaintiffs made no mention of it during oral argument on the motions to dismiss on October 6, 2005, nor did they seek to supplement their briefing either before or after that hearing. If this letter was as critical as Plaintiffs now claim, they had ample opportunity to bring it to the attention of the Court before the Court devoted significant resources to consideration of the motions and issued its detailed Order analyzing the Official Statement and dismissing the Amended Complaint without leave to amend.

Plaintiffs may not have highlighted the letter because even they recognized that it cannot revive their claims. Plaintiffs claim that the letter – purportedly written at least 6 months *after* the Official Statement was issued – referenced enrollment information allegedly discussed at the Board of Trustees meeting held one week *after* the date of the Official Statement. (Hoffman Aff., ¶ 3.) The letter purportedly states that, on May 8, 1998, the Board was informed that Bradford *expected* to miss its fall enrollment number by 30 seats.[6] Yet Plaintiffs also allege that Bradford officials "never knew what its enrollment would be until August 1," Prop. Sec. Am. Compl., ¶ 80. Thus it is difficult to see how information shared at a Board meeting in May – one week *after* the Official Statement – renders all enrollment predictions materially false and misleading. To the contrary, as this Court found in its Order, the Official Statement warned that the College "might well fall short of its enrollment goals." Order at 7. Because the potential of an enrollment shortfall was disclosed in the Official Statement, Plaintiff's "new evidence" is irrelevant to their claims.

---

[6] Plaintiffs claim not to have a copy of the document so it is not possible for the defendants or this Court to know what the letter actually says.

Aside from the irrelevance of the "new" evidence, Plaintiffs' related conduct suggests gamesmanship.  Plaintiffs assert that they "found" a letter of tenuous relevance months before the hearing on the motions to dismiss and, rather than allowing the parties or the Court the opportunity to address the letter, they held it back to use as their one "ground" for re-litigating the same issues.  Courts rightfully do not condone such tactics.  *See Nat. Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.*, **899 F.2d 119, 123 (1st Cir. 1990) ("Rule 59(e) does not allow the losing party to repeat old arguments previously considered and rejected");** *Am. Textile Mfrs.*, **179 F.R.D. at 547 (Rule 59(e) is not a means by which a party may re-litigate issues previously considered);** *EEOC v. Argent Indus., Inc.*, **746 F. Supp. 705, 706 (S.D. Ohio 1989) (same).**

For example, Judge Lindsay denied a motion to amend in precisely these circumstances.  *See In re Stone & Webster*, **217 F.R.D. 96, 98-99 (D. Mass. 2003),** *aff'd in relevant part by*, **414 F.3d 187 (1st Cir. 2005).**  The *Stone & Webster* **Plaintiffs, in a lengthy Amended Complaint, alleged that** *Stone & Webster* **had issued fraudulent financial statements and press releases in order to hide its rapidly worsening financial condition.  The court dismissed most of Plaintiffs' claims, finding that they had failed to meet the specificity requirements of Rule 9(b) and the PSLRA, and only then did the Plaintiffs move for leave to further amend their Amended Complaint.[7]** *Id.* **at 97-98.  The Plaintiffs in** *Stone & Webster*, **like the Plaintiffs here, relied on allegedly newly discovered evidence as the basis for their motion but, also like these Plaintiffs, had to concede that their "newly discovered" evidence had been available to them during the pendency of the motions to dismiss.** *Id.* **In denying the**

---

[7] **Because not all of the claims were dismissed and, therefore, no final judgment was entered, the** *Stone & Webster* **plaintiffs filed a motion for leave to amend without first filing a motion to vacate.**

motion, the court found that "[a] plaintiff shouldering the burden of pleading under the [Private

Securities Litigation Reform Act ("PSLRA")] cannot pull its punches in this way and then

expect a district court to allow that plaintiff another chance once the matter has not only been

fully briefed, but actually decided." *Id.* at 99. Judge Lindsay also criticized the Plaintiffs'

tactic of withholding allegedly reliant facts during the pendency of their motions to dismiss,

finding that their conduct "smack[ed] of gamesmanship bordering on bad faith." *Id.*

Judge Lindsay's reasoning applies with even greater force to this Motion to Vacate,

which is subject to much greater scrutiny than a simple motion to amend a complaint filed

before judgment has entered. The Plaintiffs should not be rewarded for their gamesmanship

and disregard for the resources of this Court and the parties. Plaintiffs' Motion to Vacate

should be denied.

II.    **EVEN IF THE COURT WERE TO REACH PLAINTIFFS' MOTION FOR
       LEAVE TO FILE SECOND AMENDED COMPLAINT, PLAINTIFFS HAVE
       NOT ESTABLISHED ANY BASIS FOR GRANTING THE MOTION.**

If this Court, as it should, denies Plaintiffs' Motion to Vacate, there is no need to reach

the Motion for Leave to File Second Amended Complaint. Nevertheless, even if considered,

that Motion should also be denied. As set forth below, Plaintiffs have not met the heightened

standard for granting a motion to amend after a final judgment has been entered. Further,

allowing such motion at this time would be inconsistent with the PSLRA, which was enacted to

prevent Plaintiffs from filing unsubstantiated claims with the hope of filling in the gaps through

discovery.

A.    **Plaintiffs Have Failed to Satisfy the Heightened Standard Applicable to
      their Motion for Leave to Amend After Dismissal.**

The normal liberal standard applicable to motions to amend does not apply where, as

here, judgment has entered. *See Firestone*, **76 F. 3d at 1208**; *Harris v. City of Auburn*, **27**

- 13 -

F.3d 1284, 1287 (7th Cir. 1994).  To the contrary, "the presumption that leave to amend shall be freely given pursuant to Rule 15(a) disappears after judgment has been entered." *Harris*, 27 F.3d at 1287.  Thus, in this situation, the presumption is that leave to amend will *not* to be given.  *See First Nat'l Bank v. Continental Illinois Nat'l Bank & Trust Co.*, 933 F.2d 466, 468 (7th Cir. 1991); *see also Harris*, 27 F.3d at 1287.  A party making a Rule 59(e) motion so that it can amend its complaint "had better provide the [court] with a good reason to grant its motion." *Harris*, 27 F.3d at 1287.  These Plaintiffs have failed to do so.

The decision whether to allow a motion to further amend the Amended Complaint, like the decision on the Motion to Vacate, falls within this Court's discretion.  *See e.g., Sheehan v. City of Gloucester*, 321 F.3d 21, 26 (1st Cir. 2003); *Manzoli v. Commissioner*, 904 F.2d 101, 103 (1st Cir. 1990).  Denial of such a motion, under any standard, is appropriate where there has been undue delay, bad faith, dilatory motive, prejudice or where such amendment would be futile.  *E.g., Mirpuri v. ACT Mfg., Inc.,* 212 F.3d 624, 628 (1st Cir. 2000); *Glassman v. Computervision Corp.*, 90 F.3d 617, 622 (1st Cir. 1996); *Aoude v. Mobile Oil Corp.*, 892 F.2d 1115, 1121 (1st Cir. 1989).

Plaintiffs have offered no compelling reason why their belated Motion for Leave to File Second Amended Complaint should be granted.  Indeed, Plaintiffs had years to prepare their first Complaint in this action, and as is apparent from their first Complaint, Amended Complaint, and their Opposition to the motions to dismiss the Amended Complaint, they had access to key documents and witnesses.  Bradford declared bankruptcy and defaulted on the bonds more than 6 years ago, and more than four years before this action was first filed.  This is not a situation where Plaintiffs were forced to file with little or no information or where critical information resides only with defendants.

- 14 -

Under these circumstances, Plaintiffs' only purported basis for the Motion – one irrelevant letter allegedly "discovered" more than 15 months ago –  is not sufficient.  Indeed, as Judge Lindsay held in *Stone & Webster*, holding back that letter while (i) the parties continued to brief the motions to dismiss the first Amended Complaint, (ii) the Court heard argument and then (iii) the Court issued a detailed Memorandum and Order, is "precisely the sort of undue delay that should result in a denial of leave to amend."  217 F.R.D.  at 99.[8] Plaintiffs' "wait-and-see-what-happens," *see id*. at *98*, approach verges on bad faith and certainly prejudiced the defendants who were still briefing the motions to dismiss and then argued those motions without having the opportunity to address the letter.

Such conduct cannot even arguably form the basis for a successful motion to amend at this exceedingly late stage.  Thus, having plainly failed to overcome the presumption against amendment after judgment is entered, Plaintiffs' Motion should be denied.  *See Harris*, 27 F.3d at 1285-87 (denying Plaintiff's motions to vacate and for leave to amend the complaint after granting defendants' motion to dismiss); *FDIC*, 978 F.2d at 16 (upholding a District Court's denial of a Rule 59(e) motion because the issues raised in the motion could have been raised before the District Court had entered judgment on the summary judgment motions); *Firestone*, 76 F.3d at 1208 (appellants must first satisfy Rule 59(e)'s more stringent standard before court can apply more liberal standard for determining whether to allow amendment under Rule 15(a)).

---

[8]  As noted, because some claims remained in *Stone & Webster* and thus judgment had not entered, Judge Lindsay had to apply the more liberal standard favoring amendment – which standard does not apply here.

### B. Allowing Amendment in These Circumstances is Inconsistent with the PSLRA.

Allowing Plaintiffs' belated amendment is particularly inappropriate in this securities fraud action, which is governed by the Private Securities Litigation Reform Act ("PSLRA"). As one court explained, the PSLRA "restricts Rule 15 in Securities Fraud cases." *See In re Champion Enterprises Inc., Secs. Litig. v. Champion Enterprises, Inc.*, **145 F. Supp. 2d 871, 872 (E.D. Mich. 2001).** Specifically, if the PSLRA:

> "is read to mean that when a complaint is filed under [the PSLRA], a judge must scrutinize the complaint and advise the pleader where the complaint is deficient, and then give the pleader an opportunity to amend the complaint, and when that is done, the judge must again, … advise the pleader that he or she has not passed the test,… then [the PSLRA] is meaningless."

*In re Champion*, **145 F. Supp. 2d at 872;** *see also In re Bristol-Myers Squibb Secs. Litig.*, **228 F.R.D. 221, 229 (D.N.J. 2005)** (if leave to amend complaints alleging securities fraud is liberally granted, then the PSLRA has no vitality). The applicability of the PSLRA also guided Judge Lindsay's ruling in *Stone & Webster, supra,* as he found that allowing Plaintiffs another chance to amend after the matter had been decided would be inconsistent with the purpose behind the PSLRA, which was intended to prevent Plaintiffs from filing unsubstantiated claims with the hope that they could fill in the gaps by imposing costly discovery on their adversaries. *See* **217 F.R.D. at 99.**

Plaintiffs argue that, because the PSLRA establishes such a stringent standard, they should be granted more latitude to amend their complaint, reasoning that "potentially meritorious cases should not be tossed out because the parties' lawyers failed to meet the arcane standards" of the PSLRA. Pl. Mem. at 4. This argument is totally inconsistent with Judge Lindsay's recent ruling. Moreover, this is not a "potentially meritorious" case where the pleading deficiencies easily can be cured with amendment. Rather, as the Court held,

"[P]laintiffs have failed to show that the Official Statement was false or misleading" and their overarching assertion "that the Official Statement portrayed the financial condition as 'stable and improving' . . . is not supported by the any fair reading of the Official Statement and its attached financials." Order at 5-6, 15. In its detailed opinion and Order, the Court analyzed each of the statements and omissions and correctly concluded that the allegedly misleading Official Statement adequately warned investors that the bonds were a risky investment. Plaintiffs' claims are unsupportable. Under these circumstances, there is no basis for permitting amendment.

## III. THE MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT SHOULD BE DENIED BECAUSE THE PROPOSED AMENDMENT IS FUTILE.

Even if the Court were to reach the Motion for Leave to File Second Amended Complaint, allowing amendment is inappropriate where, as here, such amendment would be futile. *See Resolution Trust Corp. v. Gold*, **30 F.3d 251, 253 (1st Cir. 1994);** *Correa-Martinez v. Arrillaga-Belendez*, **903 F.2d 49, 59 (1st Cir. 1990).** The Official Statement was not misleading and Plaintiffs have not, and cannot, show otherwise. In their Memorandum in support of the Motions, Plaintiffs purport to summarize additional allegations that allegedly explain "why" the Official Statement was misleading. Significantly, Plaintiffs' additional allegations do not affect the Court's conclusion that the cautionary language in the Official Statement adequately warned investors of the risks of an investment in Bradford. Notwithstanding the Plaintiffs' characterization of their additional allegations, an analysis of the allegations in the Proposed Second Amended Complaint shows that Plaintiffs have added nothing to change this Court's original analysis that the Official Statement was not misleading. Advest will not review all of its many potential dismissal arguments here. As set forth below, however, the Proposed Second Amended Complaint fails to cure any of the flaws in the

Plaintiffs' claims and thus would not withstand a motion to dismiss. Under these circumstances, the Court should deny the Motion for Leave to Amend as futile.

A. **The Proposed Second Amended Complaint Fails to State a Claim Against Advest Under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 or Under Section 12(a)(2) of the Securities Act of 1933**

The Proposed Second Amended Complaint, like the first, purports to bring two federal securities fraud claims against Advest: one under Section 10(b) and Rule 10b-5 of the Securities and Exchange Act of 1934 (Count 1) and a second under Section 12(a)(2) of the Securities Act of 1933. (Count 3). To state either claim, Plaintiffs first must allege, with particularity, that the Official Statement contained a materially false or misleading statement and that the statement was misleading *when made* – fraud by hindsight is not actionable. *In re Cabletron Systems*, *Inc., * **311 F.3d 11, 27 (1st Cir. 2002);** *Shaw v. Digital Equip. Corp.*, **82 F.3d 1194, 1217 (1st Cir. 1996);** *see also Gross v. Summa Four, Inc.,* **93 F.3d 987, 991 (1st Cir. 1991).** In addition, to state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege, among other things, particular facts which give rise to "a strong inference of scienter" with respect to each defendant. *See, e.g.,* **15 U.S.C. §78u-4(b)(2);** *Greebel v. FTP Software, Inc.*, **194 F.3d 185, 198 (1st Cir. 1999);** *Maldonado v. Dominguez*, **137 F.3d 1, 9 (1st Cir. 1998).** The Proposed Second Amended Complaint fails to allege an actionable misstatement or omission and fails to allege that Advest acted with the requisite scienter for the Section 10(b) and Rule 10b-5 claim. Accordingly, both federal securities fraud claims would be dismissed for those reasons alone.

Moreover, as explained further below, the Proposed Second Amended Complaint does not even purport to address additional flaws in both federal securities fraud claims. Thus, even if the Proposed Second Amended Complaint did state an actionable misstatement or omission

as to Advest – which it does not – both Counts 1 and 3 would still be dismissed for failure to state a claim.  Finally, none of the state statutory and common law claims included in the Proposed Second Amended Complaint are viable.

> **1.   *The Official Statement Contained Forward-Looking Predictions and Beliefs That Were Accompanied by Specific, Cautionary Language Which Renders All of the Purported Misstatements or Omissions Inactionable as a Matter of Law***

In the Proposed Second Amended Complaint, Plaintiffs attempt to recast their allegations so as to convince this Court to ignore the specific, cautionary language contained in the Official Statement and reverse itself by now finding that the Official Statement was misleading.  But as this Court found, the Official Statement was replete with disclosures and cautionary language regarding the College's precarious financial position, which language cannot be ignored and instead renders all of the alleged misstatements and omissions identified in the Proposed Second Amended Complaint inactionable, as a matter of law.  Specifically, as this Court held:

> The Official Statement clearly disclosed that the College had incurred operating budget deficits in *each successive year* beginning in 1989.  It also disclosed that operating expenses had increased by 64 percent from $4.7 million in 1993 to $11.7 million in 1997, far outstripping student tuition income, which had increased by only $1 million from $3.2 million to $4.2 million (or 31 percent) over the same period.  The Statement of Cashflows for the years 1995 through 1997 indicated that the College had lost $1,825,680 in 1996-1997, compared to $609,454 in 1995-1996.  Thus, in the year prior to the Official Statement, the College suffered a loss approximately three times greater than the deficit incurred during the immediately preceding year.  Finally, Standard & Poor's rating of the bonds - BBB minus - would be recognized by any reasonably sophisticated investor as the lowest grade given to a security north of junk bond status.  Moreover, as defendants note, one of the stated goals of the bond offering was to bring financial equilibrium and stability to the College.  Stability was defined in the Official Statement as operating the College within a balanced budget.  Any reasonable reader would have understood that if a goal of the offering was to achieve a balanced budget, something less than fiscal health was at play when the bonds were issued.

Official Statement at 6.

Notwithstanding these clear disclosures, the Plaintiffs still claim that the College's statements regarding its plans, goals, estimates and predictions were materially false and misleading.  A statement is material, and thus actionable, only if a reasonable investor would have viewed it as "having specifically altered the total mix of information made available" or "might have considered [it] important in the making of [the investment] decision."  *See In re Boston Tech., Inc. Sec. Litig.*, **8 F. Supp. 2d 43, 52 (D. Mass. 1998)**.  The "bespeaks caution" doctrine also provides that when statements of "soft" information – forecasts, estimates, opinions or projections – are accompanied by cautionary language, those statements may not be materially misleading under the securities laws.  *Shaw*, **82 F.3d at 1213;** *Fitzer v. Security Dynamics Tech.*, **119 F. Supp. 2d 12, 31 (D. Mass. 2000)**.  In the face of all of the foregoing disclosures, none of the forward-looking "misstatements and omissions" identified by the Plaintiffs in both their first and now their Proposed Second Amended Complaint are actionable.

> **2.    *The Proposed Second Amended Complaint Fails to Allege an Actionable Misstatement or Omission Regarding Attrition***

As the Court found, the enrollment statistics included in the Official Statement accurately disclosed an alarming attrition rate of at least 40% over *three* years.  Order at 8. Plaintiffs nonetheless continue to challenge the sufficiency of this disclosure, now complaining that the attrition rate was "as much as 64%" over *four* years and that the College improperly "amalgamated" the departing students with the transfer students.  Pl. Mem. at 11; Prop. Sec. Am. Compl., ¶ 60.

Plaintiffs are making much ado about nothing.  First, the College disclosed its raw enrollment numbers.  (Official Statement, A-8.)  Such raw data, which was not characterized

in any way, simply cannot be misleading.  As the Court found, those statistics showed a 60%
attrition rate since 1989 and 40% over three years.  Order at 7, 8.  When making their
investment decision, Plaintiffs have used the raw data provided to calculate the attrition rate in
many different ways for different periods of time, just as they have done for the purposes of
their pleading.  The enrollment statistics were what they were and they were not misleading in
any way.

Second, as the Court recognized in its Memorandum, attrition is relevant to an investor
(and thus material) only because it usually results in a decrease in tuition receipts – if there are
less students paying tuition then it would be more difficult for the College to repay its debt.
See Order (citing Official Statement warning that a failure to attract and *retain* students "could
adversely affect the ability of [the College] to make required payments on the Series 1998
Bonds.")  Thus, all that an investor needs to know is how many students were paying tuition –
the fact that some departing students may have been replaced with tuition-paying transfer
students is irrelevant.  The enrollment statistics accurately reflected the number of students
enrolled and thus accurately described the financial picture of the College.  No matter how the
Plaintiffs paint it, there is nothing misleading about the College's enrollment statistics and its
disclosure regarding its attrition rate. [9]

Further, as this Court also found, the College's retention problem was not hidden.  *See*
Order at 7.  To the contrary, the College disclosed that it hoped that enhancements to its

---

[9]     In their Memorandum in Support of their Motion for Leave to File Second Amended Complaint,
plaintiffs claim that defendants' argument that the extent of the attrition was fully disclosed was not raised until
oral argument and thus, plaintiffs assert, they were "blind sided" and did not have the opportunity to address it
until now.  Pl. Mem. at 10, n. 6.  Nothing could be further from the truth.  Advest and the Bradford Defendants
all made this argument very clearly, first in their opening briefs in support of their motions to dismiss and then
again in their reply briefs – filed on July 29, 2005 – in which the defendants reviewed the enrollment numbers and
explained how those numbers clearly and fully disclosed the very attrition rate which plaintiffs now claim was
hidden.  *See* Bradford Def. Opening Brief at 8; Bradford Def. Reply at 3-5; Advest Mem. at 13-14; Advest Reply
at 8.

dormitories would improve "the competitive position of the College and its ability to retain students," (Official Statement, A-7.) and that "a failure by the [Bradford] to attract and retain students in sufficient numbers . . . could adversely affect the ability of the College to make required payments on the Series 1998 Bonds." (*Id.* at A-11.) The retention problem was discussed openly as an investment risk and, consequently, the College's representations regarding its attrition rate are not actionable, as a matter of law. *See Shaw*, **82 F.3d at 1213**; *Fitzer*, **119 F. Supp.2d at 31.**

Finally, even if the Official Statement was found not to accurately describe the College's attrition rate, as explained in Advest's motion to dismiss the Amended Complaint, Plaintiffs have not alleged that Advest knew, or was reckless in not knowing, that the rate was not properly disclosed. Plaintiffs claim to bolster their scienter allegations by alleging that Advest received a January 22, 1998 student retention report. Prop. Sec. Am. Compl., ¶ 58. Again, however, the College disclosed its actual enrollment statistics, thus Advest's receipt of this report would not have given Advest any more information than that which was disclosed to the public in the Official Statement. Moreover, according to the Plaintiffs, *Advest provided this report to Standard & Poor's*. Prop. Sec. Am. Compl., ¶ 58. The fact that Advest provided the report to the rating agency demonstrates, definitively, that Advest did not intentionally or recklessly mislead anyone. To the contrary, Advest made sure that Standard & Poor's had complete information and, as a result, that agency gave the bonds a BBB – rating, which rating was disclosed in the Official Statement. The Proposed Second Amended Complaint, like the first one, fails to allege that Advest acted with scienter and, accordingly, the Section 10(b) and Rule 10b-5 claim would have to be dismissed for that additional reason.

### 3.    The Proposed Second Amended Complaint Fails to Allege an Actionable Misstatement or Omission Regarding Enrollment

Plaintiffs continue to challenge the accuracy of the College's statements regarding its enrollment "goals." Plaintiffs claim that the College's admissions personnel knew that the disclosed 18% increase in applications was "inflated" because they had started accepting applications over the Internet and also knew that its stated goal of enrolling 225 new students in the fall of 1998 was unrealistic. Pl. Mem. at 12-13; Prop. Sec. Am. Compl., ¶ 87. In dismissing the Amended Complaint, the Court found that the Plaintiffs provided no basis for these assertions. Order at 8-10. Plaintiffs' proposed "new" allegations do nothing to cure these deficiencies.

As an initial matter, the College made clear that enrolling 225 new students for the fall of 1998 was a *goal*. (Official Statement, A-13.) In the very same paragraph, the College also explained that "*failure to achieve this enrollment goal and future enrollment targets may adversely affect the College's ability to reach Financial Equilibrium*." (*Id.* (emphasis added.)) Thus, the forward looking statements regarding future enrollment are protected by the "bespeaks caution" doctrine and inactionable as a matter of law.

Moreover, the Proposed Second Amended Complaint offers nothing to change this Court's original analysis of these statements. Specifically, Plaintiffs now allege that, in the months leading up to the Official Statement, Advest and the Board of Trustees were presented with a budget that projected fall 1998 enrollment to include 225 new students – exactly what was disclosed in the Official Statement. Prop. Sec. Am. Compl., ¶ 82. Then, the Plaintiffs allege that, in the weeks leading up to, and following, the date of the Official Statement the executive officers of the College and the Board of Trustees – *not Advest* – were provided varying predictions of Fall 1998 enrollment: on April 20, 1998 the officers were estimating

- 23 -

220 new students and on May 8, 1998 (one week *after* the date of the Official Statement) the Board was told that they should expect 30 fewer students than previously anticipated. Prop. Sec. Am. Compl., ¶ 83, 84. Significantly, Plaintiffs do not allege that the Board was told to expect fewer new students. Further, as Plaintiffs' allegations make plain, in the spring of 1998, the enrollment estimates were changing. The unpredictability of Bradford's enrollment was confirmed by defendant Kizka who, when interviewed in the Spring of 2000, stated that "Bradford never knew what its enrollment would be until August 1 of every year." Prop. Sec. Am. Compl., ¶ 80. That is exactly the point. In the May 1 Official Statement, the College stated its *goal* of enrolling 225 new students but it did not *know, and did not state that it knew,* what its enrollment would be until months later. By definition, therefore, this goal cannot be false or misleading.

The Plaintiffs' additional allegations regarding the purported inflated application figures, likewise, are of no consequence. Significantly, Plaintiffs do *not* allege that Bradford had not received an 18% increase in applications. Rather, Plaintiffs now contend that, *in the spring of 1999* – one full year after the Official Statement was issued – Bradford's admissions personnel made a presentation to the Board in which they allegedly stated that counting web applications "artificially inflated" the number of applications received. Prop. Sec. Am. Compl., ¶ 87 & n. 4. But facts known to Bradford's admissions personnel in 1999 are irrelevant to a determination as to whether the May 1, 1998 statement regarding the College's goal of enrolling 225 new students was false or misleading when made.

Finally, even if there was something misleading about the College's enrollment goals – which there was not – the Plaintiffs have not alleged that Advest knew, or was reckless in not knowing, that. As the Plaintiffs concede, none of their additional scienter allegations relate to

Advest.  Pl. Mem. at 13.  Thus, Count 1 also would have to be dismissed as to Advest for failure to allege scienter.

### 4.     The Proposed Second Amended Complaint Fails to Allege an Actionable Misstatement or Omission Regarding Financial Aid Awards

In the Proposed Second Amended Complaint, Plaintiffs reiterate their complaints about the adequacy of the disclosures regarding the College's projected financial aid awards.  Pl. Mem. at 14.  Plaintiffs allege that it was unreasonable for the College to disclose its "current plan" of reducing financial aid spending from 30.3% of student income to 29.9% for the 1997-98 school year and to 28.8% for the 1998-99 school year.  Pl. Mem. at 14; Prop. Sec. Am. Compl., ¶ 63; (Official Statement, A-13.)  But as this Court found, none of the defendants – and least of all the underwriter, Advest – knew about the final 1997-98 financial awards until the audited financials were finalized months *after* the Official Statement was issued.  Mem. and Order at 12; *see also* Prop. Sec. Am. Compl., ¶ 64 ("the College's audited financials soon confirmed" that actual financial aid commitments exceeded the projections).  Likewise, the Court wondered whether these forward looking projections were really material as "it is doubtful" that a reasonable investor would have found the additional $280,000 in financial aid commitments for the 1998-99 school year to be of material significance.  Order at 11, n. 7.

The Proposed Second Amended Complaint does not begin to cure these deficiencies.  Plaintiffs include a series of allegations regarding the 1997-98 financial aid budget that show that defendant Kiszka, the chief financial officer of the College, was preparing revised budgets from the fall of 1997 through at least April 1998 in which the financial aid percentages varied from 28.9% to 32%.  Prop. Sec. Am. Compl., ¶¶ 65, 66.  Plaintiffs still concede that the audited financials – with the final financial aid numbers – were not available until *after* the Official Statement was issued.  *Id.*, ¶ 64.  Accordingly, the new allegations are irrelevant and

do not show that any of the defendants, least of all Advest, had any basis to believe that the College's financial aid projections for the 1997-98 school year were false when made.

The allegations regarding the 1998-99 year also establish that the financial aid budget was being revised throughout the summer. Prop. Sec. Am. Compl., ¶ 69. Specifically, Plaintiffs allege that, beginning on April 29, 1998 (two days before the date of the Official Statement) and continuing through at least June 1998, Bradford was revising its budget. *Id.* Again, Plaintiffs have not shown, because they cannot, that the 1998-99 financial aid projections were false when made – they are the definition of forward looking statements that are inactionable, as a matter of law. Moreover, in the end, Plaintiffs must still admit that the final 1998-99 financial aid commitments exceeded the predicted budget by only $280,000, which, as this Court already found, is immaterial. Order at 11, n. 7. *See also* Prop. Sec. Am. Compl., ¶ 69.

Finally, Plaintiffs complain that the College was not doing enough to decrease its financial aid commitments and did not sufficiently disclose that it was using financial aid to attract students. Prop. Sec. Am. Compl., ¶68. But, as the Court has held, the financial statements appended to the Official Statement disclosed that financial aid as a percentage of tuition revenue had risen each year since 1989. Order, at 11; (Official Statement at A-13.) The Official Statement further disclosed that "approximately 80%" of students received Bradford-funded financial aid. (Official Statement at A-13.) The Official Statement made clear that Bradford offered financial aid to virtually every student and disclosed that

"something less than fiscal health was at play when the bonds were issued." Order at 6.  No amount of artful pleading can mask these clear disclosures.[10]

The Section 10(b) and Rule 10b-5 claim also would have to be dismissed because, as the Court already noted, Plaintiffs have not established that Advest knew, or was reckless in not knowing, that the College's financial aid projections would not come to fruition.  Order at 12.  Plaintiffs now allege that Bradford's budgets, prepared by its head financial officer, were wrong, Prop. Sec. Am. Compl., ¶ 65.  But Advest had no way of knowing that and Advest was entitled to rely on the budgets.[11]  In addition, because Plaintiffs still concede, as they must, that no final financial aid numbers – for either year – were available until *after* the Official Statement was issued, Advest cannot possibly be charged with knowing that the projections would not be achieved.

> ### 5.     The Proposed Second Amended Complaint Fails to Allege an Actionable Misstatement or Omission Regarding the College's Equity Contribution

In the Official Statement, the College represented that it would make a $1 million equity contribution from internal funds towards the completion of the dormitory construction

---

[10]     Plaintiffs try to make the financial aid discrepancy appear more relevant by changing the numbers slightly:  they now claim that actual financial aid commitments for 1998-99 were 39.1% of student income, as opposed to 31.3% alleged in the Amended Complaint, and they assert that, for the 1998-1999 school year, 90% of students received financial aid.  Prop. Sec. Am. Compl., ¶73.  Bradford never promised, however, that only 80% of students would receive aid *the next year*, (*see* Official Statement at A-13), and, regardless of the percentages, plaintiffs still admit that the financial aid budget was exceeded by only $280,000 – an amount that, as this Court already found, is immaterial.  Thus, plaintiffs make one last ditch effort to exaggerate the significance of the financial aid projections, arguing that, if Bradford had reached its enrollment goals, and if it had the same percentage of aid to student income, it would have exceeded its financial aid budget by $1.26 million.  Prop. Sec. Am. Compl., ¶ 73.  This allegation is difficult to untangle, but, essentially, plaintiffs are creating a hypothetical situation in order to create a hypothetical misstatement.  But the securities laws do not impose liability for hypotheticals and the financial aid projections are not misleading and not material, as a matter of law.

[11]     Plaintiffs allege that, in October 1997, Advest received financial aid budget information from the Admissions Office that was different than the financial aid commitments included in the budgets that Kiszka provided to Advest in October 1997 and January and April 1998.  Prop. Sec. Am. Compl., ¶ 65, 66.  While plaintiffs contend that Kiszka's budgets were wrong, Advest, as the underwriter, was entitled to rely on the most up to date information from the chief financial officer of the College.

project which was to be funded by the bond offering. (Official Statement, 10.) Plaintiffs claim that this representation was false because the College never intended to make such a contribution. Prop. Sec. Am. Compl., ¶ 93. As grounds for this assertion, the Plaintiffs point to minutes from a February 5, 1998 meeting of the Finance and Buildings and Grounds Committee in which the Committee recommended that "the College would make every effort to reduce its construction costs *or* make an equity contribution *at the end of the final phase of the project.*" Am. Compl., ¶ 65; Prop. Sec. Am. Compl., ¶ 94 (emphasis in original.) As the Court held, "this is very thin gruel." Order at 14. Plaintiffs now add that the Committee's recommendation was adopted by the full Board on February 6, 1998 and seem to think that this additional allegation is sufficient to show that the representation, made on May 1, 1998, regarding the College's intent to make an equity contribution was false. Pl. Mem. at 16. But the fact that, *three months before the Official Statement was issued*, a Committee or the entire Board was considering whether it could reduce construction costs *or* make an equity contribution, does not show that, on May 1, 1998, the College did not intend to make an equity contribution. This additional allegation does not change the Court's original analysis in any way and is yet another in what is a long series of red herrings.

## 6. The Proposed Second Amended Complaint Fails to Allege an Actionable Misstatement or Omission Regarding the College's "Financial Instability"

In their Motion for Leave to File Second Amended Complaint, Plaintiffs try to revive their "blunderbuss" claim that "the Official Statement portrayed the financial condition of the College as stable and improving, when in fact the College was mired in an ongoing fiscal, financial, and operational crisis." *See* Order at 5-6 (citing Am. Compl., ¶ 3.) But as the Court found in rejecting this claim the first time, Plaintiffs' assertions simply are "not

supported by any fair reading of the Official Statement and its attached financials [which] would have alerted any reasonably attentive reader to the College's troubled financial state, both past and present." Order at 5-6.

Nonetheless, Plaintiffs claim that they have "expanded" their allegations, alleging that, at the May 8, 1998 Board meeting, the Trustees were told that they would likely miss their enrollment targets by 30 students and would need to cut the budget. Pl. Mem. at 16; Prop. Sec. Am. Compl., ¶ 49. Plaintiffs contend that the information shared at that meeting – one week *after* the date of the Official Statement – put the Trustees on notice that the College was on the brink of disaster. Pl. Mem. at 16-17.

As an initial matter, Plaintiffs do not contend that Advest was aware of any information allegedly shared at this meeting. Nor was it reckless for Advest not to know as Advest cannot possibly be responsible for ensuring that the Official Statement includes information allegedly known only *after* the date of the Official Statement. Further, as Plaintiffs noted in their Opposition to the motions to dismiss the Amended Complaint, on May 13, 1998, the two officer defendants certified that there were no material changes in the information contained in the Official Statement nor was there any other information that needed to be disclosed. Opposition at 6, n. 4. Under these circumstances, Advest cannot be liable for failing to discover and/or disclose information discussed at the May 8 meeting.

Moreover, as other allegations in the Proposed Second Amended Complaint confirm, the information discussed at the May 8 meeting was in flux. For example, defendant Kiszka acknowledged that Bradford never knew what its final enrollment would be until August 1. Prop. Sec. Am. Compl., ¶ 80. Thus, even the Board could not rely on the preliminary enrollment predictions allegedly made on May 8. Likewise, Plaintiffs allege that Bradford was

revising its budget over the next several months, thus rendering any budget information discussed on May 8 preliminary and unreliable.  Prop. Sec. Am. Compl., 69.  In short, the Plaintiffs' own allegations belie any assertion that, as of May 8, the Trustees knew anything more concrete than what was disclosed in the Official Statement and it is beyond dispute that the Official Statement disclosed that an investment in Bradford was a risky one.  Under these circumstances, this blunderbuss claim would have to be dismissed – again.[12]

   7.  *The Proposed Amendments Do Not Even Purport to Address Many of the Deficiencies in Plaintiffs' Federal Securities Fraud Claims*

  In dismissing the Amended Complaint, this Court reviewed each allegedly false or misleading statement or omission and held that the Plaintiffs "failed to show that the Official Statement was false or misleading."  Order at 15.  Having reached this conclusion, the Court did not need to reach the deficiencies with most of the Plaintiffs' scienter allegations or their failure to plead loss causation – a required element of any Section 10(b) and Rule 10b-5 claim.  Likewise the Court did not address the fact that, absent an allegedly misleading statement *made by Advest itself*, **as an underwriter that was not involved in preparing those portions of the Official Statement that contained the allegedly misleading statements, Advest cannot be subject to primary liability under the Supreme Court's holding in** *Central Bank of Denver N.A. v. First Interstate Bank of Denver*, **511 U.S. 164 (1994).  Plaintiffs' proposed amendments do not purport to address any of these flaws with the Section 10(b) and Rule 10b-5 claim.  Also, Plaintiffs do not, because they cannot, attempt to cure the additional flaws in their Section 12(a)(2) claim.  Specifically, Plaintiffs cannot overcome the fact that Section 12(a)(2) does not**

---

[12]  Plaintiffs have abandoned their claim that the College somehow misrepresented its "strategic plan."  Pl. Mem. at 16.

apply to the tax-exempt Series 1998 Bonds.  Nor have they alleged that they have standing to bring the claim.

In sum, Plaintiffs go to great lengths to try to find a misleading statement in the Official Statement – and still fail – but they do not even purport to address many other fundamental flaws in their federal securities fraud claims against Advest.  The proposed amendments do not cure any of the deficiencies in their claims and thus the Motion for Leave to Amend should be denied.

**B.    There is No Viable State Claim Against Advest**

Plaintiffs' Proposed Second Amended Complaint, like its first one, also purports to bring claims for violation of the Massachusetts Uniform Securities Act, Mass. Gen. L. ch. 110A, § 410, fraud and intentional misrepresentation, negligent misrepresentation, and violation of the Massachusetts consumer protection statute, Mass. Gen. L. ch. 93A.  All of these claims survive only if Plaintiffs allege that the Official Statement was misleading – which they have not – and, accordingly, they would have to be dismissed.  Each claim also suffers from additional failures, discussed in the Memorandum in Support of Defendant Advest, Inc.'s Motion to Dismiss the Amended Complaint, none of which have been cured by Plaintiffs' proposed amendments.[13]

---

[13]    The Proposed Second Amended Complaint contains one additional state law claim against Advest for breach of fiduciary duty to the two individual plaintiffs – John and Lois Moore.  Among other things, the Moores claim that they were unaware of the risky nature of an investment in Bradford.  As an initial matter, this was a claim that was available to the Moores at the outset of this litigation.  It would be unfair, and prejudicial to Advest, to allow the plaintiffs to add a completely new claim, with completely new facts, at this very late stage.  Moreover, as the Court already found, the Official Statement fully disclosed the risks of an investment in Bradford and, accordingly, this claim also is without merit.

IV.    PLAINTIFFS SHOULD BE REQUIRED TO PAY ADVEST'S ATTORNEYS' FEES.

Advest asks this Court to order the Plaintiffs to pay the attorneys' fees incurred by Advest in connection with the preparation of this Opposition to Plaintiffs' Motion to Vacate Dismissal and Motion for Leave to File Second Amended Complaint.  *See Roger Edwards, LLC v. Fiddes & Sons, Ltd.*, 227 F.R.D. 19, 24 (D. Me. 2005) (granting defendant attorneys' fees and expenses incurred in defending against Plaintiff's "frivolous, unreasonable" motion for relief from judgment).  Although the purported "newly discovered evidence" on which Plaintiffs rely was found more than 15 months ago, they did nothing to bring it to the attention of the defendants or this Court until *after* the defendants had incurred expenses in preparing voluminous briefing on their motions to dismiss the first Amended Complaint and arguing those motions.  As Judge Lindsay found in *Stone & Webster*,  Plaintiffs' tactic of withholding this information "smacks of gamesmanship bordering on bad faith."  217 F.R.D. at 98-99.  Further, as set forth above, their allegedly "new evidence" – in addition to not being "new" – is of no relevance to this matter.  As the Court already found, the Official Statement was replete with cautionary disclosures and outright warnings.  The Official Statement was not misleading.

Plaintiffs have acted in bad faith.  They have shown a total disregard for the resources of this Court and the defendants.  Plaintiffs have caused Advest to expend significant resources in re-litigating the same issues.  Advest, therefore, respectfully requests that it be granted its attorneys' fees associated with the preparation of this Opposition.

## CONCLUSION

For the foregoing reasons, this Court should DENY Plaintiffs' Motion to Vacate Dismissal and DENY Plaintiffs' Motion for Leave to File Second Amended Complaint.  In addition, this Court should order Plaintiffs to pay the attorneys' fees incurred by Advest in connection with the preparation of this Opposition.

ADVEST, INC.
By its attorneys,


/s/ Sarah Walters_____
Jonathan L. Kotlier (BBO#545491)
Sarah E. Walters (BBO#638378)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210
617-439-2000

December 8, 2006


### Certificate of Service

I, Sarah E. Walters, certify that on December 8, 2006, a copy of the foregoing Motion has been sent by electronic mail delivery to all counsel of record.

/s/ Sarah Walters___ _____
Sarah E. Walters


1580269.2

- 33 -

EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

T. ROWE PRICE TAX-FREE                )
HIGH YIELD FUND, INC., et al.,        )
                                      )
        Plaintiffs                    )
                                      )        Civil Action No:  04-11667-RGS
v.                                    )        Consolidated into
                                      )        Civil Action No:  05-10176
KAREN M. SUGHRUE, et al.,             )
                                      )
        Defendants                    )
_____)

**DEFENDANT ADVEST, INC.'S REPLY MEMORANDUM IN FURTHER SUPPORT
OF ITS MOTION TO DISMISS THE CONSOLIDATED ACTIONS**

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................2

I.    Both Complaints Should Be Dismissed in Their Entirety Because They Have Failed  to Allege an Actionable Misstatement or Omission................................................2

A.    The Official Statement Accurately Described the College's Financial Situation ..........2

B.    A Statement-by-Statement Analysis Demonstrates That the Plaintiffs' Claims are Not .. Actionable..........................................................................................5

    1.    Projections as to Future Enrollment Were Not Misleading and are Not ........... Actionable. ....................................................................................6

    2.    Projections as to Future Financial Aid Expenditures Were Not Misleading and . are Not Actionable. ............................................................................7

    3.    The Official Statement Adequately Disclosed Bradford's Problem with Retaining Students. .......................................................................................8

    4.    Bradford Had a Strategic Plan. ...............................................................9

    5.    There Was No Misrepresentation That Bradford Would Contribute $1 Million to the Project. ....................................................................................9

II.    The Bondholders Have Failed to Allege a Primary Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act .................................................. 10

A.    The Bondholders Have Failed to Allege That Advest Acted With Scienter............. 10

B.    The Section 10(b) and Rule 10b-5 Claims Against Advest are Barred By the Central ... Bank Doctrine................................................................................... 14

III.    The Bondholders Have Failed to State a Claim For Violation of Section  12(a)(2) of the Securities Act.................................................................................... 15

A.    The Tax-Free Series 1998 Bonds are Exempt From the Provisions of Section 12(a)(2). ............................................................................... 15

B.    The Bondholders Have Failed to Allege Standing to Bring a Section 12(a)(2) Claim. . 17

C.    The Bondholders' Section 12(a)(2) Claims Must Be, and are Not, Pled With the ........ Particularity Required By Federal Rule of Civil Procedure 9(b)............................ 17

IV.    The Plaintiffs Should Not Be Granted Leave to Amend Their Complaints. ............. 19

CONCLUSION .................................................................................. 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Boston Tech., Inc. Sec. Litigation*, 8 F.Supp.2d 52 (D. Mass. 1998) ..........................3

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) ...................................................................................................................14, 15

*Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49 (1st Cir. 1990) ...............................19

*Glassman v. Computervision*, 90 F.3d 617 (1st Cir . 1996) ...................................10, 11, 12

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999).............................................11

*Gross v. Summa Four, Inc.*, 93 F.3d 987 (1st Cir. 1991).....................................................6

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)...................................................................17

*In re Lernout & Hauspie Sec. Litigation*, 230 F.Supp.2d 152 (D. Mass 2002)................14

*In re Number Nine Visual Tech. Corp. Sec. Litigation*, 51 F.Supp.2d 1 (D. Mass. 1999)...................................................................................................... passim

*McKay v. Juran & Moody, Inc.*, No. CIV A3-97-86, 1998 WL 1780694 (D.N.D. Sept. 1, 1998) ............................................................................................................16

*Resolution Trust Corp. v. Gold*, 30 F.3d 251 (1st Cir. 1994) ...........................................19

*S.E.C. v. Dain Rauscher, Inc.*, 254 F.3d 852 (9th Cir. 2001) ...........................................11

*S.E.C. v. Lucent Tech., Inc.*, Civ. No. 04-2315 (WHW), 2005 U.S.Dist. LEXIS 5982 (D.N.J. April 6, 2005) .................................................................................15

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) .........................................5, 17

*Van de Velde v. Coopers & Lybrand*, 899 F.Supp. 731 (D. Mass. 1995)..........................14

*In re Valence Tech. Sec. Litigation.*, No. C 95-20459 JW, 1996 U.S. Dist. LEXIS 22135 (N.D. Cal. Jan. 23, 1996) ..............................................................................11

*In re Verifone Sec. Litigation*, 784 F.Supp. 1471 (N.D. Cal. 1992) ...........................11, 12

*In re Websecure, Inc. Sec. Litigation*, 182 F.R.D. 364 (D. Mass. 1998) ..........................17

*Wells v. Monarch Capital Corp.*, No. 91-10575-ADM, 1996 WL 728125
(D. Mass. Oct. 22, 1996)......................................................................................14

*Wright v. Ernst & Young*, 152 F.3d 169 (2d Cir. 1998).......................................15

## FEDERAL STATUTES

15 U.S.C. §77c(a)...................................................................................................16

## FEDERAL RULES

Federal Rule of Civil Procedure 9(b)........................................................ 12, 17-19

Federal Rule of Civil Procedure 12(b)...................................................................18

## MISCELLANEOUS

Municipal Securities Disclosure Release No. 33-7049, §IIIC3c (March 9, 1994).............8

Municipal Securities Disclosure Release No. 34-26100, 53 F.R. 37778
(Sept. 22, 1988)..............................................................................................11, 14

17 C.F.R. § 240.15c2-12........................................................................................11

1450771.1

# INTRODUCTION

The plaintiffs in these consolidated actions have submitted more than 100 pages of briefing in opposition to the defendants' motions to dismiss their federal and state statutory and common law claims.[1]  Despite the volume of these submissions, the plaintiffs have been unable to point to any materially misleading statements or omissions that are actionable, under any theory, against Advest – the underwriter of the bonds issued in May 1998 ("the Series 1998 Bonds") by the Massachusetts Industrial Finance Agency ("MIFA") for the benefit of Bradford College.  Accordingly, both complaints should be dismissed in their entirety as to Advest. Advest submits this reply memorandum to respond to only the most glaring errors in the plaintiffs' arguments in opposition to its motions to dismiss.

First, the plaintiffs dedicate the majority of their briefing to argument on how and why the statements and omissions in the Official Statement prepared by Bradford College were misleading.  In doing so, however, they ignore the specific disclosures and the plain language of the Official Statement that establish that the defendants did not make material misrepresentations or omissions.

Second, with regard to the critical scienter element of a Section 10(b) and Rule 10b-5 claim, the plaintiffs concede that they have not alleged that Advest had actual knowledge of any allegedly adverse information that should have been disclosed.  Their own citations to Securities and Exchange Commission rules and case law, even when combined with the new

---

[1]    On February 28, 2005, Advest moved to dismiss the Amended Complaint filed in *T. Rowe Price Tax-Free High Yield Fund, Inc. et al. v. Sughrue, et al.*, Civil Action No. 04-11667-RGS.  Two weeks later, Advest filed a nearly identical motion to dismiss the nearly identical complaint filed in *McKeown, et al., v. Advest, Inc., et al.*, Civil Action No. 05-10176-RGS.  Those actions have since been consolidated.  Advest, therefore, files this consolidated reply brief in response to the Opposition filed by both sets of plaintiffs. Opposition or Opp. references the brief filed by the plaintiffs in the *T. Rowe Price* action and McKeown Opposition or McKeown Opp. references the brief filed in the *McKeown* action.  Likewise, Amended Complaint or Am. Compl. references the Amended Complaint filed by the *T. Rowe Price* plaintiffs and Complaint or Compl. references the Complaint filed by the *McKeown* plaintiffs.  Advest's opening brief, filed in the *T. Rowe Price* action on February 28, is referenced throughout as Advest Br.

facts referenced in their Opposition but not included in the Amended Complaint, also show that Advest did not act recklessly in performing its duties as an underwriter. Nor have plaintiffs succeeded in establishing that Advest, as the underwriter, can be found liable as a primary violator of Section 10(b) and Rule 10b-5.

Third, despite their best efforts, the plaintiffs cannot overcome the fact that the Bradford bonds are exempt from Section 12(a)(2). Further, although they have advised this Court that it can "reasonably infer" that the plaintiffs have standing to bring a Section 12(a)(2) claim, such inference would be wrong. We know that at least some of the plaintiffs purchased their bonds in the secondary market and, as a result, do not have standing. Moreover, the fact remains that none of the plaintiff have alleged standing to bring that claim.

Finally, both sets of plaintiffs ask this Court for leave to amend their complaints. Such leave would be inappropriate where, as here, the plaintiffs have had more than six years to prepare their cases and have had access to a myriad of documents – indeed, in their Opposition the *T. Rowe Price* plaintiffs cite to many of them. Both complaints should be dismissed, in their entirety, as to Advest.

## ARGUMENT

I.  **Both Complaints Should Be Dismissed in Their Entirety Because They Have Failed to Allege an Actionable Misstatement or Omission.**

A.  **The Official Statement Accurately Described the College's Financial Situation**

Despite plaintiffs' protestations to the contrary, they have failed to allege any facts to support their contention that at the time of its issuance the Official Statement contained false statements or materially misleading omissions, let alone that Advest, the underwriter, knew of any false statements or material omissions. Moreover, the Official Statement adequately warned potential investors that the College was facing a very difficult situation and that the "BBB- rated" bonds were a very risky investment. Advest urges the Court to review the

Official Statement with the eye of a reasonable investor and submits that it will find that the Official Statement accurately warned potential investors of the problems and challenges facing the College. The Official Statement accurately portrayed the College's situation at the time it was issued. Nothing that plaintiffs argue in their Opposition regarding what was misleading in the Official Statement or what should have been disclosed would "hav[e] significantly altered the total mix of information made available" or been "important in the making of [the investment] decision." *In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 52, 54 (D. Mass 1998) (citations omitted).

In its opening brief, Advest set out at some length the various cautions and caveats contained in the Official Statement. Although Advest will not now repeat what it argued in its opening brief, it is helpful to summarize what was disclosed in the Official Statement in order to rebut plaintiffs' argument that such disclosures were inadequate, especially since approximately 40 pages of plaintiffs' briefing are devoted to this issue. The Official Statement made clear that Bradford had "incurred operating budget deficits in each year since 1989" (*see* Official Statement at A-13), and had difficulty attracting and retaining statements (*see* Official Statement at A-8), despite offering some form of financial assistance to approximately 81% of the enrolled students (*see* Official Statement at A-10). It stated that the whole purpose of the bond offering was to raise money in order to turn itself around, to improve its "competitive position... and its ability to retain students." (Official Statement at A-7).

Yet, the plaintiffs claim that the disclosures in the Official Statement were not sufficient to adequately advise an investor of the potential risks. They argue that the "key" to this false impression "was selective evidence described in the Official Statement that indicated that the College was successfully attracting increasing numbers of students without having to purchase such admissions by large grants of financial aid." Opp. at 1. The Official Statement

"indicated" no such thing. Rather, it clearly showed that in the last five years in order to attract its entering class, the College needed to accept approximately 80% of its applicants since only about 25-35% of those accepted would decide to attend Bradford. *See* Official Statement at A-8. Further, in order to attract and retain these students, Bradford had to give financial assistance to 80% of the enrolled students and had to each year provide more and more financial aid. From 1993-1997, the total amount of financial aid jumped from $5,148,086 to $8,419,488. *See* Official Statement at A-10. As plaintiffs acknowledge, the Official Statement made clear that for "the last full academic year prior to the bond offering, financial aid contributed by Bradford accounted for almost 50% of the gross tuition Bradford earned; O.S. at A-14." McKeown Opp. at 3.

No reasonable investor looking at these figures would conclude "that the college was successfully attracting increasing numbers of students without having to purchase such admissions by large grants of financial aid." Rather, the reasonable investor would conclude that the College had a very high acceptance rate (80%) to get 30% to attend while every year offering more and more in financial aid. In fact, as set forth in the Official Statement, the jump in financial aid between 1996 and 1997 was almost $1,500,000. *See* Official Statement at A-10. The plaintiffs are simply wrong when they claim that the Official Statement gave a false impression on this "key" point. Rather, it is clear as day from the Official Statement that the College had been attracting students to attend by giving them very generous financial aid packages. *See* Official Statement at A-13 ("during this period of enrollment growth, there has been a substantial increase in financial aid funded by the College").

Throughout their Opposition, the plaintiffs grasp at pieces of information in an attempt to create the sense that the Official Statement was somehow misleading. They also repeatedly make allegations that are not true or that are themselves misleading; they allege that statements

- 4 -

are false that are not, that relevant information was omitted that was disclosed, and that predictions were false (predictions can be wrong, but not false); and they make much about beliefs, goals and hopes that did not come to pass. None of their efforts, however, alter the fact that, when taken as a whole, the Official Statement painted a very clear picture of the risks of investing in the bonds.

**B.    A Statement-by-Statement Analysis Demonstrates That the Plaintiffs' Claims are Not Actionable.**

In their Opposition, the plaintiffs argue about "five categories of misrepresentations" in the Official Statement: (1) misrepresentation of expected enrollment; (2) misrepresentation of financial aid awards; (3) non-disclosure and misrepresentation of student retention problems; (4) misrepresentation of existence of a strategic plan; and (5) misrepresentation of the College's intent to contribute to the capital improvements being financed by the bonds. Opp. at 11-12. Yet, the plaintiffs have been unable to point to anything in the Official Statement that was demonstrably false at the time it was issued. Because there are no actual false statements relating to the situation at Bradford at the time of the issuance of the Official Statement, the plaintiffs must show that Advest intentionally or recklessly made decisions to omit certain information from the Official Statement in order to deceive prospective investors. See In re Number Nine Visual Tech. Corp. Sec. Litig., 51 F. Supp. 2d 1, 14 (D. Mass. 1999).

Given their reliance on alleged omissions, the plaintiffs' securities fraud claims are subject to more "exacting treatment" than even the heightened scrutiny applied to alleged affirmative misrepresentations. Number Nine, 51 F. Supp. 2d at 14 (discussing Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir. 1996)). The omissions analysis is also much more subjective than that required to identify a materially false statement. Id. (whether an alleged omission is material requires the court to make a "judgment call").

- 5 -

This more exacting standard is necessary because, as courts have recognized, plaintiffs will always be able to identify additional information that, in hindsight, they may have liked to know. *See Number Nine*, 51 F. Supp. 2d at 14. But such "fraud by hindsight" is not actionable. *See Gross v. Summa Four, Inc.*, 93 F.3d 987, 991 (1st Cir. 1991) (pleading "fraud by hindsight" does not satisfy the heightened pleading requirements applicable to securities fraud claims). Thus, when considering claims based on omission, courts must apply an exacting standard to determine whether the alleged omissions are in fact material, or whether they are simply additional pieces of information that, now that some adverse event has occurred, would have been interesting or perhaps even helpful. *Number Nine*, 51 F. Supp. 2d at 15 ("Simply referencing financial statements that were allegedly made misleading by a failure to disclose certain information seems to give securities plaintiffs an easy escape from the heightened [pleading] standard[s]"). When this exacting standard is applied to the claims in these actions, it is clear that the allegations are legally insufficient.

> 1.    *Projections as to Future Enrollment Were Not Misleading and are Not Actionable.*

The plaintiffs spend several pages of their Opposition alleging that the defendants intentionally omitted information regarding future enrollment. *See* Opp. at 14-20. In the Official Statement, however, the College simply expressed its <u>plan</u> to increase enrollment over the next few years and its <u>belief</u> that it could achieve its goal of enrolling 225 new students for the fall of 1998 based on the numbers it was seeing as of April 3, 1997, 27 days before the bond offering. Official Statement at A-13. These statements were not materially misleading. First, the statements relate to the plan and belief as to future enrollment and the goals of the College. Second, the College did not give assurances that it could reach its enrollment goal and in fact warned that if the enrollment goals are not reached, it could "adversely affect the College's ability to reach Financial Equilibrium." Official Statement at A-13. Third, nothing

in the cited passage was false at the time of the writing. Fourth, any reasonable investor (and especially the sophisticated plaintiffs here) reading about a prediction that, as of April 3, 1998, suggests that the College can reach its enrollment goal for an incoming class in September would take it for what it was - a prediction based on incomplete information. Fifth, the plaintiffs fail to allege that the College did not meet its goal of enrolling 225 new freshmen in the fall of 1998. The Official Statements' projections as to further enrollment were not misleading and were certainly not material.

2.     *Projections as to Future Financial Aid Expenditures Were Not Misleading and are Not Actionable.*

As with the projections as to future enrollment, the plaintiffs attempt to twist a goal and estimate regarding future financial aid expenditures into a material falsity. The plaintiffs do not allege that the College had calculated and knew the financial aid numbers for the year ending June 30, 1998. Rather, they want the Court to "infer" that seven weeks before the end of the fiscal year (while the relevant parties are putting together this large financing) that the defendants knew that financial aid amounts and percentages were higher than Bradford's budget. Opp. at 25-26, n. 16. Where the fiscal year ended two months after the completion of the Official Statement, there is no basis to believe that such numbers had been calculated and were available. *See* Official Statement A-10 (noting fiscal year end of June 30). The figure contained in the Official Statement is clearly designed to be an "estimate." While it is very reasonable to conclude that the Bradford defendants did not know the actual percentage of financial aid for the year about to end, it is inconceivable that Advest knew the figure, and even more importantly, that it had any reason to believe that the estimate was not accurate. It was far beyond Advest's duty to ask about figures that were not due out for at least two

months. [2] The plaintiffs' assertion that this figure "could have been discovered by Advest" is a parenthetical and is completely unfounded. Opp. at 28.

> 3.    *The Official Statement Adequately Disclosed Bradford's Problem with Retaining Students.*

It is clear from the Official Statement that Bradford entered into this bond financing in principal part to raise money to renovate existing, and construct new, residences. The purpose of doing so was to make dormitory life more appealing so that it could better attract and retain students. Official Statement at A-7. Any reasonable investor reading "the Project" section would conclude that Bradford was taking on this project because it had a problem attracting and retaining students. The main purpose of the Project was to overcome this problem. One does not need to be a "clairvoyant," as the plaintiffs argue (Opp. at 32), to figure out that there was an attrition problem, which Bradford was trying to correct.

Further, the enrollment figures and chart on A-8 of the Official Statement make clear that Bradford lost 36 students between the fall and spring; one simply has to subtract the number of full- and part-time students in the fall (602) from the number of full- and part-time students in the spring (566). This information is not hidden; it is right at the top of the page and is not, as plaintiffs claim, misleading. In addition, it is clear that Bradford was losing upperclassmen as well. If all the freshmen who enrolled in 1994 (223), 1995 (224), and 1996 (195) had stayed at Bradford, in 1997 there would have been 876 in the fall of 1997, yet there were only 602 students. The problem with attrition was made clear. In this regard, there is nothing false or misleading about the Official Statement.

---

[2]    The plaintiffs challenge Advest's discussion of their obligation to allege that Advest had a duty to disclose before they can state a claim based on allegedly material omissions. Opp. at 32, n. 21. In arguing that SEC rules and regulations can create such a duty, the Bondholders rely on SEC releases discussing the duties of the *issuer* not the underwriter. *Id.* (citing Municipal Securities Disclosure Release No. 33-7049, §IIIC3c (March 9, 1994) ). While the Bondholders are trying to treat the issuer and Advest, the underwriter, as one in the same, they are not and each has different duties. *See* Advest Br. at 17, 23-24. *See also infra* at 10-15.

### 4.    Bradford Had a Strategic Plan.

The plaintiffs' argument that the defendants made a false disclosure about a strategic plan is difficult to fathom. Bradford's plan is clearly laid out in the Official Statement. The plan was to create better residence halls, so that students would have a better quality of life, so that more students would want to attend and remain at the College, thereby attracting a pool of students whose parents could, and were willing to, take on a bigger portion of the financial burden, thereby improving the financial picture of the College. Any reasonable investor would conclude that that was Bradford's "strategic plan."

### 5.    There Was No Misrepresentation That Bradford Would Contribute $1 Million to the Project.

The Official Statement does indicate that Bradford intended to contribute $1 million to the completion of the Project. Bradford may not have wanted to make the contribution and would even have been willing to reduce the cost of the project to avoid doing so. However, the College never said that it would not make such a contribution if necessary to complete the project. Any reasonable investor looking at the College's endowment (which was disclosed in the Official Statement) would realize that it had the ability to make such a contribution. Further, there is no way that Advest would have known that Bradford was unwilling to make the contribution at the time of the offering.

*     *     *     *

In Advest's opening brief, it explained that the Official Statement truthfully and adequately painted a picture of Bradford's situation; a picture from which a reasonable investor could make an informed investment decision. Nothing that the plaintiffs have argued has undermined that explanation. They have not shown any of the statements to be false or misleading. Nor have they shown any intent to mislead, especially when it comes to Advest.

II.    **The Bondholders[3] Have Failed to Allege a Primary Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 Against Advest.**

The Bondholders' failure to allege an actionable misrepresentation or omission requires dismissal of all of their claims, including the claims for violation of Section 10(b) and Rule 10b-5 (which appear in Count I of both complaints). The Section 10(b) and Rule 10b-5 claims also should be dismissed because the Bondholders have failed to allege that Advest acted with scienter. To the extent the Bondholders are attempting to hold Advest liable for aiding and abetting a violation of Section 10(b) and Rule 10b-5, those claims are barred by the Supreme Court's holding in *Central Bank*.

A.    **The Bondholders Have Failed to Allege That Advest Acted With Scienter.**

Recognizing that they cannot establish that Advest had actual knowledge of any adverse information that should have been disclosed, the Bondholders argue that Advest acted recklessly in failing to discover such information during its due diligence process.[4] Opp. at 45. The Bondholders concede that, to fulfill its duties as an underwriter, Advest needs only verify information submitted by management "where it is possible to" do so. Opp. at 45. *See also Glassman v. Computervision*, 90 F.3d 617, 627-28 (1st Cir. 1996). As set forth in Advest's opening brief, the estimates and predictions contained in the Official Statement and Appendix prepared by Bradford are not the type of information that can be verified by an underwriter. Indeed, the Bondholders' reliance on alleged omissions – omissions that, at most, are only

---

[3]    As noted in Advest's opening brief, the Section 10(b) and Rule 10b-5 claims in Count I and the Section 12(a)(2) claims in Count III of both complaints are brought only by the institutions and individuals that actually hold the Series 1998 Bonds (the "Bondholders"). Plaintiff ACA Financial Guaranty ("ACA"), which is included in the action brought by T. Rowe Price et al., is not a party to the Section 10(b) and Rule 10b-5 claims.

[4]    In their discussion of the alleged misstatements and omissions, the *T. Rowe Price* Bondholders appear to argue that because, according to them, the Official Statement contained material misrepresentations and omissions all of the defendants must have known about them. Opp. at 20-24, 29-32, 36-37. This circular argument does nothing to establish scienter and, at most, constitutes an effort to argue that the defendants acted recklessly. In addition, although the *McKeown* Bondholders contend that they have alleged that Advest "knew of the adverse facts that were misrepresented or should have been disclosed," their argument also focuses on "circumstantial evidence" that they believe Advest "disregarded." McKeown Opp. at 13-14. This, too, is an argument that Advest acted recklessly.

apparent in hindsight – makes any blanket contention that Advest acted "knowingly or recklessly" even more tenuous. *See Number Nine*, 51 F. Supp. 2d at 43. Further, as set forth in the SEC rules and releases cited by the Bondholders, Advest need only have a "reasonable basis" to believe that management's representations are accurate. Opp. at 48 (citing 17 C.F.R. § 240.15c2-12, Municipal Securities Disclosure Release No. 34-26100, 53 F.R. 37778 (Sept. 22, 1988), attached hereto as Exhibit A (the underwriter's participation in an offering "implies that the underwriter has a reasonable basis for belief in the truthfulness and completeness of the key representations made in disclosure documents used in offerings")). *See also Glassman*, 90 F.3d at 627-28.

To rise to the level of recklessness, and therefore scienter, an underwriter's conduct must represent an "extreme departure" from the "controlling standard" of reasonableness. *S.E.C. v. Dain Rauscher, Inc.*, 254 F.3d 852, 859 (9th Cir. 2001). This is consistent with the First Circuit's definition of recklessness as "closer to being a lesser form of intent than merely a greater degree of ordinary negligence." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 199 (1st Cir. 1999). To state a Section 10(b) claim against an underwriter, therefore, plaintiffs must "assert facts which show that the underwriter defendant[] had *no* reasonable basis" to believe that the statements were accurate. *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1490-91 (N.D. Cal. 1992) (emphasis added). *See also In re Valence Tech. Sec. Litig.*, No. C 95-20459 JW, 1996 U.S. Dist. LEXIS 22135, at *17-21 (N.D. Cal. January 23, 1996), attached hereto as Exhibit B. It is not sufficient to allege that there was other, less favorable, information available or even that the underwriter in fact had access to such information. *In re Verifone*, 784 F. Supp. at 1491. Likewise, bare assertions that the underwriter did not believe the alleged misrepresentations or lacked a reasonable basis to do so does not satisfy the stringent pleading requirements established by the Private Securities Litigation Reform Act

- 11 -

("PSLRA") and Federal Rule of Civil Procedure 9(b). *See id.* (discussing strict pleading requirements even prior to the PSLRA). Rather, "it is plaintiffs' responsibility to plead factual allegations, not hypotheticals, sufficient to reasonably allow the inference that the defendants actually did not consider" the alleged adverse information, *Glassman*, 90 F.3d at 629, and that they had "no reasonable basis" to believe that the alleged misstatements were accurate. *In re Verifone*, 784 F. Supp. at 1491. The allegations in the complaints do not begin to satisfy these pleading requirements.

The Bondholders argue that "it can reasonably be inferred" that Advest had access to and/or ignored certain allegedly undisclosed financial information and failed to review more up to date budgets. Opp. at 45. Likewise, they contend that Advest "plainly knew" that Bradford possessed allegedly adverse financial aid data and yet must have failed to discover it. Opp. at 45. But the Bondholders cannot point to a single allegation from which this Court can infer how or why Advest "plainly knew" any allegedly undisclosed information. In addition, before Advest can be deemed to have been "reckless" in its diligence process, the Bondholders must first allege that Advest failed to consider the information cited *and* that the information is of such magnitude that Advest had no reasonable basis to believe the accuracy of the statements in the Official Statement. There are no such allegations in the complaints. Indeed, neither complaint contains any reference to Advest's due diligence process, let alone the particularized allegations that are required to establish a "strong inference" of scienter.

Perhaps recognizing the flaws in their pleading, the Bondholders now cite to new documents, that may or may not exist, that Advest allegedly should have considered. Opp. at 46 (alleging that Advest should have requested to review the College's "Strategic Initiatives," "new methodology" for determining financial aid awards, and admissions and enrollment information that was "routinely circulated"). Again, there is no allegation that (1) Advest

- 12 -

knew about the information, (2) Advest did not consider these perhaps non-existent documents, and (3) the information contained in the purported documents made it unreasonable for Advest to believe that the College's representations were true.[5]  Opp. at 46.  In the absence of specific factual allegations in this regard, the Bondholders have not begun to satisfy their burden to allege particular facts that establish a "strong inference" of fraudulent intent.  *Number Nine*, 51 F. Supp. 2d at 17.

In sum, even with the new allegations that appear for the first time in their Opposition, the Bondholders have not made any particularized allegations establishing that Advest acted recklessly in performing its due diligence and that it was unreasonable for Advest to believe that the College's representations were accurate.  As set forth below, their request to amend their Amended Complaint should be denied, and their request for discovery on this issue likewise should be denied.  As demonstrated by the numerous documents and even witness interviews cited in their Opposition, the Bondholders have had access to a significant amount of information.  They do not need discovery and, even with the discovery they have had to date, they have failed to allege that Advest failed to consider information of which it was, or should have been, aware.  The Bondholders have not, and even with the new allegations proposed in their Opposition cannot, allege that Advest did not have a reasonable basis to believe the statements in the Official Statement that were made by the College – not Advest.

---

[5]     The Bondholders also cite meeting minutes from two meetings that, they contend, should have put Advest on notice that the College's representations were not accurate.  Opp. at 46.  The first is the February 1998 meeting where a Board committee allegedly discussed the possibility of the College making a $1 million equity contribution to the construction project.  Opp. at 46; Am. Compl., ¶ 65, Compl., ¶ 62.  As set forth in Advest's opening brief, nothing in those minutes suggests that the statement regarding the College's plans to make an equity contribution was false.  Advest Br. at 12.  Similarly, the Bondholders point to minutes from a 1997 Board meeting where two Board members discussed their concerns about the College's financial future.  Opp. at 46; Am. Compl., ¶ 47, Compl., ¶ 45.  Even assuming that Advest did or should have reviewed the minutes from a meeting that took place more than one year before the offering, all that those minutes would have revealed is that two Board members believed that the College was in a precarious financial position and that an investment in Bradford was a risky one – both facts that were fully disclosed in the financial statements that were attached to the Official Statement and the Official Statement itself, which, among other cautionary statements, disclosed that the Bradford College bonds had received a "BBB - " rating.  Official Statement, Preliminary Statement, Official Statement at 1, 4,11, 14, A-7, A-13, B-4.

- 13 -

**B.    The Section 10(b) and Rule 10b-5 Claims Against Advest are Barred By the Central Bank Doctrine.**

As set forth in Advest's opening brief, absent any facts establishing that Advest authored the allegedly misleading statements or played a "significant role" in the preparation of those statements, the Bondholders have failed to allege that Advest may be held primarily liable for a violation of Section 10(b) and Rule 10b-5. Advest Br. at 28. In their Opposition, the Bondholders do not even attempt to point to any allegations regarding Advest's role in the preparation of the alleged misleading statements – they cannot point to such allegations because none are pled. The Official Statement itself makes clear that the allegedly misleading statements appear in sections of the Official Statement that were prepared by the College, not Advest. Official Statement at 15.

In the absence of facts, the Bondholders once again turn to SEC rules and press releases that discuss the role of underwriters in public offerings. Opp. at 48 (citing Municipal Securities Disclosure Release No. 34-26100, 53 F.R. 37778 (Sept. 22, 1988)); McKeown Opp. at 16-17 (referencing general duties of an underwriter). But the SEC press releases regarding what the SEC might expect from underwriters do not trump the case law in the First Circuit holding that, to state a claim against a "secondary actor" such as an underwriter, Bondholders must allege facts establishing that the underwriter played a "significant role" in the preparation, review or approval of the allegedly false and misleading statements. *See, e.g., In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp.2d 152, 163 (D. Mass. 2002); *Wells v. Monarch Capital Corp.*, No. 91-10575-ADM, 1996 WL 728125, at *13 (D. Mass. Oct. 22, 1996), attached hereto as Exhibit C; *Van de Velde v. Coopers & Lybrand*, 899 F. Supp. 731, 738 (D. Mass. 1995). Otherwise, the claim amounts to an effort to hold the underwriter liable for aiding and abetting a violation of Section 10(b) and Rule 10b-5 – a claim that is barred under the Supreme Court's holding in *Central Bank of Denver, N.A. v. First Interstate Bank of*

*Denver, N.A.*, 511 U.S. 164 (1994). The Bondholders do not even attempt to address this case law, and they have not identified any such factual allegations with regard to Advest.[6]

The Bondholders have failed to allege a primary violation of Section 10(b) and Rule 10b-5 against Advest and their attempt to hold Advest liable for aiding and abetting such a violation is barred by the *Central Bank* doctrine.

## III.    The Bondholders Have Failed to State a Claim For Violation of Section 12(a)(2) of the Securities Act.

The Section 12(a)(2) claims (in Count III of both complaints) should be dismissed because the Series 1998 Bonds are exempt from the provisions of Section 12(a)(2) and because the Bondholders are not alleged, and some in fact do not have, standing to bring those claims. In addition, like all of the claims in both complaints, the Bondholders' Section 12(a)(2) claims also fail because they have failed sufficiently to allege an actionable misrepresentation or omission.

### A.    The Tax-Free Series 1998 Bonds are Exempt From the Provisions of Section 12(a)(2).

The Bondholders' argument as to why the Series 1998 Bonds are not exempt from Section 12(a)(2) liability is simply wrong. The Bondholders appear to argue that simply because the Series 1998 Bonds are a type of conduit financing that they are not exempt from Section 12(a)(2). Their position is summarized as follows: "Thus, merely because the SEC did not include conduit financings on behalf of non-profit entities within the scope of Rule 131

---

[6]    In arguing that Advest should be held liable as a primary violator of Section 10(b) and Rule 10b-5 – despite Advest's lack of alleged involvement in the preparation of the allegedly misleading statements – the *T. Rowe Price* Bondholders rely on cases in which the SEC was the plaintiff. Opp. at 47, 48. The *Central Bank* doctrine, however, does not apply to the SEC. Specifically, while the Supreme Court has held that there is no *private* right of action for aiding and abetting claims, the SEC still has the authority and the ability to bring such claims. The Bondholders' reliance on SEC cases, therefore, is misplaced. *Compare Wright v. Ernst & Young*, 152 F.3d 169, 175 (2nd Cir. 1998) (no aiding and abetting liability under Section 10(b)) *with S.E.C. v. Lucent Tech., Inc.*, Civ. No. 04-2315 (WHW), 2005 U.S. Dist. LEXIS 5982, at *22 (D.N.J. April 6, 2005) (discussing aiding and abetting liability in connection with an action brought by the SEC), attached as Exhibit D.

does not mean separate securities only exist in industrial revenue bond financings." Opp. at 57.

Whether or not the Series 1998 Bonds are a type of conduit financing is not the point. The point is that, as the Bondholders concede, "the SEC did not include conduit financings on behalf of non-profit entities within the scope of Rule 131." If the Series 1998 Bonds are not within the scope of Rule 131,[7] they are exempt from Section 12(a)(2) liability since, as the Bondholders also concede, they were issued by a public instrumentality of a state. *See* Section 3(a)(2), 15 U.S.C. §77c(a)(2). Congress created a broad exemption for securities issued by any public instrumentality of a state. The SEC, through, and only through, Rule 131 created a discrete limitation to that exemption for "industrial or commercial enterprise[s]." If Rule 131 is not in play, the bonds remain exempted pursuant to Section 77c(a)(2).

Despite the Bondholders' assertions to the contrary, Rule 131 "deem[s] an obligation to be a separate 'security' within the meaning of Section 2(1) of the Act" only when part of an obligation issued by a governmental unit is payable by "an industrial or commercial enterprise." *See* Rule 131.[8] Since, as the Bondholders concede and as demonstrated in Advest's opening brief, Adv. Br. at 29-34, Bradford is not "an industrial or commercial enterprise," the Series 1998 Bonds do not contain an obligation that can be deemed a separate

---

[7]     The Bondholders concede that the Series 1998 Bonds are not within the scope of Rule 131 ("It is not surprising, therefore, that issuers such as Bradford are not subject to the terms of Rule 131." (McKeown Opp. at 18)).

[8]     If they are not "deemed" a separate security under Rule 131, the Series 1998 Bonds are simply a single security issued by a public instrumentality of a state, even if they provide for conduit financing. The Bondholders' reliance on the *McKay* case (an unpublished decision) to argue that, putting Rule 131 aside, there really are two securities, is misplaced. *McKay v. Juran & Moody, Inc.*, No. CIV A3-97-86, 1998 WL 1780694 (D.N.D. 1998), attached hereto as Exhibit E. In *McKay*, in finding that there were two separate securities, the Court specifically relied upon Rule 131, finding that "Certificates of Participation" were the mirror image of industrial development bonds. *Id.* at 5. Given that Rule 131 does not apply, the Bondholders have no basis to argue that the Series 1998 bonds could be "deemed" to be two separate securities. Only "deeming" under Rule 131 would make it so.

security and therefore the bonds are exempt from liability under Section 12(a)(2) and Count III should be dismissed.

### B.   The Bondholders Have Failed to Allege Standing to Bring a Section 12(a)(2) Claim.

None of the Bondholders is alleged to have purchased the Series 1998 Bonds during the public offering, and as a result, none is alleged to have standing to bring a Section 12(a)(2) claim. Advest Br. at 34. In the absence of *any* allegations regarding standing – each Bondholder is alleged only to "hold" bonds – the Bondholders contend that this Court can "reasonably infer" that they do in fact have standing.[9] Opp. at 62. Even if such an inference were accurate, it would be inappropriate to draw such an inference where, as here, there are no allegations from which such inference can be made. Moreover, here, and contrary to their counsel's representations, *at least some of the Bondholders in fact do not have standing to bring this claim because they purchased the Bonds in the aftermarket.* An inference that all of the Bondholders have standing not only is unreasonable, it is flat out wrong.

The Section 12(a)(2) claim should be dismissed because none of the Bondholders is alleged to have standing to bring the claim.

### C.   The Bondholders' Section 12(a)(2) Claims Must Be, and are Not, Pled With the Particularity Required By Federal Rule of Civil Procedure 9(b).

Contrary to the Bondholders' assertions, their fraud-based Section 12(a)(2) claims must be pled with the particularity required by Federal Rule of Civil Procedure 9(b). *See, e.g., Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996). *See also* Advest Br. at 35.

---

[9]   The McKeown plaintiffs argue that they need only "trace" their shares to the public offering. McKeown Opp. at 20. It is true that courts in this District have held that, to establish standing, plaintiffs in cases brought under Section 11 of the Securities Act – which applies to registered securities – do have standing if they allege that their shares are "traceable" to the public offering. *See In re Websecure, Inc. Sec. Litig.*, 182 F.R.D. 364, 368 (D. Mass 1998); *see also Number Nine*, 51 F. Supp. 2d at 11. In reaching those decisions, however, the courts specifically distinguished the standing requirements in Section 11 and Section 12(a)(2) and held that Section 11 does not have the privity requirement contained in Section 12(a)(2). *Id.* As the Supreme Court held in *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995), Section 12(a)(2) applies only to purchases made in the context of a public offering.

Recognizing the weaknesses in their assertion that the Official Statement contained material misrepresentations and omissions, the Bondholders advocate for the application of the more lenient standard of review under Federal Rule of Civil Procedure 12(b)(6). Opp. at 61. While the Bondholders have failed to state a claim under any standard, they cannot escape the heightened pleading burdens established by Rule 9(b) and applicable to both of their federal securities fraud claims.

As set forth in Advest's opening brief, where, as here, the Section 12(a)(2) claim is based on one "unified course of fraudulent conduct," fraud is deemed to lie at the core of the action and Rule 9(b) applies. Adv. Br. at 35-36. *Number Nine*, 51 F. Supp. 2d at 12-13, a case cited extensively throughout the Bondholders' Opposition, supports application of the heightened pleading standard here. In that case, the plaintiffs made specific efforts to distinguish their Section 11 Securities Act claims from their Section 10(b) and Rule 10b-5 claims.[10] *Id.* at 12. They did not even bring a Section 10(b) claim against the underwriter defendants, so all of their allegations against the underwriters related solely to their Section 11 claim. *Id.* at 5. Likewise, they made specific disclaimers in the Section 11 count, stating that the count was not based on any allegations relating to scienter and/or intentional conduct by any of the defendants. *Id.* at 12-13. Finally, the court found that none of the allegations related to the Section 11 count "sounded in fraud." *Id.* at 13. In contrast, here, the Bondholders bring both Section 10(b) and Section 12(a)(2) claims against Advest. Moreover, in their Section 12(a)(2) count, the Bondholders allege, in boilerplate fashion, that Advest knew or should have known that the Official Statement contained purported false or misleading information. Am. Compl., ¶ 90, Compl., ¶ 87. Unlike the plaintiffs in *Number Nine*, the

---

[10] As set forth in Advest's opening brief, although the Sections have different standing requirements, Section 11 is similar to Section 12(a)(2) in that it allows purchasers of securities to bring a claim against a seller based on alleged misstatements that appear in a Registration Statement without alleging scienter.

Bondholders have made no effort to distinguish their Section 10(b) and Section 12(a)(2) claims, both of which "sound in fraud" and both of which are subject to the higher pleading standards established in Rule 9(b). *See* Advest Br. at 35-36, Am. Compl., ¶¶ 46, 90, Compl., ¶¶ 43, 87. As set forth above, they have failed to even come close to satisfying these pleading burdens and the Section 12(a)(2) claim should be dismissed.[11]

## IV.    The Plaintiffs Should Not Be Granted Leave to Amend Their Complaints.

In cavalier fashion, the plaintiffs suggest that this Court should not hesitate in giving them leave to amend their complaints, one of which already has been amended once. This Court need not, nor should it, grant a request for leave as automatically as plaintiffs suggest. It has been more than six years since Bradford College filed for bankruptcy and defaulted on the Series 1998 Bonds. As set forth in their Opposition, the plaintiffs have had access to documents and even conducted witness interviews. This is not a case in which the plaintiffs filed their first complaint with little or no information or where the critical information resides only with the defendants. The plaintiffs have had ample opportunity to craft a well-pleaded complaint, and yet still have failed to do so.

Moreover, amendment is not appropriate where, as here, such amendment would be futile. *See Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994); *Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49, 59 (1st Cir 1990). The plaintiffs have included their proposed amendments in their Opposition and, as set forth above, even with those

---

[11]    As noted at the outset of this reply memorandum, Advest has not even attempted to respond to each and every one of the arguments raised by the plaintiffs in their more than 100 pages of briefing but rather focused on the most egregious errors of fact and law that apply to each of the claims in the complaints. Indeed, the plaintiffs' failure to allege any actual misstatement or omission dooms all of their state claims (violation of the Massachusetts Securities Laws, fraud and intentional misrepresentation, negligence, and violation of Chapter 93A). Likewise, because the plaintiffs have not, and cannot, allege that Advest acted knowingly, recklessly, or even negligently in disregarding any allegedly adverse information, none of their state claims can survive. For these, and for all of the reasons set forth in Advest's opening brief, the state claims brought by the plaintiffs also should be dismissed.

amendments, have failed to allege an actionable misstatement or omission for which Advest can be held liable – under any theory. Both complaints should be dismissed with prejudice and plaintiffs' request for leave to amend should be denied.

## CONCLUSION

For these reasons, and the reasons set forth in Advest's opening brief, both complaints should be dismissed with prejudice.

ADVEST, INC.
By its attorneys,

NUTTER McCLENNEN & FISH, LLP

Jonathan L. Kotlier (BBO#545491)
Sarah E. Walters (BBO#638378)
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210
617-439-2000

July 29, 2005

### Certificate of Service

I, Sarah E. Walters, certify that on July 29, 2005 I caused a true copy of the above document to be served by hand on all counsel of record.

Sarah E. Walters

1438861.1

- 20 -

EXHIBIT A TO ADVEST'S REPLY MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS ACTIONS

**SEC-REL, FSLR ¶25,097 Municipal Securities Disclosure Release No. 34-26100, Sept. 22, 1988, 53 F.R. 37778.**

© 2005, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

The interpretation in this release concerning municipal securities underwriter responsibilities is modified by Release No. 34- 26985. Sec ¶25,098.

**FSLR ¶25,097 Municipal Securities Disclosure Release No. 34-26100, Sept. 22, 1988, 53 F.R. 37778.**

17 CFR 241.26100. ACTION: Proposed Rulemaking

SUMMARY: The Securities and Exchange Commission is publishing for comment proposed Rule 15c2-12, which would require that municipal securities underwriters review and distribute to investors issuer disclosure documents. The proposed rule would require that underwriters obtain and review a nearly final official statement prior to bidding on or purchasing an offering of municipal securities in excess of ten million dollars. An underwriter participating in an offering of a new issue of municipal securities in excess of ten million dollars also would have to contract with the issuer or its agents to obtain final official statements in sufficient quantities to make them available to purchasers in accordance with rules established by the Municipal Securities Rulemaking Board. In addition, underwriters would have to provide copies of preliminary and final official statements upon request. The Commission also is publishing its interpretation of the legal obligations of municipal underwriters. The interpretation, on which the Commission has invited comments, generally emphasizes that in conjunction with their review of offering documents, municipal securities underwriters must have a reasonable basis for believing in the accuracy of key representations concerning ̱y municipal securities that they underwrite. Finally, the Commission is requesting comment on a recent proposal by the ̱ unicipal Securities Rulemaking Board to establish a central repository to collect information concerning municipal securities.

DATE: Comments should be received on or before [ninety days following publication in the Federal Register].

ADDRESS: Comments should be submitted in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, N.W., Mail Stop 6-9, Washington, D.C. 20549. Comment letters should refer to File No. S7-20-88. All comment letters received will be made available for public inspection and copying in the Commission's Public Reference Room, 450 Fifth Street, N.W., Washington, D.C. 20549. FOR FURTHER INFORMATION CONTACT: Catherine McGuire, Esq., Special Assistant to the Director, (202) 272-2790; Robert L.D. Colby, Esq., Chief Counsel, (202) 272-2848; Edward L. Pittman, Esq., Special Counsel, (202) 272-2848; or Beth E. Mastro, Esq., Branch Chief (regarding Part IV), (202) 272-2857; Division of Market Regulation, Mail Stop 5-1, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549.

# I. INTRODUCTION

*Background*

The Securities and Exchange Commission ("Commission") is proposing for comment Rule 15c2-12 under the Securities Exchange Act of 1934 ("Exchange Act"),[1] which is designed to prevent fraud by improving the extent and quality of disclosure in the municipal securities markets. Proposed Rule 15c2-12 would require that underwriters of municipal securities offerings exceeding $10 million obtain and review a nearly final official statement before bidding on or purchasing the offering. The rule also would require underwriters of municipal offerings exceeding $10 million to contract with the issuer or its agents to obtain final official statements in sufficient quantities to permit delivery to investors in accordance with any requirements of the Municipal Securities Rulemaking Board ("MSRB") and, depending on the time of the request, to make available a single copy of the preliminary and final official statement to any person on request. In addition, the Commission is publishing an interpretive statement, on which it has invested comments, emphasizing the responsibility of municipal underwriters, after reviewing the issuer's official statement, to have a reasonable basis for belief in the substantial accuracy of key representations contained in the official statement, as well as any other recommendations that they make regarding the offering.

The Commission recognizes that Rule 15c2-12, if adopted as proposed, would impose new requirements on underwriters and also might have an impact on issuers. In particular, although the rule would place the direct burden of obtaining final official statements on the underwriter, an obvious consequence would be that underwriters would require some issuers to make available official statements at a time when, or in quantitites in which, they currently might not be produced. The rule is intended to stimulate greater scrutiny by underwriters of the representations made by issuers and the circumstances surrounding the offering. The Commission believes that it is worthwhile to explore the possibility that the imposition of these requirements will result in benefits

both to the municipal securities markets as a whole and to individual investors.

The Commission's decision to propose Rule 15c2-12 at this time reflects its concern about the current quality of disclosure in certain municipal offerings. At the time the securities laws first were enacted, the market for most municipal securities largely was confined to limited geographic regions. The localized nature of the market arguably allowed investors to be aware of factors affecting the issuer and its securities.[2] Moreover, municipal securities investors were primarily institutions, which in other instances have been accorded less structured protection under the federal securities laws. Since 1933, however, the municipal markets have become nationwide in scope and now include a broader range of investors.

Today, state and local government obligations are a major factor in the United States credit markets. Currently, over $720 billion of municipal debt is held by investors.[3] Moreover, while new offerings of municipal securities declined in 1987 compared to previous years, they nevertheless accounted for $114 billion.[4] Households now are significant investors in municipal securities. On average, households, including unit investment trusts, have accounted for slightly over one-third of the direct holdings of municipal securities in recent years. Up to an additional 21% of municipal holdings are owned indirectly by households, in the form of mutual fund shares.[5]

At the same time that the investor base for municipal securities has become more diverse, the structure of municipal financings has become increasingly complex. In the era preceding adoption of the Securities Act of 1933 ("Securities Act")[6] municipal offerings consisted largely of general obligation bonds. Today, however, municipal issues include a greater proportion of revenue bonds that are not backed by the full faith and credit of a governmental entity and which, in many cases, may pose greater credit risks to investors. In addition, more innovative forms of financing have focused increased attention on call provisions and redemption rights in weighing the merits of individual municipal bond investment opportunities. Among other instruments, municipal issuers have utilized tax-exempt commercial paper, tender option bonds, and compound interest bonds in an effort to satisfy the needs of investors and assure efficient funding of municipal projects. Moreover, municipal issuers recently have begun to import financing techniques developed in the corporate debt markets to sell asset-backed securities.[7]

In 1975, Congress, recognizing that changes had occurred in the municipal securities markets, enacted a self-regulatory scheme for these markets.[8] The Securities Acts Amendments of 1975[9] created the MSRB and provided a system of regulation for both municipal securities professionals and the municipal securities markets. At the same time, however, a financial crisis experienced by the City of New York revealed serious disclosure problems in offerings of New York City's municipal securities. In 1977, the Commission released a lengthy staff report presenting the results of an investigation of the distribution of debt securities issued by New York City.[10]

The New York City Staff Report revealed that from October 1974 through April 1975, a period during which underwriters distributed approximately $4 billion in short-term debt securities, New York City had serious, undisclosed financial problems. Moreover, a number of proposals concerning the need to modify or increase disclosure about the City's problems were rejected by the underwriters for fear that accurate disclosure would render the securities unmarketable.[11] Even when a decision was made to disclose potential problems in the face of the worsening budget crisis, some underwriters denied that they had any duty to "rummage around" to determine whether, in fact, there would be revenues available to retire a contemplated offering of notes.[12] The underwriters reduced the size of their own positions in the City's debt and ceased purchasing the securities for fiduciary accounts, but they continued to sell them to the public.

The recently released Commission staff report concerning the Washington Public Power Supply System ("Supply System")[13] provides a second illustration of inadequate disclosure in an extremely large municipal debt offering. As discussed more fully therein, in 1983 the Supply System defaulted on $2.25 billion in principal[14] on tax-exempt revenue bonds sold to finance the construction of two nuclear power plants. The default on the bonds was the largest payment default in the history of the municipal bond market. The staff's investigation of the default disclosed that the underwriters of the Supply System's offerings did not conduct a close examination of the issuer's disclosure to determine the substantial accuracy of statements made to investors at the time the bonds were sold.[15]

The Supply System's offerings took place over the course of four years, from 1977 to 1981. All but one of the 14 offerings by the Supply System during this period were underwritten on a competitive basis.[16] Only two selling groups, however, successfully bid on the offerings. Despite the magnitude, frequency, and size of the offerings, and the fact that only one or two syndicates were bidding on the offerings, the underwriters did not require their public finance units to conduct an investigation,[17] or retain underwriters' counsel to conduct an investigation, as they would have done customarily in negotiated sales.[18]

The Commission recognizes that the Washington Supreme Court's decision[19] invalidating contractual agreements between the

Supply System and a number of public utilities in the Pacific Northwest was the precipitating factor in the Supply System's default. The most critical nondisclosures relating to matters apart from legal validity occurred after the great majority of the offerings had gone forward. Nevertheless, serious questions exist concerning whether the official statements for the Supply System's bonds adequately disclosed significant facts. Among other things, facts existed that call into question the adequacy of disclosures regarding the estimated cost to complete the Supply System's projects, the ability of the Supply System to meet its growing financing needs, the projected demand for power in the Pacific Northwest, and the extent to which the participating utilities continued to support the Supply System project. The Commission is concerned that the underwriters did not investigate costs and delays in the project in a professional manner. Had they done so, it is possible that they would have uncovered disclosure deficiencies in the official statements for the later offerings, and could have brought to the attention of the public important information regarding delays in completing the power plants and cost overruns that might have affected individual investment decisions.

## B. *Need for Improvements*

Notwithstanding the problems illustrated by the Supply System's disclosure, the Commission recognizes that significant changes have taken place in the practices associated with the distribution of municipal securities since the events that led to the release of the New York City Staff Report. Municipal issuers have increased substantially the quality of disclosure contained in ˈofficial statements.[20] The voluntary guidelines for disclosure established in 1976 by the Government Finance Officers Association GFOA"),[21] which are followed by many issuers, permit investors to compare securities more readily and greatly assist issuers in addressing their disclosure responsibilities.[22] Moreover, when an issuer voluntarily prepares disclosure documents, the MSRB's rules now require that the documents be distributed to investors.[23]

Other means of enhancing the disclosure provided to investors in the initial distribution of municipal securities are also under consideration. Two states, for example, have recently proposed laws requiring that official statements accompany or precede delivery of a confirmation for the sale of certain municipal securities, in the same fashion as corporate securities.[24] In addition, two other states recently have excluded from the definition of an exempt security, for state blue sky purposes, the securities of municipal issuers that have been in default.[25] Members of the municipal securities industry and the MSRB also have recommended the establishment of a central repository for official statements that would provide municipal securities dealers and others with rapid access to information, from a single source, concerning the details of an offering and the terms of any call provisions.[26]

Despite these developments, a number of commentators have recently expressed concern about a reduction of investor confidence in the municipal securities markets and have urged that mechanisms be established to improve the timeliness, dissemination, and quality of disclosure.[27] Although the recent measures by the MSRB, state regulators, and industry groups are significant, the Commission believes that further steps designed to encourage timely dissemination of disclosure to investors in rge offerings of municipal securities, and to affirm baseline standards of underwriter review of this disclosure, warrant ˌonsideration.

In the absence of specifically mandated disclosure standards to which municipal issuers can adhere,[28] the underwriter's review of disclosure concerning the financial and operational condition of the issuer can assume added importance as a means of guarding the integrity of new offerings. The Commission understands that many municipal underwriters currently conduct an investigation of the issuer in negotiated municipal offerings that, in many respects, might be comparable to the investigation conducted by underwriters in corporate offerings. Nevertheless, the practices revealed in the Supply System Staff Report underscore the need to explore the benefits that would result from a specific regulatory requirement that underwriters of municipal securities be uniformly subject to a requirement to obtain and review a nearly final disclosure document and make disclosure documents available to investors in both negotiated and competitive offerings. The Commission understands that no amount of increased review of offering materials by municipal underwriters will prevent municipal defaults totally,[29] but the Commission believes that responsible review by underwriters of the information provided by municipal issuers, in both competitive and negotiated offerings, could encourage more accurate disclosure. Investors plainly depend on accurate disclosure in considering whether to buy the offered securities. Moreover, it is a common belief, which the Commission shares, that investors in the municipal markets rely on the reputation of the underwriters participating in an offering in deciding whether to invest.

As noted earlier, the complexity of municipal bonds recently offered to the public increases the value of accurate disclosure of the terms of bond offerings. For example, inadequate disclosure of call provisions has resulted in several recent incidents in which municipal issuers attempted to call bonds that had been traded in the secondary markets as escrowed-to-maturity.[30] Because these bonds had been sold to investors in the secondary market on the basis of the yields to a fixed maturity, the exercise of early

call provisions in the outstanding bonds would have altered significantly the actual yield received by investors. [31]

Apart from concerns about the quality of disclosure, it appears that problems also exist with regard to the timely dissemination of disclosure documents. Currently, many issuers routinely prepare official statements that conform to the GFOA Guidelines for offerings exceeding one million dollars. The preparation and timely dissemination of official statements, in conjunction with a careful review of the issuer's disclosure by the underwriters, are important disciplines that benefit the participants as well as investors. The Commission is aware, however, that in some cases underwriters do not receive sufficient quantities of official statements, or do not receive official statements within time periods that would allow the underwriter to examine the accuracy of the disclosure and to disseminate copies to investors in a timely manner. In rule filings with the Commission, for example, the MSRB has indicated that the completion and delivery of official statements often is given a low priority by underwriters and financial advisors. [32] In addition, it appears that many public finance personnel are unfamiliar with the requirements of the MSRB regarding the delivery of official statements. [33] These information dissemination problems are evidenced by a recent report by the Public Securities Association, prepared after an extensive survey of its members, which concluded:

> Based on consistent [... responses] ... there appears to be a timing problem when the availability of disclosure documents are [sic] considered. The empirical evidence confirms what has been widely accepted by the marketplace as a problem in disclosure practices in the muncipal securities market. [34]

The markets for municipal securities are vital to the financial management of our nation's state and local governments, and the availability of accurate information concerning municipal offerings is integral to the efficient operation of the municipal securities markets. [35] In the Commission's view, a thorough, professional review by underwriters of municipal offering documents could encourage appropriate disclosure of foreseeable risks and accurate descriptions of complex put and call features, as well as novel financing structures now employed in many municipal offerings. In addition, with the increase in novel or complex financings, there may be greater value in having investors receive disclosure documents describing fundamental aspects of their investment. Yet, underwriters are unable to perform this function effectively when offering statements are not provided to them on a timely basis. Moreover, where sufficient quantitites of offering statements are not available, underwriters are hindered in meeting present delivery obligations imposed on them by the MSRB's rules.

For these reasons, the Commission has determined to propose a limited rule designed to prevent fraud by enhancing the timely access of underwriters, public investors, and other interested persons to municipal official statements. In the context of the assured access to offering statements provided by the proposed rule, the Commission also is reemphasizing the existence and nature of an underwriter's obligation to have a reasonable basis for its implied recommendation of any municipal securities that it underwrites.

## II. DISCUSSION OF PROPOSED RULE 15c2-12

Rule 15c2-12 is designed to prevent fraud by establishing standards for the procurement and dissemination by underwriters of disclosure documents, thus enhancing the accuracy and timeliness of disclosure to investors in large offerings of municipal securities. The rule's standards for obtaining disclosure documents are intended to assist underwriters in satisfying their responsibility to have a reasonable basis for recommending municipal securities that they underwrite. The rule also is designed to provide underwriters greater opportunity to fulfill their reasonable basis obligations by creating an express requirement for review of the mandated nearly final official statement.

The Commission believes that proposed Rule 15c2-12 may promote greater industry professionalism and confidence in the municipal markets. In the past, state and local governments have regarded regulation to enhance the municipal markets as beneficial, so long as there is no adverse impact on their capital-raising function. [36] Rule 15c2-12 is designed to strengthen the municipal markets and to benefit all participants, including issuers. The Commission wishes to emphasize, however, that the rule is not intended to inhibit the access of issuers to the municipal markets. For this reason, the Commission is particularly interested in receiving the views of municipal issuers on the provisions of proposed Rule 15c2-12.

## A. Scope of Rule 15c2-12

As proposed, the provisions of Rule 15c2-12 would apply only to underwriters participating in offerings of municipal securities that exceed $10 million in face amount. [37] Data supplied by the Public Securities Association and the MSRB indicate that in 1987,

CCH Internet Research NetWork

1,743 long-term municipal debt offerings, accounting for about 25% of total long-term municipal debt offerings, exceeded $10 million. These offerings, however, raised over $89 billion, or approximately 86% of the money borrowed annually by municipal issuers. Thus, the rule would apply only to the largest issues of municipal securities, where there is greatest reason to believe that additional costs the rule might impose by the establishment of specific standards would be justified by the potential protection provided to a large number of investors that otherwise might purchase securities on the basis of inaccurate or incomplete information.[38] By conditioning underwriters' participation in large offerings on the preparation and dissemination of official statements, the rule would provide dealers and investors with more timely access to disclosure of basic information about the issuer.[39]

The Commission requests comment on the proposed $10 million threshold and whether alternative minimum levels would be more appropriate. Specifically, would some other minimum, such as $1 million, $5 million, $20 million, or $50 million, be warranted for the rule as a whole or for particular provisions? As noted earlier, in 1987, 25% of all new issues of long-term municipal bonds, comprising 38% of all revenue bond issues and 12% of all general obligation bond issues, exceeded the $10 million threshold. These offerings accounted for 90% and 74% of the dollar amounts issued in revenue and general obligation bond offerings, respectively. The figures for alternative thresholds, as of 1987, were as follows:[40]

| Offering over | % of revenue bond issues: | % of gen. oblig. bond issues: | % of total bond issues: | % of revenue bond dollar amts. issued | % of gen. oblig. bond dollar amts. issued | % of total bond dollar amts. issued |
|---|---|---|---|---|---|---|
| $ 1 million | 87% | 72% | 79% | 99% | 99% | 99% |
| $ 5 million | 56% | 26% | 44% | 96% | 85% | 93% |
| $10 million | 38% | 12% | 25% | 90% | 74% | 86% |
| $20 million | 25% | 7% | 16% | 81% | 67% | 77% |
| $50 million | 10% | 3% | 7% | 60% | 53% | 58% |

The Commission requests comment on the range of costs under the rule for issuers and underwriters in offerings above and below the $10 million threshold, and the impact that Rule 15c2-12 might have on underwriting spreads in the municipal market. Commentators also are invited to provide their views on the quality and timeliness of disclosure currently provided at various offering amounts.

The Commission recognizes that there may be a range of credit risk and disclosure concerns associated with municipal bonds that vary according to the type of bonds and their maturity. Accordingly, the views of commentators are requested regarding whether distinctions should be made according to the type of bonds, e.g., municipal revenue, general obligation, or private activity bonds,[41] the type of offering (e.g., competitive or negotiated), or the extent to which innovative financing techniques, or unusual call provisions or redemption rights, are employed in the offering. Similarly, commentators also may address whether distinctions should be made that would exclude issues with shorter maturities.

The primary intent of the rule is to focus on those offerings that involve the general public, and which are likely to be traded in

the secondary market. While the Commission recognizes that there may be reason to create an exception from the rule for offerings that are similar to traditional private placements under Section 4(2) of the Securities Act, [42] involving a limited number of financial institutions, the proposed rule does not contain such an exception. [43] In part, this reflects the Commission's concern that, in the absence of trading restrictions, the bonds could be resold immediately to numerous secondary market purchasers lacking the sophistication of the initial purchasers of the bonds.

In order to consider whether any rule that is adopted should contain some type of "private placement exemption," the Commission requests comment on this aspect of the rule. In particular, the Commission would like specific comments on whether and in what manner the rule's disclosure dissemination provisions should distinguish between offerings made to a limited number of sophisticated investors and those involving broader selling efforts. Comment is requested on whether a specific exemption from the rule should be created for offerings to fewer than 10, 25, 35, or 50 investors and whether an exemption should look to the institutional nature or sophistication of investors. In addition, should the underwriter be required to assure that initial purchasers acquire the bonds with investment intent, rather than to resell the securities into the secondary market, or should other restrictions, such as holding periods or transfer restrictions, be imposed? Finally, the Commission solicits comment on whether exceptions for limited offerings should be applied to all provisions of the rule or only to particular parts of the rule.

**B. *Receipt and Review of Preliminary Official Statements***

Paragraph (b) of the rule would require that prior to bidding on or purchasing a municipal offering in excess of ten million dollars, an underwriter, directly or through agents, obtain and review an official statement that is final, but for the omission of information relating to offering price, interest rate, selling compensation, amount of proceeds, delivery dates, other terms of the securities depending on such factors, and the name of the underwriter. [44] This provision would apply to both competitive and negotiated offerings. It is designed to assure that underwriters receive and avail themselves of the opportunity to review an official statement that contains complete disclosure about the issuer and the basic structure of the financing, before becoming obligated to purchase a large issue of municipal securities for resale to the public.

Many issuers currently are required by state and local law to solicit bids for offerings of municipal debt. Generally, announcements inviting bids are published in newspapers that are widely followed in the industry. In addition, underwriters may be contacted directly by issuers and invited to submit bids. The actual notice of sale itself often will contain significant information about the issuer and its securities. Moreover, as part of the bidding process, many issuers routinely make available more complete disclosure concerning an offering in the form of a preliminary official statement, which generally includes information concerning the issuer and the offered securities, but omits terms of the offering dependent on the results of the bid. In some cases, the issuer, subsequent to the bidding process, prepares a final official statement containing all the terms of the offering. In other cases, the issuer releases a preliminary official statement prior to the date of sale, which, after pricing, underwriting, and other information is attached, is then regarded as the issuer's final official statement.

The Commission is aware, however, that some issuers do not provide preliminary official statements, so that prospective bidders must rely upon information contained solely in the notice of sale and on their general knowledge of the issuer. [45] Based upon this limited information, underwriters then solicit binding pre-sale orders or indications of interest from investors, and submit a bid to the issuer. In addition, although negotiated offerings provide the underwriter with greater opportunities to participate in drafting the disclosure documents, in some instances pressure to meet financing needs, or to take advantage of changes in tax laws or favorable interest rate "windows," have caused underwriters to agree to purchase securities in negotiated offerings at a time when disclosure documents were not complete.

Paragraph (b) would prevent the underwriter from submitting a bid in a competitive offering, or from committing to buy securities in a negotiated offering, until it has received and reviewed an official statement that is deemed final by the issuer, except for pricing, underwriting, and certain other specified information. This paragraph is designed to prevent fraud by providing the underwriter with information about the issue sufficient to determine, before becoming obligated to purchase the securities, whether changes to the disclosed information are needed and should be obtained before the bid is submitted. [46]

The requirement in paragraph (b) that underwriters obtain a nearly final official statement before bidding on an offering could have the consequence of altering the bidding or offering process employed by some issuers, if the issuer does not currently make available, prior to the bid or sale, a preliminary official statement as complete as required in the proposed rule. Accordingly, the Commission requests comment on the extent to which adequate information currently is available to underwriters during the negotiation or bidding process, and whether possible improvements in the availability of information would outweigh the increased costs that could result from the rule. The Commission also requests comment regarding any timing difficulties and consequent

economic burdens that might arise for issuers and underwriters as a result of the requirement that underwriters review the nearly final official statement prior to bidding on or purchasing the municipal securities.

## C. *Public Dissemination of Preliminary Official Statements upon Request*

Proposed paragraph (c) would require that preliminary official statements be sent to any person promptly upon request. [47] The purpose of paragraph (c) is to provide potential investors [48] with access to any preliminary official statement prepared by the issuer for dissemination to potential bidders or purchasers at a time when it may be of use to investors in their investment decision. Because preliminary official statements frequently are used as selling documents, large investors often are provided copies when they are solicited to purchase securities in a municipal offering. Indeed, the Commission understands that some institutional investors will not agree to purchase securities in an offering without receiving a preliminary official statement. Even so, there does not appear to be a uniform practice among underwriters of providing preliminary official statements to all potential investors. Because sales efforts may be conducted in competitive offerings prior to the time that an underwriter is awarded a bid, and investors may not have access to a final disclosure document for an extended period of time following their commitment to purchase the securities, the Commission believes that confusion concerning the offering terms and the potential for misleading sales representations would be reduced if investors had the ability to obtain information contained in the preliminary official statement. [49]

Comments are requested regarding the extent to which preliminary official statements are disseminated to investors presently, the likely demand by investors for these preliminary official statements under the proposed rule, and the estimated additional costs to underwriters that compliance with the rule would entail. In addition, the Commission requests comment on whether underwriters that provide preliminary official statements to investors on request should be excused from the requirement that final official statements also be provided to those investors, where the key representations contained in the preliminary official statement continue to be accurate.

## D. *Distribution of Official Statements*

Paragraph (d) of proposed Rule 15c2-12 would require that underwriters contract with the issuer or its agent to obtain copies of final official statements within two business days after a final agreement to purchase the offered securities. That contract must be for sufficient copies to distribute in accordance with paragraph (e) of the proposed rule and any rules adopted by the MSRB. The purpose of paragraph (d) is to facilitate the prompt distribution of disclosure documents so that investors will have a reference document to guard against misrepresentations that may occur in the selling process. In addition, this paragraph would provide investors and dealers in the secondary market with static information concerning the terms of the issued securities.

Rule G-17 of the MSRB's rules requires municipal securities brokers and dealers to deal fairly with customers. The MSRB interprets this rule to require that a dealer disclose, at or prior to a sale, all material facts concerning the transaction, including a complete description of the security. [50] Moreover, MSRB rule G-32 requires that underwriters deliver to a customer, no later than settlement, a copy of any official statement that is prepared by or on behalf of the issuer. If no official statement is prepared by the issuer, a written notice of that fact must be provided to the customer. The Tower Amendment [51] limits the authority of the MSRB, however, directly or indirectly to require municipal issuers to furnish disclosure documents. Thus, rule G-32 applies only where an official statement is prepared and does not mandate disclosure of any particular information to the investor in the official statement.

The Commission understands that it is currently the practice for issuers to state, in notices of sale, the number of official statements that will be provided to a successful bidder or that a "reasonable" number of official statements will be provided. If any official statements are prepared by the issuer, the MSRB has taken the position that the underwriter is required to produce sufficient copies to comply with rule G-32. [52] In most cases, issuers do prepare official statements. Both underwriters and investors have complained, however, that even when official statements are prepared by the issuer, there frequently is not an adequate supply, or sufficient time, to permit distribution to each investor at settlement.

Paragraph (d) of Rule 15c2-12 would require that an underwriter obtain an undertaking from the issuer or its designated agent to provide, within two business days after any final agreement to purchase or sell securities, final official statements in sufficient quantities to enable the underwriter to comply with paragraph (e) of the rule and any MSRB rules regarding the distribution of official statements. Thus, prior to submitting a bid for an offering, or otherwise agreeing to participate in a distribution, an

underwriter, or the syndicate of which it is a member, would need to ascertain that it will be able to comply with Rule 15c2-12. If the issuer's notice of sale, bid form, or underwriting agreement does not provide specifically for production of official statements in accordance with Rule 15c2-12, an underwriter would violate the rule if it participates in the offering. [53] As a practical matter, therefore, issuers would not be able to go forward with underwritten offerings exceeding the proposed $10 million threshold, unless arrangements were made to provide official statements. As discussed below, however, the Commission does not believe that this requirement will affect most issuers.

The proposed rule requires that adequate copies of the official statements would need to be provided within two business days after final agreement is reached. Nevertheless, the issuer's undertaking may call for provision of the official statement to be made by designated agents. Thus, an undertaking would comply with Rule 15c2-12 by indicating that sufficient quantities of official statements will be made available from a printer designated by the issuer, or will be reproduced by the syndicate manager from those official statements that it receives from the issuer. Also, the rule would allow a reasonable fee to be requested by the printer, issuer, or syndicate manager for providing copies of official statements to syndicate members or investors.

As emphasized earlier, if the rule is adopted, underwriters would violate the requirements of Rule 15c2-12 if they proceed with an offering in excess of $10 million without taking steps to assure the availability of official statements. Many issuers already routinely prepare official statements for offerings exceeding one million dollars. [54] Thus, while the proposed rule will enhance disclosure to investors, it is not expected that the rule would inhibit the access of any issuers to the municipal markets. The only effect on most municipal issuers offering securities that exceed the proposed minimum thresholds in the rule would be that official statements would be required to be produced in a more expeditious fashion, and perhaps in greater quantities, than currently might be the case.

The Commission preliminarily believes that the costs imposed on issuers that are not now producing official statements for offerings in excess of $10 million will be offset by the benefits that will inure both to the markets as a whole and to individual investors. The Commission requests comment on any practical problems that might be encountered by underwriters or issuers in attempting to comply with the requirements of the rule. In particular, does the two business day requirement pose a significant burden on issuers or underwriters? Should the delivery period be expanded to three or four business days, or reduced to a single business day, or to the time that final agreement is reached?

The Commission would like to receive comments concerning the net costs that might be incurred by underwriters or issuers in reproducing official statements if Rule 15c2-12 is adopted. In the past, the Commission has received comments on proposed amendments to rule G-32 that estimated the expense of producing an official statement at from three to ten dollars per copy. [55] The Commission specifically requests comment on current procedures used in estimating the number of official statements to be produced; the estimated marginal costs of producing official statements in order to comply with proposed Rule 15c2-12; and whether, and at what price, those costs may effectively be passed on to recipients of official statements.

The Commission believes that paragraph (d) will allow the MSRB to use its expertise and familiarity with the municipal markets to draft regulations more finely tuned to the needs of the market. The Commission expects that, in the event that Rule 15c2-12 is adopted in its proposed form, the MSRB would amend rule G-32, where appropriate, to modify the standards governing the timeliness of official statement delivery. In this regard, the Commission also requests comment on whether it should regulate directly the timing and manner of disclosure provided to municipal securities investors.

### E. *Public Dissemination of Official Statements upon Request*

Paragraph (e) of proposed Rule 15c2-12 would require that underwriters provide a copy of the final official statement to any person on request. [56] The purpose of this provision is to make the underwriter responsible for transmission of information to analysts, rating agencies, industry news services, and individuals who wish to analyze particular municipal securities offerings. In this regard, the Commission believes that increased availability of official statements, to potential investors, analysts, and other persons willing to pay a reasonable fee for access to the information contained in the final official statement, will promote more accurate pricing in the secondary market and may facilitate the discovery of potentially fraudulent practices. Thus, in addition to making final official statements available to actual investors, paragraph (e) would require that other interested parties be provided with copies as well.

No specific time limitation currently is specified in proposed rule 15c2-12. Comment is solicited on whether and under what circumstances a time period should be established, after which the obligation to provide information would no longer be applicable. [57] For example, if a central repository is developed, should this obligation expire after the repository receives and is in a

position to disseminate the final official statement? The Commission also requests comment on whether a purchaser's ability requirement under paragraph (e) of the rule to obtain an official statement on request for an unlimited time period reduces the need for the requirement imposed on the underwriters by MSRB rule G-32 to supply a final official statement to all purchasers. Finally, the Commission would like to receive comments on the potential costs to underwriters of complying with proposed paragraph (e). Specifically, what costs would be entailed in maintaining and disseminating copies of official statements required to be provided under paragraph (e)? Also, would it be possible, and at what price, for costs to be passed through effectively to recipients of the official statements?

## F. Definitions

In addition to containing substantive requirements, proposed Rule 15c2-12 contains two definitions. Subparagraph (f)(1) of Rule 15c2-12 would define the term "final official statement" to mean a document prepared by the issuer or its representatives setting forth, among other matters, information concerning the issuer and the proposed issue of securities that is complete as of the final agreement to purchase or sell municipal securities for or on behalf of an issuer or underwriter. A notice of sale would not be deemed a final official statement for purposes of the rule. The definition contained in subparagraph (f)(1) is based on the definition of official statement in MSRB rule G-32. By using a similar definition, the commission is seeking to avoid any conflicts that may occur, because paragraph (d) would require that underwriters distribute copies of final official statements in accordance with MSRB regulations. The Commission requests comment on the proposed definition of "final official statement."

The Commission also requests comment on the definition of an "underwriter" used in subparagraph (f)(2) of the proposed rule. As proposed, the definition of an underwriter parallels the definition in Section 2(11) of the Securities Act. [58] To ensure dissemination of documents by all professional participants in the offering, the definition includes managing underwriters, syndicate members, and selling group members that receive in excess of the usual seller's commission. Comment is requested on the proposed definition of "underwriter" and any foreseeable problems that dealers may encounter in complying with the rule. Comment also is requested concerning whether the definition of underwriter should be limited to the underwriters participating in the syndicate, as in the definition of "principal underwriter" in Rule 405 under the Securities Act. [59]

## G. Legislative Background

In contrast to the registration and reporting requirements imposed on non-exempt corporate issuers under the federal securities laws, offerings of municipal securities are not subject to review by the Commission. When Congress adopted the federal securities laws, in addition to being influenced by the local nature of markets, the absence of demonstrated abuses, and the sophistication of investors in municipal securities, it was persuaded that direct regulation of the process by which municipal issuers and municipalities raise funds to finance governmental activities would place the Commission in the position of a gate-keeper to the financial markets, a position inconsistent with intergovernmental comity. Nevertheless, Congress clearly made sales of municipal securities subject to the antifraud provisions of the federal securities laws. [60] Accordingly, broker-dealers misstating or omitting to disclose material facts about municipal securities or charging excessive mark-ups have been sanctioned for violating the antifraud provisions of the federal securities laws. [61]

The U.S. Supreme Court's interpretation of the scope of the Tenth Amendment has evolved significantly since the federal securities laws were first enacted in the 1930's. Most recently, in *South Carolina v. Baker*, [62] the Court affirmed the principle that the Tenth Amendment's limits on Congressional authority to regulate state activities are structural and not substantive. In doing so, it ruled that a provision of the Internal Revenue Code that required the registration of municipal bonds in order to maintain their tax exempt status was constitutional, since the municipal issuers had redress through the political process. Thus, a federal regulation affecting the manner in which securities are offered, adopted pursuant to Congressionally delegated authority, would not appear to violate the Tenth Amendment. [63]

In 1975, Congress revisited the application of the general antifraud provisions of the federal securities laws when it established the MSRB and provided for a system of regulation to prevent abuses in municipal securities. In adopting the 1975 Amendments, [64] Congress struck a balance between the need to protect investors and concerns about intergovernmental comity. This concern was reflected in Section 15B(d)(1), which prohibits the Commission and the MSRB from requiring "any issuer of municipal securities, directly or indirectly through a purchaser or prospective purchaser of securities from the issuer, to file with the Commission or the Board prior to the sale of such securities by the issuer any application, report, or document in connection with the issuance, sale, or distribution of such securities." [65]

At the same time, however, Congress more narrowly defined the authority of the MSRB. The so-called "Tower Amendment," which added Section 15B(d)(2) to the Exchange Act,[66] also prohibits the MSRB from requiring municipal issuers, directly or indirectly, through municipal securities broker-dealers or otherwise, to furnish the MSRB or prospective investors with any documents, including official statements. The MSRB specifically is permitted, however, to require that official statements or other documents that are available from sources other than the issuer, such as the underwriter, be provided to investors.

While Congress limited the power of the MSRB to require that disclosure documents be provided to investors, it was careful to preserve and expand the authority of the Commission under Section 15(c)(2) of the Exchange Act.[67] Section 15B(d)(2) expressly indicates that "[n]othing in this paragraph shall be construed to impair or limit the power of the Commission under any provision of this title."[68] Thus, although Section 15B(d)(1) prevents the Commission from requiring that municipal issuers file reports or documents prior to the issuance of securities in the same fashion as corporate securities, Congress expanded the Commission's authority to adopt rules reasonably designed to prevent fraud, so long as the rules did not require documents to be filed with the Commission.[69] The Commission believes that Rule 15c2-12 is consistent with its Congressional mandate to adopt rules reasonably designed to prevent fraud in the federal securities markets.[70]

## III. MUNICIPAL UNDERWRITER RESPONSIBILITIES

In connection with Rule 15c2-12's requirements to obtain and review a near-final official statement, the Commission wishes to emphasize the obligation of a municipal underwriter to have a reasonable basis for recommending any municipal securities and its responsibility, in fulfilling that obligation, to review in a professional manner the accuracy of the offering statements with which it is associated.

An underwriter, whether of municipal or other securities, occupies a vital position in an offering. The underwriter stands between the issuer and the public purchasers, assisting the issuer in pricing and, at times, in structuring the financing and preparing disclosure documents. Most importantly, its role is to place the offered securities with public investors. By participating in an offering, an underwriter makes an implied recommendation about the securities. Because the underwriter holds itself out as a securities professional, and especially in light of its position vis-a-vis the issuer, this recommendation itself implies that the underwriter has a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents used in the offerings.

Under the general antifraud provisions found in Section 17(a) of the Securities Act and Sections 10(b) and 15(c)(1) and (2) of the Exchange Act,[71] the courts and the Commission long have emphasized that a broker-dealer recommending securities to investors implies by its recommendation that it has an adequate basis for the recommendation.[72] For example, in Hanly v. SEC, affirming the Commission's sanctions against securities salesmen who recommended the stock of a financially troubled issuer both by making false and misleading representations and by failing to disclose known or reasonably obtainable adverse information, the court stated:

In summary, the standards by which the actions of each [salesman] must be judged are strict. He cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which are reasonably ascertainable. By his recommendation he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation.[73]

This obligation to have a reasonable basis for belief in the accuracy of statements directly made concerning the offering is underscored when a broker-dealer underwrites securities.[74] A municipal underwriter's obligation extends to having a reasonable basis for belief in the truth of key representations in an official statement prepared by the issuer. An underwriter's failure to have a reasonable basis for believing key representations in offering documents has resulted in private damage actions under the general antifraud provisions and in enforcement action by the Commission under Section 17(a) of the Securities Act. For example, in Hamilton Grant & Co., the Commission found that an underwriter had violated Sections 17(a)(2) and (3) of the Securities Act where the underwriter had "failed to make any substantial effort to obtain specific verification of management's key representations" and thus had "no basis for a reasonable belief in the truthfulness of the key representations made in the registration statement and prospectus."[75]

Although these cases have involved underwriters of corporate securities, which, unlike municipal securities, are subject to a comprehensive disclosure and liability scheme under the federal securities laws, the Commission has emphasized through its

enforcement program that broker-dealers selling municipal securities are also subject to high standards. In particular, the Commission has stated that underwriters of municipal securities must have a reasonable basis for their recommendations concerning offerings. [76]

Similarly, both the Commission and the courts have indicated that municipal underwriters must exercise reasonable care to evaluate the accuracy of statements in issuer disclosure documents. [77]

In recognition of their responsibilities under the general antifraud provisions of the federal securities laws and the MSRB's general fair dealing rules, [78] for some time underwriters generally have undertaken an investigation of the issuer's disclosure in negotiated offerings of municipal securities. [79] Among other things, depending upon the nature of the issuer, this has included meetings with municipal officials, visits to physical facilities, and an examination of the issuer's records and current economic trends and forecasts that bear upon the ability of the issuer to repay its debt. In addition, underwriters usually require so-called "Rule 10b-5" letters from their counsel with respect to municipal offerings. [80]

Although general practice among municipal underwriters appears to recognize a responsibility to assess the accuracy of disclosure documents used in negotiated offerings, the Commission is not convinced that this practice is recognized universally or followed in all negotiated municipal offerings. Moreover, with respect to competitively bid municipal underwritings, some underwriters mistakenly consider themselves to have virtually no responsibility regarding the accuracy of the offering disclosure document. As the Commission noted in the New York City Final Report, there appears to be no clear understanding of an underwriter's responsibility to assure the accuracy of the information disclosed. [81] The Supply System Staff Report also suggests that underwriters, even in nominally competitive bid offerings, view their responsibilities regarding the accuracy of the official statement as extremely limited. [82] The underwriters of the Supply System's bonds acknowledged no legal responsibility to read the official statements with a view to gauging their accuracy, much less to conduct a review to establish a basis for a reasonable belief in the accuracy of the key representations made in the offering statement. [83]

In light of the above, the Commission believes that further articulation of a municipal underwriter's obligations to the investing public in both negotiated and competitively bid offerings is appropriate at this time to encourage meaningful review of issuer disclosure. [84] In the Commission's view, the reasonableness of a belief in the accuracy and completeness of the key representations in the final official statement, and the extent of a review of the issuer's situation necessary to arrive at this belief, will depend upon all the circumstances. In both negotiated and competitively bid municipal offerings, the Commission expects, at a minimum, that underwriters will review the issuer's disclosure documents in a professional manner for possible inaccuracies and omissions. [85] Beyond this baseline review, the Commission believes that a number of factors generally will be relevant in determining the reasonableness of a municipal underwriter's basis for assessing the truthfulness of the key representations in final official statements. These factors would include: the extent to which the underwriter relied upon municipal officials, employees, experts, and other persons whose duties have given them knowledge of particular facts; [86] the type of underwriting arrangement (e.g., firm commitment or best efforts); the role of the underwriter (manager, syndicate member, or selected dealer) [87] ; the type of bonds being offered (general obligation, revenue, or private activity); the past familiarity of the underwriter with the issuer; the length of time to maturity of the bonds; the presence or absence of credit enhancements; and whether the bonds are competitively bid or are distributed in a negotiated offering.

In negotiated municipal offerings, where the underwriter is involved in the preparation of the official statement, the Commission believes that development of a reasonable basis for belief in the accuracy and completeness of the statements therein should involve an inquiry into the key representations in the official statement that is conducted in a professional manner, drawing on the underwriter's experience with the particular issuer, and other issuers, as well as its knowledge of the municipal markets. Sole reliance on the representations of the issuer would not suffice. [88] The role of the underwriter in assessing the accuracy of the issuer's key disclosures is of particular importance where the underwriting involves an unseasoned issuer. [89] Because of the varying types of municipal debt and extent of disclosure practices, the Commission is not attempting to delineate specific investigative requirements in this release. However, the Commission notes that commentators already have suggested a variety of investigative procedures to be followed by underwriters in connection with negotiated municipal securities offerings. [90]

With respect to competitively bid offerings of municipal securities, members of the municipal securities industry have argued that the uncertainty of the bidding process and time pressures associated with these offerings make it difficult for underwriters to conduct an investigation of the issuer or its statements. [91] The fact that an offering is underwritten on a competitive basis does not negate the responsibility that the underwriter perform a reasonable review. Nevertheless, the Commission recognizes that municipal underwriters may have little initial access to background information concerning securities that have been bid on a competitive basis. Therefore, the fact that offerings are competitively bid, rather than sold through a negotiated offering, is an element to be considered in determining the reasonableness of the underwriters' basis for assessing the truthfulness of key

representations in final official statements. In this regard, the fact that an underwriting is nominally classified as competitive will not be relevant to the scope of an underwriter's review where there is littler uncertainty about the choice of underwriters or where other factors are present that would command a closer examination.

The Commission believes that in a normal competitively bid offering, involving an established municipal issuer, a municipal underwriter generally would meet its obligation to have a reasonable basis for belief in the accuracy of the key representations in the official statement where it reviewed the official statement in a professional manner, and received from the issuer a detailed and credible explanation concerning any aspect of the official statement that appeared on its face, or on the basis of information available to the underwriter, to be inadequate. In reviewing the issuer's disclosure documents, therefore, underwriters bidding on competitive offerings should stay attuned to factors that suggest inaccuracies in the disclosure or signal that additional investigation is necessary. [92] If these factors appear, the underwriter should investigate the questionable disclosure and, if a problem is uncovered, pursue the inquiry until satisfied that correct disclosure has been made. [93]

While a municipal underwriter in a competitive bid offering may approach its reasonable basis obligation first through a professional review of the offering documents, it may not, of course, ignore other information regarding the issuer that it has available. Generally, underwriters receive notices of competitively bid offerings one week prior to the date bids must be submitted. During this period, they have the opportunity to review the issuer's preliminary official statement [94] and bring to bear any additional information they have about the issuer.

With respect to both negotiated and competitively bid offerings, apart from the information contained in the issuer's disclosure documents, and underwriter may have had opportunites to develop an independent reservoir of knowledge about an issuer. As noted above and in the Supply System Staff Report, [95] even in competitively bid offerings, underwriters may have access to information about the issuer that would allow them to reach some conclusion about the worth of its bonds and the validity of representations in the preliminary or final official statement. In addition, underwriters often engage in trading of other bonds of the issuer in the secondary market and acquire information on a continuing basis in their role as dealers of the bonds, regardless of whether they underwrite a particular offering. Moreover, many municipal issuers return to the market frequently ot meet their financing needs. Underwriters that participate in multiple offerings for an issuer have a continuing opportunity to become familiar with the issuer's financial and operational condition. From each of these sources, an underwriter may develop a reservoir of knowledge about the issuer and its securities that should be used to assess the adequacy of disclosure.

An additional source of information is the underwriter's research department. The research units of municipal underwriters produce research on bonds sold by both competitively bid and negotiated offerings, and may assist in the sales activites of the underwriter. The research units also draft reports that are sent to potential customers, including institutional investors, and sometimes write more abbreviated information circulars for the direct use of the firm's salespersons in promoting the bonds. When an underwriter participates in an offering, the research unit may have substantive knowledge about the issuer and should be consulted by the underwriter in performing its investigation. [86]

The Commission believes that the provisions in Rule 15c2-12 also contribute to a municipal underwriter's ability to meet its reasonable basis" obligation. In particular, paragraph (b) of Rule 15c2-12 would assist underwriters in complying with their reasonable basis obligation by providing that an underwriter receive a nearly final official statement prior to bidding for or purchasing an offering, which it then must review. In order to allow the underwriter to meet this obligation, issuers will have to begin drafting disclosure documents earlier and perhaps with greater care than in the past. Furthermore, this requirement should enable underwriters to receive, and if necessary influence the content of, the final official statement before committing themselves to an offering.

The Commission believes that the conduct of the underwriters in the Supply System offerings, and the position advanced by some members of the industry, with respect to their responsibilities in competitively bid offerings, raise serious concerns that warrant additional review. Although the legal standards stated above reflect the current Commission views based upon judicial decisions and previous administrative actions, the Commission is concerned that the standards applicable to municipal underwriter be articulated correctly. Accordingly, the Commission would like to receive views on the interpretation expressed above. In addition, the Commission would like to receive comment from underwriters and other members of the industry regarding current practices in both negotiated and competitively bid underwritings, and the extent to which they meet the standards articulated in this release. In this regard, the Commission requests comment on any problems experienced by underwriters in fulfilling their responsibilities that could be resolved through further Commission or MSRB rulemaking. Commentators also are invited to address whether a clearer articulation of an underwriter's responsibilities is desirable, either through additional Commission interpretation or rulemaking, or through amendment to the statutory provisions of the federal securities laws. Alternatively, should the MSRB adopt general guidelines or interpretations to assist underwriters in determining the scope of their responsibilities?

## IV. CREATION OF A CENTRAL REPOSITORY

In addition to soliciting views on proposed Rule 15c2-12, and the methods used to satisfy an underwriter's responsibility to have a reasonable basis for recommending the securities it underwrites, the Commission requests comment on a proposal advanced by the MSRB and members of the industry to create a repository of municipal securities disclosure documents. This proposal is intended to improve the flow of information to the municipal marketplace. Information concerning corporate offerings is available to the public at a single location, because most corporate issuers file registration statements with the Commission. [97] In addition, many corporate issuers are subject to the annual and periodic reporting requirements of the Exchange Act, [98] which provide a continual source of disclosure about the issuer to the secondary markets. No similar registration or reporting requirements exist for municipal issuers, however.

Although some repositories do collect information concerning municipal offerings, [99] there is no central and complete source of documentary information. Moreover, even when official statements are prepared, dealers may not retain copies following the distribution. Consequently, they may not have adequate access to complete descriptive information about an issuer's securities when trading in the secondary market. As noted earlier, lack of disclosure about important features of an issuer's securities has been a frequent complaint in MSRB arbitration proceedings and has resulted in pricing and trading inefficiencies. [100]

In an effort to improve the quality of disclosure available to both the primary and secondary market, the MSRB recently has proposed the creation of a central repository of official statements and certain refunding documents. [101] As envisioned by the MSRB, participation in the repository by municipal issuers would be mandatory, and information concerning new issues would be made available to interested persons, for a fee, shortly after filing with the repository by the issuer. Among other things, the MSRB expects that the repository would alleviate current informational problems in the offering of municipal securities by allowing dealers executing transactions in new issues of securities to gain access to information contained in official statements through in-house computer screens. It is also expected that benefits would accrue to the secondary market. Rapid access to descriptive information concerning all issues would facilitate compliance with the MSRB's rules and would provide a more complete and reliable source of information than is available at this time.

While the concept of a central repository has been endorsed by elements of the municipal securities industry, the proposal has generated a number of issues that deserve careful study. [102] The issues range from technical and operational concerns to more fundamental policy considerations regarding the nature of information to be provided to the repository, and the role of the Commission, if any, in assisting in the creation of the repository.

The Commission requests comments concerning the creation of a central repository. In addition to general comments concerning the need for a repository, commentators should address the following issues: should the repository be created by the industry or mandated by the Commission; should participation in a repository be voluntary or assisted by rulemaking efforts by the MSRB or the Commission; should the deposit requirement be placed on issuers, underwriters, or dealers; what kind of information should be submitted to the repository (e.g., official statements, escrow agreements, annual financial reports); when should the information be submitted; should there be periodic reporting requirements to keep the information current; should data be submitted in summary or complete form, in hard copy (without restrictions as to the type font or format, or with restrictions designed to facilitate use of optical character recognition technology) or electronically; and, how should the repository be funded?

## V. EFFECTS ON COMPETITION AND REGULATORY FLEXIBILITY ACT CONSIDERATIONS

Section 23(a)(2) of the Exchange Act [103] requires that the Commission, in adopting rules under the Act, consider the anticompetitive effects of such rules, if any, and balance any anticompetitive impact against the regulatory benefits gained in terms of furthering the purposes of the Exchange Act. The Commission is preliminarily of the view that proposed Rule 15c2-12 will not result in any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Exchange Act. The Commission requests comment, however, on any competitive burdens that might result from adoption of the rule. Although the rule applies equally to all underwriters of municipal securities, the Commission in particular is interested in receiving comments on the extent to which any of the proposed dollar thresholds would burden one segment of the industry more than another.

In addition, the Commission has prepared an Initial Regulatory Flexibility Analysis ("IRFA"), pursuant to the requirements of the Regulatory Flexibility Act, [104] regarding the proposed rules. The IRFA indicates that Rule 15c2-12 could impose some additional

costs on small broker-dealers and municipal issuers, particularly if a lower dollar threshold is adopted. Nevertheless, the Commission believes that many of the substantive requirements of the rule already are observed by underwriters and issuers as a matter of business practice, or to fulfill their existing obligations under the general antifraud provisions of the federal securities laws. The Commission requests comment on the extent to which current practice deviates from the requirements of the proposed rule, and the extent to which additional costs may be imposed on small municipal issuers and broker-dealers if the rule is adopted as proposed.

A copy of the IRFA may be obtained from Henry E. Flowers, Attorney, Office of Legal Policy, Division of Market Regulation, Securities and Exchange Commission, 450 Fifth Street, N.W., Mail Stop 5-1, Washington, D.C. 20549, (202) 272-2848.

## VI. STATUTORY BASIS AND TEXT OF AMENDMENTS

The Commission proposes to adopt §240.15c2-12 in Chapter II of Title 17 of the Code of Federal Regulations as follows: List of Subjects in 17 CFR Part 240

## PART 240 –GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934

1. The authority citation for Part 240 is revised by adding the following citation:

Authority: Sec. 23, 48 Stat. 901, as amended; 15 U.S.C. 78w. * * * §240.15c2-12 also issued under 15 U.S.C. 78b, 78c, 78j, 78o, 78o-4 and 78q.

2. By adding §240.15c2-12 as follows: * * * [Reproduced at ¶25,117. CCH.]

By the Commission.

[1] 15 U.S.C. 78a-78jj.

[2] See Final Report in the Matter of Transactions in the Securities of the City of New York. Submitted to the Senate Committee on Banking, Housing and Urban Affairs, 96th Cong., 1st Sess. (Comm. Print 1979), reprinted in [1979 Transfer Binder] FED. SEC. L. REP. (CCH) ¶81,936 ("New York City Final Report" or "Final Report").

[3] Source: Flow of Funds Accounts, First Quarter 1987.

Source: Bond Buyer Data Base, published in The Bond Buyer, July 15, 1988, at 3. In 1986, new issues of municipal securities declined to $162 billion from the 1985 record high amount of $223 billion. Id. See also, Federal Reserve Bulletin –Domestic Financial Statistics for New Security Issues.

[5] Source: Flow of Funds Accounts, First Quarter 1987; see also Peterson, Retail Buyers Dominate Tax-Exempts, Credit Week (June 20, 1988).

[6] 15 U.S.C. 77a-77aa.

[7] See generally Amdursky, Creative State and Local Financing Techniques, in State and Local Government Debt Financing (Gelfand ed. 1987).

[8] S. Rep. No. 75, 94th Cong., 1st Sess. 3-4 (1975).

[9] Pub. L. No. 94-29, 89 Stat. 97 (June 4, 1975) ("1975 Amendments").

[10] Securities and Exchange Commission Staff Report on Transactions in Securities of the City of New York, Subcommittee on Economic Stabilization of the House Committee on Banking, Finance and Urban Affairs, 95th Cong., 1st Sess. (Comm. Print. 1977) (Hereinafter, "New York City Staff Report"). See also New York City Final Report.

[11] New York City Staff Report at ch. 5, pp. 39-65.

[12] New York City Staff Report at ch. 5, p. 51.

[13] *Securities and Exchange Commission Staff Report on the Investigation in the Matter of Transactions in Washington Public Supply System Securities* (1988) (Hereinafter, "Supply System Staff Report").

[14] *Id.* at 1.

[15] *Id.* at 15, 168.

[16] Sales of municipal bonds by issuers to underwriters can be on either a competitively bid or negotiated basis. In a competitively bid sale, the issuer offers the bonds to underwriters in a sealed-bid auction, usually after circulating a preliminary official statement, and underwriting firms form syndicates to bid on the bonds. The syndicate offering the best bid, usually the lowest interest cost to the issuer, wins the auction and buys the bonds for resale into the market. In a negotiated sale, the issuer selects a lead underwriter, which then usually helps prepare the official statement and investigates the adequacy of disclosure in the official statement. The lead underwriter also advises on timing, price, and structure for the sale of the bonds. When the issuer agrees to the offering terms, the lead underwriter, and the syndicate that it has formed, buy the bonds from the issuer and sell them into the market. *See generally* Supply System Staff Report at 166-67.

[17] Supply System Staff Report at 171.

[18] Supply System Staff Report at 191-192.

[19] *Chemical Bank v. Washington Public Power Supply System*, 99 Wash. 2d 772, 666 P.2d 329 (Wash. 1983), *aff'd* 102 Wash. 2d 874, 691 P.2d 524 (Wash. 1984), *cert. denied sub nom. Haberman v. Chemical Bank*, 471 U.S. 1065 (1985), *and Chemical Bank v. Public Utility Dist* No. 1, 471 U.S. 1075 (1985).

[20] The New York City Staff Report revealed that there was little disclosure in the municipal securities market in 1975 and that investors had to rely primarily on the rating agencies. *See* New York City Staff Report at ch. 5, p. 5.

[21] The GFOA was known at the time as the Municipal Finance Officers Association, Inc.

[22] The GFOA's guidelines have been revised since 1976. The latest revision was published earlier this year. *See Disclosure Guidelines for State and Local Government Securities* (January 1988) ("GFOA Guidelines").

[23] *See* discussion *infra* at notes 51, 52 and accompanying text, regarding MSRB rule G-32.

[24] *See Minn. Code Agency R.* §2875.2390 and proposed §2875.0015 (except for general obligation bonds). *See also* A. 8100/S. 6093, amending *N.Y. Gen. Bus. Law* §352 and adding §§357-a and 359-ffff (except for general obligation bonds) (still pending in New York State Assembly). Other states already have laws that require such disclosure for certain types of offerings. *See, e.g., Ariz. Rev. Stat. Ann.* §§44-1843.01 and 44-1898 (certain industrial development bonds). The Commission also has learned that draft rules are being circulated by the State of Texas that would require issuers to conform to the GFOA Guidelines.

[25] *See* §517.051, Florida Securities and Investor Protection Act (unless default disclosed and described in compliance with *Fla. Admin. Code*, Rule 3E-400.003); New Jersey Uniform Securities Law, §49.3-50.

[26] *See* discussion *infra* at Part IV.

[27] *See, e.g.,* Ciccarone, *Municipal Bondholders Need More Information*, Wall St. J., March 27, 1987, at 22, col. 3; Ciccarone, *We Need Better Muni Disclosure*, 13 Financial World, 156 (June 30, 1987); Ferris, *Muni Market Needs Policing and Guidelines for Disclosure*, The Bond Buyer, August 31, 1987, at 1; *Disclosure Takes Place Among Top Municipal Market Issues This Year*, The Bond Buyer, March 7, 1988, at 1.

[28] In the past, the Commission has supported the repeal of the exemption from registration under the Securities Act for industrial development bonds ("IDBs"). *See* Letter from John S.R. Shad, Chairman, Securities and Exchange Commission, to the Honorable Timothy E. Wirth, Chairman, House Subcommittee on Telecommunications, Consumer Protection, and Finance (March 12, 1988); 1978 Industrial Development Bond Act, S. 3323, 95th Cong., 2d Sess. (1978) (legislative proposal presented to Congress by the Commission). IDB financing was restricted substantially by recent amendments to the federal tax laws, which limit the types of

facilities that may be financed, the percentage of proceeds that may be used for private purposes, and the amount of debt service that may be supported by payments from private persons. *See Tax Reform Act of 1986*, Pub. L. No. 99-514, 100 Stat. 2085 (Oct. 22, 1986). Under Rule 131 of the Securities Act, 17 C.F.R. 230.131, taxable IDBs also must be registered if they amount to purely conduit financing for corporations. Nevertheless, to the limited extent IDB financing continues, the Commission continues that to support previous recommendations that would require registration of IDBs that are, in fact, corporate obligations. *See Disclosure in Municipal Securities Markets*, Remarks of David S. Ruder, Chairman, Securities and Exchange Commission, Before the Public Securities Association (Oct. 23, 1987) at 17-18.

[29] Of the approximately $720 billion in municipal debt outstanding, it is estimated that approximately $5 billion, or roughly 0.7 percent, is currently in default. Source: Bond Investors Association. While the Supply System's $2.25 billion payment default represents the major portion of this amount, over 300 additional municipal issuers are also currently in default on their obligations. *Id*. In contrast, corporate issues are estimated to have roughly a 1.1% default rate. *See* Task Force Report, *infra* note 34, at 7.

Issuer defaults pose the most serious economic threat to investors. Nevertheless, investors also may suffer losses as a result of downgrades in ratings. In 1987 alone, one nationally recognized statistical rating organization, Moody's, lowered the ratings of 322 municipal bond issues. *See Municipal Bond Rating Revisions-1987*, Moody's Bond Survey, January 11, 1988, at 1. Moody's report indicated that almost half of the issues downgraded were concentrated in three states closely tied to mineral sectors. During the same period, Standard & Poors reduced ratings of 105 issues, amounting to $17 billion. *Credit Watch* (Feb. 1, 1988), at 1. Although there is not a great deal of emperical data in this area, downgradings clearly affect the value of bonds. For example, yields to maturity on 30-year AAA general obligation bonds are 7.60% as compared to 8.30% for the same bonds rated Baa. The direct impact of downgrades, however, may depend upon the amount of other information that is available in the markets. *See* generally, *e.g.*, Ederington, Yawitz & Roberts, *The Information Content of Bond Ratings*, 10 J. Fin. Res 211 (Fall 1987) (discussing the relationship between ratings and yields on industrial bonds).

[30] Bonds are considered to be escrowed-to-maturity when the proceeds of a refunding bond offering are placed in an irrevocable escrow account, or trust, in an amount that will generate sufficient income to pay principal and interest on the bonds in accordance with specified payment schedules.

[31] The issuers ultimately abandoned their attempts to call the bonds. The Commission and its staff, along with the MSRB and other self-regulatory and industry organizations, have emphasized the need for clear and conspicuous disclosure of call provisions, particularly in refunding bond issues. *See, e.g.*, Letter from Richard G. Ketchum, Director, Division of Market Regulation, Securities and Exchange Commission, to H. Keith Brunnemer, Jr. Chairman, MSRB (June 24, 1988); Securities Exchange Act Release No. 23856 (Dec. 3, 1986), 51 FR 44398. Moreover, the Commission understands that similar concerns exist with respect to disclosure of exercise periods for municipal put option bonds.

[32] *See generally* Securities Exchange Act Releases No. 21457 (Nov. 2, 1984), 49 FR 44835; No. 21968 (Apr. 30, 1985), 50 FR 18336; and No. 22374 (Aug. 30, 1985), 50 FR 36505 (concerning amendments to MSRB rules G-9 and G-32).

[33] *Id. See also, generally*, Picker, *The Disclosure Debate Gets Nasty*, Institutional Investor (April 1988) at 169 (discussing, among other things, problems in disseminating official statements).

[34] *Public Securities Association Municipal Securities Disclosure Task Force Report: Initial Analysis of Current Disclosure Practices in the Municipal Securities Market* (June 1988) ("Task Force Report") at 21.

[35] The current problems with disclosure in municipal securities transactions are illustrated further by statistics on arbitration that are available from the MSRB. In 1987, roughly 84% of all customer complaints, and 49% of inter-dealer complaints, that were arbitrated through the MSRB alleged that inadequate information was provided concerning the securities. *MSRB Arbitration Statistics on Allegations of Misdescriptions and Failures to Disclose Information about Municipal Securities: 1985-87* (May 18, 1988) (unpublished).

[36] *See* S. Rep. No. 75, 94th Cong., 1st Sess. 44 (1975).

[37] While the Commission has set an objective threshold for the application of Rule 15c2-12, offerings under that amount would continue to be subject to the general antifraud provisions of the Exchange Act and the Securities Act, *e.g.*, Sections 10(b) and 15 (c) of the Exchange Act, 15 U.S.C. 78j(b) and 78o(c), and the rules thereunder and Section 17(a) of the Securities Act, 15 U.S.C. 77q(a).

[38] Although Rule 15c2-12, as proposed, would apply to offerings exceeding $10 million, the Commission is aware that many defaults are likely to occur in offerings below the $10 million threshold. Information supplied by the Bond Investors Association suggests that the average dollar amount of municipal defaults, by purpose, is as set forth below. The Commission requests

comment on the distribution of defaults, by purpose, at various thresholds.

| Purpose | No. Iss. | $ Amt.* | $ Average* |
|---|---|---|---|
| Elec. Utility** | 20 | 2,412 | 120.6 |
| Retirment Housing | 56 | 725 | 12.9 |
| Ind. Lease Revenue | 60 | 520 | 8.6 |
| Nursing Homes | 65 | 411 | 6.3 |
| Hospitals | 12 | 94 | 7.8 |
| Pollution control Revenue | 5 | 343 | 68.6 |
| Housing and Apt. Development | 22 | 209 | 9.5 |
| Other Types | 59 | 523 | 8.8 |
| All Types** | 299 | 5,240 | 17.5 |

* in millions.

** including the Supply System default.

[39] Of course, dealers still would be required to comply with the provisions of MSRB rule G-15 concerning the disclosure of call and other material provisions in confirmations regardless of offering amount. *See also* discussion *infra* at Part IV, requesting comment on a proposal to create a central repository of official statements.

[40] IDD/PSA Municipal Database, including all municipal issues with a final maturity exceeding 13 months.

[41] As a general matter, there is less evidence of problems of default on general obligation bonds than municipal revenue bonds. Similarly, from 1972 to 1983, there were only 10 reported note defaults, some of which involved obligations owed only to local banks. *See generally* Advisory Commission on Intergovernmental Relations, *Bankruptcies, Defaults, and Other Local Government Financial Emergencies* (March 1985) at 24-25. Although general obligation bonds as a rule have not presented default concerns, some distinction must be made with regard to the general obligation debt of small, special-purpose districts. From 1972-1984, eleven special purpose districts declared bankruptcy. *Id.* at 9. Some of these districts were the subject of Commission enforcement actions. *See SEC v. Reclamation District No. 2090*, Case No. C-76-1231 (N.D. Cal. Aug. 27, 1978), SEC Litigation Releases No. 7551 (Sept. 8, 1976) and No. 7460 (June 22, 1976); *SEC v. San Antonio Municipal Utility District No. 1*, Civ. Action No. H-77-1868 (S.D. Tex. 1977), SEC Litigation Release No. 8195 (Nov. 18, 1977). In any event, the New York City problems did involve general obligation bonds in very large amounts. *See supra* notes 10 through 12 and accompanying text.

[42] 15 U.S.C. 77d(2).

[43] In this regard, proposed Rule 15c2-12 is consistent with the current requirements under MSRB rule G-32. Specifically, the MSRB has taken the position that G-32 applies to both public and private offerings. *Disclosure Requirements for New Issue Securities: Rule G-32*, MSRB Reports, Sept. 1986, at 17.

[44] *Cf.* Securities Act Rule 430A, 17 C.F.R. 230.430A (form of prospectus filed as part of registration statement declared effective may omit information with respect to public offering price, underwriting syndicates, underwriting discounts or commissions, discounts or commissions to dealers, amount of proceeds, conversion dates, call prices and other items dependent on offering price, delivery dates, and terms of securities dependent on offering price). Although paragraph (b) would require that underwriters receive official statements that are nearly complete prior to bidding for or purchasing an offering, this would not prevent an underwriter from requesting even substantial changes to the document where necessary to assure complete and accurate disclosure.

[45] A recent survey indicated that official statements were prepared for 84% of municipal bond issues, including both competitive and negotiated offerings. Task Force Report, *supra* note 34, at 14.

[46] *See* also discussion *infra* in Part III.

[47] Absent unusual circumstances, this would require that a preliminary official statement be sent by first class mail or other equally prompt means, no later than the close of the next business day following the receipt of the request. Requests could be made

orally or in writing.

[48] Although this requirement is intended primarily to benefit potential investors, the rule requires the preliminary official statement to be given to any person on request, to eliminate underwriters' discretion in determining who in fact is a potential investor. Comment is requested on the facility with which analysts and other industry professionals currently can obtain copies of preliminary official statements directly from the issuer; whether the underwriters' obligation to provide these statements should be limited to potential investors; and how potential investors should be defined.

[49] Of course, where key representations made in the preliminary official statement are known to the underwriter to be no longer accurate, the underwriter would have to notify investors prior to the time that they make an investment decision and would have to provide copies of the amended final official statement.

[50] See, e.g., MSRB Manual (CCH) ¶3581.30.

[51] Exchange Act Section 15B(d)(2), 15 U.S.C. 78o-4(d)(2). See discussion infra at text accompanying notes 64 to 69.

[52] The MSRB has stated that "if an issuer fails to supply a sufficient number of copies of official statements, it is incumbent on a dealer to reproduce the official statement at its own expense. These requirements apply to all municipal securities brokers and dealers who sell new issue securities, not solely to the underwriters of the issue." Rules G-8, G-9, and G-32, MSRB Reports, (Mar. 1984) at 3.

[53] Syndicate members also would need to assure themselves that their agreement with syndicate managers will provide for the prompt distribution of official statements.

[54] See, e.g., Forbes & McGrath, Disclosure Practices in Tax-Exempt General Obligation Bonds: an Update, 7 Mun. Fin. J. 207 (1986).

[55] See supra note 32. Specific comment is requested on the per copy cost for official statements for offerings at the various suggested thresholds for the rule, i.e., $1 million, $10 million, $20 million, and $50 million. See discussion supra at text accompanying note 40.

[56] The proposed rule requires that the offering statement be provided in a timely manner. For the first month following an offering, absent extraordinary circumstances, this would mean that a copy would be mailed within two business days of the request. Requests could be made orally or in writing. Later, reasonable time would be allowed to locate and duplicate requested documents.

[57] The Commission recognized that after a period of time, the disclosures contained in the official statement regarding an issuer no longer may be accurate. Accordingly, where the underwriter receives unsolicited requests for official statements, the Commission would not expect the underwriter to continue to update the disclosure to reflect inaccuracies that have resulted from intervening events. In responding to unsolicited requests, underwriters should indicate that the document contains dated information. The Commission requests common on this aspect of the rule and any concerns that underwriters may have.

[58] 15 U.S.C. 77b(11). The definition of underwriter in Section 2(11) of the Securities Act has been modified in one respect. Reference to a concession or allowance has been added to the definition to reflect the terms used in the municipal securities industry for a customary distributor's or seller's commission. The terms "concession" and "dealer's allowance," in the context of the sale of a new issue of municipal securities, refer to "the amount of reduction from the public offering price a syndicate grants to a dealer not a member of the syndicate, expressed as a percentage of par value." See Glossary of Municipal Securities Terms (MSRB 1985).

[59] 17 C.F.R. 230.405.

[60] See, e.g., In re New York Municipal Securities Litigation, 507 F. Supp. 169 (S.D.N.Y. 1980); S.E.C. v. Charles Morris & Associates, 386 F. Supp. 1327 (S.D. Tenn. 1973); Thiele v. Shields, 131 F. Supp. 416 (S.D.N.Y. 1955) (Sections 17(a) of the Securities Act and 10(b) of the Exchange Act apply to sales of municipal securities).

[61] See discussion infra at Part III.

[62] __ U.S. __, 56 U.S.L.W. 4311 (April 20, 1988).

[63] *See also Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 556 (1985) (indicating that the appropriate inquiry in determining the boundaries of state immunity from federal regulation is whether "the internal safeguards of the political process have performed as intended").

[64] *See supra* note 8.

[65] 15 U.S.C. 78o-4(d)(1).

[66] 15 U.S.C. 78o-4(D)(2).

[67] 15 U.S.C. 78o(c)(2).

[68] 15 U.S.C. 78o-4(d)(2).

[69] Section 15(c)(2) of the Exchange Act empowers the Commission with broad authority to adopt rules reasonably designed to prevent fraudulent, deceptive, or manipulative acts or practices. Prior to 1975, the Commission's regulation of municipal professionals had been limited largely to *post hoc* enforcement actions against fraud. The 1975 Amendments expanded the application of Section 15(c)(2) to subject municipal securities and municipal securities dealers to the Commission's authority to adopt rules reasonably designed to prevent acts or practices that are fraudulent, deceptive, or manipulative.

Since Rule 15c2-11, 17 C.F.R 240.15c2-11, which requires brokers and dealers to obtain certain information about an issuer before initiating quotations, would have applied to municipal securities upon enactment of the 1975 Amendments, Congress indicated that the Commission should specifically exempt municipal securities from Rule 15c2-11 immediately upon their adoption. It was believed that, since Rule 15c2-11 was drafted with corporate securities in mind, municipal securities dealers would not have been able to obtain sufficient information concerning municipal issuers to satisfy the rule's requirements. *See* S. Rep. No. 75, 94th Cong., 1st Sess. 48 (1975). *See also* Rule 15c2-11(f)(4), 17 C.F.R. 15c2-11(f)(4) (provisions of rule do not apply to publication or submission of a quotation regarding a municipal security).

[70] Although denominated under Section 15 of the Exchange Act, Rule 15c2-12 also is being adopted pursuant to the Commission's authority under Sections 2, 3, 10, 15B, 17 and 23 of the Exchange Act, 15 U.S.C. 78b, 78c, 78j, 78 o-4, 78q, and 78w.

[71] 15 U.S.C. 77q(a) and 15 U.S.C. 78j(b), 78o(c)(1), and 78o(c)(2), respectively.

[72] *See, e.g., Feeney v. SEC*, 564 F.2d 260 (8th Cir. 1977); *Nassar & Co.*, Securities Exchange Act Release No. 15347 (Nov. 22, 1978), 16 SEC Docket 222, *reprinted in* [1979 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶81,904, *aff'd without opinion*, 600 F.2d 280 (D.C. Cir. 1979), *Cortlandt Investing Corporation*, 44 S.E.C. 45 (1969); *Crow, Bourman & Chotkin, Inc.*, 42 S.E.C. 938 (1966); *Shearson Hammill & Co.*, 42 S.E.C. 811 (1965); *J.A. Winston & Co., Inc.*, 42 S.E.C. 62 (1964) (concerning transactions by dealers in the secondary market).

[73] 415 F.2d 589, 597 (2d Cir.1969), *affirming* Richard J. Buch & Co., 43 S.E.L.C. 998 (1968). *See also, e.g., Merrill Lynch Pierce, Fenner & Smith*, Securities Exchange Act Release No. 14149 (Nov. 9, 1977), 13 SEC Docket 646, 561 ("A recommendation by a broker-dealer is perceived by a customer as (and in fact it should be) the product of an objective analysis [which] can only be achieved when the scope of investigation is extended beyond the company's management"); *John R. Brick*, Securities Exchange Act Release No. 11763 (Oct. 24, 1975), 8 SEC Docket 240, 242 ("The professional ... is not an insurer. But he is under duty to investigate and to see to it that his recommendations have a reasonable basis"); M.G. Davis & Co., 44 S.E.C. 153, 157-58 (1970), *aff'd sub nom. Levine v. SEC*, 436 F.2d 88 (2d Cir. 1971) (broker-dealer registration revoked, because "representations and predictions" made and market letter relied on by registrant "were without reasonable basis," and "registrant could not reasonably accept all of the statements in the [market letter] without further investigation").

[74] The opportunity for the underwriters to require disclosure from the issuer, as well as the special selling pressures involved in the distribution of securities generally have given rise to a heightened obligation on the part of underwriters. In *Sanders v. John Nuveen & Co.*, 524 F.2d 1064 (7th Cir. 1975), *vacated and remanded on other grounds*, 425 U.S. 929 (1976), *on remand*, 554 F.2d 790 (7th Cir. 1977), *rehearing denied*, 619 F.2d 1222 (7th Cir. 1980) *cert. denied* 450 U.S. 1005 (1981), for example, the Seventh Circuit considered a case involving an underwriter of commercial paper. The underwriter did not have a formal underwriting agreement with the issuer and was not subject to liability under Section 11 of the Securities Act, 15 U.S.C. 77k. Nevertheless, the court noted that:

[a]n underwriter's relationship with the issuer gives the underwriter access to facts that are not equally available to members of the

public who must rely on published information. And the relationship between the underwriter and its customers implicitly involves a favorable recommendation of the issued security. Because the public relies on the integrity, independence and expertise of the underwriter, the underwriter's participation significantly enhances the marketability of the security. And since the underwriter is unquestionably aware of the nature of the public's reliance on his participation in the sale of the issue, the mere fact that he has underwritten it is an implied representation that he has met the standards of his profession in his investigation of the issuer. 524 F.2d at 1069-70.

[75] Securities Exchange Act Release No. 24679 (July 7, 1987), 38 SEC Docket 1346, 1353. See also the following decisions concerning corporate underwriters. *Leonard Lazaroff*, 43 S.E.C. 43, 47 (1966) (underwriter did not carry out its "duty to investigate the issuer diligently and ascertain the accuracy of the offering circular"); *Amos Treat & Co.*, 42 S.E.C. 99, 103-4 (1964) (underwriter sanctioned for knowingly using registration statement containing stale financial statements when recommending securities); *The Richmond Corporation*, 41 S.E.C. 398, 406 (1963) ("It is a well established practice, and a standard of the business, for underwriters to exercise diligence and care in examining into an issuer's business and the accuracy and adequacy of the information contained in the registration statement. By associating himself with a proposed offering, an underwriter impliedly represents that he has made such an investigation in accordance with professional standards" [footnote omitted]); *Brown, Barton & Engel* 41 S.E.C. 59, 64 (1962) (underwriters "had a responsibility to make a reasonable investigation to assure themselves that there was a basis for the representations they made and that a fair picture, including adverse as well as favorable factors, was presented to investors").

[76] *Walston & Co.*, Securities Exchange Act Release No. 8165 (Sept. 22, 1967), *reprinted in* [1966-67 Transfer Binder] FED. SEC. L. REP. (CCH) ¶77,474. This case involved a special assessment tax district consisting of one tract of undeveloped land owned by the promoter of the bonds. The manager of the bond department, but not the firm's salesmen, knew that the district consisted of one individual's land, but the firm had not inquired inot the financial condition of the owner and developer. In that context, the Commission noted:

It is incumbent on firms participating in an offering and on dealers recommending municipal bonds to their customers as "good municipal bonds" to make diligent inquiry, investigation and disclosure as to material facts relating to the issuer of the securities and bearing upon the ability of the issuer to service such bonds. It is, moreover, essential that dealers offering such bonds to the public make certain that the offering circular and other selling literature are based upon an adequate investigation and that they accurately reflect all material facts which a prudent investor should know in order to evaluate the offering before reaching an investment decision.

[77] *See, e.g., Walston & Co., supra* note 76; *Edward J. Blumenfeld*, Securities Exchange Act Release No. 16437 (Dec. 19, 1979), 18 SEC Docket 1379; *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981), *cert. denied*, 455 U.S. 936 (1982) (underwriter of industrial revenue bonds could be liable for recklessness under "fraud on the market" theory under Section 10(b) of Exchange Act, 15 U.S.C. 78j(b), where offering circular contained material omissions and underwriter had been aware of misrepresentations and omissions and had failed to look into true value of the issuer's assets); *Shores v. M.E. Ratliff Investment Co.*, No. CA 77-G-0604-5, *reprinted in* [1981-82 Transfer Binder] FED. SEC. L. REP. (CCH) ¶98,425 (N.D. Ala. 1982) (underwriter of industrial development bonds liable under Rule 10b-5 17 C.F.R. 240.10b-5, for using offering circulars not disclosing material facts and for failing to conduct reasonable inquiry); *But see, Ross v. Bank South*, N.A., 837 F.2d 980 (11th Cir. 1988), *vacated and reh'g en banc granted sub nom. Ross v. Rice*, 848 F.2d 1132 (June 10, 1988) (granting rehearing to consider a case involving, among other things, application of the fraud on the market theory to sales of bonds in an undeveloped market).

[78] Apart form the general antifraud provisions of the federal securities laws, municipal securities brokers and dealers also must comply with the MSRB's rules. Rule G-17 of the MSRB's rules requires municipal securities brokers and dealers to deal fairly with investors and prohibits them from engaging in any deceptive, dishonest, or unfair practice. The MSRB has interpreted this rule to require that a dealer disclose all material facts known by the dealer to a customer at the time of the transaction. *See supra* note 50. In addition, rule G-19 requires that a municipal securities broker or dealer not recommend a transaction to a customer unless it has reasonable grounds, based upon its knowledge of the security, for believing that the transaction is suitable for the particular customer.

[79] The recent report by the American Bar Association and National Association of Bond Lawyers on the disclosure roles of counsel in municipal offerings acknowledged that:

While issuer officials and underwriters are ... exempt from civil liabilities under Section 11 of the 1933 Act, both the SEC and private litigants have taken the position that a duty exists under the antifraud provisions similar to, although perhaps not so severe as, the investigating activities which form the statutory "due diligence" defense under Section 11.

American Bar Association, Section of Urban, State and Local Government Law, and National Association of Bond Lawyers, *Disclosure Roles of Counsel in State and Local Government Securities Offerings* (1987), at 37 ("ABA-NABL Report").

[80] Rule 10b-5 letters are obtained by underwriters from their counsel document (*e.g.*, "nothing has come to our attention that would indicate that the disclosure document contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, misleading"). *See* 17 C.F.R 240.10b-5(b). Such letters generally provide a description of the investigation undertaken by the counsel on behalf of the underwriter which serves as a basis for those assurances.

[81] New York City Final Report, *supra* note 2. The Supplemental Staff Report, which was an appendix to the New York City Final Report, stated that:

The underwriters, those discussed in the Staff Report as well as several other national and local underwriting firms interviewed by the staff, can and do perform independent credit analyses of municipalities whose securities offerings they underwrite. The underwriters have generally stated, however, that circumstances severely restrict their ability to conduct any "due diligence" inquiry in any competitive bid offering and that in these circumstances, the inquiry may consist of nothing more than a perusal of the official statement or other information provised in connection with the offering or contained in their files. In contrast, the underwriters generally stated that in any negotiated offering they do perform a due diligence inquiry in some ways similar to that conducted in underwriting corporate issues.

[82] Supply System Staff Report at 168-169. *See also* discussion *supra* at text accompanying notes 13 to 19.

[93] Unlike many competitively bid offerings, only two syndicates successfully bid on the Supply System's 14 offerings. Moreover, there appeared to be little uncertainty about which syndicate would be awarded a particular offering.

[84] As discussed above, these obligations arise out of the general antifraud provisions of the federal securities laws, particularly Section 17 of the Securities Act and Sections 10(b) and 15(c)(1) and (2) of the Exchange Act, and the rules thereunder. The factors set forth below do no change the applicable legal standards, *e.g.*, scienter or negligence, and conduct in a specific case must be measured against these standards. Nor do they attempt to establish objective standards of recklessness for purposes or any scienter requirement.

[85] Proposed Rule 15c2-12 expressly would require that municipal underwriters review preliminary official statements in offerings of over $10 million.

[86] The Commission wishes to caution underwriters that this factor does not imply that an underwriter may merely rely upon formal representations by the issuer, its officials, or employees regarding the general accuracy of disclosure contained in the official statement. The underwriter must review the information submitted to it with a view to resolving inaccuracies and inconsistencies. Reliance on portions of a statement prepared and certified or authorized by an expert to be included in the document generally would be reasonable absent actual knowledge, or a reason to know, of the inaccuracy of those statements.

[87] In other contexts, the Commission and the courts have distinguished between the obligations of managing underwriters and syndicate members. *See generally* Securities Exchange Act Release No. 9671 (July 26, 1972) (discussing the responsibility of underwriters, brokers, and dealers trading in securities, particularly of high risk ventures). Generally, a participating underwriter in an offering of municipal securities need not duplicate the efforts of the managing underwriter, but must satisfy itself that the managing underwriter reviewed the accuracy of the information in the official statement in a professional manner and therefore had a reasonable basis for its recommendation. Nevertheless, in both competitive and negotiated offerings, the syndicate members, as part of forming their own recommendations to investors, must at least familiarize themselves with the information in the official statement and should notify the managing underwriters of any factors that suggest inaccuracies in disclosure or signal the need for additional investigation.

[88] *See, e.g., Hamilton Grant & Co, supra* note 75.

[89] *Charles E. Bailey & Co.*, 35 S.E.C. 33, 42 (1953) ("where, as here, an issuer seeks funds from the public to finance a new and speculative venture, the underwriter must be particularly careful in verifying the issuer's obviously self-serving statements as to its operations and prospects").

[90] *See ABA-NABL Report, supra* note 79, at 74-98; Doty, *The Disclosure Process and Securities Laws, State and Local Government Debt Financing* (D. Gelfand ed. 1986) ("Doty") at §§8-69, 8-71.

[91] *See, e.g., Municipal Securities Full Disclosure Act of 1976, Hearing on S. 2969 and 2574 before the Subcommittee on Securities, Senate Committee on Banking, Housing and Urban Affairs*, 94th Cong., 2d Sess. 126, 127 (1976) (statement of

Richard Kezer, President of the Dealer Bank Association).

[92] In a competitively bid offering, the task of assuring the accuracy and completeness of disclosure is in the hands of the issuer, who usually will employ a financial adviser, which frequently is a broker-dealer. Ordinarily, financial advisers in competitively bid offerings publicly associate themselves with the offering, and perform many of the functions normally undertaken by the underwriters in corporate offerings and in municipal offerings sold on a negotiated basis. Thus, where such financial advisors have access to issuer data and participate in drafting the disclosure documents, they will have a comparable obligation under the antifraud provisions to inquire into the completeness and accuracy of disclosure presented during the bidding process. *See generally* Doty, *supra* note 90, at §8-78. Although the underwriter may choose to rely upon the fact that a broker-dealer acting as a financial adviser is assisting the issuer, such reliance does not relieve the underwriter of its duty to investigate questionable disclosure.

[93] The Commission requests comment on the nature and extent of any problems experienced by underwriters and issuers involving underwriting agreements that do not contemplate a reasonable investigation by the underwriters. One commentator has suggested that issuers may attempt to retain good faith deposits if underwriters refuse to go forward with an offering where sufficient disclosure is not provided. *See* Doty, *Municipal Securities Disclosure*, 13 Rev. of Sec. Reg. No. 1 (January 16, 1980). The Commission believes that any problems previously experienced in this area may be avoided by proper drafting of purchase contracts or underwriting agreements. Moreover, issuers and underwriters should consider whether agreements that do not allow for a reasonable investigation would be voidable under Section 29(b) of the Exchange Act, 15 U.S.C. 78cc(b). *Compare Kaiser-Frazer Corp. v. Otis & Co.* 195 F.2d 838 (2nd Cir. 1952), *cert. denied*, 344 U.S. 856 (1952) (invalidating an underwriting agreement under Section 14 of the Securities Act, 15 U.S.C. 77n, where inadequate disclosure was provided by the issuer); *see also, generally*, Gruenbaum & Steinberg, *Section 29(b) of the Securities Exchange Act of 1934: A Viable Remedy Awakened*, 48 Geo. Wash. L. Rev. 1 (1979).

[94] The Commission expects that the responsibilities of municipal underwriters described above would require them in most cases to receive a preliminary offering statement in this time frame.

[95] Supply System Staff Report at 170-72.

[96] The Commission notes, however, that care should be taken to avoid the misuse of any material, non-public information by the firm or its clients.

[97] Unless an exemption is available, Section 5 of the Securities Act, 15 U.S.C. 77e, requires a registration statement to be on file with the Commission prior to any offers of corporate securities, and that a registration statement have been declared effective prior to any sales. A statutory prospectus must accompany or precede the sale or delivery of a security. Registration statements are public at the time of filing with the Commission. 15 U.S.C. 77f(d). In contrast, municipal securities, which are exempt from Section 5, may be offered and sold without filing with the Commission. *Compare* MSRB rule G-34 (requiring certain information concerning a new issue to be provided to the MSRB or its designee in order to obtain a CUSIP number).

[98] *E.g.*, Sections 12 and 15(d), 15 U.S.C. 78*l* and 78*o*(d).

[99] Repositories for municipal securities information are maintained by the Bond Buyer in New York, under the name "Munifiche," and by Securities Data Company, Inc. While submission of documentary data to these repositories is voluntary, it has been strongly urged by the GFOA. *See* Procedural Statement No. 8, Dissemination of Information and Providing Statements, Reports, and Releases to a Central Repository, GFOA Guidelines at 91.

[100] *See supra* note 35.

[101] Letter from James B.G. Hearty, Chairman, MSRB, to David S. Ruder, Chairman, Securities and Exchange Commission (December 17, 1987).

[102] *See* Letter from Jeffrey L. Exxer, Executive Director, GFOA, to David S. Ruder, Chairman, Securities and Exchange Commission (December 18, 1987; letter from James H. Cheek, III, Chairman, Committee on Federal Regulation of Securities, and Robert S. Amdursky, Chairman, Subcommittee on Municipal and Governmental Obligations, American Bar Association, to David S. Ruder, Chairman, Securities and Exchange Commission (March 30, 1988) (suggesting that a careful study be made of the issues raised by a central repository before any formal actions are taken).

[103] 15 U.S.C. 78w(a)(2).

CCH Internet Research NetWork

[104] 5 U.S.C. 603.

© 2005, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

EXHIBIT B TO ADVEST'S REPLY MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS ACTIONS

LEXSEE

In re VALENCE TECHNOLOGY SECURITIES LITIGATION,

NO. C 95-20459 JW

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA

*1996 U.S. Dist. LEXIS 22135*

January 23, 1996, Decided
January 23, 1996, Filed

**DISPOSITION:** [*1] Defendant Montgomery Securities' and Defendant Alex. Brown & Sons' motion to dismiss GRANTED. All claims against Defendants Montgomery and Defendant Alex. Brown DISMISSED WITH PREJUDICE.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff investors filed a securities class action on behalf of all persons who purchased the common stock of a particular technology company during a certain period. The amended complaint named the company as a defendant as well as certain securities firms that acted as underwriters for the technology company's initial public offering. The underwriter firms filed motions to dismiss.

**OVERVIEW:** Plaintiff investors filed a class action suit alleging that a publicly traded company and its underwriting firms engaged in securities fraud. The underwriting firms filed motions to dismiss. Among the allegations in the complaint were that defendants violated § 12(2) of the Securities Act, *15 U.S.C.S. § 77l*. While plaintiffs did not purchase in the stock's public offering, their complaint claimed that a nexus existed between their after-market purchase and the public offering. The court held that liability imposed by § 12(2) could not attach unless there was an obligation to distribute the prospectus in the first place. Because the after-market purchase at issue in this case required no prospectus, the court dismissed with prejudice the § 12(2) claims for failure to state a claim. The court also dismissed plaintiffs' other claims, including plaintiffs' claims based on allegedly misleading statements contained in analysts'

reports. According to the court, plaintiffs failed to allege sufficient facts to show that the underwriter lacked a reasonable basis for the statements in the analyst reports or that the reports were not issued in good faith.

**OUTCOME:** The court granted defendant underwriting firms' motions to dismiss the class action alleging securities violations.

**CORE TERMS:** analyst, battery, offering, underwriter, misleading, stock, roadshow, reasonable basis, specificity, public offering, technology, motion to dismiss, particularity, prospectus, misstatement, conclusory, motions to dismiss, actionable, scheme to defraud, projection, Securities Act, securities fraud, polymer, plead, aiding and abetting, legal theory, omission, common stock, traceable, investor

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] A claim may be dismissed as a matter of law for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. A complaint cannot be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. A complaint should not be dismissed if it states a claim under any legal theory, even if the plaintiff erroneously relies on a different legal theory.

*Civil Procedure > Pleading & Practice > Defenses,*

*Objections & Demurrers > Failure to State a Cause of Action*

[HN2] When ruling on a motion to dismiss, all material allegations in the complaint are to be taken as true and construed in the light most favorable to the non-moving party. However, the court will not accept wholly conclusory allegations. The court need not accept legal conclusions asserted in the complaint even if pled as "facts."

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Civil Procedure > Dismissal of Actions > Involuntary Dismissal*

[HN3] When ruling on a motion to dismiss, a district court may consider certain documents. The court may consider documents attached to the complaint. If a complaint is accompanied by attached documents, the court is not limited by the allegations contained in the complaint. These documents are part of the complaint and may be considered in determining whether the plaintiff can prove any set of facts in support of his claim. The court may also consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings. This does not convert the motion to dismiss into a motion for summary judgment. Finally, a district court deciding a motion to dismiss a securities fraud action may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC.

*Securities Law > Bases for Liability > Private Securities Litigation*

[HN4] Section 12(2) of the Securities Act imposes liability on sellers of securities sold by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. *15 U.S.C.S. § 77l.*

*Securities Law > Bases for Liability > Private Securities Litigation*

[HN5] The liability imposed by § 12(2) of the Securities Act cannot attach unless there is an obligation to distribute the prospectus in the first place (or unless there is an exemption).

*Securities Law > Bases for Liability > Private Securities Litigation*

[HN6] Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to directly or indirectly, by the

use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-- (b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest of the for protection of investors. *15 U.S.C.S. § 78j.*

*Securities Law > Bases for Liability > Private Securities Litigation*

[HN7] *17 C.F.R. § 240.10b-5* provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would-operate as a fraud or deceit upon any person.

*Securities Law > Bases for Liability > Liability for Fraud*

[HN8] To state a claim for securities fraud, a plaintiff must allege (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused his injury.

*Securities Law > Bases for Liability > Liability for Fraud*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*

[HN9] Allegations of fraud must satisfy the requirements of *Fed. R. Civ. P. 9(b)* to survive a motion to dismiss. Because Section 10b-5 claims sound in fraud, they must meet the particularity requirements of Rule 9(b), which provides: In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other general condition of mind of a person may be averred generally. The intent of Rule 9(b) is to prevent the filing of claims merely to uncover unknown wrongs. In cases of corporate fraud, the requirements of Rule 9(b) may be relaxed as to matters peculiarly within the opposing party's knowledge since the plaintiffs cannot be

expected to have personal knowledge of the facts constituting the wrongdoing.

*Securities Law > Bases for Liability > Liability for Fraud*

[HN10] A projection or statement of belief contains at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy, of the statement. A projection or statement of belief is actionable to the extent that one of these implied factual assertions is inaccurate.

*Securities Law > Bases for Liability*

[HN11] Silence in connection with a purchase or sale of securities may operate as a fraud, but such liability is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction.

**COUNSEL:** For Plaintiffs: Joseph J. Tobacco, Jr., Jeffrey W. Lawrence, BERMAN, DeVALERIO, PEASE & TOBACCO, San Francisco, CA.

For Plaintiffs: William S. Lerach, Patrick J. Coughlin, MILBERG WEISS BERSHAD HYNES & LERACH, San Diego, CA.

For Plaintiffs: Reed R. Kathrein, San Francisco, CA.

For Lev M. Dawson, Defendant: Tower C. Snow, James A. Lico, BROBECK, PHLEGER & HARRISON, San Francisco, CA.

For Valence Technology, Inc., Christine Russell, Dale R. Shackle, David M. Butze, William J. Masuda, Calvin L. Reed and Carl E. Berg, Defendants: Robert P. Feldman, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA.

For Montgomery Securities, Defendant: Melvin R. Goldman, Paul T. Friedman, Robert W. Orlowsky, MORRISON & FOERSTER, San Francisco, CA.

**JUDGES:** JAMES WARE, United States District Judge.

**OPINIONBY:** JAMES WARE

**OPINION:**

ORDER GRANTING DEFENDANT MONTGOMERY SECURITIES' MOTION TO DISMISS THIRD AMENDED COMPLAINT; GRANTING DEFENDANT ALEX. BROWN & SONS, INC.'S MOTION TO DISMISS THIRD AMENDED COMPLAINT [*2]

The motion of Defendant Montgomery Securities and the motion of Defendant Alex. Brown & Sons, Incorporated to dismiss Plaintiffs' Third Amended Complaint pursuant to *Federal Rules of Civil Procedure 9(b)* and *12(b)(6)*, were submitted to the Court on December 8, 1995. The court has read the moving and responding papers and considered the oral argument of counsel. Based upon all pleadings filed to date, as well as on the oral argument of counsel, the Court GRANTS Defendant Montgomery Securities' motion and GRANTS Defendant Alex. Brown & Sons' motion.

**INTRODUCTION**

This action is a securities class action brought on behalf of all persons who purchased the common stock of Valence Technology, Inc. between May 7, 1992 and August 10, 1994. The action was transferred from the San Francisco Division, Judge Samuel Conti, and reassigned to the San Jose Division, Judge James Ware.

In their Third Amended Complaint, Plaintiffs allege (1) violations of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 of the Securities Act of 1933 against all defendants; (2) violations of Section 20(a) of The Exchange Act against some of the individual defendants and Valence; (3) violations [*3] of Section 12(2) of the Securities Act against certain individual defendants, Valence and the underwriters, Montgomery Securities and Alex. Brown & Sons; and (4) violations of Section 15 of the Securities Act against some of the individual defendants. Defendants Montgomery Securities and Alex. Brown & Sons, Incorporated now move to dismiss with prejudice the allegations against them in Plaintiffs' Third Amended Complaint (TAC). n1

n1 Defendant Valence Technology, Carl E. Berg, Calvin L. Reed, Christine A. Russell and Lev M. Dawson have joined in Montgomery Securities and Alex. Brown & Sons' Motion to Dismiss Plaintiffs' claims for violation of Section 12(2) of the Securities Act of 1933. Defendant Alan F. Shugart has joined Defendant Montgomery Securities' Motion to Dismiss Plaintiffs' Third Amended Complaint. Also, Defendant Alex. Brown & Sons and Defendant Montgomery Securities join in each others' motions.

**BACKGROUND** n2

n2 The background is taken from The Honorable Samuel Conti's September 19, 1995 order.

[*4]

Valence is a company engaged in the research, development and production of advanced lithium polymer rechargeable batteries for use in a variety of consumer electronic products, including cellular telephones, portable computers, and automobiles. Lev Dawson founded Valence in March 1989. The company was originally incorporated under the name Ultracell, Inc. In March 1992, the name was changed to Valence Technology, Inc. In July 1990, the company acquired battery technology from the Mead Corporation for approximately $ 2 million.

Valence then began research and development of battery prototypes based on Mead's technology. The acquisition agreement with Mead included a provision that if Valence was unable to commercially introduce its lithium-based rechargeable battery January 1, 1997, Mead could terminate the agreement and rights granted thereunder would revert to Mead. Valence wished to convert lithium polymer battery technology into lightweight, energy-efficient batteries.

Valence made its initial public offering ("IPO") in May 1992, and made additional stock offerings in November 1992 and December 1993. Each public offering included a prospectus, which contained an extensive discussion [*5] of the risks Valence posed to investors. Before these public offerings the primary Valence shareholders were Dawson and Carl Berg, who had also contributed significantly to the initial investment. Montgomery Securities ("Montgomery") acted as the underwriter for Valence's IPO in May 1992 and for a common stock offering in November 1992. Montgomery and Alex. Brown & Sons Incorporated ("Alex. Brown") were the co-lead underwriters of Valence's December 1993 common stock offering. Research analysts employed by Montgomery issued reports regarding Valence. Plaintiffs reference three of these reports in their Third Amended Complaint.

Valence was not able to create a commercially viable battery. When this information was released to the public, Valence's stock prices dropped dramatically. Plaintiffs allege that Defendants, along with the underwriters, committed fraud on the market by misrepresenting the true nature of the battery's development and commercial viability. Plaintiffs claim that Defendants knew at all times that

commercial mass production and usage of the battery product was an illusion and yet they decided to defraud investors so as to obtain profits in [*6] the millions through insider sales and commission. Plaintiffs note that Valence's stock, which at one point traded as high as $ 25 per share, dropped to $ 3.00. n3

n3 Valence has since abandoned its efforts to create this solid polymer-based battery, refocusing its research and development efforts on different technology.

Plaintiffs allege that securities fraud claims against Valence Technology, Inc. various officers and employees n4 and the underwriters, Montgomery and Alex. Brown.

n4 Christine A. Russel, Chief Financial Officer; Dale R. Schackle, Vice President and Chief Technical Officer; David M. Butze, Vice President, Marketing; William J. Masuda, Vice President, Operations; Calvin L. Reed, one-time Chairman of the Board of Directors, Chief Executive Officer, and Chief Operating Officer; Carl E. Berg, who helped found Valence and member of the Board of Directors since September 1991; Lev. M. Dawson, founder and Chief Executive Officer until April 1993, Chairman of the Board of Directors until October 1993; and Alan F. Shugart, outside director since March 1992.

[*7]

The underwriters Montgomery and Alex. Brown were added as defendants in September 1994. They moved to dismiss Plaintiffs' First Amended Complaint and in May 1995, Judge Conti granted the underwriters' motions to dismiss the section 10(b) claims with leave to amend and denied the motions to dismiss the section 12(2) claims. After a motion by the underwriters to reconsider the ruling on the section 12(2) claims, Judge Conti dismissed these claims with leave to amend on September 19, 1995. While the motion for reconsideration was pending, Plaintiffs filed a second amended complaint. The hearings on the underwriters' motions to dismiss were vacated to allow Plaintiffs to file the operative Third Amended Complaint responding to the Court's orders dismissing with leave to amend. Plaintiffs filed the Third Amended Complaint on October 19, 1995. Montgomery and Alex. Brown now move to dismiss this complaint on the grounds of failure to state a claim and for lack of particularity in pleading the fraud

claim.

## LEGAL STANDARDS

[HN1] A claim may be dismissed as a matter of law for one of two reasons: "(1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory." **[*8]** *Robertson v. Dean Witter Reynolds, Co., 749 F.2d 530, 534 (9th Cir. 1984).* "A complaint cannot be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Moore v. City of Costa Mesa, 886 F.2d 260, 262 (9th Cir. 1989).* "[A] complaint should not be dismissed if it states a claim under any legal theory, even if the plaintiff erroneously relies on a different legal theory." *Haddock v. Board of Dental Examiners, 777 F.2d 462, 464 (9th Cir. 1985).*

[HN2] "All material allegations in the complaint are to be taken as true mid construed in the light most favorable to the non-moving party." *Sanders v. Kennedy, 794 F.2d 478, 481 (9th Cir. 1986); NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).* However, the Court will not accept wholly conclusory allegations. *In re VeriFone Securities Litig., 11 F.3d 865, 868 (9th Cir. 1993); Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981),* cert. denied, *454 U.S. 1031, 70 L. Ed. 2d 474, 102 S. Ct. 567 (1981).* **[*9]** The Court need not accept legal conclusions asserted in the complaint even if pled as "facts." *Papasan v. Allain, 478 U.S. 265, 286, 92 L. Ed. 2d 209, 106 S. Ct. 2932 (1986).*

[HN3] When ruling on a motion to dismiss, a district court may consider certain documents. The court may consider documents attached to the complaint. "If a complaint is accompanied by attached documents, the court is not limited by the allegations contained in the complaint. These documents are part of the complaint and may be considered in determining whether the plaintiff can prove any set of facts in support of his claim." *Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987),* cert. denied, *484 U.S. 944, 108 S. Ct. 330, 98 L. Ed. 2d 358 (1987)* (citations omitted). The court may also consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir.),* cert. denied, *512 U.S. 1219, 114 S. Ct. 2704, 129 L. Ed. 2d 832 (1994).* This does not convert the motion to dismiss into a motion for summary judgment. Id. (citing *Romani v. Shearson Lehman Hutton, 929 F.2d* **[*10]** *875, 879 n.3 (1st Cir. 1991)).* Finally, a district court deciding a motion to dismiss a securities fraud action "may review and consider public disclosure

documents required by law to be and which actually have been filed with the SEC . . . ." *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2nd Cir. 1991),* cert denied, *503 U.S. 960, 112 S. Ct. 1561, 118 L. Ed. 2d 208 (1992).*

## DISCUSSION

### A. Section 12(2) Allegations

[HN4] Section 12(2) of the Securities Act imposes liability on sellers of securities sold "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . ." *15 U.S.C. § 77l.*

Defendants Montgomery and Alex. Brown contend that Plaintiffs have failed to amend their section 12(2) claims as directed by Judge Conti after the most recent motions to dismiss. Initially, Judge Conti denied Defendants' motions to dismiss Plaintiffs' § 12(2) claims. However, the United States Supreme Court decided *Gustafson v. Alloyd Co.,* **[*11]** *513 U.S. 561, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995),* during the briefing schedule for the initial motions to dismiss in this case. After a motion for reconsideration, the Court determined that it should revisit the sufficiency of Plaintiffs' allegations as to the § 12(2) claims. See September 19, 1995 Order at 7.

In the September 1995 order, Judge Conti held that "the complaint is devoid of any allegations that these named plaintiffs actually purchased stock through any of the public offerings or that their purchases were directly traceable to the public offerings. Without more specificity, plaintiffs' section 12(2) claims are not actionable." September 19, 1995 Order at 10. The Court also determined that "the named plaintiffs have not alleged with sufficient particularity that either (1) they purchased Valence stock directly through one of the three public offerings, either on the offering date or within 90 days thereafter, or (2) a nexus exists between their aftermarket purchase and the public offerings so as to state a claim under § 12(2)." Id.

Plaintiffs' third amended complaint, filed on October 20, 1995, contains no amended allegations as to thirteen of the fourteen **[*12]** named plaintiffs. The TAC does not allege a purchase by any of the named plaintiffs in the May 1992 IPO or the November 1992 secondary public offering. The amended allegations refer only to Plaintiff Bergelson and only to a stock purchase on December 22, 1993, the day of Valence's third offering. Defendants Montgomery and Alex. Brown thus contend that as

plaintiffs have had the opportunity to amend their allegations as to the May 1992 IPO or the November 1992 secondary public offering, and have failed to do so, all claims as to those offerings should be dismissed with prejudice. The Court agrees. The Court hereby dismisses with prejudice all § 12(2) claims as to all plaintiffs other than Bergelson.

As to the purchase by Bergelson, the TAC states:

> On December 22, 1993, plaintiff Bergelson purchased 200 shares of Valence stock on or directly traceable to the Company's secondary public offering. The purchase price of the stock was $ 15.25, the price the offering stock reached by the early afternoon of December 22. In connection with this purchase, Mr. Bergelson received and reviewed Valence's prospectus for the December 22 offering. Mr. Bergelson purchased this stock through [*13] the open market with the assistance of Prudential Securities, a brokerage firm which made a market for Valence stock.

Third Am. Compl. P 20(n).

As the allegations on their face demonstrate that Plaintiff did not purchase in the Valence public offering, Plaintiffs appear to be claiming that a nexus exists between this aftermarket purchase mid the public offering on December 22, 1993. However, Plaintiffs cite no authority for their proposition that § 12(2) supports liability for transactions "traceable" to a public offering. The Supreme Court has stated that ". . . [HN5] the liability imposed by § 12(2)[] cannot attach unless there is an obligation to distribute the prospectus in the first place (or unless there is an exemption)." *Gustafson v. Alloyd Co., 513 U.S. 561, 115 S. Ct. 1061, 1067, 131 L. Ed. 2d 1 (1995).* The purchase at issue in this case required no prospectus and no exemption applies. The Court also held that "the intent of Congress and the design of the statute require that § 12(2) liability be limited to public offerings." *115 S. Ct. at 1071.* Cases subsequent to Gustafson have held that section 12(2) applies only to initial public offerings. [*14] See e.g., *Stack v. Lobo, 903 F. Supp. 1361, 1375 (N.D. Cal. 1995).* The Court is persuaded that § 12(2) applies only to a transaction which requires a prospectus to be delivered. The language in Gustafson makes irrelevant whether the transaction is "traceable" to a public offering. Accordingly, the Court hereby dismisses with prejudice Plaintiffs' § 12(2) claims as to Plaintiff Bergelson for failure to state a claim.

## B. Section 10(b) Allegations

[HN6] Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to:

> directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-- . . . (b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest of the for protection of investors.

*15 U.S.C. § 78j.*

[HN7] Rule 10b-5, promulgated under § 10(b) provides:

> It shall be [*15] unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
>
> > (1) to employ any device, scheme, or artifice to defraud,
> > (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or
> > (3) to engage in any act, practice, or course of business which operates or would-operate as a fraud or deceit upon any person.

*17 C.F.R. § 240.10b-5 (1993).*

[HN8] To state a claim for securities fraud, a plaintiff must allege "(1) a misstatement or an omission

(2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused his injury." *McGonigle v. Combs, 968 F.2d 810, 817 (9th Cir. (1992), cert. dismissed, 506 U.S. 948, 113 S. Ct. 399 (1992); see also In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir. 1989),* cert. denied, *496 U.S. 943 (1990).*

[HN9] Allegations of fraud must satisfy the requirements of *Federal Rule of Civil Procedure* [*16] *9(b)* to survive a motion to dismiss. Because Section 10b-5 claims sound in fraud, they must meet the particularity requirements of Rule 9(b), which provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other general condition of mind of a person may be averred generally." The intent of Rule 9(b) is to "prevent the filing of claims merely to uncover unknown wrongs." *In re GlenFed Securities Litig., 11 F.3d 843, 847 (9th Cir. 1993)* reh'g granted, *42 F.3d 1541 (9th Cir. 1994)* (citing *Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985)).*

In cases of corporate fraud, the requirements of Rule 9(b) may be "relaxed as to matters peculiarly within the opposing party's knowledge" since the plaintiffs cannot be expected to have personal knowledge of the facts constituting the wrongdoing. *Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1439 (9th Cir. 1987).*

## 1. Montgomery

### a. Analyst Reports

Defendant Montgomery contends that Plaintiffs' section 10(b) claims based on allegedly misleading statements contained in three analyst reports should be dismissed because [*17] (1) plaintiffs have failed to add allegations to the TAC which plead with particularity why Montgomery allegedly lacked a reasonable basis for the statements in its analyst reports at the time they were made; (2) many of the statements are merely vague statements of optimism, which are not actionable as a matter of law; and (3) there is no authority for Plaintiffs' argument that analysts owe a duty for allegedly misleading statements in analyst reports that are not alleged to have been distributed to the public.

### (1) Reasonable Basis

Montgomery contends that Plaintiffs have not altered their allegations with respect to the analyst reports despite Judge Conti's determination that "plaintiffs' complaint supports Montgomery's defense that Montgomery could have had a reasonable basis for their projections, since they relied on Valence, who, according to the complaint, 'intentionally and recklessly misled

securities analysts as part of the plan and scheme to inflate artificially the market price of Valence's common stock.'" In re Valence Technology Sec. Litig., [1995 Transfer Binder] *Fed. Sec. L. Rep. (CCH) P 98,793 at 92,794.*

> To allege fraud with particularity, a plaintiff [*18] must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading. A plaintiff might do less and still identify the statement complained of, indeed, the plaintiff might do less and still set forth some of the circumstances of the fraud. But the plaintiff cannot do anything less and still comply with Rule 9(b)'s mandate to set forth with particularity those circumstances which *constitute* the fraud.

*In re GlenFed, Inc. Securities Litig., 42 F.3d 1541, 1548 (9th Cir. 1994)* (en banc).

Defendant also contends that although Plaintiffs expand on their allegations about Montgomery's technical consultant, Dr. Digby Macdonald, these allegations merely state that Macdonald, as well as Montgomery relied upon Valence, and thus these allegations do not rectify the pleading deficiencies Judge Conti previously identified in his May 8, 1995 order. In re Valence Technology Sec. Litig., [1995 Transfer Binder] *Fed. Sec. L. Rep. (CCH) P* [*19] *98,793 at 92,794.* In that order, Judge Conti determined that "it [does] not necessarily follow that because Valence knew all along of insurmountable technological problems, Montgomery was aware of and participated in the fraud." Id. at 92,795 (citing *In re VeriFone Sec. Litig., 784 F. Supp. 1471, 1481 (N.D. Cal. 1992),* aff'd *11 F.3d 865 (9th Cir. 1993)).* Judge Conti then held that although Plaintiffs alleged that the underwriters had failed in their due diligence efforts to discover the problems or chose to disregard them, that these allegations lacked the specificity required by *Federal Rule of Civil Procedure 9(b).* Id. at 92,795.

In the TAC, Plaintiffs allege that:

> On or about February 24, 1992,

Montgomery retained Dr. Digby Macdonald ostensibly to assist in a review of Valence's battery project and a comparison with competing battery technologies. Notwithstanding the many technical and performance aspects such a review would entail, Montgomery gave Macdonald only four work days to complete his project. . . . [Macdonald admitted that] his analysis was less than satisfactory involving only a review of technical documents primarily supplied to him directly by [*20] Valence or indirectly through Montgomery management . . . however, was not permitted to perform any independent testing of the Valence prototypes or the competing batteries.

[When] Macdonald began drafting his report to Montgomery of his assessment . . . he had no independent knowledge of the performance characteristics of the Valence battery nor the composition of its electrolyte, which Valence heralded as a revolutionary technological breakthrough.

Third Am. Compl. PP 67-68. Plaintiffs allege that Macdonald communicated his concerns about the foundations for his conclusions, deleted his earlier assessment that sufficient data existed to permit a meaningful analysis of Valence's battery and competitors' technology, and cautioned Montgomery that laboratory-based evaluations were warranted. Plaintiffs also allege that Montgomery was aware of, but ignored, Macdonald's concerns and refused to give him the opportunity to conduct further laboratory-based analysis, but directed Macdonald to review the IPO prospectus for technical accuracy. Finally, Plaintiffs allege that Macdonald had another opportunity to undertake independent analysis when he visited Valence's facilities on [*21] April 11, 1992, but the testing was conducted under Valence's control. Third Am. Compl. PP 69-71.

Montgomery argues that even if Macdonald stated that the data he was to analyze was "of unknown quality and uncertain foundation," that Plaintiffs have not alleged that Macdonald knew that any of this data on which he based his analysis was fraudulent. Plaintiffs respond that "the Complaint's specific allegations regarding Montgomery and Alex. Brown demonstrate their own knowing or reckless disregard for the truth about Valence and their active participation in promoting false and misleading statements to the investment community." Plaintiffs' Opposition p. 19 (emphasis in original).

Plaintiffs' allegations, however, merely conclude that Montgomery and Alex. Brown were reckless. Alleging that Montgomery did not have a reasonable basis for the statements in the reports is not the same as alleging facts which show that Montgomery knew, for example, that Valence's assurances were deceptive. The Court need not accept legal conclusions asserted in the complaint even if pled as "facts." *Papasan v. Allain, 478 U.S. 265, 286, 92 L. Ed. 2d 209, 106 S. Ct. 2932 (1986).*

Moreover, as in [*22] the first amended complaint, Plaintiffs continue to allege that:

In writing their reports about Valence, these analysts relied in substantial part upon information provided by and statements and reports made publicly by [Valence], information provided privately to them by [Valence], and assurances by [Valence] (and in Montgomery's case, further assurances channeled through the ill-founded work of an "independent" battery consultant) that information in the analysts' reports was not at material variance from [Valence's] internal knowledge of its operations and prospects.

Third Am. Compl. P 53. Thus, as in the first amended complaint, Plaintiffs allege in the TAC that the analysts and underwriters relied upon Valence, which allegedly assured them that the reports were accurate. Accordingly, the Court agrees with Defendant Montgomery that Plaintiff has not cured the pleading deficiencies of the first amended complaint as they have not alleged any additional facts to show that Montgomery lacked a reasonable basis for the statements in the analyst reports or that the reports were not issued in good faith.

### (2) Statements of Optimism

Defendant Montgomery contends [*23] that Plaintiffs cannot state a claim based on any of the portions of Montgomery analyst reports quoted in the TAC, as these passages are too vague and subjective to be actionable as a matter of law. Plaintiffs allege that three statements made by Montgomery are misleading even though they may appear to be merely general optimistic statements. Plaintiffs correctly contend that ". . . projections and general expressions of optimism may be actionable under the federal securities laws." *In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir. 1989),* cert. denied, *496 U.S. 943 (1990)* (citations omitted). The Ninth Circuit continued in Apple:

[HN10]

A projection or statement of belief contains at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy, of the statement. A projection or statement of belief is actionable to the extent that one of these implied factual assertions is inaccurate.

*In re Apple, 886 F.2d at 1113* (citing *Marx v. Computer Sciences Corp., 507 [*24] F.2d 485, 490 (9th Cir. 1974)).*

The statements at issue are contained in paragraphs 64, 91 and 97. Paragraph 64 refers to a May 28, 1992 report by Montgomery which indicates that Valence has developed and is in the early manufacturing stage of the battery and that it utilizes a solid polymer electrolyte. Plaintiffs allege that statements in Paragraph 64 are false because Valence never used a solid polymer electrolyte. Plaintiff also contends that the cost of the raw materials alone exceeds the report's estimate for the entire finished battery.

Paragraph 91 refers to Montgomery's March 1, 1993 report which stated that Valence's lithium polymer battery technology is the "leader" in the rechargeable battery market, that the product has the best price-performance characteristics of any technology Montgomery had reviewed, that Valence has met all investor expectations and should continue to do so. Paragraph 97 refers to a September 8, 1993 Montgomery report which states that Valence had received funding and technical validation from potential end-users of the battery and that Montgomery believed that Valence's longer-term outlook remains quite attractive.

Defendants, however, contend [*25] that Plaintiffs fail to plead any facts which suggest that Montgomery did not have a reasonable basis for the statements in the reports. In fact, Plaintiffs continue to plead that the analysts relied in substantial part on information provided by Valence and that Valence assured them that "information in the analysts' reports were not at material variance from [Valence's] internal knowledge of its operations and prospects." TAC P 53. Plaintiffs were permitted to amend their complaint to specify why the underwriters lacked a reasonable basis for statements made in the report. In re Valence Technology Sec. Litig., [1995 Transfer Binder] *Fed. Sec. L. Rep. (CCH) P 98,793 at 92,795.* Since that order, Plaintiffs have filed

two amendments; however, they still do not plead any facts which tend to show that the underwriters' reports lacked a reasonable basis at the time they were made or were not issued in good faith. Accordingly, the Court hereby dismisses all Plaintiffs' section 10(b) claims against the underwriters to the extent that they are based on misstatements in analysts' reports. *In re GlenFed, Inc. Securities Litig., 42 F.3d 1541, 1549 (9th Cir. 1994) (en banc)* (plaintiffs [*26] must "elaborate circumstances contemporary to the alleged false statement to explain how and why the statement was misleading when made."

**(3) Analyst Reports – Duty to Non-Clients**

Defendants contend that Plaintiffs fail to state a claim under section 10(b) on Plaintiffs' theory that a brokerage firm is liable to the entire marketplace, rather than just to its own clients for omissions in its analyst reports. Montgomery contends that it cannot be liable under section 10(b) for omissions in its analyst reports unless it breached a duty that it owed to Plaintiffs. The Supreme Court has held that [HN11] silence in connection with a purchase or sale of securities may operate as a fraud, "but such liability is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *Chiarella v. United States, 445 U.S. 222, 230, 63 L. Ed. 2d 348, 100 S. Ct. 1108 (1980).*

Plaintiffs do not allege that any named plaintiff was a client of Montgomery or that any named plaintiff read or relied upon any statements in any of Montgomery's analyst reports, nor do they allege that any of Montgomery's reports were issued to the general public. Instead, [*27] Plaintiffs contend that because Montgomery and Alex. Brown chose to speak to the investment community through their analysts' reports, that they accepted a duty to disclose materially adverse facts. Plaintiffs do not cite any competent authority to support this contention. n5 Accordingly, the Court hereby dismisses these allegations with prejudice.

n5 Plaintiffs cite *In re Wells Fargo Sec. Litig., 12 F.3d 922, 933 (9th Cir. 1993),* cert. denied, *U.S. , 115 S. Ct. 295 (1994)* and *Hanon v. Dataproducts Corp., 976 F.2d 497, 504 (9th Cir. 1992).* However, these cases do not address the issue of liability grounded upon analyst statements.

**b. Roadshow Presentation Allegations**

The allegations in the first amended complaint as to Roadshow Presentations were dismissed because

"nowhere in the complaint do plaintiffs mention the time, place, date, or individual who made the misstatement during the roadshows. Plaintiffs also fail to allege with specificity the exact misstatement." In re [*28] Valence Technology Sec. Litig., [1995 Transfer Binder] *Fed. Sec. L. Rep. (CCH) P 98,793 at 92, 975.*

The TAC alleges that "Macdonald's inadequately supported 'conclusions' found their way into Valence's IPO and subsequent prospectuses and Montgomery's and Alex. Brown's analysts' statements and salespersons' pitches." Third Am. Compl. P 7. This allegation plainly fails to meet the specificity requirements of *Federal Rule of Civil Procedure 9(b).*

Plaintiffs also allege that:

> . . . Montgomery continued to advance Macdonald's ill-founded "assessment" while knowing or recklessly disregarding the inaccuracy and falsity of the statements and comparisons it generated. As a result, Valence was successful in selling its stock in the public offering. Montgomery also agreed to help orchestrate a multi-city "roadshow" shortly before the initial and follow-on public offerings, during which it and Company officials traveled to several cities to present highly favorable information about the Company. Much of the misleading technical information in these roadshows derived from Macdonald's flawed work and his presentation to Montgomery salespersons in mid-April 1992. These presentations [*29] helped create a strong demand for the stock so that more shares could be sold at a higher price, thus financially benefitting Montgomery, the Company, and ultimately the defendant insiders who sold their shares on the November, 1992 offering.

Third Am. Compl. P 47.

The Ninth Circuit has recently reaffirmed the GlenFed standard for pleading in a securities fraud action:

> In a securities fraud action, a pleading is sufficient under Rule 9(b) if it identifies the circumstances of the alleged fraud so that the defendant can prepare an adequate

answer. This notice requirement is satisfied by allegations of the "time, place and nature of the alleged fraudulent activities." When a fraudulent statement is alleged, the 'plaintiff must set forth what is false or, misleading abut [the] statement, and why it is false.' In other words, the plaintiff must "set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made." Thus GlenFed requires a plaintiff to plead evidentiary facts and the court to consider what inferences these facts will support - despite the pitfalls and inefficiencies of such [*30] an analysis at the pleading stage[] and whether they are sufficient to satisfy the specificity requirement of Rule 9(b) as interpreted by GlenFed.

*Fecht v. The Price Company, 70 F.3d 1078, 1995 U.S. App. LEXIS 32320,* at *11 (9th Cir. 1995).

The Ninth Circuit also held that

> [a] plaintiff may also satisfy Rule 9(b) with allegations of circumstantial evidence if the circumstantial evidence alleged explains how and why the statement was misleading when made. Thus, when there is an intervening event which might account for the conflict between the alleged misrepresentation and the current state of facts . . . a plaintiff may satisfy Rule 9(b) by alleging inconsistent contemporaneous statements indicating that the defendant knew all along that the earlier statement was false, or by showing that the conflict does not merely result from the earlier statement's being based on a different but equally permissible business judgment.

*Id.* at *12-13 (9th Cir. Nov. 20, 1995) (citing *In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548-49 (9th Cir. 1994)* (en banc)). n6 Plaintiffs argue in their opposition that they have adequately alleged [*31] in paragraph 47 that the roadshows were part of the Defendants' scheme to defraud. However, the allegations are conclusory; they do not meet the specificity

requirements of *Federal Rule of Civil Procedure 9(b)*. n7 The section 10(b) claims are dismissed to the extent that they are based on roadshow allegations.

n6 Plaintiffs filed a statement of recent decision, directing the Court's attention to this recent Ninth Circuit case.

n7 The court rejects Plaintiffs' argument that the roadshow presentations are "closely guarded secrets." Defendants correctly point out that if the information is not disclosed, Plaintiffs can not contend that any allegedly misleading statements could affect the market price of Valence stock. In any event, the paragraphs referring to roadshows in the TAC fail even to set forth the content of the alleged misstatements.

Plaintiffs also argue that they have obtained "various scripts, repeating numerous falsehoods highlighted in the complaint, [which] evidence that the roadshows were designed to further the fraud." Plaintiffs represent that they attach this material to a declaration in support of their opposition. However, on a motion to dismiss, the Court may not consider these documents. "Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). The Court will not consider the material filed by Plaintiffs, as it declines to treat this motion as one for summary judgment. See *Fed. R. Civ. P. 12(b)(6)*.

[*32]

### c. "Scheme to Defraud" Allegations

In Paragraphs 40 through 47 of the TAC, Plaintiffs allege what they term "The Scheme." The allegations in paragraphs 40 to 43 allege that Valence, through its controlling shareholders, "create[d] an aura of legitimacy" in order to promote the stock. Paragraph 47 contains Plaintiffs' roadshow allegations, which the Court has already determined are insufficient to state a claim. Other than the roadshow allegations, Montgomery is mentioned only in paragraphs 44 to 46, which allege that Montgomery and Valence's controlling shareholder and top management agreed that Montgomery would act as the lead underwriter; that Montgomery issued favorable reports that helped to maintain the market price of the stock; that Montgomery agreed to do "follow-up" offerings; and that in return for their services, Montgomery requested and received an indemnification

agreement and liability insurance coverage from Valence. These allegations are conclusory. The Court need not accept such allegations. *In re VeriFone Securities Litig.*, 11 F.3d 865, 868 (9th Cir. 1993); *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981), cert. denied, 454 U.S. [*33] 1031, 70 L. Ed. 2d 474, 102 S. Ct. 567 (1981).

Even if the Court were to draw an inference that these allegations constitute a claim of conspiracy or scheme to defraud, the claim must still be dismissed. Defendant Montgomery contends that the allegations that it participated in a "scheme to defraud" is merely an attempt to state a cause of action for section 10(b) "aiding and abetting." Defendant contends that aiding and abetting liability has been explicitly rejected by the Supreme Court in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S. Ct. 1439, 1448, 128 L. Ed. 2d 119 (1994). Central Bank held that there can be no cause of action for aiding and abetting under section 10(b). *114 S. Ct. at 1446-48.*

Many courts, including those in this district, have held that "conspiracy" or "scheme" allegations are not actionable under section 10(b) after Central Bank. See, e.g., *Stack v. Lobo*, 903 F. Supp. 1361, (N.D. Cal. 1995) (citing *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1097 (N.D. Cal. 1994); In re RasterOps Corp. Sec. Litig., [Current Transfer Binder] *Fed. Sec. L. Rep. (CCH) P 98,467 at 91,195 (N.D. Cal. 1994);* [*34] In re Ross Sec. Litig., [1994-1995 Transfer Binder] *Fed. Sec. L. Rep. (CCH) P 98,363 dt 90,495 (N.D. Cal. 1994)).* Courts have dismissed claims alleged as "schemes" on the grounds that they were merely non-actionable conspiracy claims that had been recharacterized. See, e.g., In re Gupta Sec. Litig., [Current Transfer Binder] *Fed. Sec. L. Rep. (CCH) P 98,612 at 91,783-34 (N.D. Cal. 1994).* The Court also finds persuasive *In re MTC Elec. Technologies Shareholders Litig.*, 898 F. Supp. 974 (E.D.N.Y. 1995), which concludes: "If Central Bank is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)." *Id. at 987.*

### 2. Alex. Brown & Sons

Defendant Alex. Brown joins in Montgomery's arguments as to Plaintiffs' section 10(b) claims and additionally contends that Plaintiffs have failed to rectify the pleading inadequacies identified by Judge Conti in the first amended complaint. Specifically, Alex. Brown contends that Plaintiffs [*35] cannot allege Alex. Brown's participation in fraud with the specificity

required by *Federal Rule of Civil Procedure 9(b)* as required by the Ninth Circuit in *In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541 (9th Cir. 1994)* (en banc).

### a. Analyst Reports

Alex. Brown argues that the allegations in the TAC are almost identical to those dismissed by Judge Conti in his May 8, 1995 order as too conclusory to state a claim. In particular, Alex. Brown argues that the only statement directly attributed to it in the TAC is "a two line excerpt from Alex. Brown's January 26, 1994 analyst report [and this is] language that Judge Conti has already held could not support a section 10(b) claim." The TAC contains two paragraphs relating to Alex. Brown's analyst report. Paragraph 117 states.:

> On January 26, 1994, Alex. Brown issued a report based on information furnished by Valence management. Alex. Brown initiated coverage of Valence with a "buy" recommendation, citing a "Large Profit Opportunity." The report stated:

> > We expect the Company to turn profitable in F4Q 1995, with EPS of $ .02. Our FY1996 estimate of $ 2.00 reflects . . . that [the Company] should begin to generate **[*36]** large production volumes in the F4Q 1995.

Paragraph 117 of the TAC is identical to paragraph 104 of the FAC. Judge Conti has already determined that this language is not sufficient to state a claim as Plaintiffs failed to specify why Alex. Brown lacked a reasonable basis for the statement or why the report was issued in bad faith. In re Valence Technology Sec. Litig., [1995 Transfer Binder] *Fed. Sec. L. Rep. (CCH) P 98,793 at 92,795.*

Paragraph 114 of the TAC states:

> Having chosen to avoid discovering and then disclosing the readily apparent problems listed above, the underwriters apparently felt no constraint about what could and would be said about Valence, thereby allowing known false statements to continue to be circulated. For example, Alex. Brown initiated coverage of Valence on January 19, 1994 by issuing a "buy" rating to further the scheme and course of conduct complained of herein.

However, this rating turned on false and misleading descriptions of the Valence battery's performance capabilities, its purported safety, and unfounded and unreasonable projections for revenues equaling $ 500 million by fiscal year 1996. See PP 66-74, 79. Alex. Brown's willful **[*37]** ignorance and reckless disregard of the truth allowed it to headline its report with the false promise of "Large Profit Opportunity From A Better Battery."

Alex. Brown contends that Plaintiffs still have not identified any statements by Alex. Brown as false or misleading, or why such statements are false. The Court agrees that the language in the TAC as to Alex. Brown is conclusory and thus fails to state a claim. Although Plaintiffs have added language to what was paragraph 104 of the first amended complaint, Paragraph 114 of the TAC does not allege evidentiary facts as required by GlenFed.

The allegations in the TAC as to Alex. Brown still fail to set forth what is false or misleading about the statement and why it is false. There are no facts upon which the court may draw inferences. *Fecht v. The Price Company, 70 F.3d 1078, 1995 U.S. App. LEXIS 32320,* at *11 (9th Cir. 1995); *In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548-49 (9th Cir. 1994)* (en banc). Moreover, despite having several opportunities to add facts to their pleadings to support their claims against Alex. Brown, Plaintiffs have failed to do so. Accordingly, the Court hereby **[*38]** dismisses with prejudice all section 10(b) allegations against Defendant Alex. Brown that are based on misrepresentations contained in analysts reports.

### b. Roadshow Presentation Allegations

The TAC's allegations as to Defendant Alex. Brown are conclusory and fail to meet the specificity requirements of *Federal Rule of Civil Procedure 9(b)*. Alex Brown was involved only in one follow-on offering and Plaintiffs have pleaded no facts which suggest a connection between Alex. Brown and the alleged misstatements at roadshows. As stated above, despite having many opportunities to add facts to their pleadings to support their claims against Alex. Brown, Plaintiffs have failed to do so. Accordingly, the Court hereby dismisses with prejudice all section 10(b) claims against Defendant Alex. Brown which are based on roadshow allegations.

### c. "Scheme to Defraud" Allegations

The scheme to defraud allegations against Defendant Alex. Brown are not alleged with the specificity required

by *Federal Rule of Civil Procedure 9(b)*. Plaintiffs have had several opportunities to amend their allegations against Alex. Brown and have failed to allege Alex. Brown's participation in fraud with the [*39] specificity required by the Ninth Circuit in *In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541 (9th Cir. 1994)* (en banc). In any event, as set forth above, such allegations fail to state a claim after Central Bank. Accordingly, the Court dismisses with prejudice all allegations against Alex. Brown based on a scheme to defraud.

### CONCLUSION

The Court hereby GRANTS Defendant Montgomery Securities' motion to dismiss and GRANTS Defendant Alex. Brown & Sons' motion to dismiss. All claims against Defendants Montgomery and Defendant Alex. Brown are hereby DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

DATED: January 23, 1996

JAMES WARE

United States District Judge

EXHIBIT C TO ADVEST'S REPLY MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS ACTIONS

Westlaw.

Not Reported in F.Supp.

Page 1

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

**(Cite as: 1996 WL 728125 (D.Mass.))**

H

United States District Court, D. Massachusetts.
WELLS
v.
MONARCH CAPITAL CORPORATION
**No. 91-10575-ADM.**

Oct. 22, 1996.

OPINION

MAZZONE, District Judge.

**\*1 I.** *Introduction*

This matter is before me on three motions: a motion by defendants Ernst & Young LLP, Raymond Groves and William Gladstone (collectively referred to as "Ernst & Young") for summary judgment; a motion by Plaintiffs to amend the pending class action complaint; and a motion by Plaintiffs for partial summary judgment. Although the class action complaint, filed February 15, 1991, and amended September 23, 1991, sets forth securities fraud claims against one dozen defendants, all claims have been dismissed, settled, or discharged in bankruptcy except those against Ernst & Young. Plaintiffs, who purchased common stock in Monarch Capital Corporation (Monarch Capital), allege that Ernst & Young violated Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), as amended, 15 U.S.C. § 78j, and Securities Exchange Commission Rule 10b-5 (SEC Rule 10b-5), 17 C.F.R. § 240.10b-5, by auditing, preparing, or assisting the preparation of publicly disclosed financial documents that materially misrepresented the financial condition of Monarch Capital.

After entering a settlement agreement with several defendants in June, 1992, the case remained stagnant for three years. Plaintiffs did not resume prosecution of their claims against Ernst & Young until this Court scheduled a status conference in March, 1995. Three months later, on June 15, 1995, Ernst & Young filed a motion for summary judgment. In response, Plaintiffs filed an opposition to Ernst & Young's motion for summary judgment and a motion for leave to file a Second Amended Class Action Complaint. On January 25, 1996, Plaintiffs filed their own motion for partial summary judgment.

This Court has reviewed each of these motions, including the accompanying memoranda, affidavits and exhibits. I have also heard oral argument on the two motions for summary judgment. For the reasons set forth in this Memorandum and Order, Ernst & Young's motion for summary judgment is GRANTED, Plaintiffs' motion for leave to amend the pending class action complaint is DENIED, and Plaintiffs' motion for partial summary judgment is DENIED.

*II. Background*

Plaintiffs purchased shares of Monarch Capital common stock between November 10, 1989, and November 14, 1990. At that time, Monarch Capital was a financial services holding company with five areas of business, including capital markets, corporate, investment management, insurance, and insurance services. Monarch Capital was the sole shareholder of its largest subsidiary, Monarch Life Insurance Company (Monarch Life), which wholly owned its own subsidiary, Springfield Life Insurance Company (Springfield Life).

In the late 1980's, Monarch Capital experienced significant financial difficulties. According to its 1989 Annual Report, Monarch Capital suffered a substantial loss in earnings, including operating losses of $32.3 million for its capital markets sector alone. Monarch Capital also reported a $72 million pre-tax provision for estimated losses from real estate investments for the quarter ended December 31, 1989. In addition, the 1989 Annual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

**(Cite as: 1996 WL 728125 (D.Mass.))**

Report contained a message to shareholders in which the president admitted that Monarch Capital's financial results were very disappointing throughout 1988 and 1989. As a result of these losses, Monarch Capital announced plans to discontinue activities in the capital markets sector and redirect its energies to the core insurance businesses.

**\*2** Despite its revitalization plans, Monarch Capital's financial condition continued to deteriorate in 1990. Its Report on Form 10Q for the quarter ended September 30, 1990 reported a loss in earnings of $67.8 million and a $103 million pre-tax charge for estimated losses on the disposal of Monarch's real estate assets. Monarch Capital's declining financial health was reflected in the price of its stock, which fell from a high of $47.75 in 1989 to $5.63 by mid-November, 1990.

On February 15, 1991, Plaintiffs commenced this securities fraud action against Monarch Capital, Monarch Life, Springfield Life, various directors and officers of Monarch Life and Springfield Life, Ernst & Young, and two of Ernst & Young's managing partners. [FN1] Plaintiffs purport to represent a class of shareholders who bought Monarch Capital stock between November 10, 1989, and November 14, 1990. [FN2] The eight count complaint sets forth federal securities fraud claims under § 10(b) of the 1934 Act and SEC Rule 10b-5 against all defendants (Count I); "control person" liability claims under Section 20(a) of the 1934 Act (§ 20(a)) against Monarch Capital officers Brown, Robbie, Terfera, Oakes, Siguler and Freres (Count II); "control person" liability claims under § 20(a) against Monarch Capital (Count III); pendant state claims for fraud, negligent misrepresentation, Massachusetts Securities Act violations, and Massachusetts General Laws c. 93A violations against all defendants (Counts IV-VII); and an assertion of joint and several liability of the Ernst & Young partners and principals with Ernst & Young LLP (Count VIII).

> FN1. Plaintiff Channing M. Wells filed the original complaint on February 15, 1991. The Court allowed Robert R. Juengst to intervene as a plaintiff on May 10, 1991.

> FN2. This Court has not certified the class of purchasers Plaintiffs purport to represent.

Plaintiffs base their claims on a cash management account (the "Account") maintained by Monarch Capital in conjunction with its subsidiaries, including Monarch Life and Springfield Life. The companies agreed to pool all available cash in the Account at the end of each business day in order to maximize short-term investment returns and minimize administrative costs. The arrangement was formalized on September 24, 1986, by a Short-Term Investment Pool Agreement (STIP Agreement). The companies agreed that they could borrow funds from the Account to meet their cash needs and that any funds not utilized would be invested under the management of Monarch Capital. Under the STIP Agreement, Monarch Capital guaranteed that the amounts invested in the Account by the subsidiaries would be available on demand. By December 31, 1989, Monarch Life and Springfield Life maintained balances in the Account of $110.6 million and $15 million, respectively.

Plaintiffs maintain that the public financial documents of Monarch Capital, Monarch Life and Springfield Life failed to disclose the existence and true nature of the Account. Specifically, they allege that the defendants misrepresented the life insurance subsidiaries' investments in the Account as cash or short term investments and concealed the fact that Monarch Capital was actually borrowing funds from the Account to finance long term speculative investments on an unsecured basis. Plaintiffs claim that had they known of the existence and true nature of the Account, they would not have purchased shares of Monarch Capital stock for the artificially high prices they paid, if at all.

**\*3** The defendants responded to the complaint with separate motions to dismiss. Before I ruled on those motions, the Bankruptcy Court approved an involuntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code against Monarch Capital. Due to the bankruptcy proceedings, all claims against Monarch Capital were stayed.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 3

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

**(Cite as: 1996 WL 728125 (D.Mass.))**

This Court addressed the remaining defendants' motions to dismiss in a Memorandum and Order dated August 23, 1991. In that Order, I dismissed the § 20(a) "control person" liability claims as to defendants Brown, Robbie and Terfera (Count II) and the state law claims as to all defendants (Counts IV-VII). I sustained the § 20(a) "control person" liability claim against Monarch Capital (Count III) and the claims against Ernst & Young for federal securities fraud under Section 10(b) and SEC Rule 10b-5 (Count I) and for joint and several liability for damages sustained from Count I (Count VIII). The Order also instructed Plaintiffs to amend their complaint to allege the use of interstate commerce in connection with the federal securities fraud allegations. Plaintiffs filed an Amended Class Action Complaint on September 23, 1991.

In November, 1991, Plaintiffs settled their claims with defendants Oakes, Siguler, Freres, Brown, Robbie and Terfera. They entered into a separate settlement agreement with Monarch Life and Springfield Life in April, 1992. This Court approved the settlement agreement, under which the settling defendants agreed to pay Plaintiffs approximately $4.7 million, on June 15, 1992. Several days later, the Bankruptcy Court endorsed Monarch Capital's Plan of Reorganization, which discharged Plaintiffs' claims against Monarch Capital. The only remaining claims are those against Ernst & Young.

### III. *Claims Against Ernst & Young*

Plaintiffs claim that Ernst & Young violated § 10(b) of the 1934 Act and SEC Rule 10b-5 by auditing, preparing, or assisting the preparation of public financial documents that materially misrepresented the financial condition of Monarch Capital. Like their claims against other defendants, Plaintiffs' claims against Ernst & Young revolve around the intercompany cash management account established by Monarch Capital and its subsidiaries. Plaintiffs allege that they were misled as to the existence and true nature of the Account by public financial documents that were "prepared under the direction of" Ernst & Young who was "responsible for their accuracy and completeness." Complaint ¶ ¶ 43, 44, 48.

In the first Amended Class Action Complaint, Plaintiffs base their claims on the following documents: (1) Monarch Capital's Forms 10Q filed with the SEC on November 10, 1989, May 11, 1990, and August 14, 1990 (the "Forms 10Q") (Complaint ¶ 43); (2) Monarch Capital's 1989 Annual Report sent to shareholders on or about February 12, 1990 and incorporated by reference in Monarch Capital's 1989 Form 10K, which was filed with the SEC on or about March 16, 1990 (Complaint ¶ 44); (3) the Audited Consolidated Financial Statements of Monarch Capital and its subsidiaries for the year ended December 31, 1989, and Ernst & Young's opinion letter concerning those financial statements (Complaint ¶ 45); (4) Monarch Life's 1989 Annual Statement filed with the Commissioner of Insurance for the Commonwealth of Massachusetts on or about February 23, 1990 (Complaint ¶ 48); and (5) Springfield Life's 1989 Annual Statement filed with the Insurance Department for the State of Vermont on or about February 23, 1990 (Complaint ¶ 48) (collectively referred to as "the public filings"). Plaintiffs claim that Ernst & Young violated § 10(b) and SEC Rule 10b-5 by auditing the financial records of Monarch Capital, Monarch Life and Springfield Life, assisting the preparation of the documents listed above, and issuing the opinion letter in March, 1990, concerning the consolidated financial statements of Monarch Capital and its subsidiaries (the "March 1990 Audit Opinion"). According to Plaintiffs, none of these documents fairly disclosed the existence and true nature of the Account.

#### A. *Existence of the Account*

*4 With respect to Monarch Capital's public filings (the Forms 10Q, the 1989 Annual Report, and the 1989 Form 10K), Plaintiffs claim that none of the filings disclosed the existence of the Account. They allege that the 1989 Annual Statements of Monarch Life and Springfield Life were the only public documents that revealed the Account in any way. Insurance laws and regulations require insurance companies to prepare Annual Statements in accordance with accounting guidelines promulgated by the National Association of Insurance Commissioners (NAIC) and file them

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 4

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

**(Cite as: 1996 WL 728125 (D.Mass.))**

with the insurance regulator for the state in which they are incorporated. Monarch Life and Springfield Life filed their 1989 Annual Statements with the Commissioner of Insurance for the Commonwealth of Massachusetts and the Insurance Department for the State of Vermont, respectively. According to Plaintiffs, however, these Annual Statements failed to adequately disclose the Account because they described the Account as a "short-term investment pool" and categorized it as "other invested assets." Plaintiffs claim that these descriptions misrepresented the life insurance subsidiaries' Account balances as cash or short-term investments and concealed the fact that Monarch Capital was actually using the funds on a long-term, unsecured basis.

Plaintiffs also claim that several violations of NAIC guidelines contained in the life insurance subsidiaries' Annual Statements subject Ernst & Young to liability under § 10(b) and SEC Rule 10b-5. The first Amended Class Action Complaint specifies at least four NAIC guidelines that allegedly required disclosure of the Account. First, Plaintiffs claim that although NAIC guidelines required Monarch Life and Springfield Life to "list and describe transactions by the company and any affiliated insurer with any affiliate" in the notes to their financial statements, the companies' notes failed to disclose the Account, listing dividend payments as the only intercompany transaction. (Complaint § 52.) Second, Plaintiffs allege that the defendants violated the NAIC guideline requiring Monarch Life and Springfield Life to " 'describe any guarantees or undertakings for the benefit of an affiliate which result in a material contingent exposure of the company's or any affiliated insurer's assets' in their notes to financial statements." Instead of disclosing the Account, the companies "represented that 'there are no guarantees for the benefit of an affiliate which would result in material exposure of the Company's assets.' " (Complaint ¶ 53.) Third, Plaintiffs allege that in response to interrogatories, NAIC guidelines required Monarch Life and Springfield Life to mark assets which are "loaned or leased to others" with an "LS" in the balance sheet and other schedules contained in the Annual Statements, but that the companies'

responded that there were no assets "loaned to others" as of December 31, 1989. (Complaint ¶ 54.) Fourth, Plaintiffs allege that although NAIC guidelines required Monarch Life and Springfield Life to "identify 'any material activity [with any parent, subsidiary or affiliate] not in the ordinary course of business' in their schedules," neither company disclosed their participation in the Account. (Complaint ¶ 55.) Plaintiffs claim that they relied on these Annual Statements in making their investment decision and that the failure to disclose the Account constitutes securities fraud in violation of § 10(b) and SEC Rule 10b-5.

### B. Nature of the Account

*5 Plaintiffs also claim that the public filings failed to disclose the true nature of the Account. Plaintiffs allege that "instead of being a mere pooling of cash by Monarch Capital and its subsidiaries to increase efficiencies, [the Account] had become a mechanism to secretly and unlawfully cause Monarch Life and Springfield Life to issue risky, unsecured loans to Monarch Capital." (Complaint ¶ 40.) In Plaintiffs' view, instead of disclosing this information, the public filings contained omissions, descriptions, and classifications that materially misrepresented the true nature of the Account.

Plaintiffs claim that Monarch Life's and Springfield Life's financial stability was dependent on that of Monarch Capital and that the public filings wrongfully omitted this information. The life insurance subsidiaries' 1989 Annual Statements reported statutory surpluses that were calculated by treating the Account balances as assets. According to Plaintiffs, since the Account balances made up a substantial amount of the life insurance subsidiaries' reported statutory surpluses, and since Monarch Capital failed to maintain the funds in cash or cash equivalents, the public filings should have disclosed that the statutory surpluses were actually contingent upon Monarch Capital's ability to replenish the Account. Plaintiffs allege that by failing to disclose this information, the Monarch companies' public filings materially misrepresented the true nature of the Account.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 5

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

**(Cite as: 1996 WL 728125 (D.Mass.))**

Plaintiffs also allege that the public filings contained misleading descriptions of the Account. Plaintiffs claim that by describing the Account as a "short-term investment pool," the life insurance companies' 1989 Annual Statements misrepresented the Account as a cash or short-term investment. Plaintiffs argue that the filings should have disclosed the Account for what it was--a source from which Monarch Capital was borrowing funds on a long-term, unsecured basis. They also allege that Ernst & Young knew that Monarch Capital was unable to repay the loans in short term or on demand.

Plaintiffs further allege that the 1989 Annual Statements miscategorized the Account balances such that the true nature of the Account was concealed. Plaintiffs claim that the Schedule BA Reports contained in the Annual Statements should not have categorized the life insurance subsidiaries' investment in the Account as "other long-term invested assets." Since defendants could have reported the investment as an unsecured loan "due for affiliates," Plaintiffs argue that the categorization used was misleading.

In addition, Plaintiffs claim that the 1989 Annual Statements of Monarch Life and Springfield Life misrepresented the true nature of the Account by classifying the life insurance subsidiaries' Account balances as "receivables." According to Plaintiffs, instead of reporting the balances as receivables from Monarch Capital in the amount of $3.6 million and $0.5 million, respectively, Monarch Life and Springfield Life should have classified them as unsecured investments. Plaintiffs claim that the failure to do so misled them as to the true nature of the Account.

*6 Finally, Plaintiffs claim that all of the documents on which they relied, including the Forms 10Q, the 1989 Annual Report, and the 1989 Form 10K of Monarch Capital and the 1989 Annual Statements of the life insurance subsidiaries, misrepresented that Monarch Life and Springfield Life maintained substantial liquidity. Plaintiffs argue reporting these high liquidity rates was improper because the collectibility of the Account

balances was, in fact, in serious doubt. Plaintiffs allege that at the time these liquidity rates were reported, Ernst & Young knew that Monarch Capital's ability to replenish the Account was questionable.

According to Plaintiffs, the first public document to fairly disclose the existence and nature of the Account was Monarch Capital's Form 10Q for the quarter ended September 30, 1990. Monarch Capital filed this Form 10Q with the SEC on or about November 14, 1990. It disclosed that:

[Monarch Capital] has maintained an intercompany management account ("the Cash Management Account") in order to control and maximize the use of available cash for itself and its subsidiaries. Pursuant to the Cash Management Account, the Corporation and participating subsidiaries have used funds from operations and borrowed funds to meet their cash needs, and any excess funds have been deposited in the Cash Management Account. The funds in the Cash Management Account have previously been available for borrowing by the Corporation or participating subsidiaries and, to the extent not so utilized, have been invested under the management of the Corporation.... At September 30, 1990, the Corporation had a currently outstanding net liability under the Cash Management Account to Monarch Life and one of its insurance subsidiaries of approximately $165 million....

The Corporation is in the process of discontinuing the utilization of the Cash Management Account.... So long as the Corporation has insufficient assets to satisfy its obligation to Monarch Life under such account, the existence of such liability may require a reduction in Monarch Life's statutory surplus.... If the Corporation is not successful in achieving a financial restructuring plan in the near future, Monarch Life will have to consider significantly reducing or writing-off the value of such Account.

The 3rd Quarter Form 10Q also disclosed several other significant developments that adversely affected Monarch Capital's financial stability. These developments included: (1) a loss in earning

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

**(Cite as: 1996 WL 728125 (D.Mass.))**

of $67.8 million in the third quarter, (2) a pretax charge of $103 million for estimated losses on the disposal of Monarch Capital's real estate assets, (3) the violation of net worth covenants in certain financing agreements and the defaults resulting therefrom, and (4) a substantial reduction in Monarch Capital's net worth due to a reinsurance agreement concerning several variable life insurance policies. Shortly after this Form 10Q was filed with the SEC, Standard & Poors downgraded the rating of Monarch Life and placed it on "Credit Watch with negative implications." The price of Monarch Capital's stock further declined, falling from 5 5/8 per share to 1 1/4 per share. On November 15, 1990, the Commissioner of Insurance for the Commonwealth of Massachusetts ordered immediate termination of the Account.

### IV. *Motion to Amend the Pending Class Action Complaint*

*7 As stated above, Plaintiffs commenced this action on September 23, 1991. After entering the settlement agreement in June, 1992, which left Ernst & Young the only remaining defendant, Plaintiffs virtually abandoned the case. [FN3] They failed to prosecute their claims against Ernst & Young for *three years*. Plaintiffs did not refocus their attention on these claims until this Court scheduled a status conference in March, 1995.

> FN3. The only action taken by Plaintiffs between June, 1992, and March, 1995, were requests to distribute settlement funds.

In the meantime, the United States Supreme Court established new rules concerning liability under § 10(b) of the 1934 Act. On April 19, 1994, the Court held that private plaintiffs may no longer assert aiding and abetting claims under § 10(b). *Central Bank v. First Interstate Bank,* 511 U.S. 164, 114 S.Ct. 1439 (1994). The Court concluded that § 10(b) prohibits "only the making of a material misstatement (or omission) or the commission of a manipulative act" and that its text "does not itself reach those who aid and abet a § 10(b) violation." *Central Bank,* 511 U.S. at 177, 114 S.Ct. at 1448.

On July 28, 1995, Plaintiffs moved for leave to amend their first Amended Class Action Complaint. Plaintiffs assert that the amendments in the proposed Second Amended Class Action Complaint clarify the pending complaint in light of the settlement agreement and the *Central Bank* decision. Specifically, Plaintiffs claim that the proposed complaint eliminates "factual allegations pertaining to the settled claims [ ] no longer before the Court" and "clarif [ies] the allegations pertaining to Ernst & Young's primary liability under § 10(b) and withdraw[s] those allegations pertaining to its alleged aiding and abetting liability." Plas.' Mem.Supp.Mot. for Leave to Amend Pending Class Action Comp. (July 28, 1995) at 2.

Ernst & Young opposes Plaintiffs' motion as an untimely attempt to alter substantially Plaintiffs' claims. As noted in Ernst & Young's opposition, Plaintiffs filed the motion over one year after publication of the *Central Bank* opinion and four years after filing the original complaint. Ernst & Young argues that Plaintiffs failed to meet the burden of showing substantial justification for this significant delay and that Plaintiffs filed the motion in bad faith. Ernst & Young also argues that the proposed Second Amended Class Action Complaint will substantially prejudice the defendants and that it contains legally defective allegations.

Federal Rules of Civil Procedure Rule 15(a) states, in relevant part, that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." As noted by the United States Court of Appeals for the First Circuit, "[a]bsent factors such as undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, or 'futility of amendment,' the leave sought should be granted." *Executive Leasing Corp. v. Banco Popular de Puerto Rico,* 48 F.3d 66, 71 (1st Cir.1995) (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962), *cert. denied,* 116 S.Ct. 171 (1995). The district court, however, has "considerable discretion" in determining whether such factors exist. *Id.* (quoting

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 7

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

**(Cite as: 1996 WL 728125 (D.Mass.))**

*Rodriguez v. Banco Central Corp.,* 990 F.2d 7, 14 (1st Cir.1993)). The appellate court will "defer to the district court if any adequate reason for the denial [of a motion to amend] is apparent on the record." *Grant v. News Group Boston, Inc.,* 55 F.3d 1, 5 (1st Cir.1995).

**\*8** After close examination of the record, I find that Plaintiffs have not met their burden of proving substantial justification for the delayed filing of their motion to amend. Plaintiffs filed their motion (1) *four years* after filing the original complaint, (2) after having abandoned their claims against Ernst & Young for almost *three years,* (3) *four months* after the Court held a status conference to set a pre-trial schedule ensuring prompt resolution of the case, (4) *three months* before the agreed-upon deadline for fact discovery, (5) *after* Ernst & Young filed a motion for summary judgment, and (6) *on the very day* Plaintiffs' opposition to the motion for summary judgment was due. This is considerable delay. According to the First Circuit, "[w]here ... considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has the burden of showing some valid reason for his neglect and delay.' " *Grant,* 55 F.3d at 6 (footnote omitted) (quoting *Hayes v. New England Millwork Distribs., Inc.,* 602 F.2d 15, 19-20 (1st Cir.1979); *United States Inv. & Dev. Corp. v. Cruz,* 780 F.2d 166, 168 (1st Cir.1986). Plaintiffs have failed to do so in this case.

Plaintiffs argue that their motion to amend was prompted by the Supreme Court's decision in *Central Bank* and that they filed the motion within a reasonable time after its publication. They allege that the proposed complaint clarifies the claims against Ernst & Young in light of *Central Bank* and eliminates factual allegations pertaining to claims disposed of by the settlement agreement. Although newly discovered facts or law may justify a motion to amend, *Campana v. Eller,* 755 F.2d 212, 216 (1st Cir.1985), such justification does not exist in this case. Here, the settlement agreement was signed in June, 1992, and *Central Bank* was decided in April, 1994. The motion to amend was not filed until July, 1995. A year old decision does not constitute "new law" on which a motion to amend may

justifiably rely.

Plaintiffs claim that the delay was necessary to take account of newly discovered facts that relate to their claims against Ernst & Young. Plaintiffs allege that further discovery in this case revealed facts pertaining to the financial deterioration of Monarch Capital, the administration of the Account, Ernst & Young's knowledge of the collectibility of the Account balances, and representations made by Ernst & Young to state insurance regulators. They also claim that they "tagged along" behind a related state case to preserve judicial resources and obtain discovery relating to their claims against Ernst & Young.

I find these reasons inadequate. Discovery ceased in this action shortly after the 1992 settlement and did not resume until July, 1995. Discovery in the related state action was stayed in October, 1993. Amendment, therefore, could not have been prompted by newly discovered facts for over one year after the *Central Bank* decision. As stated by the First Circuit, "[w]hile leave to amend 'shall be freely given when justice so requires,' Fed.R.Civ.P. 15(a), parties seeking the benefit of the rule's liberality have an obligation to exercise due diligence." *Quaker State Oil Ref. Corp. v. Garrity Oil Co., Inc.,* 884 F.2d 1510, 1517 (1st Cir.1989). Plaintiffs did not satisfy that obligation in this case. They neither received nor took discovery in either this or the related state action between October, 1993, and July, 1995. I am unable to find that newly discovered facts justify the delayed filing of Plaintiffs' motion to amend.

**\*9** Since Plaintiffs filed their motion to amend *after* Ernst & Young moved for summary judgment, they must prove that the proposed amendments have substantial merit and are supported by "substantial and convincing evidence." *Resolution Trust Corp. v. Gold,* 30 F.3d 251, 253 (1st Cir.1994) (quoting *Torres-Matos v. ST. Lawrence Garment Co., Inc.,* 901 F.2d 1144, 1146 (1st Cir.1990); *Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir.1996). Instead of providing this proof, the record shows that the proposed complaint attempts to alter the focus and bases of Plaintiffs' claims in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                              Page 8

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

**(Cite as: 1996 WL 728125 (D.Mass.))**

order to defeat Ernst & Young's motion for summary judgment. Allowing it to replace the operative complaint at this late stage would substantially prejudice Ernst & Young.

Since 1991, the focus of Plaintiffs' claims has been the defendants' description of the use of the cash management account. With respect to the claims against Ernst & Young, this Court identified the determinative issue as "whether a reasonable investor, reading the documents which this accounting firm assisted in preparing, would be misled into thinking that the Life Companies' investment in the Account was secure rather than an unsecured, unregulated line of credit for the faltering parent company." Memorandum & Order at 35 (August 23, 1991). After the *Central Bank* decision, the issue became whether a reasonable investor would be misled by misrepresentations or omissions made by the accounting firm itself. Ernst & Young has framed its defense, conducted discovery, and moved for summary judgment based on this issue.

In the proposed complaint, however, Plaintiffs change the focus and bases of their claims. Plaintiffs' new focus is that Ernst & Young violated § 10(b) and SEC Rule 10b-5 by issuing audit opinions on certain financial statements of Monarch Life and Springfield Life which contained material misrepresentations and omissions. According to Plaintiffs, via these audit opinions, Ernst & Young certified the financial statements knowing that the life insurance companies improperly categorized their investments in the Account as "admitted assets," which greatly inflated statutory surpluses. Plaintiffs claim that Ernst & Young violated § 10(b) by issuing these certifications because it knew, or should have known, that the Account balances were unsecured and that only secured investments qualify as "admitted assets" under state insurance law.

In light of this new focus and the *Central Bank* decision, Plaintiffs also changed the bases of their claims. The proposed complaint drops the aiding and abetting claims and the claims based on Monarch Capital's Forms 10Q and the Annual Statements of Monarch Life and Springfield Life.

It seeks to base Plaintiffs' allegations on the financial statements and statutory-based financial statements of Monarch Life and Springfield Life and on Ernst & Young's audit opinions regarding those financial statements.

In light of these proposed changes, granting leave to file the Second Amended Class Action Complaint would prejudice Ernst & Young. First, the fact that Plaintiffs moved to amend the complaint on the day their opposition to Ernst & Young's motion for summary judgment was due suggests that their motion is an attempt to defeat summary judgment. *See Glassman,* 90 F.3d at 623 (stating motion to amend following motion for summary judgment constitutes "an attempt to alter the shape of the case in order to defeat summary judgment"); *Kennedy v. Josephthal & Company, Inc.,* 814 F.2d 798, 806 (1st Cir.1987) (upholding denial of motion to amend where motion filed after district court took summary judgment under advisement). Not only has Ernst & Young already spent time and money preparing the motion for summary judgment, but it informed Plaintiffs of its intention to do so as early as March, 1995. Even after receiving this information, Plaintiffs failed to indicate its intention to amend the complaint at the March 1995 status conference or at any time before Ernst & Young actually filed its motion for summary judgment. As stated in *Citizens to End Animal Suffering and Exploitation, Inc. v. New England Aquarium,* 836 F.Supp. 45, 57 (D.Mass.1993), "as the defendants had filed and briefed their meritorious motions for summary judgment before the motion to amend was filed, it would be unfair to allow that motion and thus reward an evident effort to avoid an adverse ruling on the request for summary judgment." In light of this background, it would be unfair to allow Plaintiffs' motion. *See Executive Leasing Corp.,* 48 F.3d at 70 (upholding denial of motion to amend filed after defendant sought summary judgment where "plaintiffs gave no hint" of plans to amend complaint).

**\*10** Furthermore, since the new focus of Plaintiffs' allegations expands the scope of discovery, granting leave to amend the complaint would require

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 9

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

(Cite as: 1996 WL 728125 (D.Mass.))

reopening discovery. If the complaint is amended, Ernst & Young has claimed the need for additional time to respond to the new complaint and to prepare a defense as to the allegations based on state insurance law. Not only would this prejudice Ernst & Young, but it would disserve the interests of justice by expanding issues previously narrowed by the Court and disrupting the pretrial schedule agreed to by the parties. The First Circuit has stated that: (1) the district court may deny leave to amend where it would have to reopen discovery after development of the legal issues and accumulation of an extensive record, *Kennedy,* 814 F.2d at 806; (2) prejudice may result where "defendants would need additional time to change their trial strategy in light of the proposed amendment," *Glassman,* 90 F.3d at 622 n. 9; and (3) "[t]he further along a case is toward trial, the greater the threat of prejudice." *Executive Leasing Corp.,* 48 F.3d at 71.

Finally, even if Plaintiffs had moved to amend in a timely fashion and the tendered complaint did not prejudice Ernst & Young, I find that the proposed amendments are not supported by substantial and convincing evidence. *See Executive Leasing Corp.,* 48 F.3d at 71 (affirming denial of leave to amend where tendered complaint would not block summary judgment anyway); *Kennedy,* 814 F.2d at 806 (affirming denial of leave to amend where threshold issues would prove insurmountable to recovery even if amendments allowed). As discussed in Part V and VI below, this Court finds that a reasonable investor would not be misled by the public documents filed in connection with the sale of Monarch Capital stock.

For the reasons forth above, Plaintiff's motion for leave to amend the Class Action Complaint is DENIED.

V. *Ernst & Young's Motion for Summary Judgment*
On June 15, 1995, Ernst & Young moved for summary judgment on three grounds. First, Ernst & Young argues that Plaintiffs' claims are barred by an injunction entered by the Bankruptcy Court during Monarch Capital's bankruptcy proceedings. I rejected this argument in a Memorandum and Order dated April 30.

Ernst & Young also seeks summary judgment on grounds that the *Central Bank* decision precludes liability for aiding and abetting a § 10(b) violation. According to Ernst & Young's interpretation of *Central Bank,* a party must *actually make* the misstatement or omission for § 10(b) liability to attach. Ernst & Young argues that all but one of Plaintiffs' claims arise from statements made by persons other than Ernst & Young, so, at most, these claims amount to claims for aiding and abetting and must be dismissed under *Central Bank.*

Third, Ernst & Young argues that the only claims that survive *Central Bank* and subject it to primary liability under § 10(b) are those based on allegations relating to misrepresentations in, or omissions from, the only statement actually made by [Ernst & Young]--the March 1990 Audit Opinion." Def.'s Mem.Supp.Summ.J. at 28-29. The March 1990 Audit Opinion on Monarch Capital's 1989 financial statements was published in Monarch Capital's 1989 Annual Report and in its 1989 Form 10K. According to Ernst & Young, this Court should enter summary judgment on this claim because: (1) the audit opinion was not made "in connection with" the purchase or sale of any security; (2) there was no "fraud on the market" because the existence and nature of the Account was already disclosed to the market in other public filings; and (3) since Ernst & Young was aware of these prior public disclosures, it did not issue the audit opinion with scienter, as required for § 10(b) liability.

A. *Discussion*
*11 According to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, the court must read the record in the light most favorable to the non-moving party and must indulge all inferences in favor of that party. *Lucia v. Prospect St. High Income Portfolio, Inc.,* 36 F.3d 170, 174 (1st Cir.1994); *Attallah v. United States,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

(Cite as: 1996 WL 728125 (D.Mass.))

Page 10

955 F.2d 776, 779 (1st Cir.1992); *Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 928 (1st Cir.1983). Where the nonmoving party carries the burden of proof, however, he "may not rest upon mere allegation or denials of his pleading," *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514 (1986)), *cert. denied,* 114 S.Ct. 1398 (1994), but must "make a showing sufficient to establish the existence of [the] element[s] essential to [his] case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).

As stated by the Supreme Court, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986). According to the Court, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. In addition to materiality, I must determine whether the dispute is genuine," i.e., whether "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* Accordingly, to defeat Ernst & Young's motion for summary judgment, Plaintiffs must have shown by the summary judgment record that a reasonable trier of fact could conclude that: (1) Ernst & Young made material misrepresentations or omissions; (2) in connection with the purchase or sale of Monarch Capital stock; (3) with scienter; (4) that Plaintiffs relied on these misrepresentations or omissions; and (5) that such reliance was justifiable. *Soler v. Rodriguez,* 63 F.3d 45, 53 (1st Cir.1995); *Kennedy,* 814 F.2d at 804; *Holmes v. Bateson,* 583 F.2d 542, 551 (1st Cir.1978).

### 1. Secondary liability claims

In *Central Bank,* the Supreme Court "reach[ed] the uncontroversial conclusion ... that the text of the 1934 Act does not itself reach those who aid and abet a § 10(b) violation." *Central Bank,* 511 U.S. at 177, 114 S.Ct. at 1448. The record must show that Ernst & Young made a material misstatement

or omission, not that it aided and abetted the making of one. Ernst & Young argues that with the exception of the March 1990 Audit Opinion, all of Plaintiffs' claims arise from statements made by persons other than Ernst & Young, and that they therefore amount to claims for aiding and abetting, which are precluded by *Central Bank.* Plaintiffs seem to agree. On the day their opposition to Ernst & Young's motion for summary judgment was due, Plaintiffs moved to file a proposed Second Amended Class Action Complaint which (1) drops the claims against Ernst & Young for aiding and abetting, (2) drops the claims based on Monarch Capital's Forms 10Q and the life insurance subsidiaries' 1989 Annual Statements (documents unrelated to Ernst & Young's March 1990 Audit Opinion) [FN4], and (3) bases Plaintiffs' claims on financial statements on which Ernst & Young issued audit opinions.

> FN4. In a footnote, however, Plaintiffs reserved the right to present claims based on these documents if "discovery show[ed] that E & Y performed work on these documents sufficient to support a claim against it."

*12 Courts are split over what constitutes the "making" of a material misstatement or omission for purposes of § 10(b). See *Phillips v. Kidder, Peabody & Co.,* 933 F.Supp. 303, 314-15 (S.D.N.Y.1996) (discussing jurisdictional split in approach to determine scope of professional's liability under § 10(b)); *Adam v. Silicon Valley Bancshares,* 884 F.Supp. 1398, 1400-01 (N.D.Cal.1995) (same). Some courts hold that unless the defendant *actually made* the alleged misstatement or omission, he is not subject to primary liability under § 10(b). *In re Kendall Square Research Corp. Sec. Litig.,* 868 F.Supp. 26, 28 (D.Mass.1994); *Vosgerichian v. Commodore International,* 862 F.Supp. 1371, 1378 (E.D.Pa.1994). In *Kendall Square,* a judge of this Court determined that "allegations that [an accounting firm] reviewed and approved the quarterly financial statements and the Prospectuses do not constitute the making of a material misstatement; at most, the conduct constitutes

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 11

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

**(Cite as: 1996 WL 728125 (D.Mass.))**

aiding and abetting and is thus not cognizable under Section 10(b)." *Kendall Square,* 868 F.Supp. at 28. In *Vosgerchian,* the plaintiff claimed that the accounting firm was liable under § 10(b) because it "advised or concurred with," rendered "guidance and express approval to," and "provided direct and substantial assistance to" the corporate defendant. *Vosgerichian,* 862 F.Supp. at 1378. Finding that "[e]ach and every misrepresentation alleged was made by [the corporation,]" the court held that these claims "do not go beyond allegations that [the accounting firm] assisted [the corporation] in perpetrating securities fraud and are thus not cognizable." *Id.*

Other courts hold that claims against secondary actors are not claims for aiding and abetting securities fraud if the secondary actor played a "significant role" in creating the misleading documents. *See, e.g., In re Software Toolworks, Inc. Sec. Litig.,* 50 F.3d 615 (9th Cir.1994) (holding accounting firm that significantly participated in alleged misrepresentations subject to primary liability), *cert. denied sub nom. Montgomery Securities v. Dannenberg,* 116 S.Ct. 274 (1995); *Cashman v. Coopers & Lybrand,* 877 F.Supp. 425, 432 (N.D.Ill.1995) (subjecting accountants who assumed "central role in drafting and formation of" alleged misstatements to primary liability under § 10(b)); *In re ZZZZ Best Sec. Litig.,* 864 F.Supp. 960, 970 (C.D.Cal.1994) (subjecting accountants to primary § 10(b) liability for misstatements of others in financial report). In *In re Software Toolworks, Inc. Sec. Litig.,* the Ninth Circuit determined that *Central Bank* did not bar claims against an accounting firm where "plaintiffs presented evidence that [it] played a significant role in drafting and editing" the alleged misrepresentation. *In re Software Toolworks, Inc. Sec. Litig.,* 50 F.3d at 628. This has been recognized as the "significant role" or "substantial involvement" approach. *Phillips,* 933 F.Supp. at 315.

*13 The First Circuit has not yet determined which approach to adopt, and I need not decide the issue here. With the exception of the March 1990 Audit Opinion, which was actually made by Ernst & Young, the record does not show that Ernst &

Young either made or played a significant role in making any of the documents listed in the First Amended Class Action Complaint. Plaintiffs claim that Ernst & Young and the other defendants "aid[ed] and abett[ed] one another" and that they "are sued as direct participants, and also as aiders and abettors." Complaint ¶¶ 1, 109. They base their claims on documents that were allegedly "prepared under the direction of" Ernst & Young who was "responsible for their accuracy and completeness." Complaint ¶¶ 43, 44, 48. These are claims for aiding and abetting under either approach, and are barred by the *Central Bank* decision. I therefore GRANT summary judgment in favor of Ernst & Young on all claims for aiding and abetting.

*2. Primary Liability Claims*

Although *Central Bank* precludes aiding and abetting claims under § 10(b), the Supreme Court explicitly stated that "[a]ny person or entity, including a lawyer, *accountant,* or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies *may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met."* *Central Bank,* 511 U.S. at 191, 114 S.Ct. at 1455 (emphasis added). As stated above, Plaintiffs must prove that Ernst & Young made material misstatements or omissions in connection with the purchase or sale of Monarch Capital stock with scienter and that Plaintiffs justifiably relied on those misstatements or omissions. I believe the summary judgment record, read in the light most favorable to Plaintiffs, fails to show that Ernst & Young made a material misstatement or omission with scienter.

*a. Materiality*

An alleged misrepresentation or omission is "material" if (1) "its disclosure would alter the 'total mix' of facts available to the investor" and (2) " 'there is a substantial likelihood that a reasonable investor would consider it important' to the investment decision." *Milton v. Van Dorn Co.,* 961 F.2d 965, 969 (1st Cir.1992) (quoting *Basic, Inc. v. Levinson,* 485 U.S. 224, 231- 32 (1988) (quoting

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 12

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344
**(Cite as: 1996 WL 728125 (D.Mass.))**

*TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)); *see SEC v. MacDonald,* 699 F.2d 47, 49 (1st Cir.1983) (discussing standard to determine "materiality" under § 10(b)); *Rogen v. Ilikon Corp.,* 361 F.2d 260, 266 (1st Cir.1966) (setting forth basic test for "materiality" in § 10(b) action). Although these determinations are normally for a trier of fact, "summary judgment is warranted, nonetheless, if reasonable minds could not differ as to the materiality of the undisclosed information." *Milton,* 961 F.2d at 970. In the present case, a reasonable fact-finder could not conclude that Ernst & Young made material misrepresentations or omissions by issuing its March 1990 Audit Opinion because disclosure of the alleged omission in the opinion would not have altered the "total mix" of information available to Plaintiffs. Other public filings available to Plaintiffs clearly revealed the existence and true nature of the Account.

### i. Existence of the Account

*14 A reasonable investor considering buying Monarch Capital stock during the class period relevant to this lawsuit would be aware of the existence of the Account. A reasonable, prudent investor would review Monarch Capital's Annual Report and Form 10K before deciding whether to buy its stock. In its 1989 Annual Report, Monarch Capital states that during 1989 it took significant steps to *redirect its energies to the core insurance businesses.* Def.Ex. 1, Att. A, p. 3 (emphasis added). In addition, Monarch Capital's 1989 Form 10K included notes to the audited condensed financial statements stating that "[t]he accompanying condensed financial statements *should be read in conjunction with the consolidated financial statements and notes thereto of Monarch Capital Corporation and Subsidiaries.*" Def.Ex. 1, Att. B, p. 30 (emphasis added). These documents would prompt a reasonable investor to look at the financial statements of Monarch Life and Springfield Life.

The notes to the Audited Financial Statements--Statutory Basis of both Monarch Life and Springfield Life reveal the existence of the Account and the amounts each subsidiary had invested in the Account. Plaintiffs refer to these financial statements in the pending complaint (Complaint ¶ 51) and allege to have relied on them in the proposed complaint. Monarch Life's 1989 financial statements reveal that it

participates in a short-term investment pool with most of the other affiliates of MCC. The companies investing in or borrowing from the pool are credited or charged interest at the average short-term borrowing rate of MCC. At December 31, 1989 and 1988, other invested assets included $110.6 million and $101.6 million invested in the pool.

Def.Ex. 1, Att. C, p. 8. Springfield Life's 1989 financial statements makes an identical disclosure, revealing an investment of $15.1 million at December 31, 1989. Def.Ex. 1, Att. D, p. 7. Reasonable investors would have read these documents and would have been on notice of the existence of and investments in the Account. [FN5]

> FN5. Plaintiffs also claim that they relied on the life insurance subsidiaries' 1989 Annual Statements and that these statements failed to disclose the existence of the Account. As detailed in Section 111(A), Plaintiffs argue that Ernst & Young assisted in the preparation of these documents, which failed to disclose the Account in violation of several NAIC guidelines. Even if I had not concluded that *Central Bank* insulates Ernst & Young from liability for the life insurance subsidiaries' 1989 Annual Statements, I would grant summary judgment in favor of Ernst & Young on these claims. Even if Plaintiffs were sophisticated investors, it is unreasonable to conclude that they (1) knew that NAIC guidelines require insurance subsidiaries to list and describe any intercompany arrangements, (2) reviewed the filings with that NAIC guideline in mind, (3) concluded that no such arrangement existed between Monarch Capital and its life insurance subsidiaries, and (4) relied on that conclusion in purchasing Monarch Capital

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 13

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

**(Cite as: 1996 WL 728125 (D.Mass.))**

stock.

Before making an investment decision, investors traditionally review the corporation's Prospectus, Annual Reports and, perhaps, a Form 10K. NAIC guidelines were designed to protect policyholders, not potential shareholders of insurance companies. As stated in the introduction of the NAIC guidelines,

In most commercial corporations, the users of accounting information are management, shareholders, lenders, potential investors, investment analysts, and securities regulators. Its customers have no direct financial interest beyond the price they paid for the product they purchased.... Insurance buyers, however, have a direct financial interest in their company going beyond that of the customers of most commercial corporations.... The state insurance commissioner, charged with the responsibility of supervisory control over insurance companies, requires meaningful financial and operating information about insurers to discharge those duties. The commissioner's interests and concerns may vary from those of others and, in recognition of these special concerns and responsibilities, statutory accounting has been established.... [Statutory accounting practices] attempt to determine the company's ability to satisfy its obligations to its policyholders and creditors at all times.

Blauner Aff., Att. 45 at ii. Based on the summary judgment record, a reasonable trier of fact could not conclude that a reasonable investor would turn to, and rely on, the life insurance subsidiaries' 1989 Annual Statements.

In any event, even if Plaintiffs had reviewed the Annual Statements as alleged, they would have known that the Account existed and that the life companies made substantial investments therein. Schedule BA--Part I of Monarch Life's Annual Statement lists "Monarch

Capital Short Term Investment Pool" as one of its long-term invested assets, revealing an investment of $110.6 million. Def.Ex. 1, Att. E, p. 26. Using the same description of the Account, Schedule BA--Part I of Springfield Life's Annual Statement reports an investment of $15.1 million. Def.Ex. 1, Att. F, p. 26.

### ii. *Nature of the Account*

Nothing in the Monarch companies' public filings would mislead a reasonable investor as to the nature of the Account. Plaintiffs claim that they were misled as to the nature of the Account by the way the life insurance 1989 Annual Reports and statutory basis financial statements described the Account. Plaintiffs allege that the description, "short term investment pool" misled them into believing that the Account balances were available on demand or in the short-term and that the life insurance subsidiaries had high liquidity ratios.

Although the life insurance subsidiaries' statutory basis financial statements describe the Account as a "short term investment pool," a reasonable investor would not be misled into thinking the investment was recoverable on demand or in short term. Despite this description, the statutory basis financial statements of both life insurance subsidiaries categorize the investment in the Account as "other invested assets," a category distinct from "cash or short-term investments." Def.Ex. 1, Att. C., p. 8; Def.Ex. 1, Att. D., p. 7. The balance sheets also list the investment under "other invested assets" rather than including it under "cash and short-term investments." Def.Ex. 1, Att. C, p. 2; Def.Ex. 1, Att. D, p. 2.

**\*15** The same is true for the life insurance companies' 1989 Annual Statements. Although these statements describe the Account as the "Monarch Capital Short Term Investment Pool," they categorize the life insurance subsidiaries' investment in the Account as "Other Long-Term Invested Assets." Def.Ex. 1, Att. E, p. 26 Def.Ex. 1, Att. F, p. 26. This category is separate and distinct from "Cash on Hand" and "Short-Term Investments." Def.Ex. 1, Att. E, p. 2; Def.Ex. 1,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

**(Cite as: 1996 WL 728125 (D.Mass.))**

Att. F, p. 2. Despite the arguably misleading description of the Account, since the life insurance subsidiaries' investment is *consistently categorized as a long-term investment,* a reasonable prudent investor would understand that the investment was neither a cash or cash equivalent nor a short term investment.

Similarly, contrary to Plaintiffs' arguments, a reasonable investor reviewing the Monarch companies' public filings would realize that Monarch Capital's ability to repay funds taken from the Account was not absolute. The *first sentence* in the President's message to shareholders contained in Monarch Capital's 1989 Annual Report states, " *[o]ur financial results for the past two years have been very disappointing.*" Def.Ex. 1, Att. A, p. 3 (emphasis added). This admission would certainly alert a reasonable investor that Monarch Capital's ability to repay loans involved a risk. Since the notes to the statutory basis financial statements of Monarch Life and Springfield Life disclose that "[t]he companies investing in ... the pool are credited ... interest at the average short-term borrowing rate of MCC," investors were aware that Monarch Capital was paying the interest. Def.Ex. 1, Att. C., p. 8; Def.Ex. 1, Att. D., p. 7. A reasonable prudent investor would realize that these investments were not likely secured.

In light of these disclosures, Ernst & Young would not have altered the "total mix" of facts available to Plaintiffs by revealing the existence and nature of the Account in its March 1990 Audit Opinion. The audit opinion, therefore, was not a "material" misstatement or omission which subjects Ernst & Young to primary liability under § 10(b) and SEC Rule 10b-5.

b. *Scienter*
The summary judgment record also fails to show that Ernst & Young made the alleged misstatement or omission with scienter. The Supreme Court established the scienter requirement in a § 10(b) action in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375 (1976). *See Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1217 (1st Cir.1996) (listing scienter as element necessary to recover

under § 10(b)); *Holmes,* 583 F.2d at 552 (noting scienter requirement set out in *Hochfelder* ). According to the Court, a plaintiff seeking relief under § 10(b) must prove that the defendant acted with "an intent to deceive, manipulate, or defraud." *Hochfelder,* 425 U.S. at 193; *see Aaron v. SEC,* 446 U.S. 680, 686 n. 5, 100 S.Ct. 1945, 1950 (1980) (defining scienter as "a mental state embracing intent to deceive, manipulate or defraud"). The Court expressly stated that "§ 10(b) was intended to proscribe knowing or intentional misconduct," not negligence, *Hochfelder,* 425 U.S. at 197.

**\*16** Since *Hochfelder,* several courts have held that recklessness satisfies the scienter requirement under § 10(b). *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564 (9th Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621 (1991); *ITT v. Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980); *Van de Velde v. Coopers & Lybrand,* 899 F.Supp. 731, 734 (D.Mass.1995); *see First Commodity Corp. v. Commodity Futures Trading Comm'n,* 676 F.2d 1, 7 (1st Cir.1982) (noting virtually every federal appellate court allows recklessness to satisfy scienter requirement). The Court of Appeals for the First Circuit had stated that "[p]roof of knowing conduct is sufficient to establish the necessary scienter." *MacDonald,* 699 F.2d at 50. In *MacDonald,* the First Circuit set forth a three prong test, stating that scienter is established if the defendant: (1) "had actual knowledge of undisclosed material information," (2) "knew it was undisclosed," and (3) "knew it was material." *Id.* The First Circuit has also assumed, without deciding, that recklessness amounting to "carelessness approaching indifference" satisfies that scienter requirement. *Hoffman v. Eastabrook & Co., Inc.,* 587 F.2d 509, 516 (1st Cir.1978). Since scienter is a necessary element to a § 10(b) action, "a lack of any showing of scienter is alone sufficient to support a motion a motion for summary judgment." *Bryson v. Royal Business Group,* 763 F.2d 491, 493 n. 3 (1st Cir.1985).

The summary judgment record fails to show that Ernst & Young acted intentionally or recklessly to defraud the investing public by issuing its March 1990 Audit Opinion. It is undisputed that Ernst & Young knew that the 1 989 Audited Financial

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 15

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

**(Cite as: 1996 WL 728125 (D.Mass.))**

Statements--Statutory Basis and the 1989 Annual Statements of Monarch Life and Springfield Life were publicly disclosed before publication of its audit opinion. Plaintiffs argue that these prior disclosures were misleading themselves and that they should therefore not insulate Ernst & Young from liability. As discussed above, however, I have found that a reasonable prudent investor would not be misled as to the existence and nature of the Account via these public filings. I therefore find that Ernst & Young reasonably believed that investors were sufficiently notified of the Account before publication of the March 1990 Audit Opinion, and that Ernst & Young's knowledge of the prior disclosures negates the possibility that it acted with scienter.

For the reasons set forth above, Ernst & Young's motion for summary judgment is ALLOWED. No reasonable trier of fact reading the summary judgment record in the light most favorable to Plaintiffs could conclude that Ernst & Young's March 1990 Audit Opinion failed to reveal the existence and true nature of the Account.

## VI. *Plaintiffs' Motion for Partial Summary Judgment*

On July 19, 1996, Plaintiffs moved for partial summary judgment as to liability. In addition to filing supporting memoranda, Plaintiffs presented oral argument at the summary judgment hearing on September 12, 1996. The heart of Plaintiffs' motion is that Ernst & Young violated § 10(b) by certifying financial statements that treated Monarch Life's investments in the Account as "admitted assets" in violation of state insurance law. By categorizing the Account balances as "admitted assets," Monarch Capital's 1989 audited consolidated financial statements and Monarch Life's 1989 Audited Financial Statements--Statutory Basis (collectively, "the Financial Statements") reported inflated statutory surpluses for Monarch Life. Plaintiffs claim that they relied on the inflated statutory surpluses contained in these certified Financial Statements in deciding to purchase Monarch Capital stock.

*17 According to Plaintiffs, Ernst & Young knew

or should have known that Monarch Life's investment in the Account was uncollectible and could not be categorized as an "admitted asset" under Massachusetts insurance law. Massachusetts General Laws Chapter 175, Section 11 states that the Massachusetts Commissioner of Insurance "shall not allow stockholders' obligations of any description as part of the assets or capital of any stock company, unless secured by sufficient approved collateral." Mass.Gen.L. ch. 175, § 11. Plaintiffs argue that § 11 unambiguously mandates that only secured collateral may be treated as an "admitted asset" when calculating statutory surplus. Despite this mandate, the Monarch companies categorized the Account balances as "admitted assets" and Ernst & Young issued audit opinions certifying that the Financial Statements accurately reflected the financial conditions of Monarch Capital and Monarch Life.

In light of § 11, Plaintiffs argue that by certifying the Financial Statements, Ernst & Young falsely represented that Monarch Life's $110.6 million balance in the Account was secured by collateral. According to Plaintiffs, Ernst & Young violated § 10(b) because it had an obligation to audit Monarch Life in accordance with Massachusetts insurance law, and despite this obligation, it certified the Financial Statements knowing that: (1) as of December 31, 1989, Monarch Life had an Account balance of $110.6 million, (2) Monarch Life's Account balance was not secured by collateral, and (3) § 11 defines "admitted assets" as obligations "secured by sufficient approved collateral." Plaintiffs conclude that they are entitled to judgment as a matter of law.

### A. *Discussion*

In considering Plaintiffs' motion for partial summary judgment, I apply the same summary judgment standard as discussed in Section V(A) above. Here, however, I must read the record in the light most favorable to Ernst & Young and indulge all inferences in favor of Ernst & Young. *See Lucia,* 36 F.3d at 174 (stating court must indulge all inferences favorable to party opposing summary judgment); *Attallah,* 955 F.2d at 779 (same); *Stephanischen,* 722 F.2d at 928 (same).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 16

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344
**(Cite as: 1996 WL 728125 (D.Mass.))**

As previously noted, courts must enter summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552. Accordingly, I must deny Plaintiffs' motion for partial summary judgment unless Plaintiffs could persuade a reasonable jury by the summary judgment record that Ernst & Young made a material misrepresentation or omission with scienter and that Plaintiffs justifiably relied on that misrepresentation or omission. *See Soler,* 63 F.3d at 53 (setting forth elements of § 10(b) action).

According to Plaintiffs, the record shows that by certifying the financial statements of Monarch Capital and Monarch Life despite the provisions of § 11, Ernst & Young knowingly and materially misrepresented the financial condition of both companies. Plaintiffs motion for partial summary judgment, however, fails at the threshold. Since the motion is predicated on allegations which are not raised in the pending complaint, but in a proposed complaint rejected by this Court, there is no genuine issue for trial. Although the pending complaint makes reference to inflated statutory surpluses, Plaintiffs first claim reliance on the life insurance subsidiaries' Audited Financial Statements--Statutory Basis and on Ch. 175, § 11 of Massachusetts insurance law in the proposed Second Amended Class Action Complaint. Plaintiffs did not raise these issues throughout the first four years of this litigation. As stated by Ernst & Young, "[p]laintiffs may not obtain summary judgment as to 'liability' on claims they propose to assert in a complaint which this Court has not permitted." Def.Mem.Opp. Partial Summ.J. at 4. Plaintiffs' motion for summary judgment is therefore DENIED.

**\*18** Plaintiffs motion is denied on the merits as well. As stated by the Supreme Court, "summary judgment will not lie ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 1510. Ernst & Young urges this Court to

deny Plaintiffs' motion because the alleged misrepresentation "was not false, was not material, was not made with scienter and did not cause loss." Def.Mem.Opp. Partial Summ.J. at 6. After reviewing the record in the light most favorable to Ernst & Young, I find that a reasonable jury could, in fact, determine that Ernst & Young acted without scienter in making the alleged misrepresentation.

i. *Scienter*
As explained above, scienter is an essential element to Plaintiffs' § 10(b) action. Plaintiffs must prove that Ernst & Young made material misrepresentations or omissions with "an intent to deceive, manipulate, or defraud," *Hochfelder,* 425 U.S. at 193, 96 S.Ct. at 1381. According to the First Circuit, Plaintiffs may satisfy the scienter requirement with proof that Ernst & Young "had actual knowledge of undisclosed material information" and knew that it was both undisclosed and material. *MacDonald,* 699 F.2d at 50.

According to Plaintiffs, it is undisputed that at the time the audit opinions were issued, Ernst & Young knew that Monarch Life had invested $110.6 million in the Account and that the investment was not secured by any collateral. It is also undisputed that Ernst & Young knew that Massachusetts General Laws, Ch. 75, § 11 prohibited the Massachusetts Commissioner of Insurance from categorizing obligations as "assets" unless secured by sufficient collateral. Plaintiffs argue that, as independent auditors, Ernst & Young had a duty to audit the Monarch Life in accordance with Massachusetts insurance law, including § 11. They conclude that Ernst & Young is liable under § 10(b) as a matter of law because it certified the financial statements of Monarch Capital and Monarch Life knowing that the statements treated Monarch Life's Account balance as an "admitted asset" despite the provisions of § 11.

In opposition to Plaintiffs' motion, Ernst & Young asserts that months before issuing its audit reports, the Massachusetts Insurance Department published its 1989 Triennial Examination Report expressly stating that, based on a verification of all assets and liabilities, Monarch Life's Account investments

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 17

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

**(Cite as: 1996 WL 728125 (D.Mass.))**

were admitted as statutory assets. Ernst & Young alleges that it relied on this Report in preparing the audit opinions at issue and argues that this reliance negates any finding of scienter.

According to Plaintiffs, Ernst & Young's professed reliance on the Triennial Examination Report is highly unreasonable. In Plaintiffs' view, the language of § 11 is clearly and unambiguously mandatory. The statute clearly states that the Insurance Commissioner "shall not" include unsecured investments as part of a company's assets. Mass.Gen.L. ch. 175, § 11. Plaintiffs argue that "shall not" should be read in the imperative because "where the statutory language is clear, the words are given their plain and ordinary meaning." *Elm Shank & Heel Co. v. Commonwealth*, 401 Mass. 474, 517 N.E.2d 460 (1988). In light of this clear mandate, Plaintiffs argue that no reasonable fact-finder could conclude that Ernst & Young reasonably relied on the Commissioner's conclusion that Monarch Life's Account balance qualified as an "admitted asset."

*\*19* In addition, Plaintiffs argue that Ernst & Young knew that state insurance regulators were unaware of all the facts surrounding the cash management account, yet failed to inform them of those facts. As presented forcefully at the hearing, Plaintiffs argue that Ernst & Young, who had access to the pertinent financial data, had an independent obligation to inform the regulators of their mistake. In fact, Plaintiffs claim that Ernst & Young contributed to the regulators' ignorance by issuing an audit report certifying the financial statements of the life insurance subsidiaries. In their view, Ernst & Young could not reasonably rely on the same insurance regulators that it failed to correct.

Despite Plaintiffs' arguments, I find that reasonable jurors would conclude that Ernst & Young acted without scienter. As noted above, ch. 175, § 11 states that "[the Commissioner of Insurance] shall not allow stockholders' obligations of any description as part of the assets or capital of any stock company, unless secured by sufficient approved collateral." Ch. 175, § 11, In interpreting the meaning of § 11, I must begin with the language

itself. *See Stowell v. Ives*, 976 F.2d 65, 68 (1st Cir.1992) (stating "statutory interpretation always starts with the language of the statute itself"). As plaintiffs argue, under general rules of statutory construction, the term "shall" may connote imperative obligation. *See Shore v. Howard*, 414 F.Supp. 379, 391 (N.D.Tex.1976) (noting term "shall" may create absolute, nondelegable duty under general rules of statutory construction). If the language clearly and unambiguously reveals the legislative intent, I must give full effect to that intent. *Mosquers-Perez v. Immigration & Naturalization Serv.*, 3 F.3d 553, 555 (1st Cir.1993) . If it does not, I may not impose my own construction on the statute, but must give deference to the interpretation by the agency charged with interpreting it, "unless [that interpretation] is arbitrary, capricious, or manifestly contrary to the statute." *Id.*

The term " 'shall' in a statute is commonly a word of imperative obligation" and "is inconsistent with the idea of discretion." *Elmer v. Commissioner of Ins.*, 304 Mass. 194, 196, 23 N.E.2d 95, 97 (1939). In addition to using this term, however, § 11 states that the Commissioner may accept obligations as "assets" if he determines that they are "secured by sufficient approved collateral." Ch. 175, § 11. Section 11 does not define what constitutes "sufficient approved collateral." Plaintiffs argue that the Commissioner could not reasonably categorize Monarch Life's Account balance as an "admitted asset" because it was not secured by *any* collateral. Ernst & Young argues that it reasonably relied on the Commissioner's conclusion because (1) the Commissioner is charged with interpreting § 11, (2) the Commissioner has broad authority, (3) his decisions are final and conclusive, and (4) although there was no specific pledge, he could reasonably conclude that the Account balances were secured by Monarch Capital's general assets.

*\*20* As Ernst & Young argues, it is well established that "[t]he commissioner ... has been given very broad supervisory powers over insurance companies" *Rockland Mut. Ins. Co. v. Commissioner of Ins.*, 360 Mass. 667, 672-73, 227 N.E.2d 493, 497 (1971) and that "[t]he evaluation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

**(Cite as: 1996 WL 728125 (D.Mass.))**

of a company's financial status is peculiarly within his technical competence and expertise." *Maryland Cas. Co. v. Commissioner of Ins.,* 372 Mass. 554, 562, 363 N.E.2d 1087, 1094 (1977); *Commissioner of Ins. v. Century Fire & Marine Ins. Corp.,* 373 Mass. 473, 476-77, 367 N.E.2d 842, 844 (1977). Massachusetts General Laws ch. 175, § 3A provides that "[t]he Commissioner shall administer and enforce the provisions of this chapter," including § 11. Mass.Gen.L. ch. 175, § 3A. According to ch. 175, § 4(2), "[a]t least once in every five years, ... the commissioner shall ... thoroughly inspect and examine [the] affairs [of a domestic insurance company] and ascertain its financial condition, its ability to fulfill its obligations, [and] whether it has complied with the law." Mass.Gen.L. ch. 175, § 4(2). The Commissioner is also governed by ch. 175, § 4(9), which states, in relevant part, that " *[t]he assets and liabilities of [insurance companies] shall be allowed and computed,* in any report of an examination under this section, *in accordance with sections nine to twelve,* inclusive, and may be set forth in accordance with the items specified in the forms of annual statements prescribed by section twenty-five, so far as the commissioner may deem appropriate." Mass.Gen.L. ch. 175, § 4(9) (emphasis added). The Triennial Report therefore reflects the Commissioner's decision that the Account balances were sufficiently secure to be treated as "admitted assets" under § 11.

Although Plaintiffs claim that the Commissioner's decision was unreasonable, "[t]he Commissioner's duties under [Mass.Gen.L. ch.] 175 are not solely ministerial, but involve the exercise of judgment and discretion in determining whether the provisions of the statute have been violated." *Angelico v. Commissioner of Ins.,* 357 Mass. 407, 411, 258 N.E.2d 299, 302 (1970). Furthermore, as noted by Ernst & Young, "the judgment of the commissioner in all matters of law or fact involved in determining the financial condition of a company ... is to be final and conclusive." *Provident Sav. Life Assur. Soc. v. Cutting,* 181 Mass. 261, 264, 63 N.E. 433, 434 (1902). In light of this case law, and the practice of giving "due weight to the commissioner's experience, technical competence,

specialized knowledge, and discretionary authority," *Attorney General v. Commissioner of Ins.,* 403 Mass. 370, 376, 530 N.E.2d 142, 147 (1988), I find that a reasonable trier of fact could conclude that Ernst & Young reasonably relied on the Triennial Report in issuing its audit opinions, and therefore did not make the alleged misrepresentations with the scienter necessary for Plaintiff's to recover under § 10(b).

VII. *Conclusion*

**\*21** For the reasons set forth above, Ernst & Young's motion for summary judgment is GRANTED, Plaintiffs' motion for leave to amend the pending class action complaint is DENIED, and Plaintiffs' motion for partial summary judgment is DENIED.

SO ORDERED.

1996 WL 728125 (D.Mass.), Fed. Sec. L. Rep. P 99,344

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT D TO ADVEST'S REPLY MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS ACTIONS

363 F. Supp. 2d 708, *; 2005 U.S. Dist. LEXIS 5982, **;
Fed. Sec. L. Rep. (CCH) P93,213

LEXSEE 2005 U.S. DIST. LEXIS 5982

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. LUCENT TECHNOLOGIES INC., NINA AVERSANO, JAY CARTER, ALICE LESLIE DORN, WILLIAM PLUNKETT, JOHN BRATTEN, DEBORAH HARRIS, CHARLES ELLIOT, VANESSA PETRINI, MICHELLE HAYES-BULLOCK, and DAVID ACKERMAN, Defendants.**

**Civ. No. 04-2315 (WHW)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*363 F. Supp. 2d 708; 2005 U.S. Dist. LEXIS 5982; Fed. Sec. L. Rep. (CCH) P93,213*

**April 6, 2005, Decided**

**NOTICE:** [**1] FOR PUBLICATION

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff Securities and Exchange Commission (SEC) sued defendant corporation for securities violations and corporate insiders for violations of *15 U.S.C.S. § 78j*(b) and S.E.C. Rule 10b-5, aiding and abetting the corporation in violations of *15 U.S.C.S. §§ 78j*(b) and 78m and S.E.C. Rules 10b-5, 12b-20, 13a-11 and 13a-13 The insiders argued that all of the claims against them should be dismissed.

**OVERVIEW:** The complaint alleged that the corporation fraudulently and improperly recognized revenue and pre-tax income in violation of generally accepted accounting principles (GAAP). As a result, the corporation improperly overstated its pre-tax income by sixteen percent. The GAAP violations were due to the fraudulent and reckless actions of the insiders and deficient internal controls that led to numerous accounting errors by others. Inter alia, the court held that the SEC sufficiently pled fraud with particularity in the claims against one insider, the corporation's president. The complaint noted that the president authorized a side oral agreement that made the price of equipment purchased in the uncertain and instructed his subordinates to obtain a purchase order for the equipment sent to a telecommunications company while knowing that the price was uncertain because of the side agreement. The aiding and abetting were also sufficiently pled. However, the court dismissed the claims against another of the insiders, a financial officer, because no misstatement was attributed to her and the SEC failed to adequately allege scienter.

**OUTCOME:** The court dismissed the claims against one insider, a financial officer, but declined the motion as to the corporation's president. The court also granted leave for the SEC to amend the complaint.

**CORE TERMS:** aiding and abetting, misstatement, scienter, knowingly, primary liability, particularity, bright line, plead, side agreement, motion to dismiss, omission, fiscal year, accounting, accountant, fraudulent, misrepresentation, violator, pled, violating, oral agreement, reckless, aider-abettor, misleading, future event, secondary, switching, falsified, pricing, subordinate, securities fraud

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] On a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, a court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party.

*Civil Procedure > Pleading & Practice > Defenses,*

363 F. Supp. 2d 708, *; 2005 U.S. Dist. LEXIS 5982, **;
Fed. Sec. L. Rep. (CCH) P93,213

*Objections & Demurrers > Failure to State a Cause of Action*

[HN2] On a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, the question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN3] While a court will accept well-plead allegations as true for the purposes of a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation. Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. *Fed. R. Civ. P. 8(a)(2)*. The court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN4] A document integral to or explicitly relied on in the complaint may be considered without converting a motion to dismiss for failure to state a claim into one for summary judgment. Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them.

*Securities Law > Bases for Liability > Deceptive Devices*
*Securities Law > Bases for Liability > Misleading Statements*

[HN5] Section 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, makes it unlawful for any person, directly or indirectly, to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. *15 U.S.C.S. § 78j(b)*.

*Securities Law > Bases for Liability > Deceptive Devices*
*Securities Law > Bases for Liability > Misleading Statements*

[HN6] See *17 C.F.R. § 240.10b-5(b)*.

*Securities Law > Bases for Liability > Deceptive Devices*
*Securities Law > Bases for Liability > Misleading Statements*

[HN7] To establish a violation of Section 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j*(b), and S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5(b)*, the Securities and Exchange Commission (SEC) must plead facts demonstrating that the defendant: (1) made a misrepresentation, or an omission (where there was a duty to speak), or other fraudulent device; (2) that was material in the case of a misrepresentation or omission; (3) in connection with the purchase or sale of a security; (4) where the defendant acted with scienter; and (5) the involvement of interstate commerce, the mails or a national securities exchange. Unlike a private litigant, however, the SEC need not prove either reliance or damages.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Securities Law > Bases for Liability > Liability for Fraud*

[HN8] The United States Court of Appeals for the Third Circuit has held that whether a defendant's accounting practices were consistent with Generally Accepted Accounting Principles is a question of fact, and, thus, is inappropriate to grant a motion to dismiss a securities fraud claim based on that ground.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*

[HN9] *Fed. R. Civ. P. 9(b)* requires that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. This requirement has been rigorously applied in securities fraud cases.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*

[HN10] To satisfy *Fed. R. Civ. P. 9(b)*, the plaintiff must plead with particularity the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. This requirement may be satisfied two ways: First, a plaintiff can plead the who, what, when, where, and how: the first paragraph of any newspaper story. Second, the requirement can be satisfied through alternative means of injecting precision and some measure of substantiation into their allegations

363 F. Supp. 2d 708, *; 2005 U.S. Dist. LEXIS 5982, **;
Fed. Sec. L. Rep. (CCH) P93,213

of fraud. Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation. The United States Court of Appeals for the Third Circuit has held that allegations which indicate the general content of a representation but fail to indicate who the speakers were or who received the information are inadequate to meet the requirements of Rule 9(b).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN11] Conclusory allegations are insufficient to satisfy the requirements of *Fed. R. Civ. P. 9(b)*.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
*Securities Law > Bases for Liability > Liability for Fraud*
[HN12] With regard to the *Fed. R. Civ. P. 9(b)* requirement that a plaintiff plead facts demonstrating that a defendant acted with scienter, the United States Court of Appeals for the Third Circuit has defined "scienter" in the context of securities fraud as a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
*Securities Law > Bases for Liability > Liability for Fraud*
*Securities Law > Bases for Liability > Private Securities Litigation*
[HN13] *Fed. R. Civ. P. 9(b)* provides that, in the context of pleading fraud, malice, intent, knowledge, and other condition of mind of a person may be averred generally. The Private Securities Litigation Reform Act of 1995 (PLSRA) adds an additional requirement, providing that the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *15 U.S.C.S. § 78u-4(b)(2)*. However, the heightened requirements for pleading scienter under the PSLRA do not apply to actions brought by the Securities and Exchange Commission.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
*Securities Law > Bases for Liability > Liability for*

*Fraud*
[HN14] To adequately plead scienter in a securities fraud litigation, regardless whether the Private Securities Litigation Reform Act applies, a plaintiff must either (1) identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN15] While misconduct that occurs after a supposedly fraudulent transaction cannot be the basis of a fraud claim arising from that transaction, common sense dictates that actions taken after the fraud occurred can be circumstantial evidence that the defendant had acted with the requisite state of mind.

*Criminal Law & Procedure > Accessories > Aiding & Abetting*
*Securities Law > Bases for Liability > Liability for Fraud*
*Torts > Multiple Defendants*
[HN16] To state a claim for aiding and abetting, a plaintiff must show: (1) that there has been an underlying securities violation; (2) that the alleged aider-abettor had knowledge of that act; and (3) that the aider-abettor knowingly and substantially participated in the wrongdoing.

*Securities Law > Bases for Liability > Misleading Statements*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > Disclosures & Schedules*
[HN17] Section 13(a) or the Securities Exchange Act of 1934, *15 U.S.C.S. § 78m,* and S.E.C. Rules 12b-20, 13a-11 and 13a-13 provide that an issuer of securities must file certain documents with the Securities and Exchange Commission and that such documents must contain certain information so as to not be misleading. Implicit in these provisions is the requirement that the information submitted be true and correct.

*Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Issuer Reports & Recordkeeping*
[HN18] See *15 U.S.C.S. § 78m(b)(2)(A)* and (b)(2)(B).

*Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Issuer Reports & Recordkeeping*
*Securities Law > Bases for Liability > Misleading Statements*
[HN19] See *15 U.S.C.S. § 78m(5)*.

363 F. Supp. 2d 708, *; 2005 U.S. Dist. LEXIS 5982, **;
Fed. Sec. L. Rep. (CCH) P93,213

*Securities Law > Additional Offerings, Disclosure &
the Securities Exchange Act of 1934 > Issuer Reports &
Recordkeeping*
*Securities Law > Bases for Liability > Misleading
Statements*
[HN20] See *17 C.F.R. § 240.13b2-1.*

*Criminal Law & Procedure > Accessories > Aiding &
Abetting*
*Securities Law > Bases for Liability > Liability for
Fraud*
*Torts > Multiple Defendants*
[HN21] To state a claim for aiding and abetting, a
plaintiff must show: (1) that there has been an underlying
securities violation; (2) that the alleged aider-abettor had
knowledge of that act; and (3) that the aider-abettor
knowingly and substantially participated in the
wrongdoing. The United States Supreme Court has stated
that aiding and abetting liability extends beyond persons
who engage, even indirectly, in a proscribed activity;
aiding and abetting liability reaches persons who do not
engage in the proscribed activities at all, but who give a
degree of aid to those who do. This description of aiding
and abetting liability insinuates that aiding and abetting
liability may be broader than even the test suggests.

*Governments > Legislation > Interpretation*
*Securities Law > Bases for Liability > Deceptive
Devices*
*Securities Law > Bases for Liability > Misleading
Statements*
[HN22] In an action involving the Securities and
Exchange Commission, the United States Supreme Court
has observed that while the *15 U.S.C.S. § 78j*(b) should
be construed not technically and restrictively, but flexibly
to effectuate its remedial purposes, generalized
references to the remedial purposes of the securities laws
will not justify reading a provision more broadly than its
language and the statutory scheme reasonably permit. As
to the purpose of the securities laws, the United States
Court of Appeals for the Third Circuit has commented
that the securities laws were intended to provide
investors with accurate information and to protect the
investing public from the sale of worthless securities
through misrepresentations.

*Securities Law > Additional Offerings, Disclosure &
the Securities Exchange Act of 1934 > Directors,
Officers & Principal Stockholders*
*Securities Law > Bases for Liability > Misleading
Statements*
[HN23] The United States Court of Appeals for the Third
Circuit has concluded that the "bright line" test is the

appropriate standard to apply for primary liability under
§ 10(b) of the Securities and Exchange Act of 1934, *15
U.S.C.S. § 78j*(b). While this test is more closely aligned
with the language of § 10(b) and S.E.C. Rule 10b-5, *17
C.F.R. § 240.10b-5*, thereby limiting the scope of actors
who can be primarily liable, the adoption of this test does
not mean that those who fall outside this net will escape
punishment as the Securities and Exchange Commission
readily can bring an aiding and abetting action against
such actors. Not only is this test consistent with the
statutory language of § 10(b), but it more clearly
delineates which types of behavior will give rise to
primary liability versus secondary liability. No special
consideration should be given to the fact that a defendant
is not an outside professional but a corporate insider.
While it is true that most of the cases dealing with this
issue have done so in the context of outsiders such as
accountants and lawyers, the Central Bank Court did not
limit secondary actors to such professionals.

*Criminal Law & Procedure > Accessories > Aiding &
Abetting*
*Securities Law > Bases for Liability > Private Securities
Litigation*
*Securities Law > Securities & Exchange Commission >
Investigations, Prosecution & Hearings*
[HN24] The Private Securities Litigation Reform Act
explicitly authorizes the Securities and Exchange
Commission to maintain actions for aiding and abetting.

*Criminal Law & Procedure > Accessories > Aiding &
Abetting*
*Securities Law > Bases for Liability > Private Securities
Litigation*
*Securities Law > Securities & Exchange Commission >
Investigations, Prosecution & Hearings*
[HN25] See *15 U.S.C.S. § 78t*(e).

*Criminal Law & Procedure > Accessories > Aiding &
Abetting*
*Securities Law > Bases for Liability > Private Securities
Litigation*
[HN26] For purposes of a *15 U.S.C.S. § 78t*(e) analysis,
establishing substantial assistance requires the plaintiff to
show that the secondary party proximately caused the
violation, or, in other words, that the encouragement or
assistance was a substantial factor in causing the tort.

*Criminal Law & Procedure > Accessories > Aiding &
Abetting*
*Securities Law > Additional Offerings, Disclosure &
the Securities Exchange Act of 1934 > Issuer Reports &
Recordkeeping*
*Securities Law > Bases for Liability > Misleading*

363 F. Supp. 2d 708, *; 2005 U.S. Dist. LEXIS 5982, **;
Fed. Sec. L. Rep. (CCH) P93,213

**Statements**

[HN27] The elements for claims of aiding and abetting in violating § 13(a) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78m*, and S.E.C. Rules 12b-20, 13a-11 and 13a-13 are the same as those for aiding and abetting a § 10(b) of the Securities Exchange Act of 1934 claim: (1) a primary violation by the primary actor, (2) the aider-abettor had knowledge of that act, and (3) the aider-abettor knowingly and substantially participated in the wrongdoing.

**COUNSEL:** For SECURITIES AND EXCHANGE COMMISSION, Plaintiff: MARK A. ADLER, U.S. SECURITIES AND EXCHANGE COMMISSION, WASHINGTON, DC.

For UNITED STATES, Intervenor Plaintiff: MAURO MICHAEL WOLFE, OFFICE OF THE UNITED STATES ATTORNEY, NEWARK, NJ.

For NINA AVERSANO, Defendant: EDWARD T. KOLE, WILENTZ, GOLDMAN & SPITZER, ESQS., WOODBRIDGE, NJ.

For JAY CARTER, Defendant: DONNA L. GORDON, LEBOEUF, LAMB, GREENE & MACRAE, L.L.P., NEW YORK, NY.

For ALICE LESLIE DORN, Defendant: BARRY H. EVENCHICK, WALDER, HAYDEN & BROGAN, P.A., Roseland, NJ.

For JOHN BRATTEN, CHARLES ELLIOTT, Defendants: CLAUDIA A. COSTA, STRYKER, TAMS & DILL, NEWARK, NJ.

For MICHELLE HAYES-BULLOCK, Defendant: SHEILA A. SADIGHI, LOWENSTEIN SANDLER PC, ROSELAND, NJ.

For DAVID ACKERMAN, Defendant: WILFRED P. CORONATO, HUGHES, HUBBARD & REED LLP, JERSEY CITY, NJ.

**JUDGES:** Walls, District Judge.

**OPINIONBY:** William H. Walls

**OPINION:**

**[*711] OPINION Walls, District Judge**

Defendants Jay Carter and Michelle Hayes-Bullock move separately to dismiss certain claims in the Complaint. The Court will address all of these motions in this opinion.

**FACTS AND PROCEDURAL BACKGROUND**

The Complaint alleges [**2] the following: Lucent Technologies Inc. ("Lucent") fraudulently and improperly recognized revenue and pre-tax income in violation of generally accepted accounting principles ("GAAP") during its fiscal year 2000. As a result, Lucent improperly overstated its pre-tax income that fiscal year by sixteen percent. Lucent prematurely recognized $ 511 million of revenue and $ 91 million in pre-tax income in quarterly results during Lucent's fiscal year 2000. The remaining $ 637 million in revenue and $ 379 million in pre-tax income should not have been recognized at all during Lucent's fiscal year 2000. Lucent's violations of GAAP were due to the fraudulent and reckless actions of the other named defendants who were officers, executives and employees of Lucent. The GAAP violations were also the result of deficient internal controls that led to numerous accounting errors by others.

Defendant Jay Carter was president of Lucent's AT&T customer business unit from July 1997 to September 2000, with global responsibility for sales and marketing of Lucent's products to AT&T. Defendant Michelle Hayes-Bullock was a Lucent finance director with chief financial officer ("CFO") responsibilities for the [**3] AT&T customer business unit from January 2000 to January 2001; she reported to Jay Carter.

Starting in the summer of 1999, Lucent and AT&T Wireless Services, Inc. ("AWS") began to negotiate a new business model known as Voice Path Pricing ("VPP"). Under VPP, AWS would no longer pay Lucent according to a conventional pricing model which entailed sales of individual pieces of equipment that make up a telecommunications network. Instead, AWS would pay a price for each voice path - in essence pay for each data/voice connection that could be handled on the finished network. The parties initially anticipated that VPP would take effect April 1, 2000, but the new contract was not ultimately signed until August 2000. While continuing to negotiate the VPP agreement, Carter authorized his subordinates to enter into an oral agreement with their AWS counterparts that VPP would be retroactively applied to products purchased by AWS between April 1, 2000 and the date the VPP agreement was finally reached (the "interim period"). As part of this oral agreement, any pricing differential between VPP and conventional pricing for products purchased during this interim period would be adjusted through credits [**4] via a "true-up" process once the VPP agreement was finalized. In effect, the parties agreed to have VPP commence on April 1, 2000.

363 F. Supp. 2d 708, *; 2005 U.S. Dist. LEXIS 5982, **;
Fed. Sec. L. Rep. (CCH) P93,213

[*712]    Hayes-Bullock was aware of this oral agreement because she had been explicitly told about it, both by a subordinate in the finance division and by at least one of the sales executives who made the agreement on behalf of Lucent. As finance director with CFO responsibilities for the AT&T customer business unit, she was responsible for ensuring that Lucent's financial statements complied with GAAP for transactions originating within that unit.

During the interim period, Lucent provided AWS with switching equipment valued at $ 53 million under conventional pricing. The switching equipment was provided to AWS without a purchase order, and, as a result, appeared in certain internal Lucent reports as inventory that had been shipped but not invoiced. In order to recognize revenues on the switches, Carter instructed his subordinates to obtain a purchase order from AWS for the switches. AWS provided a purchase order at the end of Lucent's third quarter of fiscal year 2000 with the expressed understanding that - in conformity with the original oral understanding [**5] - Lucent would provide a credit for that invoiced amount and that AWS would ultimately pay the VPP price for the equipment.

On June 30, 2000, at the end of Lucent's third quarter of its fiscal year, the switching equipment was invoiced under conventional pricing and Lucent violated GAAP by recognizing revenue and operating income in the amount of $ 53 million. Carter and Hayes-Bullock knew, or were reckless in not knowing, that Lucent's recognition of the revenue and operating income violated GAAP. And, so plaintiff alleges, Carter and Hayes-Bullock also took affirmative steps to mislead Lucent's chief accountant about the existence and nature of the oral agreement with AWS. More specifically, Hayes-Bullock drafted, and/or assisted in drafting, a letter to the chief accountant that falsely suggested that there were no credit agreements with AWS. Carter executed versions of that letter on September 8 and September 26, 2000. In the September 8, 2000 letter, Carter falsely represented that the June 30, 2000 invoice to AWS was "payable when due and that any credits earned will be applied against future purchase for wireless products." In the September 26, 2000 letter, Carter wrote that [**6] "if as in the past, Lucent were to offer AT&T credits in return for future volume purchases, they would be earned by AT&T when the volume commitments were achieved," falsely suggesting that Lucent had not offered AWS an opportunity to earn credits.

Under GAAP as summarized by FASB Concepts Statement No. 5 ("CON 5"), before Lucent can recognize revenue in a given transaction, the revenue must be both realized and earned. To be realizable, collection of the sales price must be reasonably assured. Moreover, notwithstanding the delivery and transfer of title to the equipment, FASB Statement No. 48 ("FAS 48") requires that the price AWS will ultimately pay be fixed and determinable.

The result of the oral agreement authorized by Carter was that the price AWS would ultimately pay was not fixed and determinable because the ultimate VPP price had not yet been determined. In addition, the Complaint charges, Lucent could have no expectation that it would collect $ 53 million for the switching equipment because the parties had orally agreed that AWS would receive an offsetting credit. This meant that the collection of the sales price was not reasonably assured, and the criteria for recognizing [**7] revenue under CON 5 were not satisfied.

[*713]    The Complaint further alleges that both Carter and Hayes-Bullock knowingly or recklessly engaged in this fraudulent conduct, as a result of which, Lucent materially overstated pre-tax income by $ 53 million in its financial statements filed with the SEC in Form 10-Q for its third quarter of fiscal year 2000. It also charges that both Carter and Hayes-Bullock knew, or were reckless in not knowing, that, as a result of their fraudulent conduct, Lucent filed materially false financial statements.

Based on these allegations, plaintiff alleges four counts against Carter and Hayes-Bullock: Count One of the Complaint alleges that Carter and Hayes-Bullock violated *Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b-5*, and that they are also liable for aiding and abetting Lucent in violating such laws. Count Three alleges that Carter and Hayes-Bullock aided and abetted Lucent in violating *Section 13(a) of the Exchange Act, Rules 12b-20, 13a-11* and *13a-13* by causing Lucent to file materially false and misleading financial statements in the fiscal year 2000. Count Four alleges that Carter and Hayes-Bullock aided and abetted [**8]   Lucent in violating *Sections 13(b)(2)(A)* and *13(b)(2)(B)* of the Exchange Act by causing Lucent's books and records to be inaccurate and by assisting in Lucent's failure to maintain sufficient internal accounting controls. Count Five alleges that Carter and Hayes-Bullock violated *Section 13(b)(5) of the Exchange Act* by knowingly circumventing Lucent's system of internal accounting controls and knowingly falsifying, or causing to be falsified, Lucent's books and records.

**STANDARD FOR A *RULE 12(b)(6)* MOTION TO DISMSS**

363 F. Supp. 2d 708, *; 2005 U.S. Dist. LEXIS 5982, **;
Fed. Sec. L. Rep. (CCH) P93,213

[HN1] On a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, a court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).* [HN2] The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984).*

[HN3] While a court will accept [**9] well-plead allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation. See *Miree v. DeKalb County, Ga., 433 U.S. 25, 27 n. 2, 53 L. Ed. 2d 557, 97 S. Ct. 2490 (1977).* Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. See *Fed. R. Civ. P. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. See *Sentinel Trust Co. v. Universal Bonding Ins. Co., 316 F.3d 213, 216 (3d Cir. 2003);* see also 5A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 at 299 (2d ed. 1990).

[HN4] "A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *Mele v. FRB, 359 F.3d 251, 255 n.5 (3d Cir. 2004)* (citing [**10] *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)).* "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim [*714] is based by failing to attach or explicitly cite them." *Id.*

## DISCUSSION

### I. Carter

Carter argues that all of the claims against him should be dismissed. His arguments will be addressed in turn.

#### A. Count One - Primary Liability

As to the fraud claims against him, Carter contends that they must fail for several reasons. First, he asserts that the fraud claim can not succeed because it is based on a future event and there was no violation of GAAP.

Second, he charges that the SEC has failed to plead fraud with particularity. And finally, he contends that the SEC has inadequately pled scienter.

1. Fraud Based on Future Event and Violations of GAAP

Carter charges that fraud claims cannot be based on contingent future events or be sustained where GAAP supports the revenue recognition at issue. He asserts that, as alleged, reaching a VPP agreement with AWS was a contingent future event when Lucent recognized the $ 53 million value of the switching equipment as revenue. [**11]

[HN5] *Section 10(b) of the Exchange Act* makes it unlawful for "any person, directly or indirectly, . . .to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." *15 U.S.C. § 78j(b).* Rule 10b-5 renders the following conduct illegal:

> [HN6] (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*17 C.F.R. § 240.10b-5(b).* [HN7] To establish a violation of *Section 10(b)* and *Rule 10b-5*, the SEC must plead facts demonstrating that [**12] the defendant: (1) made a misrepresentation, or an omission (where there was a duty to speak), or other fraudulent device; (2) that was material in the case of a misrepresentation or omission; (3) in connection with the purchase or sale of a security; (4) where the defendant acted with scienter; and (5) the involvement of interstate commerce, the mails or a national securities exchange. *S.E.C. v. Adoni, 60 F. Supp. 2d 401, 405 (D.N.J. 1999).* Unlike a private litigant, however, the SEC need not prove either reliance or damages. *GFL Advantage Fund, Ltd. v. Colkitt, 272*

*F.3d 189, 206 n.6 (3d Cir. 2001); United States v. Haddy, 134 F.3d 542, 549 (3d Cir. 1998).*

Carter contends that it was not fraudulent to recognize the $ 53 million in revenue because the Complaint, as alleged, implies that conventional pricing was still in place when the revenue was recognized and the oral agreement to credit AWS for the purchase was contingent upon Lucent and AWS finalizing the VPP agreement. Carter cites several cases, none of which are factually similar to the circumstances here, for the proposition that a material misstatement or omission involving [**13] a future event is not actionable as fraud. See *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* [*715] *Inc., 75 F.3d 801, 811 (2d Cir. 1996); Continental Bank, N.A., v. Meyer, 10 F.3d 1293, 1299 (7th Cir. 1993); Mardini v. Viking Freight, Inc., 92 F. Supp. 2d 378, 385 (D.N.J. 1999).* This situation here is unlike forward-looking statements, opinions and representations about future events such as the way an employee will be evaluated for promotions. While the Court is by no means defining the contours of the Complaint, as the Court reads it, the fraud alleged by the SEC is in recognizing the $ 53 million as revenue when Carter knew, or was reckless in not knowing, that that amount was not realizable or fixed and determinable because of the oral side agreement with AWS. This is not the same as an unactionable fraud claim predicated on a future event.

The second part of Carter's first argument is that GAAP supports the recognition of the $ 53 million as revenue, and, hence, the SEC's contention that GAAP was violated by this transaction fails as a matter of law. More specifically, Carter declares that FAS 48 does [**14] not apply to the sale of the switching equipment because the sale did not include a right of return. He also argues that the revenue recognition was consistent with CON 5. In response to a similar argument, however, [HN8] the Third Circuit has held that whether a defendant's accounting practices were consistent with GAAP was a question of fact, thereby rendering it inappropriate to grant a motion to dismiss a securities fraud claim based on that ground. *In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1421 (3d Cir. 1997).* The Court is unpersuaded that the fraud claims against Carter should be dismissed based on this argument.

2. Failure to Plead Fraud with Particularity

Carter's next challenge is that the SEC has failed to meet the requirements of *Rule 9(b)* with regard to its *Section 10(b)* claim. [HN9] *Fed. R. Civ. P. 9(b)* requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be

stated with particularity." This requirement has been "rigorously applied in securities fraud cases." *California Public Employees' Retirement System v. Chubb Corp., 394 F.3d 126, 144 (3d Cir. 2004).* [**15] [HN10] To satisfy *Rule 9(b)*, the plaintiff must plead with particularity "the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Lum v. Bank of America, 361 F.3d 217, 223-24 (3d Cir. 2004)* (quoting *Seville Indus. Machinery v. Southmost Machinery, 742 F.2d 786, 791 (3d Cir. 1984)).* This requirement may be satisfied two ways: First, a plaintiff can plead "the who, what, when, where, and how: the first paragraph of any newspaper story." *Chubb Corp., 394 F.3d at 144* (quoting *In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999)).* Second, the requirement can be satisfied through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Lum, 361 F.3d at 223-24* (quoting *Seville Indus. Machinery, 742 F.2d at 791* (holding that a plaintiff satisfied *Rule 9(b)* by pleading which machines were the subject of alleged fraudulent transactions and the nature and subject [**16] of the alleged misrepresentations)). "Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Id.* (citations omitted). The Third Circuit has held that allegations which indicate the general content of a representation but fail to indicate who the speakers were or who received the information are inadequate to meet the requirements of *Rule 9(b)*. See [*716] *Saporito v. Combustion Engineering Inc., 843 F.2d 666, 675 (3d Cir. 1988),* vacated on other grounds, *489 U.S. 1049, 103 L. Ed. 2d 576, 109 S. Ct. 1306 (1989).*

Carter says that the Complaint only contains three specific allegations about him: that he authorized the oral agreement with AWS; that he instructed his subordinates to obtain a purchase order for the switching equipment; and that he signed two letters to Lucent's Chief Accountant suggesting that there was no credit agreement with AWS. He charges that there is no allegation as to how, if at all, he was involved in the revenue recognition of the $ 53 million. He asserts that the "what, when, where, and how" are missing from the Complaint. He also notes that to the extent the SEC is relying on the letters as a basis for the [**17] claim, these letters are irrelevant because they were signed in September, more than two months after the revenue was recognized on June 30, 2000.

The SEC responds that the Complaint adequately pleads fraud with particularity under the "who, what,

Case 1:05-cv-10176-RGS    Document 68-6    Filed 12/08/2006    Page 10 of 19

Page 9

363 F. Supp. 2d 708, *; 2005 U.S. Dist. LEXIS 5982, **;
Fed. Sec. L. Rep. (CCH) P93,213

when, where, and how" standard. The "who" is Carter. The "what," according to the SEC, is "a fraudulent scheme designed to create the false appearance that Lucent had sold certain switching equipment to AWS under Lucent's conventional pricing for $ 53 million, so that Lucent could book $ 53 million in revenue in its fiscal third quarter in violation of GAAP." (Pl.'s Br. at 13). The SEC claims that the "how" is alleged in that Carter authorized his subordinates to enter the oral agreement with AWS and instructed them to obtain a purchase order. The SEC also relies on the letters as evidence of the affirmative steps Carter took to mislead the Chief accountant. The "when" and "where" of the fraud is also adequately alleged, the SEC contends, in that it provides the date on which the revenue was recognized on Lucent's books.

While it is true that [HN11] conclusory allegations are insufficient to satisfy the requirements of *Rule 9(b)*, the Court is [**18] satisfied that the SEC has sufficiently pled fraud with particularity in the claims against Carter. Contrary to Carter's arguments, the Complaint notes with particular specificity the actions taken by Carter that support the fraud claims: 1) Carter authorized a side oral agreement that made the price of equipment purchased in the interim period uncertain, 2) he instructed his subordinates to obtain a purchase order for the equipment sent to AWS during the interim period while, 3) knowing that the price of the equipment was uncertain because of the side agreement. These allegations, as well as those noting the "who, when, and where," satisfy the requirements of *Rule 9(b)*.

3. Scienter

[HN12] With regard to the requirement that a plaintiff plead facts demonstrating that a defendant acted with scienter, the Third Circuit has defined "scienter" in the context of securities fraud as "a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either [**19] known to the defendant or is so obvious that the actor must have been aware of it." *In re Alpharma Inc. Securities Litigation, 372 F.3d 137, 148 (3d Cir. 2004)* (quoting *In re Ikon Office Solutions, Inc., 277 F.3d 658, 667 (3d Cir.2002))*. [HN13] *Rule 9(b)* provides that, in the context of pleading fraud, "malice, intent, knowledge, and other condition of mind of a person may be averred generally." The [*717] *Private Securities Litigation Reform Act of 1995* ("PLSRA") adds an additional requirement, providing that "the complaint shall, with respect to each act or omission

alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)*. The parties appear to agree, however, and the case law supports the conclusion, that the heightened requirements for pleading scienter under the PSLRA do not apply to actions brought by the SEC. E.g., *S.E.C. v. Prater, 296 F. Supp. 2d 210, 215 (D.Conn. 2003)* ("Since actions brought by the SEC are not considered "private litigation," the standard imposed in the PSLRA for pleading [**20] scienter does not apply to the SEC."); *United States SEC v. ICN Pharms., Inc., 84 F. Supp. 2d 1097, 1099 (C.D.Cal. 2000)* ("The 'more rigorous' pleading requirements under the PSLRA, which go beyond the *Rule 9(b)* requirements only apply to private securities fraud actions; they do not apply to a case, such as this, brought by the SEC."); *S.E.C. v. Blackman, 2000 U.S. Dist. LEXIS 22358, 2000 WL 868770, *5 (M.D.Tenn. May 26, 2000)* (agreeing with the SEC that the pleading requirement of the PSLRA does not apply to the SEC).

[HN14] To adequately plead scienter, regardless whether the PSLRA applies, a plaintiff must either "(1) identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud." *In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1422 (3d Cir. 1997)*. As said, because the PSLRA does not apply, the SEC is exempt from the PSLRA's additional requirement of pleading scienter with particularity. See *In re Advanta Corp. Sec. Litig., 180 F.3d 525, 533-35 (3d Cir. 1999)* (noting that the PSLRA differs from the previous standard for [**21] pleading scienter only in that it requires that it be pled with particularity). It follows then that to the extent Carter claims that the SEC must plead scienter with particularity, this assertion is incorrect.

Moving to the substance of the issue, Carter argues that the SEC has failed to adequately allege facts which would satisfy either of the permitted means of demonstrating scienter. Contrary to that assertion, however, the Court is satisfied that the facts alleged identify circumstances indicating conscious or reckless behavior by Carter. His actions and his letters to the chief accountant can give rise to the inference that Carter did not want the Chief accountant to know of the oral side agreement he had authorized his subordinates to enter into with AWS. [HN15] While the Court agrees with Carter's assertion that misconduct that occurs after a supposedly fraudulent transaction cannot be the basis of a fraud claim arising from that transaction, see *Jones v. Intelli-Check, Inc., 274 F. Supp. 2d 615 (D.N.J. 2003)*, common sense dictates that actions taken after the fraud

363 F. Supp. 2d 708, *; 2005 U.S. Dist. LEXIS 5982, **;
Fed. Sec. L. Rep. (CCH) P93,213

occurred can be circumstantial evidence that the defendant had acted with the requisite state of mind. [**22] As example, that a person takes certain steps to cover up a misdeed is certainly relevant evidence that the person knew he had made a mistake. The letters described in the Complaint sufficiently indicate circumstances which would support a finding of conscious or reckless behavior on the part of Carter. Because the Court finds that the SEC has sufficiently alleged scienter in one of the two permissible ways, it is unnecessary to consider whether the SEC has also pled scienter by alleging facts that show both a motive and a clear opportunity for committing the fraud.

Carter's motion to dismiss Count One of the Complaint for failure to state a claim [*718] upon which relief can be granted and to properly plead fraud or scienter is denied.

### B. Count One - Secondary Liability

Carter contends that the aiding and abetting claim in Count One of the Complaint must be dismissed because the SEC cannot establish the first element of an aiding and abetting claim. [HN16] To state a claim for aiding and abetting, a plaintiff must show: (1) that there has been an underlying securities violation; (2) that the alleged aider-abettor had knowledge of that act; and (3) that the aider-abettor knowingly and [**23] substantially participated in the wrongdoing. *Monsen v. Consolidated Dressed Beef Co., Inc., 579 F.2d 793, 799 (3d Cir. 1978).* In a footnote, Carter repeats that the claim cannot be satisfied because the fraud is based on a future event and the transaction did not violate GAAP. These are the same arguments Carter advanced to dismiss the primary liability claim. And for the same reasons, the Court finds these arguments unavailing. Carter's motion to dismiss the securities fraud aiding and abetting claim is denied.

### C. Counts Three, Four and Five

In support of his motion to dismiss Counts Three, Four and Five of the Complaint, Carter argues that these claims must fail because Lucent properly recognized the $ 53 million in revenue according to GAAP. To recap, Count Three alleges that Carter aided and abetted Lucent in violating *Section 13(a) of the Exchange Act* and *Rules 12b-20, 13a-11* and *13a-13* by causing Lucent to file materially false and misleading financial statements in the fiscal year 2000. n1 Count Four alleges that he aided and abetted Lucent in violating *Sections 13(b)(2)(A)* and *13(b)(2)(B) of the Exchange Act* by causing Lucent's books and records [**24] to be inaccurate and by assisting in Lucent's failure to maintain sufficient internal accounting controls. n2 Count Five alleges that Carter violated *Section 13(b)(5) of the Exchange Act* and Rule

*13b-2* by knowingly circumventing Lucent's system of internal accounting controls and knowingly falsifying, or causing to be falsified, Lucent's books and records. n3

n1 [HN17] *Section 13(a)* and the rules referenced provide that an issuer of securities must file certain documents with the SEC and that such documents must contain certain information so as to not be misleading. Implicit in these provisions is the requirement that the information submitted be true and correct. *GAF Corp. v. Milstein, 453 F.2d 709, 720 (2d Cir. 1971).*

n2 *Sections 13(b)(2)(A)* and *13(b)(2)(B)* provide:

[HN18] (2) Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall--

(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that--

(i) transactions are executed in accordance with management's general or specific authorization;

(ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting

363 F. Supp. 2d 708, *; 2005 U.S. Dist. LEXIS 5982, **;
Fed. Sec. L. Rep. (CCH) P93,213

principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences;

[**25]

n3 *Section 13(b)(5)* provides that [HN19] "no person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2)." *15 U.S.C. § 78m(5).* Rule 13b-2 provides that [HN20] "no person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to *Section 13(b)(2)(A) of the Securities Exchange Act.*" *17 CFR § 240.13b2-1*

[*719] As to the *Section 13(a)* claim, Carter asserts, without any legal support, that the claim must fail because the revenue recognition of the $ 53 million was in accordance with GAAP, making the 8-K and 10-Q documents at issue inaccurate. As the Court noted earlier, however, whether the money was recognized as revenue in accordance with GAAP is a question of fact, and not appropriate to consider on a motion to dismiss.

As to the alleged violations of *Sections 13(b)* found in Counts Four and Five, Carter says that the Complaint fails to allege the elements that support such a claim. Unfortunately, he misstates the law. In [**26] the case he relies on, *S.E.C. v. Gallagher, 1989 U.S. Dist. LEXIS 9556, 1989 WL 95252, *6 (E.D.Pa. Aug. 16, 1989),* the element he points to - that "there has been a commission

of a wrongful act--an underlying securities violation" - is an element of a *Section 13(a)* claim, not a *Section 13(b)* claim. Carter also advances *S.E.C. v. Autocorp Equities, Inc., 292 F. Supp. 2d 1310, 1331-32 (D.Utah 2003),* for the proposition that to prevail on an aiding and abetting *Section 13(b)(2)(A)* claim, the SEC "must establish knowledge or reckless disregard of the fact that the defendant was aiding or abetting a violation of securities law." He again argues that the SEC can not establish this element because the revenue recognition was proper under GAAP. For the same reasons stated before, this argument fails. The Court is also satisfied, for the same reasons expressed in the discussion of the fraud claims, that the SEC has sufficiently pled facts to support the inference that Carter acted with knowledge or in reckless disregard in aiding and abetting Lucent's violations of *Section 13(b).* Carter's motion to dismiss the Third, Fourth and Fifth Counts of the Complaint is denied.

## II. Hayes-Bullock [**27]

Hayes-Bullock contends that all of the claims against her should be dismissed. As with Carter, the Court will consider her arguments in turn.

### A. Count One - Primary Liability

Hayes-Bullock proposes four reasons why the SEC has failed to state a claim against her for violation of *Section 10(b)* and *Rule 10b-5.* First, that the SEC has failed to allege that she made a misstatement or omission. Second, that the SEC has failed to allege any misstatement or omission in connection with the AWS transaction. Third, that the SEC has inadequately pled scienter. And fourth, that the statement at issue is not material as a matter of law. Hayes-Bullock also contends that the SEC has failed to allege the necessary elements for the aiding and abetting claim against her.

1. Failure to Allege a Misstatement or Omission

Hayes-Bullock first argues that the SEC has failed to allege that she made any misstatement or omission, a necessary element to state a claim under *Section 10(b)* and *Rule 10b-5.* She says that, to the extent the SEC alleges that Lucent's recognition of the $ 53 million as revenue in the third quarter of its fiscal year was a misstatement, the claim against her must fail because [**28] nowhere is there an allegation that she made the statement.

Under these circumstances, whether a claim can be maintained against her for a primary violation of *Section 10(b)* and *Rule 10b-5* [*720] is another source of disagreement between the parties. The Third Circuit has not yet resolved the issue by defining the appropriate legal standard. The emergence of two standards for

Page 12

363 F. Supp. 2d 708, *; 2005 U.S. Dist. LEXIS 5982, **;
Fed. Sec. L. Rep. (CCH) P93,213

determining whether a secondary actor can be a primary violator of *Section 10(b)* and *Rule 10b-5* is the result of the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 128 L. Ed. 2d 119, 114 S. Ct. 1439 (1994)*. There, the Supreme Court announced that a private plaintiff may not maintain an aiding and abetting suit under *Section 10(b)*, but such claims may be brought by the SEC. The Court also said that "any person or entity, including a lawyer, accountant or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under *Rule 10b-5* are met." *Id. at 191*. This has sparked the [**29] emergence of different tests for judging when persons and entities can be liable as primary violators.

Hayes-Bullock advocates that the Court follow the "bright line" test that a person must actually make the material misstatement or omission and "the misrepresentation must be attributed to the specific actor at the time of public dissemination" in order to be a primary violator. *Wright v. Ernst & Young LLP, 152 F.3d 169, 174-75 (2d Cir. 1998)*; see also *In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 583 (S.D.Tex. 2002)*. In Wright, the Second Circuit found that "a defendant must actually make a false or misleading statement in order to be held liable under *Section 10(b)*. Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under *Section 10(b)*." *152 F.3d at 175*. In finding that the misstatement must be attributed to the actor, the court said that a contrary holding "would circumvent the reliance requirements of the Act, because 'reliance only on representations made by others cannot itself be the basis of liability. [**30] '" Id. (quoting *Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1225 (10th Cir. 1996)*). Hayes-Bullock argues that in the context of pleading a primary violation, a plaintiff must attribute the misstatement or omission to each defendant who is alleged to have violated the statute, and that the SEC has not done so. *Kennilworth Partners L.P. v. Cendant Corp., 59 F. Supp. 2d 417, 428-29 (D.N.J. 1999)* (noting that a plaintiff cannot "merely lump[] together all defendants without specifically stating what role the . . . defendants had in the alleged fraud and how that role was carried out."). She further contends that a plaintiff must plead a specific link between the defendant and the alleged misstatement, omission or fraudulent act. *DiVittorio v. Equidyne Extractive Industries, Inc., 822 F.2d 1242, 1249 (2d Cir. 1987)*; *Kennilworth, 59 F. Supp. 2d at 430* ("Most importantly, the plaintiffs do not

sufficiently link the defendants, directly and specifically, with incidents or circumstances which, apart from their positions or roles within the various companies, connect them to wrongdoing and create a 'strong inference' [**31] of scienter."). Hayes-Bullock also relies on *Copland v. Grumet, 88 F. Supp. 2d 326, 330 (D.N.J. 1999)*, where the plaintiffs alleged that two officers of the defendant corporation were primarily liable for a *Section 10(b)* and *Rule 10b-5* violation because "they were directly involved in the process of creating and reviewing the financial statements . . . which contained false and misleading information . . . ." Those defendants argued, like Hayes-Bullock, that the plaintiffs were required [*721] to plead facts consistent with the "bright line" test. The plaintiffs countered that under another, earlier Second Circuit case, *SEC v. First Jersey Securities, 101 F.3d 1450 (1996)*, primary liability could be imposed not only on those people who had made fraudulent representations but also on those people who "had knowledge of the fraud and assisted in its perpetration." *Copland, 88 F. Supp. 2d at 330* (quoting *First Jersey Securities, 101 F.3d at 1471*). The Copland court applied the "bright line" test and found that the officer defendants' alleged participation in the making of fraudulent representations "cannot be considered [**32] the equivalent of *making* the false statements themselves." *Id. at 332* (emphasis in original). The Copland court also noted that while the defendant in Wright was an accounting firm that had privately but not publicly approved the defendant's financial statements, "there is nothing in Wright that indicates that its holding is limited to the facts of that case." *Copland, 88 F. Supp. 2d at 332, n.9*. The Copland court rejected the plaintiffs' arguments in favor of the Second Circuit's position on the issue because "it is consistent with the Supreme Court's holding in Central Bank and faithful to the statutory language of § 10(b)." *Id. at 333*. "In our view, holding individual defendants liable under § 10(b) for the orchestration of a company's fraudulent financial reports runs afoul of the court's holdings in Shapiro and Anixter and the notion that only speakers may be held liable for their material misstatements under this aspect of *Rule 10b-5* and § 10(b)." *Id. at 334*. See *Shapiro v. Cantor, 123 F.3d 717, 720-21 (2d Cir. 1997)* ("A claim under § 10(b) must allege a defendant has made [**33] a material misstatement or omission indicating an intent to deceive or defraud in connection with the purchase or sale of securities."); *Anixter, 77 F.3d at 1226 n. 10* ("Some post-Central Bank cases have held that third party defendants can be liable for statements made by others, where the defendant substantially participated in preparing the statements . . . . To the extent that these cases allow liability to attach without requiring a representation to be made by defendant, and reformulate

the substantial assistance element of aiding and abetting liability into primary liability, they do not comport with Central Bank."). The Copland court did not directly comment on the First Jersey case, instead distinguishing the case before it from other cases also relied on by the plaintiffs. To resolve the apparent conflict between First Jersey and Wright, the Second Circuit itself, however, has indicated that First Jersey is distinguishable because it was about the primary liability of "controlling persons," rather than secondary actors. n4 See *Wright, 152 F.3d at 175-76*. There is no allegation or argument by the SEC that Hayes-Bullock **[**34]** qualifies as a "control person."

> n4 "Control person" liability is a separate type of securities fraud liability that is not at issue here. It is "predicated upon the theory that certain corporate insiders have the power and obligation to supervise or 'control' the day-to-day 'policy and decision-making processes' of the persons beneath them who are alleged to have committed the primary wrong." *Copland, 88 F. Supp. 2d at 334* (quoting *Riggs v. Schappell, 939 F. Supp. 321, 327 (D.N.J.1996))*.

The SEC concedes that Hayes-Bullock did not directly make the misstatement in Lucent's financial statements, but argues that the primary liability claim against her is proper regardless. The SEC contends that actors who are "indirectly" responsible for the making of a material misstatement can be liable as primary violators of *Section 10(b)* and *Rule 10b-5* when scienter is proven. The SEC relies on the express language of *Section 10(b)* which **[*722]** makes it unlawful for people to engage in the prohibited **[**35]** acts, either "directly or indirectly," to support this argument. The SEC also emphasizes that this case should be distinguished from cases where the secondary actors are outsiders like accountants or lawyers because the secondary actor here is an insider. It also cites a number of cases to support its position and points to the detailed analysis undertaken by the court in *In re Enron Corp. Secs., Derivative & ERISA Litig.., 235 F. Supp. 2d 549, 583 (S.D.Tex. 2002)* regarding the issue of primary liability for secondary actors. The Enron court considered the "bright line" test, the "substantial participation" test and the test advocated by the SEC in its *amicus curiae* brief. The "substantial participation" test provides for primary liability where there is "'substantial participation or intricate involvement' of the secondary party in the preparation of fraudulent statements 'even though that participation might not lead to the actor's actual making of the statements.'" *Id. at 585*

(quoting *Howard v. Everex Systems, Inc., 228 F.3d 1057, 1061 n. 5 (9th Cir.2000))*. The Enron court ultimately rejected the "bright line" and "substantial **[**36]** participation" tests in favor of the one offered by the SEC: "when a person, acting alone or with others, creates a misrepresentation, . . . the person can be liable as a primary violator . . . if . . . he acts with the requisite scienter." *Id. at 588, 590-91*. Thus, under the Enron test, a person, although not publicly associated with a misstatement that she created, could still be liable as a primary violator.

The Third Circuit has yet to definitively decide whether a person or entity can be a primary violator of *Section 10(b)* on the basis of substantial participation in the creation of a company's misstatements. n5 And although this Court is not bound by the Copland decision, it is a source of guidance. It seems that the reason some courts have been reluctant to adopt the "substantial participation" test or some variation is because of their concern that it would revive what was aiding and abetting liability in private actions but under the umbrella of primary liability. This would run afoul of the Supreme Court's decision in Central Bank. The Second Circuit was also concerned that if the misstatement were not attributed to the defendant, it would circumvent the **[**37]** reliance requirement. Neither of these concerns is present in the context of SEC actions because the SEC is not barred from bringing aiding and abetting claims and the SEC does not have to prove reliance as an element of fraud. In light of these differences, the same test need not be applied in actions brought by the SEC and by private plaintiffs in the interest of consistency. That is not to say, however, that the same test should not be applied for other reasons. As example, the concern articulated by the Copland court that the test be consistent with the statutory language of *Section 10(b)* and *Rule 10b-5* is also present in an SEC action. Here, the Court looks to other reasons besides those specific to cases involving private plaintiffs for why it should choose one test over the other.

> n5 In 1998, the Third Circuit granted an en banc hearing and vacated the decision of the panel in *Klein v. Boyd, 1998 U.S. App. LEXIS 2004, Fed. Sec. L. Rep. P 90, 136 (3rd Cir.1998)* rehearing en banc granted, judgment vacated Mar. 9, 1998). The panel held that lawyers who significantly participate in their client's misrepresentations, to such a degree that they may fairly be deemed authors or co-authors of the misrepresentations, can be held liable as primary violators. *Id. at 90,325*. After the order granting

363 F. Supp. 2d 708, *; 2005 U.S. Dist. LEXIS 5982, **;
Fed. Sec. L. Rep. (CCH) P93,213

an en banc hearing was entered, the parties settled the litigation and the en banc hearing never happened. While this is not an indication of how the Third Circuit would have decided this issue had the hearing occurred, the Court finds this event to be noteworthy.

[**38]

[*723] The "bright line" test severely limits the scope of actors who can be held primarily liable under *Section 10(b)*, and is a strict interpretation of *Section 10(b)* and *Rule 10b-5*, which make it unlawful for actors "to make" a misstatement. The test has been adopted by both the Second and Eleventh Circuits. See *Wright, 152 F.3d at 175*; *Ziemba v. Cascade Intern'l, Inc., 256 F.3d 1194, 1205, 1207 (11th Cir. 2001)*. The Tenth Circuit has also adopted the "bright line" test but it does not require attribution. See *Anixter v. Home-Stake Production Co., 77 F.3d 1215 (10th Cir. 1996)*. Some district courts in this circuit have also used it. See *Copland, 88 F. Supp. 2d at 330*; *In re Rent-Way Secs. Litig., 209 F. Supp. 2d 493, 503 (W.D. Pa. 2002)*. The "substantial participation" test and its variation adopted by the Enron court take a broader view of what is proscribed by *Section 10(b)*. "Substantial participation" has been adopted only by the Ninth Circuit. See *Howard v. Everex Systems, Inc., 228 F.3d 1057, 1061 n.5 (9th Cir. 2000)*.

Because the SEC can maintain and has alleged here an aiding and [**39] abetting claim against Hayes-Bullock, the Court concludes that the test of primary liability should not be so similar to that of secondary liability that the line between primary and secondary liability is blurred. To decide which test to adopt, the Court considers the reach of aiding and abetting liability to actors and the reach to those actors whose conduct might be covered under either of the tests for primary liability. [HN21] To state a claim for aiding and abetting, a plaintiff must show: (1) that there has been an underlying securities violation; (2) that the alleged aider-abettor had knowledge of that act; and (3) that the aider-abettor knowingly and substantially participated in the wrongdoing. *Monsen v. Consolidated Dressed Beef Co., Inc., 579 F.2d 793, 799 (3d Cir. 1978)*. The Supreme Court in Central Bank stated that "aiding and abetting liability extends beyond persons who engage, even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." *Central Bank, 511 U.S. at 176*. This description of aiding and abetting [**40] liability insinuates that aiding and abetting liability may be broader than even the test suggests. If the Court were to adopt the substantial participation test for primary

liability, it is difficult to see what the difference would be between primary liability and aiding and abetting liability for actors who substantially participate in the making of fraudulent statements. On the other hand, as one scholar has recognized, limiting primary liability for company employees under the narrow "bright line" test seems to ignore the reality that actionable misstatements are typically issued in the company's name rather than the name of the officer or director behind such statements. Robert A. Prentice, Locating That "Indistinct" and "Virtually Nonexistent" Line Between Primary and Secondary Liability Under Section 10(b), *75 N.C.L. Rev. 691, 780 n.212 (March 1977)*. Yet that concern is not so great in the context of an SEC action because an aiding and abetting claim is viable.

The principles for interpreting *Section 10(b)* and *Rule 10b-5* also guide the Court in making its determination. Central Bank "emphasized adherence to the statutory language" of *Section 10(b)* in [**41] the context of private suits. *Id. at 173*. [HN22] In an action involving the SEC, the Supreme Court observed that while "the statute should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes, generalized references to the remedial purposes of the securities laws will not justify reading a provision [*724] more broadly than its language and the statutory scheme reasonably permit." *Aaron v. S.E.C., 446 U.S. 680, 695, 64 L. Ed. 2d 611, 100 S. Ct. 1945 (1980)* (internal quotations and citations omitted). As to the purpose of the securities laws, the Third Circuit has commented that "the securities laws were intended to provide investors with accurate information and to protect the investing public from the sale of worthless securities through misrepresentations." *U.S. S.E.C. v. Infinity Group Co., 212 F.3d 180, 191 (3d Cir. 2000)* (citing H.R. Rep. No. 85, 73d Cong., 1st Sess., at 1-5 (1933)).

In light of these principles and the SEC's ability to maintain a cause of action for aiding and abetting, [HN23] this Court concludes that the "bright line" test is the appropriate standard to apply for primary liability under *Section 10(b)*. While this test is more closely [**42] aligned with the language of *Section 10(b)* and *Rule 10b-5*, thereby limiting the scope of actors who can be primarily liable, the adoption of this test does not mean that those who fall outside this net will escape punishment as the SEC readily can bring an aiding and abetting action against such actors. Not only is this test consistent with the statutory language of *Section 10(b)*, but it more clearly delineates which types of behavior will give rise to primary liability versus secondary liability. The Court also finds unpersuasive the SEC's argument that special consideration should be given to

the fact that Hayes-Bullock is not an outside professional but a corporate insider. While it is true that most of the cases dealing with this issue have done so in the context of outsiders such as accountants and lawyers, the Central Bank Court did not limit secondary actors to such professionals. *511 U.S. at 191.*

Applying the "bright line" test to the allegations here, the SEC's primary liability claim against Hayes-Bullock must fail. There are few factual allegations in the Complaint against her, none of which if proved would satisfy the "bright line" test: She is alleged **[**43]** to have the responsibility for ensuring that the financial statements for transactions occurring within the AT&T customer business unit complied with GAAP; she was made aware of the oral side agreement with AWS; and she drafted or assisted in drafting two letters to the Chief accountant in September 2000 which indicated that there was no such oral side agreement with AWS. These allegations fail to meet the pleading requirements under the "bright line" test for the obvious reason that the misstatement of the $ 53 million as revenue is not alleged to have been made by Hayes-Bullock and was not directly attributed to her. See *In re Elan Corp. Sec. Litig., 2004 U.S. Dist. LEXIS 9837, 2004 WL 1305845, *26 (S.D.N.Y. May 18, 2004)* (finding allegations that auditor implicitly agreed that financial statements conformed with GAAP insufficient under the "bright line" test); *Lawson v. Advanced Equities, 2003 U.S. Dist. LEXIS 11899, 2003 WL 21468579, *2 (W.D.Ky. June 19, 2003)* (allegations that law firms were involved in preparing offering documents were insufficient under the "bright line" test because defendants did not make any of the misstatements themselves); *In re Rent-Way Secs. Litig., 209 F. Supp. 2d 493, 503 (W.D.Pa. 2002)* **[**44]** (auditors could not be held liable under "bright line" test for reviewing and approving a company's unaudited quarterly reports); *Winkler v. NRD Min., Ltd., 198 F.R.D. 355, 364 (E.D.N.Y. 2000)* (the "bright line" test was not satisfied when statements made in press release and portion of annual report were not attributed to the defendant director or the defendant public relations firm). Because the Court finds Hayes-Bullock's first argument meritorious, the Court need not reach her other arguments. The primary violation claim against Hayes-Bullock is dismissed.

**[*725]** *B. Count One - Aiding and Abetting Liability*

Hayes-Bullock also argues that the aiding and abetting claim embodied in Counts One must be dismissed because the SEC has failed to allege sufficiently any of the requisite elements. [HN24] The PSLRA explicitly authorizes the SEC to maintain actions for aiding and abetting:

[HN25] For purposes of any action brought by the Commission under *paragraph (1)* or *(3) of section 78u(d)* of this title, any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, **[**45]** shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

*15 U.S.C. § 78t(e).* As stated earlier, to state a claim for aiding and abetting, a plaintiff must show: (1) that there has been an underlying securities violation; (2) that the alleged aider-abettor had knowledge of that act; and (3) that the aider-abettor knowingly and substantially participated in the wrongdoing. *Monsen v. Consolidated Dressed Beef Co., Inc., 579 F.2d 793, 799 (3d Cir. 1978).*

With regard to the first element, the Court is satisfied that the SEC has sufficiently alleged a primary violation of *Section 10(b)* and *Rule 10b-5* by Lucent. The Complaint alleges that Lucent made a material misrepresentation when it recognized the $ 53 million as revenue because it overstated pre-tax income by thirteen percent in its 10-Q financial statements for the third quarter of fiscal year 2000. As to arguments that the revenue recognition was not a misstatement because the alleged fraud was based on a future event or because GAAP was not violated, the Court has already addressed these arguments and found them unpersuasive. As to Hayes-Bullock's **[**46]** argument that the misstatement is not material as a matter of law, the Court is not convinced that the misstatement as alleged would be "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality . . . ." *Weiner v. Quaker Oats Co., 129 F.3d 310, 317 (3d Cir. 1997).* Both parties acknowledge that scienter can only be established for an entity based on the scienter of its agents. And the Court has already determined that the SEC has sufficiently alleged scienter with respect to Carter, thus satisfying its pleading requirements of a primary violation by Lucent.

As to the second element, the parties disagree on whether recklessness will suffice to prove aiding and abetting liability. While Hayes-Bullock contends that only knowledge will suffice, she also argues that the SEC

has not pled any allegations that would support either an inference that she knew or was reckless in not knowing that the revenue recognition violated GAAP. The SEC charges that recklessness is sufficient and that this element is supported by the allegations that she was told of the oral side agreement, she was the person responsible for ensuring all transactions [**47] complied with GAAP, and she drafted letters to the Chief accountant that were misleading as to the existence of the side agreement. The Court need not decide whether recklessness is sufficient because the SEC's failure to adequately allege when Hayes-Bullock was told of the oral side agreement would cause this claim to fail under either a knowledge or reckless standard. The Court agrees with Hayes-Bullock that the timing of this disclosure is critical because if she were not made aware of the side agreement until after the revenue was recognized, this allegation would be irrelevant. If Hayes-Bullock did not know about the side agreement before [*726] the revenue was recognized, then the SEC could not establish the second element of the aiding and abetting claim. As the Court sees it, this amounts to a failure to plead fraud with particularity and the Court will grant the SEC leave to amend its aiding and abetting claim to include information about when Hayes-Bullock was told about the agreement and what information was disclosed to her.

While the claim cannot stand as is, the Court also considers whether the third element of the claim has been adequately pled. Hayes-Bullock argues that the [**48] SEC has failed to allege facts that give rise to a strong inference that she knowingly provided substantial assistance to the primary violator. While whether she "knowingly" or "recklessly" provided such assistance depends on when she was informed of the oral side agreement, if she was informed of the side agreement before the revenue was recognized as of June 30, 2000, the Court is satisfied that the facts as alleged sufficiently plead the element of knowingly providing substantial assistance. As the Court mentioned in its discussion of Carter's scienter, the September 2000 letters, and her part in drafting them, can be circumstantial evidence that she knew it was wrong to recognize the $ 53 million as revenue. As to her role in recognizing the revenue, the Court can conclude, and it is reasonable to so infer from the allegations, that Hayes-Bullock had an active role in the decision to recognize the $ 53 million as revenue by virtue of her position and the responsibilities she had as alleged in the Complaint. The Complaint alleges that she was "responsible for ensuring that Lucent's financial statements complied with GAAP for transactions originating within that unit." (Compl. at [**49] _ 64). The Court can infer from this allegation that part of

Hayes-Bullock's job entailed reviewing each transaction, including the transaction at issue here, to ensure that it was accounted for in accordance with GAAP, and that Hayes-Bullock was familiar with GAAP. The Court cannot think of a better example of substantially assisting another to commit fraud than exists here. If Hayes-Bullock knew of the side agreement, signed-off on the revenue recognition anyway in violation of GAAP, and then assisted in drafting letters to the Chief accountant that suggested that there was no side agreement, this would satisfy the "substantial assistance" element of an aiding and abetting claim. See *K & S Partnership v. Continental Bank, N.A.* 952 F.2d 971, 979 (8th Cir. 1991) (noting that [HN26] establishing substantial assistance "requires the plaintiff to show that the secondary party proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing the tort."). At a minimum, the allegations as to the third element are sufficient to withstand a motion to dismiss.

For the foregoing reasons, the Court dismisses the aiding and [**50] abetting claim against Hayes-Bullock without prejudice and grants plaintiff leave to amend the claim to include the missing information, if it can.

### C. Count Three

With respect to Count Three, Hayes-Bullock contends that the SEC has failed to allege with particularity any of the elements necessary to support an aiding and abetting claim. To recap, Count Three alleges that Hayes-bullock aided and abetted Lucent in violating *Section 13(a) of the Exchange Act* and *Rules 12b-20, 13a-11* and *13a-13* by causing Lucent to file materially false and misleading financial statements in a Form 10-Q for the third quarter of its fiscal year 2000. [HN27] The elements for these aiding and abetting claims are the same as those for a *Section 10(b)* [*727] claim: (1) a primary violation by Lucent, (2) the aider-abettor had knowledge of that act, and (3) the aider-abettor knowingly and substantially participated in the wrongdoing. *Monsen, 579 F.2d at 799.*

First, the parties disagree as to whether aiding and abetting claims under *Sections 13(a)* must be pled with particularity. The SEC references a district court case which held that because scienter is not required to prove a violation of *Section 13* [**51] , S.E.C. v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998)*, the heightened pleading requirement of *Rule 9(b)* does not apply to such claims. *S.E.C. v. System Software Associates, Inc., 145 F. Supp. 2d 954, 958 (N.D.Ill. 2001)*. Hayes-Bullock counters with a Third Circuit case which held that *Rule 9(b)* applies to a securities law claim that "sounds in fraud." *Shapiro v. UJB Financial Corp., 964 F.2d 272,*

363 F. Supp. 2d 708, *; 2005 U.S. Dist. LEXIS 5982, **;
Fed. Sec. L. Rep. (CCH) P93,213

287-88 (3d Cir. 1992) (holding that when *Section 11* and *12(2)* claims are grounded in fraud rather than negligence, *Rule 9(b)* applies). In Shapiro, the Court examined the factual allegations in support of the *Sections 11* and *12(2)* claims and found that they referred to the prospectus at issue as false and misleading and repeatedly aver that the defendants "intentionally," "knowingly," or "recklessly" misrepresented information. *Id. at 287*. The allegations supporting Count Three here also sound in fraud. Count Three alleges that Hayes-Bullock caused Lucent to file materially false and misleading financial statements and that she knowingly provided substantial assistance to Lucent in violating *Section 13(a), Rules 12b-20,* [**52] *13a-11* and *13a-13*. (Compl. at _ 97-99). The Complaint does not allege any facts to support this claim other than those that support the *Section 10(b)* claims against Hayes-Bullock. While a *Section 13* claim does not require a showing of scienter, that the SEC has pled that Hayes-Bullock knowingly assisted Lucent's violation of *Section 13* leads this Court to conclude that the particularity requirement of *Rule 9(b)* should apply to this claim as well.

Hayes-Bullock first argues that the Complaint fails to sufficiently allege a primary violation by Lucent for the same reasons she argued that this element was not alleged with respect to the *Section 10(b)* claim - the alleged fraud was based on a future event and the revenue recognition did not violate GAAP. The Court has already addressed these unpersuasive arguments. Her second argument is that the allegations are insufficient to establish that she knew it was improper to recognize the $ 53 million as revenue. For the same reasons the Court dismissed the SEC's aiding and abetting claim for failure [*728] to plead facts in support of the second element with particularity, the Court dismisses Count Three of the Complaint without prejudice and grants [**53] plaintiff leave to amend.

### D. Count Four

Count Four alleges that Hayes-Bullock aided and abetted Lucent in violating *Sections 13(b)(2)(A)* and *13(b)(2)(B) of the Exchange Act* by causing Lucent's books and records to be inaccurate and by assisting in Lucent's failure to maintain sufficient internal accounting controls. Count Four also alleges that Hayes-Bullock knowingly provided substantial assistance to Lucent in violating *Sections 13(b)(2)(A)* and *13(b)(2)(B)*. For the same reasons articulated in the previous section, the particularity requirement of *Rule 9(b)* applies to this claim.

Hayes-Bullock again argues that the SEC has failed to allege with particularity any of the elements necessary to support an aiding and abetting claim. For the same

reasons the Court dismissed the SEC's aiding and abetting claim for failure to plead facts in support of the second element with particularity, the Court dismisses Count Four of the Complaint without prejudice and grants plaintiff leave to amend.

### E. Count Five

Count Five alleges that Hayes-Bullock "knowingly circumvented Lucent's system of internal accounting controls and . . . knowingly falsified, or caused to be falsified, [**54] Lucent's books and records," in violation of *Section 13(b)(5)* and Rule 13b-2. While Hayes-Bullock makes a number of arguments that this claim should be dismissed, the Court dismisses this claim for the same reason it dismissed all the aiding and abetting claims - the SEC has failed to allege when Hayes-Bullock learned of the side agreement. Because the SEC has failed to plead with particularity the facts that may give rise to a strong inference that Hayes-Bullock knowingly falsified or knowingly caused such books and records to be falsified, this claim is dismissed without prejudice with leave to plaintiff to amend the Complaint.

In sum, Hayes-Bullock's motion to dismiss is granted and the SEC is granted leave to amend the Complaint's aiding and abetting liability portions of the First, Third, Fourth and Fifth Claims.

### CONCLUSION

Carter's motion to dismiss the Complaint is DENIED, Hayes-Bullock's motion to dismiss the primary liability claim in First Count of the Complaint is GRANTED with prejudice, and Hayes-Bullock's motion to dismiss the remaining claims and counts of the Complaint is GRANTED without prejudice and Plaintiff is GRANTED leave to amend the Complaint.

[**55] s/William H. Walls

United States District Judge

### ORDER

**Walls, District Judge**

It is on this 6th day of April 2005:

ORDERED that Defendant Jay Carter's motion to dismiss the Complaint is DENIED, Defendant Michelle Hayes-Bullock's motion to dismiss the primary liability claim in First Count of the Complaint is GRANTED with prejudice, and Defendant Michelle Hayes-Bullock's motion to dismiss the remaining claims and counts of the Complaint is GRANTED without prejudice and Plaintiff is GRANTED leave to amend the Complaint.

363 F. Supp. 2d 708, *; 2005 U.S. Dist. LEXIS 5982, **;
Fed. Sec. L. Rep. (CCH) P93,213

s/William H. Walls                          United States District Judge

EXHIBIT E TO ADVEST'S REPLY MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS ACTIONS

Westlaw.

Not Reported in F.Supp.2d

1998 WL 1780694 (D.N.D.)

**(Cite as: 1998 WL 1780694 (D.N.D.))**

Page 1

**C**
Only the Westlaw citation is currently available.

United States District Court, D. North Dakota,
Southeastern Division.
James McKAY, Plaintiff,
v.
JURAN & MOODY, INC., JM Capital Corp., JM
Dissolution, Inc., Juran & Moody
Financial Group, Inc., Municipal Capital Markets
Corp., George B. Frank, Edward
W. Brownell, III, Jay Hromatka and John Does
1--25 as the officers, directors,
employees, salespersons, affiliated companies,
agents and escrow agents or
trustees who acted as agents for any of the
defendants, Defendants.
**No. CIV A3-97-86.**

Sept. 1, 1998.

MEMORANDUM AND ORDER

KLEIN.

*1 Currently before the court are defendants' motions for summary judgment, (doc. # 36), for leave to file a reply brief, (doc. # 50), and to exclude the affidavit and testimony of Professor Joseph C. Long, (doc. # 51). As explained in this memorandum, the court grants defendants' motion to file a reply brief, partially grants their motion for summary judgment and denies their motion to exclude the affidavit of Professor Long.

I. BACKGROUND

Plaintiff James McKay, a retired businessman, regularly invested in tax free municipal bonds, both general obligation and revenue bonds. In 1986, McKay started purchasing his investments through George Frank, a broker with Juran & Moody, Inc.

McKay maintained a non-discretionary account with Juran & Moody, and as such, Frank did not buy or sell securities without McKay's consent. McKay regularly purchased securities through Frank until 1997, the year McKay commenced this lawsuit.

According to McKay, in approximately August 1992, Frank contacted him to inquire if McKay was interested in purchasing an issue of bonds involving Lincoln County, Nevada. Frank told McKay that the bonds were being issued to construct a new jail for Lincoln County and also told him the maturity date and expected rate of return for the bonds. This was apparently typical of how McKay purchased bonds from Frank; Frank would contact McKay, give him some basic information about the bonds and if McKay was interested, he would purchase the bonds. McKay testified that he never asked specific details about the bonds; rather he trusted and relied on Frank's expertise and judgment. McKay did purchase $65,000 of the Lincoln County securities in August 1992.

After the Lincoln County purchase, McKay purchased three other similar securities through Frank. In September 1992, McKay purchased $10,000 of securities involving the construction of an office building for the Texas Employment Commission. In December 1992, McKay purchased $50,000 of securities involving the construction of a jail in Presidio County, Texas. Lastly, in October 1993, McKay purchased $55,000 of securities involving the construction of a jail in Winkler County, Texas. The sales of these securities were allegedly accomplished in the same manner as the Lincoln County transaction; Frank contacted McKay about each of the securities, gave McKay some basic information and McKay purchased the securities based on Frank's judgment. Shortly after each purchase, McKay was provided with documentation regarding the specific security, including the offering memorandum for each

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

1998 WL 1780694 (D.N.D.)

**(Cite as: 1998 WL 1780694 (D.N.D.))**

security. McKay admits that he did not read any of the documentation when he received it.

The securities purchased by McKay were actually "Certificates of Participation" (COP) in lease agreements, not bonds. A COP is a vehicle for governmental entities to finance public projects without incurring any debt obligation, as is the case with a general bond issue. The COP's at issue in this case were created by a Juran & Moody affiliate entering into a lease agreement with a public entity, where the J & M affiliate would agree to finance the construction of a public facility for the public entity, who in turn agreed to lease the facility, with an option to buy, from the J & M affiliate. [FN1] The J & M affiliate would then transfer all right, title and interest in the facility, including the right to the lease payments, to an escrow agent, usually a bank. The escrow agent would then create the COP's and offer them to the public to generate the funds to complete the project. Juran & Moody, Inc. was the underwriter for the COP's at issue in this case and sold the COP's through its brokers. The investment risk inherent in COP's comes from the fact that the lease payments for the facility (although paid by a public entity) are the sole source of revenue for holders of the COP's, similar to a revenue bond. However, in the COP's in this case, the public entity had the right to terminate the lease at any time, which made them a higher risk investment than ordinary revenue bonds. [FN2] The public lessee in each COP issuance in this case has no obligation whatsoever to continue the lease and thus, the holders of the COP's have no guarantee of any return on their investment, and could lose some or all of their principal as well.

> FN1. For example, Juran & Moody Capital Corp. agreed to construct a jail for Lincoln County, Nevada, and the County agreed to lease the jail from J & M Capital. The specific details regarding each COP issuance are not disputed and are set out in defendants' statement of facts. (Doc. # 37.)

> FN2. Based on the court's experience, generally the lessee involved in a revenue bond does not have the option to terminate

the lease agreement at its discretion.

*2 In July 1994, the escrow agent for the Lincoln County COP's sent notices to all COP holders informing them that Lincoln County had exercised its right to terminate the lease. McKay claims he did not read the notice from the escrow agent, but did have a conversation with Frank at that time, where Frank indicated that Juran & Moody was trying to correct the situation. However, since July 1994, no payments have been made to any of the Lincoln County COP holders. Additionally, Presidio County, Texas has been delinquent in its lease payments, although it has not terminated its lease and continues to make payments. Thus, the Presidio County COP holders are not realizing their expected rate of return as well.

After experiencing the problems with the Lincoln and Presidio County COP's, McKay began looking into the details of his investments. McKay claims that it was not until the beginning of 1997 that he realized that the securities he had purchased through Frank were not bonds, but were actually COP's. McKay then commenced this action in July 1997. After twice amending his complaint, McKay asserts claims for federal and state securities law violations, fraud and deceit, North Dakota RICO violations and breach of fiduciary duty. McKay seeks rescission of the securities sales, treble damages under RICO and punitive damages.

II. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment ... against a party failing to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322. If the moving party has supported its motion for summary judgment, the nonmoving party has an affirmative burden placed on it to go beyond the pleadings and show a genuine triable issue of fact. *Commercial Union Ins. Co. v. Schmidt*, 967

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

1998 WL 1780694 (D.N.D.)

**(Cite as: 1998 WL 1780694 (D.N.D.))**

F.2d 270, 271 (8th Cir.1992). However, the court considering a motion for summary judgment must view the evidence in the light most favorable to the nonmoving party who enjoys "the benefit of all reasonable inferences to be drawn from the facts." *Vacca v. Viacom Broadcasting of Missouri, Inc. et al.,* 875 F.2d 1337, 1339 (8th Cir.1989) (citation omitted).

Summary judgment is improper if the court finds a genuine issue of material fact; however, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Commercial Union Insurance Co. v. Schmidt,* 967 F.2d 270, 271- 72 (8th Cir.1992) (citation omitted). The issue is whether "the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." *Landon v. Northwest Airlines, Inc.,* 72 F.3d 620, 624 (8th Cir.1995).

III. Discussion

*3 Initially, the court grants defendants' motion to file their reply brief. Defendants' reply has clarified the parties' arguments and remaining claims and the court has considered it in reaching its decision. Also, the court denies defendants' motion to exclude the affidavit of Professor Long. Although Prof. Long's affidavit does contain his legal conclusions and opinions, it also explains many of the specialized terms and structure of the securities involved in this case, in which the court is not well versed. Although the court denies defendants' motion to exclude the affidavit, the court notes that it has considered Prof. Long's legal opinion in the same manner as it has considered defendants' legal arguments and other scholarly authorities. [FN3] To the extent defendants' motion is a motion in limine to exclude Prof. Long's testimony at trial, the court will defer making that decision.

> FN3. The court would like to caution plaintiff's attorneys about merely "incorporating" what essentially is a law review article into their brief and advise them to present their own arguments in the future. The court was tempted to exclude

plaintiff's brief for exceeding the 40-page limit set in Local Rule 7.2(B), but in the interest of justice to plaintiff, decided against exclusion.

A. *Federal Securities Claims*

With respect to their motion for summary judgment, defendants first argue that plaintiff's claims under the Securities Act of 1933 are barred by the applicable statute of limitations set forth in that Act. Plaintiff did not address this issue in his brief opposing the motion. Thus, under Local Rule 7.1(C), plaintiff has admitted that defendants' arguments are well-taken. The court notes that Count V of plaintiff's complaint was added after defendants had filed their motion for summary judgment and asserts a claim under § 10(b) of the Securities Exchange Act of 1934. However, the statute of limitations applicable to this claim is the same as that applicable to plaintiff's claims under the 1933 Act. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 361 (1991). Since plaintiff's new claims are subject to defendants' motion under the court's order granting plaintiff's motion to amend, (doc. # 56), and in light of plaintiff's concession that defendants' argument is meritorious, the court summarily grants defendants' motion with respect to Counts I through VI of plaintiff's complaint.

B. *State Securities Claims*

Defendants also argue that plaintiff's state law securities claims are barred by the applicable statute of limitations. The statute of limitations applicable to plaintiff's claims under the North Dakota Securities Act is contained in N.D.C.C. § 10-04-17. Although plaintiff argues that the statute of limitations in effect at the time he filed his claim is the one that should be applied, the court agrees with defendants that such an argument is contrary to North Dakota law. The North Dakota Supreme Court has made it clear that all statutes, whether substantive or procedural, "are to be applied prospectively; i.e. they are to be applied only to causes of action that arise after the effective date of the statute, unless the legislature clearly expresses

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that they are to be applied retroactively." *Reiling v. Bhattacharyya,* 276 N.W.2d 237, 240-41 (N.D.1979). Since the alleged misrepresentations and/or omissions for which plaintiff seeks recovery under the North Dakota Securities Act occurred at the time of sale, his cause of action arose at that time. As it is undisputed that plaintiff purchased the COP's in question between August 1992 and December 1993, the court must apply the 1991 version of § 10-04-17 and not the current version that became effective August 1, 1995. *See Reiling,* 276 N.W.2d at 239.

*4 Contrary to both parties' assertions, the 1991 version of § 10-04-17 provides:

> 1. That no action shall be brought under this section for the recovery of the purchase price after *five years* from the date of such sale or contract for sale nor more than *one year* after the purchaser has received information as to matter or matters upon which the proposed recovery is based;....

(emphasis added). [FN4] Since it is undisputed that plaintiff purchased the first COP in August 1992 and that he filed this action in July 1997, plaintiff clearly is within § 10-04-17's five year limitation period. The question now becomes whether plaintiff "received information as to matter or matters upon which" his claims are based prior to July 1996. If so, plaintiff's state securities claims are barred by § 10-04-17's one year statute of limitation.

> FN4. Contrary to the parties' research, the limitations period in § 10-04-17 was changed from three to five years in 1991, not 1995. *See* 1991 N.D. Laws, ch. 97, § 6. The 1995 amendment removed the one year limitation period and changed when the five year period starts from "the date of the sale or contract" to "the date the aggrieved party knew or reasonably should have known about the facts that are the basis for the alleged violation." *See* 1995 N.D. Laws, ch. 100, § 6.

In his second amended complaint, plaintiff asserts essentially three different claims under the North Dakota Securities Act. In Count VII, plaintiff

claims that defendants failed to register the COP's involved in this case with the state securities commissioner, as required by N.D.C.C. § 10-04-04. Defendants argue that plaintiff received information relating to this claim when he received the offering memoranda shortly after the purchase of each COP, and at the latest in 1994 when plaintiff received notice that Lincoln County was terminating the lease involved in that COP. Defendants argue that this information put plaintiff on inquiry notice, and that if he had performed even a minimal investigation, he would have discovered that the COP's were not registered. Plaintiff asserts that nothing in the offering memoranda provides any information regarding registration of the COP's and that defendants have not pointed to any other specific information that plaintiff received that would form the basis of his registration claim.

Based on the language of the 1991 version of § 10-04-17(1), the court finds that defendants misconstrue the standard to be applied to plaintiff's claim. The applicable statutory language requires that plaintiff must have actually received information that indicated that the COP's were not registered but should have been registered before the one year limitations period would start to run. Receiving information that constitutes "storm warnings" may put plaintiff on inquiry notice, but that is insufficient to trigger the one year limitations period in the 1991 version of § 10-04-17(1). This interpretation is supported by the fact that in 1995 the North Dakota Legislature amended § 10-04-17(1) to specifically add language that triggers the limitations period when "the aggrieved party knew or *reasonably should have known* about the facts that are the basis for the alleged violation ...." (emphasis added). Thus, the standard argued by defendants did not take effect until 1995.

Applying the applicable standard to plaintiff's registration claim, although defendants argue that the offering memoranda and other documents received by plaintiff contain information regarding plaintiff's registration claim, plaintiff claims nothing in these documents provide any information related to the registration of the COP's. The fact that plaintiff had received information indicating the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

1998 WL 1780694 (D.N.D.)

**(Cite as: 1998 WL 1780694 (D.N.D.))**

securities he purchased were COP's rather than bonds, and that with some minimal investigation could have discovered that these COP's were not registered, is insufficient to trigger the one year limitations period, as explained above. Viewing the facts in favor of plaintiff, the court finds that a material issue of fact exists as to whether plaintiff did receive information regarding registration of the COP's prior to July 1996. Thus, summary judgment on statute of limitations grounds is inappropriate as to plaintiff's registration claim.

*5 Even if plaintiff's registration claim is not barred by the statute of limitations, defendants argue that they are nonetheless entitled to summary judgment on plaintiff's registration claim because the COP's in this case were exempt from registration under the North Dakota Securities Act. Defendants argue that N.D.C.C. § 10-04-05(1) exempts from registration any security issued or guaranteed by a political subdivision of a state, which includes county governments. Furthermore, defendants argue that the COP's in this case are substantially similar to equipment trust certificates, and thus under § 10-04-02(5)(b), which applies to equipment trust certificates and "like securities," the issuer of such securities is the entity who actually uses the property. Since the counties were the entities actually using the property involved in the COP's in this case, defendants argue that they are the "issuers" of the COP's, making the securities exempt from registration under § 10-04-05(1).

The court agrees with defendants' argument that the counties can be considered issuers; however, it does not go far enough. Although the court finds that the counties are issuers of the COP's, it further finds that the escrow agents involved in these COP's are also considered issuers. The court bases this finding on SEC Rule 131, 17 C.F.R. § 230.131, which provides that any security issued by a government entity involving a lease agreement between it and a private entity is deemed to be two separate securities, with both entities considered to be issuers. Rule 131 was promulgated to deal with problems created by certain revenue bonds, in particular industrial development bonds, which generally involve a government entity issuing bonds

to finance the construction of a facility that is then leased to a private entity, with the lease payments providing the sole revenue source to pay off the bondholders. Prior to Rule 131, revenue bonds were exempt from registration under federal securities law because they are technically issued by a government entity. However, revenue bonds are not backed in any way by the taxing authority of the particular government entity like general obligation bonds are. Thus, revenue bonds were exempt from registration, but did not have the commitment of repayment that general obligation bonds have. Since this obligation or guarantee of repayment provided by a government's taxing authority is the primary reason government bonds were allowed to be exempt from registration, Rule 131 was enacted to exclude revenue bonds from the exemption provisions since they did not have the same public commitment as general obligation bonds. *See* Thomas Lee Hazen, 1 *The Law of Securities Regulation,* § 4.3 (3d ed.1995); Louis Loss and Joel Seligman, *Fundamentals of Securities Regulation,* pp. 268-72 (3d ed.1995).

COP's are essentially the mirror image of a revenue bond, and as defendants admit, involve similar risks since the county undertakes no commitment or obligation to continue making lease payments. Furthermore, in light of the fact that the North Dakota Securities Act is based on and is to be interpreted and administered consistent with federal securities law, *see* N.D.C.C. § 10-03-03(2), the court finds the principles of Rule 131 apply in this case. The court therefore finds that the COP's in this case are considered two separate securities, with both the county governments and the escrow agents being issuers. [FN5] Since the escrow agents are deemed to be issuers of the COP's, the COP's do not qualify for the exemption from registration under N.D.C.C. § 10-04-05(1). [FN6] The court notes that this finding is consistent with the decision of the North Dakota Securities Commissioner, although based on somewhat different reasoning. (Doc. # 49.) Because defendants are not entitled to summary judgment on either of the grounds they have argued with respect to plaintiff's registration claim, the court denies defendants' motion as to Count VII of plaintiff's second amended complaint.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

1998 WL 1780694 (D.N.D.)

**(Cite as: 1998 WL 1780694 (D.N.D.))**

FN5. Rule 131(b) does allow certain securities to still be considered a single security issued by the governmental agency. It lists three situations when the Rule will not apply. Subsection 2 of Rule 131(b) comes close to describing the structure of the COP's in this case. However, that exception requires that the public facility be "owned and operated by or on behalf of" a governmental unit. Although the facilities involved in the COP's were clearly operated by the counties, they were not owned by the counties. Thus, that exception to Rule 131 does not apply in this case.

FN6. The court notes that plaintiff has conceded that the Presidio County COP is exempt from registration, and thus cannot base his registration claim on defendants' failure to register that particular COP.

*6 Plaintiff also brings a claim under the North Dakota Securities Act based on Frank's alleged misrepresentation that the COP's were bonds when he offered them to plaintiff. Plaintiff does not address defendants' argument that the offering memoranda, the last of which was received by plaintiff in December 1993, clearly state that the securities plaintiff purchased were COP's and not bonds, thus triggering § 10-04-17(1)'s one year limitations period. As stated above, under the Local Rules, plaintiff's failure to address this issue constitutes an admission that defendants' arguments are well-taken, and the court summarily grants defendants' motion as to Count VII of plaintiff's second amended complaint.

Plaintiff's final claims under the North Dakota Securities Act are based on defendants' alleged failure to disclose material information regarding the Lincoln County project. In Counts IX and X, plaintiff alleges that defendants failed to exercise due diligence in underwriting the COP's and failed to disclose that Lincoln County was building a jail that was larger than necessary for the County's own use and that the jail was planned to be used as a contract facility, i.e., Lincoln County would

contract with other cities, counties, etc. to house inmates from outside Lincoln County. Although these counts were added after defendants had moved for summary judgment, as stated in the court's previous order, they will nonetheless be subject to defendants' motion and considered in light of the arguments made by defendants in their summary judgment brief and in their brief opposing plaintiff's motion to amend, (doc. # 47).

As such, the court finds that applying the 1991 version of § 10-04-17(1) to Counts IX and X results in the same analysis and decision as reached above with respect to Count VII. Although plaintiff may have received information which put him on notice with minimal investigation of the facts underlying the COP's at issue, that is not sufficient to trigger § 10-04-17(1)'s one year limitations period. Furthermore, the court finds nothing in the evidence presented by defendants that proves that plaintiff actually received any information about the facts that form the basis for Counts IX and X prior to July 1996. Thus, as with Count VII, the court finds that a material question of fact exists as to whether plaintiff received information relating to his claims about the failure to disclose that the Lincoln County jail was intended to be used as a contract facility prior to July 1996, and defendants' motion is denied as to Counts IX and X of plaintiff's second amended complaint.

*C. Fraud*

Count XI of plaintiff's complaint alleges a claim for fraud and deceit under North Dakota law. Plaintiff asserts essentially two grounds for this claim: (1) Frank's misrepresenting the COP's as bonds; and (2) defendants' failing to disclose that the Lincoln County jail was being built larger than necessary for the County and was intended to be used as a contract facility. Defendants move for summary judgment on this count based on the fact that since plaintiff received offering memoranda and other documents that clearly showed he was purchasing COP's and not bonds at the time of the sales, he cannot show "reasonable reliance" on Frank's alleged misrepresentations, which is a necessary element of a fraud claim. Again, plaintiff did not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 7

1998 WL 1780694 (D.N.D.)

**(Cite as: 1998 WL 1780694 (D.N.D.))**

address defendants' argument, and thus concedes that defendants' argument is correct. Defendants are therefore entitled to summary judgment on this part of plaintiff's fraud claim.

*7 Furthermore, although the allegations regarding defendants' failure to disclose that the Lincoln County jail was intended to be used as a contract facility were added after defendants' motion was filed, these claims are subject to defendants' motion. With respect to these new claims, defendants again argue that plaintiff cannot establish the necessary element of reliance. The court agrees. To recover in a fraud claim, a plaintiff must prove that he/she relied on the misrepresentation and that such reliance was reasonable or justified. *Adams v. Little Missouri Mineral Assoc., Inc.,* 143 N .W.2d 659, 683 (N.D.1966); RESTATEMENT (SECOND) OF TORTS, § 537. When a fraud claim is based on failure to disclose a material fact, reliance may be inferred from the circumstances; that is, based on the circumstances, it may be inferred that the plaintiff would have taken a different action had the information been disclosed. *See Adams,* 143 N.W.2d at 683. In this case, based on plaintiff's own testimony, it is clear that he would not have relied on the Lincoln County information even if it had been disclosed. Plaintiff did not read the offering memorandum or other documents that were sent to him shortly after the sale, and he stated that in accordance with their usual manner of doing business, he completely relied on Frank's judgment regarding the risk involved in Lincoln County COP and did not ask Frank about any specific details. (Doc. # 37, 42 (McKay Depo.)) Based on plaintiff's testimony, it is clear that even if the fact that the Lincoln County jail was intended to be used as a contract facility had been disclosed, plaintiff would not have actually relied on it. Thus, plaintiff's new allegations of fraud also fail to establish a necessary element of his claim. As such, the court finds that defendants are entitled to judgment as a matter of law and Count XI of plaintiff's complaint is dismissed. [FN7]

FN7. The court notes that Count XII of plaintiff's second amended complaint does not state a separate claim, but merely

alleges joint and several liability of defendants as allowed under N.D.C.C. § 10-04-17. Thus, the court will not address defendants' motion as it relates to Count XII.

**D. RICO**

Count XIII of plaintiff's complaint asserts a claim under the North Dakota Racketeering Influenced and Corrupt Organizations Act (RICO). Plaintiff alleges that defendants' violations of the North Dakota Securities Act constitute a "pattern of racketeering" which injured plaintiff, and thus defendants are liable under North Dakota RICO. Defendants move for summary judgment on this claim based on the fact that plaintiff has not, and cannot, show the existence of an "enterprise," which is allegedly an essential element of a RICO claim. Plaintiff counters by arguing that while proof of an enterprise is required in a federal RICO claim, proof of an enterprise is not required in a North Dakota RICO claim. Although once again both parties' statutory research is inaccurate, their arguments are still applicable. The court agrees with plaintiff.

Section 12.1-06.1-05(1) of the N.D.C.C. provides that a "person who sustains injury to person, business, or property by racketeering ... may file an action in district court...." [FN8] Furthermore, § 12.1-06.1-01(2)(d) defines racketeering as:

FN8. § 12.1-06.1-05(1) did not require a "pattern of racketeering" until it was amended on August 1, 1997. As already discussed above, since plaintiff's claim arose long before this date, the current version of this statute is inapplicable to this case.

*8 any act ... committed for financial gain which is chargeable or indictable under the laws of the state in which the act occurred and, if the act occurred in a state other than this state, would be chargeable or indictable under the laws of this state had the act occurred in this state and punishable by imprisonment for more than one

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 8

1998 WL 1780694 (D.N.D.)

**(Cite as: 1998 WL 1780694 (D.N.D.))**

year, regardless of whether such act is charged or indicted involving:

\* \* \*

(15) Fraud.
(16) Sale of unregistered securities or real property securities....

\* \* \*

Although North Dakota RICO is based on federal RICO, there is a significant difference in the language creating civil liability under each. Federal RICO makes it unlawful to use money gained from a pattern of racketeering in any enterprise. 18 U.S.C. § 1962. If any person is injured by such activity, he/she may bring a civil RICO action under 18 U.S.C. § 1964(c). However, the word "enterprise" is not used anywhere in N.D.C.C. § 12.1-06.1-05(1) or in the definition of racketeering. The applicable version of North Dakota's RICO only requires that a person be injured by a single act of racketeering; there is no requirement that the money gained from racketeering be used in an enterprise to constitute a violation of North Dakota RICO. Therefore, based on the plain statutory language, plaintiff does not need to prove the existence of an enterprise in order to maintain a claim under North Dakota RICO. [FN9]

> FN9. Defendants argue that this court dismissed a North Dakota RICO claim for failing to show the existence of an enterprise in *Meyer v. First National Bank and Trust Co. of Dickinson,* 698 F.Supp. 798, 808 (D.N.D.1987), and thus, that case should be controlling. However, defendants misconstrue Judge Conmy's holding in that case. In that case, Judge Conmy specifically found "that plaintiff's complaint satisfactorily alleges an 'enterprise'...." *Id.* at 808. Thus, although Judge Conmy did dismiss both federal and state RICO claims against one of the defendants, it was not because of plaintiff's failure to prove the existence of an enterprise.

Defendants also argue that since plaintiff has only

lost money on the Lincoln County COP, he cannot prove injury from a "pattern of racketeering," which requires two or more acts. Defendant argues that § 12.1-06.1-05(1) should be interpreted to require plaintiff to show injury from each act of racketeering. Although the court disagrees with defendants' interpretation, the argument is moot given that the applicable version of § 12.1-06.1-05(1) does not require a pattern of racketeering; all that plaintiff is required to show is injury from a single act of racketeering, which defendants admit plaintiff has alleged.

Lastly, defendants also argue that plaintiff has not pled the predicate acts of fraud with particularity, as required by Rule 9(b) of the North Dakota Rules of Civil Procedure. The court disagrees. Plaintiff has specifically alleged that Frank misrepresented that the COP's were bonds and has also alleged that defendants Brownell and Hromatka were responsible for performing the underwriting the COP, and thus they were responsible for not registering the COP's and failing to disclose all material information. The purpose of requiring that fraud claims be pled with particularity is to provide defendants with sufficient notice of the basis of the claim. The court finds that plaintiff has sufficiently alleged facts to give defendants notice of the basis of plaintiff's fraud claim. Therefore, the court denies defendants' motion with respect to Count XIII.

E. *Breach of Fiduciary Duty*

*9 Plaintiff's last claim is that Frank breached a fiduciary duty owed to him. Defendants move for summary judgment on this claim, arguing that the relationship between plaintiff and Frank did not create any fiduciary relationship between the two, and thus, plaintiff fails to state a claim. The court agrees.

A fiduciary or confidential relationship has been described as "something approximating business agency, professional relationship, or family tie impelling or inducing the trusting party to relax the care and vigilance he [or she] would ordinarily exercise." *The Land Office Co. v. Clapp Thomssen Co.,* 442 N.W.2d 401, 406 (N.D.1989). Plaintiff

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

1998 WL 1780694 (D.N.D.)

**(Cite as: 1998 WL 1780694 (D.N.D.))**

alleges that he and Frank were friends, often playing golf together, and that he trusted Frank's judgment when purchasing securities. Based on these facts, plaintiff argues a fiduciary relationship existed between the two. However, "[a] person's implicit faith in another's honesty and integrity is insufficient to establish a fiduciary relationship; nor does a fiduciary or confidential relationship ordinarily arise when business persons deal with each other at arm's-length." *Id.* Thus, the fact that plaintiff trusted Frank and played golf with him is clearly insufficient to create any fiduciary duty between the two. Plaintiff was an experienced businessman and investor who had a good relationship with his broker, but that does not create a fiduciary relationship. Under plaintiff's argument, nearly every attorney, accountant, banker, broker, etc. would owe fiduciary duties to their good clients. The court finds that plaintiff has failed to state a claim for breach of fiduciary duty, and therefore grants defendants' motion with respect to Count XIV of plaintiff's complaint.

Defendants' last argument for summary judgment is that defendant Juran & Moody Financial Group, Inc. had no involvement in any of the transactions or agreements involved in this action, and therefore all claims against it should be dismissed. Although plaintiff does not directly address this issue, he has indirectly addressed it through his other arguments in that he has alleged that Juran & Moody Financial Group was Frank's employer and therefore may be vicariously and/or jointly liable on some of plaintiff's claims. Thus, based on the fact that Juran & Moody Financial Group may be liable for Frank's actions, the court denies defendants' motion to dismiss all claims against Juran & Moody Financial Group, Inc. [FN10]

> FN10. Defendants have not separately addressed the remaining counts of plaintiff's complaint in their motion for summary judgment, and thus the court also will not address these counts.

IT IS ORDERED:

1. Defendants' motion for leave to file a reply brief

is granted. (Doc. # 50.)

2. Defendants' motion to exclude the affidavit of Prof. Long is denied (Doc. # 51.)

3. Defendants' motion for summary judgment, (doc. # 36), is granted as to Counts I through VI, VIII, XI and XIV of plaintiff's Second Amended Complaint. Plaintiff's claims under those counts are dismissed with prejudice.

4. Defendants' motion for summary judgment is denied in all other respects.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.