UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DENISE MCKEOWN, ROBERT LUTTS,
                              Plaintiffs,

vs.

ADVEST, INC., KAREN SUGHRUE, et
al.,
                              Defendants

C.A. No. 05-10176-RGS
CONSOLIDATED WITH
C.A. No. 04-11667-RGS

## BRADFORD DEFENDANTS' AMENDED OPPOSITION TO T. ROWE PRICE PLAINTIFFS' MOTIONS TO VACATE DISMISSAL AND FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT[1]

The Bradford Defendants submit this amended opposition pursuant to this Court's order of December 15, 2006, regarding the page limit for the brief.

In moving to vacate the dismissal of this action, plaintiffs do not claim any error in the Court's ruling, but seek instead to "cure the deficiencies noted by the Court in the Memorandum" by moving for leave to file a Second Amended Complaint. Plaintiffs' Memorandum in Support of Motions to Vacate Dismissal and for Leave to File a Second Amended Complaint ("Mo. to Amend") at 10. The Court should deny plaintiffs' motions because they have delayed unduly in moving to amend. Plaintiffs have had all but one piece of the information on which they base their additional allegations since 2000 or earlier. Although plaintiffs have been aware of the one piece of purportedly "new" information since June 2005, they never made any reference to it or moved to amend their complaint until after the Court had decided the motions to dismiss, more than one year later. Where plaintiffs gambled on the sufficiency of their existing complaint but lost that gamble, they should not be permitted to shunt their risk onto the Court or the

---

[1] "Bradford Defendants" refers to all defendants in this action except Advest, Inc.

defendants.  The amendment should also be denied as futile because it fails to cure the fatal deficiencies in plaintiffs' claims.

## DISCUSSION

### I.     THE COURT MAY DENY THE MOTION TO AMEND FOR PLAINTIFFS' UNDUE DELAY.

As plaintiffs recognize, a motion to amend a complaint may be denied for undue delay.  Mo. to Amend at 7; *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Denial of leave to amend is reviewed for abuse of discretion, and the First Circuit will "defer to the district court if any adequate reason for the denial is apparent on the record." *Larocca v. Borden, Inc.,* 276 F.3d 22, 32 & n.9 (1st Cir. 2002).  "When considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has the burden of showing some valid reason for his neglect and delay." *Acosta-Mestre v. Hilton Int'l of Puerto Rico,* 156 F.3d 49, 52 (1st Cir. 1992).

Although nearly two years have passed since plaintiffs filed their Amended Complaint in January 2005, they have offered no reason at all (much less a valid one) for failing to move to amend before the Court ruled on the motions to dismiss.  The vast bulk of the allegations that plaintiffs propose to add have obviously been gleaned from the same documents on which plaintiffs have based every other complaint they have filed against these defendants since 2000, and plaintiffs do not suggest otherwise. *See, e.g.,* Amended Complaint ¶109; Second Amended Complaint ("SAC") at ¶144.[2]  Plaintiffs do not explain why they did not seek to amend earlier if they believed that the additional

---

[2]     Plaintiffs filed their first lawsuit in November 2000, in this Court. *See* docket for Case No. 00-12408 (NG).  In July 2004, plaintiffs commenced two more lawsuits, one in this Court and one in state court.  Their complaints in the two lawsuits were virtually identical, except that the federal suit asserted only federal claims, while the state suit asserted only state claims, and they were also virtually identical to their 2000 complaint in federal court.

allegations could cure the deficiencies identified in defendants' motions to dismiss. Although plaintiffs purport to base some of their new allegations on a piece of "new evidence" (a purported letter from Karen Sughrue), plaintiffs' attorneys acknowledge that they have been aware of this "evidence" since June 2005, and, in fact, have believed since then that it was "very important" to this case.  Mo. to Amend at 17-19; Affidavit of Thomas Hoffman in Support of T. Rowe Plaintiffs' Motion to Vacate Dismissal ("Hoffman Aff.") at ¶¶3, 4.[3]  Plaintiffs venture no explanation at all as to why they sat on this "evidence" for 16 months and did not disclose anything about it until after the Court had ruled on the motions to dismiss.

The First Circuit has affirmed denials of motions to amend where the movant failed to justify its delay in moving to amend, including where, as here, a PSLRA plaintiff failed to move to amend the complaint until after the district court had granted a motion to dismiss.  In *In re Stone & Webster, Inc., Securities Litigation*, 414 F.3d 187 (1st Cir. 2005), *aff'd in relevant part, Stone & Webster, Inc., Securities Litigation*, 217 F.R.D. 96 (D. Mass. 2003), plaintiffs moved to amend their securities fraud complaint after Judge Lindsay granted defendants' motion to dismiss.  217 F.R.D. at 97.  They invoked the "liberal policy in this Circuit of permitting amendment," and argued that their delay was justified by newly discovered facts that they claimed would remedy the defects in their pleading.  *Id.* at 97-98.  Judge Lindsay deemed these arguments unpersuasive in view of the fact that the purportedly "new" evidence had been available to the plaintiffs while the motion to dismiss was pending, and that plaintiffs could

---

[3]     Plaintiffs do not state <u>when</u> in June 2005 they discovered the letter, but the date of the document review was in fact June 3, 2005.  *See* Bradford Defendants' Response to Plaintiffs' Supplemental Opposition to Bradford Trustee Defendants' Motion to Dismiss and Proposal for Discovery on Trustee Compensation at 9 n.7 (Docket No. 53 in Case No. 05-10176).

therefore have sought to amend to add allegations based on that evidence before he ruled

on the motion.  *Id.* at 98-99.  Judge Lindsay made clear that he considered plaintiffs'

"wait-and-see" strategy to amending the complaint to be tantamount to bad faith, and thus

to constitute "undue delay."  As he stated, "[w]hen a plaintiff fails to seek leave to amend

after a motion to dismiss has been filed, and is aware of the [PSLRA's] stringent pleading

requirements, the logical inference is that the plaintiff intends to stand on his or her

complaint."  *Id.* at 99.  Accordingly, he held,

> [t]he fact that the plaintiffs chose to oppose the motions to dismiss on the grounds
> that their complaint was, in their view, sufficiently pleaded, rather than providing
> the additional information known to them during the necessarily lengthy period
> during which the motions to dismiss were being considered, smacks of
> gamesmanship bordering on bad faith.  A plaintiff shouldering the burden of
> pleading under the PSLRA cannot pull its punches in this way and then expect a
> district court to allow that plaintiff another chance once the matter has not only
> been fully briefed, but actually decided.

*Id.* at 98-99.

Judge Lindsay's ruling is amply supported by other case law, which has long held

that plaintiffs are not permitted to await the outcome of a pending motion to dismiss

before seeking leave to amend on the basis of "new evidence" they had before the motion

was decided, and that, under such circumstances, it is tantamount to bad faith to take a

"wait-and-see" approach to amending the complaint.  *See, e.g., Vine v. Beneficial*

*Finance Co.,* 374 F.2d 627, 637 (2d Cir. 1967) ("one basis for denial of leave to amend

was the bad faith of appellant in waiting to see how he would fare on the prior motion to

dismiss"); *Krantz v. Prudential Invs.*, 305 F.3d 140, 144 (3d Cir. 2002) (" a District Court

has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as

to the deficiencies in his complaint, but chose not to resolve them"); *In re Capstead*

*Mortgage Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 568 (N.D. Tex. 2003) (denying leave to

4

amend securities fraud complaint when plaintiffs brought motion to amend after motion

to dismiss was granted; "Plaintiffs made a <u>strategic decision to stand on their amended</u>

<u>complaint</u> as filed until after the court ruled on the pending motions to dismiss")

(emphasis added); *In re Digital Island Sec. Litig.,* No. Civ. A. 92-57-GMS (D. Del. Nov.

25, 2002) (2002 WL 31667863 at *1), *aff'd*, 357 F.3d 322 (3d Cir. 2004) (denying

motion to amend securities fraud claims that plaintiffs brought after complaint was

dismissed; where "plaintiffs were aware of the facts which they now seek to add at the

time the original pleading was filed … there is no excuse for failure to plead them before

the case was dismissed").

 Plaintiffs recognize that *Stone & Webster* is relevant to their request to amend, but

wholly fail in their attempts to distinguish it.  Mo. to Amend at 9-10.  Plaintiffs took

exactly the same "wait-and-see" approach here as the plaintiffs did in *Stone & Webster*.

Namely, even though plaintiffs here had all the information on which they base their

"new" allegations since June 2005 (and all the rest of it since 2000 or earlier), even

though defendants' motions to dismiss put plaintiffs on notice of the deficiencies in the

Amended Complaint, and even though plaintiffs had ample time to move to amend over

the nearly two years in which the motions were pending, they did not move to amend

their complaint until after the parties and the Court had devoted significant time and

resources to addressing the sufficiency of the allegations in the existing complaint.[4]  Like

the plaintiffs in *Stone & Webster*, plaintiffs also had multiple contacts with the Court

during the pendency of the motion to dismiss that indicated that they were standing on

---

[4] The motions to dismiss raised a panoply of issues relating to the sufficiency of the allegations in
plaintiffs' complaint, which contained 109 paragraphs and asserted eight different legal theories against 19
defendants.  By the time the defendants' motions to dismiss had been fully briefed and argued, the Court
had before it some <u>368</u> pages of briefs.  *See* Docket Nos. 29, 33, 38, 41, 43, and 45 in Case No. 04-11667,
and Docket Nos. 39, 40, 44, 45, 47, 52, and 53 in Case No. 05-10176.

the existing complaint, including (1) stipulating to a briefing schedule for the motions to dismiss, (2) filing a 91-page opposition to the motions which argued squarely that the allegations of the existing complaint were sufficient,[5] (3) assenting to the defendants' filing of reply briefs on the motions to dismiss, (4) arguing in support of the allegations in the Amended Complaint at the hearing, and (5) submitting a supplemental brief in opposition to the motions to dismiss after the hearing.  *See* Docket Nos. 25 and 41 in Case No. 04-11667, and Docket Nos. 43 and 47 in Case No. 05-10176.  If anything, plaintiffs' conduct here is even less justifiable than that of the plaintiffs in *Stone & Webster*, in that the motion to amend in *Stone & Webster* was premised entirely on evidence that the plaintiffs claimed to have discovered after they filed the action, whereas the vast bulk of the allegations that plaintiffs now seek to add by amendment are based on documents they had for years before they brought this action.  217 F.R.D. at 98.

There is no merit in plaintiffs' assertion that their conduct was less "disingenuous" than that of the plaintiffs in *Stone & Webster* because, they claim, plaintiffs' opposition to the motions to dismiss here "noted some shortcomings" in their complaint and gave notice of their desire to amend.  Mo. to Amend at 9-10.  Contrary to plaintiffs' argument, nothing in their Opposition (much less their other conduct) suggested that plaintiffs had conceded any deficiency in the Amended Complaint (with the possible exception of the fiduciary duty claim whose dismissal they did not oppose), or that they intended to substitute a new complaint for the Amended Complaint whose allegations were under attack.  It is this aspect of plaintiffs' conduct – their failure to

---

[5]        *See* Opp'n at 11 (asserting that "PLAINTIFFS HAVE SUCCESSFULLY ALLEGED VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AGAINST ALL DEFENDANTS"); *id.* at 40 ("the Court must decide the motion to dismiss on the allegations in the complaint") (emphasis added).

inform the Court that it need not go to the considerable trouble of ruling on the sufficiency of the existing complaint – that is indistinguishable from the conduct that offended Judge Lindsay in *Stone & Webster*, and that justifies denying them leave to amend.

Indeed, what plaintiffs now tout as notice of their desire to amend was a transparent attempt to have it both ways, at minimal expense to themselves. While the Opposition voiced a vague desire to amend "if," "to the extent," or "in the event" the Court should find the allegations of the existing complaint to be deficient, it failed to commit plaintiffs to any actual amendment, failed to provide any proposed amended complaint, and, for the most part, failed to point to particular facts that could be added, as opposed to generalities.[6] Courts have found such "bare requests" or "signals" in oppositions to motions to dismiss insufficient to indicate an intent to amend. *See*, *e.g.*, *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 699 (6th Cir. 2004) (denying leave to amend after grant of motion to dismiss, where plaintiffs had not moved to amend during the pendency of the motion to dismiss, but had merely included a "bare request" to amend in their opposition to the motion; "[p]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an

---

[6]     *See, e.g.*, Opp'n at 10 (claiming plaintiffs "can provide additional details regarding what the Defendants and Bradford did (and did not do) in connection with the issuance of the bonds and the Official Statement," without stating any particulars); *id.* at 15 n.9 (claiming plaintiffs can include allegations that the 20% reduction in deposits refers to "statistics from the prior year at the same time," without stating the time, and that "these figures come from Admissions status reports generated in the ordinary course of business by Bradford and circulated to, among others, the president and CFO," without stating what was in the reports, what they said, or when they were circulated); *id.* at 17 n.12 (stating that plaintiffs can allege "facts" relating to presentation by admissions personnel but not indicating when presentation was made); *id.* at 18 n.13 (stating that facts regarding "well-known admissions cycle" for colleges can be alleged, but not stating what those "facts" may be); *id.* at 28 n.19 (stating that plaintiffs can allege facts relating to a memorandum from Kiszka with respect to purported "changes," but not identifying the changes); *id.* at 29 n.20 (plaintiffs can add "[f]actual allegations" relating to undescribed "admissions and financial aid records" and as to what plaintiffs "believe" Jean Scott would testify to); *id.* at 46 n.33 (plaintiffs can add "facts" as to the "true status of the College's enrollment prospects as set forth in Admissions Reports," but not indicating which "facts," what the "true status" was, or when the Admissions Reports were circulated).

opportunity to cure those deficiencies"); *In re Digital Island*, *supra*, 2002 WL 31667863 at *2 (rejecting plaintiff's argument that the "nature" of their opposition brief on the motion to dismiss had "signaled" to the court that, "in the event it agreed with defendants' argument concerning pleading deficiencies, plaintiffs could adequately and easily replead to cure any such deficiencies"; "the plaintiffs have apparently forgotten that it is their duty, not the court's, to request leave to amend").

Plaintiffs also err in suggesting that their conduct is less egregious than the plaintiffs' conduct in *Stone & Webster* because the plaintiffs in that case waited to move to amend for two months after the Court ruled on motion to dismiss, while plaintiffs here moved to amend within 10 days of the ruling. Mo. to Amend at 10. Where plaintiffs here, unlike the plaintiffs in *Stone & Webster*, were <u>required</u> by Fed. R. Civ. P. 59(e) to bring their motions to vacate and amend within 10 days after the dismissal ruling (because that ruling disposed of the entire case), their decision to file their motion by that deadline can hardly be attributed to diligence; to the contrary, they waited until the last possible day to move to amend. 217 F.R.D. at 97-98; Mo. to Amend at 2 n.2.

Nor is there any merit in plaintiffs' suggestion that they could not have addressed all the deficiencies in the Amended Complaint until after the Court had ruled on the motions to dismiss. Mo. to Amend at 10 n.6. The motions to dismiss gave plaintiffs a veritable road map of the deficiencies in that complaint. Plaintiffs point to only one deficiency they claim they could not have foreseen, namely, "Defendants' argument that the extent of attrition was sufficiently disclosed in the Official Statement because the current enrollment figures could be compared against the size of the last several years['] freshman classes," which they claim was "never expressed in writing." Mo. to Amend at

10 n.6. Plaintiffs' assertion is unaccountable, as this argument was explicitly discussed, in writing and in detail, in the defendants' reply briefs, and was also addressed in post-hearing briefs that were filed nearly one year before the Court ruled.[7]

Plaintiffs are likewise wrong in suggesting (without explanation) that *Stone & Webster*, or the cases which Judge Lindsay cited in that opinion, are "now erroneous in light of the more recent" cases of *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048 (9th Cir. 2003), and *Belizan v. Herson*, 434 F.3d 579 (D.C. Cir. 2006). Mo. to Amend at 10. The decision in *Eminence* entered in January 2003, some <u>seven months before</u> Judge Lindsay denied the motion to amend in *Stone & Webster*.[8] To the extent plaintiffs appear to suggest that *Eminence* and *Belizan* require courts to allow PSLRA plaintiffs to amend after the grant of a motion to dismiss, regardless of undue delay, these cases wholly fail to support that position. Mo. to Amend at 10. Neither case considered an argument that plaintiffs had unduly delayed in moving to amend, and both recognized that traditional grounds for denying motions to amend apply in PSLRA cases. *See Eminence*, 316 F.3d at 1052-53; *Belizan*, 434 F.3d at 583. Plaintiffs also err in claiming, based on *Eminence* and *Belizan*, that the liberality of amendment under Fed. R. Civ. P. 15(a) is increased in PSLRA cases. Mo. to Amend at 4-5. The First Circuit has never indicated any inclination to adopt such a position, and other circuits have held, to the contrary, that the PSLRA <u>limits</u>, rather than expands, the extent of amendments in securities fraud cases, in order to preserve the PSLRA's function in preventing baseless securities fraud claims.

---

[7]     *See* Bradford Defendants' Reply at 3-5 (Docket No. 44 in Case No. 05-10176); Advest's Reply at 8; McKeown Supp. Opp'n at 3 (Docket No. 48 in Case No. 05-10176); Bradford Defendants' Response to Plaintiffs McKeown and Lutts' Written Supplementation in Lieu of Oral Argument Regarding Defendants' Motion to Dismiss ("Supplemental Response") at 5-8 (Docket No. 52 in Case No. 05-10176).

[8]     Moreover, two of the four cases on which Judge Lindsay relied in *Stone & Webster*, 217 F.R.D. at 98, were decided or affirmed <u>after</u> the January 2003 decision in *Eminence*; namely, *In re Capstead*, 258 F. Supp. 2d, was decided on March 31, 2003, and *In re Digital Island*, 2002 WL 31667863, was affirmed in 2004 (at 357 F.3d 322).

*See PR Diamonds, Inc., supra*, 364 F.3d at 699-700; *California Public Employees'*

*Retirement System v. Chubb Corp.*, 394 F.3d 126, 164 (3rd Cir. 2004).

Finally, the fact that a district judge in Pennsylvania considered the ruling in

*Stone & Webster* but granted leave to amend does not indicate that he considered Judge

Lindsay's ruling to be in error, as plaintiffs suggest.  Mo. to Amend at 10, *citing Winer*

*Family Trust v. Queen*, No. Civ. A. 03-4318 (E.D. Pa. 2005) (2005 WL 102936 at *3-4).

In *Winer*, the motion to amend was based "solely" on new evidence the plaintiffs had

discovered some <u>two months</u> before they moved to amend, a delay the court found

"sufficiently undue" to justify denying leave to amend.  *Id.* at *4.  Nothing in *Winer*

suggests any disapproval of Judge Lindsay's decision in *Stone & Webster* to deny leave

to amend where, just as here, the plaintiffs had been aware of their new allegations they

proposed to add during much of the pendency of the motion to dismiss, rather than just

two months.

In short, as in *Stone & Webster*, the plaintiffs here gambled that the Court might

not dismiss their existing complaint and that they might not have to draft a new

complaint.  Plaintiffs, however, bear the sole responsibility for their gamble, and cannot

claim they were unaware of its potential risk.  Allowing plaintiffs to amend now, after

they sat back and permitted the Court and defendants to devote considerable time and

resources to the sufficiency of the existing complaint, would reward plaintiffs for their

"wait-and-see" tactics, not to mention shunt their PSLRA pleading burden onto the

defendants and the Court.  Because plaintiffs have offered no reason for failing to amend

earlier, their motion to amend, as well as their motion to vacate the dismissal, should be

denied for undue delay.

10

## II.    THE MOTION TO AMEND IS FUTILE BECAUSE THE ALLEGATIONS OF THE PROPOSED SECOND AMENDED COMPLAINT CANNOT SAVE PLAINTIFFS' CLAIMS.

A motion to amend a complaint may be denied for futility, if the proposed amendment "serves no legitimate purpose or is without legal merit.'" *Resnick v. Copyright Clearance Center, Inc.,* 422 F. Supp. 2d 252, 256 (D. Mass. 2006), *quoting Savoy v. White*, 139 F.R.D. 265, 267 (D. Mass. 1991).  Plaintiffs' motion to amend may be denied as futile because their proposed Second Amended Complaint ("SAC") fails to cure the deficiencies in their claims.[9]

### A.    Plaintiffs' New Claim Regarding the Purported Nondisclosure of Budget Cuts Is Time-Barred and Fails to State an Actionable Claim.

#### 1.    The New Claim Based on Budget Cuts Is Time-Barred.

Plaintiffs do not challenge the Court's conclusion that the Official Statement ("OS") did not portray the College's financial condition as "stable and improving" (as plaintiffs still allege).  However, they seek to "expand" the "Financial Stability" section of their complaint by adding a claim that the OS failed to disclose a recommendation to cut the College's budget by $300,000 and the consequences that plaintiffs claim such budget cuts would "likely" have on the College's ability to reach certain purported goals. Mo. to Amend at 16-17.  Although plaintiffs do not claim they were unaware of the recommended budget cuts when they brought this action (or, indeed, when they brought

---

[9]    To the extent plaintiffs' Opposition purported to suggest any identifiable categories of facts that plaintiffs claimed they could allege "if" the Court found the Amended Complaint deficient, the Bradford Defendants established in their reply brief that such matters, even if pled, could not support plaintiffs' claims.  *See* Reply at 7-8 (addressing Opp'n at 17 n.12), at 11-12 (addressing Opp'n at 15 n.9), at 16 (addressing Opp'n at 28 n.19).

their first action in 2000), they included no such claim in any of their previous complaints.[10]

This new claim is time-barred regardless of whether it is subject to (1) the two-year statute of limitations in the Sarbanes-Oxley Act, which was effective July 30, 2002, or (2) the one-year statute of limitation that applied before July 30, 2002.  *See Stone & Webster, supra*, 2006 WL 1738348 at *3; 28 U.S.C. §1658(b).  Plaintiffs allege that they learned on November 22, 1999, "that a reasonable possibility existed that their bonds would not be paid in accordance with the bond indenture."  SAC ¶112.  Assuming that the running of the statute of limitation was tolled by the Tolling Agreement (which was in effect as of November 21, 2000, until it was terminated on December 21, 2004), a total of more than two years has run on the claim (at least one year had run before the Tolling Agreement became effective, and nearly two more years passed from the time the Tolling Agreement was terminated in December 2004 until plaintiffs filed their proposed Second Amended Complaint in October 2006).[11]  *See* SAC ¶114; *see also* Exhibits A and B hereto (Tolling Agreement and termination letter, respectively).

---

[10]    The motion to amend indicates that plaintiffs have long been aware of the budget cuts.  *See* Mo. to Amend at 18 (asserting that their only "new" evidence, Ms. Sughrue's letter, "caused the Plaintiff's attorneys to review all <u>the records they possessed regarding</u> the May 1998 Trustees' meeting and <u>the budget cuts</u> enacted as a result of that meeting in a new light") (emphasis added).

[11]    Indeed, all of plaintiffs' federal securities claims would face serious statute of limitations obstacles if the case were to go forward.  Although the parties entered into a Tolling Agreement in November 2000, that agreement did not purport to give plaintiffs greater rights than they had, but froze the limitations period where it was.  *See* Exhibit A hereto at §2.  Because a one-year statute of limitations period was in effect when plaintiffs' claims arose, there are significant factual questions as to whether plaintiffs' claims were brought within one year after plaintiffs discovered them, and thus as to whether the claims were barred before the Tolling Agreement was entered.  Moreover, given that courts have held that a statute of repose <u>cannot</u> be tolled, as well as the fact that this action was brought in July 2004, more than five years after the issuance of the OS in May 1998, all the federal claims may be barred by the statute of repose,.  *See, e.g.*, *Stone & Webster, Inc. Securities Litigation*, No. 00-10874-RWZ (D. Mass. Jun. 23, 2006) (2006 WL 1738348 at *3 (statute of repose for §10(b) claims is "not subject to tolling"); *but see ESI Montgomery County, Inc. v. Montenay Int'l Corp.,* 899 F. Supp. 1061, 1063 (S.D.N.Y. 1995) (holding that tolling agreement tolled statute of repose for §10(b) claim).

This claim cannot be saved by the "relation-back" of Rule 15(c)(2). In *Stone & Webster, Inc. Securities Litigation*, *supra,* Judge Zobel held that new allegations that the defendants had failed to disclose their participation in a kickback scheme relating to a particular deal did not relate back to claims that the defendants had overstated revenues and failed to report an expected loss in connection with the same deal. 2006 WL 1738348 at *3. As Judge Zobel held, "[c]ourts have … rejected attempts by plaintiffs to raise new factual allegations in an amended complaint via Rule 15(c)(2), simply because such allegations concern a 'general fact situation' discussed in the original complaint." *Id.*, *citing In re Alcatel Sec. Litig.,* 382 F. Supp. 2d 513, 528 (S.D.N.Y. 2005) (new claims based on defendant's alleged misrepresentations in an IPO with respect to defendant's acquisition campaign did not relate back to claims that the IPO had failed to disclose "material changes" in the business).[12] Similarly here, although plaintiffs' new claim that the OS failed to disclose budget cuts arises out of the same "general fact situation" as their previous claims, the Amended Complaint made no mention of any such matter. The new claim therefore does not relate back to the filing of the complaint and accordingly is time-barred. *Id.* at *4.

### 2. The SAC Fails to State an Actionable Claim for Failure to Disclose the Alleged Budget Cuts.

The SAC also fails to state an actionable claim in alleging that the OS should have disclosed that defendant Donald Kiszka, the College's former Treasurer and Vice

---

[12]   In *Quaak v. Dexia, S.A.,* 445 F. Supp. 2d 130, 137 (D. Mass. 2006), Judge Saris, in what she deemed a "particularly close case," held that newly discovered evidence that the defendant had engaged in insider trading and issued fraudulent analyst reports related back to original claims that involved misconduct with loan transactions. Judge Saris relied in large part on cases "establishing the proposition that when the original complaint alleges a wide-ranging fraudulent scheme, amended complaints relate back when they assert newly discovered aspects of that scheme." *Id.* at 137-138. She also held that plaintiffs had amended the complaint with "new" information as they learned it in discovery. *Id.* at 137. Here, in contrast, the SAC does not allege a scheme to defraud, nor do plaintiffs suggest that the information about budget cuts was newly discovered (and they plainly have had it for years).

President for Administration and Finance, purportedly informed the trustees at a meeting in May 8, 1998 (one week <u>after</u> the date of the OS), that "the projected budget would have to [be] cut by $300,000."  SAC ¶¶32, 49.  Plaintiffs baldly state that the defendants knew that the budget cuts "would harm the College's academic programs, the marketing and admissions programs designed to increase enrollment and critical student programs needed to retain students," SAC ¶49, but they offer no facts to suggest that a $300,000 cut in the budget was substantial, and their allegations indicate the contrary.  *See* SAC (no allegation as to amount of projected budget for 1998); OS, Appx. A at A-13 (attached to SAC as Exhibit A) (operating budget for 1997 was $<u>11.7 million</u>).  Plaintiffs also fail to allege facts suggesting that any of the defendants knew in May 1998 that the implementation of a $300,000 budget cut would have a substantial effect on the College. To the contrary, they admit that "at the time of the bond issuance the Trustees and Officer Defendants <u>did not know</u> precisely which programs or positions would be cut," and that the cuts that were ultimately made to particular budget items were recommended in "June 1998," <u>after</u> the bonds were issued.  SAC ¶¶50, 51.

There is no merit in plaintiffs' attempt to fill this critical hole by alleging that defendant Kiszka had identified certain "additions" that were "critical for the expansion of programs, maintain government regulations, support additional fund raising and maintain human resource development," and by surmising, "upon information and belief," that defendants "knew" these programs would be cut because it is "easier" to cut programs intended for expansion rather than existing positions.  SAC ¶50.  Speculation cannot substitute for allegations of fact.  Moreover, even if plaintiffs could allege facts suggesting that any of the defendants knew that some or all the funds for any or all such

"expansion" projects would be cut, plaintiffs do not allege that any of those programs were necessary for the College's survival or its financial well-being, they do not allege the cost of any such "expansion" programs, and they do not state the degree to which such programs might be affected by a $300,000 budget cut. *Id.*

Nor can plaintiffs base a claim on the allegation that the OS did not state that the College was unlikely to meet its "current" budget, by which plaintiffs evidently refer to the same alleged recommendation to cut the preliminary operating budget for the <u>next</u> academic year. SAC ¶¶49-52. Plaintiffs claim this omission was misleading because, they allege, "[t]he Official Statement disclosed that the College believed it could meet financial equilibrium if it met its current budget." SAC ¶52. Plaintiffs do not cite the page of the OS that purportedly makes this statement, which is not surprising, as the statement is simply not there. Indeed, the OS does not purport to pin financial equilibrium on reaching any single goal, as plaintiffs appear to claim, but instead makes clear that financial equilibrium depends on a number of different factors. OS, Appx. A at A-12. Moreover, although the OS defines financial equilibrium, in part, as "[o]perating the College within <u>a</u> balanced budget," it does not purport to state the amount of any "current" budget, and makes clear that there was no "current" budget as of the date of the OS. *Id.* (emphasis added). Namely, the OS discloses that the College's budget is developed in a collaborative, months-long process that is not finalized until October of the school year to which it applies. *Id.* at A-17. Thus, any reasonable person reading the OS would know that there would be no "current" budget for the 1998-99 academic year until October 1998, and that any preliminary budget that was under consideration would be subject to change. Nor would it surprise any reasonable reader of the OS that the

College might be in the process of cutting its operating budget. Not only does the OS state that "the College has incurred operating budget deficits in each year since 1989" and is trying to operate "within a balanced budget," it also discloses that "[t]he College has attempted to minimize the size of the budget deficits by instituting cost-containment measures." *Id.* (emphasis added). *See* A-12, A-17. Where the OS made clear that the College was trying to balance its budget and that it might cut costs to do so, the OS cannot reasonably be deemed to be misleading because it did not state that a recommendation had been made during the development of the next year's budget to cut a proposed budget by $300,000.

### B.   The Proposed SAC Does Not Plead an Actionable Misrepresentation or Omission About Attrition.

The allegations that plaintiffs propose to add to the SAC cannot save their claim that the OS failed to disclose the College's attrition rate. They are demonstrably wrong in asserting that the Court's calculation of attrition as "approximately 40%" from those enrollment figures shows that the OS failed to disclose the College's alleged 60% attrition rate. Mo. to Amend at 11. This assertion is illogical because, mathematically speaking, plaintiffs are comparing apples with oranges (or, more accurately, three-quarters of an apple with a whole apple). The SAC makes clear that the alleged 60% "attrition rate" means the percentage of entering students who leave Bradford before they graduate – e.g., over a four-year period. *See* SAC ¶53 (alleging that 60% attrition rate "mean[t] that substantially fewer than half of all entering freshmen remained enrolled at the College through their senior year") (emphasis added). In contrast, as the Court's opinion shows, the 40% "attrition rate" that the Court derived from the enrollment figures in the OS refers not to the percentage of students who remained at Bradford "through

their senior year," but, instead, the percentage who were still at Bradford at the beginning of their senior year. *See* slip op. at 8 ("in the fall of 1996, only 373 of the students who had enrolled during the years 1993 through 1995 [e.g., three years] remained enrolled. In other words, 260 of 633 students had left the College [by fall 1996], an attrition rate of nearly 40 percent"). Such a calculation establishes only the number of students who have left the College over a three-year period (from fall 1993 to fall 1996). *See* Supplemental Response at 6. Because the SAC alleges that the alleged 60% "attrition rate" means attrition over four years, the Court's three-year attrition rate of "approximately 40%" must be increased by one-third to extrapolate the attrition rate over four years. Plaintiffs also ignore the fact that (as the Bradford Defendants also previously pointed out) four-year attrition rates of approximately 60% may be determined by using a different approach to the same enrollment figures in the OS, and, specifically, by considering the amount by which the students in each year's incoming class exceeded the expected replacement proportion of 25% (i.e., graduating seniors). *Id.* at 8 n.6.

Plaintiffs nonsensically claim that the OS does not accurately disclose attrition because the enrollment figures "aggregated freshman and transfer admissions." SAC ¶60. This cannot be deemed material because plaintiffs do not state how many of the "new" enrollees represented transfer students. To the extent plaintiffs claim that these "aggregated" numbers show an attrition rate of 31%, they are wrong on the math as well as logic. *See* SAC ¶60 ("if an investor compared the disclosed number of 'new admissions' for the fall semesters 1994 through 1997, 862, with the total Fall 1997 enrollment, 602, it would appear that the College had lost 274 students, an attrition rate of 31%"). The SAC does not indicate how a 31% attrition rate was or could be derived

from these numbers. Plaintiffs appear to have calculated the number of new students who had enrolled in 1994, 1995, and 1996, but who had left before fall 1997 (876 – 602 = 274 students), <u>not</u> as a percentage of the total new student enrollment for those three years (which was 642 (223 (in 1994) + 224 (in 1995) + 195 (in 1996) = 642)), but as a percentage of the total new students who had enrolled in each of the <u>four</u> years from 1994, 1995, 1996, and 1997 (876), which would yield a figure of approximately 31% (274 ÷ 876 = .3127).[13] However, this approach is fundamentally flawed, as the students who were newly enrolled in fall 1997 cannot be included in calculating the attrition rate among the students who enrolled in 1994, 1995, and 1996.[14] Plaintiffs then compounded the error by failing to recognize that, as discussed above, the figure they reached would at best indicate attrition over <u>three</u> years, and must therefore be increased by another one-third to extrapolate a four-year attrition rate. Plaintiffs' illogical and mathematically mistaken calculation is no substitute for a factual allegation and cannot save their baseless claim.

And finally, even if plaintiffs could establish that the OS failed to disclose attrition, they have failed to allege facts suggesting a strong inference of scienter with respect to attrition. The alleged fact that defendant Kiszka distributed a student retention report in January 1998 to "persons involved in the bond offering, including Advest," which showed an attrition rate of 64% for the class of 1997 (which is consistent with the

---

[13]     Plaintiffs appear to have made an error in arithmetic in suggesting that the total number of "new admissions" shown in the OS for the fall semesters 1994 through 1997 is 862. SAC ¶60. The second table on page A-8 of the OS shows that the correct figure is actually 876 (new enrollment of 233 in 1994, 224, in 1995, 195 in 1996, and 234 in 1997 = 876).

[14]     Had plaintiffs instead calculated the 274 students who enrolled in the three years from 1994, 1995, and 1996, but had left by 1997, as a percentage of the total number of new students who had enrolled in each of those <u>three</u> years (223 (1994) + 224 (1995) + 195 (1996) = <u>642</u>), the <u>three-year</u> attrition figure would be 43% (274 ÷ 642 = .4267). Adding another one-third (14%) would indicate a four-year attrition rate of approximately 57% -- again, entirely consistent with the alleged actual four-year attrition rate.

enrollment figures in the OS) does not support plaintiffs' conclusory assertion that any defendant "deliberately" failed or "refused" to include some of its information in the OS. SAC ¶¶58, 62.

**C.    Plaintiffs' Additional Allegations Fail to State a Claim that the OS Misrepresented the College's Intention to Make an Equity Contribution to the Construction Project.**

In trying to shore up their claim that the OS misrepresented the College's intention to make an equity contribution to the dormitory construction project, plaintiffs Plaintiffs seek to amend the complaint to add allegations suggesting that the "informal" committee that is alleged to have made this recommendation actually had more influence on the board and the management than their previous allegations had suggested. Mo. to Amend at 16. SAC ¶¶94, 95. Their conclusory new allegations, however, do not indicate that the informal committee actually issued any directive to the "College's officers" not to make an equity contribution until the end of the project, as plaintiffs suggest, nor do they indicate that, when the full board was informed of "the commitment of College funds," it was told of the "either/or" alternative the informal committee had contemplated in January 1998. *Id.* Thus, the new allegations do not correct the only deficiency plaintiffs have chosen to address in this claim. Plaintiffs also ignore the fact that, even if the College had intended to make the equity contribution only at the end of the project, the SAC provides no basis for any reasonable inference that the OS made a misrepresentation, much less an intentional one, in stating that the College would make such a contribution, where nothing in the OS purported to suggest <u>when</u> the contribution would be made. Finally, plaintiffs have added nothing to the SAC to suggest that a

reasonable investor would have deemed the representation relating to the equity contribution to be material.

### D.    The SAC Fails to State a Claim that the OS Misrepresented the College's Future Enrollment.

The allegations that plaintiffs propose to add to the SAC still fail to support the claim that the OS made an actionable misrepresentation in stating that the College "believed" it could meet its goal of enrolling 225 new students in fall 1998.  Plaintiffs' newly proposed allegations are frankly contradictory and only highlight the lack of merit in the claim.  On the one hand, plaintiffs now acknowledge the difficulty of predicting future enrollment.  *See* SAC ¶¶80, 81 (noting Kiszka's alleged comments that it was "impossible" to predict fall enrollment); *see also* SAC ¶82 ("Bradford may not have known in May 1998 exactly how many students it would have in the fall of 1998").  On the other hand, despite this allegation, plaintiffs still try to bolster their claim that defendants actually knew in May 1998 that the College would not be able to enroll 225 new students in fall 1998.  Even if such claims could survive in light of the OS's express disclaimers as to future enrollment, the proposed additional allegations still fail to show that defendants had such knowledge, much less that they acted with scienter in making the prediction of new student enrollment.

Plaintiffs do not deny that defendants were informed that the College had received 18% more applications for the 1998-99 academic year than for the current year.  There is no merit in their allegation that defendants should have known in May 1998 that the 18% increase in applications the College had received for the 1998 academic year was due to the fact that the College's admissions department had purportedly counted, as actual

20

applications, mere inquiries that the College had received by internet.  SAC ¶87.[15]
Plaintiffs do not allege that the Board was informed of this purported counting policy
before spring 1999, and acknowledge that "it is unknown if the Defendants had specific
knowledge of the changes in Admissions Office policies regarding the counting of
admissions [sic]."  SAC ¶87 n.4.  Although plaintiffs now claim that the mere increase in
numbers of applications should have led the defendants to investigate the practices of the
admissions office, they offer no facts suggesting that the defendants actually knew
anything that should have raised suspicion as to the legitimacy of the application
numbers.  SAC ¶87 n.4.  Moreover, the OS belies any inference that the defendants had
any reason to question the 18% increase in applications, as it shows not only that the
College had "embarked upon an intensive process of strengthening Bradford's student
recruitment efforts," which might reasonably be believed to have produced more
applications, but also that applications had increased by as much as 22% in another recent
year.  *See* OS, Appx. A at A-8, A-17 (College received 926 applications for 1993 and
1127 applications for 1994, which was a 22% increase).

  Similarly, although plaintiffs now try to beef up their allegations that the
defendants knew, as of the date of the OS, that the College's "acceptance rate" was lower
than the rate for the previous year, those allegations still fail to suggest that the
defendants knew that the OS's projection of 225 new students for fall 1998 (nine fewer
than for 1997) was not correct, much less materially so.  SAC ¶88.  As the Court noted,
the reduction in the "acceptance rate" is "statistically meaningless" given the
acknowledged fact that the College had received more applications, and plaintiffs offer
no additional facts that suggest otherwise.  Slip op. at 9-10.  Moreover, and particularly

---

[15]  Plaintiffs no longer claim that web applicants are less likely to enroll than mail applicants.

given plaintiffs' acknowledgement that the College did not know its actual enrollment until the fall semester actually began, the SAC fails to allege any facts suggesting that the College's acceptance rate <u>as of April 1998</u> is a meaningful predictor of enrollment in fall 1998. SAC ¶82.[16] And although plaintiffs claim that, if the OS had disclosed the "actual acceptances or the acceptance rate," an investor could have applied the historic matriculation rate to "calculate that the College would likely fail to meet its new student enrollment goal by 15%," they still provide no explanation of how such a number could actually be calculated from any such figures, nor do they provide any way to assess the validity of their conclusion. *Id.* ¶89. Plaintiffs likewise fail in their attempt to shore up their claim that defendants should have known from the deposits the College had received by May 6, 1998, five days after the date of the OS, that "the prediction of new students was likely off by 16 students." SAC ¶90. Plaintiffs still do not suggest the degree to which deposits received by May 6 correlate with actual fall enrollment, nor do they provide any explanation for the assertion that the number could actually have been quantified from the deposits received, much less any way to assess the validity of that assertion. *Id.*

There is also no merit in plaintiffs' attempt to support the claim that the OS misrepresented future enrollment by alleging that defendant Kizska informed the Board on May 8, 1998, "that based on the information he had learned from the College Cabinet and additional follow up information, Bradford should expect to have 30 fewer students

---

[16] Plaintiffs compare the "acceptance rate" as of April 1998 with the "historic acceptance rates," but do not claim that the "historic acceptance rates" were determined in April of any academic year, rather than <u>after</u> actual enrollment had been determined in the fall. SAC ¶88. The SAC makes clear instead that the figure plaintiffs refer to as the "historic acceptance rate" is the "historic <u>matriculation</u> rate for accepted students," in other words, how many of the accepted students actually <u>enroll</u>. SAC ¶¶88, 89 (emphasis added).

than anticipated in the earlier budgets." SAC ¶84. The allegation does not speak to the number of <u>new</u> students, nor does it come close to suggesting that the OS was wrong in stating that the College anticipated it could enroll 225 <u>new</u> students in fall 1998. (To the contrary, the allegation appears to be based on Kiszka's alleged meeting with the College Cabinet on April 20, 1998, when he was allegedly informed that it was estimated that 220 new students would be enrolled in the fall. SAC ¶¶83, 84.)

Plaintiffs also seek to add allegations that Kiszka told a reporter in spring 2000, after the College had closed, that he was "surprised" that the College had said in 1998 that it planned to expand to 725 students by the fall of 2000 and that the number "clearly wasn't realistic." SAC ¶79. However, what Kiszka may have viewed in retrospect as "realistic," after the passage of two years and the various events that led to the College's demise, cannot reasonably be deemed to reflect his knowledge or thinking in May 1998, much less to suggest that he acted fraudulently at that time.

And finally, the claim based on the prediction of new enrollment cannot stand because the SAC does not, and cannot, offer anything to correct two other significant problems that are fatal to this claim. First, nothing in the SAC suggests that the prediction in the OS that the College would enroll 225 new students in fall 1998 – 9 <u>fewer</u> than in 1997 – was material. *See* Reply at 10 n.9. Second, such a claim is barred by the "bespeaks caution" doctrine because the OS contains an express disclaimer as to the prediction of future enrollment. *Id.* at 13.

     **E.**     **The SAC Fails to Allege Actionable Misrepresentations Relating to Financial Aid as a Percentage of Student Revenues.**

     **1.**     **The 1997-98 Academic Year.**

The SAC fails to state an actionable claim that the OS made misrepresentations in estimating financial aid as a percentage of student revenue, for either the current academic year or the next. Plaintiffs have proposed no new allegations that reasonably suggest that the Bradford Defendants knew in May 1998 that the 29.9% estimate for the current academic year was materially inaccurate, much less that they acted with scienter. Plaintiffs cannot save this claim with their allegation that, in May 1998, defendant Kiskza used different financial aid numbers from those he had received from the Admissions Office in October 1997. SAC ¶65. Although plaintiffs claim that they are "unaware of the Admissions Office ever revising these numbers," they provide no facts suggesting that their lack of awareness of such revisions may reasonably be deemed to indicate that the Admissions Office made no revisions to the numbers during the seven months from October 1997 to May 1998, nor do they provide any facts suggesting that the amount of financial aid awarded to students could not change as the academic year progressed. *Id.*

Plaintiffs similarly err in alleging that defendants should have known that the estimate of financial aid for the current year was incorrect because revised operating budgets circulated in January 1998 and April 1998 showed "respectively that financial aid was 31% and 32% of student income." SAC ¶66. Plaintiffs claim that as of the times the budgets were circulated "the College had received all or substantially all tuition income for the academic year and committed financial aid to the students who had attended." SAC ¶66. However, their suggestion that the income and financial aid numbers were fixed and immutable as of January and April 1998 is belied by the SAC's

allegations that financial aid as a percentage of student revenues changed by one percentage point between January and April 1998, and was found to be even higher when the numbers were audited after the end of the fiscal year in June 30, 1998. *Id.* ¶¶64, 66.

Plaintiffs have also failed to show that it would have material that the estimate for the current academic year might be off by a few percentage points. Their "new" allegations of materiality mischaracterize the OS in asserting that "one of the keys to the College achieving financial equilibrium, according to the Official Statement, was increasing net tuition revenue by controlling financial aid awards," and that "the OS stated that the College believed it could reach this goal because the financial aid percentage was expected to decrease." SAC ¶67. Contrary to plaintiffs' suggestion, however, the OS neither suggests any direct correlation between financial health and financial aid as a percentage of student revenue, nor does it represent that the College believes it will reach financial equilibrium (or even increase net tuition revenues) because the percentage of financial aid to student revenue was expected to decrease. Moreover, the OS stated that the College's ability to reach "financial equilibrium" would depend on several different factors, one of which was "increasing net tuition revenues," and it stated that success in increasing net tuition revenues would depend not only on decreasing financial aid, but also "enrollment growth and additional programs." OS, Appx. A at A-12. Accordingly, the OS makes clear that reducing financial aid is only one of a number of factors that are needed to reach financial stability. And further belying plaintiffs' attempt to suggest that the OS draws a direct line between reduced financial aid percentages and financial health, the OS's estimates of financial aid as a percentage of

revenue are <u>not</u> accompanied by any representation about how those numbers may affect net tuition revenues, much less financial equilibrium. *See* OS, Appx. A at A-13.

To the extent the SAC now also appears to allege that the OS should have disclosed that, for the 1997-98 academic year, financial aid awards to new students were 12% higher than to returning students, that claim fails as well. SAC ¶65. First, because none of plaintiffs' previous complaints made such a claim, the new claim is time-barred for the same reasons discussed at Section II(A)(1) above. Second, the premise of the claim, as stated in the SAC, is illogical. Plaintiffs assert that the failure to disclose the purported fact that new students were given more financial aid than returning students was "highly misleading" because it hid the purported fact that "[t]he College attracted a record number of new students by offering them a record amount of aid," and that, if investors had known that fact, they would have known "that the College needed to engage in steep tuition discounting in order to increase enrollment" and they "would be able to recognize the substantial risks posed by the College's growth strategy." SAC ¶68. Apart from the fact that the OS predicted that the College would enroll 9 <u>fewer</u> students in 1998 than it had the previous year, nobody reading the OS could fail to see that the College was already engaged in "steep tuition discounting." [17] Additionally, the SAC does not suggest that it was anything new in the 1997-98 academic year for the College to give new students relatively more financial aid than returning students; that the College had given new students more financial aid in that year than it had in any other year; or

---

[17]    *See, e.g.*, OS, Appx. A at A-13 ("during this period of enrollment growth, there has been a substantial increase in financial aid funded by the College"); *id.* at A-10 ("[d]uring the 1997-98 academic year, approximately 81% of the enrolled students are receiving some form of financial assistance"); *id.* at A-8 to A-10 (total student financial aid in 1997 was $8,419,488, and total enrollment was 602, which indicates an average of $13,985.86 in financial aid per student; 1997 tuition was $15,850, fees were $565, and room and board was $6,720).

how much more, if any, it gave new students in the current academic year than in

previous years.  Accordingly, the SAC wholly fails to support the conclusory assertion

that "the College had attracted a record number of new students by offering them a record

amount of financial aid," much less that any such information would have been material.

*Id.*

### 2.    The 1998-99 Academic Year.

The SAC similarly fails to support the claim that the estimate of financial aid as a

percentage of revenues for the next academic year, 1998-99, was materially false, or that

defendants entertained scienter with respect to the estimate.  Even if the express

disclaimers in the OS did not bar the claim, the proposed additional allegations are

insufficient to support it.  To try to suggest that defendants knew in May 1998 that the

estimates for the following year were wrong, plaintiffs now allege that, "in connection

with the 1998-99 school year, Bradford instituted several new financial aid programs

which its administrators knew would increase Bradford's financial aid obligations," and,

"[u]pon information and belief," that Kiszka and defendant Joseph Short, the College's

former President, approved those programs.  SAC ¶¶71, 72.  Notably, however, plaintiffs

do not allege <u>when</u> those programs were instituted or approved, nor do they allege that

any of the defendants had any knowledge of such anticipated programs at the time the OS

issued.  Indeed, their allegation that the changes in financial aid are "not reflected in any

of Kiszka's budget reports for 1998-99" suggests, if anything, that defendants were not

aware of such programs at that time.  SAC ¶72.

Plaintiffs likewise err in trying to support their claim that defendants knew, from

the financial aid commitments they allege had been made to the next year's prospective

students by May 1998, that the OS's estimate of the percentage of financial aid to revenue for the next academic year was materially false. *See* SAC ¶74. Where the percentage of financial aid to student revenue for the next year is subject to all the vagaries of the current year, as well as many more, defendants cannot reasonably be deemed to have known in May 1998 that the estimate of financial aid as a percentage of revenue for the fiscal year to end June 30, 1999 (more than a year away) was materially inaccurate.

Plaintiffs wholly fail in their attempt to suggest certainty in a process that their own allegations show was subject to flux. While plaintiffs allege that "the aid commitments to returning students and the vast majority of commitments to new students had already been made by the time the bonds were issued," their own allegations show that neither of the numbers required to determine the relevant percentage for the 1998-99 academic year (total student revenue and total financial aid provided) could be determined with any kind of certainty in May 1998. SAC ¶74. Plaintiffs have alleged, for example, that the College had a 60% attrition rate; accordingly, even if some financial aid commitments had been made to returning students by May 1998, it was unclear which students would actually be returning and thus which financial aid commitments might ultimately be honored. Similarly, plaintiffs have admitted that the College did not know in May 1998 how many students would enroll the following fall; it was therefore unclear in May 1998 how much the College would ultimately receive in student revenues. Although plaintiffs also allege that, by April 1998, the College had already accepted "more than 75% of the applicants it ultimately accepted for the fall 1998-99 term" and had made financial commitments to those prospective new students, there is no allegation

28

that anyone at the College, much less the defendants, knew this figure in April 1998 (it is by definition the sort of calculation that can be made only in retrospect, <u>after</u> all such applicants have been accepted), much less that they knew which of those students would actually enroll and thus which financial aid commitments would be honored.  SAC ¶74 n.3.

**F.    The Proposed Amendment Is Futile for Other Reasons as Well.**

The amendment should also be denied as futile because it fails to correct a number of other deficiencies that were not mentioned in the Court's opinion, but that are nonetheless fatal to plaintiffs' federal securities claims.  First, plaintiffs acknowledge that the SAC "does not make any significant changes" to their allegations relating to the "lack of a strategic plan," which the Court has already found to be deficient.  Mo. to Amend at 16.  Thus, the proposed amendment is plainly futile as to that claim.  Second, although plaintiffs' Opposition to defendants' motions to dismiss acknowledged that plaintiffs had "not pled specific facts that connect any of the Trustee Defendants to the misrepresentations and omissions in the Official Statement," the proposed SAC adds no allegations to link the Trustee Defendants to the alleged representations in the OS.  Opp'n at 51.  Because the SAC, like the existing complaint, fails to allege any facts that could support imposing liability on any of the Trustee Defendants, the motion to amend should be denied as to them as futile.

Third, the SAC still fails to support the necessary element of loss causation, as it still fails to allege facts showing that the losses of which plaintiffs complain were due to anything other than the same problems that were disclosed in the OS, as well as the manner in which the College responded to those problems.  *See* SAC ¶¶39, 99-101.  And

finally, the SAC still fails to allege facts that could support control liability against any of

the Bradford Defendants:  it still does not allege a primary violation by "the College," the

purportedly controlled entity, nor does it allege facts supporting a reasonable inference

that any of the Bradford Defendants actually controlled the College, and did so with

respect to the alleged misstatements.

## CONCLUSION

For the foregoing reasons, plaintiffs should be denied leave to amend their

complaint.  Because their motion to vacate rests entirely on the motion to amend, the

motion to vacate should be denied as well.

<div style="margin-left: 40%;">

THE BRADFORD DEFENDANTS
By their attorneys,


/s/  A. Lauren Carpenter
Robert E. Sullivan, BBO #487820
Scott A. Roberts, BBO #550732
A. Lauren Carpenter, BBO #551258
SULLIVAN, WEINSTEIN & McQUAY, P.C.
Two Park Plaza
Boston, MA 02116
(617) 348-4300
Email:  lcarpenter@swmlawyers.com

</div>

Dated:  December 19, 2006

## CERTIFICATE OF SERVICE

I, A. Lauren Carpenter, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 19, 2006.

/s/  A. Lauren Carpenter
A. Lauren Carpenter

# STANDSTILL AND TOLLING AGREEMENT

This Standstill and Tolling Agreement (the "Agreement") dated as of November 1, 2000 is made and entered into by and among Bradford College (the "College"), those present or former trustees and/or officers of the College who join in this agreement by execution hereof (collectively, the "D&O"), Advest, Inc. ("Advest", and together with the College and the D&O, the "Potential Defendants")), ACA Financial Guaranty Corporation ("ACA"), T. Rowe Price Tax-Free High Yield Fund ("T Rowe"), Smith Barney Municipal High Income Fund ("SSB") and Prudential Municipal Series Fund - Massachusetts Series ("Prudential", and together with ACA, T Rowe and SSB, the "Bondholders"). The Bondholders and the Potential Defendants are collectively referred to herein as the "Parties".

## W I T N E S S E T H :

WHEREAS, the College is indebted to the Bondholders as beneficial holders of the MIFA Revenue Bonds, Bradford College Issue, Series 1998, issued by the College (the "Bonds"), pursuant to a Loan and Trust Agreement dated May 1, 1998 among the College, MIFA and Chittenden Trust Company as indenture trustee (the "Indenture Trustee"); and

WHEREAS, the Bondholders have information that may support claims against the Potential Defendants, and the Potential Defendants deny that there are any such claims; and

WHEREAS, the Bondholders and the College are engaged in negotiations regarding the Bonds and a possible sale of substantially all of the assets of the College, and the Parties desire to continue (and in the case of Advest and the D&O, to facilitate) such negotiations, and all the parties desire to avoid the need for litigation at the present time; and

WHEREAS, the Bondholders are desirous of preserving any causes of action that they now may have and are willing to forbear from commencing litigation against the Potential Defendants, possibly including class-action litigation on behalf of all persons who purchased Bonds, only upon agreement that any statutes of limitation, statutes of repose, laches, discovery periods or similar time bars or any other condition of law whether statutory or not, requiring the bringing of an action within a period of time or other requirements imposed by any rule of court under State or Federal law (collectively the "Limitations Periods") relating to the Claims (as that term is defined below) will be tolled as provided below; and

WHEREAS, the Bondholders are relying on the agreements and representations of the Potential Defendants in this Agreement in determining not to seek remedies against the Potential Defendants at this time; and

WHEREAS, the Bondholders and the Potential Defendants desire to make third-party beneficiaries of this Agreement (without, however, giving any such persons other than the Bondholders the right to consent to amendment or waiver thereof) all the following persons: (i) all purchasers (whether of record or beneficially) of Bonds at any time on or after May 1, 1998; (ii) recordholders and beneficial owners of bonds at any time from May 1, 1998 through the present; and (iii) the College and the Attorney General of the Commonwealth of Massachusetts (the "AG").

NOW, THEREFORE, for good, valuable, fair and reasonably equivalent consideration, the receipt of which is hereby acknowledged, the parties hereto, each intending to be legally bound, agree as follows:

1.  Tolling. Each of the Potential Defendants agrees that, with respect to any claim, right, liability or cause of action that could, as of the date of this Agreement, be initiated directly by any Beneficiary (as that term is defined in Section 4) or derivatively on behalf of any Beneficiary of this Agreement, or by any Beneficiary's successors or assigns as provided in Section 8, against any Potential Defendant, including but not limited to any of the foregoing for misrepresentation or for breach of fiduciary duty under the federal securities laws, the so-called blue-sky laws of Massachusetts, or any other federal, state or local law, whether statutory or not, arising out of or relating in any manner to the Bonds or the issuance thereof, Massachusetts statutory law, or the common law (the foregoing are collectively the "Claims"), the time periods for commencing any Action (as that term is defined in Section 5) and the deadline for extinguishment of any such Action under applicable law, be, and hereby are, tolled for the Tolling Period provided in Section 3 of this Agreement. Each of the Potential Defendants, for itself and its successors and assigns, hereby stipulates and agrees that the Tolling Period shall be excluded from any Limitations Period and not considered in any determination of the timelines of commencement of any Action with respect to the Claims. Each Potential Defendant hereby agrees and acknowledges that he, she, or it shall not plead or raise and is estopped from pleading or raising the period of time during the Tolling Period as part of a defense or bar based upon any Limitations Period with respect to any Claim.

2.  This Agreement shall be, and hereby is, effective as of November 1, 2000 (the "Effective Date") as to each Potential Defendant who joins in this agreement by such Potential Defendant's execution hereof. This Agreement shall be effective as to each Potential Defendant who joins in this Agreement without regard to whether any or all of the other Potential Defendants join in this Agreement. This Agreement shall not apply to any causes of action that the respective Bondholders may have had and for which, if any, the applicable Limitations Periods have already passed.

3.  With respect to each Potential Defendant, the tolling of time periods provided for in Section 1 of this Agreement shall commence on the Effective Date and shall terminate (the "Termination Date") on the latter of July 2, 2001 or the forty-fifth (45th) day after such Potential Defendant delivers a written notice of termination (a "Termination Notice") addressed to each of the Bondholders and at the Notice Addresses set forth beneath their signatures, infra, in accordance with Section 9 hereof. The period from the Effective Date to the respective Termination Date for such Potential Defendant shall be the "Tolling Period" for such Potential Defendant. Termination with respect to any particular Potential Defendant shall not cause termination of this Agreement with respect to any other Potential Defendant.

4.  The following persons are intended beneficiaries (collectively the "Beneficiaries") of this Agreement: (i) purchasers (whether of record or beneficially) of Bonds at any time on or after May 1, 1998, (ii) recordholders and beneficial owners of Bonds at any time from May 1, 1998 through the present, (iii) the Bondholders and (iv) the College and the AG. Subject to Section 7, such persons are entitled to the benefit of, and to enforce, the tolling, stipulations and

agreements set forth in Section 1 of this Agreement as well as all other provisions of this Agreement.

5.    In consideration of the Potential Defendant's agreements set forth above, the Bondholders agree (i) to file a motion for dismissal in form reasonably satisfactory to the Bondholders seeking dismissal without prejudice pursuant to Fed. R. Civ. P. Rules 41(a)(2) and 23(e) of the complaint in the case of T. Rowe Price Tax-Free High Yield Fund, Inc., and Smith Barney Municipal High Income Fund, on behalf of themselves and all others similarly situated, and ACA Financial Guaranty Corporation v. Karen M. Sughrue, Garry L. Crago, Jean W. Childs, Paula Edwards Cochran, G. Stevens Davis, Jr., Julia B. DeMoss, William R. Dill, Leslie A. Ferlazzo, Joyce Shaffer Fleming, Eric W. Hayden, Catherine Chapin Kobacker, Anne Marcus, Celeste Reid, Richard J. Sheehan, Jr., Joseph Short, Gregory E. Thomas, Susan K. Turben, Donald W. Kiszka, Bradford College and Advest, Inc., C.A. No. 00-12408-NG (U.S.D.C. D. Mass.), and (ii) not to commence any other civil actions, proceeding (including arbitral proceeding) or litigation against a Potential Defendant (collectively an "Action") with respect to the Claims until the first to occur of July 2, 2001 or following receipt of a Termination Notice with respect to that Potential Defendant (the foregoing is the "Standstill Period"). As used herein, the term "Action" shall not include (and shall not preclude the bringing of) any action or proceeding against the College or the real or personal property of the College to enforce the rights to payment of principal, interest or premium, if any, on the Bonds or to foreclose or otherwise realize upon any collateral which secures such right to payment (an "Enforcement Action"). Except for the Bondholders' agreement not to commence any Action during the Standstill Period, all rights and remedies of the Bondholders and other Beneficiaries with respect to the bringing of any Action with respect to the Claims and with respect to any Enforcement Action are not impaired hereby and are preserved.

6.    This Agreement shall not operate as an admission of, or evidence of, liability or wrongdoing of any nature by any Potential Defendant, or that there is any element of or basis for any Claim against any of the Potential Defendants.

7.    This Agreement may be amended, changed, modified, supplemented, released or discharged, in whole or in part, as between any particular Potential Defendant, on the one hand, and the Beneficiaries, on the other hand; provided, however, that such an amendment, change, modification, supplement, release or discharge must be signed by the particular Potential Defendant whose rights under this Agreement are being altered and by the Bondholders. The rights of the third-party beneficiaries of this Agreement may be amended, changed, modified, supplemented, released or discharged, in whole or in part, upon the written consent of the Bondholders.

8.    This Agreement is binding on and inures to the benefit of the Potential Defendants and their successors and assigns including their successors and assigns by operation of law, their bankruptcy estates, any chapter 7 or 11 trustee and any other estate representative, trustee, receiver or conservator in insolvency proceedings. No Potential Defendant may assign this Agreement without the prior written consent of the Bondholders. This Agreement is binding on and inures to the benefit of each of the Beneficiaries and the Bondholders and their successor and assigns; provided, that any Bondholder may freely assign its rights under this Agreement to any party to whom it sells all or any portion of its interest in any Bonds held by it, or with whom

such Bondholder reinsures its risk as an insurer of Bonds, and such Bondholder's rights under this Agreement shall be preserved to the extent that it retains or continues to insure any Bonds; and, provided, further, that the rights conferred upon the third-party beneficiaries of this Agreement shall automatically devolve upon any duly appointed successors or assigns of them, as the case may be.

9. All notices required or permitted to be given under the Agreement shall be in writing. Notices may be delivered: (a) by certified or registered mail; (b) by nationally recognized overnight courier; (c) by facsimile, provided such notice is also sent by the sender by any of the methods referenced in (a) or (b); or (d) personally. Couriered, mailed or personally delivered notices shall be deemed delivered when actually delivered as addressed, or if the addressee refuses delivery, when presented for delivery notwithstanding such refusal. Notices sent by facsimile shall be deemed delivered when sent, with electronic confirmation of receipt evidencing the same, provided such notice is also sent by the sender by any of the methods referenced in (a) or (b). Unless a Party changes its address by giving notice to the other Parties as provided herein, notices shall be delivered to the Parties at the addresses and to the attention of the Parties set forth below:

| Potential Defendants: | In each case, at the address listed for such Potential Defendant with its signature hereon, with a copy to any person, as set forth in the Notice Address for such Potential Defendant set forth beneath its signature. |
| Bondholders: | In each case, at the address listed for such Bondholder with its signature hereon, with a copy to Ropes & Gray, as set forth in the Notice Address for such Bondholder set forth beneath its signature. |

10. Each of the Parties hereto hereby represents and warrants that this Agreement is its legal, valid and binding obligation and agrees not to contest the enforceability of this Agreement in any bankruptcy or insolvency proceeding or Action. The Parties have entered into this Agreement freely and voluntarily, after having consulted with counsel and after having the terms of this Agreement explained to them by counsel. The Parties appreciate and understand the terms contained in this Agreement and are fully satisfied therewith. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of its other provisions, and it is the intent of the Parties that this Agreement be given effect to the maximum extent possible.

11. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. This Agreement is an agreement under seal, and shall be governed by the internal laws of The Commonwealth of Massachusetts.

T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC.

By: _____

Title: Executive Vice President

Bonds: $ 4, 000, 000

Notice Address:

 c/o T. Rowe Price Associates, Inc.
 100 East Pratt Street
 Baltimore, Maryland 21202
 Telecopier: 410-345-4672
 Attention: C. Stephen Wolfe, II
      Trish Deford

 Copy to:

 T. Rowe Price Associates, Inc.
 100 East Pratt Street
 Baltimore, Maryland 21202
 Telecopier: 410-345-6575
 Attention: Laura Chasney, Esq.

   -and-

 Ropes & Gray
 One International Place
 Boston, Massachusetts 02110
 Telecopier: 617-951-7050
 Attention: Steven T. Hoort, Esq.

[Tolling #1]

Standstill and Tolling Ageement.DOC

ACA FINANCIAL GUARANTY CORPORATION

By: _Kathleen G Cully_____

Title: _Managing Director + General Counsel_

Bonds: $ _5,510,000.00_____

Notice Address:

      140 Broadway
      New York, New York 10005
      Telecopier:   212-375-2100
      Attention:   Elizabeth Hill
                  William J. Hogan

      Copies to:

      American Capital Access
      140 Broadway
      New York, New York 10005
      Telecopier:   212-375-2302
      Attention:   Kathleen G. Cully, Esq.

         -and-

      American Capital Access
      7315 Wisconsin Avenue
      Bethesda, Maryland 20814
      Telecopier:   301-657-7722
      Attention:   G. Richard Dent, Esq.

         -and-

      Ropes & Gray
      One International Place
      Boston, Massachusetts 02110
      Telecopier:   617-951-7050
      Attention:   Steven T. Hoort, Esq.

[Tolling #2]

SMITH BARNEY MUNICIPAL HIGH INCOME FUND

By: _Michael J Maher, Director_

Title: _Investment Officer_

Bonds: $ _2,345,000.00_

Notice Address:

        c/o SSB Citi Asset Management Group
        388 Greenwich Street
        New York, New York 10013
        Telecopier:    212-816-5134
        Attention:    Brendan W. Phalen

        Copy to:

        Ropes & Gray
        One International Place
        Boston, Massachusetts 02110
        Telecopier:    617-951-7050
        Attention:    Steven T. Hoort, Esq.

**[Tolling #3]**

PRUDENTIAL MUNICIPAL SERIES FUND - MASSACHUSETTS SERIES
By: The Prudential Investment Corporation, its investment adviser

By: _____
    Title:   managing director

Bonds: $   1,000,000

Notice Address:

     c/o Prudential Investments
     Fixed Income Research
     2 Gateway Center
     Newark, New Jersey 07102
     Telecopier:   973-802-3181
     Attention:   Gyliane Morgan

     Copies to:

     Prudential Investment Corporation
     Legal Department
     2200 Ross Avenue, Suite 4200E
     Dallas, Texas 75201
     Telecopier:   214-720-6296
     Attention:   William H. Bulmer, Esq.

         -and-

     Ropes & Gray
     One International Place
     Boston, Massachusetts 02110
     Telecopier:   617-951-7050
     Attention:   Steven T. Hoort, Esq.

[Tolling #4]

11/28/2000  10:08    7819447213
11/27/00  16:23 FAX 617 345 7050           GADSBY HANNAH    BRENDA SMITH                    PAGE  01

**BRADFORD COLLEGE**

By: *Brenda E. Smith*
   Title: *VP for Administration & Finance*

Notice Address:

    320 South Main Street
    Bradford, Massachusetts 01835
    Telecopier:    978-372-5370
    Attention:     President

    Copy to:

    Gadsby & Hannah LLP
    225 Franklin Street
    Boston, Massachusetts 02110
    Telecopier:    617-345-7050
    Attention:     Charles A. Dale, III, Esq.

[Tolling #5]

•B0166617.DOC;1•

**BRADFORD COLLEGE**

By: *Brenda E. Smith*

Title: *VP for Administration & Finance*

Notice Address:

> 320 South Main Street
> Bradford, Massachusetts 01835
> Telecopier: 978-372-5370
> Attention: President

> Copy to:

> Gadsby & Hannah LLP
> 225 Franklin Street
> Boston, Massachusetts 02110
> Telecopier: 617-345-7050
> Attention: Charles A. Dale, III, Esq.

[Tolling #5]

•B0168617.DOC;1•

ADVEST, INC.

By: _____

Title: EVP, General Counsel

Notice Address:

       Advest, Inc.
       90 State House Square
       Hartford, CT  06103
       Telecopier:    860-509-2143
       Attention:     Lee G. Kuckro, General Counsel

[Tolling #6]

## PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: *GARRY CRAIG*

Signature: *[signature]*

Notice Address:

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:     Hugh R. Jones, Jr., Esq

[Tolling #7]

▪B3:168817.DOC;1▪

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _GARRY CRAIG_

Signature: _[signature]_

Notice Address:

_____

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:     Hugh R. Jones, Jr., Esq

[Tolling #7]

■B0168617.DOC;1■

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: __JEAN W. CHILDS__

Signature: __Jean W Childs__


Notice Address:

_____

_____, Massachusetts _____
Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq.


[Tolling #7]


-B0168617.DOC;1-

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _JEAN W. CHILDS_____

Signature: _Jean W. Childs_____

Notice Address:

_____

_____, Massachusetts _____

Telecopier:    _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq.

[Tolling #7]

=B0168617.DOC;1=

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _Paula E. Cochran_

Signature: _Paula E. Cochran_

Notice Address:

_____

_____, Massachusetts _____
Telecopier:    _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _Paula E. Cochran_

Signature: _Paula E. Cochran_

Notice Address:

_____

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:   617-562-6000
Attention:     Hugh R. Jones, Jr., Esq

[Tolling #7]

**PRESENT OR FORMER OFFICERS AND TRUSTEES**

Name: _Julia B. DeMoss_

Signature: _Julia B. DeMoss_

Notice Address:

_____

_____, Massachusetts ____ _____

Telecopier:      _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:      617-562-6000
Attention:      Hugh R. Jones, Jr., Esq

[Tolling #7]

«B0166617.DOC;1»

**PRESENT OR FORMER OFFICERS AND TRUSTEES**

Name: _Julia B. DeMoss_

Signature: _Julia B. DeMoss_


Notice Address:

_____

_____, Massachusetts _____

Telecopier:    _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq


**[Tolling #7]**


«B0168617.DOC;1»

TO :                    PHONE NO. :
FROM : DILL = VOICE PHONE NO. : 207 781 2951        FAX        NOV.18.2000    1:36AM  P 1
                                                              PHONE NO. : 207 781 7821

Name: _____  William R Dill

Signature: _____  William R Dill

Notice Address:

_____  _____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:     Hugh R. Jones, Jr., Esq



→ Chad Dale

Name: _____ William R Dill _____

Signature: _____ William R Dill _____

Notice Address:

_____, Massachusetts _____
Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:     Hugh R. Jones, Jr., Esq

[Tolling #7]

`11/21/00   TUE 09:00 FAX
11/17/00   14:21 FAX 617 345 7050          GADSBY HANNAH                          ⓐ013/013 ⓐ002

## PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: LESLIE A. FERLAZZO

Signature:

Notice Address:

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:   617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

## PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: LESLIE A. FERLAZZO

Signature: _Leslie A. Ferlazzo_

Notice Address:

_____

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

## PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: *Joyce Schaffer Fleming*

Signature: *Joyce Schaffer Fleming*


Notice Address: *Joyce Fleming*
*c/o Hugh R. Jones, Jr. Esq.*
*Hale & Dorr LLP*
*60 State Street*, Massachusetts 02109
*Boston*
Telecopier: *617-562-6000*

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

=B0168617.DOC;1=

## PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _Joyce Schaffer Fleming_

Signature: _Joyce Schaffer Fleming_

Notice Address: _Joyce Fleming_
_c/o Hugh R. Jones, Jr., Esq._
_Hale & Dorr LLP_
~~60 STATE STREET~~
~~BOSTON~~, Massachusetts _02109_
Telecopier:  _617-562-6000_

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

•B0168617.DOC;1•

Nov 17 00 03:57p          Eric W. Hayden          781-729-9418          P.1

11/17/00 14:42 FAX 617 345 7005          GADSBY HANNAH          Case 1:05-cv-10176-RGS          Document 70-2          Filed 12/19/2006          Page 26 of 46          ☑013/013

ó Chad Dale

## PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: ERIC W. HAYDEN

Signature: Mr. W. Nil

Notice Address:

_____

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:   617-562-6000
Attention:    Hugh R. Jones, Jr., Esq.

[Tolling #7]

*Chad Date*

## PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _ERIC W. HAYDEN_

Signature: _[signature]_

Notice Address:

_____

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq



[Tolling #7]

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _CELESTE REID LEE_

Signature: _Celeste Reid Lee_

Notice Address:

        _____

        _____, Massachusetts _____

Telecopier:    _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:   617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _CELESTE REID LEE_

Signature: _Celeste Reid Lee_

Notice Address:

_____

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:     617-562-6000
Attention:      Hugh R. Jones, Jr., Esq

[Tolling #7]

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _Richard J. Sheehan Jr_

Signature: _[signature]_

Notice Address:

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _Joe N. Short_

Signature: _Joe N. Short_

Notice Address:

_____

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

«B0168617.DOC;1»

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _Joe N. SHORT_

Signature: _Joe N. Short_

Notice Address:

_____

_____, Massachusetts _____

Telecopier:    _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _Donald W. Kiszka_
_Former Vice President & Treasurer of Bradford College_

Signature: _Donald W. Kiszka_

Notice Address:

_____

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:     Hugh R. Jones, Jr., Esq

[Tolling #7]

PRESENT OR FORMER OFFICERS AND TRUSTEES

Donald W. Kiszka
FORMER VICE PRESIDENT & TREASURER of
Name: BRADFORD COLLEGE

Signature: _Donald W Kiszka_

Notice Address:

_____

_____, Massachusetts _____
Telecopier:     _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:     617-562-6000
Attention:     Hugh R. Jones, Jr., Esq

[Tolling #7]

**PRESENT OR FORMER OFFICERS AND TRUSTEES**

Name: _G. STEVENS DAVIS_

Signature: _[signature]_

Notice Address:

*3 Dorian Drive*

*Bradford, Massachusetts 01835*

Telecopier: 617-348-4819

Copy to:

Hale & Dorr LLP

60 State Street

Boston. Massachusetts 021 09

Telecopier: 617-562-6000

Attention: Hugh R. Jones, Jr., Esq

[Tolling #7]

«80168617.DOC;1»

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _G. STEVENS DAVIS, JR._

Signature: _[signature]_

Notice Address:

_3 DORIAN DRIVE_
_BRADFORD_, Massachusetts _01835_
Telecopier: _617-346-4819_

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

«B0168617.DOC;1»

Tolling #6]
PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _Karen M. Sughrue_

Signature: _Karen M. Sughrue_

Notice Address:

_____
_____, Massachusetts _____
Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:  617-562-6000
Attention:   Hugh R. Jones, Jr., Esq

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: KAREN M. SUGHRUE

Signature: _Karen M. Sughrue_

Notice Address:

_____

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

-B0168617.DOC;1-

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _Catherine Chapin Kobacker_

Signature: _Cent. J. S.-Kobacker_

Notice Address:

Charles A. Dale III
225 Franklin St.
Boston, Massachusetts 02310
Telecopier: 617 204-8064

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:     Hugh R. Jones, Jr., Esq.

[Tolling #7]

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: Catherine Chapin Tobacker

Signature:

Notice Address:

_____

_____, Massachusetts _____

Telecopier:  _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:     Hugh R. Jones, Jr., Esq

[Tolling #7]

«B0188617.DOC;1»

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _Anne Upson MARCUS_

Signature: _Anne Upsa Marcus_

Notice Address:

_____

_____, Massachusetts _____
Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

«B0168617.DOC;1»

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _Anne Upson Marcus_

Signature: _Anne Upsa Marcus_

Notice Address:

_____

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

«B0168617.DOC;1»

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: GREGORY E. THOMAS

Signature: _Gregory E. Thomas_

Notice Address:

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:   617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: GREGORY E. THOMAS

Signature: _____

Notice Address:

PO Box 1891
Andover_____, Massachusetts 01810
Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

‹B0168617.DOC;1›

NOV-21-00 TUE 12:36     KIRTLAND CAPITAL PRTNRS.     FAX NO. 4405859699          P. 02/02
11/17/00  14:11 FAX 617 345 7050         GADSBY HANNAH                          @013/013

COPY

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: Susan H. Turben, Ph.D.

Signature: Susan H. Turben

Notice Address: 8 966 Booth Rd.          FAX  440 585 9960
Mentor  OH. 44060       PHONE  440 585 9097
_____               HOME  440 256 3296
_____, Massachusetts _____
Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:  617-562-6000
Attention:   Hugh R. Jones, Jr., Esq

[Tolling #7]

NOV 2 7 2000

PRESENT OR FORMER OFFICERS AND TRUSTEES

Name: _Susan H. Turben, Ph.D._

Signature: _Susan H. Turben_

Notice Address: 8966 Booth Rd.
Mentor OH. 44060

FAX 440 585 9960
PHONE 440 585 9097
HOME 440 256 3296

_____, Massachusetts _____

Telecopier: _____

Copy to:

Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Telecopier:    617-562-6000
Attention:    Hugh R. Jones, Jr., Esq

[Tolling #7]

**SULLIVAN WEINSTEIN & McQUAY**

A PROFESSIONAL CORPORATION
COUNSELLORS AT LAW

SCOTT A. ROBERTS
(617) 348-4340
SRoberts@swmlawyers.com

December 21, 2004

***BY FAX AND FEDERAL EXPRESS***

To:  Recipients on Attached Distribution List

     Re:     **Termination of Standstill and Tolling Agreements with Bradford Officers and Trustees**

Dear Sir/Madam:

     This firm represents certain trustees and officers of Bradford College, namely, Karen M. Sughrue, Garry L. Crago, Jean W. Childs, Paula Edwards Cochran, G. Stevens Davis, Jr., Julia B. DeMoss, William R. Dill, Leslie A. Ferlazzo, Joyce Shaffer Fleming, Eric W. Hayden, Catherine Chapin Kobacker, Anne Marcus, Celeste Reid, Richard J. Sheehan, Jr., Joseph Short, Gregory E. Thomas, Susan K. Turben, and Donald W. Kiszka (the "Bradford Officers and Trustees").

     We write to advise you that the Bradford Officer and Trustees hereby give notice of their termination of the Standstill and Tolling Agreement dated November 1, 2000, and the Second Standstill and Tolling Agreement dated June 22, 2001, among the Bradford Officers and Trustees, Bradford College, Advest, Inc., ACA Financial Guaranty Corporation, T. Rowe Price Tax-Free High Yield Fund, Smith Barney Municipal High Income Fund, Prudential Municipal Securities Fund – Massachusetts Series, and others ("Termination Notice").

Sincerely,

Scott A. Roberts

cc:     Jonathan L. Kottlier, Esq.
          Michael Tabb, Esq.
          Sonja Shauer, Esq.